OLIVER J. PANCHERI, ESQ.
Nevada Bar No. 7476
MARGARITA ELIAS, ESQ.
Nevada Bar No. 14867
**HOLLEY DRIGGS**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 791-0308
Fax: (702) 791-1912
Email: opancheri@nevadafirm.com
          melias@nevadafirm.com

JEAN-PAUL CIARDULLO, ESQ. *(pro hac vice admission forthcoming)*
California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel.: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; and LT GAME (CANADA) LIMITED, a Nevada corporation,<br><br>              Plaintiffs,<br><br>       v.<br><br>EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; and DARYN KIELY, an individual,<br><br>              Defendants. | Case No. 2:24-cv-00428<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Paradise Entertainment Limited ("Paradise") and LT Game (Canada) Limited ("LT Game") (collectively, "Plaintiffs") file this Complaint against Defendants Empire Technological Group Limited ("Empire"); Gaming Specialized Logistics LLC ("GSL"); Mr. Linyi "Frank" Feng ("Mr. Feng"), Mr. Roy Kelcey Allison ("Mr. Allison"), and Mr. Daryn Kiely ("Mr. Kiely") (collectively, "Defendants") and as claim for relief state as follows:

## NATURE OF THE ACTION

1.     This is an action for state and federal claims of misappropriation of trade secrets, copyright infringement, fraud, constructive fraud, conspiracy, conversion, racketeering, unjust enrichment, breach of fiduciary duty, aiding and abetting, breach of contract, and tortious interference with contract.

## PARTIES

2.     Paradise is a Bermuda corporation with its principal place of business at Unit C, 19th Floor, Entertainment Building, 30 Queen's Road Central, Hong Kong.  Paradise is a public company with its issued shares traded on the Main Board of The Stock Exchange of Hong Kong Limited (Stock Code: 1180).  Paradise is the parent company of LT Game.

3.     LT Game is a Nevada corporation with its principal place of business at 6445 W. Sunset Road, Suite 134, Las Vegas, Nevada 89118.  LT Game is an indirect wholly owned subsidiary of Paradise.

4.     Empire is a Nevada corporation with its principal place of business at 1106 Palms Airport Drive, Las Vegas, Nevada 89119.

5.     GSL is a Nevada limited liability company with its principal place of business at 225 Cromarty Street, Henderson, Nevada 89012.

6.     Mr. Feng is an individual residing in Clark County, Nevada.

7.     Mr. Allison is an individual residing in Clark County, Nevada.

8.     Mr. Kiely is an individual residing in Clark County, Nevada.

/ / /

## JURISDICTION

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because multiple claims at issue are governed by the laws of the United States, specifically the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, et seq., the Copyright Act, 17 U.S.C. §§ 101, et seq., and the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq.  Plaintiffs invoke the supplemental jurisdiction of this Court to hear and decide claims arising under state law pursuant to 28 U.S.C. § 1367.

10.      This Court has personal jurisdiction over Defendants because Empire is a Nevada Corporation and GSL is a Nevada limited liability company, both with principal places of business in this district and Mr. Feng, Mr. Allison, and Mr. Kiely reside in Nevada.

11.      Venue in this judicial district is proper under 28 U.S.C. §§ 1391 and 1400 because Defendants reside in this district and because a substantial part of the events giving rise to the dispute occurred and are occurring in this district, a substantial part of the property that is the subject of the action was and is situated in this district, and the Court has personal jurisdiction over each of the defendants as alleged throughout this Complaint.

## FACTUAL BACKGROUND
### Paradise, LT Game, and Empire

12.      Paradise is a well-known global supplier of electronic gaming equipment and systems.  It was incorporated in 1996 and listed on the Main Board of The Stock Exchange of Hong Kong Limited in 1997.

13.      Paradise is an innovator in gaming technology and possesses significant intellectual property assets.  Together, Paradise and its subsidiaries (collectively, the "Paradise Group") develop, sell, and lease their high-tech electronic gaming products worldwide.  The Paradise Group dominates the electronic table game market in Macau and, through LT Game and other group companies, has been investing in the development of slot machines, electronic table game machines, and other high-tech gaming products worldwide.

/ / /

- 3 -

14.     Paradise operates its worldwide electronic gaming equipment and systems business under the brand name "LT Game."  Paradise's subsidiary companies include LT Game Limited, which operates in Macau, and LifeTec (Holdings) Limited ("LifeTec"), which owns LT Capital Limited, which in turn owns LT Game.

15.     The electronic gaming equipment and systems business is a highly competitive industry.  To gain and maintain a competitive advantage, the Paradise Group expends substantial time, effort, and resources developing, creating, and maintaining, among other things: (1) confidential and proprietary information, including but not limited to information about the Paradise group, its employees, and its customers, operational and financial information, product information, marketing and sales strategies, and institutional knowledge relating to the electronic gaming industry (collectively, "Confidential Business Information"); (2) trade secrets, including but not limited to financial, business, technical, and engineering information including software, hardware, computer programming code, and product designs and prototypes (collectively, "Trade Secrets"); and (3) relationships with customers, employees, and third-party vendors.

16.     The Paradise Group's Confidential Business Information and Trade Secrets are not generally known to the public or within the electronic gaming industry and have independent economic value because the information is not readily ascertainable by independent investigation and provide the Paradise Group with a significant competitive advantage.

17.     Competitors would greatly benefit from obtaining the Paradise Group's Confidential Business Information and Trade Secrets.  Accordingly, the Paradise Group takes care to safeguard and protect its Confidential Business Information and Trade Secrets from disclosure or use by competitors, third parties, or the public.

18.     The Paradise Group's efforts to maintain the secrecy of its Confidential Business Information and Trade Secrets include, but are not limited to, the following: (1) implementing policies and procedures that limit access to such information; (2) entering into confidentiality and non-compete agreements with Paradise Group employees; (3) limiting internal distribution of the information to only those employees who need the information to perform their specific job

- 4 -

functions; (4) restricting physical and technological access to the information; (5) securing the physical and electronic storage of the information; and (6) clearly and conspicuously marking the information as confidential.

19.     For example, the Paradise Group maintains password protections, trains employees to safeguard Confidential Business Information and Trade Secrets, marks confidential materials with confidentiality provisions, and operates in a culture and environment where employees understand and take seriously the need to keep all Confidential Business Information and Trade Secrets confidential.

20.     The Paradise Group is led by Dr. Jay Chun ("Dr. Chun"), who is the controlling shareholder, executive and managing director, and co-chairman of Paradise.  All of Paradise's subsidiary companies are ultimately controlled by Paradise's management team, which includes Dr. Chun and his immediate reports.  Dr. Chun is a prolific inventor and entrepreneur in the gaming industry and has decades of casino management and investment experience in global gaming markets.

21.     Dr. Chun is married to Mr. Feng's sister; Mr. Feng is Dr. Chun's brother-in-law.

22.     On information and belief, prior to 2008, Mr. Feng was unemployed.  Although Mr. Feng had no experience in the gaming industry, Dr. Chun desired to assist Mr. Feng out of his care and patronage.  In consideration of Mr. Feng being a close family member, Dr. Chun arranged for Mr. Feng to join the Paradise Group as a North American representative.

23.     As a close family member, Mr. Feng induced reliance on his special fiduciary relationship with Dr. Chun and Paradise by professing his desire to work to exclusively advance the interests of the Paradise Group.  Because of this inducement and Mr. Feng's unique position of confidence,  Paradise went on to entrust Mr. Feng with leadership roles in the Paradise Group's North American operations.

/ / /

/ / /

/ / /

24.     In February 2008, Paradise incorporated LT Game in Ontario, Canada, to explore the North American market for its electronic gaming products.  LT Game, now a Nevada corporation, is involved with the development, marketing, sale, and lease of the Paradise Group's electronic gaming products in the North American market.

25.     Relying on Mr. Feng's special fiduciary relationship and his affirmations of loyalty, Paradise arranged for Mr. Feng to manage LT Game, which Mr. Feng did from February 19, 2008, to February 28, 2022, as its president, secretary, treasurer, and sole director.

26.     As president, secretary, treasurer, and sole director of LT Game, Mr. Feng was given access to and was permitted to use the Paradise Group's Confidential Business Information and Trade Secrets to the extent necessary to perform his duties during his employment.  This access and permission was given based upon Mr. Feng's special fiduciary relationship, his affirmations of loyalty, and his position as an officer of LT Game.  Mr. Feng knew that the information he was given access to and was permitted to use constituted Confidential Business Information and Trade Secrets, knew that he had a duty to keep the information confidential and secret, and understood that using the Confidential Business Information and Trade Secrets for any unauthorized purpose would be misappropriation.

27.     In September 2012, Paradise arranged for the incorporation of Empire in the British Virgin Islands under the name "LT Game International Limited."  Paradise installed Mr. Wang Tao Feng (an individual with no relation to either Mr. Feng or Dr. Chun) to act as the sole shareholder of the company.  The official correspondence address and the location of books and records for LT Game International Limited was Paradise's offices in Hong Kong.

28.     Soon after its incorporation, LT Game International Limited changed its name to "LT Game International (US) Limited," highlighting Paradise's intention for the entity to promote its LT Game business in the U.S. gaming market.  In June 2016, the name LT Game International (US) Limited was changed to "Empire Technological Group Limited."

/ / /

/ / /

- 6 -

29.    In 2014, Paradise subsidiary LifeTec entered into a "Consultancy Agreement" with Mr. Feng whereby Mr. Feng agreed to act as a consultant to provide general consultancy services to LifeTec and the Paradise Group with respect to casino gaming equipment sales and services.  In exchange, Mr. Feng was paid a fee of several thousand dollars a month.  The arrangement was managed by Paradise.  Under the Consultancy Agreement, Paradise caused a significant sum of money to be paid, including by interstate and/or foreign wire, to Mr. Feng over the course of many years.

30.    In 2015, relying on Mr. Feng's special fiduciary relationship and his affirmations of loyalty, Paradise placed Mr. Feng in charge of Empire.  Paradise arranged the transfer of the company from Mr. Wang Tao Feng to Mr. Feng, recording a nominal payment of $1 for the transfer.

31.    The parties agreed that Mr. Feng would operate Empire, with Paradise's support and financial assistance, for the exclusive benefit of the Paradise Group.  Empire's role was to be a long-term exclusive distributor for the Paradise Group.  Through his conduct and communications with Paradise (including specifically Dr. Chun), including communications by interstate and/or foreign wire, Mr. Feng continuously reaffirmed this basic business structure at all relevant time periods, consistently seeking out Paradise's approval to engage in corporate actions for Empire, requesting financial support for Empire, and providing updates on Empire activities.

32.    Mr. Feng repeatedly referred to and addressed Dr. Chun as the leader of the overall business operations among all the companies, consistently seeking Dr. Chun's approvals and reporting to Dr. Chun as his boss (using that term).

33.    Empire was intended to be—and was operated as—the long-term exclusive distributor for the Paradise Group.  Paradise and/or LT Game paid for Empire's business expenses. In his own communications and correspondence with Paradise, including communications and correspondence by interstate and/or foreign wire, Mr. Feng consistently reaffirmed, supported, and actively pursued this arrangement among the companies.  Paradise invested substantial sums of money to be paid to Empire, including by interstate and/or foreign wire, for Empire's benefit so

- 7 -

that Empire could act as the Paradise Group's long-term exclusive distributor.

34.     In addition to financial support, Dr. Chun and Paradise at all times provided to Mr. Feng and the other defendants the business support necessary to build up Empire, including but not limited to business strategies, insights, guidance, directions, networks, connections, partners, and opportunities.  Paradise arranged for Defendants to participate in global gaming exhibitions, including but not limited to the Global Gaming Expo in Las Vegas and Asia, the ICE Show in London, and the MGS Entertainment Show in Macau.  The Paradise Group shared its human resources and intellectual assets with Defendants, including but not limited to its research and development and marketing resources.

35.     While Mr. Feng operated Empire, Mr. Feng simultaneously continued in his role as the president, secretary, treasurer, and sole director of LT Game until February 28, 2022, when he resigned.

### Mr. Feng's Scheme and the Involvement of Messrs. Allison and Mr. Kiely

36.     On information and belief, at least as early as 2018, Mr. Feng decided to surreptitiously transform Empire into a direct competitor of Plaintiffs.  Mr. Feng commenced a scheme to misappropriate Plaintiffs' intellectual property assets, Trade Secrets, Confidential Business Information, and financial resources for his individual benefit.

37.     On information and belief, in 2018, Mr. Feng communicated to Mr. Allison an interest in getting into the slot machine business.  At that time, Mr. Allison was self-employed as the sole owner and operator of GSL, where he provided consulting services relating to the gaming industry.

38.     Mr. Allison had been the chief executive officer of Aruze Gaming, a competitor of LT Game, from 2009 until 2016.

39.     Mr. Feng arranged for GSL to provide sales consulting services to Empire.  Mr. Feng sought Paradise's approval and permission to engage GSL and jointly agreed that LT Game would contract with GSL but that the contract was for service provided to Empire.  GSL proceeded to provide sales consulting services to Empire, and LT Game paid GSL's invoices.

40.     On information and belief, Mr. Feng and Mr. Allison began conspiring to leverage Plaintiffs' resources to pursue independent business opportunities while intentionally misleading Paradise into believing that the longstanding arrangement with Empire—where Empire was to act as the Paradise Group's long-term exclusive distributor—was still in place.

41.     At all material times, Paradise had no knowledge that Empire would pursue separate business with other gaming companies.  As such, Paradise continued to provide Empire with financial resources, including by interstate and/or foreign wire, and other support.  Paradise also continued to allow Mr. Feng to serve dual roles, managing both LT Game and Empire, not knowing that Mr. Feng was surreptitiously transforming Empire into a direct competitor.

42.     For many years, Empire occupied the same physical location as LT Game, such that Mr. Feng was literally performing his duties for Empire and LT Game in the same place at the same time.  This arrangement meant that Plaintiffs were subsidizing Empire by paying for Empire's office space and equipment.  Plaintiffs did this premised on the understanding that Empire was being built up to be the Paradise Group's long-term exclusive distributor.  Mr. Feng induced this understanding with his special fiduciary relationship and his affirmations of loyalty. Empire eventually leased additional office space while still siphoning off money and resources from LT Game.

43.     At the direction and approval of Paradise, LT Game paid for the salaries of Empire's employees.  Plaintiffs did this premised on the understanding that Empire was being built up to be the Paradise Group's long-term exclusive distributor.   Mr. Feng induced this understanding with his special fiduciary relationship and his affirmations of loyalty, and Mr. Feng actively pursued this arrangement.

44.     Paradise and/or LT Game paid for, including by interstate and/or foreign wire, the required certifications of gaming equipment distributed by Empire by way of sale or lease.  This included payments to BMM Testlabs on behalf of Empire for the purpose of testing game equipment and systems.  Paradise and LT Game did this premised on the understanding that Empire was being built up to be the Paradise Group's long-term exclusive distributor.  Mr. Feng

- 9 -

induced this understanding with his special fiduciary relationship and his affirmations of loyalty.

45.     Mr. Feng arranged for LT Game employees to have Empire email accounts and leveraged LT Game employees to engage in work that benefited Empire.

46.     On information and belief, in February 2019, Mr. Feng and Mr. Allison, endeavoring to establish Empire as a direct competitor of Plaintiffs, recruited Mr. Kiely to participate in their scheme.  Mr. Kiely had been serving as the executive director of engineering and the vice president of engineering for LT Game since joining the company in February 2016. Mr. Kiely began working concurrently for Empire.

47.     In 2019, Mr. Feng attempted to assign approximately 5% of shares in Empire to Mr. Kiely without obtaining  prior approval from Paradise and Dr. Chun.  Paradise communicated to Mr. Feng that Empire was not his personal property and instructed him to undo the arrangement for the purpose of not diluting the shares of Empire.  To Paradise's knowledge, Mr. Feng complied with Paradise's direction.

48.     In 2019, LT Game entered into an employment agreement with Mr. Kiely to become its chief technology officer at an annual pay of $243,000.  Mr. Kiely and Mr. Feng, as president of and on behalf of LT Game, signed the August 30, 2019 Employment Contract (attached as Exhibit A).

49.     Mr. Kiely's August 30, 2019 Employment Contract includes a broadly worded confidentiality provision (Section 6), as well as a non-competition/non-solicitation clause (Section 7).  The Employment Contract also calls for the return of all proprietary documents and information to LT Game upon termination (Section 5).

50.     As chief technology officer of LT Game, Mr. Kiely's duties included managing LT Game's technical teams and working closely with the Paradise Group's research and development teams on new products and features.  Mr. Kiely reported directly to Mr. Feng.

51.     As chief technology officer of LT Game, Mr. Kiely was given access to and was permitted to use the Paradise Group's Confidential Business Information and Trade Secrets to the extent necessary to perform his duties during his employment.  This access and permission was

- 10 -

given based upon Mr. Kiely's agreement to preserve the confidentiality of such information as detailed in the August 30, 2019 Employment Contract and his position as an officer of LT Game. Mr. Kiely knew that the information he was given access to and was permitted to use constituted Confidential Business Information and Trade Secrets, knew that he had a duty to keep the information confidential and secret, and understood that using the Confidential Business Information and Trade Secrets for any unauthorized purpose would be misappropriation.

52.     Mr. Kiely had access to Plaintiffs' proprietary gaming platform, including its source code, related assets, and libraries.  This proprietary gaming platform is based on confidential source code that Plaintiffs began licensing from Aspect Group Limited ("Aspect"), a Cayman Islands corporation based in Hong Kong, in May 2017.  In January 2019, Plaintiffs purchased the legal and beneficial ownership of a version of Aspect's confidential source code.  Plaintiffs have since developed, modified, altered, and improved the confidential source code, resulting in Plaintiffs' proprietary gaming platform.

53.     Mr. Kiely had access to a computer program called "LTShoe" designed and developed by Paradise subsidiary LT Game Limited.  The LTShoe program is used in the Paradise Group's smart card shoes, which are software-controlled playing card dispensing machines that sit on top of card tables and are used by card dealers ("Smart Card Shoes").  As chief technology officer of LT Game and to the extent necessary to perform his duties during his employment, Mr. Kiely had access to the LTShoe source code, which comprises and contains trade secret material.

54.     The LTShoe source code was completed in 2017, and the LTShoe program was used in the Smart Card Shoes beginning in March 2018.  The LTShoe source code contains a large amount of material wholly original with LT Game Limited and is copyrightable subject matter.

55.     Paradise is the owner of all rights, title, and interest in and to the LTShoe source code.  On February 7, 2024, LT Game Limited registered the LTShoe source code with the Register of Copyrights following the rules for submitting source code containing trade secret material.  The Certificate of Registration (attached as Exhibit B) bears the number TX 9-358-765.  On February 29, 2024, LT Game Limited assigned all rights, title, and interest in and to the LTShoe copyright

to Paradise.

56.     Mr. Kiely also had access to a computer program called "Paradise Golden Frog Baccarat" ("Paradise Golden Frog") designed and developed by Paradise subsidiary LT Game Limited. Paradise Golden Frog was a variation to the standard game of baccarat comprised of various types of optional wagers. As chief technology officer of LT Game and to the extent necessary to perform his duties during his employment, Mr. Kiely had access to the Paradise Golden Frog source code, which comprises and contains trade secret material.

57.     Paradise Golden Frog was never published by the Paradise Group. The current version of the Paradise Golden Frog source code was completed in 2020. The Paradise Golden Frog source code contains a large amount of material wholly original with LT Game Limited and is copyrightable subject matter.

58.     Paradise is the owner of all rights, title, and interest in and to the Paradise Golden Frog source code. On February 7, 2024, LT Game Limited registered the Paradise Golden Frog source code with the Register of Copyrights following the rules for submitting source code containing trade secret material. The Certificate of Registration (attached as Exhibit C) bears the number TXu 2-411-586. On February 29, 2024, LT Game Limited assigned all rights, title, and interest in and to the Paradise Golden Frog copyright to Paradise.

59.     With respect to the creation of intellectual property, including patents, the August 30, 2019 Employment Contract required that Mr. Kiely "accept that all notes, Intellectual Property . . . made by you or that come into your possession whilst providing the Services under this agreement remain the property of LT Game, and must be surrendered by you upon termination of your employment" and defined "Intellectual Property" as "all intellectual property rights (as well as any continuations, continuations-in-part, divisionals, reissues, re-examinations, and foreign counterparts thereof), including but not limited to trademarks, trade dress . . . trade secrets, security keys and the associated software thereof . . . and any other intellectual property or proprietary rights (whether . . . patentable or unpatentable, patented or unpatented, copyrighted or uncopyrighted) recognized in any country, region or jurisdiction worldwide . . . ."

60.    At all material times, the Paradise Group, including LT Game, were the entities developing, manufacturing, and supplying innovative gaming products to Empire for distribution. Empire merely did minor customization services on the gaming products for their North American clients.   Empire did not have the necessary resources to develop and manufacture its own innovative products.

61.    In 2020, LT Game hired Mr. Allison to be its senior vice president of operations and business development at a base annual salary of $190,000.   Mr. Allison and Mr. Feng, as President of and on behalf of LT Game, signed the January 1, 2020 Employment Contract (attached as Exhibit D).

62.    Mr. Allison's January 1, 2020 Employment Contract includes a broadly worded confidentiality provision (Section 6), as well as a non-competition/non-solicitation clause (Section 7).  The Employment Contract also calls for the return of all proprietary documents and information to LT Game upon termination (Section 5).

63.    As senior vice president of operations and business development of LT Game, Mr. Allison's duties included assisting Mr. Feng and Mr. Kiely on new slot machine product development, production, and sales.  Mr. Allison reported directly to Mr. Feng.

64.    As senior vice president of operations and business development of LT Game, Mr. Allison was given access to and was permitted to use the Paradise Group's Confidential Business Information and Trade Secrets to the extent necessary to perform his duties during his employment. This access and permission was given based upon Mr. Allison's agreement to preserve the confidentiality of such information as detailed in the January 1, 2020 Employment Contract and his position as an officer of LT Game.  Mr. Allison knew that the information he was given access to and was permitted to use constituted Confidential Business Information and Trade Secrets, knew that he had a duty to keep the information confidential and secret, and understood that using the Confidential Business Information and Trade Secrets for any unauthorized purpose would be misappropriation.

/ / /

- 13 -

65.     In 2022, LT Game entered into an agreement with GSL under similar terms as Mr. Allison's January 1, 2020 Employment Contract, including provisions relating to confidentiality, intellectual property, and non-competition/non-solicitation.  Per the terms of the agreement, Mr. Allison retained ultimate responsibility for and control of the services performed by GSL for LT Game.  Mr. Allison, on behalf of GSL, signed the June 30, 2022 Agreement (attached as Exhibit E).  Mr. Feng was aware of this Agreement and its terms, including that GSL was an agent of LT Game.

66.     As an agent of LT Game, GSL was given access to and was permitted to use the Paradise Group's Confidential Business Information and Trade Secrets to the extent necessary to provide the agreed-upon services.  This access and permission was given based upon GSL's agreement to preserve the confidentiality of such information as detailed in the June 30, 2022 Agreement and the principal-agent relationship between LT Game and GSL.

**Paradise and LT Game Pay for Empire's Gaming Licenses**

67.     In or around 2018, Plaintiffs and Empire engaged legal counsel to assist in, among other things, the handling of Empire's application for a Nevada gaming license and other gaming licenses and the handling of employment law matters for LT Game.  Plaintiffs delegated Mr. Feng to be the primary point of contact with legal counsel.  However, Plaintiffs paid the legal bills for these matters, including bills for Empire's pursuit of gaming licenses in Nevada and elsewhere.  Mr. Feng fully supported this arrangement.

68.     On information and belief, Mr. Feng, at Plaintiffs' expense, directed legal counsel to do work that Mr. Feng intended to be for his own benefit to the detriment of Plaintiffs.  In his several updates and reports during the relevant time period, including updates and reports by means of interstate and/or foreign wire, Mr. Feng fraudulently induced Plaintiffs (including Dr. Chun) to believe and understand that these actions were for the benefit of Plaintiffs.

/ / /

/ / /

/ / /

- 14 -

69.     Paradise and/or LT Game paid for, including by interstate and/or foreign wire, Empire's expenses and fees (including legal fees) in obtaining gaming licenses necessary to distribute products in different U.S. states and territories.   Mr. Feng actively pursued this arrangement and induced Paradise and/or LT Game to spend the money based on Mr. Feng's assurances of his fiduciary role and the intention that Empire would be the Paradise Group's long-term exclusive distributor.   Mr. Feng also regularly reported to Paradise on the status of the licenses, writing from his LT Game email account and consistently referring to the Empire licenses as "our licenses," confirming that the licenses were intended to further Empire's exclusive distribution of products for the benefit of the Paradise Group.   Other LT Game employees made similar reports to Paradise, also consistently referring to the Empire licenses as "our licenses."

70.     Pursuant to this collective effort, the most important license for Empire to obtain was a Nevada gaming license.   Among other things, a Nevada gaming license is expensive to obtain, requiring payment of both licensing investigation charges and relevant attorneys' fees.   The large expense was well worth it to Plaintiffs for the sake of securing long-term distribution rights for their exclusive distributor, Empire.

71.     For the benefit of the Paradise Group, Paradise and/or LT Game paid legal fees associated with obtaining the Nevada gaming license for Empire.   The process of obtaining the Nevada gaming license for Empire began in or around 2018, and the license was ultimately obtained in August 2023.

72.     On information and belief, Mr. Feng intentionally steered the Nevada Gaming Commission's investigation away from Plaintiffs and arranged that certain employees like Mr. Kiely be interviewed by the Commission to ensure Mr. Feng's fraudulent narrative was all the Commission would hear.

**The Commerce Casino Smart Card Shoe Deal**

73.     Leading up to 2018, Paradise and LT Game had invested considerable time and resources to develop a business relationship with Commerce Casino in Los Angeles, California.

/ / /

- 15 -

74.     On November 1, 2018, Empire, in its capacity as exclusive distributor for LT Game, entered into an "Equipment Lease Agreement" with Commerce Casino.  Plaintiffs authorized Empire to make the deal for the benefit of LT Game.  Under the deal, LT Game supplied Empire with Smart Card Shoes containing the LTShoe program.  Empire in turn leased LT Game's Smart Card Shoes to Commerce Casino.  Ownership of the Smart Card Shoes at all times remained with LT Game.  The Equipment Lease Agreement was signed by Mr. Feng for Empire and by Mr. Jeffrey Harris ("Mr. Harris") for Commerce Casino.

75.     The Commerce Casino Smart Card Shoe leasing deal was lucrative for LT Game for a number of years.

76.     In a January 21, 2022 email sent just before Mr. Feng resigned as president of LT Game, Mr. Feng wrote to Dr. Chun saying: "I received a phone call from Commerce today and they informed me their decision to remove our leasing card shoes on their game floor.  The reason which they gave to me is that they decided to go with other vendor's products.  The true reason behind this is that our friend Commerce CEO Haig Papaian has retired from his position (due to Commerce internal political fight) and Jeff Harris has been reduced his responsibilities.  And the new management members are very close to [Scientific Games].  That is why they made that decision."

77.     As far as Paradise knew, Commerce Casino had terminated the contract at that point.  Paradise believed that the Smart Card Shoes had been returned to LT Game and repeatedly asked Mr. Feng to try to deploy them for the further benefit of LT Game.  In reporting on the status of the Smart Card Shoes to Dr. Chun and other managers at Paradise, including reporting by means of interstate and/or foreign wire, Mr. Feng failed to explain the true fate of the card shoes, as discussed infra ¶¶ 115–18.

### Paradise First Learns of Mr. Feng's Misconduct

78.     Mr. Feng resigned as President of LT Game in February 2022.  At the time of his resignation, Mr. Feng nonetheless reaffirmed in email messages to Dr. Chun and others in Paradise management that he still considered himself to be working for the benefit of the Paradise Group.

79.     In a February 9, 2022 email to Dr. Chun and others in Paradise management, Mr. Feng induced reliance on his special fiduciary relationship, stating that he had been working for Dr. Chun for more than 10 years as a close family member and representing that his obligations as a fiduciary would continue after his resignation from LT Game. Mr. Feng stated that he would take good care of the company's property and that if there were profitable business opportunities, he would reach out to Dr. Chun. Mr. Feng further stated that he would continue to work on obtaining U.S. gaming licenses and other matters of which his assistance would be needed by the Paradise Group.

80.     Mr. Feng remained president of Empire, which Paradise still believed to be in the role of the Paradise Group's long-term exclusive distributor.

81.     On information and belief, Mr. Feng misappropriated the Paradise Group's Confidential Business Information and Trade Secrets upon leaving LT Game, using the Confidential Business Information and Trade Secrets to benefit himself and Empire to the detriment of Plaintiffs.

82.     Mr. Kiely resigned from his position as LT Game's chief technology officer on March 31, 2023. A subsequent review of his LinkedIn profile showed that he professed himself to be working concurrently as chief technology officer for Empire from February 2019 through the present. In or around August 2023, Paradise learned that Mr. Kiely was working at Empire.

83.     On information and belief, Mr. Kiely misappropriated the Paradise Group's Confidential Business Information and Trade Secrets upon leaving LT Game, using the Confidential Business Information and Trade Secrets to benefit himself and Empire to the detriment of Plaintiffs.

84.     By working for Empire in competition with and adverse to Plaintiffs' interests both during and after his employment with LT Game, Mr. Kiely breached the terms of his August 30, 2019 Employment Contract.

/ / /

/ / /

85.   Mr. Allison left LT Game on June 30, 2023.  A subsequent review of his LinkedIn profile showed that he professed himself to be working concurrently as senior vice president of sales and marketing for Empire from March 2022 through September 2023.  In or around August 2023, Paradise learned that Mr. Allison was working at Empire.

86.   On information and belief, Mr. Allison misappropriated the Paradise Group's Confidential Business Information and Trade Secrets upon leaving LT Game, using the Confidential Business Information and Trade Secrets to benefit himself and Empire to the detriment of Plaintiffs.

87.   By working for Empire in competition with and adverse to Plaintiffs' interests both during and after his employment with LT Game, Mr. Allison breached the terms of his January 1, 2020 Employment Contract.

88.   On information and belief, GSL, through the actions of its sole owner and operator Mr. Allison, acquired and misappropriated the Paradise Group's Confidential Business Information and Trade Secrets.

89.   GSL, through the actions of its sole owner and operator Mr. Allison that were adverse to Plaintiffs' interest, breached the terms of the June 30, 2022 Agreement.

90.   Ultimately, Empire solicited, recruited, and hired away key LT Game employees, including but not limited to individuals who were part of LT Game's management and technology teams.  These individuals, to the extent necessary to perform their duties during their employment with LT Game, were given access to and were permitted to use the Paradise Group's Confidential Business Information and Trade Secrets while employed by LT Game.  It is impossible for these former employees—now employed by Empire—to perform their duties at Empire without using the Paradise Group's Confidential Business Information and Trade Secrets and, as a result, causing injury to Plaintiffs.

/ / /

/ / /

/ / /

- 18 -

91.     In or around August 2023, Paradise became aware of news reports that Empire (doing business as "Play Synergy," a name that Paradise had not heard before) had acquired out of bankruptcy the electronic gaming assets and intellectual property of Aruze Gaming, which had until then been one of LT Game's primary competitors in the distribution of gaming equipment. Empire paid $7 million to buy the Aruze assets.

92.     The publicity surrounding the Aruze deal marked the first time Paradise learned that Mr. Feng was in business for himself and using Empire to serve his own independent business purposes.

93.     Mr. Feng's acquisition of the Aruze assets was also notable because Paradise had asked Mr. Allison for advice about whether to purchase any of those assets, and Mr. Allison deliberately dodged the inquiry, refusing to advise on it.  Mr. Allison desired that Mr. Feng and Empire would be unchallenged in pursuing the Aruze assets.

94.     In the ensuing discussions between Mr. Feng and Paradise after Empire's acquisition of the Aruze assets, Mr. Feng insisted that he had no obligations to Plaintiffs and was free to use Empire—and the gaming licenses that Plaintiffs had paid for—however he wanted, including to compete with Plaintiffs.

95.     On October 3, 2023, Empire and Mr. Feng filed a Nevada state declaratory judgment action against Plaintiffs in the Clark County District Court, Case No. A-23-878908-B, Dept. No. XVI.  The complaint states that Empire and Mr. Feng seek "a declaration that Paradise has no ownership interest in, and no right to control, Empire, and no legal or equitable interest in any of Empire's assets, including its gaming licenses."

**Subsequent Revelations About Mr. Feng's Improper Activities**

96.     The initiation of Mr. Feng's declaratory judgment lawsuit prompted Plaintiffs to engage in a deeper investigation of Mr. Feng's prior activities.  This investigation has thus far revealed that Mr. Feng was secretly engaged in significant self-dealing, competition with Plaintiffs, and usurpation of Plaintiffs' opportunities, all at a time when he was president of LT Game and owed Plaintiffs fiduciary duties.

97.     Indeed, Mr. Feng was engaged in fraud, extracting and leveraging money and resources from Plaintiffs for his own personal ambitions.  Mr. Feng not only concealed his business activities from Paradise but actively tried to deflect any suspicion by continuing to converse and behave with Dr. Chun and others in Paradise management, including in communications by means of interstate and/or foreign wire, as if he were playing the role that Paradise believed him to be in—president of LT Game, acting in the company's best interests, and president of Empire, operating that company as a long-term exclusive distributor for the Paradise Group.

98.     It is apparent now that Mr. Feng was liberally using LT Game employees to double as employees not only for Empire but also for Mr. Feng's other various companies and in service of Mr. Feng's business plan to have Empire compete with Plaintiffs.

99.     On information and belief, Mr. Feng induced Mr. Allison and Mr. Kiely to perform substantive work for Empire in furtherance of Mr. Feng's plan to supplant Plaintiffs at a time when Mr. Allison and Mr. Kiely were still working for LT Game and had access to the Paradise Group's Confidential Business Information and Trade Secrets.  Mr. Feng then ultimately induced Mr. Allison and Mr. Kiely to leave LT Game completely in favor of Empire.  Mr. Feng deliberately concealed all these arrangements from Paradise, and Paradise was otherwise unaware of Mr. Feng's plans and secret actions.

100.    On April 29, 2019, Mr. Feng set up a new Nevada company called "Playful Interactive Inc." ("Playful Interactive").  As of the most recent filing, April 29, 2022, Mr. Feng was listed as the president, secretary, treasurer, and director.  Playful Interactive was dissolved on October 25, 2022.

101.    On December 14, 2019, Empire filed a trademark application with the United States Patent and Trademark Office ("USPTO") for "GOLDEN FROG BACCARAT," U.S. Serial No. 88727507.  Ultimately, Empire failed to respond or filed a late response to a USPTO action, and the application was abandoned.

/ / /

/ / /

- 20 -

102.    In July 2020, Mr. Feng and Mr. Kiely had filed a U.S. provisional patent application for what would ultimately result in U.S. Patent No. 11,341,807 entitled "Display Assembly for Relevant Messaging for Gaming Apparatus and Methods Therefor." Although this patent reflected a corporate opportunity for LT Game and was drafted while Mr. Kiely was an employee/officer of LT Game, Mr. Feng concealed his patent strategy from Plaintiffs. The '807 Patent was assigned to Empire. On June 8, 2022, Empire filed a patent infringement lawsuit against Light & Wonder, Inc. and SG Gaming, Inc. Mr. Feng never informed Paradise of any of these activities, nor was Paradise otherwise aware of them. In fact, Mr. Feng and Mr. Kiely are the named inventors on several patents that were filed and prosecuted while they worked for LT Game but which were assigned to Empire.

103.    The terms of Mr. Kiely's employment with LT Game would have required him to assign ownership of such patent rights to LT Game, so the assignment to Empire breached Mr. Kiely's obligations to LT Game. The assignment also amounts to a usurpation of a business opportunity of LT Game in favor of Empire.

104.    On February 21, 2020, Playful Interactive posted a YouTube video titled "ShortDeck Poker Demo." The video depicts an online multiplayer poker game and shows the player username "Jeff Conradi." Jeff Conradi ("Mr. Conradi") is a software engineer employed by LT Game. On information and belief, Mr. Feng induced Mr. Conradi to develop this Playful Interactive poker game while working for LT Game.

105.    On June 4, 2020, Playful Interactive posted a YouTube video titled "Golden Frog Baccarat Demo." The video depicts a Golden Frog Baccarat mobile application ("app") allowing for online multiplayer baccarat and shows the player usernames "Daryn Kiely" and "Jeff Conradi." On information and belief, Mr. Feng induced Mr. Conradi to develop the Playful Interactive app while working for LT Game by using, copying, reproducing, and/or creating derivative versions of LT Game Limited's Paradise Golden Frog source code.

/ / /

/ / /

- 21 -

106.   On June 29, 2020, Mr. Allison emailed a screenshot of the Golden Frog Baccarat app from his phone to his Empire email address.   The screenshot shows the player username "Kelcey Allison."

107.   In August 2020, Playful Interactive released an app called "Golden Frog Casino—Baccarat," an online version of Golden Frog Baccarat.   On information and belief, the Golden Frog Casino—Baccarat app uses, copies, reproduces, and/or is a derivative version of the Paradise Golden Frog source code.   Further, the misappropriated, infringing app was distributed through the Apple App Store and Android Google Play, where it was made available to the public.

108.   On May 21, 2021, Mr. Feng set up a new Nevada company called Akkadian Enterprises ("Akkadian").   Mr. Feng deliberately concealed Akkadian from Paradise.   Akkadian became a covert vehicle to help Mr. Feng build up his competitive business against Plaintiffs.

109.   Mr. Feng used Akkadian to purchase a large portfolio of intellectual property from a company called Synergy Blue LLC in 2021.   Mr. Feng deliberately concealed this opportunity, usurping it from LT Game despite his role as president and a fiduciary of LT Game and despite LT Game's objective to develop gaming equipment and pursue relevant intellectual property opportunities.

110.   On information and belief, Mr. Feng caused Akkadian to enter into various agreements with Empire and deliberately concealed these dealings from Paradise.

111.    On information and belief, in 2021, Empire began engaging in business under the brand name "Play Synergy."

112.   Between August 12, 2021, and October 4, 2021, Mr. Feng rapidly formed several other companies, including: (1) Solution Gaming Technologies ("Solution Gaming"); (2) Victorian Investment Holdings; (3) Ephesus Holdings; (4) F&T Holdings LLC; (5) F&T LV Real Estate 1, LLC; (6) F&T LV Real Estate 2, LLC; and (7) F&T LV Real Estate 3, LLC.   The formation of these companies was done without Paradise's knowledge and at a time when LT Game—under the direction of Mr. Feng—was operating at a financial loss and unable to generate any profit.   Mr. Feng formed these companies in furtherance of his fraudulent scheme to build up

a competing business to supplant Plaintiffs in the market.

113.   On November 5, 2021, Empire again filed a trademark application with the USPTO for "GOLDEN FROG BACCARAT," U.S. Serial No. 97110870.  Empire indicated that the first use date was January 7, 2019, and the first use in commerce date was April 16, 2019.  The USPTO granted registration on September 13, 2022, U.S. Registration No. 6846402.

114.   In December 2021, while president of LT Game, Mr. Feng negotiated with Sockeye Software to have Empire become the exclusive licensee of Sockeye's platform development software for computerized slot machines, entering into an agreement effective February 8, 2022. The Sockeye Software deal was conducted without Paradise's knowledge, and Mr. Feng deliberately concealed it from Plaintiffs. This was an opportunity that Mr. Feng usurped from LT Game at a time when LT Game—under the direction of Mr. Feng— was operating at a financial loss and unable to generate any profit.

115.   On or around January 2022, Mr. Feng induced Mr. Harris to terminate Commerce Casino's prior Smart Card Shoe leasing agreement that benefited LT Game and instead enter into a new agreement with Mr. Feng and Empire, whereby Empire would receive the lease income and LT Game would receive nothing.  Thus, Mr. Feng's January 21, 2022 email to Dr. Chun claiming that Commerce Casino had found another vendor was fraudulent—the other vendor was indeed Mr. Feng himself.  That email had also suggested that Mr. Harris was departing Commerce Casino, when in fact he was soon named its new chief executive officer.

116.   LT Game's Smart Card Shoes were never returned to LT Game, despite the fact that they are the lawful property of LT Game.  Instead, they are still at Commerce Casino, a few with the LT Game branding still displayed on them while others bear Empire's "Play Synergy" logo.

117.   On information and belief, Mr. Feng and Mr. Harris had either already entered into a broader business arrangement or did so soon after the Commerce Casino Smart Card Shoe deal. Public records reflect that Mr. Harris supplied a large loan to Empire.

/ / /

118.    Since at least as early as September 2020, Empire has offered a smart card shoe product called "SMRT Power Shoe."  On information and belief, each Empire SMRT Power Shoe uses, copies, is a derivative version of, and/or distributes the Paradise Group's LTShoe source code.

119.    On June 6, 2022, Empire entered into a "Sales and Security Agreement" with Mr. Feng's company Solution Gaming, whereby Empire sold a substantial amount of gaming equipment to Solution Gaming.  The equipment did not belong to Empire; rather, it belonged to LT Game.  Leading up to the agreement, Mr. Allison, through communications by interstate and/or foreign wire, had persuaded Paradise that the sale was worthwhile even though the equipment was being sold at a very small margin.  Mr. Allison and Mr. Feng deliberately failed to inform Paradise that Mr. Feng owned and controlled Solution Gaming and induced Paradise to supply the equipment at a very small margin.

120.    Upon completion of the Aruze asset purchase, Mr. Feng caused Empire to undergo a rebranding, dropping the former Play Synergy brand name and now positioning the company as the new incarnation of Aruze Gaming, taking on Aruze's former brand appearance. The re-branded Empire/Aruze debuted at the October 2023 Global Gaming Expo trade show conference in Las Vegas.

121.    The Empire/Aruze website lists Golden Frog Baccarat as one of its electronic table game products.  The Golden Frog Baccarat description states, "Our POWER SHOE and SMRT BOARD allows casinos to eliminate dealer errors and needless keypad entries, while providing valuable gaming data for analytics and game protection."  On information and belief, this electronic table game product misappropriates and infringes the Paradise Golden Frog source code and/or the LTShoe source code.

122.    The misappropriated and infringing Empire/Aruze Golden Frog Baccarat electronic table games are currently in use in at least the following casinos: (1) Durango Casino and Resort (Las Vegas, NV); (2) Red Rock Casino Resort Spa (Las Vegas, NV); (3) Rampart Casino (Las Vegas, NV); (4) Santa Fe Station Hotel and Casino (Las Vegas, NV); (5) Agua Caliente (Palm

- 24 -

Springs, CA, and Rancho Mirage, CA); (6) Bay 101 Casino (San Jose, CA); (7) Graton Resort and Casino (Rohnert Park, CA); (8) Red Hawk Resort Casino (Placerville, CA); (9) Hard Rock Hotel Casino Sacramento (Wheatland, CA); (10) Cache Creek Casino Resort (Brooks, CA); (11) Monarch Casino Resort Spa (Black Hawk, CO); and (12) Hard Rock Hotel Casino Biloxi (Biloxi, MS).

123.  In morphing Empire into Aruze, Mr. Feng had taken the final step in trying to erase Empire's true origin as an intended long-term exclusive distributor for the Paradise Group, whose very existence and Nevada gaming license have been subsidized by Plaintiffs.

124.  Mr. Feng has stripped LT Game of its management and technology teams, misappropriating Plaintiffs' Confidential Business Information and Trade Secrets and hobbling LT Game as a company.

125.  Plaintiffs spent millions of dollars trying to build up LT Game's business in the United States and trying to build up Empire as the Paradise Group's exclusive distributor.  Mr. Feng fraudulently used that money to advance his own interests, hired away LT Game's management and technology teams even as they were still working as officers of LT Game, and unjustly enriched himself with Empire's business assets and gaming licenses that Plaintiffs had subsidized.

126.  In early 2024, Plaintiffs became aware that Empire had opened an office in Macau where Empire will now be directly competing with Plaintiffs' business operations and interests in that jurisdiction.

**COUNT ONE**
**Misappropriation of Trade Secrets Under Defend Trade Secrets Act**
**18 U.S.C. §§ 1836, *et seq.***
**(Against All Defendants)**

127.  Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–126 herein.

128.  Plaintiffs assert this claim for misappropriation of trade secrets under federal law against all Defendants.

129.    Plaintiffs possess valuable Trade Secrets, including but not limited to financial, business, technical, and engineering information including software, hardware, computer programming code, including but not limited to the Paradise Golden Frog source code and LTShoe source code, and product designs and prototypes.

130.    Plaintiffs' Trade Secrets relate to products and/or services used in and intended for use in interstate and/or foreign commerce.

131.    Mr. Feng, Mr. Allison, and Mr. Kiely (collectively, the "Employee Defendants") had access to and acquired Plaintiffs' Trade Secrets as a result of their respective relationships with Plaintiffs and under circumstances where each Employee Defendant was vested with extreme trust and confidence and had a duty to protect and maintain the secrecy of Plaintiffs' Trade Secrets.

132.    Through the Employee Defendants' conduct, Empire and GSL gained access to and acquired Plaintiffs' Trade Secrets, which were not previously known to Empire or GSL.

133.    Each of the Defendants knew that the information Plaintiffs provided to the Employee Defendants comprised Plaintiffs' Trade Secrets.

134.    Plaintiffs have invested significant money and other resources into developing and protecting their Trade Secrets.

135.    Plaintiffs enjoy an advantage over existing and would-be competitors in the gaming industry by virtue of the Trade Secrets, which have been developed and/or compiled over years of hard work and through the substantial investment of money and resources.

136.    Plaintiffs derive significant competitive and economic benefits insofar as the Trade Secrets are not readily available to the public and are not readily ascertainable or duplicated by others, and as such the Trade Secrets have independent economic value.

137.    Plaintiffs have taken reasonable steps designed to safeguard the secrecy of the Trade Secrets, including but not limited to the following: (1) implementing policies and procedures that limit access to Trade Secrets; (2) entering into confidentiality and non-compete agreements with Paradise Group employees; (3) limiting internal distribution of Trade Secrets to only those employees who need the information to perform their specific job functions; (4) restricting

physical and technological access to Trade Secrets; (5) securing the physical and electronic storage of Trade Secrets; and (6) clearly and conspicuously marking Trade Secrets as confidential.

138. The Employee Defendants have used and provided Empire and GSL with Plaintiffs' Trade Secrets, which have been used by Defendants to compete against Plaintiffs.

139. Defendants have used the misappropriated Trade Secrets to operate and grow competing businesses in the same markets as Plaintiffs and to solicit and recruit Plaintiffs' employees to Empire.

140. Defendants have used and intend to use Plaintiffs' Trade Secrets for their economic benefit to the detriment of Plaintiffs.

141. Defendants' improper use of Plaintiffs' Trade Secrets has resulted in significant and irreparable harm to Plaintiffs.

142. Defendants' improper use of Plaintiffs' Trade Secrets has provided Defendants with an unfairly obtained competitive advantage.

143. Defendants' misappropriation of Plaintiffs' Trade Secrets has directly and proximately caused damages to Plaintiffs, and Plaintiffs are therefore entitled to an award of actual damages in an amount to be proven at trial.

144. Defendants' misappropriation of Plaintiffs' Trade Secrets has been and continues to be conducted in a willful and malicious manner, and Plaintiffs are entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) in an amount not exceeding two times the award of damages as well as to attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

145. At all relevant times, the actions described above have caused and are continuing to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law, and Defendants will continue to offend unless enjoined.

146. Plaintiffs are entitled to injunctive relief against Defendants to prevent further damage and harm to Plaintiffs.

/ / /

/ / /

- 27 -

## COUNT TWO
### Misappropriation of Trade Secrets Under Nevada Uniform Trade Secrets Act
### Nev. Rev. Stat. §§ 600A, *et seq.*
### (Against All Defendants)

147.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–146 herein.

148.   Plaintiffs assert this claim for misappropriation of trade secrets under state law against all Defendants.

149.   Plaintiffs possess valuable Trade Secrets, including but not limited to financial, business, technical, and engineering information including software, hardware, computer programming code, including but not limited to the Paradise Golden Frog source code and LTShoe source code, and product designs and prototypes.

150.   The Employee Defendants had access to and acquired Plaintiffs' Trade Secrets as a result of their respective relationships with Plaintiffs and under circumstances where each Employee Defendant was vested with extreme trust and confidence and had a duty to protect and maintain the secrecy of Plaintiffs' Trade Secrets.

151.   Through the Employee Defendants' conduct, Empire and GSL gained access to and acquired Plaintiffs' Trade Secrets, which were not previously known to Empire or GSL.

152.   Each of the Defendants knew that the information Plaintiffs provided to the Employee Defendants comprised Plaintiffs' Trade Secrets.

153.   Plaintiffs have invested significant money and other resources into developing and protecting their Trade Secrets.

154.   Plaintiffs enjoy an advantage over existing and would-be competitors in the gaming industry by virtue of the Trade Secrets, which have been developed and/or compiled over years of hard work and through the substantial investment of money and resources.

155.   Plaintiffs derive significant competitive and economic benefits insofar as the Trade Secrets are not readily available to the public and are not readily ascertainable or duplicated by others, and as such the Trade Secrets have independent economic value.

156.   Plaintiffs have taken reasonable steps designed to safeguard the secrecy of the Trade Secrets, including but not limited to the following: (1) implementing policies and procedures that limit access to Trade Secrets; (2) entering into confidentiality and non-compete agreements with Paradise Group employees; (3) limiting internal distribution of Trade Secrets to only those employees who need the information to perform their specific job functions; (4) restricting physical and technological access to Trade Secrets; (5) securing the physical and electronic storage of Trade Secrets; and (6) clearly and conspicuously marking Trade Secrets as confidential.

157.   The Employee Defendants have used and provided Empire and GSL with Plaintiffs' Trade Secrets, which have been used by Defendants to compete against Plaintiffs.

158.   Defendants have used the misappropriated Trade Secrets to operate and grow a competing business in the same markets as Plaintiffs and to solicit and recruit Plaintiffs' employees to Empire.

159.   Defendants have used and intend to use Plaintiffs' Trade Secrets for their economic benefit to the detriment of Plaintiffs.

160.   Defendants' improper use of Plaintiffs' Trade Secrets has resulted in significant and irreparable harm to Plaintiffs.

161.   Defendants' improper use of Plaintiffs' Trade Secrets has provided Defendants with an unfairly obtained competitive advantage.

162.   Defendants' misappropriation of Plaintiffs' Trade Secrets has directly and proximately caused damages to Plaintiffs, and Plaintiffs are therefore entitled to an award of actual damages in an amount to be proven at trial.

163.   Defendants' misappropriation of Plaintiffs' Trade Secrets has been and continues to be conducted in a willful and malicious manner, and Plaintiffs are entitled to exemplary damages under NRS § 600A.050(2) in an amount not exceeding two times the award of damages as well as to attorneys' fees under NRS § 600A.060(3).

/ / /

/ / /

1     164.   At all relevant times, the actions described above have caused and are continuing

2   to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law, and

3   Defendants will continue to offend unless enjoined.

4     165.   Plaintiffs are entitled to injunctive relief against Defendants to prevent further

5   damage and harm to Plaintiffs.

**COUNT THREE**
**Copyright Infringement**
**17 U.S.C. § 101, *et seq.***
**(Against All Defendants)**

9     166.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–165

10  herein.

11    167.   Plaintiffs assert this claim for copyright infringement against all Defendants.

12    168.   The Paradise Golden Frog source code and LTShoe source code are subject to valid,

13  registered copyrights.

14    169.   Paradise is the owner of all rights, title, and interest in and to the Paradise Golden

15  Frog source code and LTShoe source code, including the exclusive rights to reproduce, prepare

16  derivative works, distribute copies, and publicly display pursuant to 17 U.S.C. § 106.

17    170.   Upon information and belief, Defendants willfully and repeatedly copied and

18  reproduced protected elements of the Paradise Golden Frog source code and LTShoe source code

19  in order to develop Defendants' own gaming products, including but not limited to Empire's

20  Golden Frog Baccarat electronic table games and app and Empire's SMRT Power Shoe.

21    171.   Upon information and belief, Defendants have prepared derivative works based

22  upon protected elements of the Paradise Golden Frog source code and LTShoe source code in

23  order to develop Defendants' own gaming products, including but not limited to Empire's Golden

24  Frog Baccarat electronic table games and app and Empire's SMRT Power Shoe.

25    172.   Upon information and belief, Defendants have distributed and publicly displayed

26  copies of protected elements of the Paradise Golden Frog source code and LTShoe source code to

27  the public by sale and/or lease of Defendants' infringing gaming products, including but not

- 30 -

HOLLEY DRIGGS

limited to Empire's Golden Frog Baccarat electronic table games and app and Empire's SMRT Power Shoe.

173.   Defendants knew or should have known that their actions infringed the exclusive rights of Plaintiffs.

174.   In addition to directly infringing the exclusive rights of Paradise, Defendants have contributorily and vicariously infringed the exclusive rights of Paradise by controlling, directing, intentionally encouraging, inducing, and/or materially contributing to the copying, reproducing, creation of derivative works, distribution, and public display of protected elements of the Paradise Golden Frog source code and LTShoe source code.

175.   Defendants' infringement has proximately caused and is continuing to cause injury to Plaintiffs and their property.

176.   Plaintiffs have been damaged by Defendants' infringement in an amount to be determined at trial.

177.   Defendants' infringement has caused Plaintiffs irreparable injury, and unless restrained and enjoined, Defendants will continue to commit such acts.  Plaintiffs remedies at law are not adequate to compensate them for these inflicted and threatened injuries, entitling them to remedies including injunctive relief as provided by 17 U.S.C. § 502 and an order impounding or destroying any and all infringing materials pursuant to 17 U.S.C. § 503.

**COUNT FOUR**
**Fraud**
**(Against Empire, GSL, Mr. Feng, and Mr. Allison)**

178.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–177 herein.

179.   Plaintiffs assert this claim for fraud against Empire, GSL, Mr. Feng, and Mr. Allison.

180.   Despite being president, secretary, treasurer, and sole director of LT Game, and despite assuming the role of president of Empire for the agreed purpose of having Empire act as the Paradise Group's long-term exclusive distributor, Mr. Feng went into business for himself and

used Empire and his other several companies in furtherance of a fraudulent scheme to compete against Plaintiffs, usurp Plaintiffs' business opportunities, siphon away LT Game's management, and generally seek to eliminate competition from Plaintiffs in the market so that Mr. Feng's separate business endeavors could supplant those of Plaintiffs.

181.   Mr. Feng deliberately and maliciously engaged in fraudulent concealment by failing to inform Paradise that he was engaged in the foregoing scheme.  In fact, Mr. Feng maintained the facade that he was acting in Plaintiffs' interests while serving as president, secretary, treasurer, and sole director of LT Game.  Subsequently, as president of Empire, Mr. Feng still maintained the facade that he was operating Empire for Plaintiffs' benefit as an intended long-term exclusive distributor, deliberately failing to inform Plaintiffs of his other activities and ulterior motives.  At all times, Mr. Feng's conduct and communications were intended to affirm that he was working for the benefit of Plaintiffs when in fact Mr. Feng was engaging in deliberate self-dealing adverse to Plaintiffs.  Mr. Feng's concealment occurred in all of his numerous communications with Dr. Chun and others in Paradise management.

182.   Mr. Feng had an obligation to disclose his activities because he was in a position of unique informational advantage and in a position of special fiduciary trust as LT Game's president, secretary, treasurer, and sole director and because of his close family ties in being Dr. Chun's brother-in-law.  During the relevant time period herein—and even after he had resigned from LT Game—Mr. Feng continued to profess his loyalty to Dr. Chun, Paradise, and LT Game, claiming to be acting for their benefit.  Indeed, Mr. Feng held himself out as an agent of Plaintiffs.

183.   Mr. Feng also purposefully engaged in numerous express misrepresentations. These include but are not limited to his January 21, 2022 misrepresentation to Dr. Chun regarding the Commerce Casino card shoe deal, and more broadly, all of the many instances in which Mr. Feng expressly stated to Dr. Chun and others in Paradise management that he was working for the benefit of Plaintiffs.

184.   Mr. Feng engaged in his deliberate and willful misrepresentations and concealment to entice Plaintiffs (through Dr. Chun and other Paradise managers controlling LT Game) to

continue to pay, including by interstate and/or foreign wire, large sums of money to support his improper operations at LT Game and Empire.  Paradise (and, at its direction, LT Game) were spending a substantial amount of money that Mr. Feng was using to, among other things: (1) secure gaming licenses for Empire that Mr. Feng covertly intended to ultimately use for his own business purposes; (2) pay salaries of those employed at LT Game and Empire who Mr. Feng had recruited to actively help him implement his improper scheme; (3) pay for office space, equipment, and business supplies, all for the financial benefit of Mr. Feng's improper plan; (4) pay for legal services in furtherance of Mr. Feng's improper plan; and (5) continue supporting Mr. Feng financially so that he was able to have the financial freedom to pursue his improper plan.  Mr. Feng fraudulently caused Plaintiffs to unwittingly pay for their own usurpation in the market.

185.  Mr. Feng also engaged in his deliberate and willful misrepresentations and concealment to entice Plaintiffs to continue to lend their valuable reputation to his business affairs. It was Mr. Feng's association with Paradise that opened doors for him to make business connections, which were important to his plan to ultimately usurp Plaintiffs in the market.

186.  Plaintiffs (including Dr. Chun and other Paradise managers controlling LT Game) reasonably relied on Mr. Feng's fraud because of his role as a fiduciary of LT Game, his long-time position as a consultant for the Paradise Group, and the fact that he is Dr. Chun's brother-in-law. They also relied upon Mr. Feng's continual affirmations of loyalty to the family and the family business (i.e., the Paradise Group).

187.  Plaintiffs would never have agreed to supply the support and resources that they did had they known of Mr. Feng's plans to create his own competing business and usurp Plaintiffs in the market.

188.  Acting as Empire's President, Mr. Feng directed Empire to participate in his fraudulent scheme.  Empire engaged in fraudulent concealment by not revealing its involvement in Mr. Feng's fraudulent scheme to Plaintiffs.  Empire did this so that it could continue to receive support and funding from Plaintiffs.  Empire owed a duty of disclosure to Plaintiffs in view of the close relationship between the companies, Plaintiffs' role as Empire's benefactors, and Empire's

1   superior knowledge of the circumstances.

2       189.   Mr. Allison actively and knowingly participated in Mr. Feng's fraudulent scheme.

3   Like Mr. Feng, Mr. Allison knowingly engaged in fraudulent concealment in failing to disclose

4   that, while still working at LT Game, he was also actively assisting Mr. Feng to build up a

5   competitive business enterprise with the intent that it usurp Plaintiffs in the market.  Mr. Allison

6   had become a fiduciary of Plaintiffs because of his role with LT Game and his representations to

7   Paradise management that he was acting for Plaintiffs' benefit.  Because of the close trusted

8   relationship between the parties and Mr. Allison's superior knowledge of the circumstances, he

9   owed a duty of disclosure.

10       190.   Mr. Allison continued his fraudulent conduct after Mr. Feng resigned from LT

11   Game by, for example, inducing Plaintiffs to approve of the deal with Solution Gaming while

12   concealing the fact that Solution Gaming was controlled by Mr. Feng and was part of Mr. Feng's

13   scheme to usurp Plaintiffs in the market.

14       191.   On information and belief, GSL is an entity controlled by Mr. Allison.  GSL is

15   liable for the same misconduct as Mr. Allison.

16       192.   Plaintiffs reasonably relied on Mr. Allison and GSL's fraud because of Mr.

17   Allison's role as a fiduciary and agent of LT Game, his contract with LT Game, and his close ties

18   to Mr. Feng, who was otherwise trusted as Dr. Chun's brother-in-law and long-time consultant for

19   the Paradise Group.  Mr. Allison was aware of Plaintiffs' trust in Mr. Feng and took advantage of

20   that trust in associating himself with Mr. Feng.

21       193.   Plaintiffs suffered substantial monetary losses as a result of the fraud alleged herein.

22   These losses include: (1) all monies paid into LT Game and Empire that were used without

23   Plaintiffs' knowledge to further Mr. Feng's fraudulent scheme; (2) monies that Plaintiffs

24   knowingly paid to support Empire based upon the misrepresentation that Empire was to be the

25   Paradise Group's long-term exclusive distributor, including Empire employee salaries, Empire

26   office expenses, and Empire gaming license procurement expenses and legal fees; (3) the loss of

27   the Smart Card Shoes at Commerce Casino, as well as the lucrative Commerce Casino leasing

- 34 -

contract; (4) losses on the sale to Solution Gaming; (5) lost business opportunities usurped by Mr. Feng; (6) loss of reputation; and (7) other losses to be shown by the evidence adduced in this case.

194.   Plaintiffs seek compensation for their monetary losses.

195.   Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

196.   As a direct and proximate result of the fraud alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**COUNT FIVE**
**Constructive Fraud**
**(Against Empire, GSL, Mr. Feng, and Mr. Allison)**

197.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–196 herein.

198.   Plaintiffs assert this claim for constructive fraud against Empire, GSL, Mr. Feng, and Mr. Allison.

199.   The same facts alleged under Plaintiffs' claim for fraud also support a cause of action for constructive fraud against Mr. Feng, Empire, Mr. Allison, and GSL.

200.   Because of the special position of fiduciary trust and obligation that Mr. Feng, Empire, Mr. Allison, and GSL occupied with respect to Plaintiffs, they can be found liable under the constructive fraud doctrine.

201.   Plaintiffs seek compensation for their monetary losses, which are the same as those alleged under the fraud claim.

202.   Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

203.   As a direct and proximate result of the fraud alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

/ / /

**COUNT SIX**
**Conspiracy**
**(Against Empire, GSL, Mr. Feng, and Mr. Allison)**

204.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–203 herein.

205.    Plaintiffs assert this claim for conspiracy against Empire, GSL, Mr. Feng, and Mr. Allison.

206.    The same facts that support Plaintiffs' claims for fraud against Mr. Feng, Empire, Mr. Allison, and GSL also support a claim for civil conspiracy against them because they all worked in knowing concert to engage in the fraudulent scheme to covertly build up a competing business through Empire and Mr. Feng's other businesses to usurp Plaintiffs in the market at a time when they owed Plaintiffs a duty of disclosure and honesty.  Mr. Feng, Empire, Mr. Allison, and GSL cooperated to engage in fraudulent concealment and misrepresentations that caused Plaintiffs to unwittingly subsidize their own usurpation in the market.

207.    Plaintiffs suffered substantial monetary losses as a result of the civil conspiracy alleged herein.  These losses include: (1) all monies paid into LT Game and Empire that were used without Plaintiffs' knowledge to further Mr. Feng's fraudulent scheme; (2) monies that Plaintiffs knowingly paid to support Empire based upon the misrepresentation that Empire was to be the Paradise Group's long-term exclusive distributor, including Empire employee salaries, Empire office expenses, and Empire gaming license procurement expenses and legal fees; (3) the loss of the Smart Card Shoes at Commerce Casino, as well as the lucrative Commerce Casino leasing contract; (4) losses on the sale to Solution Gaming; (5) lost business opportunities usurped by Mr. Feng; (6) loss of reputation; and (7) other losses to be shown by the evidence adduced in this case.

208.    Plaintiffs seek compensation for their monetary losses.

209.    Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

/ / /

/ / /

210.   As a direct and proximate result of the misconduct alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**COUNT SEVEN**
**Conversion**
**(Against Empire and Mr. Feng)**

211.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–210 herein.

212.   Plaintiffs assert this claim for conversion against Empire and Mr. Feng.

213.   The same facts that support Plaintiffs' claims for fraud against Mr. Feng and Empire also support a claim for conversion. In particular, Mr. Feng and Empire wrongfully induced Plaintiffs to transfer, including by interstate and/or foreign wire, large sums of money to finance the fraudulent activities of Mr. Feng and Empire, which Plaintiffs would never have provided if they had known of the misconduct.  Mr. Feng and Empire also unlawfully retained dominion over the Smart Card Shoes that should have been returned to LT Game, claiming them instead for Empire and converting the cash flow from their lease to Commerce Casino.

214.   Plaintiffs seek compensation for their monetary losses.

215.   Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

216.   As a direct and proximate result of the misconduct alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**COUNT EIGHT**
**Racketeer Influenced and Corrupt Organizations (RICO)**
**18 U.S.C. § 1961, *et seq.***
**(Against GSL, Mr. Feng, and Mr. Allison)**

217.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–216 herein.

/ / /

- 37 -

218.   Plaintiffs assert this claim for RICO violations against GSL, Mr. Feng, and Mr. Allison (collectively, the "RICO Defendants"). These individuals and entities satisfy the "person" requirement for purposes of the RICO Act.

219.   The "enterprise" is Empire, through which all the RICO Defendants conceived of and executed an unlawful artifice or scheme to defraud Plaintiffs to their financial detriment. Empire is engaged in and its activities affect interstate and/or foreign commerce.

220.   Beginning at least as early as 2018 and continuing to the present, the RICO Defendants executed a scheme to misappropriate Plaintiffs' Trade Secrets, Confidential Business Information, financial resources, and other support for the benefit of Empire and for their individual benefit. The scheme involved a continuous pattern of misrepresentations, half-truths, and material omissions, including misrepresentations, half-truths, and material omissions made by means of interstate and/or foreign wire, intended for the common purpose of defrauding Plaintiffs.

221.   The RICO Defendants conducted or participated in the conduct of the enterprise's affairs and were employed by or affiliated with the enterprise. During the relevant time period, the RICO Defendants committed multiple predicate acts, i.e., crimes, listed in 18 U.S.C. § 1961(1), including but not limited to wire fraud under 18 U.S.C. § 1343, in furtherance of their scheme and in a manner that constitutes a pattern of racketeering in violation of the RICO Act.

222.   The RICO Defendants knowingly and intentionally used interstate and international wires to make, or caused to be made, misrepresentations, half-truths, and/or material omissions alleged herein with the intent to deceive and defraud Plaintiffs and obtain money and property. These included wire and telephonic communications with parties in various U.S. jurisdictions outside the State of Nevada, as well as wire and telephonic communications internationally, including with persons and entities in China. Likewise, the RICO Defendants knowingly and intentionally used interstate and international wires to make, or cause to be made, statements in furtherance of or incident an essential component to the scheme to defraud. The RICO Defendants also employed their fraudulent interstate and international wire communications to induce interstate and international wire transfers of money, including from Paradise.

- 38 -

223.   Plaintiffs have suffered injury by reason of the RICO Defendants' repeated and systemic misrepresentations, half-truths, and/or material omissions, including multiple instances of wire fraud.  As a result of the RICO Defendants' fraud, Plaintiffs have wired money and payments to and for the benefit of Empire and the RICO Defendants.

224.   Plaintiffs have been damaged by the RICO Defendants' violations of 18 U.S.C §1962 in an amount to be determined at trial, including treble damages, attorneys' fees, and costs.

**COUNT NINE**
**Unjust Enrichment**
**(Against Empire and Mr. Feng)**

225.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–224 herein.

226.   Plaintiffs assert this claim for unjust enrichment against Empire and Mr. Feng.

227.   Plaintiffs paid large sums of money to unknowingly support Mr. Feng's unlawful personal business agenda to build up a competing business operation to supplant Plaintiffs in the market.  Paradise (and, at its direction, LT Game) were spending a substantial amount of money that Mr. Feng was using to, among other things: (1) secure gaming licenses for Empire that Mr. Feng covertly intended to ultimately use for his own business purposes; (2) pay salaries of those employed at LT Game and Empire who Mr. Feng had recruited to actively help him implement his improper scheme; (3) pay for office space, equipment, and business supplies, all for the financial benefit of Mr. Feng's improper plan; (4) pay for legal services in furtherance of Mr. Feng's improper plan; and (5) continue supporting Mr. Feng financially so that he was able to have the financial freedom to pursue his improper plan.  Mr. Feng fraudulently caused Plaintiffs to unwittingly pay for their own usurpation in the market.

228.   Plaintiffs' unknowing financial support for Mr. Feng and Empire's improper dealings constitute unjust enrichment of Mr. Feng and Empire that they should not equitably be allowed to keep.

229.   Plaintiffs seek recovery of the money that was used by Mr. Feng and Empire to engage in Mr. Feng's fraudulent plans.

- 39 -

230.   Plaintiffs seek imposition of a constructive trust to recover all ill-gotten gains of Mr. Feng and Empire.

**COUNT TEN**
**Breach of Fiduciary Duty**
**(Against Mr. Feng, Mr. Allison, and Mr. Kiely)**

231.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–230 herein.

232.   Plaintiffs assert this claim for breach of fiduciary duties against the Employee Defendants.

233.   The Employee Defendants were corporate officers of LT Game and in that role owed a fiduciary duty to Plaintiffs.  This included a duty to advance the interests of Plaintiffs, to not engage in self-dealing, to not usurp corporate opportunities, to avoid waste, and to not engage in separate business plans adverse to Plaintiffs.

234.   Mr. Feng was also a fiduciary of Plaintiffs because of his unique position of special confidence with Dr. Chun and the other managers of Paradise who controlled LT Game, having repeatedly reaffirmed for years that he was acting in the best interests of the family and the family business (i.e., the Paradise Group).  Indeed, Mr. Feng held himself out to be an agent of Plaintiffs.

235.   Mr. Allison likewise aligned himself with Mr. Feng and in his communications with Plaintiffs presented himself as acting in the best interests of Plaintiffs.  Mr. Allison was aware of the special trust that Plaintiffs had in Mr. Feng and associated himself with that knowing that Plaintiffs would rely upon it.

236.   Mr. Kiely similarly associated himself with Mr. Feng and in communications with Plaintiffs presented himself as acting in the best interests of Plaintiffs.

237.   The Employee Defendants breached their fiduciary duties by actively and knowingly engaging in a covert scheme to build up a business through Empire and Mr. Feng's other companies to compete with and usurp Plaintiffs in the market, taking away corporate opportunities while siphoning Plaintiffs' money and the labor of LT Game employees in furtherance of the scheme.  The Employee Defendants owed Plaintiffs duties of loyalty and

disclosure that they breached by maintaining their covert plan.

238.    The Employee Defendants continued to be fiduciaries after Mr. Feng's resignation from LT Game.  Mr. Feng continued to profess loyalty to Plaintiffs in his communications with Dr. Chun and others in Paradise management in charge of LT Game and failed to disclose his activities.  Mr. Allison continued to work for LT Game through GSL and join in Mr. Feng's fraud and concealment.  Mr. Kiely continued to work as the chief technology officer of LT Game well into 2023 while also participating in Mr. Feng's improper plans.

239.    Plaintiffs suffered substantial monetary losses as a result of the breach of fiduciary duties alleged herein.  These losses include: (1) all monies paid into LT Game and Empire that were used without Plaintiffs' knowledge to further Mr. Feng's fraudulent scheme; (2) monies that Plaintiffs knowingly paid to support Empire based upon the misrepresentation that Empire was to be the Paradise Group's long-term exclusive distributor, including Empire employee salaries, Empire office expenses, and Empire gaming license procurement expenses and legal fees; (3) the loss of the Smart Card Shoes at Commerce Casino, as well as the lucrative Commerce Casino leasing contract; (4) losses on the sale to Solution Gaming; (5) lost business opportunities usurped by Mr. Feng; (6) loss of reputation; and (7) other losses to be shown by the evidence adduced in this case.

240.    Plaintiffs seek compensation for their monetary losses.

241.    Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

242.    As a direct and proximate result of the breaches alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

### COUNT ELEVEN
### Aiding and Abetting
### (Against Mr. Feng, Mr. Allison, and Mr. Kiely)

243.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–242 herein.

244.   Plaintiffs assert this claim for aiding and abetting breaches of fiduciary duties against the Employee Defendants.

245.   As set forth in Plaintiffs' cause of action for breach of fiduciary duties, each of Mr. Feng, Mr. Allison, and Mr. Kiely breached their fiduciary duties to Plaintiffs.

246.   Each of Mr. Feng, Mr. Allison, and Mr. Kiely also knowingly and actively aided and abetted each other to breach the other's fiduciary duties, acting in concert.

247.   Plaintiffs suffered substantial monetary losses as a result of the breach of fiduciary duties alleged herein, and Mr. Feng, Mr. Allison, and Mr. Kiely are responsible for losses that they aided and abetted.  These losses include: (1) all monies paid into LT Game and Empire that were used without Plaintiffs' knowledge to further Mr. Feng's fraudulent scheme; (2) monies that Plaintiffs knowingly paid to support Empire based upon the misrepresentation that Empire was to be the Paradise Group's long-term exclusive distributor, including Empire employee salaries, Empire office expenses, and Empire gaming license procurement expenses and legal fees; (3) the loss of the Smart Card Shoes at Commerce Casino, as well as the lucrative Commerce Casino leasing contract; (4) losses on the sale to Solution Gaming; (5) lost business opportunities usurped by Mr. Feng; (6) loss of reputation; and (7) other losses to be shown by the evidence adduced in this case.

248.   Plaintiffs seek compensation for their monetary losses.

249.   Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

250.   As a direct and proximate result of the breaches alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**COUNT TWELVE**
**Breach of Contract**
**(Against GSL, Mr. Allison, and Mr. Kiely)**

251.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–250 herein.

252.   Plaintiffs assert this claim for breach of contract against GSL, Mr. Allison, and Mr. Kiely.

253.   Each of Mr. Kiely, Mr. Allison, and GSL had entered into contracts with LT Game under which they were bound to not compete with LT Game and to maintain confidentiality of all non-public LT Game business information.   These included Mr. Kiely's August 30, 2019 Employment Contract with LT Game, Mr. Allison's January 1, 2020 Employment Contract with LT Game, and GSL's June 30, 2022 Agreement with LT Game.

254.   While those contracts were in force, Mr. Kiely, Mr. Allison, and GSL each performed work for Mr. Feng and Empire in furtherance of Mr. Feng's fraudulent scheme to build up a competing business against LT Game and usurp LT Game in the market.   Mr. Kiely, Mr. Allison, and GSL used their special knowledge of Plaintiffs' Trade Secrets and Confidential Business Information to support Mr. Feng and Empire's scheme.   Mr. Kiely, Mr. Allison, and GSL thereby breached their contracts with LT Game.

255.   Mr. Kiely further breached his agreements with LT Game by assigning rights in intellectual property developed at LT Game to Empire.

256.   Plaintiffs suffered substantial monetary losses as a result of the breaches alleged herein, as the breaches contributed in part directly and foreseeably to other monetary losses alleged in Plaintiffs' other causes of action herein.

257.   Plaintiffs seek compensation for their monetary losses.

258.   Plaintiffs seek an injunction precluding Mr. Kiely, Mr. Allison, and GSL from using or disclosing Plaintiffs' Trade Secrets and Confidential Business Information to anyone outside of Paradise and LT Game.

259.   Paradise and LT Game seek an order declaring that they have an ownership interest in all intellectual property rights improperly assigned to Empire and/or in Defendants' possession and requiring transfer of such interests.

/ / /

/ / /

- 43 -

260.    As a direct and proximate result of the breaches alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**COUNT THIRTEEN**
**Tortious Interference with Contract**
**(Against Empire and Mr. Feng)**

261.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–260 herein.

262.    Plaintiffs assert this claim for tortious interference with contract against Empire and Mr. Feng.

263.    As alleged in Plaintiffs' claim for breach of contract, Mr. Kiely, Mr. Allison, and GSL breached their contracts with LT Game.

264.    Mr. Feng (and through him, Empire) was well aware of those contracts, yet knowingly and tortiously interfered with them by compelling Mr. Kiely and Mr. Allison to covertly support Mr. Feng's scheme to supplant LT Game and siphon its money and resources.  Mr. Feng and Empire did this at a time when they knew that Mr. Kiely, Mr. Allison, and GSL's contracts with LT Game were in effect.

265.    Plaintiffs suffered substantial monetary losses as a result of the breaches alleged herein, as the breaches contributed in part directly and foreseeably to other monetary losses alleged in Plaintiffs' other causes of action herein.

266.    Plaintiffs seek compensation for their monetary losses.

267.    Plaintiffs seek punitive damages for Mr. Feng and Empire's knowing and deliberate misconduct.

268.    As a direct and proximate cause of the breaches alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

/ / /

/ / /

- 44 -

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that this Court enter judgment against Defendants and in favor of Plaintiffs:

A.    For an award of compensatory, actual, and special damages;

B.    For an award of exemplary and punitive damages;

C.    For an accounting of all gains, profits, and advantages derived by Defendants as a result of their misappropriation, improper use, and infringement of Plaintiffs' Trade Secrets, Confidential Business Information, copyrighted works, financial resources, and other support;

D.    For an injunction enjoining Defendants and their affiliates from: (1) accessing, disseminating, or otherwise using Plaintiffs' Trade Secrets and Confidential Business Information, and requiring that any such information in their possession be returned to Plaintiffs; (2) using Plaintiffs' Trade Secrets and Confidential Business Information to interfere with Plaintiffs' business; (3) using Plaintiffs' Trade Secrets and Confidential Business Information for the benefit of Defendants or any third parties; (4) using Plaintiffs' Trade Secrets and Confidential Business Information to solicit and/or recruit Plaintiffs' employees; and (5) manufacturing, reproducing, distributing, adapting, displaying, advertising, promoting, or offering for sale and/or selling, or performing any materials that are substantially similar to Plaintiffs' copyrighted works, and ordering Defendants to deliver to the Court for destruction or other reasonable disposition all such materials and means for producing same in Defendants' possession or control;

E.    For an award of restitution;

F.    For an award of prejudgment and post-judgment interest until the judgment is paid in full;

G.    For an award of attorneys' fees and costs as allowed by law; and

H.    For such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

- 45 -

### DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury for all issues triable by jury.

Dated:  March 1, 2023.

                                **HOLLEY DRIGGS**

                                */s/ Margarita Elias*
                                OLIVER J. PANCHERI, ESQ.
                                Nevada Bar No. 7476
                                MARGARITA ELIAS, ESQ.
                                Nevada Bar No. 14867
                                300 South Fourth Street, Suite 1600
                                Las Vegas, Nevada 89101
                                Tel.: (702) 791-0308
                                Fax: (702) 791-1912
                                Email: opancheri@nevadafirm.com
                                          melias@nevadafirm.com

                                JEAN-PAUL CIARDULLO, ESQ.
                                *(pro hac vice admission forthcoming)*
                                California bar No. 284170
                                **FOLEY & LARDNER LLP**
                                555 Flower Street, Suite 3300
                                Los Angeles, California 90071
                                Tel.: (213) 972-4500
                                Fax: (213) 486-0065
                                Email: jciardullo@foley.com

## **INDEX OF EXHIBITS**

| **Exhibit** | **Description** |
|---|---|
| A. | August 30, 2019 Employment Contract |
| B. | Certificate of Registration bears the number TX 9-358-765 |
| C. | Certificate of Registration bears the number TXu 2-411-586 |
| D. | January 1, 2020 Employment Contract |
| E. | June 30, 2022 Agreement |