# EXHIBIT 1

*Plaintiffs' Proposed First Amended Complaint*

OLIVER J. PANCHERI, ESQ. (NBN 7476)
JESSICA M. LUJAN, ESQ. (NBN 14913)
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 408-3400 / Fax: (702) 938-8648
Email: opancheri@spencerfane.com
          jlujan@spencerfane.com

STEWART RAY NELSON, ESQ. (*pro hac vice*)
Utah Bar No. 17286
HANNAH L. ANDREWS, ESQ. (*pro hac vice*)
Utah Bar No. 18157
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, UT 84111
Tel.: (801) 401-8900
Email: srnelson@foley.com
          handrews@foley.com

JEAN-PAUL CIARDULLO, ESQ.
(*pro hac vice*)
California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

*Attorneys for Plaintiffs/Counterdefendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

PARADISE ENTERTAINMENT
LIMITED, a Bermuda corporation;
LT GAME, INC., a Nevada corporation;
and LT GAME LIMITED, a British
Virgin Islands corporation,

           Plaintiffs,

    v.

EMPIRE TECHNOLOGICAL GROUP
LIMITED, a Nevada corporation;
GAMING SPECIALIZED LOGISTICS
LLC, a Nevada limited liability company;
LINYI FENG, an individual;
ROY KELCEY ALLISON, an individual;
DARYN KIELY, an individual; and YI
ZHAO, an individual,

           Defendants.

Case No. 2:24-cv-00428-JCM-BNW

**<u>FIRST AMENDED COMPLAINT</u>**

**JURY TRIAL DEMANDED**

1
2
3
4
5
6
7
8
9
10
11

EMPIRE TECHNOLOGICAL GROUP
LIMITED, a Nevada corporation;
GAMING SPECIALIZED LOGISTICS
LLC, a Nevada limited liability company;
LINYI FENG, an individual;
ROY KELCEY ALLISON, an individual;
and DARYN KIELY,

          Counterclaimants,

   v.

PARADISE ENTERTAINMENT
LIMITED, a Bermuda corporation; and
LT GAME, INC., a Nevada corporation,

          Counterdefendants.

12

## FIRST AMENDED COMPLAINT

13

Plaintiffs Paradise Entertainment Limited ("**Paradise**"), LT Game, Inc. (formerly called

14 LT Game (Canada) Limited) ("**LT Game**"), and LT Game Limited ("**LTG Limited**")

15 (collectively, "**Plaintiffs**") file this Complaint against Defendants Empire Technological Group

16 Limited ("**Empire**"); Gaming Specialized Logistics LLC ("**GSL**"); Mr. Linyi "Frank" Feng ("**Mr.**

17 **Feng**"), Mr. Roy Kelcey Allison ("**Mr. Allison**"), Mr. Daryn Kiely ("**Mr. Kiely**"), and Ms. Yi

18 "Betty" Zhao ("**Ms. Zhao**") (collectively, "**Defendants**") and as claim for relief state as follows:

19

## NATURE OF THE ACTION

20

1.     This is an action for state and federal claims of misappropriation of trade secrets,

21 copyright infringement, fraud, constructive fraud, conspiracy, conversion, racketeering, unjust

22 enrichment, breach of fiduciary duty, aiding and abetting, breach of contract, and tortious

23 interference with contract.

24

## PARTIES

25

2.     Paradise is a Bermuda corporation with its principal place of business at Unit C,

26 19th Floor, Entertainment Building, 30 Queen's Road Central, Hong Kong. Paradise is a public

27 company with its issued shares traded on the Main Board of The Stock Exchange of Hong Kong

Limited (Stock Code: 1180). Paradise is the parent company of LT Game and LTG Limited.

3.      LT Game is a Nevada corporation with its principal place of business at 6445 W. Sunset Road, Suite 134, Las Vegas, Nevada 89118. LT Game is an indirect wholly owned subsidiary of Paradise. On April 16 2024, the company changed its name from LT Game (Canada) Limited to LT Game, Inc.

4.      LTG Limited is a British Virgin Islands corporation with its principal place of business at Em Macau, Avenida de Venceslau de Morais NºS 175-179, Industrial Kin Ip 10º Andar B, Macau. LTG Limited is a subsidiary of Paradise.

5.      Empire is a Nevada corporation with its principal place of business at 1106 Palms Airport Drive, Las Vegas, Nevada 89119.

6.      GSL is a Nevada limited liability company with its principal place of business at 225 Cromarty Street, Henderson, Nevada 89012.

7.      Mr. Feng is an individual residing in Clark County, Nevada.

8.      Mr. Allison is an individual residing in Clark County, Nevada.

9.      Mr. Kiely is an individual residing in Clark County, Nevada.

10.     Ms. Zhao is an individual residing in Macau.

## **JURISDICTION**

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because multiple claims at issue are governed by the laws of the United States, specifically the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*, the Copyright Act, 17 U.S.C. §§ 101, *et seq.*, and the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.* Plaintiffs invoke the supplemental jurisdiction of this Court to hear and decide claims arising under state law pursuant to 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Defendants because Empire is a Nevada Corporation and GSL is a Nevada limited liability company, both with principal places of business in this district, and Mr. Feng, Mr. Allison, and Mr. Kiely reside in Nevada. The Court has jurisdiction over Ms. Zhao because Ms. Zhao has contracted with Empire, a Nevada Corporation,

to work as an employee of Empire, has traveled to Nevada to do business on behalf of Empire, and receives direction from and works closely with individuals located in and operating out of Nevada, including Mr. Feng, Mr. Allison, and Mr. Kiely. Thus, Ms. Zhao has purposefully directed her activities towards Nevada and has availed herself of conducting business in Nevada, and Plaintiffs' claims arise from and relate to these activities. Additionally, Ms. Zhao knowingly caused harm to LT Game, a Nevada corporation, in this District and should expect to be called to court here.

13.     Venue in this judicial district is proper under 28 U.S.C. §§ 1391 and 1400 because Empire, GSL, Mr. Feng, Mr. Allison, and Mr. Kiely reside in this district and because a substantial part of the events giving rise to the dispute occurred and are occurring in this district, a substantial part of the property that is the subject of the action was and is situated in this district, and the Court has personal jurisdiction over each of the defendants as alleged throughout this Complaint. Pursuant to 28 U.S.C. § 1391(c)(3), Ms. Zhao, who is not a resident of the United States, may be sued in any judicial district.

## **FACTUAL BACKGROUND**

### **Paradise, LT Game, Empire and LTG Limited**

14.     Paradise is a well-known global supplier of electronic gaming equipment and systems. It was incorporated in 1996 and listed on the Main Board of The Stock Exchange of Hong Kong Limited in 1997.

15.     Paradise is an innovator in gaming technology and possesses significant intellectual property assets. Together, Paradise and its subsidiaries (collectively, the "**Paradise Group**") develop, sell, and lease their high-tech electronic gaming products worldwide. The Paradise Group dominates the electronic table game market in Macau and, through LT Game, LTG Limited, and other group companies, has been investing in the development of slot machines, electronic table game machines, and other high-tech gaming products.

16.     Paradise operates its worldwide electronic gaming equipment and systems business under the brand name "LT Game." Paradise's subsidiary companies include LTG Limited, which operates in Macau, and LifeTec (Holdings) Limited ("**LifeTec**"), which owns LT Capital Limited,

which in turn owns LT Game. LTG Limited has acted as an intermediate company under the control of Paradise to manage various LT Game affairs, including the hiring and payment of LT Game counsel. LTG Limited is an entity that would have stood to gain income from LT Game, and that, like Paradise, lost income due to LT Game's losses.

17. The electronic gaming equipment and systems business is a highly competitive industry. To gain and maintain a competitive advantage, the Paradise Group expends substantial time, effort, and resources developing, creating, and maintaining, among other things: (1) confidential and proprietary information, including but not limited to information about the Paradise group, its employees, and its customers, operational and financial information, product information, marketing and sales strategies, and institutional knowledge relating to the electronic gaming industry (collectively, "Confidential Business Information"); (2) trade secrets, including but not limited to financial, business, technical, and engineering information including software, hardware, computer programming code, and product designs and prototypes (collectively, "Trade Secrets"); and (3) relationships with customers, employees, and third-party vendors.

18. The Paradise Group's Confidential Business Information and Trade Secrets are not generally known to the public or within the electronic gaming industry and have independent economic value because the information is not readily ascertainable by independent investigation and provide the Paradise Group with a significant competitive advantage.

19. Competitors would greatly benefit from obtaining the Paradise Group's Confidential Business Information and Trade Secrets. Accordingly, the Paradise Group takes care to safeguard and protect its Confidential Business Information and Trade Secrets from disclosure or use by competitors, third parties, or the public.

20. The Paradise Group's efforts to maintain the secrecy of its Confidential Business Information and Trade Secrets include, but are not limited to, the following: (1) implementing policies and procedures that limit access to such information; (2) entering into confidentiality and non-compete agreements with Paradise Group employees; (3) limiting internal distribution of the information to only those employees who need the information to perform their specific job

functions; (4) restricting physical and technological access to the information; (5) securing the physical and electronic storage of the information; and (6) clearly and conspicuously marking the information as confidential.

21.    For example, the Paradise Group maintains password protections, trains employees to safeguard Confidential Business Information and Trade Secrets, marks confidential materials with confidentiality provisions, and operates in a culture and environment where employees understand and take seriously the need to keep all Confidential Business Information and Trade Secrets confidential.

22.    The Paradise Group is led by Dr. Jay Chun ("**Dr. Chun**"), who is the controlling shareholder, executive and managing director, and chairman of Paradise.  All of Paradise's subsidiary companies are ultimately controlled by Paradise's management team, which includes Dr. Chun and his immediate reports.  Dr. Chun is a prolific inventor and entrepreneur in the gaming industry and has decades of casino management and investment experience in global gaming markets.

23.    Dr. Chun is married to Mr. Feng's sister; Mr. Feng is Dr. Chun's brother-in-law.

24.    On information and belief, prior to 2008, Mr. Feng was unemployed.  Although Mr. Feng had no experience in the gaming industry, Dr. Chun desired to assist Mr. Feng out of his care and patronage.  In consideration of Mr. Feng being a close family member, Dr. Chun arranged for Mr. Feng to join the Paradise Group as a North American representative.

25.    As a close family member, Mr. Feng induced reliance on his special fiduciary relationship with Dr. Chun and Paradise by professing his desire to work to exclusively advance the interests of the Paradise Group.  Because of this inducement and Mr. Feng's unique position of confidence, Paradise went on to entrust Mr. Feng with leadership roles in the Paradise Group's North American operations.

26.    In February 2008, Paradise incorporated LT Game in Ontario, Canada, to explore the North American market for its electronic gaming products.  LT Game, now a Nevada corporation, is involved with the development, marketing, sale, and lease of the Paradise Group's

electronic gaming products in the North American market.

27.    Relying on Mr. Feng's special fiduciary relationship and his affirmations of loyalty, Paradise arranged for Mr. Feng to manage LT Game, which Mr. Feng did from February 19, 2008, to February 28, 2022, as its president, secretary, treasurer, and sole director.

28.    As president, secretary, treasurer, and sole director of LT Game, Mr. Feng was given access to and was permitted to use the Paradise Group's Confidential Business Information and Trade Secrets to the extent necessary to perform his duties during his employment.  This access and permission were given based upon Mr. Feng's special fiduciary relationship, his affirmations of loyalty, and his position as a senior officer of both LT Game and the Paradise Group.  Mr. Feng knew that the information he was given access to and was permitted to use constituted Confidential Business Information and Trade Secrets, knew that he had a duty to keep the information confidential and secret, and understood that using the Confidential Business Information and Trade Secrets for any unauthorized purpose would be misappropriation.

29.    In September 2012, Paradise arranged for the incorporation of Empire in the British Virgin Islands under the name LT Game International ("**LT Game International**").  Paradise installed Mr. Wang Tao Feng (an individual with no relation to either Mr. Feng or Dr. Chun) to act as the sole shareholder of the company.  The official correspondence address and the location of books and records for LT Game International was Paradise's offices in Hong Kong.

30.    Soon after its incorporation, LT Game International changed its name to LT Game International (US) Limited ("**LT Game US**"), highlighting Paradise's intention for the entity to promote its LT Game business in the U.S. gaming market.  In May 2016, the name LT Game US was changed to Empire.

31.    In 2014, Paradise subsidiary LifeTec entered into a "Consultancy Agreement" with Mr. Feng whereby Mr. Feng agreed to act as a consultant to provide general consultancy services to LifeTec and the Paradise Group with respect to casino gaming equipment sales and services.  In exchange, Mr. Feng was paid a fee of several thousand dollars a month.  The arrangement was managed by Paradise.  Under the Consultancy Agreement, Paradise caused a significant sum of

money to be paid to Mr. Feng over the course of many years.

32.    In 2015, relying on Mr. Feng's special fiduciary relationship and his affirmations of loyalty, Paradise placed Mr. Feng in charge of Empire.  Paradise arranged the transfer of Empire from Mr. Wang Tao Feng to Mr. Feng, recording a nominal payment of $1 for the transfer.

33.    The parties agreed that Mr. Feng would operate Empire, with Paradise's support and financial assistance, for the exclusive benefit of the Paradise Group.  Empire's role was to be a long-term exclusive distributor for the Paradise Group.   Through his conduct and communications with Paradise (including specifically Dr. Chun), including communications by interstate and/or foreign wire, Mr. Feng continuously reaffirmed this basic business structure at all relevant time periods, consistently seeking out Paradise's approval to engage in corporate actions for Empire, requesting financial support for Empire, and providing updates on Empire activities.

34.    Mr. Feng repeatedly referred to and addressed Dr. Chun as the leader of the overall business operations among all the companies, consistently seeking Dr. Chun's approvals and reporting to Dr. Chun as his boss (using that term).

35.    Empire was intended to be—and was operated as—the long-term exclusive distributor for the Paradise Group.  Paradise along with LT Game or other subsidiaries paid for Empire's business expenses.  In his own communications and correspondence with Paradise, including communications and correspondence by interstate and/or foreign wire, Mr. Feng consistently reaffirmed, supported, and actively pursued this arrangement among the companies. Paradise invested substantial sums of money to be paid to Empire, including by interstate and/or foreign wire, for Empire's benefit so that Empire could act as the Paradise Group's long-term exclusive distributor.

36.    In addition to financial support, Dr. Chun and Paradise at all times provided to Mr. Feng and the other defendants the business support necessary to build up Empire, including but not limited to business strategies, insights, guidance, directions, networks, connections, partners, and opportunities.  Paradise arranged for Defendants to participate in global gaming exhibitions, including but not limited to the Global Gaming Expo in Las Vegas and Asia, the ICE Show in

London, and the MGS Entertainment Show in Macau. The Paradise Group shared its human resources and intellectual assets with Defendants, including but not limited to its research and development and marketing resources.

37.    While Mr. Feng operated Empire, Mr. Feng simultaneously continued in his role as the president, secretary, treasurer, and sole director of LT Game until February 28, 2022, when he resigned.

**Mr. Feng's Scheme and the Involvement of Mr. Allison, Mr. Kiely, and Ms. Zhao**

38.    On information and belief, at least as early as 2018, Mr. Feng decided to surreptitiously transform Empire into a direct competitor of Paradise, LT Game, and LTG Limited. Mr. Feng commenced a scheme to misappropriate Plaintiffs' intellectual property assets, Trade Secrets, Confidential Business Information, and financial resources for his individual benefit.

39.    On information and belief, in 2018, Mr. Feng communicated to Mr. Allison an interest in getting into the slot machine business. At that time, Mr. Allison was self-employed as the sole owner and operator of GSL, where he provided consulting services relating to the gaming industry.

40.    Mr. Allison had been the chief executive officer of Aruze Gaming America, Inc. ("**Aruze**"), a competitor of Paradise and LT Game, from 2009 until 2016.

41.    Mr. Feng arranged for GSL to provide sales consulting services to Empire. Mr. Feng sought Paradise's approval and permission to engage GSL and jointly agreed that LT Game would contract with GSL but that the contract was for service provided to Empire. GSL proceeded to provide sales consulting services to Empire, and LT Game paid GSL's invoices.

42.    On information and belief, Mr. Feng and Mr. Allison began conspiring to leverage Plaintiffs' resources to pursue independent business opportunities while intentionally misleading Paradise into believing that the longstanding arrangement with Empire—where Empire was to act as the Paradise Group's long-term exclusive distributor—was still in place.

43.    At all material times, Paradise had no knowledge that Empire would pursue separate business with other gaming companies. As such, Paradise continued to provide Empire

with financial resources, including by interstate and/or foreign wire, and other support.  Paradise also continued to allow Mr. Feng to serve dual roles, managing both LT Game and Empire, not knowing that Mr. Feng was surreptitiously transforming Empire into a direct competitor.

44.     For many years, Empire occupied the same physical location as LT Game, such that Mr. Feng was literally performing his duties for Empire and LT Game in the same place at the same time.  This arrangement meant that Paradise and LT Game were subsidizing Empire by paying for Empire's office space and equipment.  Paradise and LT Game did this premised on the understanding that Empire was being built up to be the Paradise Group's long-term exclusive distributor.  Mr. Feng induced this understanding with his special fiduciary relationship and his affirmations of loyalty.  Empire eventually leased additional office space while still siphoning off money and resources from LT Game.

45.     At the direction and approval of Paradise, LT Game paid for the salaries of Empire's employees, including but not limited to Mr. Allison and Mr. Kiely.  Paradise and LT Game did this premised on the understanding that Empire was being built up to be the Paradise Group's long-term exclusive distributor.  Mr. Feng induced this understanding with his special fiduciary relationship and his affirmations of loyalty, and Mr. Feng actively pursued this arrangement.

46.     Paradise, along with LT Game or other subsidiaries, paid for, including by interstate and/or foreign wire, the required certifications of gaming equipment distributed by Empire by way of sale or lease.  This included payments to BMM Testlabs on behalf of Empire for the purpose of testing game equipment and systems.  Paradise and LT Game did this premised on the understanding that Empire was being built up to be the Paradise Group's long-term exclusive distributor.  Mr. Feng induced this understanding with his special fiduciary relationship and his affirmations of loyalty.

47.     Mr. Feng arranged for LT Game's employees to have Empire email accounts  and leveraged LT Game's employees to engage in work that benefited Empire.

48.     On information and belief, in February 2019, Mr. Feng and Mr. Allison,

endeavoring to establish Empire as a direct competitor of Paradise and LT Game, recruited Mr. Kiely to participate in their scheme. Mr. Kiely had been serving as the Executive Director of Engineering and the Vice President of Engineering for LT Game and the Paradise Group since joining the company in February 2016. Mr. Kiely began working concurrently for Empire.

49.     In 2019, Mr. Feng attempted to assign approximately 5% of shares in Empire to Mr. Kiely without obtaining prior approval from Paradise and Dr. Chun. Paradise communicated to Mr. Feng that Empire was not his personal property and instructed him to undo the arrangement for the purpose of not diluting the shares of Empire. To Paradise's knowledge, Mr. Feng complied with Paradise's direction.

50.     In 2019, LT Game entered into an employment agreement with Mr. Kiely to become chief technology officer for LT Game and the Paradise Group at an annual pay of $243,000. Mr. Kiely and Mr. Feng, as president of and on behalf of LT Game, signed the August 30, 2019 Employment Contract (attached as **Exhibit A**).

51.     Mr. Kiely's August 30, 2019 Employment Contract includes a broadly worded confidentiality provision (Section 6), as well as a non-competition/non-solicitation clause aimed at protecting the interests of LT Game and the Paradise Group (Section 7). The Employment Contract also calls for the return of all proprietary documents and information to LT Game upon termination (Section 5).

52.     As chief technology officer of LT Game and the Paradise Group, Mr. Kiely's duties included managing LT Game's technical teams and working closely with the Paradise Group's research and development teams on new products and features. Mr. Kiely reported directly to Mr. Feng.

53.     As chief technology officer of LT Game and the Paradise Group, Mr. Kiely was given access to and was permitted to use the Paradise Group's Confidential Business Information and Trade Secrets to the extent necessary to perform his duties during his employment. This access and permission were given based upon Mr. Kiely's agreement to preserve the confidentiality of such information as detailed in the August 30, 2019 Employment Contract and his position as an

officer of LT Game and the Paradise Group. Mr. Kiely knew that the information he was given access to and was permitted to use constituted Confidential Business Information and Trade Secrets, knew that he had a duty to keep the information confidential and secret, and understood that using the Confidential Business Information and Trade Secrets for any unauthorized purpose would be misappropriation.

54.     Mr. Kiely had access to Plaintiffs' proprietary gaming platform, including its source code, related assets, and libraries. This proprietary gaming platform is based on confidential source code that Plaintiffs began licensing from Aspect Group Limited ("**Aspect**"), a Cayman Islands corporation based in Hong Kong, in May 2017. In January 2019, Plaintiffs purchased the legal and beneficial ownership of a version of Aspect's confidential source code. Plaintiffs have since developed, modified, altered, and improved the confidential source code, resulting in Plaintiffs' proprietary gaming platform.

55.     Mr. Kiely had access to a computer program called "LTShoe" designed and developed by Paradise subsidiary LTG Limited. The LTShoe program is used in the Paradise Group's smart card shoes, which are software-controlled playing card dispensing machines that sit on top of card tables and are used by card dealers ("**Smart Card Shoes**"). As chief technology officer of LT Game and the Paradise Group and to the extent necessary to perform his duties during his employment, Mr. Kiely had access to the LTShoe source code, which comprises and contains trade secret material.

56.     The LTShoe source code was completed in 2017, and the LTShoe program was used in the Smart Card Shoes beginning in March 2018. The LTShoe source code contains a large amount of material wholly original with LTG Limited and is copyrightable subject matter.

57.     Paradise is the owner of all rights, title, and interest in and to the LTShoe source code. On February 7, 2024, LTG Limited registered the LTShoe source code with the Register of Copyrights following the rules for submitting source code containing trade secret material. The Certificate of Registration (attached as **Exhibit B**) bears the number TX 9-358-765. On February 29, 2024, LTG Limited assigned all rights, title, and interest in and to the LTShoe copyright to

Paradise.

58.     Mr. Kiely also had access to a computer program called "Paradise Golden Frog Baccarat" ("**Paradise Golden Frog**") designed and developed by LTG Limited. Paradise Golden Frog was a variation to the standard game of baccarat comprised of various types of optional wagers. As chief technology officer of LT Game and the Paradise Group and to the extent necessary to perform his duties during his employment, Mr. Kiely had access to the Paradise Golden Frog source code, which comprises and contains trade secret material.

59.     Paradise Golden Frog was never published by the Paradise Group. The current version of the Paradise Golden Frog source code was completed in 2020. The Paradise Golden Frog source code contains a large amount of material wholly original with LTG Limited and is copyrightable subject matter.

60.     Paradise is the owner of all rights, title, and interest in and to the Paradise Golden Frog source code. On February 7, 2024, LTG Limited registered the Paradise Golden Frog source code with the Register of Copyrights following the rules for submitting source code containing trade secret material. The Certificate of Registration (attached as **Exhibit C**) bears the number TXu 2-411-586. On February 29, 2024, LTG Limited assigned all rights, title, and interest in and to the Paradise Golden Frog copyright to Paradise.

61.     With respect to the creation of intellectual property, including patents, the August 30, 2019 Employment Contract required that Mr. Kiely "accept that all notes, Intellectual Property . . . made by you or that come into your possession whilst providing the Services under this agreement remain the property of LT Game, and must be surrendered by you upon termination of your employment" and defined "Intellectual Property" as "all intellectual property rights (as well as any continuations, continuations-in-part, divisionals, reissues, re-examinations, and foreign counterparts thereof), including but not limited to trademarks, trade dress . . . trade secrets, security keys and the associated software thereof . . . and any other intellectual property or proprietary rights (whether . . . patentable or unpatentable, patented or unpatented, copyrighted or uncopyrighted) recognized in any country, region or jurisdiction worldwide."

62.     At all material times, the Paradise Group, including LT Game, were the entities developing, manufacturing, and supplying innovative gaming products to Empire for distribution. Empire merely did minor customization services on the gaming products for their North American clients.  Empire did not have the necessary resources to develop and manufacture its own innovative products.

63.     In 2020, LT Game hired Mr. Allison to be its senior vice president of operations and business development at a base annual salary of $190,000.  Mr. Allison and Mr. Feng, as President of and on behalf of LT Game, signed the January 1, 2020 Employment Contract (attached as **Exhibit D**).

64.     Mr. Allison's January 1, 2020 Employment Contract includes a broadly worded confidentiality provision (Section 6), as well as a non-competition/non-solicitation clause (Section 7).  The Employment Contract also calls for the return of all proprietary documents and information to LT Game upon termination (Section 5).

65.     As senior vice president of operations and business development of LT Game, Mr. Allison's duties included assisting Mr. Feng and Mr. Kiely on new slot machine product development, production, and sales, and liaising with the management of the Paradise Group when necessary.  Mr. Allison reported directly to Mr. Feng and agreed to perform the duties as assigned by Mr. Feng, Mr. Kiely, and the Paradise Group management.

66.     As senior vice president of operations and business development of LT Game, Mr. Allison was given access to and was permitted to use the Paradise Group's Confidential Business Information and Trade Secrets to the extent necessary to perform his duties during his employment. This access and permission were given based upon Mr. Allison's agreement to preserve the confidentiality of such information as detailed in the January 1, 2020 Employment Contract and his position as a senior officer of LT Game and the Paradise Group.  Mr. Allison knew that the information he was given access to and was permitted to use constituted Confidential Business Information and Trade Secrets, knew that he had a duty to keep the information confidential and secret, and understood that using the Confidential Business Information and Trade Secrets for any

1    unauthorized purpose would be misappropriation.

2    67.    In 2022, LT Game entered into an agreement with GSL under similar terms as Mr.

3    Allison's January 1, 2020 Employment Contract, including provisions relating to confidentiality,

4    intellectual property, and non-competition/non-solicitation.  Per the terms of the agreement, Mr.

5    Allison retained ultimate responsibility for and control of the services performed by GSL for LT

6    Game and the Paradise Group.  Mr. Allison, on behalf of GSL, signed the June 30, 2022 Agreement

7    (attached as **Exhibit E**).  Mr. Feng was aware of this Agreement and its terms, including that GSL

8    was an agent of LT Game and the Paradise Group.

9    68.    As an agent of LT Game and the Paradise Group, GSL was given access to and was

10   permitted to use the Paradise Group's Confidential Business Information and Trade Secrets to the

11   extent necessary to provide the agreed-upon services.  This access and permission were given

12   based upon GSL's agreement to preserve the confidentiality of such information as detailed in the

13   June 30, 2022 Agreement and the principal-agent relationship between LT Game, Paradise Group

14   and GSL.

15   69. On information and belief, at least as early as November 2022, Mr. Feng, Mr. Allison,

16   and Mr. Kiely, endeavoring to establish Empire as a direct competitor of the Paradise Group,

17   recruited Ms. Zhao to participate in their scheme.  Ms. Zhao had been serving as the Chief

18   Operating Officer of the Paradise Group's electronic gaming business since 2012.  Prior to that,

19   she served from 2007 to 2012 as a Paradise Group marketing manager.

20   70.    Ms. Zhao and Mr. Feng are cousins.  Likewise, Ms. Zhao and Dr. Chun's wife (Mr.

21   Feng's sister) are cousins.

22   71.    Like Mr. Feng, Ms. Zhao induced reliance on her special fiduciary relationship as

23   a close family member of Dr. Chun and professed her desire to work to exclusively advance the

24   interests of the Paradise Group.

25   72.    As chief operating officer of the Paradise Group's electronic gaming business, Ms.

26   Zhao's duties included managing all Paradise Group operations under its "LT Game" brand,

27   including Paradise Group marketing teams, sales teams, product development teams, technical

1  teams, and IT support teams.  Ms. Zhao would receive supervision and directives from Paradise's
2  board of directors and senior management, execute assigned tasks, and report to management on
3  the performance of these duties, particularly regarding matters that could impact the interests of
4  the Paradise Group.  Ms. Zhao reported directly to Dr. Chun.

5  73.    As chief operating officer of LTG Limited and the Paradise Group, Ms. Zhao was given
6  access to and was permitted to use the Paradise Group's Confidential Business Information and
7  Trade Secrets to the extent necessary to perform her duties during his employment.  This access
8  and permission were given based upon Ms. Zhao's special fiduciary relationship, her affirmations
9  of loyalty, and her position as an officer of the Paradise Group.  Ms. Zhao knew that the
10  information she was given access to and was permitted to use constituted Confidential Business
11  Information and Trade Secrets, knew that she had a duty to keep the information confidential and
12  secret, and understood that using the Confidential Business Information and Trade Secrets for any
13  unauthorized purpose would be misappropriation.

**Paradise and LT Game Pay for Empire's Gaming Licenses**

14
15  74.    In or around 2018, Paradise, LT Game and/or LTG Limited, and Empire engaged
16  legal counsel to assist in, among other things, the handling of Empire's application for a Nevada
17  gaming license and other gaming licenses and the handling of employment law matters for LT
18  Game.  Plaintiffs delegated Mr. Feng to be the primary point of contact with legal counsel.
19  However, Plaintiffs paid the legal bills for these matters, including bills for Empire's pursuit of
20  gaming licenses in Nevada and elsewhere. Mr. Feng fully supported and encouraged this
21  arrangement.

22  75.    On information and belief, Mr. Feng, at the expense of Paradise, LTG Limited
23  and/or LT Game, directed legal counsel to do work that Mr. Feng intended to be for his own benefit
24  to the detriment of Plaintiffs.  In his several updates and reports during the relevant time period,
25  including updates and reports by means of interstate and/or foreign wire, Mr. Feng fraudulently
26  induced Paradise (including Dr. Chun), LTG Limited, and/or LT Game to believe and understand
27  that these actions were for the benefit of Plaintiffs.

76.     Paradise, along with LT Game or other subsidiaries, paid for, including by interstate and/or foreign wire, Empire's expenses and fees (including legal fees) in obtaining gaming licenses necessary to distribute products in different U.S. states and territories.  Mr. Feng actively pursued this arrangement, and induced Plaintiffs to spend the money based on Mr. Feng's assurances of his fiduciary role and the intention that Empire would be the Paradise Group's long-term exclusive distributor.  Mr. Feng also regularly reported to Paradise on the status of the licenses, writing from his LT Game email account and consistently referring to the Empire licenses as "our licenses," confirming that the licenses were intended to further Empire's exclusive distribution of products for the benefit of the Paradise Group.  Other LT Game's employees made similar reports to Paradise, also consistently referring to the Empire licenses as "our licenses."

77.     Pursuant to this collective effort, the most important license for Empire to obtain was a Nevada gaming license.  Among other things, a Nevada gaming license is expensive to obtain, requiring payment of both licensing investigation charges and relevant attorneys' fees.  The large expense was well worth it to Plaintiffs for the sake of securing long-term distribution rights for their exclusive distributor, Empire.

78.     For the benefit of the Paradise Group, Paradise, along with LT Game or other subsidiaries, paid legal fees associated with obtaining the Nevada gaming license for Empire.  The process of obtaining the Nevada gaming license for Empire began in or around 2018, and the license was ultimately obtained in August 2023.

79.     On information and belief, Mr. Feng intentionally steered the Nevada Gaming Commission's investigation away from Paradise and LT Game and arranged that certain employees like Mr. Kiely be interviewed by the Commission to ensure Mr. Feng's fraudulent narrative was all the Commission would hear.

**The Commerce Casino Smart Card Shoe Deal**

80.     Leading up to 2018, Paradise and LT Game had invested considerable time and resources to develop a business relationship with Commerce Casino in Los Angeles, California.

81.     On November 1, 2018, Empire, in its capacity as exclusive distributor for LT Game,

entered into an "Equipment Lease Agreement" with Commerce Casino. Plaintiffs authorized Empire to make the deal for the benefit of LT Game. Under the deal, LT Game supplied Empire with Smart Card Shoes containing the LTShoe program. Empire in turn leased LT Game's Smart Card Shoes to Commerce Casino. Ownership of the Smart Card Shoes at all times remained with LT Game. The Equipment Lease Agreement was signed by Mr. Feng for Empire and by Mr. Jeffrey Harris ("Mr. Harris") for Commerce Casino.

82.     The Commerce Casino Smart Card Shoe leasing deal was lucrative for LT Game for a number of years.

83.     In a January 21, 2022 email sent just before Mr. Feng resigned as president of LT Game, Mr. Feng wrote to Dr. Chun saying: "I received a phone call from Commerce today and they informed me their decision to remove our leasing card shoes on their game floor. The reason which they gave to me is that they decided to go with other vendor's products. The true reason behind this is that our friend Commerce CEO Haig Papaian has retired from his position (due to Commerce internal political fight) and Jeff Harris has been reduced his responsibilities. And the new management members are very close to [Scientific Games]. That is why they made that decision."

84.     As far as Paradise knew, Commerce Casino had terminated the contract at that point. Paradise believed that the Smart Card Shoes had been returned to LT Game and repeatedly asked Mr. Feng to try to deploy them for the further benefit of LT Game. In reporting on the status of the Smart Card Shoes to Dr. Chun and other managers at Paradise, including reporting by means of interstate and/or foreign wire, Mr. Feng failed to explain the true fate of the card shoes, as discussed *infra* ¶¶ 140–43.

**Paradise First Learns of Mr. Feng's Misconduct**

85.     Mr. Feng resigned as President of LT Game in February 2022. At the time of his resignation, Mr. Feng nonetheless reaffirmed in email messages to Dr. Chun and Paradise management that he still considered himself to be working for the benefit of the Paradise Group.

86.     In a February 9, 2022 email to Dr. Chun and others in Paradise management, Mr.

Feng induced reliance on his special fiduciary relationship, stating that he had been working for Dr. Chun for more than 10 years as a close family member and representing that his obligations as a fiduciary would continue after his resignation from LT Game and the Paradise Group. Mr. Feng stated that he would take good care of the company's property and that if there were profitable business opportunities, he would reach out to Dr. Chun. Mr. Feng further stated that he would continue to work on obtaining U.S. gaming licenses and on other matters of which his assistance would be needed by the Paradise Group.

87.    Mr. Feng remained president of Empire, which Paradise still believed to be in the role of the Paradise Group's long-term exclusive distributor.

88.    On information and belief, Mr. Feng misappropriated the Paradise Group's Confidential Business Information and Trade Secrets upon leaving LT Game and the Paradise Group, using the Confidential Business Information and Trade Secrets to benefit himself and Empire to the detriment of Plaintiffs.

89.    Mr. Kiely resigned from his position as chief technology officer of LT Game and the Paradise Group on March 31, 2023. A subsequent review of his LinkedIn profile showed that he professed himself to be working concurrently as chief technology officer for Empire from February 2019 through the present. In or around August 2023, Paradise learned that Mr. Kiely was working at Empire.

90.    On information and belief, Mr. Kiely misappropriated the Paradise Group's Confidential Business Information and Trade Secrets upon leaving LT Game and the Paradise Group, using the Confidential Business Information and Trade Secrets to benefit himself and Empire to the detriment of Plaintiffs.

91.    By working for Empire in competition with and adverse to Plaintiffs' interests both during and after his employment with LT Game and the Paradise Group, Mr. Kiely breached the terms of his August 30, 2019 Employment Contract.

92.    Mr. Allison left LT Game and the Paradise Group on June 30, 2023. A subsequent review of his LinkedIn profile showed that he professed himself to be working concurrently as

senior vice president of sales and marketing for Empire from March 2022 through September 2023. In or around August 2023, Paradise learned that Mr. Allison was working at Empire.

93.     On information and belief, Mr. Allison misappropriated the Paradise Group's Confidential Business Information and Trade Secrets upon leaving LT Game and the Paradise Group, using the Confidential Business Information and Trade Secrets to benefit himself and Empire to the detriment of Plaintiffs.

94.     By working for Empire in competition with and adverse to Plaintiffs' interests both during and after his employment with LT Game and the Paradise Group, Mr. Allison breached the terms of his January 1, 2020 Employment Contract.

95.     On information and belief, GSL, through the actions of its sole owner and operator Mr. Allison, acquired and misappropriated the Paradise Group's Confidential Business Information and Trade Secrets.

96.     GSL, through the actions of its sole owner and operator Mr. Allison that were adverse to Plaintiffs' interest, breached the terms of the June 30, 2022 Agreement.

97.     On September 19, 2023, Ms. Zhao tendered her resignation via email to Dr. Chun, which was approved, with the last working day scheduled for October 20, 2023.  Ms. Zhao communicated verbally to Dr. Chun that her reason for resigning was exhaustion from years of work and her desire to take a break.

98.     Ms. Zhao assured Dr. Chun (through Dr. Chun's wife/Ms. Zhao's cousin) that she would not work for Mr. Feng after leaving the Paradise Group.  Induced by these misrepresentations, the management of the Paradise Group—as a token of appreciation for her years of service—provided Ms. Zhao with a long service payment exceeding the legal requirements, despite her resignation being voluntary.

99.     The following month, Ms. Zhao began formally working at Empire as its senior vice president of international operations.  On November 22, 2023, Empire issued a press release regarding the appointment of Ms. Zhao.

100.     Before leaving the Paradise Group yet only becoming apparent to Plaintiffs

following Ms. Zhao's departure, Ms. Zhao formatted the hard drive of her Paradise Group computer such that all data on Ms. Zhao's computer was removed or erased. In doing so, Ms. Zhao deleted files belonging to Plaintiffs. This action was not in accordance with standard procedures or company policy, leading Plaintiffs to view it as suspicious.

101.    On information and belief, Ms. Zhao misappropriated the Paradise Group's Confidential Business Information and Trade Secrets upon leaving LTG Limited and the Paradise Group, using the Confidential Business Information and Trade Secrets to benefit herself and Empire to the detriment of Plaintiffs.

102.    Ultimately, Empire solicited, recruited, and hired away key employees of LT Game, LTG Limited, and the Paradise Group, including but not limited to individuals who were part of the management and technology teams of the Paradise Group. These individuals, to the extent necessary to perform their duties during their employment with LT Game, LTG Limited, and the Paradise Group, were given access to and were permitted to use the Paradise Group's Confidential Business Information and Trade Secrets while employed by LT Game and the Paradise Group. It is impossible for these former employees—now employed by Empire—to perform their duties at Empire without using the Paradise Group's Confidential Business Information and Trade Secrets and, as a result, causing injury to Plaintiffs.

103.    In or around August 2023, Paradise became aware of news reports that Empire (doing business as "Play Synergy," a name that Paradise had not heard before) had acquired out of bankruptcy the electronic gaming assets and intellectual property of Aruze, which had until then been one of the primary competitors of LT Game and the Paradise Group in the distribution of gaming equipment. Empire had paid $7 million to buy the Aruze assets.

104.    The publicity surrounding the Aruze deal marked the first time that Paradise had learned that Mr. Feng was in business for himself and using Empire to serve his own independent business purposes.

105.    Mr. Feng's acquisition of the Aruze assets was also notable because Paradise had asked Mr. Allison for advice about whether to purchase any of those assets, and Mr. Allison

deliberately dodged the inquiry, refusing to advise on it.  Mr. Allison desired that Mr. Feng and Empire would be unchallenged in pursuing the Aruze assets.

106.    In the ensuing discussions between Mr. Feng and Paradise after Empire's acquisition of the Aruze assets, Mr. Feng insisted that he had no obligations to Plaintiffs and was free to use Empire—and the gaming licenses that Paradise had paid for—however he wanted, including to compete with Plaintiffs.

107.    On October 3, 2023, Empire and Mr. Feng filed a Nevada state declaratory judgment action against LT Game and Paradise in the Clark County District Court, Case No. A-23-878908-B, Dept. No. XVI.  The complaint states that Empire and Mr. Feng seek "a declaration that Paradise has no ownership interest in, and no right to control, Empire, and no legal or equitable interest in any of Empire's assets, including its gaming licenses."  That case has since been dismissed.

### Subsequent Revelations About Mr. Feng's Improper Activities

108.    The initiation of Mr. Feng's declaratory judgment lawsuit prompted Plaintiffs to engage in a deeper investigation of Mr. Feng's prior activities.  This investigation has thus far revealed that Mr. Feng was secretly engaged in significant self-dealing, competition with Plaintiffs, and usurpation of Plaintiffs' opportunities, all at a time when he was president of LT Game and senior management of the Paradise Group and owed LT Game and the Paradise Group fiduciary duties.

109.    Indeed, Mr. Feng was engaged in fraud, extracting and leveraging money and resources from Plaintiffs for his own personal ambitions.  Mr. Feng not only concealed his business activities from Paradise but actively tried to deflect any suspicion by continuing to converse and behave with Dr. Chun and Paradise management, including through interstate and/or foreign wire communications, as if he were playing the role that Paradise believed him to be in—president of LT Game and senior management of the Paradise Group, acting in the best interests of LT Game and the Paradise Group, and president of Empire, operating that company as a long-term exclusive distributor for the Paradise Group.

110.    It is apparent now that Mr. Feng was liberally using LT Game's employees to double as employees not only for Empire but also for Mr. Feng's other various companies and in service of Mr. Feng's business plan to have Empire compete with Plaintiffs.

111.    Mr. Feng induced Mr. Allison, Mr. Kiely, and Ms. Zhao to perform substantive work for Empire in furtherance of Mr. Feng's plan to supplant Plaintiffs at a time when Mr. Allison, Mr. Kiely, and Ms. Zhao were still working for Plaintiffs, were fiduciaries of Plaintiffs, and had access to the Paradise Group's Confidential Business Information and Trade Secrets.  Mr. Feng then ultimately induced Mr. Allison, Mr. Kiely, and Ms. Zhao to leave Plaintiffs completely in favor of Empire.  Mr. Feng deliberately concealed all these arrangements from Paradise, and Paradise was otherwise unaware of Mr. Feng's plans and secret actions.

112.    ████████████████████████████████████ ████████████████████████████████████ ████████████████████████ That company did not exist.

113.    On August 7, 2017, Mr. Kiely presented Paradise with a draft Master Service Agreement with "Playful Games, Inc.," which lists the fake company's address as a particular address located on Iron Ridge Drive in Las Vegas ("**the Iron Ridge Property**").  Public records show that Mr. Feng and his wife, Ms. Tiehui Qiu ("**Ms. Qiu**"), purchased the Iron Ridge Property in May 2017.

114.    In response, Paradise noted that information regarding "Playful Games, Inc." could not be found and that the Iron Ridge Property's address appeared to be a residential address. Paradise indicated that in order to proceed, it would need written evidence that "Playful Games, Inc." exists.

115.    After this response from Paradise, Mr. Feng and Mr. Kiely ceased their attempt to have LT Game contract with the fake company Playful Games, Inc.

116.    Upon conducting a deeper investigation into Mr. Feng's prior activities, it was revealed that on April 29, 2019, without informing Paradise or LT Game, Mr. Feng set up a new Nevada company called "Playful Interactive Inc." ("**Playful Interactive**"), ███████████ ████████████████████████████. As of the most recent filing, April 29, 2022, Mr. Feng was listed as the President, Secretary, Treasurer, and Director of Playful Interactive. ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████. Playful Interactive was dissolved on October 25, 2022.

117.    Upon conducting a deeper investigation into Mr. Feng's prior activities, it was revealed that on December 14, 2019, without informing Paradise or LT Game, Empire filed a trademark application with the United States Patent and Trademark Office ("**USPTO**") for "GOLDEN FROG BACCARAT," U.S. Serial No. 88727507. Ultimately, Empire failed to respond or filed a late response to a USPTO action, and the application was abandoned.

118.    Upon conducting a deeper investigation into Mr. Feng's prior activities, it was revealed ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████.

119.    Without informing Plaintiffs, ████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████.

120.    ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████. This was done without the knowledge or approval of Paradise.

121. ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

122. On information and belief, ███████████████████████████████

██████████████████████████████

123. In July 2020, Mr. Feng and Mr. Kiely filed a U.S. provisional patent application for what would ultimately result in U.S. Patent No. 11,341,807 entitled "*Display Assembly for Relevant Messaging for Gaming Apparatus and Methods Therefor*." Although this patent reflected a corporate opportunity for LT Game and was drafted while Mr. Kiely was an employee/officer of LT Game and Paradise Group, Mr. Feng concealed his patent strategy from Plaintiffs. The '807 Patent was assigned to Empire. On June 8, 2022, Empire filed a patent infringement lawsuit against Light & Wonder, Inc. and SG Gaming, Inc. Mr. Feng never informed Paradise of any of these activities, nor was Paradise otherwise aware of them. In fact, Mr. Feng and Mr. Kiely are the named inventors on several patents that were filed and prosecuted while they worked for the interests of LT Game and the Paradise Group but which were assigned to Empire.

124. The terms of Mr. Kiely's employment with LT Game would have required him to assign ownership of such patent rights to LT Game, so the assignment to Empire breached Mr. Kiely's obligations to LT Game. The assignment also amounts to a usurpation of a business opportunity of LT Game in favor of Empire.

125. On February 21, 2020, Playful Interactive posted a YouTube video titled "ShortDeck Poker Demo." The video depicts an online multiplayer poker game and shows the player username "Jeff Conradi." On information and belief, Mr. Feng induced Mr. Conradi to develop this Playful Interactive poker game while working for LT Game.

126. On June 4, 2020, Playful Interactive posted a YouTube video titled "Golden Frog Baccarat Demo." The video depicts a Golden Frog Baccarat mobile application ("**app**") allowing for online multiplayer baccarat and shows the player usernames "Daryn Kiely" and "Jeff Conradi."

On information and belief, Mr. Feng induced Mr. Conradi to develop the Playful Interactive app while working for LT Game by using, copying, reproducing, and/or creating derivative versions of the Paradise Golden Frog source code.

127.    On June 29, 2020, Mr. Allison emailed a screenshot of the Golden Frog Baccarat app from his phone to his Empire email address.  The screenshot shows the player username "Kelcey Allison."

128.    In August 2020, Playful Interactive released an app called "Golden Frog Casino— Baccarat," an online version of Golden Frog Baccarat.  On information and belief, the Golden Frog Casino—Baccarat app uses, copies, reproduces, and/or is a derivative version of the Paradise Golden Frog source code.  Further, the misappropriated, infringing app was distributed through the Apple App Store and Android Google Play, where it was made available to the public.

129.    On May 21, 2021, Mr. Feng set up a new Nevada company called Akkadian Enterprises ("**Akkadian**").  Mr. Feng deliberately concealed Akkadian from Paradise.  Akkadian became a covert vehicle to help Mr. Feng build up his competitive business against Plaintiffs.

130.    ███████████████████████████████████████████████████████████████████████████████████████.

131.    Mr. Feng used Akkadian to purchase a large portfolio of intellectual property from a company called Synergy Blue LLC in 2021.  Mr. Feng deliberately concealed this opportunity, usurping it from LT Game despite his role as president and a fiduciary of LT Game and the Paradise Group and despite LT Game's objective to develop gaming equipment and pursue relevant intellectual property opportunities.

132.    On information and belief, Mr. Feng caused Akkadian to enter into various agreements with LT Game and deliberately concealed these dealings from Paradise.

133.    On April 26, 2022, Mr. Kiely caused LT Game to enter into a contract with Akkadian for slot game development.  Mr. Kiely signed on behalf of LT Game.  Mr. Feng and Mr. Kiely deliberately failed to inform Paradise that ████████████████████████████████████ ████████████████.

- 26 -

134.    On information and belief, in 2021, Empire began engaging in business under the brand name "Play Synergy."

135.    Between August 12, 2021, and October 4, 2021, Mr. Feng rapidly formed several other companies, including: (1) Solution Gaming Technologies ("**Solution Gaming**"); (2) Victorian Investment Holdings ("**Victorian**"); (3) Ephesus Holdings, LLC; (4) F&T Holdings LLC; (5) F&T LV Real Estate 1, LLC; (6) F&T LV Real Estate 2, LLC; (7) F&T LV Real Estate 3, LLC; (8) Montemoro, LLC; (9) F&T Business LLC; (10) F&T Commercial Real Estate LLC; (11) F&T Gaming LLC; (12) F&T Holdings LLC; and (13) F&T Residential Real Estate LLC. All of the formation of these companies was done without Paradise's knowledge and at a time when LT Game — under the direction of Mr. Feng — was operating at a financial loss and unable to generate any profit.   Mr. Feng formed these companies in furtherance of his fraudulent scheme to build up a competing business to supplant Plaintiffs in the market.

136.    ██████████████████████████████████████████████████████████████████████████████████████████████

137.    ████████████████████████████████████████████████████████████████████████████████████████████████.

138.    On November 5, 2021, Empire again filed a trademark application with the USPTO for "GOLDEN FROG BACCARAT," U.S. Serial No. 97110870.  Empire indicated that the first use date was January 7, 2019, and the first use in commerce date was April 16, 2019.  The USPTO granted registration on September 13, 2022, U.S. Registration No. 6846402.

139.    In December 2021, while still serving as president of LT Game, Mr. Feng negotiated with Sockeye Software to have Empire become the exclusive licensee of Sockeye's platform development software for computerized slot machines, entering into an agreement effective February 8, 2022.   The Sockeye Software deal was conducted without Paradise's knowledge, and Mr. Feng deliberately concealed it from Plaintiffs. This was an opportunity that

1   Mr. Feng usurped from LT Game at a time when LT Game —under the direction of Mr. Feng—

2   was operating at a financial loss and unable to generate any profit.

3       140.    On or around January 2022, Mr. Feng induced Mr. Harris to terminate Commerce

4   Casino's prior Smart Card Shoe leasing agreement that benefited LT Game and instead enter into

5   a new agreement with Mr. Feng and Empire whereby Empire would receive the lease income and

6   LT Game would receive nothing.  Thus, Mr. Feng's January 21, 2022 email to Dr. Chun claiming

7   that Commerce Casino had found another vendor was fraudulent—the other vendor was indeed

8   Mr. Feng himself.  That email had also suggested that Mr. Harris was departing Commerce Casino,

9   when in fact he was soon named its new chief executive officer.

10      141.    LT Game's Smart Card Shoes were never returned to LT Game, despite the fact

11  that they were and are the lawful property of LT Game.  Instead, at the time of filing the original

12  Complaint (ECF No. 1), the LT Game Smart Card Shoes were still at Commerce Casino, a few

13  with the LT Game branding still displayed on them while others displayed  Empire's "Play

14  Synergy" logo.

15      142.    On information and belief, Mr. Feng and Mr. Harris had either already entered into

16  a broader business arrangement or did so soon after the Commerce Casino Smart Card Shoe deal.

17  Public records reflect that Mr. Harris supplied a large loan to Empire.

18      143.    On information and belief, Empire's Smart Card Shoe products misappropriate

19  Paradise Group Trade Secrets and use, copy, are derivative versions of, and/or distribute the

20  Paradise Group's LTShoe source code.

21      144.    On June 6, 2022, Empire entered into a "Sales and Security Agreement" with Mr.

22  Feng's company Solution Gaming, whereby Empire sold a substantial amount of gaming

23  equipment to Solution Gaming.  The equipment did not belong to Empire; rather, it belonged to

24  LT Game.  Leading up to the agreement, Mr. Allison, through communications by interstate and/or

25  foreign wire, had persuaded Paradise that the sale was worthwhile even though the equipment was

26  being sold at a very small margin.  Mr. Allison deliberately failed to disclose that, at that time, Mr.

27  Allison was an employee of Solution Gaming.  Further, Mr. Allison and Mr. Feng deliberately

failed to inform Paradise that Mr. Feng owned and controlled Solution Gaming.  Mr. Allison induced Paradise to supply the equipment at a very small margin.

145.    Following the sale of LT Game equipment to Solution Gaming, Solution Gaming withheld payment for some time.  When Paradise inquired about the outstanding payment, Mr. Allison told Paradise that the customer (i.e., Solution Gaming) was withholding payment because of an issue with the equipment.  ███████████████████████████████████████████████

████████████████████████████████████████████.

146.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

147.    In November 2022, Jason Wu ("**Mr. Wu**"), a Paradise Group employee and subordinate of Ms. Zhao, reported to Ms. Zhao that the Dropbox business account managed by Mr. Kiely had expired and was downgraded to a locked state, such that Mr. Wu, who was responsible for quality assurance and compliance, now had only limited access to the important files stored there.  These files contained critical intellectual property and product development information, including source code, compiled files, CFast card images, approval letters, certification documents, demo versions and mathematical models for games, and submission packages for gaming regulators.

148.    Ms. Zhao informed Mr. Wu that management did not intend to continue using Dropbox.  In response, Mr. Wu explained the importance of downloading and saving the files stored on Dropbox, noting his now-limited access and that only individuals in the United States, like Mr. Kiely, had full access.  Further, Mr. Wu stressed the need to download all data to prevent significant losses.

149.    Subsequently, Mr. Wu provided his Dropbox account details to LTG Limited's IT department so that the available files could be downloaded, which was completed on January 16, 2023, and saved on LTG Limited's storage server.

150.    On February 22, 2023, LTG Limited's IT personnel discovered that the available files on the Dropbox had been continuously decreasing and some had been deleted.  This was communicated to Mr. Wu, who realized that someone with higher access privileges would have had to delete the data from Dropbox.  Mr. Wu expressed his concerns to Ms. Zhao that this information could have been unlawfully copied, stolen, or deleted, likely by an administrator with higher access privileges.  However, Ms. Zhao never informed Paradise Group management about this significant incident.

151.    During the game application submission process, Mr. Wu was responsible for communicating with various regulatory agencies in the United States.  On December 14, 2022, Mr. Wu reported to Ms. Zhao that he had received four gaming certificates issued by the Mississippi Gaming Commission for Empire products that he had not been involved with.  One of these games, "Draw Poker," had gameplay similar to a game discussed in a prior Paradise Group internal meeting.  Mr. Wu expressed his concern that Mr. Feng may be using Empire to develop competing products with Plaintiffs' funds and resources, intending to sell them in Macau. However, Ms. Zhao never informed Paradise Group management about this significant incident.

152.    It is now apparent that Ms. Zhao had been recruited by Mr. Feng to assist in his plans to usurp corporate opportunities from Plaintiffs and form a competing business for more than a year before Ms. Zhao formally resigned from the Paradise Group.  Ms. Zhao was privy to Defendants' improper plans and activities, and even though she owed a fiduciary duty to Plaintiffs to inform them of Defendants' misconduct and her involvement in it, she instead engaged in fraudulent concealment for a period at least over a year.

153.    ████████████, at a time when Mr. Allison and Ms. Zhao still worked for the Paradise Group, ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████.

154.    ████████████████████████████████████████████

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████.

5   155.    Mr. Allison and Ms. Zhao, who both still worked for the Paradise Group, failed to

6 inform Paradise that ████████████████████████████████████████████

7 ████████████████████████████, including Paradise Group Trade Secrets and Confidential

8 Business Information, ████████████████████████████████ to the detriment of

9 Plaintiffs.   On information and belief, Mr. Allison and Ms. Zhao ████████████████

10 ████████ assisted with the misappropriation of Paradise Group Trade Secrets and Confidential

11 Business Information.

12   156.    ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████

14 ████████████████████████.  Despite being an officer and fiduciary of the Paradise Group,

15 Ms. Zhao failed to disclose her involvement in Mr. Feng's plans to compete with Plaintiffs in the

16 Macau market.  ████████████████████████████████████████.  On

17 September 23, 2023, Empire set up a branch in Macau under the name of "Empire Technological

18 Group Limited, Macau Branch."  Empire has since obtained licenses from the Gaming Inspection

19 and Coordination Bureau to be an electronic gaming machines manufacturers or providers in

20 Macau.

21   157.    ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████

24 ████████████████████████

25   158.    ████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████

159. ███████████████████████████████████████

160.    Upon completion of the Aruze asset purchase, Mr. Feng caused Empire to undergo a rebranding, dropping the former Play Synergy brand name and now positioning the company as the new incarnation of Aruze, taking on Aruze's former brand appearance and doing business as "Aruze Gaming Global" or "AG2."  The re-branded Empire/AG2 debuted at the October 2023 G2E trade show conference in Las Vegas.

161.    At the time of filing the original Complaint (ECF No. 1), the Empire/AG2 website listed Golden Frog Baccarat as one of its electronic table game products.  The Golden Frog Baccarat description stated, "Our POWER SHOE and SMRT BOARD allows casinos to eliminate dealer errors and needless keypad entries, while providing valuable gaming data for analytics and game protection."  On information and belief, the Golden Frog Baccarat electronic table game product and related equipment misappropriates Paradise Group Trade Secrets and/or infringes the Paradise Golden Frog source code and/or the LTShoe source code.

162.    At the time of filing the original Complaint (ECF No. 1), the Empire/AG2 Golden Frog Baccarat electronic table games were currently in use in at least the following casinos: (1) Durango Casino and Resort (Las Vegas, NV); (2) Red Rock Casino Resort Spa (Las Vegas, NV); (3) Rampart Casino (Las Vegas, NV); (4) Santa Fe Station Hotel and Casino (Las Vegas, NV); (5) Agua Caliente (Palm Springs, CA, and Rancho Mirage, CA); (6) Bay 101 Casino (San Jose, CA); (7) Graton Resort and Casino (Rohnert Park, CA); (8) Red Hawk Resort Casino (Placerville, CA); (9) Hard Rock Hotel Casino Sacramento (Wheatland, CA); (10) Cache Creek Casino Resort (Brooks, CA); (11) Monarch Casino Resort Spa (Black Hawk, CO); and (12) Hard Rock Hotel

Casino Biloxi (Biloxi, MS).

163.    In morphing Empire into Aruze, Mr. Feng had taken the final step in trying to erase Empire's true origin as an intended long-term exclusive distributor for the Paradise Group, whose very existence and Nevada gaming license has been subsidized by Plaintiffs.

164.    Mr. Feng has stripped LT Game and the Paradise Group of their management and technology team, misappropriating Plaintiffs' Confidential Business Information and Trade Secrets and hobbling LT Game as a company.

165.    Plaintiffs had spent millions of dollars trying to build up the Paradise Group's business in the United States and trying to build up Empire as the Paradise Group's exclusive distributor. Mr. Feng fraudulently used that money to advance his own interests, hired away LT Game's management team even as they were still working as officers of LT Game, and unjustly enriched himself with Empire's business assets and gaming licenses that Plaintiffs had subsidized.

**COUNT ONE**
**Misappropriation of Trade Secrets Under Defend Trade Secrets Act**
**18 U.S.C. §§ 1836,** *et seq.*
**(Against All Defendants)**

166.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–165 herein.

167.    Plaintiffs assert this claim for misappropriation of trade secrets under federal law against all Defendants.

168.    Plaintiffs possess valuable Trade Secrets, including but not limited to financial, business, technical, and engineering information including software, hardware, computer programming code, including but not limited to the Paradise Golden Frog source code and LTShoe source code, and product designs and prototypes, including those related to Smart Card Shoes.

169.    Plaintiffs' Trade Secrets relate to products and/or services used in and intended for use in interstate and/or foreign commerce.

170.    Mr. Feng, Mr. Allison, Mr. Kiely, and Ms. Zhao (collectively, the "**Employee Defendants**") had access to and acquired Plaintiffs' Trade Secrets as a result of their respective

relationships with Plaintiffs and under circumstances where each Employee Defendant was vested with extreme trust and confidence and had a duty to protect and maintain the secrecy of Plaintiffs' Trade Secrets.

171. Through the Employee Defendants' conduct, Empire and GSL gained access to and acquired Plaintiffs' Trade Secrets, which were not previously known to Empire or GSL.

172. Each of the Defendants knew that the information Plaintiffs provided to the Employee Defendants comprised Plaintiffs' Trade Secrets.

173. Plaintiffs have invested significant money and other resources into developing and protecting their Trade Secrets.

174. Plaintiffs enjoy an advantage over existing and would-be competitors in the gaming industry by virtue of the Trade Secrets, which have been developed and/or compiled over years of hard work and the substantial investment of money and resources.

175. Plaintiffs derive significant competitive and economic benefits insofar as the Trade Secrets are not readily available to the public and are not readily ascertainable or duplicated by others, and as such the Trade Secrets have independent economic value.

176. Plaintiffs have taken reasonable steps designed to safeguard the secrecy of the Trade Secrets, including but not limited to the following: (1) implementing policies and procedures that limit access to Trade Secrets; (2) entering into confidentiality and non-compete agreements with Paradise Group employees; (3) limiting internal distribution of Trade Secrets to only those employees who need the information to perform their specific job functions; (4) restricting physical and technological access to Trade Secrets; (5) securing the physical and electronic storage of Trade Secrets; and (6) clearly and conspicuously marking Trade Secrets as confidential.

177. The Employee Defendants have used and provided Empire and GSL with Plaintiffs' Trade Secrets, which have been used by Defendants to compete against Plaintiffs.

178. Defendants have used the misappropriated Trade Secrets to operate and grow competing businesses in the same markets as Plaintiffs and to solicit and recruit Plaintiffs' employees to Empire.

179.    Defendants have used and intend to use Plaintiffs' Trade Secrets for their economic benefit to the detriment of Plaintiffs.

180.    Defendants' improper use of Plaintiffs' Trade Secrets has resulted in significant and irreparable harm to Plaintiffs.

181.    Defendants' improper use of Plaintiffs' Trade Secrets has provided Defendants with an unfairly obtained competitive advantage.

182.    Defendants' misappropriation of Plaintiffs' Trade Secrets has directly and proximately caused damages to Plaintiffs, and Plaintiffs are therefore entitled to an award of actual damages in an amount to be proven at trial.

183.    Defendants' misappropriation of Plaintiffs' Trade Secrets has been and continues to be conducted in a willful and malicious manner, and Plaintiffs are entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) in an amount not exceeding two times the award of damages as well as to attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

184.    At all relevant times, the actions described above have caused and are continuing to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law, and Defendants will continue to offend unless enjoined.

185.    Plaintiffs are entitled to injunctive relief against Defendants to prevent further damage and harm to Plaintiffs.

<strong><u>COUNT TWO</u></strong><br><strong>Misappropriation of Trade Secrets Under Nevada Uniform Trade Secrets Act</strong><br><strong>Nev. Rev. Stat. §§ 600A, <em>et seq.</em></strong><br><strong>(Against All Defendants)</strong>

186.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–185 herein.

187.    Plaintiffs assert this claim for misappropriation of trade secrets under state law against all Defendants.

188.    Plaintiffs possess valuable Trade Secrets, including but not limited to financial, business, technical, and engineering information including software, hardware, computer

programming code, including but not limited to the Paradise Golden Frog source code and LTShoe source code, and product designs and prototypes, including those related to Smart Card Shoes.

189. The Employee Defendants had access to and acquired Plaintiffs' Trade Secrets as a result of their respective relationships with Plaintiffs and under circumstances where each Employee Defendant was vested with extreme trust and confidence and had a duty to protect and maintain the secrecy of Plaintiffs' Trade Secrets.

190. Through the Employee Defendants' conduct, Empire and GSL gained access to and acquired Plaintiffs' Trade Secrets, which were not previously known to Empire or GSL.

191. Each of the Defendants knew that the information Plaintiffs provided to the Employee Defendants comprised Plaintiffs' Trade Secrets.

192. Plaintiffs have invested significant money and other resources into developing and protecting their Trade Secrets.

193. Plaintiffs enjoy an advantage over existing and would-be competitors in the gaming industry by virtue of the Trade Secrets, which have been developed and/or compiled over years of hard work and the substantial investment of money and resources.

194. Plaintiffs derive significant competitive and economic benefits insofar as the Trade Secrets are not readily available to the public and are not readily ascertainable or duplicated by others, and as such the Trade Secrets have independent economic value.

195. Plaintiffs have taken reasonable steps designed to safeguard the secrecy of the Trade Secrets, including but not limited to the following: (1) implementing policies and procedures that limit access to Trade Secrets; (2) entering into confidentiality and non-compete agreements with Paradise Group employees; (3) limiting internal distribution of Trade Secrets to only those employees who need the information to perform their specific job functions; (4) restricting physical and technological access to Trade Secrets; (5) securing the physical and electronic storage of Trade Secrets; and (6) clearly and conspicuously marking Trade Secrets as confidential.

196. The Employee Defendants have used and provided Empire and GSL with Plaintiffs' Trade Secrets, which have been used by Defendants to compete against Plaintiffs.

197.    Defendants have used the misappropriated Trade Secrets to operate and grow a competing business in the same markets as Plaintiffs and to solicit and recruit Plaintiffs' employees to Empire.

198.    Defendants have used and intend to use Plaintiffs' Trade Secrets for their economic benefit to the detriment of Plaintiffs.

199.    Defendants' improper use of Plaintiffs' Trade Secrets has resulted in significant and irreparable harm to Plaintiffs.

200.    Defendants' improper use of Plaintiffs' Trade Secrets has provided Defendants with an unfairly obtained competitive advantage.

201.    Defendants' misappropriation of Plaintiffs' Trade Secrets has directly and proximately caused damages to Plaintiffs, and Plaintiffs are therefore entitled to an award of actual damages in an amount to be proven at trial.

202.    Defendants' misappropriation of Plaintiffs' Trade Secrets has been and continues to be conducted in a willful and malicious manner, and Plaintiffs are entitled to exemplary damages under NRS § 600A.050(2) in an amount not exceeding two times the award of damages as well as to attorneys' fees under NRS § 600A.060(3).

203.    At all relevant times, the actions described above have caused and are continuing to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law, and Defendants will continue to offend unless enjoined.

204.    Plaintiffs are entitled to injunctive relief against Defendants to prevent further damage and harm to Plaintiffs.

**COUNT THREE**
**Copyright Infringement**
**17 U.S.C. § 101, *et seq.***
**(Against All Defendants)**

205.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–204 herein.

206.    Plaintiffs assert this claim for copyright infringement against all Defendants.

207.    The Paradise Golden Frog source code and LTShoe source code are subject to valid, registered copyrights.

208.    Paradise, through its subsidiary LTG Limited, is the owner of all rights, title, and interest in and to the Paradise Golden Frog source code and LTShoe source code, including the exclusive rights to reproduce, prepare derivative works, distribute copies, and publicly display pursuant to 17 U.S.C. § 106.

209.    Upon information and belief, Defendants willfully and repeatedly copied and reproduced protected elements of the Paradise Golden Frog source code and LTShoe source code in order to develop Defendants' own gaming products, including but not limited to Empire's Golden Frog Baccarat electronic table games and app and Empire's SMRT Power Shoe.

210.    Upon information and belief, Defendants have prepared derivative works based upon protected elements of the Paradise Golden Frog source code and LTShoe source code in order to develop Defendants' own gaming products, including but not limited to Empire's Golden Frog Baccarat electronic table games and app and Empire's SMRT Power Shoe.

211.    Upon information and belief, Defendants have distributed and publicly displayed copies of protected elements of the Paradise Golden Frog source code and LTShoe source code to the public by sale and/or lease of Defendants' infringing gaming products, including but not limited to Empire's Golden Frog Baccarat electronic table games and app and Empire's SMRT Power Shoe.

212.    Defendants knew or should have known that their actions infringed the exclusive rights of Plaintiffs.

213.    In addition to directly infringing the exclusive rights of Paradise, Defendants have contributorily and vicariously infringed the exclusive rights of Paradise by controlling, directing, intentionally encouraging, inducing, or materially contributing to the copying, reproducing, creation of derivative works, distribution, and public display of protected elements of the Paradise Golden Frog source code and LTShoe source code.

214.    Defendants' infringement has proximately caused and is continuing to cause injury

to Plaintiffs and their property.

215.    Plaintiffs have been damaged by Defendants' infringement in an amount to be determined at trial.

216.    Defendants' infringement has caused Plaintiffs irreparable injury, and unless restrained and enjoined, Defendants will continue to commit such acts.  Plaintiffs' remedies at law are not adequate to compensate them for these inflicted and threatened injuries, entitling them to remedies including injunctive relief as provided by 17 U.S.C. § 502 and an order impounding or destroying any and all infringing materials pursuant to 17 U.S.C. § 503.

## COUNT FOUR
### Fraud
### (Against All Defendants)

217.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–216 herein.

218.    Plaintiffs assert this claim for fraud against all Defendants.

219.    Despite being president, secretary, treasurer, and sole director of LT Game, and despite assuming the role of president of Empire for the agreed purpose of having Empire act as the Paradise Group's long-term exclusive distributor, Mr. Feng went into business for himself and used Empire and his other several companies in furtherance of a fraudulent scheme to compete against Plaintiffs, usurp Plaintiffs' business opportunities, siphon away LT Game's management, and generally seek to eliminate competition from Plaintiffs in the market so that Mr. Feng's separate business endeavors could supplant those of Plaintiffs.

220.    Mr. Feng deliberately and maliciously engaged in fraudulent concealment by failing to inform Paradise that he was engaged in the foregoing scheme.  In fact, Mr. Feng maintained the facade that he was acting in Plaintiffs' interests while serving as president, secretary, treasurer, and sole director of LT Game.  Subsequently, as president of Empire, Mr. Feng still maintained the facade that he was operating Empire for Plaintiffs' benefit as an intended long-term exclusive distributor, deliberately failing to inform Plaintiffs of his other activities and ulterior motives.  At all times, Mr. Feng's conduct and communications were intended to affirm

that he was working for the benefit of Plaintiffs when in fact Mr. Feng was engaging in deliberate self-dealing adverse to Plaintiffs. Mr. Feng's concealment occurred in all of his numerous communications with Dr. Chun and others in Paradise management.

221. Mr. Feng had an obligation to disclose his activities because he was in a position of unique informational advantage and in a position of special fiduciary trust as LT Game's president, secretary, treasurer, and sole director and because of his close family ties in being Dr. Chun's brother-in-law. During the relevant time period herein—and even after he had resigned from LT Game —Mr. Feng continued to profess his loyalty to Dr. Chun, Paradise, and LT Game, claiming to be acting for their benefit. Indeed, Mr. Feng held himself out as an agent of Plaintiffs.

222. Mr. Feng also purposefully engaged in numerous express misrepresentations. These included (but are not limited to) his January 21, 2022 misrepresentation to Dr. Chun regarding the Commerce Casino card shoe deal, and more broadly, all of the many instances in which Mr. Feng expressly stated to Dr. Chun and others in Paradise management that he was working for the benefit of Plaintiffs.

223. Mr. Feng engaged in his deliberate and willful misrepresentations and concealment to entice Plaintiffs (through Dr. Chun and other Paradise managers controlling LT Game) to continue to pay large sums of money to support his improper operations at LT Game and Empire. Paradise (and, at its direction, LT Game) were spending a substantial amount of money that Mr. Feng was using to, among other things: (1) secure gaming licenses for Empire that Mr. Feng covertly intended to ultimately use for his own business purposes; (2) pay salaries of those employed at LT Game and Empire who Mr. Feng had recruited to actively help him implement his improper scheme; (3) pay for office space, equipment, and business supplies, all for the financial benefit of Mr. Feng's improper plan; (4) pay for legal services in furtherance of Mr. Feng's improper plan; (5) fund Mr. Feng's operation of F2; and (6) continue supporting Mr. Feng financially so that he was able to have the financial freedom to pursue his improper plan. Mr. Feng fraudulently caused Plaintiffs to unwittingly pay for their own usurpation in the market.

224. Mr. Feng also engaged in his deliberate and willful misrepresentations and

concealment to entice Plaintiffs to continue to lend their valuable reputation to his business affairs. On information and belief, it was Mr. Feng's association with Paradise that opened doors for him to make business connections, which was important to his plan to ultimately usurp Plaintiffs in the market.

225.    Paradise and LT Game (including Dr. Chun and other managers in Paradise management controlling LT Game) reasonably relied on Mr. Feng's fraud because of his role as a fiduciary of LT Game, his long-time position as a consultant for the Paradise Group, and the fact that he is Dr. Chun's brother-in-law. They also relied upon Mr. Feng's continual affirmations of loyalty to the family and the family business.

226.    Plaintiffs would never have agreed to supply the support and resources that they did had they known of Mr. Feng's plans to create his own competing business and usurp Plaintiffs in the market.

227.    Acting as Empire's President, Mr. Feng directed Empire to participate in his fraudulent scheme.  Empire engaged in fraudulent concealment by not revealing its involvement in Mr. Feng's fraudulent scheme to Plaintiffs.  Empire did this so that it could continue to receive support and funding from Plaintiffs. Empire owed a duty of disclosure to Plaintiffs in view of the close relationship between the companies, Plaintiffs' role as Empire's benefactors, and Empire's superior knowledge of the circumstances.

228.    Mr. Allison actively and knowingly participated in Mr. Feng's fraudulent scheme. Like Mr. Feng, Mr. Allison knowingly engaged in fraudulent concealment in failing to disclose that, while still working at LT Game, he was also actively assisting Mr. Feng to build up a competitive business enterprise with the intent that it usurp Plaintiffs in the market.  Mr. Allison had become a fiduciary of LT Game because of his role there and his representations to Paradise management that he was acting for the company's benefit.   Because of the close trusted relationship between the parties and Mr. Allison's superior knowledge of the circumstances, he owed a duty of disclosure.

229.    Mr. Allison continued his fraudulent conduct after Mr. Feng resigned from LT

Game by, for example, inducing Plaintiffs to approve of the deal with Solution Gaming while concealing the fact that he was an employee of Solution Gaming and that Solution Gaming was controlled by Mr. Feng and was part of Mr. Feng's scheme to usurp Plaintiffs in the Market.

230.    Further, Mr. Allison's participation in Mr. Feng's fraudulent scheme included his assistance with the misappropriation of Paradise Group Trade Secrets and Confidential Business Information ███████████████████████████████████████.

231.    On information and belief, GSL is an entity controlled by Mr. Allison.  GSL is liable for the same misconduct as Mr. Allison.

232.    Paradise and LT Game reasonably relied on Mr. Allison's and GSL's fraud because of Mr. Allison's role as a fiduciary and agent of LT Game and the Paradise Group, his contract with LT Game, and his close ties to Mr. Feng, who was otherwise trusted as Dr. Chun's brother-in-law and long-time consultant for the Paradise Group.  Mr. Allison was aware of Plaintiffs' trust in Mr. Feng and took advantage of that trust in associating himself with Mr. Feng.

233.    Mr. Kiely also actively and knowingly participated in Mr. Feng's fraudulent scheme.  Like Mr. Feng, Mr. Kiely knowingly engaged in fraudulent concealment in failing to disclose that, while still working at LT Game for the interests of LT Game and the Paradise Group, he was also actively assisting Mr. Feng to build up a competitive business enterprise with the intent that it usurp Plaintiffs in the market.  Mr. Kiely had become a fiduciary of LT Game and the Paradise Group because of his role there and his representations to Paradise management that he was acting for the company's benefit.  Because of the close trusted relationship between the parties and Mr. Kiely's superior knowledge of the circumstances, he owed a duty of disclosure.

234.    Mr. Kiely's participation in Mr. Feng's fraudulent scheme included causing LT Game to enter into a contract with Akkadian for slot game development, signing on behalf of LT Game while deliberately failing to inform Paradise ████████████████████████████ ███████████████████.

235.    Further, Mr. Kiely's participation in Mr. Feng's fraudulent scheme included his assistance with the misappropriation of Paradise Group Trade Secrets and Confidential Business

Information ███████████████████████████████

236.    In concert with Mr. Feng, Mr. Kiely also attempted to have LT Game contract with the non-existent Playful Games, Inc. for slot game development.

237.    Paradise and LT Game reasonably relied on Mr. Kiely's fraud because of Mr. Kiely's role as a fiduciary of LT Game and the Paradise Group, his contract with LT Game, and his close ties to Mr. Feng, who was otherwise trusted as Dr. Chun's brother-in-law and long-time consultant for the Paradise Group.  Mr. Kiely was aware of Plaintiffs' trust in Mr. Feng and took advantage of that trust in associating himself with Mr. Feng.

238.    Ms. Zhao also actively and knowingly participated in Mr. Feng's fraudulent scheme.  Like Mr. Feng, Ms. Zhao knowingly engaged in fraudulent concealment in failing to disclose that, while still working for the Paradise Group to advance the interests of the Paradise Group, she was also ████████████████████████████████████████ ████████████████████████████.  Ms. Zhao had become a fiduciary of the Paradise Group because of her role there, her position of special confidence with Dr. Chun and the other managers of Paradise, and her representations to Paradise management that she was acting for the company's benefit.  Because of the close trusted relationship between the parties and Ms. Zhao's superior knowledge of the circumstances, she owed a duty of disclosure.

239.    Ms. Zhao's participation in Mr. Feng's fraudulent scheme included ██ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████.  Ms. Zhao was aware of Defendants' improper plans and activities and intentionally concealed these wrongdoings by, for example, failing to report to Paradise Group management the significant incidents observed and reported to Ms. Zhao by Mr. Wu.

240.    Further, Ms. Zhao's participation in Mr. Feng's fraudulent scheme included her assistance with the misappropriation of Paradise Group Trade Secrets and Confidential Business Information ██████████████████████████████.

241.    Ms. Zhao also used her special fiduciary relationship close trusted position as an officer of LTG Limited and the Paradise Group to covertly disclose internal information, such as ███████████████████████████████████████.

242.    Plaintiffs reasonably relied on Ms. Zhao's fraud because of Ms. Zhao's role as a fiduciary of the Paradise Group and her position of special confidence with Dr. Chun and the other managers of Paradise.

243.    Plaintiffs suffered substantial monetary losses as a result of the fraud alleged herein. These losses include: (1) all monies paid into LT Game and Empire that were used without Plaintiffs' knowledge to further Mr. Feng's fraudulent scheme; (2) monies that Plaintiffs knowingly paid to support Empire based upon the misrepresentation that Empire was to be the Paradise Group's long-term exclusive distributor, including Empire employee salaries, Empire office expenses, and Empire gaming license procurement expenses and legal fees; (3) the loss of the Smart Card Shoes at Commerce Casino, as well as the lucrative Commerce Casino leasing contract; (4) losses on the sale to Solution Gaming; (5) lost business opportunities usurped by Mr. Feng, including the F2 opportunity; (6) loss of reputation; and (7) other losses to be shown by the evidence adduced in this case.

244.    Plaintiffs seek compensation for their monetary losses.

245.    Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

246.    As a direct and proximate result of the fraud alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**<u>COUNT FIVE</u>**
**Constructive Fraud**
**(Against All Defendants)**

247.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–246 herein.

248.    Plaintiffs assert this claim for constructive fraud against all Defendants.

249. The same facts alleged under Plaintiffs' claim for fraud also support a cause of action for constructive fraud against Defendants.

250. Because of the special position of fiduciary trust and obligation that Defendants occupied with respect to Plaintiffs, they can be found liable under the constructive fraud doctrine.

251. Plaintiffs seek compensation for their monetary losses, which are the same as those alleged under the fraud claim.

252. Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

253. As a direct and proximate result of the fraud alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**COUNT SIX**
**Conspiracy**
**(Against All Defendants)**

254. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–253 herein.

255. Plaintiffs assert this claim for constructive fraud against all Defendants.

256. The same facts that support Plaintiffs' claims for fraud against Defendants also support a claim for civil conspiracy against them because they all worked in knowing concert to engage in the fraudulent scheme to covertly build up a competing business through Empire and Mr. Feng's other businesses to usurp Plaintiffs in the market at a time when they owed Plaintiffs a duty of disclosure and honesty. Defendants cooperated to engage in fraudulent concealment and misrepresentations that caused Plaintiffs to unwittingly subsidize their own usurpation in the market.

257. Plaintiffs suffered substantial monetary losses as a result of the civil conspiracy alleged herein. These losses include: (1) all monies paid into LT Game and Empire that were used without Plaintiffs' knowledge to further Mr. Feng's fraudulent scheme; (2) monies that Plaintiffs knowingly paid to support Empire based upon the misrepresentation that Empire was to be the

Paradise Group's long-term exclusive distributor, including Empire employee salaries, Empire office expenses, and Empire gaming license procurement expenses and legal fees; (3) the loss of the Smart Card Shoes at Commerce Casino, as well as the lucrative Commerce Casino leasing contract; (4) losses on the sale to Solution Gaming; (5) lost business opportunities usurped by Mr. Feng, including the F2 opportunity; (6) loss of reputation; and (7) other losses to be shown by the evidence adduced in this case.

258.    Plaintiffs seek compensation for their monetary losses.

259.    Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

260.    As a direct and proximate result of the misconduct alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

## COUNT SEVEN
### Conversion
### (Against Empire and Mr. Feng)

261.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–260 herein.

262.    Plaintiffs assert this claim for conversion against Empire and Mr. Feng.

263.    The same facts that support Plaintiffs' claims for fraud against Mr. Feng and Empire also support a claim for conversion. In particular, Mr. Feng and Empire wrongfully induced Plaintiffs to transfer large sums of money to finance the fraudulent activities of Mr. Feng and Empire, which Plaintiffs would never have provided if they had known of the misconduct. Mr. Feng and Empire also unlawfully retained dominion over the Smart Card Shoes that should have been returned to LT Game, claiming them instead for Empire, and converting the cash flow from their lease to Commerce Casino.

264.    Plaintiffs seek compensation for their monetary losses.

265.    Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

266.    As a direct and proximate result of the misconduct alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**COUNT EIGHT**
**Racketeer Influenced and Corrupt Organizations (RICO)**
**18 U.S.C. § 1961, *et seq.***
**(Against GSL, Mr. Feng, Mr. Allison, Mr. Kiely, and Ms. Zhao)**

267.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–266 herein.

268.    Plaintiffs assert this claim for RICO violations against GSL, Mr. Feng, Mr. Allison, Mr. Kiely, and Ms. Zhao (collectively, the "**RICO Defendants**").  These individuals and entities satisfy the "person" requirement for purposes of the RICO Act.

269.    The "enterprise" is Empire, through which all the RICO Defendants conceived of and executed an unlawful artifice or scheme to defraud Plaintiffs to their financial detriment. Empire is engaged in and its activities affect interstate and/or foreign commerce.

270.    Beginning at least as early as 2018 and continuing to the present, the RICO Defendants executed a scheme to misappropriate Plaintiffs' Trade Secrets, Confidential Business Information, financial resources, and other support for the benefit of Empire and for their individual benefit.  The scheme involved a continuous pattern of misrepresentations, half-truths, and material omissions, including misrepresentations, half-truths, and material omissions made by means of interstate and/or foreign wire, intended for the common purpose of defrauding Plaintiffs.

271.    The RICO Defendants conducted or participated in the conduct of the enterprise's affairs and were employed by or affiliated with the enterprise.  During the relevant time period, the RICO Defendants committed multiple predicate acts, *i.e.*, crimes, listed in 18 U.S.C. § 1961(1), including but not limited to wire fraud under 18 U.S.C. § 1343, in furtherance of their scheme and in a manner that constitutes a pattern of racketeering in violation of the RICO Act.

272.    The RICO Defendants knowingly and intentionally used wires to make, or caused to be made, misrepresentations, half-truths, and/or material omissions alleged herein with the

1  intent to deceive and defraud Plaintiffs and obtain money and property.  Likewise, the RICO

2  Defendants knowingly and intentionally used wires to make, or cause to be made, statements in

3  furtherance of or incident an essential component to the scheme to defraud.

4      273.    Plaintiffs have suffered injury by reason of the RICO Defendants repeated and

5  systemic misrepresentations, half-truths, and/or material omissions, including multiple instances

6  of wire fraud.  As a result of the RICO Defendants' fraud, Plaintiffs have wired money and

7  payments to and for the benefit of Empire and the RICO Defendants.

8      274.    Plaintiffs have been damaged by the RICO Defendants' violations of 18 U.S.C §

9  1962 in an amount to be determined at trial, including treble damages, attorneys' fees, and costs.

10                                **COUNT NINE**
                                **Unjust Enrichment**
11                          **(Against Empire and Mr. Feng)**

12      275.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–274

13  herein.

14      276.    Plaintiffs assert this claim for unjust enrichment against Empire and Mr. Feng.

15      277.    Plaintiffs paid large sums of money to unknowingly support Mr. Feng's unlawful

16  personal business agenda to build up a competing business operation to supplant Plaintiffs in the

17  market.  Paradise (and, at its direction, among other subsidiaries, LT Game) were spending a

18  substantial amount of money that Mr. Feng was using to, among other things: (1) secure gaming

19  licenses for Empire that Mr. Feng covertly intended to ultimately use for his own business

20  purposes; (2) pay salaries of those employed at LT Game and Empire who Mr. Feng had recruited

21  to actively help him implement his improper scheme; (3) pay for office space, equipment, and

22  business supplies, all for the financial benefit of Mr. Feng's improper plan; (4) pay for legal

23  services in furtherance of Mr. Feng's improper plan; (5) fund Mr. Feng's operation of F2; and (6)

24  continue supporting Mr. Feng financially so that he was able to have the financial freedom to

25  pursue his improper plan.  Mr. Feng fraudulently caused Plaintiffs to unwittingly pay for their own

26  usurpation in the market.

27      278.    Plaintiffs' unknowing financial support for Mr. Feng and Empire's improper

dealings constitutes unjust enrichment of Mr. Feng and Empire that they should not equitably be allowed to keep.

279.    Plaintiffs seek recovery of the money that was used by Mr. Feng and Empire to engage in Mr. Feng's fraudulent plans.

280.    Plaintiffs seek imposition of a constructive trust to recover all ill-gotten gains of Mr. Feng and Empire.

### COUNT TEN
### Breach of Fiduciary Duty
### (Against Mr. Feng, Mr. Allison, Mr. Kiely, and Ms. Zhao)

281.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–280 herein.

282.    Plaintiffs assert this claim for breach of fiduciary duties against the Employee Defendants.

283.    The Employee Defendants were corporate officers of LT Game/LTG Limited and the Paradise Group, and in that role owed a fiduciary duty to the company and the group. This included a duty to advance the interests of the company, to not engage in self-dealing, to not usurp corporate opportunities, to avoid waste, and to not engage in separate business plans adverse to the company.

284.    Mr. Feng was also a fiduciary of Plaintiffs because of his unique position of special confidence with Dr. Chun and the other managers of Paradise who controlled LT Game, having repeatedly reaffirmed for years that he was acting in the best interests of the family and the family business. Indeed, Mr. Feng held himself out to be an agent for Plaintiffs.

285.    Mr. Allison aligned himself with Mr. Feng, and in his communications with Plaintiffs presented himself as acting in the best interests of the companies. Mr. Allison was aware of the special trust that Plaintiffs had in Mr. Feng and associated himself with that knowing that Plaintiffs would rely upon it.

286.    Mr. Kiely likewise associated himself with Mr. Feng, and in communications with Plaintiffs presented himself as acting in the best interests of the companies. Mr. Kiely was aware

of the special trust that Plaintiffs had in Mr. Feng and associated himself with that knowing that Plaintiffs would rely upon it.

287.    Ms. Zhao aligned herself with Mr. Feng, her cousin, and in her communications with Plaintiffs presented herself as acting in the best interests of the companies.  Ms. Zhao was aware of the special trust that Plaintiffs had in Mr. Feng and associated herself with that knowing that Plaintiffs would rely upon it. Ms. Zhao herself occupied a position of special confidence with Dr. Chun as a close family member and as a direct report to Paradise management, including Dr. Chun.

288.    The Employee Defendants breached their fiduciary duties by actively and knowingly engaging in a covert scheme to build up a business through Empire and Mr. Feng's other companies to compete with and usurp Plaintiffs in the market, taking away corporate opportunities while siphoning Plaintiffs' money and the labor of LT Game and the Paradise Group employees in furtherance of the scheme.  The Employee Defendants owed Plaintiffs duties of loyalty and disclosure that they breached by maintaining their covert plan.

289.    Mr. Feng, Mr. Allison, Mr. Kiely, and Ms. Zhao continued to be fiduciaries after Mr. Feng's resignation from LT Game.  Mr. Feng continued to profess loyalty to Plaintiffs in his communications with Dr. Chun and others in Paradise management in charge of LT Game and failed to disclose his activities.  Mr. Allison continued to work for the interests of LT Game and the Paradise Group through GSL and to join in Mr. Feng's fraud and concealment.  Mr. Kiely continued to work as the chief technology officer of LT Game and the Paradise Group well into 2023, while also participating in Mr. Feng's improper plans.  Ms. Zhao likewise continued to work as the chief operating officer of the Paradise Group until October 2023, while also participating in Mr. Feng's scheme.

290.    Plaintiffs suffered substantial monetary losses as a result of the breach of fiduciary duties alleged herein.  These losses include: (1) all monies paid into LT Game and Empire that were used without Plaintiffs' knowledge to further Mr. Feng's fraudulent scheme; (2) monies that Plaintiffs knowingly paid to support Empire based upon the misrepresentation that Empire was to

be the Paradise Group's long-term exclusive distributor, including Empire employee salaries, Empire office expenses, and Empire gaming license procurement expenses and legal fees; (3) the loss of the Smart Card Shoes at Commerce Casino, as well as the lucrative Commerce Casino leasing contract; (4) losses on the sale to Solution Gaming; (5) lost business opportunities usurped by Mr. Feng, including the F2 opportunity; (6) loss of reputation; and (7) other losses to be shown by the evidence adduced in this case.

291.    Plaintiffs seek compensation for their monetary losses.

292.    Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

293.    As a direct and proximate result of the breaches alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**COUNT ELEVEN**
**Aiding and Abetting**
**(Against Mr. Feng, Mr. Allison, Mr. Kiely, and Ms. Zhao)**

294.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–293 herein.

295.    Plaintiffs assert this claim for aiding and abetting breaches of fiduciary duties against the Employee Defendants.

296.    As set forth in Plaintiffs' cause of action for breach of fiduciary duties, each of Mr. Feng, Mr. Allison, Mr. Kiely, and Ms. Zhao breached their fiduciary duties to Plaintiffs.

297.    Each of Mr. Feng, Mr. Allison, Mr. Kiely, and Ms. Zhao also knowingly and actively aided and abetted each other to breach the other's fiduciary duties, acting in concert.

298.    Plaintiffs suffered substantial monetary losses as a result of the breach of fiduciary duties alleged herein, and the Employee Defendants are responsible for losses that they aided and abetted.  These losses include: (1) all monies paid into LT Game and Empire that were used without Plaintiffs' knowledge to further Mr. Feng's fraudulent scheme; (2) monies that Plaintiffs knowingly paid to support Empire based upon the misrepresentation that Empire was to be the

Paradise Group's long-term exclusive distributor, including Empire employee salaries, Empire office expenses, and Empire gaming license procurement expenses and legal fees; (3) the loss of the Smart Card Shoes at Commerce Casino, as well as the lucrative Commerce Casino leasing contract; (4) losses on the sale to Solution Gaming; (5) lost business opportunities usurped by Mr. Feng, including the F2 opportunity; (6) loss of reputation; and (7) other losses to be shown by the evidence adduced in this case.

299.    Plaintiffs seek compensation for their monetary losses.

300.    Plaintiffs seek punitive damages for the knowing, willful, and intentional misconduct alleged herein.

301.    As a direct and proximate result of the breaches alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, late fees, attorneys' fees, and costs.

**COUNT TWELVE**
**Breach of Contract**
**(Against GSL, Mr. Allison, Mr. Kiely and Ms. Zhao)**

302.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–301 herein.

303.    Plaintiffs assert this claim for breach of contract against GSL, Mr. Allison, Mr. Kiely, and Ms. Zhao.

304.    Each of Mr. Kiely, Mr. Allison, and GSL had entered into written contracts with LT Game under which they were bound to not compete with LT Game and the Paradise Group and to maintain confidentiality of all non-public LT Game and the Paradise Group business information.  These included Mr. Kiely's August 30, 2019 Employment Contract with LT Game, Mr. Allison's January 1, 2020 Employment Contract with LT Game, and GSL's June 30, 2022 Agreement with LT Game.

305.    Likewise, Ms. Zhao had entered into oral contracts with the Paradise Group relating to her employment from 2007 to 2023.  The Paradise Group reasonably relied on these oral contracts because Ms. Zhao occupied a position of special confidence with Dr. Chun as a close

family member and because Paradise's senior management were advised by their Macau attorneys that such oral employment contracts were in accordance with Macau law.  During her employment, the Paradise Group provided payments for Ms. Zhao's remuneration, income taxes, medical and sick leave benefits, and other benefits, such as discretionary bonuses.  In exchange, Ms. Zhao agreed to, among other things, serve as the Paradise Group's chief operating officer, which necessarily required that Ms. Zhao exclusively advance the interests of the Paradise Group and safeguard all Paradise Group property and non-public business information.

306.    While those contracts were in force, Mr. Kiely, Mr. Allison,  GSL and Ms. Zhao, each performed work for Mr. Feng and Empire in furtherance of Mr. Feng's fraudulent scheme to build up a competing business against LT Game and the Paradise Group and usurp LT Game in the market.  Mr. Kiely, Mr. Allison,  GSL and Ms. Zhao used their special knowledge of confidential LT Game and the Paradise Group information to support Mr. Feng and Empire's scheme.  Mr. Kiely, Mr. Allison,  GSL, and Ms. Zhao thereby breached their contracts with Plaintiffs.

307.    Mr. Kiely further breached his agreements with LT Game by assigning rights in intellectual property developed at LT Game and the Paradise Group to Empire.

308.    Plaintiffs suffered substantial monetary losses as a result of the breaches alleged herein, as the breaches contributed in-part directly and foreseeably to other monetary losses alleged in Plaintiffs' other causes of action hereunder.

309.    Plaintiffs seek compensation for their monetary losses.

310.    Plaintiffs seek an injunction precluding Mr. Kiely, Mr. Allison,  GSL, and Ms. Zhao from using or disclosing Plaintiffs Trade Secrets and Confidential Business Information to anyone outside of the Paradise Group.

311.    Plaintiffs seek an order declaring that they have an ownership interest in all intellectual property rights improperly assigned to Empire and/or in Defendants' possession and requiring transfer of such interests.

312.    As a direct and proximate result of the breaches alleged herein, Plaintiffs have been

injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**COUNT THIRTEEN**
**Tortious Interference with Contract**
**(Against Empire and Mr. Feng)**

313.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–312 herein.

314.    Plaintiffs assert this claim for tortious interference with contract against Empire and Mr. Feng.

315.    As alleged in Plaintiffs' claim for breach of contract, Mr. Kiely, Mr. Allison, GSL, and Ms. Zhao breached their contracts with Plaintiffs.

316.    Mr. Feng (and through him, Empire) was well aware of those contracts, yet knowingly and tortiously interfered with them by compelling Mr. Kiely, Mr. Allison, and Ms. Zhao to covertly support Mr. Feng's scheme to supplant LT Game and the Paradise Group and siphon their money and resources.  Mr. Feng and Empire did this at a time when they knew that the respective contracts between Plaintiffs and Mr. Kiely, Mr. Allison,  GSL, and Ms. Zhao were in effect.

317.    Plaintiffs suffered substantial monetary losses as a result of the breaches alleged herein, as the breaches contributed in-part directly and foreseeably to other monetary losses alleged in Plaintiffs' other causes of action herein.

318.    Plaintiffs seek compensation for their monetary losses.

319.    Plaintiffs seek punitive damages for Mr. Feng and Empire's knowing and deliberate misconduct.

320.    As a direct and proximate cause of the breaches alleged herein, Plaintiffs have been injured and damaged in an amount to be proven at trial plus applicable interest, attorneys' fees, and costs.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that this Court enter judgment against Defendants and in favor

of Plaintiffs:

        A.     For an award of compensatory, actual, and special damages;

        B.     For an award of exemplary and punitive damages;

        C.     For an accounting of all gains, profits, and advantages derived by Defendants as a result of their misappropriation, improper use, and infringement of Plaintiffs' Trade Secrets, Confidential Business Information, copyrighted works, financial resources, and other support;

        D.     For an injunction enjoining Defendants and their affiliates from: (1) accessing, disseminating, or otherwise using Plaintiffs' Trade Secrets and Confidential Business Information, and requiring that any such information in their possession be returned to Plaintiffs; (2) using Plaintiffs' Trade Secrets and Confidential Business Information to interfere with Plaintiffs' business and/or for the benefit of Defendants or any third parties; (3) using Plaintiffs' Trade Secrets and Confidential Business Information to solicit and/or recruit Plaintiffs' employees; and manufacturing, reproducing, distributing, adapting, displaying, advertising, promoting, or offering for sale and/or selling any materials that are substantially similar to Plaintiffs' copyrighted works, and to deliver to the Court for destruction or other reasonable disposition all such materials and means for producing same in Defendants' possession or control;

        E.     For an award of restitution;

        F.     For an award of prejudgment and post-judgment interest until the judgment is paid in full;

        G.     For an award of attorneys' fees and costs as allowed by law; and

        H.     For such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury for all issues triable by jury.

DATED: February 27, 2025

                    */s/ Jessica M. Lujan*
                    OLIVER J. PANCHERI, ESQ.
                    Nevada Bar No. 7476

JESSICA M. LUJAN, ESQ.
Nevada Bar No. 14913
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
        jlujan@spencerfane.com

JEAN-PAUL CIARDULLO, ESQ. *(pro hac vice)*
California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel.: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

STEWART RAY NELSON, ESQ. (*pro hac vice*)
HANNAH L. ANDREWS, ESQ. (*pro hac vice*)
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, UT 84111
Tel.: (801) 401-8900
Email: srnelson@foley.com
        handrews@foley.com

*Attorneys for Plaintiffs/Counterdefendants*