Oliver J. Pancheri, Esq. (Nevada Bar No. 7476)
Jessica M. Lujan, Esq. (Nevada Bar No. 14913)
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
        jlujan@spencerfane.com

Jean-Paul Ciardullo, Esq. (*pro hac vice*)
 California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

Robert T. Stewart, Esq. (Nevada Bar No. 13770)
Stewart Ray Nelson, Esq. (*pro hac vice*)
Hannah L. Andrews, Esq. (*pro hac vice*)
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
        srnelson@foley.com
        handrews@foley.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; LT GAME, INC., a Nevada corporation; and LT GAME LIMITED, a British Virgin Islands Corporation, | Case No. 2:24-cv-00428-JCM-BNW |
| | **PLAINTIFFS' RENEWED MOTION TO COMPEL PRODUCTION OF LEWIS ROCA RECORDS** |
| *Plaintiffs, Counterdefendants*, | |
| vs. | |
| EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; DARYN KIELY, an individual; and YI ZHAO, and individual, | [ORAL ARGUMENT REQUESTED] |
| *Defendants, Counterclaimants*. | |

Plaintiffs Paradise Entertainment Limited ("Paradise") and its subsidiaries LT Game Limited ("LTG Limited") and LT Game Inc. ("LT Game," formerly LT Game (Canada) Ltd.) hereby move, pursuant to Fed. R. Civ. P. 37(a)(1) and LR 26-6, to compel defendants Linyi "Frank" Feng, Roy Kelcey Allison, Daryn Kiely, and Empire Technological Group Ltd. (collectively "Defendants") to disclose their communications with LT Game's legal counsel, Lewis Roca Rothgerber Christie, LLP ("Lewis Roca") – as well as other past LT Game counsel – that Defendants are improperly withholding under a claim of privilege (the "Motion"). Specifically, Plaintiffs seek an order directing production of (1) communications that Defendants had with LT Game's counsel at a time when Defendants were managers of LT Game, and (2) any other communications that included LT Game employees. Such records properly belong to LT Game and cannot be withheld by Defendants. This Motion is also made pursuant to Fed. R. Civ. P. 45(d)(2)(B)(i) to compel several subpoenaed non-party companies controlled by Feng to the extent Defendants communicated with LT Game's counsel through those non-party companies' accounts. This Motion is made and based upon the papers and pleadings on file herein, the following points and authorities, the accompanying Declaration of Jean-Paul Ciardullo, Esq. ("Ciardullo Dec.") attached hereto as **Exhibit 1**, the Declaration of Chan Kin Man ("Leo Chan"), previously filed as ECF No. 55-2, at 23-32, the Declaration of Marco Medero, previously filed as ECF No. 55-2, at 90-95, any additional exhibits attached hereto, and any oral argument at the hearing on this matter.

DATED:  June 5, 2025

*/s/ Jessica M. Lujan*
OLIVER J. PANCHERI, ESQ.
Nevada Bar No. 7476
JESSICA M. LUJAN, ESQ.
Nevada Bar No. 14913
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
        jlujan@spencerfane.com

## TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................................... 1

II.     FACTUAL BACKGROUND ........................................................................................ 3

III.    PROCEDURAL BACKGROUND ............................................................................... 7

        A.      The Privilege Issue Cuts Across Virtually All Of Discovery ........................... 7

        B.      Plaintiffs' Meet And Confer Efforts ................................................................. 9

        C.      Defendants' Privilege Logs ............................................................................... 9

IV.     APPLICABLE LAW: THE *BEVILL* TEST ............................................................... 11

V.      DEFENDANTS CANNOT WITHHOLD THEIR COMMUNICATIONS WITH LT
        GAME'S LAWYERS ................................................................................................ 12

        A.      Defendants Cannot Satisfy The *Bevill* Test ................................................. 13

        B.      Defendants Cannot Claim Privilege Over Communications That Included LT
                Game Employees, Or That Happened Over LT Game's Shared Email Account
                With Paradise ................................................................................................. 15

        C.      Alternatively, LT Game and Defendants Hold a Joint Client Privilege ........ 15

        D.      Defendants Have The Burden To Prove That Other Counsel Were Hired And Paid
                For Separately By Empire, And Were Not Advising LT Game .................... 16

        E.      Plaintiffs Also Seek Production From The Non-Party Companies ................ 16

VI.     ALTERNATIVELY, PLAINTIFFS REQUEST IN-CAMERA INSPECTION ..................... 17

VII.    CONCLUSION .......................................................................................................... 18

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                      **Page(s)**

*Acosta v. Wellfleet Commc'ns, LLC*
  No. 216CV02353GMNGWF, 2018 WL 11409850 (D. Nev. Aug. 10, 2018).............................. 16, 17

*Bass Pub. Co. v. Promus Companies Inc.*
  868 F. Supp. 615 (S.D.N.Y. 1994)................................................................ 15

*Ciuffitelli v. Deloitte & Touche LLP*
  No. 3:16-CV-0580-AC, 2017 WL 788394 (D. Or. Mar. 1, 2017)........................................ 12

*Diamond State Ins. Co. v. Rebel Oil Co., Inc.*
  157 F.R.D. 691 (D. Nev. 1994).................................................................. 11

*Flannery Assocs., LLC v. Barnes Fam. Ranch Assocs., LLC*
  No. 2:23-CV-0927 TLN AC, 2024 WL 5111885 (E.D. Cal. Dec. 13, 2024)............................... 14

*Garvy v. Seyfarth Shaw LLP*
  966 N.E.2d 523 (Ill. App. Ct. 2012) ........................................................... 15

*Hall CA-NV, LLC v. Ladera Dev., LLC*
  No. 318CV00124RCJWGC, 2019 WL 5448458 (D. Nev. Oct. 24, 2019)................................... 14

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*
  805 F.2d 120 (3d Cir.1986).................................................................. passim

*In re Grand Jury Investigation*
  974 F.2d 1068 (9th Cir. 1992) ................................................................. 16

*In re Napster, Inc. Copyright Litigation*
  479 F.3d 1078 (9th Cir. 1007) ................................................................. 16

*Lahr v. National Transportation Board,*
  569 F.3d 964 (9th Cir. 2009) ................................................................. 17

*Livingston v. Wagner*
  42 P. 290 (1895).............................................................................. 14

*Mohawk Indus., Inc. v. Carpente,*
  558 U.S. 100 (2009)........................................................................... 16

*Sovereign Holdings, Inc. v. Deck*
  No. 4:17-CV-04105-KES, 2018 WL 4441468 (D.S.D. Sept. 17, 2018) ................................. 12

*United States v. Chen*
  99 F.3d 1495 (9th Cir.1996) .................................................................. 10

*United States v. Christensen*
  828 F.3d 763 (9th Cir. 2016) ............................................................... 16, 17

*United States v. Graf*
  610 F.3d 1148 (9th Cir. 2010) .............................................................. passim

*United States v. Holmes*
   No. 18CR00258EJD1NC, 2021 WL 2309980 (N.D. Cal. June 3, 2021) ........................................... 12

*United States v. Ruehle*
   583 F.3d 600 (9th Cir. 2009) ........................................................................................ 10

*United States v. Zolin*
   491 U.S. 554 (1989) ............................................................................................... 16, 17

*Upjohn Co. v. United States*
   449 U.S. 383 (1981) ..................................................................................................... 10

*Weil v. Inv. Indicators, Research Mgmt., Inc.*
   647 F.2d 18 (9th Cir. 1981) ........................................................................................ 14

**Federal Statutes**

Fed. R. Civ. P. 26(b)(5) ......................................................................................................... 11

Fed. R. Civ. P. 45(d)(2)(b)(i) ............................................................................................... 15

## I.  **INTRODUCTION**

Plaintiffs Paradise Entertainment Limited ("Paradise") and its subsidiaries LT Game Limited ("LTG Limited") and LT Game Inc. ("LT Game," formerly LT Game (Canada) Ltd.) hereby move to compel defendants Linyi "Frank" Feng, Roy Kelcey Allison, Daryn Kiely, and Empire Technological Group Ltd.[1] (collectively "Defendants") to disclose their communications with LT Game's legal counsel, Lewis Roca Rothgerber Christie, LLP ("Lewis Roca") – as well as other past LT Game counsel – that Defendants are improperly withholding under a claim of privilege. Specifically, Plaintiffs seek an order directing production of (1) communications that Defendants had with LT Game's counsel at a time when Defendants were managers of LT Game, and (2) any other communications that included LT Game employees. Such records properly belong to LT Game and cannot be withheld by Defendants. Plaintiffs also move to compel several subpoenaed non-party companies controlled by Feng to the extent Defendants communicated with LT Game's counsel through those non-party companies' accounts.

The parties to this case are in the business of supplying gaming equipment to casinos. Paradise is a well-known Macau-based company led by Dr. Jay Chun, Paradise's Chairman. As detailed in the operative Complaint (ECF No. 69), many years ago, Dr. Chun appointed his brother-in-law – Defendant Feng – to help run various subsidiaries for the purpose of expanding Paradise's business into North America. Despite Feng's lack of prior experience, Dr. Chun trusted him as a family member. Feng was ultimately assigned the role of President of Paradise's subsidiary LT Game in Las Vegas, while simultaneously serving as the President of another company – Defendant Empire – which was intended to be the long-term exclusive distributor of LT Game. Until 2023, LT Game and Empire overlapped significantly, sharing employees and the same office space the entire time. Until he resigned as President of LT Game in February 2022, Feng answered to Dr. Chun (who he referred to as "Boss") and Paradise's

---

[1] It will be apparent in certain contexts herein that the term "Defendants" is used as a convenient shorthand for the individual persons rather than the company, Empire. To the extent the records sought herein are also in the possession of Gaming Specialized Logistics LLC – which is Defendant Allison's consulting company – Allison should produce them in his capacity as manager of that company. Plaintiffs separately note that Defendant Yi Zhao was recently added to the case and Plaintiffs believe that she was involved in the same conspiracy as the other Defendants. However, because she technically is not yet subject to any discovery requests, Plaintiffs do not here purport to move to compel her in her individual capacity, and for simplicity, Plaintiffs will not refer to her in the Motion.

PLAINTIFFS' RENEWED MOTION TO COMPEL
Case No. 2:24-cv-00428-JCM-BNW

Chief Financial Officer, Chan Kin Man ("Leo Chan"). Feng's immediate reports – Allison and Kiely – likewise were simultaneously managers of LT Game and Empire. Feng, Allison, and Kiely all owed fiduciary duties and contractual obligations to Paradise and LT Game during their tenure there. By 2023, Paradise had invested millions of dollars into LT Game and Empire, including for Lewis Roca legal fees.

As alleged in the Complaint, unbeknownst to Plaintiffs, starting in 2017 and escalating by 2020, Defendants embarked on a secret plan to leverage Plaintiffs' money, employees, and reputation to build an entirely separate and competing business under Empire that was intended to usurp LT Game corporate opportunities and supplant LT Game. Defendants – who were fiduciaries of LT Game – employed Lewis Roca and other lawyers to assist in their fraud, despite the fact that these were LT Game's own attorneys, and Paradise was paying their legal bills on the understanding that Lewis Roca's advice was for the benefit of LT Game. Today, LT Game has been left a shell, with its employees poached for Empire, while Empire has expanded into Macau to compete directly with Paradise.

Defendants have claimed sweeping privilege over their communications with Lewis Roca and other attorneys for the 2017-2023 timeframe. This is improper: under the *Bevill* test (discussed herein) those communications belong to LT Game because they were made by LT Game's own managers (Feng, Allison, and Kiely) concerning matters that directly impacted LT Game, and LT Game paid for the legal services. Additionally or alternatively, the communications during that time period are subject to a joint privilege and are co-owned by LT Game.

The Lewis Roca communications (as well as other similar law firm correspondence) undoubtedly hold the key to exposing the full story of what transpired during the 2017-2023 timeframe, including Defendants' fraudulent intent to supplant LT Game through various business deals and licensing strategies that Lewis Roca was advising Defendants about without the knowledge of Dr. Chun's team. Notably, the Nevada Gaming Control Board has shown interest in understanding the details of Defendants' dealings during this period. In March and July 2023, the Nevada Gaming Commission conducted hearings on whether to approve a limited 2-year license for Defendants, and questioned them extensively about Empire's close overlapping relationship with LT Game.[2] Plaintiffs believe that the documents that

---

[2] *See* March 2023 hearing at 2:50:00 to 3:45:00 [https://www.youtube.com/watch?v=T5Ryqm8bzX8 ] and July 23, 2023 hearing at 1:55:00 to 2:27:00 [ https://www.youtube.com/watch?v=0cmV2NjPpFU ].

Defendant are now withholding contain information relevant to both the Nevada Gaming Control Board's investigation and Plaintiffs' case. The Board's investigation remains active as Defendants prepare for their upcoming license renewal this year.

By this Motion, Plaintiffs respectfully ask the Court to order production of the legal communications being withheld from Plaintiffs under an improper claim of privilege. In the alternative, Plaintiffs seek an in-camera inspection so that the Court (or an appointed Special Master) can determine how these records should be treated.

It is apparent that Defendants – while still managers of LT Game – were using LT Game's own lawyers to undermine LT Game, while having LT Game unwittingly pay for that legal counsel. Without relief from the Court, Plaintiffs will be precluded from accessing what should properly be regarded as their own client file.[3]

## II.    FACTUAL BACKGROUND

Plaintiffs' heavily-researched Complaint (ECF No. 69) asserts thirteen causes of action against Defendants relating to fraud, conspiracy, conversion, racketeering, unjust enrichment, breach of fiduciary duty, aiding and abetting, breach of contract, tortious interference with contract, misappropriation of trade secrets, and copyright infringement. The summary of basic background facts in the Introduction is supported by the contemporaneously filed Declarations of Chan Kin Man ("Leo Chan," Paradise's CFO) and Marco Medero, one of LT Game's remaining employees. Those Declarations elaborate as follows.

Paradise management and LT Game considered Lewis Roca to be an all-purpose legal advisor, providing legal advice on how LT Game (and Empire) should properly and lawfully conduct business. (ECF No. 55-2, at 26, ¶ 5.) The broad scope of the engagement was confirmed in the March 2012, July 2017, and January 2018 LT Game engagement letters, which memorialized that Lewis Roca was representing LT Game for "gaming and regulatory matters," "intellectual property matters," and "labor and employment." (ECF No. 55-2, at 33-65.)[4] Paradise management and LT Game also believed that

---

[3] Plaintiffs note that they are uncertain at this time how much Lewis Roca and other counsel understood about what was happening. Plaintiffs suspect that Feng falsely told counsel that his actions had been approved by Plaintiffs in order to quell concerns counsel may have had about conflicts of interest.

[4] The engagement letters are direct to "LT Game Ltd." Based on context, Plaintiffs believe this may have been a typo for "LT Game (Canada) Ltd.," but in any event, LTG Limited – now also a co-plaintiff in the lawsuit – has the same management as Plaintiffs and is controlled by Paradise, so it is a distinction without

Lewis Roca was simultaneously serving as all-purpose legal counsel for Empire, especially with respect to obtaining gaming licenses, since the understood purpose of Empire was to be LT Game's long term exclusive distributor. (ECF No. 55-2, at 26, ¶ 6.) It was on this understanding that Plaintiffs paid Lewis Roca's legal bills to Empire, totaling hundreds of thousands of dollars. (ECF No. 55-2, at 26-28, ¶¶ 6-7, 12). This is over and above hundreds of thousands more dollars otherwise paid by LT Game to Lewis Roca. (ECF No. 55-2, at 28, ¶ 12.) Much of Plaintiffs' money that was paid on behalf of Empire went towards Lewis Roca obtaining gaming licenses for Empire to act as the exclusive distributor for LT Game. (ECF No. 55-2, at 28, ¶ 12.) Feng would submit Requisition Forms to LT Game to cover Empire's expenses, and a sampling of these is at (ECF No. 55-2, at 66-89.).[5] Below is a representative image from one of the Requisitions in which Feng arranged for LT Game to pay Empire's bills from Lewis Roca.

| Requisition Form | | |
|---|---|---|
| LT Game (Canada) Limited | | |
| ☐ Bill to client | ☒ Office use only | ☐ Others |
| | HK07.2021-07 | |
| Paid by: | ☐ Australia office  ☐ US office  ☐ Macau office  ☒ HK office | |
| Payee: | **Lewis Roca Rothgerber**  ☒ Existing vendor  ☐ New vendor (Attach an approved Vendor Request Form if over USD5,000) | |
| Amount: | ☐ HK$  ☒ USD  ☐ AUD  ☐ Other (Please specify): $46,430.50 | |
| Payment due date: | August 05 2021 | |
| Applicant's Dept: | LT Game (Canada) Limited  Applicant: | |
| Period: | July 2021 | |
| Invoice #: | 1409477, 1405646 | |
| Location: | HK | |
| Reasons: | Legal fees to obtain Nevada Gaming License  Filing of game trademarks | |
| Requested by:  Marcos Medero  Date: July 20 2021 | Approved by:  Frank Feng  Date: July 20 2021 | Approved by:  Date: | Approved by Chairman:  Date: |

US COA Code: _ 66710 – Legal Fees – Gaming License
66715 – Legal fees – Other

---

a difference. (ECF No. 55-2, at 25-27, ¶¶ 1, 7).

[5] To avoid confidentiality concerns, Plaintiffs have refrained from attaching the various underlying invoices themselves to this pleading, but can provide these upon request. Defendants are already in possession of them, as it was Feng who approved all the Requisitions.

Although Paradise management had authorized the engagement of Lewis Roca and were paying Lewis Roca's legal bills (including for Empire), because Paradise's management is based in Macau, they necessarily left day-to-day management of the Lewis Roca relationship to Feng, who they relied on as a fiduciary to truthfully and accurately report on legal advice received from Lewis Roca. (ECF No. 55-2, at 26-28, ¶¶ 6, 11.) Feng was supported in his management role at LT Game by Defendants Allison and Kiely. Kiely had been promoted to LT Game's Chief Technology Officer in 2019 after having already worked at the company for several years prior to that and gaining the trust of Paradise management. (ECF No. 55-2, at 27, ¶ 8; ECF No. 1-1, Ex. A, 8-30-2019 Kiely Employment Contract.) Kiely remained in the role of CTO until his resignation on March 31, 2023. (ECF No. 55-2, at 26-27, ¶ 8). Separately, Allison was appointed as LT Game's Senior Vice President of Operations and Business Development on January 1, 2020. (ECF No. 55-2, at 26-27, ¶ 9; ECF No. 1-4, Ex. D, 1-1-2020 Allison Employment Contract.) Then on July 1, 2022, Allison's company, GSL, entered into a consulting agreement with LT Game with a one-year term. (ECF No. 55-2, at 27, ¶ 10; ECF No. 1-5, Ex. E, 6-30-2022 Agreement.) Ultimately, Feng resigned as President of LT Game in February 2022, while Allison and Kiely stayed on in senior roles at LT Game until 2023. (ECF No. 55-2, at 28, ¶ 13).

Unbeknownst to Dr. Chun, Leo Chan, and the Paradise management team overseeing LT Game, Feng – with the assistance of Allison and Kiely – had embarked on a covert plan to build up a parallel gaming conglomerate under Empire in conjunction with several other new gaming companies that Feng was creating without the knowledge of Paradise's management, including Playful Interactive (formed in Nevada on 4/29/2019), F2 TPS (formed in California on 1/14/2020), Akkadian (formed in Nevada on 5/21/2021), Solution Gaming (formed in Nevada on 5/21/2021), and others.[6] (ECF No. 55-2, at 29, ¶ 15.) This misconduct began in 2017 or earlier, and escalated by 2019. Examples of Defendants' fraudulent conduct include matters listed below, which are not exhaustive. Had Paradise management known that Defendants were engaged in these covert activities, they would not have continued to provide funding and support to Defendants. (ECF No. 55-2, at 29-30, ¶ 17.)

- In 2020, Feng took over $1 million from LT Game as funding for a separate company, F2

---

[6] Company formation dates available from public Secretary of State records online.

PLAINTIFFS' RENEWED MOTION TO COMPEL
Case 2:24-cv-00428

TPS. Paradise was not aware of the transaction and would not have authorized such transaction without the Paradise Group's involvement in the company. (ECF No. 55-2, at 30, ⁋ 17(b); ECF No. 55-2, at 94, ¶ 8.)

- In 2020, Feng and Kiely filed a patent application for what became U.S. Patent No. 11,341,807 pertaining to casino gaming equipment. (ECF No. 69, ⁋ 123-24.) Unbeknownst to Plaintiffs, they assigned ownership to Empire, even though Kiely's employment contract with LT Game required assignment to LT Game. (ECF No. 1-1, at 4, Ex. A, Section 5.B.)

- LT Game owned many card shoes (electronic machines for dispensing playing cards) that it allowed Empire to lease to Commerce Casino in Los Angeles so that LT Game could earn money from those leases. In January 2022, Feng reported to Paradise that Commerce Casino had found another supplier and no longer wanted to do business with LT Game. Based on the evidence now uncovered, it appears that Defendants simply re-branded LT Game's card shoes, kept them at Commerce Casino, and took the leasing revenue for themselves. (ECF No. 55-2, at 30, ⁋ 17(c).)

- Empire and LT Game employees worked in the same office space, yet starting in mid-2021, Feng had moved them to another location while having LT Game continue to pay rent at what had become effectively an unoccupied address. (ECF No. 55-2, at 92, ¶ 4.)

- At one point, Feng arranged for Lewis Roca to prepare a "Shared Services Agreement" to be signed by Mr. Feng on behalf of both LT Game and Empire. Paradise management was not made aware of this document. (ECF No. 55-2, at 31, ⁋ 17(d).)

- In 2022, Defendants persuaded Paradise to authorize the sale of a large amount of LT Game equipment at a heavily discounted price to a company called Solution Gaming. They failed to inform Paradise that Feng and Allison controlled Solution Gaming. Paradise would not have authorized the transaction if they knew that. (ECF No. 55-2, at 31, ⁋ 17(f).)

- In around October 2021, Feng approached Paradise saying that LT Game's lawyers at Lewis Roca had determined that LT Game needed to enter into a new series of contracts with Empire. Plaintiffs trusted Feng and their lawyers to give them lawful and appropriate legal advice that was for LT Game's benefit and in furtherance of Plaintiffs' understanding

of Empire being LT Game's exclusive distributor. However, had Paradise management been aware of Defendants' covert conduct in establishing a competing business conglomerate, and the true circumstances surrounding the proposed contracts, they would never have authorized execution. (ECF No. 55-2, at 31, ₱ 17(g).)

It was not until mid-2023 that Plaintiffs began to understand what Defendants had been doing. At that time, Plaintiffs became aware of news reports indicating that Feng was using Empire to purchase assets out of bankruptcy of Aruze Gaming, a competitor in the sale of gaming equipment. (ECF No. 55-2, at 29, ₱ 15.) This revelation prompted an investigation and dialogue with Defendants, ultimately leading to the present litigation. As late as August 2023 (shortly before the parties' legal dispute began), Lewis Roca was still representing LT Game as its client.

Empire has now opened a branch in Macau where it is attempting to compete directly in Paradise's primary market. (ECF No. 55-2, at 29, ₱ 15.) Meanwhile, Plaintiffs have lost tens of millions of dollars in their investment in LT Game and Empire (not including lost business opportunities usurped by Defendants), and watched as LT Game's employees have been poached away in service of a competitor that Plaintiffs unwittingly helped build. (ECF No. 55-2, at 27-29, ₱₱ 10, 15.)

## III.    PROCEDURAL BACKGROUND

### A.    The Privilege Issue Cuts Across Virtually All Of Discovery

Plaintiffs have served expansive Requests for Production and Interrogatories on Defendants seeking documents and information about essentially all of Defendants' various business activities. Defendants' objections and responses invoke privilege across the board, and even where Defendants agreed to produce documents or written responses, it was subject to a claim of privilege. (*See* all Requests, Responses, and Objections, ECF No. 55-1, at 4-6, ¶¶ 1-7, Ex. 1-A-F.) The following is a non-exhaustive summary of discovery requests that Defendants have responded to invoking privilege, irrespective of whether Defendants were obtaining LT Game's counsel's legal advice with respect to these matters while they were managers and fiduciaries of LT Game:

- corporate formation and deal-making to supplant LT Game (RFP Nos. 17, 18, 36, 15, 19, 24, 118-120, 121, ECF No. 55-1, at 105-145). (*See*, *e.g.*, ECF No. 69 at ¶¶ 129-135, 144-146);

- sabotaging LT Game's business relationships with Commerce Casino and others (RFP Nos. 8-11, 27, 51, and 58, ECF No. 55-1, at 102-120). (*See*, *e.g.*, ECF No. 69 at ¶¶ 92-96, 129-132, 139, 142, 223);

- leveraging LT Game counsel to obtain gaming licenses for Empire, which was supposed to be LT Game's exclusive distributor (RFP Nos. 67-69, 70, ECF No. 55-1, at 122-124). (*See*, *e.g.*, ECF No. 69 ¶¶ 106-107, 86, 165);

- communicating about or with LT Game, Paradise Group, their executives, employees, and affiliates (RFP Nos. 1, 2, 5-7, 33, 37-40, 42-44, 46-48, ECF No. 55-1, at 100-117); and

- engaging in acts that would constitute infringement (RFP No. 75, ECF No. 55-1, at 126-127). (*See*, *e.g.*, ECF No. 69 at ¶¶ 38, 61, 103, 131, 209-211.)

On September 27, 2024, Plaintiffs also served Rule 45 subpoenas on Mr. Feng's non-party companies, including Akkadian, Solution Gaming, and F2 TPS (as to all of Feng's other companies, the "Non-Party Companies")[7], seeking documents concerning their involvement with Defendants. (ECF No. 55-1, at 102-120, at 6, ⁋ 8; 149-189.) Here again, these entities (*i.e.*, Feng, since he is their manager) universally invoked privilege, irrespective of whether Feng was seeking legal advice while serving as LT Game's President and fiduciary.[8] (ECF No. 55-1, at 102-120, at 6, ¶ 9; 190-197.)

Not only does the question of privilege cut across essentially all document discovery and interrogatory responses, but it will soon become an issue at upcoming depositions. For example, Plaintiffs will be asking Defendants questions about their strategies and plans with respect to Empire and LT Game, including their motivations, for example, in wanting LT Game to sign contracts that Feng had arranged for Lewis Roca to prepare. Plaintiffs should be able to probe about what LT Game's own lawyers at Lewis Roca told LT Game's President and management team about matters that impacted LT Game's business. However, based on their present objections, Defendants are expected to invoke privilege.

---

[7] Plaintiffs subpoenaed the following Non-Party Companies: (1) Akkadian Enterprises; (2) Ephesus Holdings; (3) F2 TPS, LLC; (4) F&T LV Holdings, LLC; (5) F&T LV Real Estate 1, LLC; (6) F&T LV Real Estate 2, LLC; (7) F&T LV Real Estate 3, LLC; (8) Playful Interactive, Inc.; (9) Pro-Tek Limited; (10) Solution Gaming Technologies; and (11) Victorian Investment Holdings.

[8] As Feng is a party in the case, Plaintiffs believe he should be independently responsible for producing the requested documents and information regarding his non-party companies that are in his custody and control, but Plaintiffs served subpoenas on them as a belt-and-suspenders approach.

### B.    Plaintiffs' Meet And Confer Efforts

On September 21, 2024, Plaintiffs contacted Lewis Roca in their capacity as a client and requested all records, including emails and communications, relating to LT Game's and Empire's representation during the time that Defendants still managed LT Game. (ECF No. 55-1, at 6, ¶ 10, ECF No. 55-2, at 17.) This prompted multiple emails chains that expanded to include Defendants and that went back and forth on the question of privilege several times. (ECF No. 55-2, at 8-17, 5-7, 18-20.) On October 8, 2024, Plaintiffs' counsel conferred with Defendants by phone, at which point Defendants proposed that they take possession of all the Lewis Roca records that they deemed privileged, and that they would prepare a privilege log. (ECF No. 55-1, at 7, ¶ 11.) Plaintiffs objected to the idea that Defendants had superior rights to what Plaintiffs regard as LT Game's own client file, and stated that Plaintiffs preferred court intervention, including perhaps an in-camera review. (*Id.*) However, no resolution was reached.

On October 25, 2024, Plaintiffs served a subpoena on Lewis Roca seeking the same documents. (ECF No. 55-1, at 6, ¶ 12.) Lewis Roca responded on November 12, 2024, objecting to the production of the communications that are now the subject of this Motion. (*Id.*) During further discussions, Plaintiffs stated their intent to move to compel Defendants, expecting that Defendants themselves likely were already in possession of most of the relevant Lewis Roca communications and documents. (ECF No. 55-1, at 7, ¶¶ 11, 13.) Ultimately Plaintiffs agreed to postpone motion practice until Defendants provided a privilege log and the parties could discuss the matter further, as they now have. (ECF No. 55-1, at 7, ¶ 13.)

### C.    Defendants' Original Privilege Logs

On December 13, 2024, Defendants produced two privilege logs, one logging redacted documents that were produced in response to Plaintiffs' discovery requests and another logging entirely withheld documents in response to Plaintiffs' discovery requests. (ECF No. 55-1, at 7, ¶¶ 14-15.) Copies of those logs were filed in the previous iteration of this motion, though as discussed below they have now been updated to a degree. (ECF No. 55-1, at 7, ¶¶ 14-15; ECF 55-2, at 21-22.) Defendants' original privilege logs contains 2,731 documents that were completely withheld under an asserted attorney-client privilege, and 2,272 documents that contained redactions on asserted attorney-client privilege grounds. These documents span a time period that goes back as far as 2017, long before Defendants ceased to have

management roles at LT Game. Many of the emails from Defendants on the logs came from their Empire email accounts (@etgltd.com), but there were also a significant number that were from or sent to LT Game's email accounts (@hk1180.com). Regardless of the email account used, the privilege logs show that many of the communications included LT Game employees, which would seem on its face to undermine the claim of privilege. The accompanying Medero Declaration provides a list of LT Game employees referenced in the privilege logs to help the Court understand which individuals on the logs worked for LT Game. (ECF No. 55-2, at 93, ¶ 5.) In terms of ultimate substance, the privilege logs contained vague narratives insufficient to assess the nature of the asserted privilege.

The privilege logs also revealed a curious discrepancy. Given that many of the logged emails were sent to or from @hk1180.com email addresses (Plaintiffs' server domain), Plaintiffs expected to have those emails in their possession. However, searches did not yield any of those particular emails, while Plaintiffs otherwise still have Defendants' former LT Game email accounts. (Ex. 1, Ciardullo Dec., ¶ 4.) While the present Motion does not address this discrepancy, Plaintiffs are still investigating this.

### D.    Plaintiffs' Original Motion, And Subsequent Events

On January 30, 2025, Plaintiffs had another call with Defendants, voicing objections regarding the sufficiency of the privilege log and other discovery issues. (Ex. 1, Ciardullo Dec., ¶ 5.) Plaintiffs again stated their view that if Feng – when he was President of LT Game – discussed matters with LT Game's own attorneys that directly or necessarily impacted LT Game, such communications could not be considered privileged. (*Id.*) Plaintiffs also pointed out that many of the emails on the log were with or copied other LT Game employees and managers, questioning how such communications could be privileged as against LT Game. (*Id.*) While Defendants appeared open to re-visiting their privilege logs, the parties remained at an impasse concerning the fundamental issue of what could properly be withheld under a claim of privilege. (*Id.*)

Plaintiffs filed an earlier version of this same motion (along with a second motion to compel on other issues) on February 24, 2025. (ECF No. 55.) Defendants responded to both motions by saying they would supplement their document productions. (Ex. 1, Ciardullo Dec., ¶ 6.) The parties then filed a stipulation with the Court allowing for suspension of both motions and affording Defendants another month to produce additional documents. (ECF No. 67) (Ex. 1, Ciardullo Dec., ¶ 6.) In view of the parties'

stipulation, the Court denied the two motions as moot, with leave for Plaintiffs to refile them if Plaintiffs believed they were necessary. (ECF No. 71.)

The parties have been busy over the intervening several weeks, exchanging further document productions, meeting and conferring on a variety of discovery issues, engaging in additional depositions, and participating in a mediation. (Ex. 1, Ciardullo Dec., ¶ 7.) Defendants supplemented their document production to produce a collection of emails with @hk1180.com email addresses that were previously withheld as privileged. (*Id*.) Mr. Feng's Non-Party Companies, who had previously not produced documents in response to the subpoenas, made a production. (Ex. 1, Ciardullo Dec., ¶ 8.) However Defendants, with the exception of the @hk1180.com emails, did not produce the balance of documents that Plaintiffs requested in their original motion. (Ex. 1, Ciardullo Dec., ¶ 9.) Defendants also updated their privilege logs, the current versions of which are attached as Exhibits L and M. (Ex. 1, Ciardullo Dec., ¶¶ 2-3.) The log for redacted documents contains generic statements in support of the claimed privileges such as "Redacted email providing confidential legal advice of counsel regarding licenses and applications" (Ex. 1-L, at 14), "Redacted email requesting and providing confidential legal advice of counsel regarding Empire financials" (Ex. 1-L, at 16), and "Redacted email providing confidential legal advice of counsel regarding employment matters." (Ex. 1-L, at 102.) The log for completely withheld documents similarly contains generic statements in support of the claimed privileges, such as "Email and attachments requesting and providing confidential legal advice of counsel regarding licenses and applications" (Ex. 1-M, at 6), "Email providing confidential legal advice of counsel regarding patent issues" (Ex. 1-M, at 99), and "Email requesting and providing confidential legal advice of counsel regarding mergers and acquisitions." (Ex. 1-M, at 184.)

After a further meet and confer on the matter, Defendants confirmed that they would maintain their claim of privilege as to the documents now sought via the present motion.[9] (Ex. 1, Ciardullo Dec., ¶ 9.) Though Defendants have had the benefit of Plaintiffs' original motion, they have not articulated any new bases to maintain their claim of privilege in view of the legal authority and arguments that Plaintiffs previously presented. (*Id*.)

## IV.    APPLICABLE LAW: THE *BEVILL* TEST

---

[9] The parties are still meeting and conferring on the second motion to compel.

"[A] party asserting the attorney-client privilege has the burden of establishing the [existence of an attorney-client] relationship *and* the privileged nature of the communication." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009). In *Upjohn Co. v. United States*, 449 U.S. 383 (1981), the Supreme Court held that a corporation's privilege extends to communications between corporate employees and corporate counsel when the communications are "made at the direction of corporate superiors in order to secure legal advice." *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir.1996) (citing *Upjohn,* 449 U.S. at 390–94). In *United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010), the Ninth Circuit adopted the 5-part test outlined in *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 123 (3d Cir.1986), which made clear that "any privilege that exists as to a corporate officer's role and functions within a corporation belongs to the corporation, not the officer." *Id.* at 124. Under the *Bevill* test, individual corporate officers or employees seeking to assert a personal claim of attorney-client privilege separate from that of their company (as Defendants do here) must satisfy five factors:

> *First,* they must show they approached counsel for the purpose of seeking legal advice. *Second,* they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. *Third,* they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. *Fourth,* they must prove that their conversations with counsel were confidential. And *fifth,* they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

*Graf*, 60 F.3d at 1159-60.

The burden of establishing privilege under *Bevill* rests on Defendants. *See id.* at 1156. A party claiming privilege must provide a log accompanied by sufficient information to support and conclude the applicability of the privilege. Fed. R. Civ. P. 26(b)(5) (party claiming privilege must "describe the nature of the documents, … in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."). Failure to assert privileges in accordance with Rule 26(b)(5) can result in a waiver of the privilege. *See, e.g., Diamond State Ins. Co. v. Rebel Oil Co., Inc.*, 157 F.R.D. 691, 698 (D. Nev. 1994).

## V.    DEFENDANTS CANNOT WITHHOLD THEIR COMMUNICATIONS WITH LT GAME'S LAWYERS

PLAINTIFFS' RENEWED MOTION TO COMPEL
Case 2:24-cv-00428

### A.    Defendants Cannot Satisfy The *Bevill* Test

While Plaintiffs do not seek Defendants' most recent communications with counsel from after all the Defendants formally resigned from LT Game, Plaintiffs do seek Defendants' communications with LT Game counsel from the time when they were managers of LT Game, as well as communications that have otherwise copied or included other LT Game employees. Because Defendants cannot satisfy the *Bevill* test, those communications should be produced.

Regarding the first *Bevill* factor, for purposes of this Motion only, Plaintiffs will assume that counsel was approached with the intent of seeking legal advice. However, Plaintiffs reserve the right to challenge that conclusion on a case-by-case basis at a later time as the parties continue to discuss specific entries in the privilege logs.

As to the second *Bevill* factor, Defendants have failed to provide any evidence – through their privilege logs or otherwise – that they were "seeking legal advice in their individual rather than in their representative capacities." *Bevill* requires "a 'clear' communication that the individual sought legal advice as an individual, not as a representative of the company." *United States v. Holmes*, No. 18CR00258EJD1NC, 2021 WL 2309980, at *3–4 (N.D. Cal. June 3, 2021), *objections overruled sub nom. United States v. Holmes*, No. 5:18-CR-00258-EJD-1, 2021 WL 2711230 (N.D. Cal. July 1, 2021) (citing *Graf*, 60 F.3d at 1160). The evidence shows that Defendants were managers of LT Game during the relevant time period, and that there was significant overlap between LT Game and Empire, such that counsel would have seen LT Game and Empire as two sides of the same coin. *See Sovereign Holdings, Inc. v. Deck*, No. 4:17-CV-04105-KES, 2018 WL 4441468, at *12–13 (D.S.D. Sept. 17, 2018) (failing second *Bevill* factor where "[n]either Deck nor Kisting has provided the court with authority to support the position that it is a corporate attorney's job to keep track of which hat an officer of the corporation is wearing in each communication with the attorney."). Additionally, Feng's subjective belief regarding whether Lewis Roca jointly represented him in addition to LT Game is irrelevant, *Graf*, 60 F.3d at 1161, and mere conclusory assertions without supporting documentary evidence are insufficient to satisfy the second *Bevill* factor. *See*, *Graf*, 610 F.3d at 1155; *Holmes*, 2021 WL 2309980, at *3; *Ciuffitelli v. Deloitte & Touche LLP*, No. 3:16-CV-0580-AC, 2017 WL 788394, at *4 (D. Or. Mar. 1, 2017).

As to the third *Bevill* factor, Defendants have failed to provide any evidence – through their

privilege logs or otherwise – demonstrating what Lewis Roca or the other law firms understood concerning conflicts between LT Game and Empire. Indeed, Plaintiffs contend it is likely that Feng misled counsel, claiming that Plaintiffs had approved of his business plans to prevent objections based on conflicts of interest. It is difficult to believe that a reputable law firm like Lewis Roca would have knowingly advised Defendants in how to commit such blatant fraud on another of their own clients.

As to the fourth *Bevill* factor, none of the communications with Lewis Roca or other law firms that included LT Game employees can be deemed confidential, and Defendants have provided no evidence to the contrary in their privilege logs or otherwise. After Mr. Feng stepped down as President of LT Game, Mr. Kiely and Mr. Allison continued in management roles well into 2023, and Defendant Zhao was the sole Director of LT Game until late 2023, so any Lewis Roca communications copying these Defendants or any other LT Game employees during that time period were not privileged.

Finally, regarding the fifth *Bevill* factor, Defendants have not demonstrated – through their privilege log or otherwise – that "the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company." Plaintiffs cannot conceive how Defendants' communications with counsel, while they were managers of LT Game, could fail to pertain LT Game, either explicitly or by necessity. LT Game and Empire were intertwined, with overlapping finances and employees engaged in shared projects. For instance, LT Game was financing Empire to obtain gaming licenses with the expectation of Empire would serve as LT Game's long-term exclusive distributor. Therefore, any discussions about planning around gaming licenses would necessarily relate to LT Game's business plans. Additionally, if Defendants, while they were managers of LT Game, were seeking advice on how to structure the relationship between LT Game and Empire, or how to allocate employees and payroll between them, all of that would also concern LT Game. Furthermore, if Defendants, while they were managers of LT Game, were in essence seeking advice about how to usurp corporate opportunities from LT Game, that too would necessarily concern LT Game.

As a broader proposition, it cannot be the case that LT Game's own managers can have used the company's own lawyers to perpetrate a fraud on Plaintiffs and now argue that Plaintiffs cannot see those communications. This contradiction undermines the integrity of the legal process and the principles of transparency and accountability that are essential in corporate governance.

**B.    Defendants Cannot Claim Privilege Over Communications That Included LT Game Employees**

Independent from the *Bevill* analysis is the simple fact that many of the communications listed on the privilege log were with LT Game employees. (ECF No. 55-2, at 25, ¶ 2.) "[V]oluntary disclosure of privileged communications constitutes waiver of the privilege for all other communications on the same subject." *Weil v. Inv. Indicators, Research Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) (collecting cases). Furthermore, there could not have been any expectation of privacy regarding messages sent or received at hk1180.com email addresses because Defendants knew that was Paradise's domain with administrative control and access from Macau headquarters. *See, e.g.*, *Flannery Assocs.*, 2024 WL 5111885, at *4.

Mr. Medero's accompanying declaration explains the time period when certain individuals listed on the privilege logs were LT Game employees. (*Compare* (ECF No. 55-2, at 93-94, ¶¶ 5-6 *with* Exs. 1-J, 1-K.) These is no basis for any privilege claim regarding these communications that included LT Game personnel.

**C.    Alternatively, LT Game and Defendants Hold a Joint Client Privilege**

In the alternative to finding that the identified records should be disclosed to Plaintiffs in view of *Bevill*, Plaintiffs submit in the alternative that a joint privilege exists between LT Game and Empire, entitling Plaintiffs to access those documents. Under Nevada law, one of the exceptions to the attorney-client privilege provides that there is no privilege "[a]s to a communication relevant to a matter of common interest between two or more clients if the communications was made by any of them to a lawyer *retained or consulted in common*, when offered in an action between any of the clients." NRS 49.115(5) (emphasis added). In other words, "[w]hen a lawyer acts as the common attorney of two parties, their communications to him are privileged as far as concerns strangers, but as to themselves they stand on the same footing as to the lawyer, and either can compel him to testify against the other as to their negotiations." *Hall CA-NV, LLC v. Ladera Dev., LLC*, No. 318CV00124RCJWGC, 2019 WL 5448458, at *9–10 (D. Nev. Oct. 24, 2019), *aff'd*, No. 318CV00124RCJWGC, 2020 WL 1033560 (D. Nev. Mar. 2, 2020) (quoting *Livingston v. Wagner*, 42 P. 290, 292, 23 Nev. 53 (1895). The District of Nevada has acknowledged that "this exception extends to legal files created by an attorney representing co-clients, including any work product in the file." *Id.* (collecting cases). Other jurisdictions have similarly

acknowledged this exception to the attorney-client privilege. *See, e.g.*, *Bass Pub. Co. v. Promus Companies Inc.*, 868 F. Supp. 615, 620 (S.D.N.Y. 1994); *Garvy v. Seyfarth Shaw LLP*, 966 N.E.2d 523, 538 (Ill. App. Ct. 2012).

Because LT Game and Empire engaged Lewis Roca to provide legal advice on matters benefiting both LT Game and Empire, Lewis Roca was acting as the common attorney for both parties. Consequently, Defendants cannot shield their communications with shared counsel, particularly during a time when Defendants were simultaneously serving as managers of both LT Game and Empire.

### D.    Defendants Have The Burden To Prove That Other Counsel Were Hired And Paid For Separately By Empire, And Were Not Advising LT Game

While Plaintiffs are well-acquainted with Lewis Roca and understood them to be LT Game's attorneys, Plaintiffs are not immediately familiar with the rest of the attorneys on Defendants' privilege logs. It is possible that Feng engaged these other lawyers in a manner similar to how LT Game had engaged Lewis Roca, with those law firms also providing legal services to LT Game. The same analysis that is applied to Lewis Roca should be extended to such other attorneys. The burden is on Defendants to prove that the other counsel were hired and paid for separately by Empire and that they were not providing legal advice related to LT Game.

### E.    Plaintiffs Also Seek Production From The Non-Party Companies

To the extent that Defendants – particularly Feng – used any email or messaging accounts of the subpoenaed Non-Party Companies to communicate with LT Game's counsel, those Non-Party Companies should be compelled pursuant to Rule 45(d)(2)(B)(i) to produce such records being withheld under a claim of privilege according to the same criteria discussed *supra*.[10] Plaintiffs note that it is not clear whether the privilege logs the Defendants produced on December 13, 2024 or March 31, 2025, were intended to also serve as logs for the Non-Party Companies, but to the extent that the Non-Party Companies have not provided any privilege logs, that would further cut against their claims of privilege. Defendants have

---

[10] With the exception of F2, which is a California company, all the subpoenaed Non-Party Companies are Nevada companies. However, F2 is managed by Feng from this District, and Plaintiffs have understood Feng to have agreed to roll up the F2 production as part of his and the other companies' responses that are being provided in this District, making it appropriate for the Court to compel F2 under Rule 45. Alternatively, the Court may simply compel Feng as a defendant in this case to produce records of F2 in his possession, custody, or control.

produced some documents on behalf of the Non-Party Companies but, to Plaintiffs' understanding, have not served a privilege log or included any privilege assertions in Defendants' Amended Privilege Logs. *See* Ex. 1-L, 1-M.

## VI.    ALTERNATIVELY, PLAINTIFFS REQUEST IN-CAMERA INSPECTION

In the alternative to ordering the production of the records being withheld by Defendants and the Non-Party Companies, Plaintiffs request that the Court or an appointed Special Master conduct an in-camera review of those documents to determine that the materials contain information that is not privileged. While the Court has discretion to order such inspection even absent a showing of Defendants' misconduct, in-camera review would also be warranted in this case under the crime-fraud exception. To obtain in-camera review under the crime-fraud exception, the Supreme Court requires merely a "showing of a factual basis adequate to support a good faith belief by a reasonable person" that such review may establish the applicability of the crime-fraud exception. *United States v. Zolin*, 491 U.S. 554, 572 (1989); *see also U.S. v. Christensen*, 828 F.3d 763, 800 (9th Cir. 2016). The same standard applies for in-camera review of documents when challenging any other claim of privilege. *See Acosta v. Wellfleet Commc'ns, LLC*, No. 216CV02353GMNGWF, 2018 WL 11409850, at *8 (D. Nev. Aug. 10, 2018) (citing *In re Grand Jury Investigation*, 974 F.2d 1068 1074-75 (9th Cir. 1992)). "The threshold is not a stringent one because in-camera review of documents is a much smaller intrusion on the attorney-client privilege than full disclosure." *Christensen*, 828 F.3d at 800 (inner citations omitted) (quoting *Grand Jury Investigation*, 974 F.2d at 1071). Indeed, "[s]ome speculation is required under the *Zolan* threshold." *Id.* Once that showing is made, the decision of whether to conduct an in-camera review rests in the sound discretion of the district court based on consideration of the importance to the case of the alleged privileged information, the volume of materials, and the likelihood that the crime-fraud exception may apply. *Id.* at 798.

Furthermore, regarding the crime-fraud exception, "[t]he attorney need not have been aware that the client harbored an improper purpose. Because both the legal advice and the privilege are for the benefit of the client, it is the client's knowledge and intent that are relevant." *In re Napster, Inc. Copyright Litigation*, 479 F.3d 1078, 1090 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 130 (2009). The planned crime or fraud need not have succeeded for the exception to apply either. *Id.* "The client's abuse of the attorney-client relationship, not his or her

successful criminal or fraudulent act, vitiates the privilege." *Id.* (citations omitted).

For the reasons stated in Section V, *supra*, Plaintiffs have made the threshold showing to support a reasonable good faith showing that the communications withheld by Defendants are not privileged. *See Acosta*, 2018 WL 11409850, at *8 ("Courts have ordered *in camera* review when the privilege log does not provide sufficient information to determine whether the documents are within the scope of the privilege, and where the 'content-specific nature of the inquiry' makes it unlikely that a more specific privilege log would aid the court's review." (quoting *Lahr v. National Transportation Board*, 569 F.3d 964, 982, n.16 (9th Cir. 2009)).

Furthermore, under the crime-fraud exception, Plaintiffs can meet the *Zolin* threshold. *See Christensen*, 828 F.3d at 800. As discussed in Section II, *supra*, and in the accompanying affidavits, Defendants engaged in fraud throughout their tenure at LT Game, taking money, employees, and resources from the company while concealing their parallel plans to build a competing business enterprise.

The thousands of records that Defendants are withholding are exceptionally important given that Lewis Roca and other counsel were consulted regularly by Defendants about how to engage in the actions that constitute the very fraud and misconduct central to Plaintiffs' Complaint – misconduct which cost Plaintiffs millions of dollars. Disclosure of the Lewis Roca records could potentially be case dispositive, making in-camera review well worth the Court's effort.

## VII.    **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' Motion and compel Defendants and the Non-Party Companies to produce: (1) all communications that Defendants had (including from Non-Party Company accounts) with LT Game's counsel during the time when Defendants were managers of LT Game, and (2) any other communications that included LT Game employees.

DATED:  June 5, 2025                          Respectfully submitted,


                                               */s/ Jessica M. Lujan*
                                               OLIVER J. PANCHERI, ESQ.
                                               Nevada Bar No. 7476
                                               JESSICA M. LUJAN, ESQ.
                                               Nevada Bar No. 14913
                                               **SPENCER FANE LLP**
                                               300 South Fourth Street, Suite 1600

Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
    jlujan@spencerfane.com

JEAN-PAUL CIARDULLO, ESQ.  (*pro hac vice*)
California Bar No. 284170
**FOLEY & LARDNER LLP**
S555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

ROBERT T. STEWART, ESQ.
Nevada Bar No. 13770
STEWART RAY NELSON, ESQ. (*pro hac vice*)
 Utah Bar No. 17286
HANNAH L. ANDREWS, ESQ. (*pro hac vice*)
 Utah Bar No. 18157
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
    srnelson@foley.com
    handrews@foley.com