Patrick J. Reilly
Nevada Bar No. 6103
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, 16th Floor
Las Vegas, Nevada 89106
Telephone: 702.382.2101
Facsimile: 702.382.8135 preilly@bhfs.com

Mark Oakes (*pro hac vice*)
Zach McHenry (*pro hac vice*)
Ethan Glenn (*pro hac vice*)
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
mark.oakes@nortonrosefulbright.com
zach.mchenry@nortonrosefulbright.com
ethan.glenn@nortonrosefulbright.com

*Attorneys for Defendants/Counterclaimants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

|  |  |
|---|---|
| PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; LT GAME INC., a Nevada corporation; and LT GAME LIMITED, a British Virgin Islands corporation,<br><br>*Plaintiffs*,<br><br>v.<br><br>EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; DARYN KIELY, an individual; and YI ZHAO, an individual,<br><br>*Defendants*. | Case No. 2:24-cv-00428-JCM-BNW<br><br><br>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF LEWIS ROCA RECORDS** |

**Table of Contents**

Page

I. INTRODUCTION .................................................................................................. 1

II. FACTUAL AND PROCEDURAL BACKGROUND ........................................... 2

   A.   Empire and Plaintiffs are Separate Entities, and Empire Was Never Intended To Be Plaintiffs' "Exclusive Distributor" ................................................................ 2

   B.   Empire Had an Attorney-Client Relationship with Lewis Roca, Which Empire Understood to be Separate from LT Game's Representation ............................................ 4

   C.   Lewis Roca Considered Empire and Plaintiffs as Separate Clients ............................ 5

   D.   Defendants Produced Plaintiffs' Legal Communications, and Withheld Empire's Legal Communications .................................................................................... 6

III. APPLICABLE LAW ............................................................................................ 6

   A.   Empire's Attorney-Client Privilege Must Not Be Pierced Lightly ........................... 6

   B.   Plaintiffs Rely on the Incorrect Legal Standard; *Bevill* Does Not Address the Relevant Inquiry—Whether the Parties Were Joint or Separate Clients ................................ 7

IV. ARGUMENT ...................................................................................................... 9

   A.   Defendants' Privilege Assertions Over Lewis Roca Communications Are Proper ............ 9

      1.   Empire and Plaintiffs Were Separate Lewis Roca Clients ................................ 9

      2.   Even Under *Bevill*, Defendants' Privilege Assertions Are Proper ...................... 14

   B.   Plaintiffs' Request for Privileged Communications with Other Attorneys They "Are Not Immediately Familiar with" is Improper ................................................................ 16

   C.   Empire Did Not Waive Privilege By Communicating With Its Own Employees ............ 16

   D.   Plaintiffs Fail To Justify an *In-Camera* Review ...................................................... 17

      1.   Plaintiffs Fail To Establish The Crime-Fraud Exception .................................. 18

      2.   Plaintiffs' Vague Privilege and Waiver Challenges Are Insufficient ................... 19

V. CONCLUSION ................................................................................................... 20

**Table of Authorities**

**Page(s)**

**Cases**

*Acosta v. Wellfleet Commc'ns, LLC*,
No. 2:16-CV-02353-GMN-GWF, 2018 WL 11409850 (D. Nev. Aug. 10,
2018) ................................................................................................................ 17

*Afremov v. Sulloway & Hollis, P.L.L.C.*,
No. CV 09-3678, 2012 WL 12981665 (D. Minn. July 5, 2012) ............................ 12

*Bittaker v. Woodford*,
331 F.3d 715 (9th Cir. 2003) ................................................................................. 16

*Ciuffitelli v. Deloitte & Touche LLP*,
No. 3:16-CV-0580-AC, 2017 WL 788394 (D. Or. Mar. 1, 2017) ........................... 7

*Dole v. Milonas*,
889 F.2d 885 (9th Cir. 1989) ................................................................................. 12

*In re Grand Jury Investigation*,
231 F. App'x 692 (9th Cir. 2007) .................................................................... 18, 19

*In re Grand Jury Proc.*,
87 F.3d 377 (9th Cir. 1996) ................................................................................... 18

*Hall CA-NV, LLC v. Ladera Dev., LLC*,
No. 3:18-CV-00124-RCJ-WGC, 2019 WL 5448458 (D. Nev. Oct. 24, 2019),
*aff'd*, No. 3:18-CV-00124-RCJ-WGC, 2020 WL 1033560 (D. Nev. Mar. 2,
2020) .............................................................................. 8, 9, 10, 11, 13, 19

*Hernandez v. Creative Concepts, Inc.*,
No. 2:10-CV-02132-PMP, 2013 WL 1405776 (D. Nev. Apr. 5, 2013) ................... 18

*Hickman v. Taylor*,
329 U.S. 495 (1947) ................................................................................................ 7

*Humphries v. Button*,
No. 2:21-CV-01412-ART-EJY, 2024 WL 1077550 (D. Nev. Feb. 15, 2024),
*reconsideration denied*, No. 2:21-CV-01412-ART-EJY, 2024 WL 3707893
(D. Nev. Apr. 4, 2024), *and reconsideration denied*, No. 2:21-CV-01412-
ART-EJY, 2024 WL 1549293 (D. Nev. Apr. 8, 2024) .................................... 12, 17

*In re J&J Inv. Litig.*,
No. 2:22-CV-00529-GMN-NJK, 2023 WL 11113645 (D. Nev. July 28, 2023) ................... 17

*Johnson v. Garofalo*,
No. 3:21-CV-00239-MMD-CLB, 2023 WL 11830746 (D. Nev. Mar. 17, 2023) ................. 16

*LifeScan, Inc. v. Smith*,
No. CV 17-5552 (CCC) (JSA), 2022 WL 22895625 (D.N.J. Mar. 22, 2022) ........................ 9

*Lux v. Buchanan*,
    No. 2:23-CV-00839-MMD-NJK, 2024 WL 1598805 (D. Nev. Apr. 12, 2024)........... 9, 15, 20

*In re Napster, Inc. Copyright Litig.*,
    479 F.3d 1078 (9th Cir. 2007), *abrogated on other grounds by Mohawk Indus.,*
    *Inc. v. Carpenter*, 558 U.S. 100 (2009) ................................................................................. 18

*Sovereign Holdings, Inc. v. Deck*,
    No. 4:17-CV-04105-KES, 2018 WL 4441468 (D.S.D. Sept. 17, 2018).................................. 7

*In re Teleglobe Commc'ns Corp.*,
    493 F.3d 345 (3d Cir. 2007).................................................................................... 8, 9, 14

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010)............................................................................. 7, 8, 14, 15

*United States v. Nobles*,
    422 U.S. 225 (1975)........................................................................................................... 7

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981)...................................................................................................... 6, 16

**Rules and Statutes**

Nev. Rev. Stat. § 49.055 ...................................................................................................... 17

1   Defendants Empire Technological Group Limited ("Empire"), Gaming Specialized
2   Logistics, LLC ("GSL"), Linyi Feng, Roy Kelcey Allison, and Daryn Kiely (collectively
3   "Defendants") respectfully submit this opposition to Plaintiffs Paradise Entertainment Limited
4   ("Paradise"), LT Game Limited ("LTG Limited"), and LT Game Inc.'s ("LT Game") (collectively
5   "Plaintiffs") Renewed Motion to Compel Production of Lewis Roca Records ("Mot.").

6                                **I. INTRODUCTION**

7   The Court should deny Plaintiffs' Motion because it is wrong on the facts and wrong on the
8   law.  To start, Plaintiffs fundamentally misrepresent this dispute by claiming to seek production of
9   "their own client file."  Following an exhaustive, document-by-document privilege review,
10  Defendants provided Plaintiffs with any communications reasonably reflecting legal representation
11  conducted on behalf of Plaintiffs, including producing communications involving the law firm at
12  the center of this dispute, Lewis Roca Rothgerber Christie, LLP (now known as Womble Bond
13  Dickinson (US) LLP) ("Lewis Roca").  The documents Defendants withheld, that Plaintiffs now
14  seek to compel, are communications reflecting *Empire's legal representation* that are properly
15  subject to *Empire's attorney-client privilege*.  Plaintiffs' Motion does not dispute that these
16  communications are privileged; it only contends that Plaintiffs are entitled to invade Empire's
17  attorney-client privilege.  All of their arguments fall flat.

18  Plaintiffs lead with a false premise propped up by conclusory, self-serving allegations—
19  that Empire's privilege "properly belong[s] to LT Game" because Empire "was intended to be the
20  long-term exclusive distributor of LT Game."  This ignores that the written agreements between
21  the parties are clear that Empire has always been its own company, free to pursue its own business
22  interests.  When Plaintiffs finally reach the merits, their Motion fails to mention that Lewis Roca
23  treated Empire and LT Game as separate clients, directly refuting their suggestion that the law firm
24  viewed the two companies as one-and-the-same.

25  Attempting to paper over their evidentiary failings, Plaintiffs entreat the Court to assess
26  privilege under the "*Bevill* test," a legal framework that would unfairly prejudice Defendants
27  because it is designed for an inapposite issue: whether the *individual Defendants* established
28  *personal* attorney-client privilege with Lewis Roca.  Empire holds the disputed privilege, and the

1

proper inquiry is whether Empire had a separate attorney-client relationship with Lewis Roca, in which case it can assert privilege against LT Game, or whether the two companies had a joint client relationship. In fixating on *Bevill*, Plaintiffs overlook that this Court has previously used a fact-specific, totality of the circumstances approach to assess exactly this question, which the Court should apply here. The evidence establishes that Empire was a separate client, including a sworn declaration from Lewis Roca stating: "At all times of concurrent representation, Lewis Roca considered the LT Game Plaintiffs and Empire to be separate clients."

Plaintiffs' Motion then goes from bad to worse. Plaintiffs make the spectacular leap that, because Lewis Roca represented both LT Game and Empire, LT Game is presumptively entitled to communications pertaining to all of Empire's other legal counsel—which Plaintiffs admit they "are not immediately familiar with." Because they can only speculate that those attorneys may have been engaged for the benefit of LT Game, Plaintiffs fail to satisfy the basic threshold requirement to establish why Defendants' privilege assertions with those attorneys are improper. From there, Plaintiffs offer a misguided waiver argument centered on instances where employees were employed simultaneously by Empire and LT Game. There is no legal support for their argument that a corporation cannot have privileged communications with employees who work second jobs. Finally, Plaintiffs fail to justify *in-camera* review. Their attempt to invoke the crime-fraud exception is the product of an undisciplined pen, failing to connect the alleged fraud to Empire's privileged communications with counsel; nor can Plaintiffs' other, vague privilege challenges satisfy the threshold showing required for the Court to even consider ordering an *in-camera* review. The Court should deny Plaintiffs' Motion in its entirety.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Empire and Plaintiffs are Separate Entities, and Empire Was Never Intended To Be Plaintiffs' "Exclusive Distributor"

This lawsuit was precipitated by a demand letter Mr. Feng received from Paradise, in which Paradise asserted that it owned Empire because the company was its "de facto subsidiary." (*See* Ex. B, Declaration of Linyi Feng ("Feng Decl."), ¶ 4). Mr. Feng is the sole owner of Empire. (*Id.* ¶ 1). Paradise has never possessed an ownership interest in Empire, has never had a right to control

Empire, and has never held any legal or equitable interest in any of Empire's assets, including its gaming licenses. (*Id.* ¶ 5). Though Paradise has since abandoned its claim to ownership, Plaintiffs' claims in this lawsuit are primarily based on a similar idea—that Mr. Feng allegedly agreed to operate Empire "for the exclusive benefit of the Paradise Group," namely, "Empire's role was to be a long-term exclusive distributor for the Paradise Group." *E.g.*, Amend. Compl., at ¶ 33 (ECF No. 69). The alleged exclusivity underlies the instant Motion to Compel. *See, e.g.*, Mot. at 3-4 ("Paradise management and LT Game also believed that Lewis Roca was simultaneously serving as all-purpose legal counsel for Empire, especially with respect to obtaining gaming licenses, since the understood purpose of Empire was to be LT Game's long term exclusive distributor. It was on this understanding that Plaintiffs paid Lewis Roca's legal bills to Empire, totaling hundreds of thousands of dollars." (citations omitted)). This is a false premise.

The written agreements between the parties explicitly refute Plaintiffs' position. All dealings between Empire and Plaintiffs were subject to a Supply Framework Agreement that unambiguously stated that the arrangement between the companies was "non-exclusive."[1] (Ex. B, Feng Decl., ¶ 7); Ex. B-1 (Supply Framework Agreement), §§ 3.1, 3.4). The Supply Framework Agreement is signed by Jay Chun on behalf of Paradise, who is Paradise's Chairman and Managing Director. (*See* Ex. B-1, pg. 12). Empire also entered into various written agreements with LT Game that memorialize the arms-length relationship between Plaintiffs and Empire—all of which are signed by Jay Chun on behalf of LT Game. (*See* Ex. B-2, (Distribution Agreement), p. 1 ("WHEREAS, LT Game is wholly-owned by Paradise Entertainment Limited . . . and Empire is controlled by Mr. Linyi Feng."), § 11(a) ("Independence of the Parties. LT Game and Empire each individually acknowledge and agree that they have not relied on the other Party in negotiating, writing and entering into this Agreement. LT Game and Empire each individually acknowledge and agree that each reviewed this entire Agreement and any attachments or exhibits thereto prior to entering into this Agreement and entered into this Agreement as their own free and voluntary act."), § 11(e) ("LT Game - Empire Relationship. The relationship between LT Game and Empire

---

[1] Exhibit B-1 is the 2021 annual renewal of the Supply Framework Agreement, which Defendants cite as an example. The renewals for all other relevant years contain the same non-exclusivity language.

established by this Agreement shall not be construed to make any Party the agent, partner, employee or representative of any other Party nor shall this Agreement be deemed to establish a joint venture or partnership."); Ex. B-3, (Game Development Agreement) (same); Ex. B-4 (Master Hardware Purchase Agreement) (same at p. 1, § 9(a), § 9(b)).

There was never any understanding that Empire was intended to operate for Paradise's exclusive benefit. (Ex. B, Feng Decl., ¶ 9). Nor was there any understanding that Empire was intended to operate exclusively as Paradise's distributor. (*Id*.). To the contrary, the agreements between the parties reflect that Empire was its own company, free to pursue its own business ventures. Empire has been pursuing its own business interests since Mr. Feng purchased the company, nearly a decade ago. (*Id*. ¶ 10). For example, Empire began developing its own proprietary gaming products in 2016, and Empire has prominently featured these products on its website. (*Id*. ¶ 11).

**B.** **Empire Had an Attorney-Client Relationship with Lewis Roca, Which Empire Understood to be Separate from LT Game's Representation**

Lewis Roca began representing Empire in approximately 2013. (Ex. C, Declaration of Kenneth Rossman ("Rossman Decl."), ¶ 9). This legal work predominantly consisted of gaming regulatory work. (Ex. B, Feng Decl., ¶ 12). In or around 2016, Lewis Roca's work for Empire expanded, and, over the next several years, Lewis Roca handled regulatory work, labor and employment work, intellectual property work, and transactional work for Empire. (*Id*. ¶ 13).

Empire was aware that Lewis Roca also represented LT Game, but Empire expected and intended to have a separate client relationship with Lewis Roca. (*Id*. ¶¶ 14, 15). Empire never intended to jointly engage Lewis Roca with LT Game, never signed a joint representation agreement with LT Game, and never expected or intended any such joint representation. (*Id*. ¶ 16). Empire expected and understood Lewis Roca would maintain, and did maintain, separate client files for Empire, and would not share privileged communications and work product with LT Game (or any other third party). (*Id*. ¶¶ 17, 18). It is Empire's belief that Lewis Roca acted consistent with Empire's expectations. (*Id*. ¶ 19).

**C.      Lewis Roca Considered Empire and Plaintiffs as Separate Clients**

Lewis Roca is a large law firm that services many clients in many matters.  Beginning in 2011, Lewis Roca represented LTG Limited and LT Game, and opened over 20 matter files in the course of representing those clients. (Ex. C, Rossman Decl., ¶ 7).  Lewis Roca had attorney-client privileged communications with the LT Game clients related to the work that was not shared with other parties.  (*Id*.).  Lewis Roca began representing Empire in approximately 2013, and has opened over 80 matter files in the course of representing Empire.  (*Id*. ¶ 9).  Lewis Roca had attorney-client privileged communications with Empire related to the work that was not shared with other parties. (*Id*.).

Though Lewis Roca has represented LT Game at the same time as Empire, the law firm considered them to be separate clients.  (*Id*. ¶ 11).  Lewis Roca sought and obtained separate engagement agreements for both LT Game and Empire.[2]  (*Id*. ¶ 12).  "None of the engagement letters provided for joint representation of the LT Game Plaintiffs and Empire."  (*Id*.).  Nor did the parties' engagement agreements include a right of access to communications between Lewis Roca and the other party.  (*Id*. ¶ 13).  Lewis Roca maintained separate sets of client files LT Game and Empire.  (*Id*. ¶ 14).  Lewis Roca issued separate invoices to LT Game and Empire for the legal services it provided to the companies.  (*Id*. ¶ 15).  Additionally, at times during the concurrent representation, Lewis Roca sought and obtained conflict of interest waivers from Empire and/or the LT Game.  (Ex. B, Feng Decl., ¶ 20; Ex. B-5 (conflict waiver)).  For example, in late 2021, Lewis Roca represented Empire with respect to drafting several agreements between LT Game and Empire, for which Lewis Roca "did not understand it was representing LT Game Inc., and sought and obtained conflict waivers from LT Game Inc. signed by Frank Feng."  (Ex. C, Rossman Decl., ¶ 10).

---

[2] Plaintiffs submitted Lewis Roca engagement agreements directed at LT Game in support of their Motion.  *See* Mot. at 3 (citing ECF No. 55-2, at 33-65).  Copies of some of Empire's engagement agreements with Lewis Roca are attached to this Response.  (*See* Ex. B-6 (engagement agreements)).  One of Empire's early engagement agreements with Lewis Roca are addressed to "LT Game International (US) Limited," which was Empire's former name (Mr. Feng renamed the company to Empire Technological Group Limited in 2016).  (Ex. B, Feng Decl., ¶ 22).

**D.**     **Defendants Produced Plaintiffs' Legal Communications, and Withheld Empire's**
         **Legal Communications**

Defendants have produced a total of approximately 52,000 documents, of which approximately 5,300 have been withheld as privileged.  (Ex. A, Declaration of Zach McHenry ("McHenry Decl."), ¶¶ 3,4).  The documents that have been withheld are subject to Empire's attorney-client privilege.  (Ex. B, Feng Decl., ¶ 32).  Defendants conducted an exhaustive privilege review and produced to Plaintiffs any documents reasonably reflecting legal representation conducted on behalf of Plaintiffs.  (*See* Ex. A, McHenry Decl., ¶ 5).  This included producing communications involving the law firm Lewis Roca.  (*Id*.).  The documents Defendants withheld are communications reflecting Empire's legal representation, and these documents are listed on privilege logs Defendants have provided to Plaintiffs.  (*Id*.).  After Plaintiffs filed the initial version of this motion (ECF No. 55.), and meet and confer efforts regarding the same, Defendants supplemented their document productions to produce all communications on their privilege logs that included a Paradise email domain (*i.e.*, emails with a "@hk1180.com" email domain).[3]  (*Id*. ¶ 6).  This included producing approximately 228 additional documents.  (*Id*.).

### III. APPLICABLE LAW

**A.**     **Empire's Attorney-Client Privilege Must Not Be Pierced Lightly**

In court, few things are more sacred than the attorney-client privilege; it "is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  The privilege covers both "the giving of professional advice" to the client and the client's "giving of information to the lawyer to enable him to give sound and informed advice." *Id*. at 390.

The privilege "encourage[s] full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and administration of justice." *Id*.  It recognizes that sound legal advice or advocacy depends upon the lawyer being

---

[3] Defendants produced these documents subject to the parties' agreed stipulation that (i) the production would not constitute subject-matter waiver of privilege to the subjects therein, and (ii) Plaintiffs would not argue that the production of these documents somehow constitutes a waiver of privilege to any other documents on Defendants' privilege log or an admission regarding the merits of Defendants' privilege claims regarding any other privileged documents.  (Ex. A, McHenry Decl., ¶ 6).

1  fully informed by the client, and the client being fully advised by the attorney.  *See id.*  It is therefore

2  imperative that the privilege is protected.

3      Similarly, the attorney work-product doctrine shelters the mental processes of the attorney,

4  providing a privileged area within which he can analyze and prepare his client's case.  *See United*

5  *States v. Nobles*, 422 U.S. 225, 238 n.11 (1975).  This protection allows an attorney to be fully

6  candid and even-handed when providing a client with analysis, without which the attorney would

7  be incentivized to be more guarded, to the detriment of the client.  *See, e.g.*, *Hickman v. Taylor*,

8  329 U.S. 495, 511 (1947) ("Were [work-product] materials open to opposing counsel on mere

9  demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts,

10 heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would

11 inevitably develop in the giving of legal advice and in the preparation of cases for trial.").

12 **B.      Plaintiffs Rely on the Incorrect Legal Standard; *Bevill* Does Not Address the**

13 **Relevant Inquiry—Whether the Parties Were Joint or Separate Clients**

14      The Court should refuse to apply the "*Bevill* test," as adopted in *United States v. Graf*, 610

15 F.3d 1148, 1161 (9th Cir. 2010).  The *Bevill* test was designed to analyze when a corporate

16 employee holds a personal attorney-client privilege with corporate counsel.  *See Graf*, 610 F.3d at

17 1158-60.  This does not fit the privilege dispute here, which is between separate corporations—

18 Empire and LT Game.

19      More importantly, the test prejudices Defendants because it assumes an attorney-client

20 relationship between LT Game and Lewis Roca and analyzes whether a second relationship was

21 ever created.  This analysis presumes that the individual approached counsel in their corporate

22 capacity, as opposed to seeking personal legal advice.  *See Sovereign Holdings, Inc. v. Deck*, No.

23 4:17-CV-04105-KES, 2018 WL 4441468, at *9 (D.S.D. Sept. 17, 2018).  Here, however, it is

24 undisputed that Empire has long had an attorney-client relationship with Lewis Roca.  *See* Mot. at

25 3-4 (recognizing that Lewis Roca provided legal services to both LT Game and Empire).

26 Presuming otherwise unfairly shoulders Defendants with the burden of establishing an attorney-

27 client relationship that Lewis Roca itself readily admits existed.  *Compare generally* Ex. C,

28 Rossman Decl., *with Graf*, 610 F.3d at 1161 ("Neither attorney ever informed Graf that he was

their client."); *Ciuffitelli v. Deloitte & Touche LLP*, No. 3:16-CV-0580-AC, 2017 WL 788394, at *5 (D. Or. Mar. 1, 2017) ("[N]one of the Intervenors offers evidence to refute, contradict, or in any way call into question [counsels'] statements that they never entered into an attorney-client relationship with any of them.").

Plaintiffs offer no argument as to why the Court should decide the Motion under *Bevill*. The only apparent reason is that certain individuals were, at times, employed by both Empire and LT Game. This alone does not justify application of a legal analysis that ignores the reality of what occurred here—two corporations represented by the same legal counsel and employees communicating with counsel on legal matters pertaining to a specific corporation. Plaintiffs offer no precedent to support application of *Bevill* under these circumstances. Indeed, the Ninth Circuit only adopted *Bevill* after ruling that the defendant "was a functional employee, not an independent outside consultant to [the corporation]." *Graf*, 610 F.3d at 1159.

The proper framework for resolving this dispute is the fact-specific totality of the circumstances approach this Court adopted in *Hall*, which involved an issue nearly identical to what is currently before the Court—external counsel had previously represented both the plaintiff and defendant, and one of the parties sought to obtain privileged communications between the other party and the law firm. *Hall CA-NV, LLC v. Ladera Dev., LLC*, No. 318CV00124RCJWGC, 2019 WL 5448458, at *1, *10-*11 (D. Nev. Oct. 24, 2019), *aff'd*, No. 318CV00124RCJWGC, 2020 WL 1033560 (D. Nev. Mar. 2, 2020). The Court resolved the issue by analyzing whether the parties had jointly consulted counsel, or maintained concurrent—but separate—representations. *See id*. at *8-*11.

As this Court recognized, "clients of the same lawyer who share a common interest are not necessarily co-clients." *Id*. at *11 (quoting *In re Teleglobe Commc'ns Corp*., 493 F.3d 345, 362 (3d Cir. 2007), *as amended* (Oct. 12, 2007)) (internal citation omitted). "Instead, '[w]hether individuals have jointly consulted a lawyer or have merely entered concurrent but separate representations is determined by the understanding of the parties and the lawyer in light of the circumstances.'" *Id*. (same). A "wide variety of circumstances are relevant to the determination of whether two or more parties intend to create a joint-client relationship," but the focus of the

analysis is the "parties' intent and expectations," and thus the court "should carefully consider" testimony from the parties and attorney.[4]  *Id.*  If the court determines there was a joint representation, the parties cannot assert privilege against each other, but communications remain privileged as to third parties.  *Id.* at *9.  Unlike *Bevill's* rigid and factually inapposite framework, the totality of the circumstances approach adopted in *Hall* allows the Court considers the relevant facts, evaluating privilege by weighing context, purpose, and expectations.  The Court should apply this standard here.

## IV. ARGUMENT

### A.    Defendants' Privilege Assertions Over Lewis Roca Communications Are Proper

The undisputed evidence establishes that Empire and LT Game were separate clients with Lewis Roca.  This evidence is also sufficient to satisfy the *Bevill* test.  Therefore, Defendants' privilege assertions over the Lewis Roca communications are proper under either legal framework.

#### 1.    Empire and Plaintiffs Were Separate Lewis Roca Clients

As an initial matter, Plaintiffs make no genuine attempt to argue that Empire and LT Game were joint clients.  *See* Mot. at 15-16.  Plaintiffs do not even mention the totality of the circumstances test this Court uses to analyze joint vs. separate representation (despite citing to *Hall*), and their entire argument consists of a single sentence with no factual or legal support: "Because LT Game and Empire engaged Lewis Roca to provide legal advice on matters benefiting both LT Game and Empire, Lewis Roca was acting as the common attorney for both parties."  *Id.* at 16.  Notwithstanding that "Courts only address well-developed arguments," *Lux v. Buchanan*, No. 2:23-CV-00839-MMD-NJK, 2024 WL 1598805, at *1 (D. Nev. Apr. 12, 2024), this misses the mark.  Plaintiffs offer no evidence regarding why Empire engaged Lewis Roca.  Putting aside that Empire engaged Lewis Roca for its own benefit, (Ex. B, Feng Decl., ¶ 23), it is immaterial that the legal advice may have mutually benefited LT Game and Empire.  The analysis turns on "the understanding of the parties and the lawyer in light of the circumstances," and thus "clients of the same lawyer who share a common interest are not necessarily co-clients."  *Hall*, 2019 WL 5448458,

---

[4] The Court listed 11 factors from the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS that are relevant to whether a joint client relationship exists.  *Hall*, 2019 WL 5448458, at *11.

at *11 (quoting *In re Teleglobe*, 493 F.3d at 362); *LifeScan, Inc. v. Smith*, No. CV 17-5552 (CCC) (JSA), 2022 WL 22895625, at *6 (D.N.J. Mar. 22, 2022) ("[T]he key issue is whether the clients' interests are conjoined, not whether they are similar or even identical.").

As set forth below, the undisputed evidence establishes that both Empire and Lewis Roca intended and understood the representation of Empire and LT Game was separate.  And, though Plaintiffs "maintain[] it was a joint client relationship," "[t]he problem is that [Plaintiffs] present[] no credible evidence to support [their] position."  *Hall*, 2019 WL 5448458, at *13.

First, it is undisputed Empire understood that it was a separate Lewis Roca client.  Empire never intended to jointly engage Lewis Roca with LT Game, never signed a joint representation agreement with LT Game, and never expected or intended any such joint representation.  (Ex. B, Feng Decl., ¶¶ 15,16; *see also* Ex. C, Rossman Decl., ¶ 12).  Instead, Empire expected and understood Lewis Roca would maintain separate client files for Empire, and would not share privileged communications and work product with LT Game.  (Ex. B, Feng Decl., ¶¶ 17-18).  Empire's expectations and understandings are consistent with separate representation.  *See Hall*, 2019 WL 5448458, at *12.  Plaintiffs offer no evidence to the contrary, and, regardless, any claim that Empire intended to create a joint relationship with LT Game would be fundamentally inconsistent with Plaintiffs' core allegation that Defendants were covertly working to undermine Plaintiffs.

Critically, Lewis Roca also understood Empire and LT Game to be separate clients.  Lewis Roca sought and obtained separate engagement agreements for both LT Game and Empire, none of which provided for joint representation.  (Ex. C, Rossman Decl., ¶ 12).  The engagement agreements are directed at either LT Game or Empire.  (*Compare* ECF No. 55-2, at 33-65 (LT Game's Lewis Roca engagement agreements) *with* Ex. B-6 (Empire's Lewis Roca engagement agreements)).  The numerous agreements also define the specific scope of representation, *see id.*; none provide that Lewis Roca was an "all-purpose legal advisor," as Plaintiffs suggest, Mot. 3-4. Lewis Roca sought and obtained conflict of interest waivers from Empire and/or the LT Game in the course of representing both companies.  (Ex. B, Feng Decl., ¶ 20).  Notably, Lewis Roca's conflict waivers explicitly state: "**our concurrent representation** of Empire and LT Game as

described above may constitute a conflict of interest."  (Ex. B-5, pgs. 5,7 (conflict waiver) (emphasis added)).  This included obtaining conflict waivers from LT Game in late 2021, when Lewis Roca represented Empire with respect to drafting several agreements between LT Game and Empire.  (Ex. C, Rossman Decl., ¶ 10).  Further, Lewis Roca maintained separate sets of client files for LT Game and Empire.  (*Id.* ¶ 14).  Lewis Roca also issued separate invoices to LT Game and Empire for the legal services it provided to the companies.  (*Id.* ¶ 15).  These actions reflect that Lewis Roca treated Empire and LT Game to be separate clients.  *See Hall*, 2019 WL 5448458, at *12.

Plaintiffs offer nothing to contradict Empire and Lewis Roca's understanding of the legal representation.  Remarkably—despite citing no evidence—Plaintiffs assert that "[t]he evidence shows that Defendants were managers of LT Game during the relevant time period, and that there was significant overlap between LT Game and Empire, *such that counsel would have seen LT Game and Empire as two sides of the same coin.*"  Mot. at 13 (emphasis added).  This is misguided and insincere.  Plaintiffs are well aware that Lewis Roca had extensive information regarding the history and relationship between Empire and Plaintiffs, and, far from seeing the two companies "as two sides of the same coin," Lewis Roca advocated to Nevada gaming regulators exactly what Defendants say here—that Empire has always been a separate company, Plaintiffs have never owned Empire, and Empire has long been pursuing its own business interests.[5]  Plaintiffs also fail to mention that they were aware that Lewis Roca maintained separate client files for Empire and LT Game, and that the law firm described the separate legal work it did for the two companies.[6]  Defendants have also produced Lewis Roca conflict waivers to Plaintiffs, belying their claim that "Defendants have failed to provide any evidence – through their privilege logs or otherwise –

---

[5] For example, Lewis Roca prepared memoranda for Nevada gaming regulators detailing the relationship between Empire and Plaintiffs, which Plaintiffs attached in support of a separate motion to compel they filed in February of this year (since withdrawn).  *See* ECF nos. 58-8 (Ex. 1G, June 13, 2023 Memorandum), 58-9 (Ex. 1H, July 25, 2022 Memorandum).  The June 2023 memorandum includes two sections, spanning over 15 pages, titled "Overview of Mr. Feng's involvement with Paradise Entertainment Limited and its subsidiaries" and "Detailed timeline of Mr. Feng's involvement with Paradise."  The July 2022 memorandum also includes extensive information on the relationship between Empire and Plaintiffs, and both documents discuss, in detail, that Empire and LT Game previously shared certain employees.

[6] Lewis Roca disclosed this information to counsel in October 2024, and Plaintiffs submitted these emails (among other exhibits) in support of their initial Motion to Compel Production of Lewis Roca Records (ECF 55).  *See* Pls.' Ex. 1I, ECF 55-2 at pg. 14 ("Just to ensure everyone is on the same page, we have two sets of client files."); *id.* at pgs. 11-12.

1    demonstrating what Lewis Roca or the other law firms understood concerning conflicts between

2    LT Game and Empire."  Mot. at 13-14.

3         Finally, Plaintiffs cannot credibly claim that they intended for LT Game and Empire to be

4    joint clients.  Plaintiffs make much of the fact that they paid some of Empire's legal fees related to

5    gaming licenses; the suggestion that this entitles them to Empire's privileged communications is

6    incorrect.[7]  "There is a reason [Plaintiffs] cited no case law in support of this proposition—because

7    the law is quite clearly the opposite."  *Afremov v. Sulloway & Hollis, P.L.L.C.*, No. CV 09-3678

8    (PJS/JSM), 2012 WL 12981665, at *11 (D. Minn. July 5, 2012) ("In the absence of an attorney-

9    client relationship, a third party payor of an attorney's fees is not entitled to privileged or protected

10   communications."); *Humphries v. Button*, No. 2:21-CV-01412-ART-EJY, 2024 WL 1077550, at

11   *2 (D. Nev. Feb. 15, 2024), *reconsideration denied*, No. 2:21-CV-01412-ART-EJY, 2024 WL

12   3707893 (D. Nev. Apr. 4, 2024), *and reconsideration denied*, No. 221CV01412ARTEJY, 2024

13   WL 1549293 (D. Nev. Apr. 8, 2024) ("The existence of an attorney-client relationship and privilege

14   is not dependent on the client paying the attorney." (quoting *Dole v. Milonas*, 889 F.2d 885, 888

15   n.5 (9th Cir. 1989) (internal citation omitted)).

16        Nor do the payments indicate that Plaintiffs intended to establish a joint client relationship.

17   Far from seeking to establish some special relationship with Empire, Plaintiffs had a strong

18   financial incentive to help Empire acquire licensing—specifically, because LT Game could not

19   obtain its own gaming licenses, Plaintiffs could only access United States gaming jurisdictions if

20   Empire had the applicable licenses.[8]  As a result of Empire distributing Plaintiffs' products, LT

21   Game surely generated revenue far exceeding the "hundreds of thousands of dollars" Plaintiffs

22   claim to have spent on Empire's legal fees.  *See* Mot. at 4.  To be sure, Plaintiffs contend the

---

[7] To be clear, Plaintiffs did not pay for all of Empire's legal fees, nor did they pay for all the attendant fees for Empire's gaming licenses (nor do they allege to have done so).  (*See* Ex. B, Feng Decl., ¶¶ 24-26).  Empire has paid for the vast majority of its own legal fees (including the vast majority of its fees from Lewis Roca) and has paid for the vast majority of all fees related to its gaming licenses.  (*See id.* ¶¶ 25-26).

[8] There is no evidence that Plaintiffs have ever held a gaming license from any jurisdiction in the United States; nor have they ever applied for any such license—including since initiating this dispute and severing ties with Empire (and Empire's licenses).  (*See* Ex. B, Feng Decl., ¶ 28).  The United States gaming industry is strictly regulated, and the licensing application process generally involves thorough background investigations, including investigations into the character and fitness of key individuals, as well as their international business holdings.  (*Id.* ¶ 29).  Rather than undergo such investigations, Plaintiffs decided to expand their access to the United States gaming market by paying for some of the costs for Empire to obtain certain gaming licenses.

payments were made upon their belief that Empire was serving as LT Game's exclusive distributor. *Id*. This rings particularly hollow. The available evidence—namely, the written agreements between the parties, signed on Plaintiffs by Paradise's Chairman and Managing Director—establishes that Empire has always been a separate company, under separate ownership, and free to pursue its own business ventures. (*See* Ex. B-1 (Supply Framework Agreement), §§ 3.1, 3.4) (providing for "non-exclusive" relationship; Ex. B-2, (Distribution Agreement); Ex. B-3, (Game Development Agreement); Ex. B-4 (Master Hardware Purchase Agreement); *see also* Ex. B, Feng Decl., ¶¶ 9-11). Rather than confront these facts, Plaintiffs retreat from them. The allegation that Empire was intended to operate exclusively for Plaintiffs' benefit is central to Plaintiffs' claims; yet, after more than a year of discovery, Plaintiffs support their narrative only though conclusory and self-serving statements identical to the allegations in their Complaint. *See* Mot. at 3-4 (citing Leo Chan Decl.).

Plaintiffs also emphasize that some individuals were, at times, employed by both Empire and LT Game. This proves nothing with respect to whether Lewis Roca jointly represented companies, as Plaintiffs fail to connect the shared employment with the legal representation. With the exception of Mr. Feng, Plaintiffs offer no evidence that the other individuals interacted with counsel, let alone with respect to matters pertaining to LT Game. None of the individuals referenced in Plaintiffs' Motion regularly interacted with counsel. (*See* Ex. B, Feng Decl., ¶¶ 30-31). Regardless, Defendants undertook an exhaustive privilege review and produced communications (even those that occurred on Empire's email addresses) that could be construed as being part of an LT Game's legal representation. (*See* Ex. A, McHenry Decl., ¶ 5). Accordingly, communications Defendants withheld as privileged relate to Empire's legal representation. (*See id*.) The mere fact that an individual may have also been an LT Game employee does not automatically transform separate legal representation into joint representation, and Plaintiffs offer no precedent to support such a proposition. Plaintiffs' insistence that Empire's privilege "properly belongs" to LT Game because the companies, at times, shared some employees is an attempt to create a bright line rule where no such line exists. To the contrary, *Hall* provides for a flexible totality of the circumstances test, and the shared employment cannot outweigh all the other

evidence establishing that Empire and LT Game were separate clients.  *See Hall*, 2019 WL 5448458, at *10 ("[C]ourts must be careful not to imply joint representations too readily." (quoting *In re Teleglobe Comm. Corp.*, 493 F.3d at 362).

**2.    Even Under *Bevill*, Defendants' Privilege Assertions Are Proper**

For the reasons discussed, the Court should decide this Motion by analyzing whether the parties were joint or separate clients under *Hall's* totality of the circumstances test.  Should the Court apply the *Bevill* test, though, Defendants satisfy each of the five factors, and the communications remain properly privileged.[9]

First, the evidence shows that Defendants made clear to Lewis Roca that they were seeking legal advice in their capacities as Empire employees, not LT Game, employees.[10]  *See Graf*, 60 F.3d at 1160.  As discussed, *supra*, Lewis Roca understood that Empire and LT Game were two separate clients, and this was evidenced through various documents, such as separate engagement agreements for Empire, separate invoices for Empire, and conflict of interest waivers.  *Compare with United States v Holmes*, No. 18-cr-00258-EJD-1 2021 WL 2309980, at *3 (N.D. Cal. July 1, 2021) (finding *Bevill* test not satisfied when, among other factors, employee failed to identify documents evidencing a relationship existed).  Accordingly, Lewis Roca clearly understood that it was providing legal advice to Empire, not LT Game.

Second, Defendants have demonstrated that Lewis Roca "saw fit" to communicate with them in their capacities as Empire employees.  *See Graf*, 60 F.3d at 1160.  As noted, Lewis Roca sought and obtained conflict of interest waivers from Empire and/or the LT Game in the course of representing both companies.  (Ex. B, Feng Decl., ¶ 20; Ex. B-5 (conflict waiver)).  This included obtaining conflict waivers from LT Game in late 2021, when Lewis Roca represented Empire with respect to drafting several agreements between LT Game and Empire.  (Ex. C, Rossman Decl., ¶ 10).  Of particular note, Lewis Roca and Empire executed engagement agreements in September

---

[9] Plaintiffs concede the first *Bevill* factor.  Mot. at 13.  Defendants thus begin the analysis with the second factor.

[10] As discussed, the *Bevill* test does not apply here because it distinguishes between legal advice pertaining to an employee's "individual capacity" as opposed to their "corporate capacity," yet this dispute is between separate corporations.  Defendants thus analyze the factors with respect to the distinction between a shared employee's capacity as an Empire employee and as a LT Game employee.

and November 2023, and in February 2024, (*see* Ex. B-6 (engagement agreements), pgs. 15, 20, 26), and thus the firm "saw fit" to continue to represent Empire even after this dispute began.

Third, Defendants have demonstrated that their conversations with Lewis Roca were confidential. *See Graf*, 60 F.3d at 1160. As discussed, Empire expected and understood Lewis Roca would maintain separate client files for Empire and would not share privileged communications and work product with LT Game, and Lewis Roca acknowledges that it "had attorney-client privileged communications with Empire related to [its legal work for Empire] that was not shared with other parties." (Ex. B, Feng Decl., ¶¶ 17, 18; Ex. C, Rossman Decl., ¶ 9). Additionally, Plaintiffs are incorrect in contending there was no confidentiality with respect to communications involving employees were employed simultaneously by Empire and LT Game, as discussed below (*see* Section IV.C, *infra*).

Finally, Defendants have shown that the substance of their conversations with Lewis Roca concerned matters within the scope of its representation of Empire. *See Graf*, 60 F.3d at 1160. Plaintiffs contend they "cannot conceive how Defendants' communications with counsel, while they were managers of LT Game, could fail to pertain LT Game, either explicitly or by necessity." Mot. 14. Putting aside that the final *Bevill* factor does not assess whether the communications "pertain[ed] LT Game," the law is not limited by Plaintiffs' imagination. In any event, this tragic failure of imagination ignores the fact Empire was its own company, free to pursue its own business. It is undisputed that Lewis Roca represented both companies, and, "[a]t all times of concurrent representation, Lewis Roca considered the LT Game Plaintiffs and Empire to be separate clients." (Ex. C, Rossman Decl., ¶ 11). Indeed, Lewis Roca opened over 80 matter files in the course of representing Empire, compared to the over 20 matter files it owned in the course of representing the LT Game Plaintiffs. (Ex. C, Rossman Decl., ¶¶ 7, 9). Defendants conducted an exhaustive privilege review and produced to Plaintiffs any communications reasonably reflecting legal representation conducted on LT Game's behalf. (*See* Ex. A, McHenry Decl., ¶ 5).

**B.**   **Plaintiffs' Request for Privileged Communications with Other Attorneys They "Are Not Immediately Familiar with" is Improper**

Plaintiffs seek to compel communications not only with Lewis Roca, but also the "rest of the attorneys on Defendants' privilege logs." Mot. at 16. This request is fatally deficient, as Plaintiffs admit that they "are not immediately familiar with" those attorneys, and provide no evidence to justify invading Empire's privilege with those attorneys. *See id.*

Plaintiffs flunk the basic threshold requirement of establishing why Defendants' privilege assertions are improper. *See Lux*, 2024 WL 1598805, at *1 ("[T]he movant must still present meaningfully developed argument as to each particular discovery objection in dispute."); *Johnson v. Garofalo*, No. 3:21-CV-00239-MMD-CLB, 2023 WL 11830746, at *2 (D. Nev. Mar. 17, 2023) ("[T]he party moving for an order to compel discovery bears the initial burden of informing the court: (1) which discovery requests are the subject of the motion to compel; (2) which of the responses are disputed; (3) why he believes the response is deficient; (4) why defendants' objections are not justified; and (5) why the information he seeks through discovery is relevant to the prosecution of this action."). Plaintiffs' Motion focuses exclusively on Lewis Roca. It does not name any other counsel, let alone provide any argument—or evidence—suggesting that the privileged communications involving the other counsel were on behalf of LT Game. To the contrary, Plaintiffs merely speculate that ***"[i]t is possible"*** the other law firms were engaged for LT Game. Mot. at 16 (emphasis added). Plaintiffs' complete failure to substantiate their request renders it baseless.

**C.**   **Empire Did Not Waive Privilege By Communicating With Its Own Employees**

The Court can quickly dispense with Plaintiffs' misguided attempt to argue waiver, which merely asserts that Empire waived attorney-client privilege with respect to communications with "LT Game employees." *Id.* at 15. Playing hide-the-ball, Plaintiffs fail to mention that the "LT Game employees" were also Empire employees. (*See* Ex. B, Feng Decl., ¶ 30 (providing that the individuals Plaintiffs' Motion references are current or former Empire employees)). It is blackletter law that a corporation's privilege extends to communications between corporate employees and corporate counsel as long as the communications are made at the direction of corporate superiors

16

1  for purposes of obtaining legal advice.  *Upjohn*, 449 U.S. at 390–94.  Plaintiffs' waiver argument

2  holds no water.

3          Further, it is immaterial that the individuals may have been employed by both Empire and

4  LT Game at the same time.  "An express waiver occurs when a party discloses privileged

5  information **to a third party who is not bound by the privilege**, or otherwise shows disregard for

6  the privilege by making the information public."  *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir.

7  2003) (emphasis added).  A corporate employee does not transform into a "third party" simply by

8  holding a second job.  And it cannot be the case that employees with second jobs automatically

9  destroy corporate attorney-client privilege.  This would stifle communication between corporate

10  counsel and employees, and render the corporate privilege unworkable.  Plaintiffs offer no

11  argument to support such a bright-line rule.

12          Moreover, this Court has recognized that "whether or not a given communication is

13  confidential within the meaning of the privilege is determined from the perspective of the client."

14  *Humphries*, 2024 WL 1077550, at *2 (internal quotations omitted); *see also* Nev. Rev. Stat. §

15  49.055 ("A communication is 'confidential' if it is not intended to be disclosed to third persons

16  other than those to whom disclosure is in furtherance of the rendition of professional legal services

17  to the client or those reasonably necessary for the transmission of the communication.").

18  Regardless of any dual employment, Empire undoubtedly intended those communications to be

19  confidential because the individuals were Empire employes—indeed they were all using Empire

20  email addresses.[11]  Therefore there was no wavier.

21  **D.    Plaintiffs Fail To Justify an *In-Camera* Review**

22          Plaintiffs' misguided attempt to invoke the crime-fraud exception, and their vague privilege

23  challenges, lack the requisite factual foundation to justify an *in-camera* review.  "*[I]n camera*

24  review is a disfavored practice that is not a substitute for the adversarial process."  *In re J&J Inv.*

25  *Litig.*, No. 2:22-CV-00529-GMN-NJK, 2023 WL 11113645, at *2 n.5 (D. Nev. July 28, 2023).

26  The Court applies a two-part test to determine whether in camera review is appropriate.  *Acosta v.*

---

27
28  [11] As noted, Defendants supplemented their document productions to produce all communications on their privilege logs that included a Paradise email domain (*i.e.*, emails with "@hk1180.com" email addresses).  (*See* Ex. A, McHenry Decl., ¶ 6).

1    *Wellfleet Commc'ns, LLC*, No. 2:16-CV-02353-GMN-GWF, 2018 WL 11409850, at *8 (D. Nev.

2    Aug. 10, 2018).  "First, the party opposing the privilege must make a threshold showing to support

3    a reasonable good faith belief that *in camera* review may reveal evidence that information in the

4    materials is not privileged."  *Id*.  "If that threshold is met, then the court exercises its discretion as

5    to whether to conduct in camera review" by "consider[ing] the amount of material it has been asked

6    to review, the relevance of the alleged privileged material to the case, and the likelihood that in

7    camera review will establish that the materials are not privilege."  *Id*.  As discussed below, Plaintiffs

8    fail to make the required threshold showing.  The court should also refuse to approve an *in-camera*

9    review in light of the significant volume of material at issue.  As noted, Defendants have withheld

10   approximately 5,300 privileged communications, and Plaintiffs do not identify any specific entries

11   for the Court to review.  Plaintiffs fail to justify an *in-camera* review, and the Court should decline

12   the invitation to do Plaintiffs' work for them.

13          **1.      Plaintiffs Fail To Establish The Crime-Fraud Exception**

14          Plaintiffs have not made a sufficient showing to justify *in-camera* review on the basis of the

15   crime-fraud exception.  As a threshold matter, Plaintiffs are required to show that Defendants were

16   engaged in a fraudulent scheme at the time they consulted with counsel.  *See In re Napster, Inc.*

17   *Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007), *abrogated on other grounds by Mohawk*

18   *Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009) ("A party seeking to vitiate the attorney-client

19   privilege under the crime-fraud exception must satisfy a two-part test.").  Plaintiffs' Motion merely

20   alleges the same sprawling fraud-by-deceit scheme underlying their Complaint—that Defendants

21   supposedly took "money, employees, and resources from [LT Game] while concealing their parallel

22   plans to build a competing business enterprise."  *See* Mot. at 18.  Plaintiffs trot out seven purported

23   examples of "fraudulent conduct" that are supported only by conclusory statements parroting their

24   Complaint (in one instance Plaintiffs directly cite their Complaint).  *See* Mot. at 5-7.  This hardly

25   establishes the expansive fraudulent scheme that Plaintiffs have been alleging for over a year.  *See*

26   *In re Grand Jury Proc.*, 87 F.3d 377, 381 (9th Cir. 1996) ("[I]t isn't enough for the government

27   merely to allege that it has a sneaking suspicion the client was engaging in or intending to engage

28   in a crime or fraud when it consulted the attorney.").

Regardless, the crime-fraud exception fails for a separate and independent reason. Even assuming an alleged fraud, Plaintiffs also have the burden to "demonstrate that the attorney-client communications at issue are sufficiently related to and were made in furtherance of" the alleged fraud. *Hernandez v. Creative Concepts, Inc.*, No. 2:10-CV-02132-PMP, 2013 WL 1405776, at *4 (D. Nev. Apr. 5, 2013) (internal quotations omitted) (quoting *In re Napster, Inc. Copyright Litig.*, 479 F.3d at 1090); *In re Grand Jury Investigation*, 231 F. App'x 692, 695 (9th Cir. 2007) ("[t]he test for invoking the crime-fraud exception ... is whether there is reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme." (internal quotations omitted) (alternations in original)). Plaintiffs make no attempt to do so.

The only alleged misconduct related to counsel is that Lewis Roca prepared agreements between Empire and LT Game. *See* Mot. at 6-7. Plaintiffs do not even connect these legal services to the alleged fraud, let alone attempt to explain how such agreements ***furthered*** the alleged scheme. All Plaintiffs contend is that they supposedly would not have signed the agreements had they "been aware" of the alleged scheme. *See id*. Worse, Plaintiffs make no attempt to connect specific communications to the alleged scheme, apparently presuming all of Empire's privileged communications fall within the crime-fraud exception. *See In re Grand Jury Investigation*, 231 F. App'x at 695 (finding district court's "analysis was improper" based on "an insufficient nexus between the documents sought and the alleged illegality," and remanding "to the district court so that it may determine which, if any, of the documents and communications sought were in furtherance of a crime or fraud."). Tellingly, Plaintiffs claim to have relied on Mr. Feng "to truthfully and accurately report on legal advice received from Lewis Roca," yet they never allege that Mr. Feng failed to do so. *See* Mot. at 5. Because Plaintiffs wholly fail to establish that Empire engaged counsel to further the alleged fraudulent scheme, they cannot invoke the crime-fraud exception. Plaintiffs therefore cannot justify *in-camera* review on this basis.

### 2.    Plaintiffs' Vague Privilege and Waiver Challenges Are Insufficient

Plaintiffs' alternative basis for *in-camera* review—that Defendants' privilege assertions are improper (whether under the *Hall* or *Bevill* framework)—is equally baseless. As discussed above, the undisputed evidence (including a sworn declaration from Lewis Roca) demonstrates that

Empire has an attorney-client privilege over communications with Lewis Roca separate from that of LT Game. As for Empire's other counsel, Plaintiffs admit they "are not immediately familiar with" those attorneys, and concede that they can only speculate that such counsel may have been engaged for LT Game. *Id.* at 16. As discussed, Defendants conducted an exhaustive privilege review and only withheld communications reflecting Empire's legal representation, which are properly subject to Empire's attorney-client privilege, while producing to Plaintiffs communications reasonably reflecting legal representation conducted on behalf of LT Game. Ultimately, Plaintiffs' Motion fails to provide the required threshold showing to support that these communications are not privileged.[12]

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion to Compel in its entirety.

DATED this June 20, 2025

/s/ Patrick J. Reilly
Patrick J. Reilly
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, 16th Floor
Las Vegas, Nevada 89106

Mark Oakes (*pro hac vice*)
Zach McHenry (*pro hac vice*)
Ethan Glenn (*pro hac vic*)
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255

*Attorneys for Defendants/Counterclaimants*

---

[12] Defendants' privilege logs do not provide a basis for *in-camera* review. Plaintiffs contend that the logs "contain[] generic statements in support of the claimed privileges," *e.g.*, Mot. at 11, which their Motion suggests suffices to meet the initial showing required for *in-camera* review, *see id.* at 18. This is incorrect. Plaintiffs' Motion is only premised on the argument that Defendants do not own the legal privilege—not that the logs are insufficient to support the privilege assertions. *E.g.*, *id.* at 2 ("[U]nder the *Bevill* test (discussed herein) those communications belong to LT Game because they were made by LT Game's own managers (Feng, Allison, and Kiely) concerning matters that directly impacted LT Game, and LT Game paid for the legal services. Additionally or alternatively, the communications during that time period are subject to a joint privilege and are co-owned by LT Game."). Plaintiffs make this argument with respect to *all communications* withheld as privileged, not on a communication-by-communication basis. Nor does Plaintiffs' Motion identify specific, allegedly-deficient privilege log entries, let alone provide that Plaintiffs met and conferred with Defendants regarding such entries (and that Defendants declined to remedy any such entries). *See id.* at 9-11. "Courts are [] not obliged to dig through voluminous exhibits or filings elsewhere in the record to piece together arguments for a party that are not made properly in the briefing." *Lux*, 2024 WL 1598805, at *1 n.2.

1                         Index of Exhibits

2     •   Exhibit A: Declaration of Zach McHenry.

3     •   Exhibit B: Declaration of Linyi Feng.

4     •   Exhibit B-1: Supply Framework Agreement.

5     •   Exhibit B-2: Distribution Agreement.

6     •   Exhibit B-3: Game Development Agreement.

7     •   Exhibit B-4: Master Hardware Purchase Agreement.

8     •   Exhibit B-5: Conflict waiver.

9     •   Exhibit B-6: Engagement agreements.

10     •   Exhibit C: Declaration of Ken Rossman

11

12

13                         Certificate of Service

14       Pursuant to Fed. R. Civ. P. 5(b), and Section IV of the United States District of Nevada

15 Electronic Filing Procedures, I certify that I am an employee of BROWNSTEIN HYATT FARBER

16 SCHRECK, LLP, and that the foregoing **OPPOSITION TO PLAINTIFFS' MOTION TO**

17 **COMPEL PRODUCTION OF LEWIS ROCA RECORDS** was served via electronic service on

18 the 20th day of June, 2025, to all parties on the CM/ECF service list.

19

20

21            */s/ Wendy Cosby*
            An employee of BROWNSTEIN HYATT FARBER SCHRECK, LLP

22

23

24

25

26

27

28