1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

Paradise Entertainment Limited, et al.,

      Plaintiffs/Counter-Defendants,

     v.

Empire Technological Group Limited, et al.,

      Defendants/Counter-Claimants.

Case No. 2:24-cv-00428-JCM-BNW

**ORDER**

10

11

12

13

14

     Before this Court is Plaintiffs' Motion to Compel, in which Plaintiffs seek disclosure of withheld attorney-client communications under exceptions to the privilege. ECF No. 87. Defendants opposed, and Plaintiffs replied. ECF Nos. 90 and 98. This Court held a hearing on the motion on August 25, 2025, and took the matter under submission. ECF No. 108. For the reasons discussed below, this Court denies Plaintiffs' motion without prejudice.

15

   **I.    BACKGROUND**

16

      **A.  Facts and Procedural History**

17

18

19

20

21

22

23

24

     Plaintiffs and Defendants are companies that supply gaming equipment to casinos. Plaintiffs consist of Paradise Entertainment Limited ("Paradise") and LT Game (Canada) Limited ("LT Game"). Paradise is a Macau-based company headed by its chairman, Dr. Jay Chun. LT Game is a wholly owned subsidiary of Paradise that is based in Nevada. It is involved with the development, marketing, sale, and lease of Paradise's electronic-gaming products in the North American market. Defendants consist of Empire Technological Group Limited ("Empire"), Gaming Specialized Logistics LLC, and individuals Linyi "Frank" Feng, Roy Allison, Daryn Kiely, and Yi Zhao.

25

26

27

28

     Lewis Roca began representing LT Game in 2011. It opened over 20 matter files during the course of this representation. Lewis Roca began representing Empire in 2013, and it opened over 80 matter files in the course of that representation. Lewis Roca contends that the companies

1    had separate engagement letters, none of which provided for joint representation. In addition to

2    maintaining separate files, Lewis Roca billed the companies separately.

3         In early 2008, Dr. Chun appointed his brother-in-law, Mr. Feng, to manage LT Game. In

4    2012, Paradise arranged for the incorporation of Empire under the name LT Game International.

5    Paradise placed Mr. Feng in charge of the company in 2015, and the company changed its name

6    to Empire in 2016. Defendants contend that Paradise never possessed an ownership, legal, or

7    other interest in Empire or its assets. ECF No. 90 at 7–8.  The parties disagree as to whether

8    Empire was supposed to be Plaintiffs' long-term exclusive distributor of gaming equipment in

9    North America.

10        Mr. Feng served as President of LT Game and Empire simultaneously from 2015 through

11   2022. Mr. Kiely entered into an employment contract with LT Game as its chief technology

12   officer in August 2019. Mr. Allison entered into an employment contract with LT Game in

13   January 2020 to be its senior vice president of operations and business development. Mr. Kiely

14   resigned from LT Game in March 2023 to work for Empire. Similarly, Mr. Allison left LT Game

15   in June 2023 to work for Empire. Plaintiffs assert that both employees' LinkedIn profiles show

16   that they were working for Empire while employed at LT Game, like Mr. Feng.

17        The parties' business dealings were subject to a supply framework agreement. According

18   to the 2021 version of that agreement, Paradise would supply or procure to supply the products to

19   Defendants by way of sale and/or leasing. Then, Defendants would further develop, assemble,

20   enhance, or otherwise manufacture the same into customized devices for onward sale and/or

21   leasing of gaming users in the territory on a "non-exclusive basis." ECF No. 90-3, Section 3.1.

22        Plaintiffs allege that, beginning in 2018, Mr. Feng started to surreptitiously transform

23   Empire into their direct competitor. For example, Plaintiffs contend that: Mr. Feng took over one

24   million dollars from LT Game to fund a separate company that he controlled; Defendants re-

25   branded LT Game's gaming equipment and leased it to a large casino so that it could earn money

26   from those leases; Defendants persuaded Paradise to sell a large amount of heavily discounted

27   gaming equipment to a company unknowingly owned by Mr. Feng and Mr. Allison. Plaintiffs

28

also allege that Empire is now competing directly with Paradise in Macau, and that they have lost tens of millions of dollars as a result of Defendants' fraud.

Plaintiffs filed two motions to compel in early February of this year. ECF Nos. 55 and 58. This Court denied those motions without prejudice given the parties' notice that the motions may be mooted by a large document production. ECF No. 71. Following the document production, Plaintiffs filed one renewed motion to compel, which is the subject of this Order. ECF No. 87.

### B. Parties' Arguments

Plaintiffs move to compel Defendants to disclose their communications with Lewis Roca (and other counsel that LT Game used) on the ground that Defendants are improperly claiming attorney-client privilege. ECF No. 87 at 1. Specifically, Plaintiffs seek communications between Empire, Lewis Roca, and other LT Game counsel during the period when Defendants were managers at LT Game, as well as communications that involved LT Game employees. Plaintiffs further seek any emails or messaging accounts that Defendants used via Mr. Feng's non-party companies to communicate with LT Game's counsel under Rule 45. *See id.* at 16. They note that Defendants have not served privilege logs regarding the non-party companies. *Id.*

Plaintiffs put forth a variety of arguments in support of their request. First, Plaintiffs argue that Defendants waived the attorney-client privilege because (a) the privilege logs are vague, and (b) the Empire employees who communicated with Lewis Roca disclosed the communications to third parties because they were also employees of LT Game. *Id.* at 12, 15. Second, Plaintiffs argue that the withheld communications between Mr. Feng (on behalf of Empire and his other corporations) and Lewis Roca should be disclosed because those communications belong to LT Game, and Mr. Feng did not show that he sought legal advice in his individual capacity under *Bevill*. *Id.* at 13–14 (citing *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 124 (3d Cir. 1986)). Third, Plaintiffs argue that Empire and LT Game were joint clients of Lewis Roca, such that the joint-client exception applies. *Id.* at 15–16. Fourth, as an alternative argument, Plaintiffs ask for in camera review of the withheld communications based on the crime-fraud exception and improper privilege logs. *Id.* at 17–18.

In response, Defendants contend that their privilege logs are proper. In addition, they argue that just because an employee holds two jobs does not automatically constitute waiver of the attorney-client privilege. ECF No. 90 at 16–17, 20. Defendants explain that *Bevill* is inapplicable here as Mr. Feng is not asserting an individual attorney-client privilege; rather, Empire is asserting the privilege. Further, Defendants argue that Empire and LT Game were separate clients of Lewis Roca, as demonstrated by the fact that Lewis Roca maintained separate client files, separate engagement agreements, and obtained conflict waivers. *Id.* at 10–13. Finally, Defendants contend that Plaintiffs have not met their evidentiary burden to show that in camera review is warranted. *Id.* at 17–18.

## II.    DISCUSSION

### A.  Legal Standard

The attorney-client privilege protects confidential disclosures made by a client to an attorney to obtain legal advice and an attorney's advice in response to such disclosures. *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996). It is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The attorney-client privilege serves to protect confidential communications between a party and its attorney in order to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* However, it is essential to distinguish the broader policy objectives from the means of achieving them. *In re Teleglobe Communications Corp.*, 493 F.3d 345, 360 (3d Cir. 2007). "*Upjohn* counsels a more nuanced inquiry into whether according a type of communication protection is likely to encourage compliance-enhancing communication that makes our system for resolving disputes more operable." *Id.* at 361.

The federal laws of privilege apply to cases that involve both state and federal claims, like this one. *See Wilcox v. Arpaio*, 753 F.3d 872, 876 (9th Cir. 2014); ECF No. 69 at 3. Under federal law, an attorney-client relationship exists: (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at this instance permanently protected (7) from

disclosure by himself or by the legal adviser, (8) unless the protection be waived. *Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Arizona*, 881 F.2d 1486, 1492 (9th Cir. 1989) (citing *In re Fischel,* 557 F.2d 209, 211 (9th Cir. 1977)). Furthermore, the party asserting the attorney-client privilege—here, Defendants—has the burden of proving the attorney-client privilege applies. *See Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 25 (9th Cir. 1980).

### B. Empire has an attorney-client relationship with Lewis Roca.

As an initial matter, this Court finds that an attorney-client relationship exists between Empire and Lewis Roca. The parties do not meaningfully address this point. Nonetheless, based on Defendants' privilege logs and exhibits, which include a declaration by counsel at Lewis Roca and engagement-agreement addendums between Lewis Roca and Empire, this Court finds that Defendants have met their burden of proving that an attorney-client relationship was formed. *See In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992) ("We have previously recognized a number of means of sufficiently establishing the [attorney-client] privilege, one of which is the privilege log approach.").

### C. Defendants have not waived the attorney-client privilege.

Plaintiffs appear to make two waiver arguments: one regarding the privilege logs and one regarding voluntary disclosure. As to Plaintiffs' first argument, they state:

> A party claiming privilege must provide a log accompanied by sufficient information to support and conclude the applicability of the privilege. Fed. R. Civ. P. 26(b)(5) (party claiming privilege must "describe the nature of the documents, … in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."). Failure to assert privileges in accordance with Rule 26(b)(5) can result in a waiver of the privilege. *See, e.g.*, *Diamond State Ins. Co. v. Rebel Oil Co., Inc.*, 157 F.R.D. 691, 698 (D. Nev. 1994).

ECF No. 87 at 12. Plaintiffs offer no explanation as to how or why Defendants' privilege logs are insufficient or constitute waiver.[1] Still, this Court will consider the argument given that it is Defendants' burden to show that it did not waive the privilege. *See Weil v. Inv./Indicators, Rsch.*

---

[1] In their reply, Plaintiffs do state that the privilege logs are vague and ambiguous, however, they made these statements in the section on in camera review and did not otherwise connect them to a waiver argument. ECF No. 98 at 8–9.

& *Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981). Here, Defendants' privilege logs contain information detailing the communication date, communication type, who sent the communication (including email addresses), who received the communication (including email addresses), who was copied and blind copied on the communication (including email addresses), the level of privilege (e.g., completely privileged), the privileged basis, and a description of the communication. ECF No. 88-1, Ex. L and Ex. M. The description notes whether it was a request or provision of legal advice, and what that legal advice concerned, such as "licenses and applications" or "product sales." *Id.* This is sufficient to determine that Defendants did not waive the privilege based on an insufficient log theory. *See Diamond State Ins. Co. v. Rebel Oil Co., Inc.*, 157 F.R.D. 691, 698 (D. Nev. 1994) ("This demonstration is generally accomplished by the submission of a privilege log which identifies (a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the documents or informed of its substance, and (e) the date the document was generated, prepared, or dated.").

As to Plaintiffs' second argument, "[a]n express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003); *see also United States v. Sanmina Corp.*, 968 F.3d 1107, 1116–17 (9th Cir. 2020). Under Plaintiffs' view, for example, Mr. Feng's communications with Lewis Roca in his role as President of Empire would be expressly waived because he was simultaneously an employee of LT Game. *See* ECF No. 87 at 15. As Defendants point out, this view has several flaws. *See* ECF No. 90 at 16–17.

First, it is illogical for a client to also be a third party under the plain meaning of the word. A "third party" is "someone other than the principal parties in a matter, or someone who is not a party to a lawsuit, agreement, or other transaction . . . ." THIRD PARTY, Black's Law Dictionary (12th ed. 2024). Second, adopting Plaintiffs' interpretation of waiver would undermine the purpose of the attorney-client privilege—to promote compliance enhancing communications between attorneys and their clients. *See In re Teleglobe Communications Corp.*, 493 F.3d 345,

360 (3d Cir. 2007) (citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981)). For example, if an employee worked at company A and company B, any communication that employee made with either company would automatically be waived. Such a result would discourage employees from communicating with attorneys for fear of their communications being waived. Finding there has been no waiver, this Court turns to Plaintiffs' other arguments.

### D. The *Bevill* test is inapplicable here.

Any privilege related to a corporate officer's role and responsibilities "within a corporation" belongs to the corporation, not the individual officer. *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 124 (3d Cir. 1986) (citing *Commodity Futures Trading Comm'n. v. Weintraub,* 471 U.S. 343, 348 (1985)). However, in *Bevill*, the Third Circuit held that individual corporate officers or employees could assert a personal claim of attorney-client privilege if they met five factors:

> *First,* they must show they approached counsel for the purpose of seeking legal advice. *Second,* they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. *Third,* they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. *Fourth,* they must prove that their conversations with counsel were confidential. And *fifth,* they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

*Id.* at 123, 125 (quoting *In re Grand Jury Investigation,* 575 F. Supp. 777, 780 (N.D. Ga. 1983)) (brackets omitted and emphases added). The Ninth Circuit adopted the *Bevill* test in *United States v. Graf.* 610 F.3d 1148, 1161 (9th Cir. 2010).

Plaintiffs argue that Defendants cannot meet the five factors under *Bevill*. ECF No. 87 at 13–14. Defendants respond that *Bevill* is not the appropriate test because it was designed to analyze whether a corporate employee holds a personal attorney-client privilege with corporate counsel—not a privilege dispute between separate corporations. ECF No. 90 at 7. Plaintiffs respond that *Bevill* should apply because it is a scenario in which company managers used the company's attorneys, and the Third Circuit did not draw a distinction as to whether the manager sought advice for a company. ECF No. 98 at 5–6.

1    This Court agrees with Defendants. *Bevill* is inapposite because the individual

2    Defendants—Mr. Feng, Mr. Kiely, and Mr. Allison (corporate officers of LT Game and

3    Empire)—are not asserting a *personal claim* of attorney-client privilege between themselves and

4    Lewis Roca. Rather, Defendants are asserting a claim of attorney-client privilege between Lewis

5    Roca and a separate corporation, Empire. Plaintiffs' arguments that *Bevill* should apply fail to

6    address why the holding in *Bevill*—which considered individual officers and personal claims of

7    privilege—extends to a separate corporation asserting a claim of privilege. Moreover, this Court

8    has not found case law that supports interpreting *Bevill* so broadly.

9              **E.  The Joint-Client Privilege**

10   Lawyers may represent multiple clients on the same matter if the clients give their consent

11   and there is no significant risk that the lawyer will be unable to fulfill his duties to all clients. *In*

12   *re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362 (3d Cir. 2007), *as amended* (Oct. 12, 2007)

13   (citing Restatement (Third) of the Law Governing Lawyers §§ 128–31). A joint-client

14   relationship arises when co-clients convey their desire for representation, and the lawyer agrees.

15   *Id.* Like single-client representations, joint-client representations may arise by implication. *Id.*

16   If a court determines that two parties are joint clients, then communications made in the

17   scope of the joint representation are not privileged as to each other but remain privileged to those

18   outside the joint representation. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir.

19   2007), *as amended* (Oct. 12, 2007). Thus, determining the scope of a joint-client relationship is

20   key to determining which materials are not privileged as to the co-clients.

21   The Ninth Circuit has yet to elaborate on a test to determine whether an implied-joint-

22   client relationship exists, but courts in this district and many others are frequently guided by *In re*

23   *Teleglobe Commc'ns Corp.*, 493 F.3d 345 (3d Cir. 2007), *as amended* (Oct. 12, 2007) and *Sky*

24   *Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648 (N.D. Cal. 1993).[2] As explained in

25   _____

26   [2] *See Hall CA-NV, LLC v. Ladera Dev., LLC*, No. 3:18-CV-00124-RCJ-WGC, 2019 WL 5448458
     (D. Nev. Oct. 24, 2019), *aff'd*, No. 3:18-CV-00124-RCJ-WGC, 2020 WL 1033560 (D. Nev. Mar.
27   2, 2020); *see also Newmark Grp., Inc. v. Avison Young (Canada) Inc.*, No. 2:15-CV-00531-RFB-
     EJY, 2020 WL 5514156 (D. Nev. Sept. 14, 2020).
28

*Teleglobe* and *Sky Valley*, courts may consider a wide variety of circumstances to determine whether the parties intended to create an implied-joint-client relationship, including:

> (1) the conduct of the two parties toward one another,
> (2) the terms of any contractual relationship (express or implied) that the two parties may have had,
> (3) any fiduciary or other special obligations that existed between them,
> (4) the communications between the two parties (directly or indirectly),
> (5) whether, to what extent, and with respect to which matters there was separate, private communication between either of them and the lawyer as to whom a "joint" relationship allegedly existed,
> (6) if there was any such separate, private communication between either party and the alleged joint counsel, whether the other party knew about it, and, if so, whether that party objected or sought to learn the content of the private communication,
> (7) the nature and legitimacy of each party's expectations about its ability to access communications between the other party and the allegedly joint counsel,
> (8) whether, to what extent, and with respect to which matters either or both of the alleged joint clients communicated privately with *other* lawyers,
> (9) the extent and character of any interests the two alleged joint parties may have had in common, and the relationship between common interests and communications with the alleged joint counsel,
> (10) actual and potential conflicts of interest between the two parties, especially as they might relate to matters with respect to which there appeared to be some commonality of interest between the parties, and
> (11) if disputes arose with third parties that related to matters the two parties had in common, whether the alleged joint counsel represented both parties with respect to those disputes or whether the two parties were separately represented.

*Sky Valley*, 150 F.R.D. at 652–53. These factors are also relevant to determining the scope of any joint representation. *Teleglobe*, 493 F.3d at 363.

Courts must be careful not to confuse joint clients with clients of the same lawyer who share a common interest. *Id.* "Whether individuals have jointly consulted a lawyer or have merely entered concurrent but separate representations is determined by the understanding of the parties and the lawyer in light of the circumstances." *Id.* (quoting Restatement (Third) of the Law Governing Lawyers § 75). Courts must also consider the ultimate policy rationales behind the attorney-client and joint-client privileges. *Id.* at 653. "For each possible resolution we must ask: would this holding cause harm to or would it promote the underlying purposes that inform privilege doctrine?" *Id.*

Finally, the burden of proof rests with the party asserting that a joint-client relationship exists. *See Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648, 650 (N.D. Cal. 1993); *see also McMorgan & Co. v. First California Mortg. Co.*, 931 F. Supp. 699, 701 (N.D. Cal. 1996)

1    ("The party asserting the joint client exception has the burden of establishing its existence.").

2    Here, it is Plaintiffs' burden to establish that LT Game and Empire have a joint-client

3    relationship, as well as the scope of such relationship.

4         To meet this burden, Plaintiffs cite to Nevada Revised Statute 49.115(5) and *Hall*, a

5    District of Nevada case, to describe the joint-client privilege. ECF no. 87 at 15–16. However,

6    Plaintiffs do not address the test in *Teleglobe* or *Sky Valley*, even though the court in *Hall* relied

7    on those cases to reach its decision. *See id.* The extent of Plaintiffs' analysis is as follows:

8         Because LT Game and Empire engaged Lewis Roca to provide legal advice on matters
         benefiting both LT Game and Empire, Lewis Roca was acting as the common attorney for
9         both parties. Consequently, Defendants cannot shield their communications with shared
         counsel, particularly during a time when Defendants were simultaneously serving as
10        managers of both LT Game and Empire.

11   *Id.* at 16.

12        Defendants respond that this argument has no factual or legal support. ECF No. 90 at 9.

13   They contend that Lewis Roca understood Empire and LT Game to be separate clients, hence the

14   separate matter files, separate invoices, and separate engagement agreements. *Id.* at 10 (citing

15   ECF No. 90-9 (Ex. C) Declaration of Ken Rossman, an attorney at Lewis Roca). Defendants

16   further state that Empire also understood the representation to be separate, as it never signed a

17   joint-representation agreement or otherwise intended to be joint clients. *Id.* (citing ECF No. 90-2

18   (Ex. B), Declaration of Mr. Feng).

19        In their reply, Plaintiffs argue that the record is clear that Empire and LT Game were

20   overlapping entities that Lewis Roca would have perceived as two sides of a joint operation. ECF

21   No. 98 at 7. Plaintiffs then state that several factors from *Sky Valley* stand out—such as fiduciary

22   obligations, common interests, the relationship between common interests and communications

23   with joint counsel, and potential conflicts of interests. *Id.* But Plaintiffs fail to connect their

24   evidence to these factors, and instead conclude: "All of these factors, and others, support the

25   conclusion that LT Game and Empire comprised a joint engagement during the relevant time

26   period." *Id.*

27        Here, Plaintiffs have not met their burden to show that a joint-client relationship exists.

28   They have not explained, in any meaningful detail, how their evidence establishes a joint-client

1  relationship between LT Game and Empire, or what the scope of such a relationship would be.

2  This Court is particularly mindful of the Third Circuit's directive in *Teleglobe* that "[o]rdering the

3  production of documents on the privilege log must be predicated on a factual finding [of a joint-

4  client relationship]," and that the factfinder . . . should consider "the existence and *scope* of a co-

5  client relationship." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 380 (3d Cir. 2007), *as*

6  *amended* (Oct. 12, 2007) (emphasis added). On this record, this Court cannot conclude that the

7  joint-client exception applies to the privileged communications.

8       Even considering the undeveloped arguments, the evidence presents a mixed bag as to

9  whether LT Game and Empire were joint clients. Regarding the parties' conduct towards one

10  another (factor one), Plaintiffs contend that they invested tens of millions of dollars towards the

11  combined LT Game and Empire operations. ECF No. 55-2 at 27, ¶ 10 (Declaration of Mr. Chan).

12  LT Game financed Empire to obtain gaming licenses and paid hundreds of thousands of dollars

13  for Empire's legal fees with Lewis Roca. *Id.* at 28, ¶ 12. As Defendants point out, Plaintiffs had a

14  strong financial incentive to help Empire acquire gaming licenses because they could only access

15  United States gaming jurisdictions via Empire and its licenses. ECF No. 90 at 12. They further

16  state that Empire paid for the vast majority of its own legal fees, including paying for the majority

17  of its fees from Lewis Roca and for its gaming licenses. ECF No. 90-2 at 5, ¶ 25–26.

18       Nonetheless, LT Game and Empire shared the same office space until 2021 and the same

19  employees (notably Mr. Feng, Mr. Allison, and Mr. Kiely) until around 2022/2023. *Id.* at 92–93,

20  ¶ 4 (Declaration of Marcos Medero). Plaintiffs paid the lease for the office, which was about

21  $13,000 per month, and many of the shared employees were on LT Game's payroll. *Id.* at 93, ¶ 5.

22  This conduct between Empire and LT Game shows that their management and operations were

23  closely intertwined.

24       The contractual relationship between Empire and LT Game (factor two), remains neutral.

25  According to the 2021 supply framework agreement which was renewed annually, the parties had

26  an extensive business relationship. Still, that agreement provided Plaintiffs would supply products

27  to the Defendants, who would sell or lease the products to gaming users in North America "on a

28  non-exclusive basis." ECF No. 90-3, Section 3.1 (Supply Framework Agreement). Despite this,

1  Plaintiffs contend that they justifiably believed that Empire was their long-time-exclusive

2  distributor. ECF No. 87 at 14. As Mr. Chan stated: "It is plainly against common sense that we

3  would invest significant funds and resources to support the establishment of a competitor,

4  including hiring lawyers at our own expense to secure gaming licenses for Empire." ECF No. 55-

5  2 at 30, ¶ 17. Of course, Mr. Feng stated otherwise: "Empire was never intended to operate for

6  Paradise's exclusive benefit, nor exclusively as Paradise's distributor." ECF No. 90-2 at 4, ¶ 9.

7  This factor remains neutral as the supply framework agreement contradicts Paradise's belief—

8  though well justified—that Empire was its exclusive distributor.

9        The fiduciary obligations between the parties (factor three) favors a joint-client

10  relationship). Mr. Feng, Mr. Kiely, and Mr. Allison were all employees of LT Game who owed a

11  fiduciary duty to the company. ECF No. 98 at 1. As Plaintiffs explain, Lewis Roca could not have

12  expected to keep communication with Mr. Feng confidential knowing that he was a fiduciary to

13  LT Game as its President. *Id.* at 3. Defendants do not dispute Mr. Feng's fiduciary obligation to

14  LT Game. Rather, they explain that Paradise never possessed an ownership, legal, or other

15  interest in Empire or its assets. ECF No. 90 at 7–8. But the fact that Mr. Feng (and other shared

16  employees) owed fiduciary duties to both companies could support a joint-client relationship

17  because it follows that the companies should be aligned as to legal and business goals.

18        Based on the submitted evidence, LT Game and Empire appear to have separate

19  engagement letters with Lewis Roca, which weighs against finding a joint-client relationship.

20  While this consideration does not fit squarely among the factors, it is important. Defendants did

21  not attach any original engagement agreements, and neither did Plaintiffs. However, Defendants

22  did attach numerous engagement addendums for when Lewis Roca opened new matter files with

23  Empire. ECF No. 90-8 at 3–37. The addendums identify Empire as the client and are addressed to

24  Mr. Feng or Mark Hettinger, who was general counsel for Empire. *Id.*

25        Plaintiffs attached engagement addendums regarding LT Game. ECF No. 55-2 at 34-65.

26  These addendums identified LT Game as a client and were all addressed to Mr. Feng, except for

27  two, which were addressed to Leo Chan (CFO/Secretary). *Id.* at 56, 61. While Plaintiffs argue

28  that these are addendums to a pre-existing "master agreement," there is no master agreement on

the record. This Court bases its decision on the evidence in front of it. Because the addendums demonstrate that Lewis Roca opened new matters under separate client files for LT Game and Empire, the addendums suggest—but are not conclusive of—separate attorney-client agreements with Lewis Roca.

Plaintiffs contend that they did not know about Empire's private communications with Lewis Roca, hence why they are presently seeking to learn the content of those communications (factor six). In addition, Plaintiffs' expectations about their ability to access communications between Empire and Lewis Roca is somewhat justified (factor seven). Mr. Feng owed a fiduciary duty to Plaintiffs, and Plaintiffs invested millions of dollars into Empire under the belief that it would be their exclusive and long-time distributor. *See* ECF No. 87 at 12. These factors slightly favor a joint-client relationship.

Considering the actual and potential conflicts of interest between LT Game and Empire, this factor (ten) cuts both ways. Lewis Roca sought and obtained conflict waivers from LT Game and Empire concerning a promissory note. ECF No. 90-7 at 3–8. The firm wrote: "Because we have done work for both parties, we kindly ask that Frank sign the attached conflict waivers. For the purposes of drafting the Note, we will represent Empire." *Id.* Lewis Roca's express statement that it was representing Empire (and not LT Game) is evidence that the parties were not jointly represented. But the wrinkle here is that Mr. Feng signed the conflict waiver on behalf of Empire and LT Game. *Id.* at 5–8. Even if the conflict waivers suggest separate representations, the waivers are limited to the promissory note. It may be the case that the parties had a joint-client relationship as to other matters.

Therefore, while the fiduciary obligations of Mr. Feng and the extremely close relationship between LT Game and Empire favor a joint-client relationship, evidence of separate engagement agreements, invoices, and matter files cuts against such a relationship. Perhaps more importantly, however, is the fact that there is little evidence apart from declarations and privilege logs. This Court does not have the original engagement agreements, and there is not enough evidence to properly determine the scope of the joint-client relationship were this Court to find

1    one. For example, the evidence regarding the requisition forms, engagement addendums, conflict

2    waivers, and contracts appear to be incomplete.

3           In addition, this Court heeds the Third Circuit's warning that judges "should not confuse

4    joint clients with clients of the same lawyer who share a common interest." *See In re Teleglobe*

5    *Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007), *as amended* (Oct. 12, 2007). It is possible

6    that the relationship between Empire and LT Game constitutes the latter. In sum, this Court

7    declines to find a joint-client relationship between Empire and LT Game on this record. As such,

8    it need not consider policy rationales at this time.

9                      **F.  In Camera Review**

10          Though the attorney-client privilege is one of the oldest and most fundamental common-

11   law privileges, it is not absolute. *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th

12   Cir. 2007), *abrogated by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). Under the

13   crime-fraud exception, clients who consult attorneys for advice in furtherance of fraud will not be

14   protected by the attorney-client privilege. *Id.* Parties seeking disclosure under this exception must

15   show (1) that "the client was engaged in or planning a criminal or fraudulent scheme when it

16   sought the advice of counsel to further the scheme"; and (2) that the sought after communications

17   are "sufficiently related to" and made "in furtherance of [the] intended, or present, continuing

18   illegality." *Id.* (quoting *In re Grand Jury Proceedings*, 87 F.3d 377, 381–83 (9th Cir. 1996)). A

19   lesser evidentiary showing is needed to trigger in camera review, as Plaintiffs seek here. *United*

20   *States v. Zolin*, 491 U.S. 554, 572 (1989).

21          Under *Zolin*, the district court conducts a two-step analysis to decide whether in camera

22   review is appropriate to determine the applicability of the crime-fraud exception. *Id.* First, "'the

23   judge should require a showing of a factual basis adequate to support a good faith belief by a

24   reasonable person' that *in camera* review of the materials may reveal evidence to establish the

25   claim that the crime-fraud exception applies." *Id.* (internal citation omitted). "The threshold we

26   set . . . need not be a stringent one." *Id.* Second, the district court exercises its discretion in

27   deciding whether to conduct an in camera review. *Id.* In reaching its decision, the court should

28   consider, among other things: "the volume of materials the district court has been asked to

1   review, the relative importance to the case of the alleged privileged information, and the

2   likelihood that the evidence produced through *in camera* review, together with other available

3   evidence then before the court, will establish that the [] exception does apply." *Id.*

4        Plaintiffs cite to the factual-background section of their brief to argue that they can meet

5   the *Zolin* threshold. Their background section includes the following allegations:

6   • In 2020, Mr. Feng took over one million dollars from LT Game as funding for a

7        separate company, F2 TPS, and Paradise was unaware of the transaction/would not

8        have authorized it. ECF No. 55-2 at 30 ¶ 17(b) (Declaration of Mr. Chan); ECF

9        No. 55-2 at 94 ¶ 8 (Declaration of Marcos Medero).

10  • In 2020, Mr. Feng and Mr. Kiely filed a patent application pertaining to casino

11       gaming equipment, and they assigned that patent to Empire despite Mr. Kiely's

12       employment contract requiring assignment to LT Game. ECF No. 69, ¶¶ 123–24

13       (Amended Complaint); ECF No. 1-1, at 4, Ex. A, Section 5.B (Original Complaint

14       Exhibit, Mr. Kiely's Employment Contract).

15  • In 2022, Mr. Feng reported to Paradise that Commerce Casino no longer wanted to

16       do business with LT Game. Defendants then re-branded the LT Game card shoes

17       at Commerce Casino and took the leasing revenue. ECF No. 55-2 at 30 ¶ 17(d)

18       (Declaration of Mr. Chan).

19  • Mr. Feng moved the shared employees between LT Game and Empire to a new

20       office space starting in 2021 while LT Game continued to pay rent at an

21       unoccupied address. ECF No. 55-2 at 30 ¶ 17(d) (Declaration of Mr. Chan).

22  • In 2021, Mr. Feng arranged for Lewis Roca to prepare a Shared Services

23       Agreement to be signed by Mr. Feng on behalf of LT Game and Empire, though

24       Paradise was not aware of the document. ECF No. 55-2 at 30 ¶ 17(d) (Declaration

25       of Mr. Chan).

26  • In 2022, Defendants persuaded Paradise to sell a LT Game equipment at a

27       discounted rate to Solution Gaming, which, unbeknownst to Paradise, was

28

1           controlled by Mr. Feng and Mr. Allison. ECF No. 55-2 at 30 ¶ 17(f) (Declaration

2           of Mr. Chan).

3         • In 2021, Mr. Feng approached Paradise saying that Lewis Roca determined that

4           LT Game needed to enter into new contracts with Empire. Paradise entered into

5           these contracts under the belief that Empire was LT Game's exclusive distributor

6           and not actively establishing a competing business. ECF No. 55-2 at 31, ¶ 17(g)

7           (Declaration of Mr. Chan).

8         • Empire has now opened a branch in Macau where it is attempting to compete

9           directly in Paradise's primary market. ECF No. 55-2 at 29, ¶¶ 10–15.

10  ECF No. 87 at 6–7.

11       Defendants respond that these purported examples of fraud are conclusory statements that

12  merely parrot the complaint and cannot meet the threshold. ECF No. 90 at 18. They argue that

13  "[b]ecause Plaintiffs wholly fail to establish that Empire engaged counsel to further the alleged

14  fraudulent scheme, they cannot invoke the crime-fraud exception. Plaintiffs therefore cannot

15  justify in camera review." *Id.* at 19. Specifically, Defendants argue that the conclusory allegations

16  of fraud cannot meet the threshold because a "sneaking suspicion" that a client engaged in crime

17  or fraud when it consulted an attorney is insufficient. *Id.* at 18 (citing *In re Grand Jury Proc.*, 87

18  F.3d 377, 381 (9th Cir. 1996)). Defendants further argue that Plaintiffs make no attempt to

19  demonstrate that the attorney-client communications are "sufficiently related to" and made "in

20  furtherance of [the] intended, or present, continuing illegality" at this stage. *Id.* at 19 (citing *In re*

21  *Grand Jury Proc.*, 87 F.3d at 381–83).

22       Plaintiffs reply that Lewis Roca "was advising Defendants in every aspect of how to

23  advance in the gaming industry, and that advice necessarily was to the detriment of LT Game,

24  which Empire was supplanting." ECF No. 98 at 8. Plaintiffs further explain that Lewis Roca

25  helped Empire obtain gaming licenses on the false belief that those licenses were for LT Game's

26  benefit; that Lewis Roca prepared the 2021 documents at the direction of Mr. Feng, who was

27  trying to make it appear that Empire and LT Game were separate companies; and that any other

28

1    kind of legal advice, such as employment matters or payroll or the Nevada Gaming Control

2    Board, would have been in furtherance of fraud. *Id.* at 8.

3         First, Plaintiffs have not met the threshold showing for in camera review. Though the

4    threshold is low, Plaintiffs merely reiterated facts from their complaint and attached no exhibits to

5    support their allegations. The only exhibits attached to the motion are the privilege logs and a

6    three-page declaration from counsel. ECF No. 88-1. These unsupported allegations are not

7    enough for a reasonable person to determine, in good faith, that in camera review of the

8    privileged materials may reveal evidence that the crime-fraud exception applies. *See United*

9    *States v. Zolin*, 491 U.S. 554, 574 (1989) (holding that the party seeking in camera review "must

10   present *evidence* . . . .") (emphasis added). Finding differently would be akin to the kind of

11   "groundless fishing expedition" *Zolin* sought to prevent. *Id.* at 575.

12        Even if this Court were to consider the two declarations that Plaintiffs incorporated by

13   reference in their motion, it would still be insufficient to meet the *Zolin* threshold. While the

14   declarations by Mr. Chan and Mr. Medero support Plaintiffs' factual allegations by repeating

15   similar facts, they do not cite to any supporting evidence. While the Ninth Circuit has found an

16   affidavit sufficient to meet the *Zolin* threshold, the affidavit in that case was "based on testimony

17   of two former employees of the Corporation as well as on telephone records, invoices, and other

18   documentary evidence." *See In re Grand Jury Subpoena 92-1(SJ)*, 31 F.3d 826, 830 (9th Cir.

19   1994).

20        More concerning, however, is that Plaintiffs did not sufficiently explain why the scope of

21   in camera review should include all 5,000+ documents. The Ninth Circuit has found error when a

22   district court did not limit the scope of its in camera review to documents generated during the

23   course of the alleged criminal scheme. *Id.* at 831. So, even if this Court decided to conduct an in

24   camera review, it is unclear what the scope of such review would be.

25        Here, Plaintiffs generally contend that any kind of advice that Lewis Roca gave

26   Defendants would be in furtherance of fraud because the firm advised them on every aspect of

27   how to advance in the gaming industry. ECF No. 98 at 8. But the scope of Plaintiffs' fraud

28   allegations appears narrower than the scope of the privilege logs. For example, the privilege logs

1   identify materials spanning from 2017 to 2023, but Plaintiffs allege instances of fraud occurring

2   between 2020 and 2022. Further, the privilege logs have descriptions of the privileged

3   communications like "providing confidential legal advice of counsel regarding Empire financials

4   and CARES Act," which do not align with any instance of fraud Plaintiffs have alleged. *See* ECF

5   No. 88, Ex. L. Therefore, Plaintiffs have not provided a factual basis upon which a reasonable

6   person, in good faith, could find that all 5,000+ documents may reveal evidence to establish that

7   the crime-fraud exception. *See In re Outlaw Lab'ys, LP Litig.*, No. 18CV840 GPC (BGS), 2020

8   WL 5500220, at *5 (S.D. Cal. Sept. 11, 2020) ("Here, the Stores must provide a *factual basis* in

9   *this motion* showing that review of *these seven categories of documents* may reveal evidence to

10  establish the crime-fraud exception applies.).

11      Because Plaintiffs have not met the threshold showing under *Zolin*, this Court denies their

12  request for in camera review. However, this decision is without prejudice. Should discovery

13  reveal evidence to support Plaintiffs' position, they may re-file their motion.

14                  **G.  Other LT Game Counsel and the Non-Party Companies**

15      Plaintiffs argue that "it is possible" Defendants engaged other lawyers in a manner similar

16  to how LT Game had engaged Lewis Roca, and it is Defendants' burden to prove differently.

17  ECF No. 87 at 26. They contend the same analysis that is applied to Lewis Roca should be

18  extended to other attorneys. *Id.* This is the extent of Plaintiffs' arguments. As to the non-party

19  companies, Plaintiffs seek production of "any email or messaging accounts of the subpoenaed

20  Non-Party Companies to communicate with LT Game's counsel" that are being withheld under a

21  claim of privilege. *Id.* Plaintiffs note that Defendants have not provided privilege logs as to these

22  non-party companies. *Id.*

23      Defendants argue that "Plaintiffs flunk the basic threshold requirement of establishing

24  why Defendants' privilege assertions are improper." ECF No. 90 at 16. They contend that

25  Plaintiffs' motion focuses exclusively on Lewis Roca and does not provide any argument or

26  evidence as to the other attorneys. *Id.* Defendants do not appear to address Plaintiffs' argument

27  regarding the non-party companies.

28

1    This Court will not address Plaintiffs' undeveloped argument as to other counsel. *See*

2    *Hibbs v. Dep't of Hum. Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001) (denying relief based on

3    argument that was "too undeveloped to be capable of assessment"); *see also Lux v. Buchanan*,

4    No. 2:23-CV-00839-MMD-NJK, 2024 WL 1598805 (D. Nev. Apr. 12, 2024) ("While it may

5    ultimately be the responding party's burden of persuasion to defend against a motion to compel,

6    the movant must still present meaningfully developed argument as to each particular discovery

7    objection in dispute.") (internal citations omitted). Plaintiffs' arguments are mere speculations,

8    and they cite to no authority. As to the non-party companies, however, this Court will order the

9    parties to meet and confer regarding the need for Defendants to produce a privilege log.

10   **III.    CONCLUSION**

11        **IT IS THEREFORE ORDERED** that Plaintiffs' motion to compel (ECF No. 87) is

12   **DENIED without prejudice**.

13        **IT IS FURTHER ORDERED** that the parties must meet and confer within 21 days of

14   this Order regarding the privilege log as to the non-party companies.

15

16

17        DATED: October 20, 2025.

18

19                                                   _____

20                                                   BRENDA WEKSLER
                                                     UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28