PATRICK J. REILLY, ESQ.
Nevada Bar No. 6103
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
100 North City Parkway, 16th Floor
Las Vegas, Nevada  89106
Telephone:      (702) 382-2101
Facsimile:      (702) 382-8135
preilly@bhfs.com

MARK T. OAKES, ESQ. (*pro hac vice*)
ZACHARY P. MCHENRY, ESQ. (*pro hac vice*)
ETHAN GLENN, ESQ. (*pro hac vice*)
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Blvd., Suite 1100
Austin, Texas  78701-4255
Telephone:      (512) 474-5201
Facsimile:      (512) 536-4598
mark.oakes@nortonrosefulbright.com
zach.mchenry@nortonrosefulbright.com
ethan.glenn@nortonrosefulbright.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; and LT GAME INC., a Nevada corporation; and LT GAME LIMITED, a British Virgin Islands corporation, <br><br> *Plaintiffs*, <br><br> v. <br><br> EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; and DARYN KIELY, an individual, <br><br> *Defendants*. | Case No. 2:24-cv-00428-JCM-BNW <br><br> **DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> **ORAL ARGUMENT REQUESTED** |

51259649

**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants Empire Technological Group Limited ("Empire"), Gaming Specialized Logistics, LLC ("GSL"), Linyi "Frank" Feng, Roy Kelcey Allison, and Daryn Kiely (collectively "Defendants") move for partial summary judgment under FED. R. CIV. P. 56 on Counts 1 through 13 (*see* Appx. A (Chart of Claims)) of the Second Amended Complaint filed by Plaintiffs Paradise Entertainment Limited ("Paradise"), LT Game, Inc. ("LT Game"), and LT Game Limited ("LT Ltd."). Summary judgment is appropriate because there are no genuine issues of material fact with respect to Plaintiffs' claims, there is evidence disproving (or no evidence to support) at least one key element of each of Plaintiffs' claims, and Defendants are entitled to judgment as a matter of law.

The motion is supported by the accompanying Memorandum of Points and Authorities and evidence cited therein, the papers, and the pleadings on file in this action. For the reasons set forth in this Motion and accompanying documents and from any oral argument the Court may allow, Defendants respectfully request that the Court grant this motion and enter summary judgment in their favor.

DATED this 20th day of April, 2026.

/s/ Patrick J. Reilly
PATRICK J. REILLY, ESQ.
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
100 North City Parkway, 16th Floor
Las Vegas, Nevada 89106
Tel.: (702) 382-2101 / Fax: (702) 382-8135
Email: preilly@bhfs.com

Mark Oakes (*pro hac vice*)
Zach McHenry (*pro hac vice*)
Ethan Glenn (*pro hac vice*)
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255

*Attorneys for Defendants*

51259649

**TABLE OF CONTENTS**

I.   SUMMARY OF ARGUMENT .................................................................................. 1

II. STATEMENT OF UNDISPUTED FACTS............................................................... 2

   A.   Mr. Feng Has Always Been The Sole Owner of Empire..................................... 2

   B.   Plaintiffs Needed Distributors Like Empire to Sell Their Products in the United States. ... 3

   C.   Mr. Feng Has Always Had an Arm's-Length, "Non-Exclusive" Relationship with Plaintiffs. ................................................................................................................... 6

   D.   Empire Has Been Developing and Promoting Its Own Proprietary Products Since 2016... 8

   E.   Empire Did Not Compete With Plaintiffs............................................................. 9

   F.   Plaintiffs Were Unsuccessful in the United States Slot Machine Market For Reasons Other Than Defendants. ....................................................................................... 10

III.   LEGAL STANDARD........................................................................................... 13

IV.   ARGUMENT ......................................................................................................... 14

   A.   All Claims Based on Mr. Feng's and Empire's Independent Business Fail ..................... 16

     1.   The Evidence Shows the Parties' Relationship Was Non-Exclusive............................ 16

     2.   Plaintiffs' Fraud-Based Claims Are Untimely Because Plaintiffs Were on Inquiry Notice By August 2017 ................................................................................ 20

     3.   Plaintiffs' Notice Also Defeats These Claims On The Merits...................................... 22

     4.   There is Not Sufficient Evidence of the Specific Misrepresentations Underlying Plaintiffs' Tort Claims that Satisfy Rule 9(b). .......................................... 24

     5.   To the Extent that Plaintiffs' Trade Secret Claims Survive, They Displace Plaintiffs' Tort Claims ................................................................................... 25

   B.   Plaintiffs Could Not Have Taken Advantage of the F2 Corporate Opportunity ............... 26

   C.   Plaintiffs' Trade Secrets Misappropriation Claims Fail as a Matter of Law. ................... 30

     1.   Plaintiffs Identify No Trade Secrets Beyond Source Code........................................... 30

     2.   Empire Owned the Golden Frog Source Code, and Defendants Did Not Acquire Any Source Code by Improper Means......................................................... 30

     3.   Plaintiffs Have No Evidence of Unauthorized Use or Disclosure. .............................. 31

     4.   Plaintiffs Also Cannot Prove Damages From Any Alleged Golden Frog Misappropriation. ....................................................................................... 32

   D.   Paradise's Copyright Claims Fail as a Matter of Law. ..................................................... 33

     1.   Empire Owned the Golden Frog Code and Created the Product First.......................... 33

     2.   Defendants Never Created Their Own Shoe. ................................................................ 34

     3.   In Any Event, Defendants Had at Least an Implied License as to Both Products. ........ 34

   E.   LT Ltd.'s Unjust Enrichment and Conversion Claims Fails............................................. 35

   F.   Plaintiffs' Unjust Enrichment Claim Fails Because Written Contracts Govern the Alleged Harm................................................................................................. 35

i

51259649

G.    LT Game's Breach of Contract Claims Fail. ....................................................... 36

    1.    The Claim As To Mr. Allison Fails. ....................................................... 36

    2.    The Claim As To Mr. Kiely Fails. ....................................................... 37

    3.    The Claim As To GSL Fails. ....................................................... 39

H.    LT Game's Tortious Interference Claims Fail. ....................................................... 40

V.    CONCLUSION ....................................................... 40

ii

51259649

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adherence v. CVS Pharmacy, Inc.*,
  No. 2:24-CV-1590, 2025 WL 1798883 (D. Nev. June 25, 2025) (Mahan, J.) ................. 33, 35

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
  483 U.S. 143 (U.S. 1987).................................................................................................. 20

*Agensys, Inc. v. Regents of Univ. of California*,
  No. CV 24-3961-JFW(PDX), 2024 WL 5679162 (C.D. Cal. Oct. 22, 2024)....................... 31

*In re Albion Disposal, Inc.*,
  152 B.R. 794 (Bankr. W.D.N.Y. 1993) .............................................................................. 27

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
  166 F.3d 772 (5th Cir. 1999)....................................................................................... 34, 36

*Alexander & Alexander of New York, Inc. v. Fritzen*,
  147 A.D.2d 241 (1st Dep't 1989)...................................................................................... 27

*Am. Casino & Entm't Props, LLC v. Marchex Sales, Inc.*,
  No. 2:12-cv-01054, 2012 WL 2674611 (D. Nev. July 5, 2012) (Navarro, J.)......................... 9

*Amer. Fire and Casualty Co. v. Unforgettable Coatings, Inc., et al.*,
  No. 2:21-CV-1555, 2023 WL 2930042 (D. Nev. Apr. 13, 2023) (Mahan, J.) ................. 37, 38

*In re Amerco Deriv. Lit.*,
  127 Nev. 196 (Nev. 2011)................................................................................................. 20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................................................................... 14

*Aristocrat Techs., Inc. v. Light & Wonder, Inc.*,
  2024 WL 4415361 (D. Nev. Sept. 20, 2024) (Navarro, J.)................................................. 30

*Asset Mktg. Sys., Inc. v. Gagnon*,
  542 F.3d 748 (9th Cir. 2008)............................................................................................ 32

*Astarte, Inc. v. Pac. Indus. Sys., Inc.*,
  865 F. Supp. 693 (D. Colo. 1994)..................................................................................... 27

*Attia v. Google LLC*,
  983 F.3d 420 (9th Cir. 2020)............................................................................................ 31

*Backman v. Goggin*,
  No. 2:16-CV-1108, 2017 WL 1015008 (D. Nev. Mar. 15, 2017) (Mahan, J.) ...................... 35

*Berry v. Valence Tech., Inc.*,
  175 F.3d 699 (9th Cir. 1999)............................................................................................ 22

iii

*Broz v. Cellular Info. Sys., Inc.*,
673 A.2d 148 (Del. 1996) .......................................................................................... 28

*Cap. Advisors, LLC v. Cai*,
548 P.3d 1202 (2024).......................................................................................... 27, 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).......................................................................................... 13, 14

*Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*,
312 F. Supp. 3d 944 (D. Nev. 2018) (Du, J.)...................................................... 38, 39

*Citibank, N.A. v. Rancho Las Brisas Master Homeowners Ass'n*,
No. 2:18-CV-765, 2019 WL 4280583 (D. Nev. Sept. 10, 2019) (Mahan, J.)......................... 14

*Clark v. Robison*,
944 P.2d 788 (Nev. 1997) .......................................................................................... 20

*Diamond X Ranch LLC v. Atl. Richfield Co.*,
No. 3:13-cv-00570, 2017 WL 4349223 (D. Nev. Sept. 29, 2017) (Du, J.)........................... 20

*Digital Camera Int'l, Ltd. v. Antebi*,
No. 11 CV 1823 (SJ), 2017 WL 2992719 (E.D.N.Y. July 14, 2017) ................................ 9, 24

*Ellis v. McDaniel*,
95 Nev. 455 (1979) .......................................................................................... 37

*Fleetwood v. Stanley Steemer Int'l, Inc.*,
725 F. Supp. 2d 1258 (E.D. Wash. 2010) .............................................................. 18

*Frantz v. Johnson*,
999 P.2d 351 (Nev. 2000) .......................................................................................... 26

*G & H Assocs. v. Ernest W. Hahn, Inc.*,
934 P.2d 229 (Nev. 1997) .......................................................................................... 20

*Goodman v. Perpetual Bldg. Ass'n*,
320 F. Supp. 20 (D.D.C 1970) .................................................................................... 27

*GoPets Ltd. v. Hise*,
657 F.3d 1024 (9th Cir. 2011)..................................................................................... 9

*Graham v. James*,
144 F.3d 229 (2d Cir. 1998)........................................................................................ 34

*Hexcel Corp. v. Ineos Polymers, Inc.*,
681 F.3d 1055 (9th Cir. 2012)............................................................................... 20, 23

*Horton Grand Saddlery Hotel Joint Venture v. Rose*,
64 F.3d 666 (9th Cir. 1995).......................................................................................... 27

*Hotel Emps. & Rest. Emps. Int'l Union v. Davis*,
981 P.2d 990 (Cal. 1999) .......................................................................................... 26

iv

51259649

*Industrial Indem. Co. v. Golden State Co.*,
117 Cal. App. 2d 519, 256 P.2d 677 (1st Dist. 1953) ........................................................... 28

*Jones Distrib. Co. v. White Consol. Indus.*,
943 F. Supp. 1445 (N.D. Iowa 1996) ................................................................... 17, 19

*JustMed, Inc. v. Byce*,
600 F.3d 1118 (9th Cir. 2010) ........................................................................ 32

*Keg Techs., Inc. v. Laimer*,
436 F. Supp. 2d 1364 (N.D. Ga. 2006) ............................................................. 28

*Kennametal, Inc. v. Subterranean Equip. Co.*,
543 F. Supp. 437 (W.D. Pa. 1982) .................................................................... 17

*King v. Fox*,
458 F.3d 39 (2d Cir. 2006) ............................................................................. 24

*Lapham v. Porach*,
2007 WL 1224924 (S.D.N.Y. Apr. 25, 2007) .................................................... 34

*Las Vegas Rental Homes Corp. v. Bank of N.Y. Mellon*,
137 Nev. 932 (Nev. Ct. App. July 21, 2021) .................................................... 20

*Leasepartners Corp. v. Robert L. Brooks Tr.*,
113 Nev. 747, 942 P.2d 182 (1997) .................................................................. 36

*Leigh-Pink v. Rio Props., LLC*,
138 Nev. 530 (2022) ...................................................................................... 20

*Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*,
387 F. Supp. 2d 521 (M.D.N.C. 2005) .......................................................... 31, 35

*Marine Travelift, Inc. v. Marine Lift Sys., Inc.*,
No. 10-C-1046, 2013 WL 4046331 (E.D. Wis. Aug. 8, 2013) ............................... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .................................................................................. 13, 14

*Maxon Hyundai Mazda, et al. v. Carfax, Inc.*,
726 F. App'x 66 (2d Cir. 2018) ........................................................................ 17

*McGucken v. Triton Elec. Vehicle LLC*,
No. CV213624DMGGJSX, 2022 WL 2101725 (C.D. Cal. Mar. 21, 2022) ................... 9

*Moser v. Devine Real Estate, Inc.*
(Fla.), 42 A.D.3d 731 (N.Y. Ct. App. 2007) ..................................................... 30

*Nelson, Inc. v. Nelson*,
109 F.3d 1388 (9th Cir. 1997) ...................................................................... 27, 28

*Neumann v. Metro. Med. Grp.*,
153 A.D.2d 885, 545 N.Y.S.2d 590 (1989) ........................................................ 24

v

51259649

*New England Life Ins. Co. v. Lee*,
No. 2:14-CV-1797, 2015 WL 1413391 (D. Nev. Mar. 27, 2015) (Mahan, J.) ................ 35, 40

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
210 F.3d 1099 (9th Cir. 2000)........................................................................................ 13

*NLRK, LLC v. Indoor Ag-Con, LLC*,
No. 3:21-CV-00073-CSD, 2023 WL 3724741 (D. Nev. May 30, 2023)............................ 33

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
18 F.3d 1468 (9th Cir. 1994).......................................................................................... 13

*O'Connor v. Boeing N. Am., Inc.*,
311 F.3d 1139 (9th Cir. 2002)........................................................................................ 21

*Octaform Sys. Inc. v. Johnston*,
No. 2:16-cv-02500, 2017 WL 2562110 (D. Nev. June 12, 2017) (Gordon, J.) ...................... 25

*Paxi, LLC v. Shiseido Americas Corp.*,
636 F. Supp. 2d 275 (S.D.N.Y. 2009)............................................................................. 17

*Pincay v. Andrews*,
238 F.3d 1106 (9th Cir. 2001)........................................................................................ 20

*Rankin v. Frebank Co.*,
47 Cal. App. 3d 75, 121 Cal. Rptr. 348 (Ct. App. 1975) ...................................................... 30

*Rasmussen v. Lopez*,
127 Nev. 1169, 373 P.3d 953 (2011) .............................................................................. 27

*RedHawk Holdings Corp. v. Schreiber*,
No. CV 17-819, 2018 WL 4963597 (E.D. La. Oct. 15, 2018)................................................ 24

*Siragusa v. Brown*,
114 Nev. 1384 (Nev. 1998)............................................................................................. 20

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020)........................................................................................ 33

*Soliman v. Philip Morris Inc.*,
311 F.3d 966 (9th Cir. 2002).......................................................................................... 21

*Steinmeyer v. Couvares*,
No. 3:25-CV-00258, 2025 WL 3687804 (D. Nev. Dec. 18, 2025) (Du, J.) .......................... 18

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987).......................................................................................... 14

*USACM Liquidating Trust v. Deloitte & Touche LLP*,
764 F. Supp. 2d 1210 (D. Nev. 2011) (Pro, J.) ........................................................... 20, 21

**Rules and Statutes**

17 U.S.C. § 501(a) ......................................................................................................... 34

51259649

18 U.S.C. § 1836(b)(3)(B) ................................................................................................ 33

CAL. BUS. & PROF. CODE, § 19852 ................................................................................ 27, 29

CAL. BUS. & PROF. CODE, § 19858 ................................................................................ 27, 29

CAL. BUS. & PROF. CODE, § 19859 ................................................................................ 27, 29

CAL. CODE REGS., tit. 4, § 12201 ..................................................................................... 29

CAL. CODE REGS., tit. 4, § 12202 ..................................................................................... 29

CAL. CODE REGS., tit. 4, § 12204 ................................................................................ 27, 29

CAL. PENAL CODE § 330 .................................................................................................... 26

FED. R. CIV. P. 9(b) ................................................................................................... 16, 25

FED. R. CIV. P. 56 ........................................................................................................ 2, 13

NEV. REV. STAT.. § 78.070(8) ........................................................................................... 18

NEV. REV. STAT. § 463.01715.1 ................................................................................... 7, 32

NEV. REV. STAT. § 463.650.6 ...................................................................................... 7, 32

NEV. REV. STAT. § 600A.030 ..................................................................................... 31, 32

NEV. REV. STAT.. § 600A.050 ........................................................................................... 33

NEV. REV. STAT. § 613.195(a) ......................................................................................... 37

NEV. REV. STAT. § 11.190(3) ........................................................................................... 20

**Other Authorities**

19 Am.Jur.2d, Corporations, § 1313 ................................................................................ 30

51259649

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

## I.   SUMMARY OF ARGUMENT

This case seeks to rewrite a decades-long business relationship after the fact so that Plaintiffs can be saved from the consequences of their own business decisions.  But the evidence shows the truth: Defendant Linyi Feng ("Mr. Feng") owns Empire. Empire engages in the development, manufacture, sale, and leasing of electronic gaming products and slot machines. Paradise provides casino management services in Macau and also engages in the development, sale, and leasing of electronic gaming equipment. Dr. Jay Chun ("Dr. Chun") is Paradise's controlling shareholder, executive director, and chairman. Dr. Chun is also married to Mr. Feng's sister and is Mr. Feng's brother-in-law. Mr. Feng and companies owned by him, including Empire, have entered into various business transactions with Paradise and its affiliates from 2007 until 2022.  During that time, the parties operated through a deliberately structured, non-exclusive arrangement.

This dispute arose in 2023 when Paradise learned that Empire had acquired the assets of a slot machine company called "Aruze Gaming America" through a public bankruptcy sale. Paradise claimed that Empire was its de facto subsidiary and demanded that Mr. Feng transfer ownership of Empire to Paradise. Although Paradise later abandoned its ownership claim after Empire filed suit in state court, the claims in this suit rest on a similar theory—that Mr. Feng allegedly agreed to operate Empire for the exclusive benefit of the Paradise Group and that Empire's sole purpose was to serve as a long-term exclusive distributor for Plaintiffs.

Plaintiffs' claims are over-pleaded and riddled with deficiencies. This motion seeks to streamline the case and focus the Parties' and the Court's resources on the disputes that are actually triable. To do that, Defendants move for summary judgment on three categories of claims in Plaintiffs' Second Amended Complaint, each of which fails on the undisputed facts. The first category encompasses claims premised on Plaintiffs' assertion that Defendants were legally or contractually prohibited from conducting any business other than business benefiting Plaintiffs, and that Defendants committed fraud and breached fiduciary and contractual duties by doing so.  These claims fail because the parties expressly and repeatedly agreed—in written contracts negotiated at arm's length, with the assistance of counsel—that the relationship between Paradise and Empire

1

51259649

was non-exclusive, and because the undisputed evidence demonstrates that Empire did not compete with Plaintiffs when any Defendant worked with Plaintiffs.

Instead, the evidence shows the parties deliberately maintained the separateness and independence of both companies, in part because Plaintiffs' control over Empire would have subjected Plaintiffs to U.S. gaming licensing requirements with which they either could not or chose not to comply. That arrangement was carefully constructed to comply with various gaming law licensing requirements. Plaintiffs now seek to disregard it because (1) they failed to achieve success in the U.S. slot market; (2) Empire purchased valuable assets from a separate slot company at a time when all individual Defendants had ceased working for Plaintiffs; and (3) Mr. Feng achieved success in business areas wholly unrelated to slot machines or any other business Plaintiffs actually conducted. Plaintiffs' claims succeed only if the Court disregards that arrangement.

The second category concerns intellectual property. Plaintiffs allege that Defendants misappropriated trade secrets and committed copyright violations to grow and operate their allegedly competing business. These claims fail for multiple reasons, including that the parties' written agreements expressly vested ownership of Plaintiffs' intellectual property in Empire as the licensed manufacturer and distributor to enable Empire to sell Plaintiffs' products in U.S. markets. Even if that were not the case, Plaintiffs fail to identify any trade secrets or copyrighted material used for anything other than Plaintiffs' own business.

The third category comprises contractual claims primarily based on the allegation that two individuals and one company violated non-compete and confidentiality agreements. The agreements, however, contain no applicable non-compete provisions, and the contracted parties did not compete with Plaintiffs. Additionally, there is no evidence that any confidential material was disclosed. These claims are without merit, and the Court should grant summary judgment.

## II.    STATEMENT OF UNDISPUTED FACTS

**A.  Mr. Feng Has Always Been The Sole Owner of Empire.**

Since 2011, Mr. Feng has owned and operated Empire (and its predecessor companies). Ex. B (Declaration of Linyi Feng) ¶ 7. Plaintiffs do not have any ownership in Empire. *E.g.*, Ex. B-5 (PARADISE 00021744) at Recital D; Ex. A-8 (Medero Dep.) at 27:21-28:3. Empire develops,

2

51259649

manufactures, sells, and leases gaming products and table games. Ex. B ¶ 12. On June 15, 2023, Empire purchased significant assets from Aruze Gaming America, Inc. ("Aruze"), a major developer of slot machines, through a public bankruptcy auction. *Id.* ¶ 31. As a result, Empire (d/b/a Aruze Gaming Global) is now one of the better-known gaming companies in the slot machine industry. That purchase is also the genesis of this dispute; when Dr. Chun—President and controlling shareholder of Paradise, owner of LT Ltd. and LT Game, and Mr. Feng's brother-in-law—learned of the purchase, he and Plaintiffs demanded that Mr. Feng turn over all interests in Empire to Paradise, including the "transfer" of gaming licenses to Plaintiffs. Ex. B-1 (ETG_00000237969). That letter intentionally misrepresented the Parties' relationship—characterizing Empire as Paradise's "de facto subsidiary"—reflecting an untenable misunderstanding of Nevada's and other U.S. gaming jurisdictions' regulatory schemes. *See id.;* Ex. B ¶ 44; Nev. Gaming Comm'n Reg. 15.1594-6, 15.482-4 (requiring Commission approval to control a corporate licensee). In response, Mr. Feng filed suit in Nevada state court seeking declaratory relief. SAC ¶ 106. Because Mr. Feng refused to submit to Plaintiffs' demand and hand over his company, Plaintiffs have asserted over a dozen claims against Defendants in state and federal court. *See, e.g.*, SAC.

The two other individual Defendants, Mr. Kiely and Mr. Allison, both worked for Empire—Mr. Kiely as Empire's Chief Technology Officer from February 2019 until July 2025, and Mr. Allison as Empire's Senior Vice President of Sales and Marketing, among other roles, from March 2022 until January 2025. Ex. C (Declaration of Daryn Kiely) ¶ 4; Ex. A-1 (Allison Dep.) at 107:15-18. Defendant GSL is Mr. Allison's sales consulting business. Dkt. No. 161 ¶ 94.

**B. Plaintiffs Needed Distributors Like Empire to Sell Their Products in the United States.**

Paradise provides casino management services in Macau, China, and also develops, sells, and leases electronic table games and slot machines under the moniker "LT Game." Ex. A-2 (Chan Dep. Day 1) at 36:20-23, 37:5-39:8, 44:10-15. Dr. Jay Chun is Paradise's controlling shareholder, executive director, and chairman, and Mr. Feng's brother-in-law. Dkt. No. 161 ¶¶ 21-22. In 2008, Paradise established Plaintiff LT Game, Inc. (f/k/a LT Game (Canada) Ltd.) ("LT Game") to explore the North American market for Paradise's popular electronic table game product (referred

3

51259649

to as "Stadium Gaming") and to assist with research and development for other gaming products Paradise sold in Macau. *See* Ex. A-4 (Feng Dep. (Vol. 1)) at 15:12-17:8, 53:13-21; Ex. A-3 (Chun Dep.) at 77:11-78:4.

In response to Paradise searching for third parties to distribute Stadium Gaming outside of Macau, Mr. Feng formed his own company in January 2011, LT Game International Limited ("LT Game International").[1] Ex. A-4 (Feng Dep. (Vol. 1)) at 21:6-22:21.  As explained below, this company later became Empire.  For the next several years, Mr. Feng worked with a separate company, LT Game International (US) Limited (wholly owned by an independent third-party, "Mr. Wang") to market and distribute Paradise's Stadium Gaming products in North America. Ex. A-4 (Feng Dep. (Vol. 1)) at 22:22-23:16.

In August 2014, Paradise ceased distributing products through LT Game International (US) Limited and entered an exclusive distribution arrangement with IGT, a multinational publicly-traded gaming company with the resources to distribute the Stadium Gaming products on a larger scale. *See id*. at 28:10-29:8.  Mr. Wang subsequently exited the industry and sold LT Game International (US) Limited to Mr. Feng.[2] *See id*. at 27:13-21. In July 2016, with no Stadium Gaming business remaining, Mr. Feng merged the two companies he owned, LT Game International Limited and LT Game International (US) Limited, renamed the merged company Empire Technological Group Limited, and began manufacturing table gaming equipment (*see infra*, II.D). *Id*. at 29:13-21, 30:13-18. At that time, Empire did not manufacture electronic table games or slot machines. Ex. B ¶ 15.

Prior to 2016, LT Game's role had largely been to support the supply of Paradise's Stadium Gaming products and conduct product development and research. *See* Ex. A-4 (Feng Dep. (Vol. 1)) at 24:5-24. That reflects the fact that LT Game was not created simply to market Paradise products in North America—it was designed to serve Paradise's Macau operations. Ex. A-3 (Chun

---

[1] Mr. Feng used "LT Game" in the name of his company for brand recognition purposes; but also added "International" to distinguish his company from the Paradise entities. Ex. B ¶ 9.  At no point did Plaintiffs ever own any interest in this company. *Id*. ¶ 10.

[2] Mr. Wang sold LT Game International (US) Limited to Mr. Feng for a nominal amount because the company had lost the distribution rights to the Stadium Gaming products and thus had no major assets or operations. *See* Ex. A-4 (Feng Dep. (Vol. 1)) at 27:22-29:8.

4

51259649

Dep.) at 77:11-78:4; Ex. B-19 (ETG_TRANSLATION_00000000119 (ETG_00000166384)) at 11 (" ."); see also Ex. A-36 (ETG_00000115443); Ex. A-37 (PARADISE 00003675).

LT Game did offer a smart card shoe product (the LTShoe), which Empire began distributing. *See* Ex. A-4 (Feng Dep. (Vol. 1)) at 30:19-31:3; Ex. B ¶ 21. Between 2016 and 2021, Empire and LT Game shared various services, including warehouse space, administrative expenses, and payroll. This mutually beneficial arrangement allowed both companies to maximize resources, reduce overhead, and attract experienced employees. Ex. A-4 (Feng Dep. (Vol. I)) at 31:15-21; Ex. B-20 (PARADISE 00000736). During this time, some employees worked concurrently for both companies, including, at times, the individual Defendants. Ex. B ¶ 33. Mr. Feng served as LT Game's President, Secretary, Treasurer (and, later, Director) from 2008 until February 2022. Ex. A-4 (Feng Dep. (Vol. I)) at 15:20-16:6, 21:4-5. Mr. Kiely held various roles at LT Game, including Chief Technology Officer, from February 2016 through February 24, 2023. Ex. C ¶ 5. Mr. Allison consulted (via GSL) for LT Game from January 1, 2019, until December 31, 2019; served as LT Game's Senior Vice President of Operations and Business Development from January 1, 2020, until June 30, 2022; and consulted (via GSL) for LT Game from June 30, 2022, until June 30, 2023. Ex. D ¶ 5; Ex. D-3 (PARADISE 00006572).

In mid-2019, after its distribution agreement with IGT ended, LT Game developed and began offering a Class III slot machine product in the U.S. (the LTS-1), which Empire distributed until June 2022, at which time Plaintiffs had exited the U.S. market (*see infra*, II.F). *See* Ex. A-4 (Feng Dep. (Vol. 1)) at 53:13-18, 58:11-13; Ex. B-2 (PARADISE 00013080) at 5; Ex. C-1 (PARADISE 00052738). Until 2022, Empire also provided product development services, including research, design, coding, testing, and documentation to Plaintiffs for certain products Plaintiffs sold in foreign markets. Ex. B ¶ 13. Throughout this period, Plaintiffs have never held (or attempted to obtain) any gaming licenses in the United States, and therefore cannot sell applicable products without a licensed distributor such as Empire.[3] *See* Ex. A-6 (PARADISE 00021605); Ex.

---

[3] The United States gaming industry is strictly regulated, and the licensing application process generally involves thorough background investigations, including investigations into the character and fitness of key individuals, as well as their international business holdings. Ex. A-5 (Bernhard Dep.) at 27:20-31:21, 51:23-53:16, 147:25; Ex. A-40

5

51259649

A-2 (Leo Dep.) at 22:8-19.

**C. Mr. Feng Has Always Had an Arm's-Length, "Non-Exclusive" Relationship with Plaintiffs.**

Although Mr. Feng and Empire entered into various business transactions with Plaintiffs over the years, the parties have always expressly agreed the relationship was non-exclusive and Mr. Feng and his companies were free to work with other companies. Ex. B ¶ 40; *see also* Ex. A-10 (D. So Dep.) at 82:19-20 ( ███████████████████████████████████ ) Any other arrangement, in which Paradise controlled Empire's business, would have (i) run afoul of U.S. gaming regulations, as Plaintiffs were not licensed, and (ii) been contrary to Paradise's representations to the Hong Kong Stock Exchange. As a publicly traded company on the Hong Kong Stock Exchange, Paradise is required to disclose related-party transactions (like here, where Mr. Feng and Dr. Chun are brothers-in-law). *See* Ex. A-2 (L. Chan Dep. (Vol. I)) at 81:1-82:11, 104:2-19. Paradise disclosed those transactions via a Distributorship Framework Agreement between Paradise (signed by Dr. Chun) and Mr. Feng (encompassing Mr. Feng's businesses—*e.g.*, Empire) that Paradise filed with the Hong Kong Stock Exchange. *See, e.g.*, Ex. B-5 (PARADISE 00021744) at Recitals C, D. The initial Distributorship Agreement was effective from 2016 through 2018, and the parties entered into renewal agreements annually for the years 2019 through 2023. *See* Ex. B-5 (PARADISE 00021744); Ex. B-3 (ETG_00000082267) (2019 renewal); Ex. B-6 (ETG_00000116837) (2020 renewal); Ex. B-7 (ETG_00000140060) (2021 renewal); Ex. B-8 (ETG_00000162360) (2022 renewal); Ex. B-9 (ETG_00000291588) (2023 renewal).

Critically, the Distributorship Agreement establishes a non-exclusive supply arrangement where Paradise provides products to Mr. Feng and his companies, which then independently develop, manufacture, and distribute gaming devices. *See, e.g.*, Ex. B-3 (ETG_00000082267) at § 3. Empire also entered into various written agreements with LT Game, all subject to the annual Distributorship Agreements, that further memorialize the arm's-length relationship between

(Baldwin Dep.) at 150:13-23, 152:14-17. If LT Game were to apply for a gaming license, regulators would investigate Paradise and, by extension, Dr. Chun and, potentially, related family members. *See id.*

6

51259649

Plaintiffs and Empire and establish Empire's rights as a distributor. *E.g.*, Ex. B-4 (ETG_00000159329) (Game Development Agreement) at p. 1, §§ 11(a), 11(e); Ex. B-10 (ETG_00000159318) (Master Hardware Purchase Agreement) (same); Ex. B-57 (ETG_00000159220) (Distribution Agreement); Ex. A-40 (Baldwin Dep.) at ¶ 160:12-162:1.

Pursuant to these agreements, Empire was approved to distribute Plaintiffs' products and do other things necessary to effectuate distribution, like obtaining certifications for those gaming products. Ex. B ¶ 38; Ex. B-3 (ETG_00000082267) (Distributorship Agreement) at § 3.4(C); Ex. B-4 (ETG_00000159329) (Game Development Agreement) at §§ 3(a), 12(a). Empire commonly incurred these necessary certification costs directly and was subsequently reimbursed by Plaintiffs. Ex. B ¶ 39; Ex. A-8 (Medero Dep.) at 110:9-24; Ex. A-9 (Chattin Dep.) at 138:6-9 (LT Game reimbursed Empire for any reimbursements that pertained to LT Game).

As a necessary condition of the distribution arrangement, Empire was also contractually granted the right to access, possess, and use Plaintiffs' source code. *See* Ex. B-3 (ETG_00000082267) (Distributorship Agreement) at § 3.4(B); *see also* Ex. B-4 (ETG_00000159329) (Game Development Agreement) at § 7. These provisions reflect Nevada gaming regulations, which expressly provide that gaming equipment developed by unlicensed third parties—like Plaintiffs—can only be sold if a licensed entity—like Empire—"assumes responsibility" for those products, meaning Empire was required to "[a]cquire complete control over, or ownership of," and "[a]ccept continuing legal responsibility" for, Plaintiffs' products—including complete control with respect to product modifications (*i.e.*, source code). *See* NEV. REV. STAT. §§ 463.01715.1, 463.650.6; Ex. A-4 (Feng Dep. (Vol. 1)) at 63:8-25.[4] Using this contractual right, Empire took actions typical of a distributor, like submitting the source code to independent

---

[4] *See* Ex. B-3 (ETG_00000082267) (Distributorship Agreement) at § 3.4(B) ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████ ); Ex. B-4 (ETG_00000159329) (Game Development Agreement) at § 7 ("█ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████

7

test laboratories in order to obtain regulatory product certifications for Plaintiffs' products.[5] Ex. A-10 (D. So Dep.) at 20:11-22:16; Ex. A-11 (J. Wu Dep.) at 47:22-48:2.

**D.  Empire Has Been Developing and Promoting Its Own Proprietary Products Since 2016.**

Empire started manufacturing its own proprietary gaming equipment in 2016. Ex. B ¶ 16; Ex. A-12 (Mason Dep.) at 107:7-10; Ex. A-1 (Allison Dep.) at 97:17-19 ("[Empire] had always promoted their own products, yes."). Initially focusing on table game products for California card rooms, Empire developed a line of "SMRT" products that increase play on table games and provide real-time tracking data to operators, such as a trend board that displays historical game results. Ex. B ¶ 8; Ex. B-11 (ETG_00000174095) at 4-5.  Of note, though these products are electronic, they are not electronic table games (or "ETG"), which is an entirely separate category of gaming products.  Ex. B ¶ 19.

By 2018, Empire began offering proprietary table games, ultimately developing five such products—most notably Golden Frog Baccarat, a standard live baccarat game with unique side wagers. *Id*. ¶ 22; Ex. B-11 (ETG_00000174095) at 4; Ex. B-12 (ETG_00000071335). Empire has filed numerous trademark and patent applications in connection with its proprietary products, including filing trademark applications in 2019 for "Golden Frog Baccarat" and "SMRT Trend Board," among other products. *See* Ex. A-60 (Golden Frog USPTO); Ex. A-61 (SMRT Trend Board USPTO); Ex. A-62 (Vegas 6+ USPTO); Ex. A-63 (Short Deck Vegas 6+ USPTO); Ex. A-64 (SMRT USPTO); Ex. B-11 (ETG_00000174095) at 4.

Empire's proprietary products were well publicized and publicly available. Ex. B ¶ 24. From at least as early as 2020, Empire prominently featured these products on its website. *See*, *e.g.*, *id*. ¶ 25; Ex. A-13 (ETG_00000331271); Ex. A-14 (ETG_00000331273); Ex. A-15 (ETG_00000331276); Ex. A-16 (ETG_00000331268); Ex. A-17 (ETG_00000331287).[6] Industry

---

[5] Any changes to a product's source code (*e.g.*, updates or bug fixes) require recertification. Ex. A-10 (D. So Dep.) at 22:1-16.

[6] Exhibits 13-17 are copies of Empire's website at various times in 2020 through 2023 archived by the Wayback Machine, which the Court may take judicial notice of.  *See, e.g.*, *McGucken v. Triton Elec. Vehicle LLC*, No. CV213624DMGGJSX, 2022 WL 2101725, at *3 (C.D. Cal. Mar. 21, 2022); *see also Am. Casino & Entm't Props, LLC v. Marchex Sales, Inc.*, No. 2:12-cv-01054, 2012 WL 2674611, at *4 (D. Nev. July 5, 2012) (Navarro, J.).

8

51259649

press repeatedly reported on Empire's proprietary products,[7] and Empire's table game products were also featured in multiple industry research reports.[8] Empire also distributed other companies' products (*see, e.g.*, Ex. A-18 (Dolan Dep.) at 28:18-24) and it did not hide business information from Dr. Chun or Plaintiffs' teams in China. Ex. A-39 (Olson Dep) at 122:15-122:24. It was common knowledge, "down to the warehouse guys," that Empire manufactured its own products. Ex. A-8 (Medero Dep.) at 41:7-15; *see also id.* at 147:1-149:22.

### E. Empire Did Not Compete With Plaintiffs

While operating Empire, Mr. Feng was also striving to expand LT Game in the United States, and surfaced a range of potential gaming-industry opportunities during this period, including the possible purchase of a Las Vegas casino in April 2015, developing SMRT products in 2016, investing in an iGaming company in 2018, and acquiring an electronic-gaming business with an existing portfolio of slot products in 2019—but Paradise declined each of them.[9] Ex. B ¶ 35; *see* Ex. B-21 (PARADISE 00059500); Ex. B-24 (ETG_TRANSLATION_00000000289 (PARADISE 00036090)). Ex. B-22 ETG_TRANSLATION_00000000323 (ETG_00000331327)); Ex. B-23 (ETG_00000331546). Accordingly, throughout this period, LT Game's actual business in the United States remained narrowly focused on only two products: (i) a card shoe, from approximately 2016 until February 2022, and (ii) a Class III slot machine, from mid-2019 until June 2022 (*see supra*, II.B).

While Empire began manufacturing proprietary table game products (SMRT products) in

---

[7] *See, e.g.*, Ex. A-19 (GGB March 9, 2020 article); Ex. A-20 (GGB July 12, 2020 article); Ex. A-21 (GGB July 27, 2020 article); Ex. A-22 (GGB August 23, 2020 article); Ex. A-23 (GGB September 18, 2020 article); Ex. A-24 (GGB September 24, 2020 article); Ex. A-25 (GGB November 23, 2020 article); Ex. A-26 (GGB March 7, 2021 article); Ex. A-27 (GGB June 20, 2021 article); Ex. A-28 (GGB September 22, 2021 article); Ex. A-29 (GGB October 30, 2022 article); Ex. A-30 (CDC Gaming October 18, 2022 article); Ex. A-31 (IAG October 28, 2022 article); Ex. A-32 (GGB March 12, 2023 article); Ex. A-33 (GGB May 27, 2023 article); Ex. A-34 (GGB June 1, 2023 article); Ex. A-35 (GGB June 6, 2023 article).

[8] *See* Ex. XX (ETG_00000350499); Ex. XX at 9 (ETG_00000350500); Ex. XX (ETG_00000329281); Ex. XX at 9 (ETG_00000329282); Ex. XX at 9 (ETG_00000350439); Ex. XX at 9 (ETG_00000350379).

[9] Illustrating the broader defect in Plaintiffs' case, the complaint alleges that Mr. Feng formed Playful Interactive Inc. in April 2019 "to engage in direct competition with LT Game." SAC ¶ 115. But Playful Interactive was an iGaming company, and one year earlier Dr. Chun had told Mr. Feng unequivocally: "███████████████aming." Ex. B ¶ 54; Ex. B-22 ETG_TRANSLATION_00000000323 (ETG_0000331327). Having rejected that line of business outright, Plaintiffs cannot now recast Mr. Feng's pursuit of it as wrongful competition. *See Digital Camera Int'l, Ltd. v. Antebi*, No. 11-CV-1823, 2017 WL 2992719, at *3 (E.D.N.Y. July 14, 2017).

51259649

2016, it "has not manufactured its own card shoe product . . . ." SAC ¶ 217; Ex. A-38 (Feng Dep. (Vol. II)) at 109:25-110:8. Empire subsequently began developing traditional table games, whereby live dealers deal physical cards, not electronic table games that replace dealers and physical cards. *See* Ex. A-38 (Feng Dep. (Vol. II)) at 114:6-11; Ex. B ¶ 22. Plaintiffs never offered table games for sale in the United States (or anywhere else to Defendants' knowledge). Ex. B ¶ 29. Until approximately 2022, the only products Empire was selling for itself were SMRT table game products and table games. Ex. A-38 (Feng Dep. (Vol. II)) at 114:6-11.

In November 2021, Mr. Feng (through a separate company) acquired assets from Synergy Blue related to skill-based gaming equipment, and, in early 2022, Empire began doing business under the name "Play Synergy." Ex. B ¶ 29. Plaintiffs never offered any skill-based gaming products for sale in the United States. *Id*.; Ex. A-8 (Medero Dep.) at 156:25-157:2. In February 2022, Empire entered into an agreement with Sockeye Software to distribute Sockeye's Class II video poker gaming products. Ex. B ¶ 30. Class II products are restricted to Tribal properties; Plaintiffs didn't offer them for sale in the United States during the relevant period. Ex. B ¶ 30; Ex. B-25 (PARADISE 00013125) at 4, 15 (recognizing Class II as a "niche market"); Ex. B-25 (PARADISE 00013125) at 4.

**F. Plaintiffs Were Unsuccessful in the United States Slot Machine Market For Reasons Other Than Defendants.**

To successfully compete in the U.S. slot machine market, a company must constantly develop new games, which requires significant and ongoing capital investment. Ex. A-39 (G. Olson Dep.) at 103:7-15; Ex. A-40 (Baldwin Dep.) at ¶ 67:12-69:18, 88:20-90:2, 99:19-100:24, 146:6-18. Mr. Feng informed Dr. Chun of this reality on numerous occasions, including even before LT Game entered the United States slot business and again in late 2019 when he alerted Paradise management that the company's "██████" game library was "████████████████████lve." Ex. B-26 (PARADISE 00013227); Ex. B-25 (PARADISE 00013125) at 37; Ex. B-27 (PARADISE 00019050); Ex. B-2 (PARADISE 00013080) at 5, 6.

But rather than investing in LT Game's products after the LTS-1 went to market, Dr. Chun did the opposite and directed Mr. Feng to cut LT Game's expenses because Paradise began

10

suffering losses in 2020 as a result of the COVID-19 pandemic. Ex. B ¶ 41. In February 2020, Mr. Feng informed Dr. Chun: "███████████████████████████████████████████ ████████████████████████." Ex. A-41 (PARADISE 00027921). Despite Mr. Feng's objections, by March of 2020, LT Game had cut 25% of its workforce, and by the end of the year the company had undergone "three large scale layoffs." Ex. B-28 (ETG_TRANSLATION_00000000339 (ETG_00000125665)); Ex. A-8 (Medero Dep.) at 61:6-13.

The cuts only deepened over the next year. In July 2021, Paradise ordered a further 20% expense reduction, triggering additional layoffs—despite Mr. Feng warning Dr. Chun that ████ ████████████████████████████ and that reduced development resources meant they had "not yet begun to modify the [slot machine] platform according to Nevada standards." Ex. B-29 (ETG_TRANSLATION_00000000027 (PARADISE 00002634)). By August 2021, Mr. Feng reiterated that LT Game's budget was "████████████████████ and the company faced imminent shutdown. Ex. B-30 (ETG_00000153551). Dr. Chun responded that Paradise "████t ███ ███ ███ ██████" for LT Game. Ex. A-42 (ETG_TRANSLATION_00000000132 (ETG_00000153769)) at 51. Mr. Feng explained that ██████████████████████████████" to break even, but "[████████████████████████████." Id. at 50. Mr. Feng's advice fell on deaf ears; Mr. Chan instructed LT Game to prioritize cash sales of its slot products over product leases. See Ex. B-31 (ETG_TRANSLATION_00000000055 (PARADISE 00000765)) at 9. As Mr. Kiely observed, Dr. Chun "███████████████████████████████████████ ██████████." Ex. C-2 (ETG_00000162765). By October 2021, Paradise instructed LT Game to focus on developing craps machines, card shoes, and other non-slot products. Ex. B-32 (PARADISE 00009048).

In January 2022, LT Game's operations review confirmed the company had a "██████ ██████████" and that becoming cash flow positive would require "████████████████████████." Ex. B-31 (ETG_00000163081) at 11, 12. In February, Mr. Feng made a final appeal to Paradise, warning Dr. Chun that ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████." Ex. B-19 (ETG_TRANSLATION_00000000119 (ETG_00000166384)).

11

51259649

Dr. Chun then conceded that Paradise had "███████████████████████████████ ███████████████████████████████████ness." *Id.* He directed LT Game to focus on products "████████████cau" and to revert back to LT Game's original mission and transfer development "███████ *Id.*; *see also* Ex. A-1 (Allison Dep.) at 129:2-20 (recalling Dr. Chun had told him that Paradise ███████████████████████████anted ███████████████████████████████████ Mr. Chan confirmed Paradise would "█████████████████████████" and ██████ ██████" on non-slot products for Macau. Ex. B-34 (ETG_TRANSLATION_00000000001 (ETG_00000166414)). He later stated that Paradise intended to ██████████████████████████n US," and thus █████████████████████." Ex. C-3 (ETG_00000167863). Dr. Chun and Mr. Chan both reiterated that Paradise was focusing on non-slot machine products.[10] *See* Ex. C-3 (ETG_00000167863); Ex. A-43 (ETG_TRANSLATION_00000000331 (PARADISE 00054382)); Ex. B-35 (ETG_00000167484). Having endured two years of downsizing and faced with Paradise's unequivocal refusal to adequately invest in its United States business, Mr. Feng resigned from LT Game on February 10, 2022. Ex. B-19 (ETG_TRANSLATION_00000000119 (ETG_00000166384)).

The inevitable collapse followed. In April 2022, Mr. Allison reported that customers were returning LT Game's slot machines "██████████" and refusing to "███████its ██████" because of a "[l]████████████." Ex. B-36 (PARADISE 00030966) at 12, 13, 14; *see also* Ex. A-44 (ETG_TRANSLATION_00000000271 (PARADISE 00027823)). Consistent with Mr. Chan instruction to prioritize cash sales, Mr. Allison presented an option to sell all remaining machines to a third party, which Dr. Chun approved. *See* Ex. B-36 (PARADISE 00030966) at 16-20. The sale closed in June 2022, after which LT Game had no more slot machines deployed in the United States and "██████████████████████." Ex. C-1 (PARADISE 00052738). Paradise continued its global retreat—laying off employees at its

---

[10] Mr. Allison reported to Mr. Chan that products Dr. Chun was prioritizing would be unsuccessful in the United States, yet, when he raised this directly to Dr. Chun, his concern fell on "[d]eaf ears." Ex. D-2 (ETG_00000331235).

51259649

Taiwanese subsidiaries, directing that remaining slot development be "███████████ the ██████████," and effectively closing its Australian branch. See Ex. A-45 (PARADISE 00053893); Ex. A-46 (ETG_TRANSLATION_00000000349 (PARADISE 00026691)); Ex. A-47 (PARADISE 00052424); Ex. A-48 (PARADISE 00052721). In February 2023, Mr. Chan confirmed to Mr. Allison that Paradise had no "█████████████ . . . to sell in overseas markets particularly the markets in North America and regions nearby at least in coming 6 months." Ex. A-49 (PARADISE 00014335); Ex. A-1 (Allison Dep.) at 182:13-18, 211:12-18 (noting the "edict" to wind down LT Game came from Paradise and that the intent was to "lay pretty much everybody off.  Close down LT in the U.S."). Since March 2023, LT Game's sole remaining employee in the United States has been an accountant, and the company has had essentially no operations.[11] See Ex. A-8 (Medero Dep.) at 66:6–67:10.

### III.   LEGAL STANDARD

Summary judgment is appropriate when the record shows no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). It exists to "isolate and dispose of factually unsupported claims or defenses" and to avoid trials on undisputed facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). To succeed, the moving party must either produce evidence that negates an essential element of the nonmovant's claim or show the nonmovant lacks evidence to carry its ultimate burden at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the opposing party, who must identify specific facts in the admissible record that create a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp.*, 477 U.S. at 324. A dispute is "genuine" only if a reasonable jury could find for the nonmovant, and a fact is "material" only if it might affect the outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–

---

11 Although Paradise reported to its shareholders that it opened a showroom in Las Vegas in 2024 "████████████████████████████████████" LT Game's sole remaining employee testified that "█████████████" and his employment with LT Game requires only "████ ████ work per week. Ex. B-37 (PARADISE 00033826 at 18); Ex. A-8 (Medero Dep.) at 18:2-9, 46:1-19. Likewise, in April 2025, Dr. Chun reportedly stated that Plaintiffs had suspended Untied States sales because of the tariffs, but Mr. Chan subsequently testified that, actually, that there had been no sales in the United States. Ex. A-50 (ETG_00000331290); Ex. A-51 (L. Chan Dep. (Vol. II)) at 182:18-183:5; Ex. A-71 (PARADISE 00034028) at 7.

13

51259649

49 (1986).

The nonmovant cannot avoid summary judgment with conclusory allegations, speculation, or a "mere scintilla" of evidence; the court must grant judgment where the record as a whole could not lead a rational trier of fact to find for the nonmovant. *See id.* at 252; *Matsushita*, 475 U.S. at 587; *Citibank, N.A. v. Rancho Las Brisas Master Homeowners Ass'n*, No. 2:18-CV-765, 2019 WL 4280583, at *1-2 (D. Nev. Sept. 10, 2019) (Mahan, J.); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In applying this framework, the court does not weigh evidence but only determines whether a genuine dispute exists for trial; if the nonmovant fails to come forward with specific, significantly probative facts, summary judgment must be entered. *Anderson*, 477 U.S. at 249–52; *Citibank*, 2019 WL 4280583, at *2.

## IV.    ARGUMENT

For purposes of summary judgment, Plaintiffs' claims are best analyzed in three groups. The first group, the Independent Business Claims, consists of Counts Four through Six and Ten through Eleven (fraud, constructive fraud, conspiracy, breach of fiduciary duty, aiding and abetting), the funds-based portion of Count Seven (conversion), the wire-fraud/financial-resource portion of Count Eight (RICO), and the fraud-based portion of Count Nine (unjust enrichment). Those claims all rest on the same premise: because Empire was supposed to function exclusively for Plaintiffs' benefit, any independent business activity by Empire was wrongful by definition.

Plaintiffs allege that Defendants committed fraud because, despite the purported "agreed purpose of having Empire act as the Paradise Group's long-term exclusive distributor," Mr. Feng "went into business for himself and used Empire and his other several companies in furtherance of a fraudulent scheme to compete against Plaintiffs," and "Mr. Feng deliberately and maliciously engaged in fraudulent concealment by failing to inform Paradise that he was engaged in the foregoing scheme." SAC ¶¶ 233–34. Plaintiffs contend that the "same facts alleged under Plaintiffs' claim for fraud also support" claims for constructive fraud, conspiracy, and conversion. *Id.* ¶¶ 263, 270, 277. Their breach of fiduciary duty and aiding and abetting claims are based on allegedly "engaging in a covert scheme to build up a business . . . to compete with and usurp Plaintiffs in the market." *Id.* ¶ 317. And the discrete corporate-opportunity theories are a narrower version of the

14

51259649

same idea: because Mr. Feng supposedly could not operate his own business, he also supposedly could not take particular opportunities for himself.[12] *See, e.g.*, *id*. ¶ 319.

These claims fail. The parties expressly and contractually agreed that Empire and Mr. Feng could operate independently. Plaintiffs knew or had notice that Mr. Feng was operating Empire as his own business years before suit. Empire's proprietary products and Mr. Feng's other businesses are distinct from Plaintiffs' business, and Defendants never competed or sought to compete with Plaintiffs. On this record, Plaintiffs cannot show any affirmative fraud, concealment, justifiable reliance, lack of consent, or timely suit. Once the premise that Mr. Feng was forbidden to run Empire independently is removed, the rest of the theory falls with it, and no claim in this category can survive summary judgment.

The second group consists of the intellectual-property claims: Counts One through Three (federal and Nevada trade-secret misappropriation, and copyright infringement) and the IP-based aspect of Count Eight (RICO). The trade secret claims fail because Plaintiffs have not sufficiently identified any trade secrets beyond source code; the agreements vested ownership of the Golden Frog code in Empire; any code Empire received was pursuant to contract and regulatory requirements, not improper means; and Plaintiffs have no evidence of unauthorized Golden Frog sales or resulting profits. The copyright claim fails as well. As to Golden Frog, Empire owned the code, and the chronology forecloses copying because Empire created its Golden Frog Baccarat games first. As to the LTShoe, Plaintiffs do not allege that Defendants created a competing shoe from copied code. And as to both products, the parties' agreements and course of dealing gave Empire at least an express or implied license to use source code as needed to perform the distribution relationship.

The third group consists of contract—Counts Twelve (breach of contract) and Thirteen

---

[12] Defendants' Motion addresses Plaintiffs' discrete F2 corporate-opportunity claim. Although they appear to allege discrete corporate opportunity theories regarding (i) Empire's 2023 acquisition of Aruze assets, (ii) the 2021 purchase of Synergy Blue intellectual property, and (iii) the 2022 Sockeye Software transaction (*see* SAC ¶¶ 102, 130, 138), Plaintiffs do not assert any remedies theories specific to those transactions. *See* Ex. A-57 (Nelson Dep.) at 215:6-12, 226:23-227:3. Plaintiffs therefore abandon those transactions as independent bases for liability or damages. *See, e.g., Design Strategy, Inc. v. Davis*, 469 F.3d 284, 292-99 (2d Cir. 2006) (affirming exclusion of corporate opportunity damages when party failed to disclose information regarding the amount of, or basis for computing, its alleged damages).

15

51259649

tortious interference)—or quasi-contractual—Count Nine (unjust enrichment)—claims. Specifically, Plaintiffs allege that Mr. Kiely, Mr. Allison, and GSL breached employment or consulting agreements by performing work for Mr. Feng or Empire and using or disclosing non-public information. Those claims fail because the agreements do not contain noncompete provisions and there is no evidence of any breach of confidentiality. Plaintiffs separately allege that Mr. Kiely breached his contract by improperly assigning intellectual property rights to Empire, but there is no evidence that he did so while providing services to LT Game. Plaintiffs' claim that Mr. Feng and Empire tortiously interfered with those agreements fails because there is no actual evidence of interference; all that Plaintiffs have are conclusory allegations and speculation. And Plaintiffs' unjust enrichment claim is not available, and therefore fails, because there are express, written contracts governing the actions of which Plaintiffs complain.

### A. All Claims Based on Mr. Feng's and Empire's Independent Business Fail

Summary judgment should be entered on all claims premised on the notion that Mr. Feng was not allowed to operate Empire as an independent business.

#### 1. The Evidence Shows the Parties' Relationship Was Non-Exclusive

Plaintiffs' theory begins with an assertion they cannot prove: Mr. Feng agreed to operate Empire "for the exclusive benefit of the Paradise Group." *See, e.g.*, SAC ¶¶ 33, 38, 42, 217–227. Despite alleging "***numerous express misrepresentations***" and "***many instances***" when "Mr. Feng ***expressly stated***" he was working solely for their benefit, Plaintiffs still cannot identify the basic particulars of any actual representation that Empire would not operate independently. *See id.* ¶ 236 (emphasis added); *see also* FED. R. CIV. P. 9(b). Despite over two years of discovery, Plaintiffs cannot point to a single contemporaneous document memorializing the supposed exclusivity representation that purportedly defined a years-long, multimillion-dollar business relationship. If the exclusivity was real, it would appear somewhere in the contemporaneous record.

What does appear in the record is the parties' fully-integrated Distributorship Framework Agreement ("Distributorship Agreement"), which defeats Plaintiffs' theory at the threshold because it says exactly the opposite—the parties agreed to a "non-exclusive," arm's-length relationship between independent principals. *See, e.g.*, Ex. B-5 (PARADISE 00021744) at § 5.2 (stating contract

16

"constitutes the entire agreement between the Parties" and "supersedes any previous agreement between the Parties"). Specifically, the Distributorship Agreement—which Paradise filed with the Hong Kong Stock Exchange specifically to describe its relationship with Mr. Feng—states that the ███████████████████████████████████████████████ *lusive*," that Paradise would supply products to Mr. Feng's companies "████████████████████," and the parties' legal relationship was one of "████████████████."[13] *See, e.g.,* Ex. B-5 (PARADISE 00021744) §§ 3.1, 3.4, 5.9 (emphasis added). The parties renewed the Distributorship Agreement five times, and each of those subsequent agreements memorialized Mr. Feng's preexisting, independent operations. *See, e.g.,* Ex. B-3 (ETG_00000082267) at Recital C (Empire developed and manufactured gaming products). That is not a captive-distributor arrangement—it is a non-exclusive, arm's-length relationship.

By its ordinary meaning, a non-exclusive arrangement preserves the right to pursue other business. *See, e.g., Maxon Hyundai Mazda, et al. v. Carfax, Inc.,* 726 F. App'x 66, 68 (2d Cir. 2018) (summary order) (recognizing that non-exclusive agreements "could not have foreclosed competition as a matter of law"); *Kennametal, Inc. v. Subterranean Equip. Co.,* 543 F. Supp. 437, 439-440 (W.D. Pa. 1982) (granting summary judgment where "plain reading" of non-exclusive distributorship agreement "did not restrict the rights of [party] to compete in the marketplace"). *Jones Distrib. Co. v. White Consol. Indus.* is directly on point: "WCI granted Jones a 'nonexclusive' distributorship. ***In other words, Jones had the right to distribute other companies' products.***" 943 F. Supp. 1445, 1454 (N.D. Iowa 1996) (emphasis added).[14] And this Court has already recognized the point: "***the supply framework agreement contradicts Paradise's belief . . . that Empire was its exclusive distributor.***" Dkt. No. 128 at 12 (emphasis added).

The Distributorship Agreement (and subsequent renewal agreements) foreclose Plaintiffs' effort to treat Empire's independent business as inherently wrongful. Those agreements govern the

---

[13] Exhibit B-5 (PARADISE 00021744) is the initial Distributorship Agreement, which governed the relationship from 2016 through 2018. The subsequent renewal agreements contain the same non-exclusivity language. *See* Ex. B-3 (ETG_00000082267) (2019 renewal); Ex. B-6 (ETG_00000116837) (2020 renewal); Ex. B-7 (ETG_00000140060) (2021 renewal); Ex. B-8 (ETG_00000162360) (2022 renewal); Ex. B-9 (ETG_00000291588) (2023 renewal).

[14] *See also Paxi, LLC v. Shiseido Americas Corp.,* 636 F. Supp. 2d 275, 284 (S.D.N.Y. 2009) (ruling breach of contract claim unlikely to succeed since defendant had a right to sell its cosmetic products to anyone it wanted to because agreement between parties was "on a non-exclusive basis"); *Marine Travelift, Inc. v. Marine Lift Sys., Inc.,* No. 10-C-1046, 2013 WL 4046331, at *4 (E.D. Wis. Aug. 8, 2013) (ruling defendant not precluded from selling competing products when agreement merely required best efforts to sell plaintiff's products).

51259649

relationship and expressly provide that it was non-exclusive, disproving Plaintiffs' overarching fraud theory and the tort claims built upon it. Plaintiffs authorized the conduct that they now claim was wrongful; they cannot now invoke generalized fiduciary rhetoric to rewrite a mutually non-exclusive relationship for which the parties expressly bargained. *See, e.g., Fleetwood v. Stanley Steemer Int'l, Inc.*, 725 F. Supp. 2d 1258, 1271–72 (E.D. Wash. 2010), *aff'd sub nom.*, 446 F. App'x 868 (9th Cir. 2011) (recognizing contract can limit scope and nature of fiduciary duty); *see also* NEV. REV. STAT. § 78.070(8) (establishing statutory safe harbor when corporation's Board of Directors renounces "any interest or expectancy to participate in . . . specified classes or categories of business opportunities").

Other evidence reinforces the contractual non-exclusive relationship. Leo Chan (Paradise's Chief Financial Officer and Secretary) acknowledged that the agreement was non-exclusive when negotiating the subsequent Supply Framework Agreement in 2018. Ex. B-40 (ETG_00000079833)

Plaintiffs' lawyers at Lewis Roca treated Empire and Plaintiffs as separate clients—specifically warned Paradise it could face regulatory scrutiny if it had the ability to control a U.S.-licensed gaming manufacturer—and repeatedly represented to regulators that Empire and Paradise were separate companies and that Empire—not Paradise—owned Empire's products and technology. *See* Dkt. No. 90-9 ¶ 11; Ex. B-39 (PARADISE 00007479) at 8-10; Ex. B-11 (ETG_00000174095) at 15; Ex. A-7 (March 23, 2023 transcript) at 14; Ex. B-38 (ETG_00000289228). Paradise itself made the same representations to regulators and shareholders—that Mr. Feng controlled Empire and that the parties dealt at arm's length as independent principals with no authority to bind one another. *E.g.*, Ex. B-5 (PARADISE 00021744) at Recital C, §§ 3.2, 5.9. Indeed, any other arrangement would have violated Nevada gaming regulations and therefore would be void due to illegality. *See* Nev. Gaming Comm'n Reg. 15.1594-6 (requiring Commission approval to control a corporate licensee); *id.* 15.482-4 (providing broad definition of "control"); *Steinmeyer v. Couvares*, No. 3:25-CV-00258, 2025 WL 3687804, at *5 (D. Nev. Dec. 18, 2025) (Du, J.) (refusing to enforce oral agreement to commit fraud).

Although Plaintiffs allege that Mr. Feng continued "to profess loyalty to Dr. Chun" even

18

51259649

after resigning from LT Game, Dr. Chun admitted that after the resignation he had no business communications with Mr. Feng whatsoever—despite claiming he "supervise[d]" Empire's business. SAC ¶ 318; Ex. A-3 (Chun Dep.) at 94:23-97:22, 86:21-24, 108:25-109; *see also* Ex. A-38 (F. Feng Dep. (Vol. II)) at 169:7-11 (Mr. Feng confirming no communications with Dr. Chun). And when Dr. Chun learned that Mr. Feng had acquired the Aruze assets, his immediate response was "Good luck to him" and "For our future U.S. sales, can we still use Empire's license? Ask Frank [Feng]," Ex. A-55 (ETG_TRANSLATION_00000000357 (PARADISE 00026907))—statements irreconcilable with a supposed belief that Mr. Feng was obligated to work, and was at the time working, exclusively for Paradise. *See* SAC ¶ 104.

The truth is that Plaintiffs lacked a U.S. gaming license and therefore necessarily required a licensed distribution channel to access the United States market. *See supra*, II.B; *see also* SAC ¶¶ 42–45 (alleging Paradise supported Empire because Empire functioned as its U.S. distribution vehicle). Supporting Empire, including helping to pay for gaming licenses, is entirely consistent with Plaintiffs investing in a strategically useful distributor while preserving a non-exclusive, arm's-length structure. Further undermining the assertion that support was provided in exchange for exclusivity, Mr. Chan attempted to justify the below-market commissions Paradise paid Empire by emphasizing that Paradise provided funding and other support to Empire. Ex. A-2 (L. Chan Dep. (Vol. I)) at 75:7–77:13, 102:16–103:11 ████████████████████ ██████████████████."); Ex. A-6 (PARADISE 00021605). But funding and support do not create an exclusive relationship, and Plaintiffs cannot create a secret exclusivity obligation that no contemporaneous document reflects and enforce it now, especially where Mr. Feng was openly pursuing his own business interests and Plaintiffs knew it (*see infra*). *See Jones Distrib. Co. v. White Consol. Indus.*, 943 F. Supp. 1445, 1465 (N.D. Iowa 1996) (granting summary judgment after rejecting argument that course of dealing established exclusive relationship when "none of the agreements" provided for exclusivity, but "[r]ather, all of them specifically state that Jones's distributorship is "non-exclusive"" and other party had acted in non-exclusive manner).

This failure is dispositive. Plaintiffs' case depends on an exclusivity premise the record does

19

51259649

not support. Plaintiffs have *no evidence* that Mr. Feng affirmatively misrepresented Empire's relationship with Plaintiffs—once that premise collapses, so does Plaintiffs' narrative. Any claim predicated on Empire's allegedly improper independent business necessarily turns on a misrepresentation or failure to make a required disclosure. But a non-exclusive relationship negates both theories, and a key element of each claim is therefore absent.

### 2. Plaintiffs' Fraud-Based Claims Are Untimely Because Plaintiffs Were on Inquiry Notice By August 2017

Plaintiffs contend they did not learn until August 2023—after Empire acquired the Aruze assets—that Mr. Feng was "in business for himself." SAC ¶¶ 102–03. But Plaintiffs were on inquiry notice of the acts forming the basis of their allegations no later than August 2017, and the statute of limitations for all of Plaintiffs' claims had long expired before they filed suit (including before they filed their counterclaims in the prior state-court litigation). *See* NRS § 11.190(3) (establishing three-year statute of limitations for claims based in fraud).[15] Their claims are therefore time-barred.

Under Nevada's discovery rule, a claim accrues when the plaintiff knew or reasonably should have known of the material facts giving rise to the injury. *See Clark v. Robison*, 944 P.2d 788, 789 (Nev. 1997); *G & H Assocs. v. Ernest W. Hahn, Inc.*, 934 P.2d 229, 233 (Nev. 1997). Constructive knowledge is enough: the clock starts once a plaintiff has information sufficient to prompt a reasonable investigation. *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012); *Diamond X Ranch LLC v. Atl. Richfield Co.*, No. 3:13-cv-00570, 2017 WL 4349223, at *5 (D. Nev. Sept. 29, 2017) (Du., J.); *see also Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001) ("[C]onstructive notice begins to run the statute of limitations regardless of any fiduciary relationship . . .").

In August 2017 a recently terminated LT Game employee emailed Dr. Chun to "tell [him] what's really going on" and specifically reported that ███████████████████

---

[15] *See also In re Amerco Deriv. Lit.*, 127 Nev. 196, 229 (Nev. 2011) (three-year statute of limitations for breach of fiduciary duty); *Las Vegas Rental Homes Corp. v. Bank of N.Y. Mellon*, 137 Nev. 932, at *3 (Nev. Ct. App. July 21, 2021) (three-year statute of limitations for conversion and four-year statute of limitations for unjust enrichment); *USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F. Supp. 2d 1210, 1231 (D. Nev. 2011) (Pro, J.) (three-year statute of limitations for aiding and abetting claims arising from fraud); *Siragusa v. Brown*, 114 Nev. 1384, 1391 (Nev. 1998) (four-year statute of limitations for civil conspiracy); *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (U.S. 1987) (four-year statute of limitations for civil RICO claims).

51259649

████████████ ].”[16] Ex. B-41 (ETG_TRANSLATION_00000000311 (PARADISE 00036751)). The email went further, asserting that Empire was using Paradise funds to develop a ████████ product, Empire and Mr. Feng were "████ ]" that work from Dr. Chun, and selling the product to Commerce Casino. *See id.* That detail was more than enough to trigger a duty to investigate the very theory Plaintiffs press now—that Empire was not operating exclusively for Plaintiffs and that Mr. Feng was using Empire as his own business. Knowledge acquired by Dr. Chun in his capacity as President and Chairman is imputed to Plaintiffs for purposes of trigging the statute of limitations. *See USACM Liquidating Tr. v. Deloitte & Touche LLP*, 764 F. Supp. 2d 1210, 1217 (D. Nev. 2011).

In response to the whistleblower email, Dr. Chun contacted Mr. Feng, who acknowledged that he was marketing products under Empire's brand name. *See* Ex. B-41 (ETG_TRANSLATION_00000000311 (PARADISE 00036751)). At that point, Plaintiffs had all they needed to investigate further. They did not need every later detail, every later transaction, or every later piece of evidence before limitations began to run. *See Soliman v. Philip Morris Inc.*, 311 F.3d 966, n.7 (9th Cir. 2002); *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1147 (9th Cir. 2002). But that is not all that happened in 2017 according to Plaintiffs' own allegations. Plaintiffs allege that Mr. Feng and Mr. Kiely tried to route business through "Playful Games, Inc." using a residential address tied to Mr. Feng, and that Plaintiffs questioned the legitimacy of that entity at the time. SAC ¶¶ 111–114; Ex. B-42 (ETG_00000059351). The complaint also alleges that Plaintiffs' later investigation into "Mr. Feng's prior activities" revealed the self-dealing, competition, and usurpation they now invoke. SAC ¶¶ 107, 115–117. That allegation forecloses any suggestion that the facts were inherently undiscoverable. Despite all of this information, there is no evidence that Dr. Chun investigated the matter any further. Plaintiffs had constructive knowledge, yet sat on their hands, and now press claims that depend on the supposed concealment of Empire's independent business. These claims are therefore untimely, and summary judgment should be granted.

---

[16] Notably, Mr. Chan visited LT Game in late 2017 and, prior to his trip, he asked Dr. Chun: "Should you need me do anything for you at US office, please let me know." Ex. A-52 (PARADISE 00021656). There is no evidence that Mr. Chun asked him to conduct an investigation.

21

51259649

**3.      Plaintiffs' Notice Also Defeats These Claims On The Merits**

Along with being fatal to Plaintiffs' statute of limitations, this evidence also forecloses their claims on the merits. Public information alone rendered Plaintiffs' claimed ignorance untenable. By at least January 2020, Empire's website openly advertised its proprietary products and partnerships,[17] and industry press repeatedly reported on those same subjects—publishing at least 17 such articles before Plaintiffs claim to have first learned that Mr. Feng was in business for himself.[18] *See Berry v. Valence Tech., Inc.*, 175 F.3d 699, 703 n.4 (9th Cir. 1999) (courts may impute knowledge from public information without proof that the plaintiff read every article).

Here, the record is stronger still because Plaintiffs followed the sources that reported on Empire's activities. Global Gaming Business ("GGB") published an article regarding Empire's table games on March 9, 2020—just weeks prior, GGB had interviewed Dr. Chun, and he had a digital subscription to GGB and was reading its articles in March 2020.[19] *See* Ex. A-19 (GGB March 9, 2020 article); Ex. A-66 (GGB Jay Chun article (ETG_00000350244)); Ex. B-43 (ETG_00000331556). GGB also reported on Empire's distribution of LT Game products and, tellingly, Mr. Chan appears to have deleted text messages from his phone confirming that he reviewed the press release for one such article and told Mr. Allison that he "support[ed] ETG [Empire] and hope[d] you can grab more business for [Empire]." Ex. A-67 (GGB October 24, 2019 article); Ex. A-68 (GGB July 25, 2021 article); Ex. D-1 (ETG_00000350551). Further, Eilers-Fantini, a leading industry research firm, also featured Empire's proprietary table game products in

---

[17] *See, e.g.*, Ex. A-13 (ETG_00000331271); Ex. A-14 (ETG_00000331273); Ex. A-15 ETG_00000331276); Ex. A-16 (ETG_00000331268); Ex. A-17 (ETG_00000331287).

[18] Ex. A-19 (GGB March 9, 2020 article); Ex. A-20 (GGB July 12, 2020 article); Ex. A-21 (GGB July 27, 2020 article); Ex. A-22 (GGB August 23, 2020 article); Ex. A-23 (GGB September 18, 2020 article); Ex. A-24 (GGB September 24, 2020 article); Ex. A-25 (GGB November 23, 2020 article); Ex. A-26 (GGB March 7, 2021 article); Ex. A-27 (GGB June 20, 2021 article); Ex. A-28 (GGB September 22, 2021 article); Ex. A-29 (GGB October 30, 2022 article); Ex. A-30 (CDC Gaming October 18, 2022 article); Ex. A-31 (IAG October 28, 2022 article); Ex. A-32 (GGB March 12, 2023 article); Ex. A-33 (GGB May 27, 2023 article); Ex. A-34 (GGB June 1, 2023 article); Ex. A-35 (GGB June 6, 2023 article).

[19] Following the interview, Dr. Chun requested that GGB reporter to consult for Paradise for an upcoming gaming show, to which the reporter requested a $25,000 fee. Ex. A-65 (ETG_00000122726).

22

51259649

multiple 2022 reports.[20]  Dr. Chun and Mr. Chan received at least one of those reports.[21] *See* Ex. B-15 (ETG_00000329281); Ex. B-16 at 9 (ETG_00000329282). Plaintiffs cannot manufacture a triable issue by calling this a "secret" when the trade press they followed and the reports they received described it openly. *See Hexcel Corp.*, 681 F.3d at 1064 (9th Cir. 2012) (affirming that "self-serving, boilerplate declarations" from plaintiffs' employees insufficient to create a genuine issue of material fact against "voluminous evidence" of constructive knowledge).

Any remaining pretense of ignorance ended no later than February 2022, when Mr. Feng resigned from LT Game and told Dr. Chun in writing that it was "now time for me to go out on my own again." Ex. B-19 (ETG_TRANSLATION_00000000119 (ETG_00000166384)). Plaintiffs' contemporaneous emails and the subsequent distributorship amendments and renewal that Dr. Chun himself signed with Mr. Feng definitively show that Plaintiffs were well aware of Mr. Feng's and Empire's activities at that time. *E.g.*, Ex. C-3 (ETG_00000167863) (Feb. 22, 2022 email from Mr. Chan, copying Dr. Chun: "Frank has tendered resignation for his position in LT Game (Canada) for personal reasons (***of course he will keep his role and position in Empire***)") (emphasis added); Ex. B-9 (ETG_00000291588) (2023 renewal).

The rest of the record only makes the point clearer. By mid-2022, Empire was doing business under the name "Play Synergy." Ex. B ¶ 29. From May 2022 forward, Dr. Chun and Mr. Chan received at least 10 communications from Defendants' "@play-synergy.com" email addresses or otherwise expressly linking Empire to Play Synergy[22]—both of whom directly participated in some of the communications, which concerned significant matters, including audit requests and funds Empire allegedly owed to LT Game.[23]

---

[20] *See* Ex. B-13 (ETG_00000350499); Ex. B-14 at pg. 9 (ETG_00000350500); Ex. B-15 (ETG_00000329281); Ex. B-16 at pg. 9 (ETG_00000329282); Ex. B-17 at pg. 9 (ETG_00000350439); Ex. B-18 at pg. 9 (ETG_00000350379).

[21] At Dr. Chun's request, Paradise internally circulated Fantini slot-machine reports on a regular basis, and when Empire was featured in a Fantini report for distributing LT Game's products, Dr. Chun sought to promote that publicity to "investors or the media." *See* Ex. B-44 (PARADISE 00019131); Ex. B-45 (ETG_TRANSLATION_00000000011 (PARADISE 00000552)).

[22] *See* Ex. B-15 (ETG_00000329281); Ex. B-46 (ETG_00000331619); Ex. B-47 (ETG_00000331671); Ex. B-48 (ETG_00000173916); Ex. C-4 (ETG_00000330057); Ex. C-5 (ETG_00000331716); Ex. C-6 (PARADISE 00081872); Ex. C-7 (PARADISE 00081873); Ex. A-53 (ETG_00000331255); Ex. A-54 (PARADISE 00023889).

[23] *See* Ex. B-48 (ETG_00000173916); Ex. C-8 (ETG_00000330047); Ex. A-54 (PARADISE 00023889); Ex. A-54 (PARADISE 00023889); Ex. B-48 (ETG_00000173916); Ex. A-53 (ETG_00000331255); Ex. C-8 (ETG_00000330047).

23

51259649

This information was not confined to Defendants. Mr. Feng told third parties—including a mutual business associate of Plaintiffs—that he had no relationship with Plaintiffs. *See, e.g.*, Ex. B-49 (ETG_00000331719). Third parties likewise knew that Mr. Feng was pursuing the Aruze bankruptcy and raised that subject with Dr. Chun directly. When Dr. Chun later learned that Empire had acquired Aruze assets, he responded, "[███████████████] Ex. A-55 (ETG_TRANSLATION_00000000357 (PARADISE 00026907)). Finally, Mr. Medero testified that, sometime between June and December 2022, he informed Mr. Chan that Mr. Feng was operating separate businesses. Ex. A-8 (M. Medero Dep.) at 86:13-87:13; 147:1-149:22; 184:3-15. The evidence establishes that Plaintiffs were aware that Empire was operating as an independent business long before the Aruze publicity in August 2023.

And Plaintiffs did not merely know that Mr. Feng had independent business pursuits since at least 2017—they continued dealing with Mr. Feng and Empire and even renewed the Distributorship Agreement (through the Supply Framework Agreement and subsequent agreements and amendments) with that knowledge. A party that proceeds after learning material facts cannot later recast the same conduct as actionable concealment. *See Neumann v. Metro. Med. Grp.*, 153 A.D.2d 885, 887–88 (1989) (rejecting breach of fiduciary duty claim when plaintiff was aware of defendant's other business activities and parties' agreement made no attempt to limit or restrict that separate business). At minimum, that defeats any claim of reasonable reliance and establishes acquiescence to (if not ratification of) Empire's existence and operation as an independent business. *See, e.g.*, *RedHawk Holdings Corp. v. Schreiber*, No. CV 17-819, 2018 WL 4963597, at *4 (E.D. La. Oct. 15, 2018); *Digital Camera Int'l, Ltd. v. Antebi*, No. 11 CV 1823, 2017 WL 2992719, at *3 (E.D.N.Y. July 14, 2017) (finding no breach when plaintiff allowed defendant to use company assets for personal gain for four years: "[plaintiff] cannot now complain about its use after falling out with [defendant]").

### 4. There is Not Sufficient Evidence of the Specific Misrepresentations Underlying Plaintiffs' Tort Claims that Satisfy Rule 9(b).

Plaintiffs' tort claims are also fatally deficient for the simple reason that the summary judgment record establishes there is no evidence of any specific, actionable alleged

24

51259649

misrepresentations underlying those claims. Plaintiffs repeatedly allege that Mr. Feng "purposefully engaged in numerous express misrepresentations" but fail to allege the relevant details required under Rule 9(b). That defect continues here in summary judgment; Plaintiffs' conclusory allegations are not supported by the evidence, and Plaintiffs cannot use a single representation made by Mr. Feng regarding the LTShoe (*see* SAC ¶ 236) to support their entire grand conspiracy. Because of that, Plaintiffs cannot establish a key element of each tort claims— that any Defendant made an express misrepresentation that Plaintiffs relied on to their detriment.[24]

### 5. To the Extent that Plaintiffs' Trade Secret Claims Survive, They Displace Plaintiffs' Tort Claims

Plaintiffs' allege state trade secret misappropriation claims against each Defendant, primarily based on Defendants allegedly taking Plaintiffs' source code and other secrets to Empire and using those secrets for Empire's benefit. *See* SAC ¶¶ 185-203. Defendants move for summary judgment on those claims *infra*. But to the extent that those claims survive this motion, they displace any surviving tort claims based on misappropriation of a trade secret. *See* NEV. REV. STAT. 600A.090.1.

"A tort claim conflicts with NUTSA if its proof depends on the defendant misappropriating a trade secret. In other words, if a plaintiff must prove misappropriation of a trade secret to succeed on its tort claim, that tort claim is barred." *Octaform Sys. Inc. v. Johnston*, No. 2:16-cv-02500, 2017 WL 2562110, at *4 (D. Nev. June 12, 2017) (Gordon, J.). Consequently, a plaintiff cannot pursue a common law tort claim that arises from the "single factual episode" that also establishes misappropriation of a trade secret. *Frantz v. Johnson*, 999 P.2d 351, 357-58 (Nev. 2000).

That displacement touches each of Plaintiffs' tort claims here; Plaintiffs' entire theory is that Defendants bled LT Game dry and misappropriated trade secrets and confidential information to Empire's benefit. And Plaintiffs' fraud claims explicitly call out that alleged misappropriation— "Mr. Allison's participation in Mr. Feng's fraudulent scheme included his assistance with the

---

[24] It also is important to note that one misrepresentation may not be enough to support Plaintiffs' entire theory of the case and each of their tort claims; the Court should scrutinize any representations carefully to insure that (1) they are actually actionable misrepresentations; and (2) that all of Plaintiffs' tort claims are supported by the evidenced misrepresentations.

25

51259649

misappropriation of Paradise Group Trade Secrets and Confidential Business Information . . . ." SAC ¶ 244; *see also*, *e.g.*, *id*. ¶¶ 249 (same as to Mr. Kiely), 263 (Constructive Fraud claim: "The same facts alleged under Plaintiffs' claims for fraud also support a cause of action for constructive fraud against Defendants."), 270 (Civil Conspiracy claim: "The same facts alleged under Plaintiffs' claims for fraud also support a claim for civil conspiracy . . . ."). To the extent Plaintiffs' trade secret claims survive, any tort claims are based on trade secrets misappropriation are barred and summary judgment should be granted.

### B. Plaintiffs Could Not Have Taken Advantage of the F2 Corporate Opportunity

Even assuming, *arguendo*, that Defendants had an obligation to disclose Empire's independent business and did not, Plaintiffs' claims relating to the TPPPS gaming opportunity at the Hawaiian Gardens Casino fail for separate reasons. *See* SAC ¶ 319. As background, in January 2020, Mr. Feng formed F2 TPS, LLC ("F2") to provide third-party proposition player services ("TPPPS") for the Hawaiian Gardens Casino, a California card room. Ex. A-4 (F. Feng Dep. (Vol. I)) at 73:20-74:19. Under California law, card rooms cannot directly operate a player-dealer game and therefore commonly contract with a licensed TPPPS to participate as players and assume the bank role in compliance with regulatory requirements.[25] *See* CAL. PENAL CODE § 330; *see also Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 981 P.2d 990, 996 (Cal. 1999); Ex. E (Declaration of Tiffany Lichtig) ¶ 10-11. Plaintiffs contend Mr. Feng failed to disclose the opportunity to provide TPPPS to Hawaiian Gardens and thereby misappropriated it for himself. But that theory is actionable only if Plaintiffs can prove that the F2 opportunity belonged to them in the first place— that is, that they had an expectancy interest or property right in it. *Cap. Advisors, LLC v. Cai*, 548 P.3d 1202, 1210 (2024). To establish such an expectancy, it is not enough that the opportunity would have been valuable; rather, Plaintiffs must show a "practical, not a mere theoretical, basis" to pursue it. *Id.*; *Astarte, Inc. v. Pac. Indus. Sys., Inc.*, 865 F. Supp. 693, 707 (D. Colo. 1994); *see also Horton Grand Saddlery Hotel Joint Venture v. Rose*, 64 F.3d 666 (Table), 1995 WL 499789,

---

[25] In support of this Motion, Defendants submit the Declaration of Tiffany Lichtig, who is an expert in TPPPS licensing. *See* Ex. E ("Lichtig Dec."). For the Court's convenience, Ms. Lichtig's declaration provides information regarding California's regulatory framework governing card rooms and TPPPS providers, including the applicable licensing requirements.

26

51259649

at *3 (9th Cir. 1995). They cannot do so here for three independent reasons.

First, Plaintiffs were legally incapable of pursuing the F2 opportunity when it arose. At the time, California law barred any person or entity with "any financial interest" in a house-banked gambling operation—wherever located—from obtaining a TPPPS registration or license. *See* CAL. CODE REGS. tit. 4, § 12204(f) (repealed); CAL. BUS. & PROF. CODE § 19858(a); Ex. E ¶ 13, 16. Paradise derived substantial revenue from casino management operations in Macau, including revenue-sharing from house-banked games—activity that California law prohibited in this context. *See* Ex. A-2 (Chan Dep. Day 1) at 37:5-39:8 (Paradise received approximately ***$60-80 million*** dollars for its casino management services); Ex. B-54 (PARADISE 00032985) at 7, 10-11, Ex. B-55 (PARADISE 00033167) at 9, 11-12; Ex. E ¶ 18. That licensing barrier is fatal. Under Nevada law, Plaintiffs needed a "practical, not a mere theoretical, basis" to exploit the opportunity. *See Cap. Advisors*, 548 P.3d at 1210 (affirming judgment as a matter of law); *see also Rasmussen v. Lopez*, 127 Nev. 1169, 373 P.3d 953, *3 (2011). A plaintiff that cannot lawfully obtain the license necessary to pursue an opportunity has no corporate opportunity claim as a matter of law. *See, e.g.*, *Goodman v. Perpetual Bldg. Ass'n*, 320 F. Supp. 20, 36-37 (D.D.C 1970).[26]

Second, even if Plaintiffs could become licensed in California, TPPPS was not "reasonably incident" to Plaintiffs' "present or prospective business." *Robinson, Leatham & Nelson, Inc. v. Nelson*, 109 F.3d 1388, 1392 (9th Cir. 1997).[27] Plaintiffs' business is the research and development of electronic gaming equipment and systems, and selling those products in North America, Macau, and elsewhere. Ex. A-3 (Chun Dep.) at 77:11–78:4. TPPPS is something entirely different: a licensed financial-services business that supplies services to California card rooms. *See* Ex. E ¶ 11. Plaintiffs have never operated a TPPPS business. *See* Ex. A-8 (M. Medero Dep.) at 155:15–156:3.

---

[26] *See also Alexander & Alexander of New York, Inc. v. Fritzen*, 147 A.D.2d 241, 248-49 (1st Dep't 1989); *In re Albion Disposal, Inc.*, 152 B.R. 794, 818 (Bankr. W.D.N.Y. 1993) ("[A] defense against usurpation of corporate opportunity is the corporation's inability to take advantage of the opportunity for itself. This inability may stem from financial, practical or legal considerations. A firm may be barred by regulation from pressing an opportunity.").

[27] *See also Block on behalf of Carrier Project, Inc. v. Maro Chermayeff, Carrier Project*, Inc., No. 2:09-CV-01046, 2010 WL 11507602, at *5 (C.D. Cal. Aug. 16, 2010) (*quoting Industrial Indem. Co. v. Golden State Co.*, 117 Cal. App. 2d 519, 533, 256 P.2d 677 (1st Dist. 1953)) (directors and officers can engage in an independent enterprise that is "similar" the corporation's business provided it does "not interfere with the business enjoyed by the corporation"); *Keg Techs., Inc. v. Laimer*, 436 F. Supp. 2d 1364, 1376 (N.D. Ga. 2006) (finding no breach of fiduciary duty when selling devices that "were not 'competing products' with any product offered" by plaintiff).

27

51259649

They cannot plausibly say that they could have taken advantage of the opportunity just because it was related to gaming; the gaming industry is massive, with different divisions within it.   Ex. A-40 (Baldwin Dep.) at 67:12-71:12; Ex. A-56 (Glaser Dep.) at 102:18-106:8.  This disconnect is underscored by how Mr. Feng learned of the opportunity: through a close personal friend who was then consulting for Empire—not through his position with LT Game. *See Robinson*, 109 F.3d at 1394; Ex. A-4 (F. Feng Dep. (Vol. I)) at 59:20–21, 141:22–142:1; Ex. B-50 (ETG_00000194099).

This underscores the fact that pursuing the F2 opportunity did not place Mr. Feng in conflict with any duty he owed LT Game or Plaintiffs. *See Broz v. Cellular Info. Sys., Inc*., 673 A.2d 148, 157 (Del. 1996) ("[T]he corporate opportunity doctrine is implicated only in cases where the fiduciary's seizure of an opportunity results in a conflict between the fiduciary's duties to the corporation . . ."). F2's work for Hawaiian Gardens did not compete with LT Game's sale of gaming equipment. Because the F2 opportunity was outside Plaintiffs' line of business and created no conflict with Mr. Feng's duties, Plaintiffs had no cognizable interest in it.

Plaintiffs' documents confirm the point. Just two months before the F2 opportunity, in October 2019, Mr. Chan traveled to Nevada to discuss structures through which Paradise might invest in the U.S. gaming market, including licensing requirements, with attorneys at Lewis Roca—including an opportunity Mr. Feng had raised to Dr. Chun and Mr. Chan in September 2019 to acquire an existing electronic-gaming business with 55 active gaming licenses. Ex. B-51 (ETG_00000111164); Ex. B-23 (ETG_00000331546). Lewis Roca prepared a memorandum analyzing possible investment structures on the express premise that "Paradise does not want to get licensed." Ex. B-52 (PARADISE 00049143); Ex. B-39 (PARADISE 00007479) at 2.

Because TPPPS requires licensure (*see supra*), it fell squarely within a category of business that Paradise had already indicated it did not want to engage in. Further, years earlier Mr. Feng actually proposed that Plaintiffs consider establishing a California card-room operations management company and a TPPPS business, as well as acquiring an equity interest in a California card room (the Aviator Casino). Ex. B-53 (ETG_TRANSLATION_00000000367 (PARADISE 00055335)).  Plaintiffs did not pursue the opportunity, choosing instead to focus on slot machines.

Third, even if Plaintiffs could somehow have satisfied California's licensing requirements

28

51259649

and were engaged in this sort of business, they could not have done so in time to obtain the business. Hawaiian Gardens had only 60 days to secure a TPPPS provider—it needed an applicant that regulators could approve within that narrow window or would otherwise face an immediate loss of gaming activity and revenue. *See* Ex. B ¶ 28 Ex. E at ¶ 12; Ex. A-69 (Capitol Weekly article). Plaintiffs plainly were not such an applicant. Paradise's status as a public company, combined with Plaintiffs' layered web of affiliates and subsidiaries, would have created regulatory delay. *E.g.*, Ex. A-2 (L. Chan Dep. (Vol. I)) at 51:9-52:19 (estimating Paradise has 100 subsidiaries). As a publicly traded company, Paradise would have had to identify its shareholders, require the necessary owners to complete personal disclosures and background investigations, and ensure that no owner was subject to a statutory or regulatory disqualifier for Paradise's application. *See* CAL. BUS. & PROF. CODE, §§ 19852, 19858, 19858.5, 19859; Cal. Code Regs., tit. 4, §§ 12201, 12202, 12204; Ex. E at ¶ 20-26. Yet Paradise could not even identify all of its shareholders, and, in any event, it likely had hundreds or thousands of shareholders and ownership changed daily through public trading.[28] Ex. A-2 (L. Chan Dep. (Vol. I)) at 51:7-52:7. On these facts, Plaintiffs had no "practical basis" to pursue the opportunity. *See Cap. Advisors*, 548 P.3d at 1210.

Hawaiian Gardens, facing a 60-day deadline, would not have selected an applicant burdened by that kind of approval risk in the first place; in fact, no public company like Paradise had been licensed under that period's TPPPS regulatory scheme. *See* Ex. E ¶ 21; *Moser v. Devine Real Estate, Inc.* (Fla.), 42 A.D.3d 731, 735-36 (N.Y. Ct. App. 2007) ("[E]vidence that the third party would not have done business with the corporation . . . is sufficient to preclude the finding that a corporate opportunity existed."); *Rankin v. Frebank Co.*, 47 Cal. App. 3d 75, 88, 121 Cal. Rptr. 348, 357 (Ct. App. 1975) (same) (quoting 19 Am.Jur.2d, Corporations, § 1313, p. 721). Plaintiffs cannot prove that the F2 opportunity was theirs. It was outside their line of business, they had already declined to enter that business, they were barred from obtaining the required license, and they could not have been approved in time even if licensure were theoretically possible. Because Plaintiffs had no

---

[28] By contrast, Mr. Feng was F2's sole owner, and California regulators had already vetted his suitability in connection with Empire's licensure to sell gaming products in the state, which had been granted on or around April 2019. *See* Ex. B ¶ 21. F2 therefore posed materially less regulatory risk than an unfamiliar applicant with a complex and diffuse ownership structure. *See* Ex. E ¶ ¶ 26, 29.

29

51259649

expectancy interest in the F2 opportunity, the claim fails as a matter of law.

### C. Plaintiffs' Trade Secrets Misappropriation Claims Fail as a Matter of Law.

#### 1. Plaintiffs Identify No Trade Secrets Beyond Source Code.

As the Court already recognized, Plaintiffs alleged a laundry list of supposed trade secrets. *See* Order Granting in Part Rule 12(c) Mot. to Compel at 6, Dkt. No. 155 (Mar. 19, 2026); *see also* SAC ¶ 16. That may suffice at the pleading stage, but not at summary judgment. Plaintiffs must identify the asserted trade secret with sufficient particularity to distinguish it from general industry knowledge or the know-how of skilled employees. *See Aristocrat Techs., Inc. v. Light & Wonder, Inc.*, 2024 WL 4415361, at *2 (D. Nev. Sept. 20, 2024) (Navarro, J.), opinion clarified, 2024 WL 4332060 (D. Nev. Sept. 27, 2024), and appeal dismissed, 2024 WL 5277374 (9th Cir. Oct. 16, 2024). The only potential trade secrets that the record actually pinpoints are source code for two products: Golden Frog and the LTShoe. Unlike the source code, the remaining items Plaintiffs list are vague descriptions untethered to specific evidence. Summary judgment should therefore be granted as to any alleged trade secret other than the Golden Frog and LTShoe source code.

#### 2. Empire Owned the Golden Frog Source Code, and Defendants Did Not Acquire Any Source Code by Improper Means.

The Golden Frog theory fails at the threshold because the parties' written agreement under which Empire distributed Plaintiffs' slot machine games, such as Golden Frog, provides that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮." *See* Ex. B-4 (ETG_00000159329) (Game Development Agreement) at § 7 (emphasis added). Likewise, the Distributorship Agreement provides that, once Empire accepted Paradise's products, Empire had "▮▮▮▮▮▮▮▮" to manufacture them and make additions, alterations, or improvements to them as its own devices, and *Paradise retained* ▮▮▮▮▮▮ ▮▮▮▮▮," those devices. *See* Ex. B-3 (ETG_00000082267) (Distributorship Agreement) at § 3.4(B) (emphasis added). In return, Plaintiffs received ninety percent of all sales revenue. *Id.* § 3.5. As to Golden Frog, that is a complete defense: Plaintiffs cannot maintain a trade-secret misappropriation claim against Empire for source code that Empire owned. *See Agensys, Inc. v. Regents of Univ. of California*, No. CV 24-3961-JFW(PDX), 2024 WL 5679162, at *4 (C.D. Cal.

30

51259649

Oct. 22, 2024) ("[I]n the absence of ownership of the purported trade secret, a plaintiff lacks standing to assert a DTSA claim.") (citing *Attia v. Google LLC*, 983 F.3d 420, 425 (9th Cir. 2020)).

In any event, misappropriation requires proof of improper acquisition—such as theft, bribery, misrepresentation, or espionage. *See* NEV. REV. STAT. § 600A.030. Plaintiffs have no such evidence because the record establishes the opposite with respect to both products: Empire obtained source code with Plaintiffs' knowledge and consent as part of the parties' distribution arrangement. The contracts are explicit—Plaintiffs vested ownership in Empire; and, as to the LTShoe, they at minimum gave Empire the very access, possession, and use rights Plaintiffs now try to relabel as "misappropriation." *See* Ex. B-3 (ETG_00000082267) (Distributorship Agreement) at § 3.4(B); Ex. B-4 (ETG_00000159329) (Game Development Agreement) at § 7.

This arrangement was foundational to the Parties' business relationship and necessary for Empire to distribute Plaintiffs' products in the United States. Because Plaintiffs were unlicensed, their products could be sold only if a licensed entity like Empire "assumes responsibility" for them—meaning that Empire had to "[a]cquire complete control over, or ownership of," the products and "[a]ccept continuing legal responsibility" for them, including control over product modifications. *See* NEV. REV. STAT. §§ 463.01715(2)(a)(1)–(2), 463.650(13)(b); Ex. A-4 (Feng Dep. (Vol. 1)) at 63:8-25. As part of that control, Empire submitted Plaintiffs' games to independent test laboratories in the course of obtaining regulatory certifications, which requires submitting source code. Ex. A-10 (D. So Dep.) at 20:11-22:16; Ex. A-11 (J. Wu Dep.) at 47:22-48:2. Plaintiffs cannot now recharacterize conduct authorized by contract and required by regulation as misappropriation. *See* NEV. REV. STAT. § 600A.030 (defining misappropriation as, among other things, disclosure or use ***without consent***) (emphasis added); *see also Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 758 (9th Cir. 2008) ("[H]aving concluded that [plaintiff] granted [defendant] an implied, unlimited license to the programs software, we conclude that [defendant] could not have misappropriated [plaintiff's] trade secret."); *see also JustMed, Inc. v. Byce*, 600 F.3d 1118, 1129 (9th Cir. 2010).

### 3. Plaintiffs Have No Evidence of Unauthorized Use or Disclosure.

Authorized acquisition leaves Plaintiffs one remaining path: prove that Defendants later

31

51259649

used or disclosed the source code without consent. The record forecloses that theory too because there is no evidence that Defendants used the code to sell an unauthorized competing product. *See JustMed, Inc. v. Byce*, 600 F.3d at 1130 ("The term 'use' in the context of misappropriation of a trade secret generally contemplates some type of use that reduces the value of the trade secret to the trade secret owner."). Plaintiffs have no evidence of Golden Frog sales in the United States at all—Plaintiffs' damages expert conceded he has no product-level slot sales data for Empire and no data showing sales of the Golden Frog game specifically. *See* Ex. A-57 (Nelson Dep.) at 216:19-217:17; *JustMed, Inc. v. Byce*, 600 F.3d at 1131 ("That [defendant] did not use the source code is evident from the damages analysis."). And even if Plaintiffs could identify some Golden Frog sales, that still would not prove misappropriation. As to the card shoe, Plaintiffs' own theory confirms why this is not a trade-secret case. They allege that Empire "unlawfully retained" their card shoe—not that Defendants destroyed the value of the LTShoe source code or exploited that code to build a competing product. SAC ¶¶ 216, 217 ("Empire has not manufactured its own card shoe product and has only ever distributed Plaintiffs' Smart Card Shoe product."). At most, Plaintiffs allege that Empire failed to remit Plaintiffs' claimed share of revenue under an ongoing commercial arrangement. That is a contract dispute, not trade-secret misappropriation.

> **4.      Plaintiffs Also Cannot Prove Damages From Any Alleged Golden Frog Misappropriation.**

Plaintiffs must establish actual loss or unjust enrichment caused by the alleged misappropriation. *See* 18 U.S.C. § 1836(b)(3)(B); NEV. REV. STAT. § 600A.050. They can do neither. Plaintiffs have no evidence of unauthorized Golden Frog sales in the United States, so they cannot show any resulting loss, and because their expert lacks product-level sales data and no evidence identifies profits attributable to Golden Frog, they likewise cannot prove unjust enrichment. *See* Ex. A-57 (Nelson Dep.) at 216:19-217:17. Without evidence of damages as a result of any alleged Golden Frog misappropriation, the claim fails. *See NLRK, LLC v. Indoor Ag-Con, LLC*, No. 3:21-CV-00073-CSD, 2023 WL 3724741, at *12 (D. Nev. May 30, 2023).

51259649

**D. Paradise's Copyright Claims Fail as a Matter of Law.**

    **1.    Empire Owned the Golden Frog Code and Created the Product First.**

Paradise also asserts a copyright infringement claim against all Defendants regarding the Paradise Golden Frog source code and the LTShoe source code. *See* SAC ¶ 204 *et seq.* To prove copyright infringement, Paradise must establish (i) ownership of a valid copyright and (2) unauthorized copying of protected expression. *See Adherence v. CVS Pharmacy, Inc.*, No. 2:24-CV-1590, 2025 WL 1798883, at *2 (D. Nev. June 25, 2025) (Mahan, J.) (citation omitted).

Paradise cannot do either as to Golden Frog. As explained above, the parties' written agreements provide that Empire owed the Golden Frog source code. *See* Ex. B-3 (ETG_00000082267) (Distributorship Agreement) at § 3.4(B); Ex. B-4 (ETG_00000159329) (Game Development Agreement) at § 7. Defendants cannot have copied Paradise's Golden Frog source code to create a product that already existed. *See Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) ("[I]ndependent creation is a complete defense to copyright infringement").

Even putting ownership aside, the chronology independently defeats the claim. The undisputed evidence shows that Empire created the Golden Frog Baccarat table game before Paradise created the Golden Frog slot-machine game it now invokes. *See* Ex. C ¶ 8-9; Ex. A-18 (Dolan Dep.) at 114:2-10; Ex. A-59 (Omohundro Dep.) at 83:23-84:5 ( ▮▮▮ ▮▮▮ ▮▮▮ Ex. A-58 (Cranford Dep.) at 116:21-25, 117:7-11. In fact, LT Game had nothing to do with creating the Golden Frog Baccarat table game. *See* Ex. A-58 (Cranford Dep.) at 118:8-22 ▮▮▮ ."). Moreover, the original Golden Frog Baccarat game was a table game, not a software product. There was no Golden Frog "source code" to copy when Empire created that game. *See* Ex. A-39 (Olson Dep.) at 42:3-4; Ex. A-11 (J. Wu Dep.) at 49:7-11 (" ▮▮▮ ."). Defendants cannot have copied Paradise's Golden Frog source code to create a product that already existed. The same chronology defeats any theory based on the Golden Frog app: Empire created the app first too. If

33

51259649

anything, the record shows *the flow of assets ran the other direction*—Empire shared its Golden Frog assets with Paradise so Paradise could create its own Golden Frog slot content. *See* Ex. A-70 (ETG_00000131258) (directing Empire employee to send "███████████████" to Paradise). On this record, Paradise cannot prove copying.

### 2. Defendants Never Created Their Own Shoe.

The LTShoe theory fails because Paradise cannot show copying. Paradise expressly alleges that Defendants **did not** create a competing shoe. SAC ¶ 217 ("Empire has not manufactured its own card shoe product and has only ever distributed Plaintiffs' Smart Card Shoe product."). Rather, Paradise alleges that Empire "retained" Plaintiffs' shoe (*see id.* ¶ 216)—but rebranding or distributing Plaintiffs' product is not the same as copying Plaintiffs' source code. Mere possession of copyrighted material is not infringement. *See, e.g., Lapham v. Porach*, 2007 WL 1224924, at *6 (S.D.N.Y. Apr. 25, 2007); *see also* 17 U.S.C. § 501(a) (protecting exclusive right to reproduction, adaptation, distribution, performance, and display); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 787–88 (5th Cir. 1999) (use outside that scope does not constitute copyright infringement). At most, Plaintiffs allege a contract dispute over Empire's distribution of the production—not copyright infringement. *See, e.g., Graham v. James*, 144 F.3d 229, 236–38 (2d Cir. 1998) (holding non-payment of royalties under a copyright license to be breach-of-contract claim, not copyright infringement); *Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 534 (M.D.N.C. 2005) (granting summary judgment "[b]ecause the payment term is a covenant of the Agreement, Defendant's remedy does not lie in copyright infringement, but in breach of contract").

### 3. In Any Event, Defendants Had at Least an Implied License as to Both Products.

Even apart from the product-specific failures above, Paradise's copyright claim fails because Defendants had, at minimum, an implied license to copy and use code for both Golden Frog and the LTShoe as required by the parties' relationship. As the trade-secret section explains, the parties' agreements gave Empire broad rights to manufacture Plaintiffs' products, make additions, alterations, and improvements, rectify faults, and support regulatory certification and distribution in the United States. *See* Ex. B-3 (ETG_00000082267) (Distributorship Agreement) at

34

51259649

§ 3.4(B); Ex. B-4 (ETG_00000159329) (Game Development Agreement) at § 7.

### E.  LT Ltd.'s Unjust Enrichment and Conversion Claims Fails.

The Court should grant summary judgment on LT Ltd.'s unjust enrichment and conversion claims because there is no evidence that *LT Ltd.* conferred a benefit on Empire or Mr. Feng, or that they converted *LT Ltd.'s* funds.  Conferring a benefit on a defendant is a key element of any unjust enrichment claim.  *See Backman v. Goggin*, No. 2:16-CV-1108, 2017 WL 1015008, at *4 (D. Nev. Mar. 15, 2017) (Mahan, J.).  And conversion requires wrongfully exerting dominion over another's personal property in denial that person's rights. *See New England Life Ins. Co. v. Lee*, No. 2:14-CV-1797, 2015 WL 1413391, at *8 (D. Nev. Mar. 27, 2015) (Mahan, J.) (citation omitted). Plaintiffs' theory is that "Plaintiffs paid large sums of money" to Empire and Mr. Feng, constituting unjust enrichment and conversion.  *See* SAC ¶ 277, 307.  Yet there is no evidence that *LT Ltd.* paid large (or any) sums of money to either, or that any Defendant converted any of *LT Ltd.'s* funds. Instead, the evidence establishes that Paradise would send money to LT Game, and LT Game would pay Empire.  Ex. A-9 (Chattin Dep.) at 57:19-58:6; *see also* Ex. A-8 (Medero Dep.) at 177:25-179:6 (Q: "Did *Paradise* cover expenses for Empire . . ." A: "Maybe indirectly.").  LT Ltd. was not involved in the funding.  This evidentiary deficiency is fatal.

### F.  Plaintiffs' Unjust Enrichment Claim Fails Because Written Contracts Govern the Alleged Harm.

All of Plaintiffs' unjust enrichment claims fail because, as quasi-contractual claims, they cannot persist when a contract covers the same behavior. *Leach Logistics, Inc. v. CF USA, Inc.*, 751 F. Supp. 3d 1087, 1113 (D. Nev. 2024) (Du, C.J.) ("An action based on a theory of unjust enrichment is not available when there is an express, written contract.") (*citing Leasepartners Corp. v. Robert L. Brooks Tr.*, 113 Nev. 747, 942 P.2d 182, 187 (1997)). "As a threshold matter, because unjust enrichment permits recover[y] by quasi-contract only where an express contract does not exist, [Plaintiffs'] unjust enrichment claim[s] can only survive to the extent" they seek recovery for harm outside the coverage of the express contracts. *Leach Logistics*, 751 F. Supp. At 1113.

The behavior Plaintiffs complain about for this claim asserted against Empire and Mr. Feng—paying large sums of money to unknowingly support Mr. Feng's unlawful personal business

51259649

agenda—is covered by the contracts at issue. The evidence shows that the Distributorship Agreement (and the subsequent agreements between Plaintiffs and Mr. Feng and Paradise) covers any alleged breaches of exclusivity, any failures to pay Plaintiffs for selling other products, any alleged use of licenses to sell products other than Plaintiffs', any legal services Plaintiffs should not have paid for, and any other alleged violation that undergirds Plaintiffs' claim. *See* SAC ¶¶ 300–308. l those alleged payments were made by Plaintiffs pursuant to those agreements. If Empire and Mr. Feng breached, Plaintiffs could have asserted a breach of contract claim. They did not. They do not get an unjust enrichment claim instead.

### G. LT Game's Breach of Contract Claims Fail.

The Court should grant summary judgment for Defendants on Plaintiffs' contract claims because the contracts LT Game had with Mr. Allison, Mr. Kiely, and GSL—contracts Plaintiffs attached to their complaint (Dkt. Nos. 1-1, 1-4, 1-5)—simply did not include noncompete provisions applicable to the actions they complain about, and there is no evidence that those Defendants breached their confidentiality provisions.

### 1.    The Claim As To Mr. Allison Fails.

Plaintiffs allege that Mr. Allison had a noncompete agreement and confidentiality agreement with LT Game, and that he breached both provisions. *See* SAC ¶ 354. His relevant employment contract states the following regarding noncompetition:

> You hereby covenant with and undertake to the Company that you shall not directly or indirectly: (a) at any time during the term of this Agreement and upon termination, are subject to the non-compete clause. During which time the Company will compensate him an amount equal to his base salary for the period of the noncompete. ***The noncompete duration will be negotiated upon at the time of termination by both parties***.

Dkt. 1-4 at 7 (emphasis added). It states the following regarding confidentiality:

> During and after your employment, you shall not . . . make use of or divulge, reveal or publish to any person, firm or company . . .any of the trade secrets, operations, software, programs, processes, formulae or methods of the Company and/or its Group . . ."

Dkt. 1-4 at 6. However, even though the covenant references a non-compete clause, ***Mr. Allison's employment agreement does not actually include an enforceable noncompete provision***, and

51259649

there is no separate noncompete agreement either.  *See* Dkt. 1-4 at 7; *see also* Ex. D (Declaration of Kelcey Allison) at ¶ 6.  In fact, the above reference indicates that the noncompete will be negotiated later . . . but it never was.  A party cannot breach a contract provision that does not exist.  *See Amer. Fire and Casualty Co. v. Unforgettable Coatings, Inc., et al.*, No. 2:21-CV-1555, 2023 WL 2930042, at *2 (D. Nev. Apr. 13, 2023) (Mahan, J.) (noting a breach of contract claim requires a breach by the defendant).  Because a noncompete was never agreed to, he could not breach it.

Second, even if there was a noncompete provision somewhere in the contract or was negotiated later, there is no evidence that Mr. Allison received any compensation—much less his base salary—in exchange for that noncompete.  A noncompetition clause is unenforceable unless the noncompetition covenant is, among other things, supported by valuable consideration.  *See* NEV. REV. STAT. § 613.195(a).  "[B]ecause the loss of a person's livelihood [via a noncompete provision] is a very serious matter, post-employment anti-competitive covenants are scrutinized with greater care than are similar covenants . . ." *Ellis v. McDaniel*, 95 Nev. 455, 458-459 (1979).  Here, the evidence is clear that Mr. Allison ***did not*** receive ***any*** compensation for an agreement not to compete.  *See* Ex. D ¶ 7. He was therefore not subject to a noncompete provision.

Plaintiffs' claim based on alleged breach of a confidentiality provision likewise fails.  Plaintiffs allege that Mr. Allison "used [his] special knowledge of confidential LT Game and Paradise Group information to support Mr. Feng and Empire's scheme." SAC ¶ 355.  But there is no evidence that this occurred at all—let alone evidence of "specific instances where [Mr. Allison] divulged trade secrets or confidential and proprietary information" nor evidence of the specific confidential information he allegedly disclosed. *See Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 312 F. Supp. 3d 944, 963 (D. Nev. 2018), on reconsideration in part, No. 315CV00294MMDVPC, 2018 WL 3127454 (D. Nev. June 26, 2018).

**2.    The Claim As To Mr. Kiely Fails.**

Similar to Mr. Allison, Plaintiffs also allege that Mr. Kiely had a noncompete agreement and confidentiality agreement with LT Game pursuant to his employment agreements with LT Game, and that he had an agreement that any intellectual property he created while an employee would be LT Game's property.  *See* SAC ¶¶ 354–355.  His confidentiality agreement generally

37

51259649

mirrors Mr. Allison's. *Compare* Dkt. 1-1 at 4, *with* Dkt. 1-4 at 6. Yet unlike Mr. Allison, Mr. Kiely's employment agreement does not mention a noncompete agreement or provision **at all**. *See* Dkt. 1-1 (2019 employment agreement for position as Chief Technology Officer); *see also* Ex. C-9 (ETG_00000250013) (2016 employment agreement for position as Executive Director). Plaintiffs nonetheless alleged that he breached one.

Mr. Kiely cannot breach a contract provision that does not exist. The evidence shows that his contract did not contain a noncompete provision; the word "noncompete" literally does not appear in it (unlike Mr. Allison's, where the word is at least used to reference a potential, separate agreement). LT Game's claim therefore fails the most basic contractual element: there is no enforceable contract to breach. *See Amer. Fire and Casualty Co.*, 2023 WL 2930042, at *2) (noting a breach of contract claim requires an enforceable contract). Summary judgment should be granted.

Likewise, there is no evidence that Mr. Kiely breached the confidentiality provision. Plaintiffs allege that he "used [his] special knowledge of confidential LT Game and Paradise Group information to support Mr. Feng and Empire's scheme." SAC ¶¶ 354-355. But there is no evidence this occurred, and none of what specific confidential information Mr. Kiely allegedly disclosed. *See Chemeon Surface Tech*, 312 F. Supp. 3d at 963. In fact, he did not disclose. Ex. C ¶ 14.

Finally, there is no evidence that Mr. Kiely improperly assigned any intellectual property rights to Defendants while providing services to LT Game. Mr. Kiely's intellectual property provision states that all "Intellectual Property . . . made by you or that come into your possession **whilst providing the Services under this agreement** remain the property of LT Game . . . ." Dkt. No. 1-1 at 4. This provision is limited not only to the term of the agreement but also—and more relevant here—to only situations where Mr. Kiely was performing services for LT Game. Unlike broader intellectual property provisions that might encompass any work product created during the contract term regardless of context, this provision reflects the Parties' shared understanding that Mr. Kiely worked for both LT Game and Empire concurrently. Plaintiffs therefore have the burden to demonstrate not just that Mr. Kiely made or came into possession of intellectual property that he assigned to Empire at some point during his contract with LT Game, but also that he made or came into possession of it **whilst providing services** to LT Game. There is no evidence of that. In fact,

38

51259649

the only evidence proves the opposite.  *See* Ex. C ¶ 13. Summary judgment should be granted.

### 3.   The Claim As To GSL Fails.

Plaintiffs' claim as to GSL is weaker. GSL's contract with LT Game is different than Mr. Kiely's and Mr. Allison's, with different provisions and obligations.  *See* Dkt. No. 1-5 at 2.  Yet Plaintiffs make the same allegations: that GSL had agreed not to compete against LT Game, that it agreed to confidentiality with LT Game, and that it breached both agreements.  SAC ¶¶ 354-355.

GSL did not breach its noncompete provision because it did not work with any of the named companies. Unlike Mr. Kiely's and Mr. Allison's contracts, there is actually a noncompete provision in GSL's contract.  However, as required by Nevada law, it is narrow and specific:

> "The Consultant . . . will not undertake any substantially similar jobs or duties ***with any of the following named companies*** during the term of this Agreement . . . : IGT, Novamatic, Ainsworth, Light & Wonder (formerly known as Scientific Games), Konami, Aruze, Aristocrat, Interblock or Everi."

Dkt. No. 1-5 at 7 (emphasis added).  The next provision clarifies the scope even more:

> "[T]he Consultant agrees to refrain from engaging, directly or indirectly, in any form of direct competition . . . ***with any of the aforesaid gaming manufacturers referenced in Section 7(a) above***."

Dkt. No. 1-5 at 7 (emphasis added).  Under those two provisions, the only way GSL can breach its noncompete provision with LT Game is if it works for any of those named companies.

There is no evidence that GSL ever worked for those companies; the only evidence says otherwise.  Ex. D ¶ 9.  In fact, Plaintiffs don't even allege that GSL breached the noncompete in that way; instead, Plaintiffs' claim is based on an entirely different theory: that GSL breached the noncompete because it "performed work for Mr. Feng and Empire in furtherance of Mr. Feng's fraudulent scheme to build up a competing business against LT Game and the Paradise Group and usurp LT Game in the market."  SAC ¶ 355.  Regardless of the merits of those allegations—and even if the Court were to assume the worst of GSL—those actions clearly do not fall within the scope of GSL's noncompete provision.  Because there is thus no evidence that GSL breached the noncompete provision ***as it is written***, and because Plaintiffs do not even allege a breach of the provision as written, the claim fails as a matter of law and summary judgment should be granted.

Finally, there is no evidence that GSL breached the confidentiality provision. The

51259649

confidentiality provision in GSL's agreement is broad and vague. *See* Dkt. No. 1-5 at 3, 6. However, there is no evidence that GSL (or its employees), during the life of its contract, ever disclosed confidential information to any party. There is thus no evidence that GSL breached.

### H. LT Game's Tortious Interference Claims Fail.

The Court should also grant summary judgment on LT Game's tortious interference claims against Mr. Feng and Empire. A tortious interference claim requires "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *New England Life Ins. Co. v. Lee*, No. 2:14-CV-1797, 2015 WL 1413391, at *9 (D. Nev. Mar. 27, 2015) (Mahan, J.). LT Game's claim is that Mr. Feng and Empire interfered with LT Game's contracts by inducing Mr. Allison, Mr. Kiely, and GSL to breach their noncompetes. SAC ¶ 365. But those noncompete provisions are either nonexistent or inapplicable. There is thus no contractual provision to disrupt. Summary judgment should be granted.

### V.   CONCLUSION

Defendants ask the Court to grant this motion and enter summary judgment in their favor on the claims above.

Dated: 20th day of April, 2026.

Respectfully submitted,

*/s/ Patrick J. Reilly*
Patrick J. Reilly
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
100 North City Parkway, 16th Floor
Las Vegas, Nevada 89106

Mark Oakes (*pro hac vice*)
Zach McHenry (*pro hac vice*)
Ethan Glenn (*pro hac vice*)
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Boulevard, Suite 1100
Austin, Texas  78701-4255

*Attorneys for Defendants*

40

51259649

**INDEX OF EXHIBITS**

Appendix A: Chart of Claims

41

51259649

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b) and Section IV of the District of Nevada Electronic Filing Procedures, I certify that the foregoing *Defendants' Motion for Partial Summary Judgment* was served via electronic service on April 20, 2026, to all parties on the CM/ECF service list.

/s/ Patrick J. Reilly

Patrick J. Reilly

42

51259649