Oliver J. Pancheri, Esq. (Nevada Bar No. 7476)
Jessica M. Lujan, Esq. (Nevada Bar No. 14913)
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
         jlujan@spencerfane.com

Robert T. Stewart, Esq. (Nevada Bar No. 13770)
Stewart Ray Nelson, Esq. (*pro hac vice*)
  Utah Bar No. 17286
Hannah L. Andrews, Esq. (*pro hac vice*)
  Utah Bar No. 18157
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
         srnelson@foley.com
         handrews@foley.com

Jean-Paul Ciardullo, Esq. (*pro hac vice*)
  California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

Dariush Keyhani (*pro hac vice*)
**KEYHANI LLC**
1050 30th Street NW
Washington, DC 20007
Tel: (202) 748-8950
Email: dkeyhani@keyhanillc.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; and LT GAME, INC., a Nevada corporation, and LT GAME LIMITED, a British Virgin Islands Corporation,<br><br>    *Plaintiffs, Counterdefendants*,<br><br>    vs.<br><br>EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; and DARYN KIELY, an individual; and YI ZHAO, an individual,<br><br>    *Defendants, Counterclaimants*. | Case No. 2:24-cv-00428-JCM-BNW<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION**<br><br>[ORAL ARGUMENT REQUESTED] |

**CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     DEFENDANTS DISTORT HISTORY AND PLAINTIFFS' LEGAL
        THEORIES ........................................................................................................2

        A.      Mr. Feng Was Dependent On Dr. Chun, And Dr. Chun Trusted Him
                As Family .............................................................................................2

        B.      Defendants Incorrectly Frame Plaintiffs' Legal Theories..........................4

III.    THE FRAMEWORK AGREEMENT DOES NOT SUPPORT
        DEFENDANTS' UNPLED AFFIRMATIVE DEFENSE OF CONSENT ...........4

V.      DEFENDANTS COMMITTED YEARS OF FRAUD; PLAINTIFFS HAD
        NO NOTICE ....................................................................................................10

                1.      Defendants' Fiduciary And Contractual Duties............................10

                2.      The Scope Of LT Game's Potential Corporate
                        Opportunities Was Broad................................................................11

                3.      Defendants Engaged In Both Express
                        Misrepresentations And Concealment ...........................................12

                4.      Defendants Are Estopped From Arguing That Plaintiffs
                        Should Have Figured Out That They Were Being
                        Defrauded ......................................................................................13

                5.      Defendants Conspired To Usurp Table Games............................16

                6.      Defendants Allowed Plaintiffs To Believe Empire Was
                        Exclusive To Plaintiffs ..................................................................17

                7.      Mr. Feng Covertly Formed Numerous Companies To
                        Implement His Plans .....................................................................18

                8.      Defendants Devoted Their Time And LT Game
                        Resources To Empire .....................................................................19

                9.      Mr. Feng Leveraged Plaintiffs' Own Lawyers To
                        Deceive Plaintiffs ..........................................................................21

                10.     All Post-2016 Agreements Are Void As Having Been
                        Procured By Fraud, And Regardless Do Not Support
                        Defendants' Arguments..................................................................22

                11.     Defendants Covered Up Their 2022 Theft Of LT
                        Game's Card Shoes .......................................................................24

                12.     Mr. Feng Misled Plaintiffs About His Resignation, And
                        Continued To Conspire With Plaintiffs' Employees To
                        Commit Fraud................................................................................25

                13.     The Nevada Gaming Regulators Are Holding Up

Empire's Licensing ............................................................................................27

VI.  F2 WAS A USURPED BUSINESS OPPORTUNITY, AND MR. FENG
     EMBEZZLED $1 MILLION FROM LT GAME TO GET IT ..........................27

     A.  Mr. Feng's Unlawful Scheme To Usurp The Hawaiian Gardens
         TPPPS Opportunity ...............................................................................27

     B.  Defendants' Affirmative Defense Of Legal Impossibility Fails................29

     C.  Defendants Have Waived A Summary Judgment Challenge To
         Plaintiffs' Alternative Theory Of Unjust Enrichment Recovery Of F2
         Profits ....................................................................................................31

VII.  PLAINTIFFS' UNJUST ENRICHMENT THEORIES ARE NOT
      SUPERSEDED ....................................................................................................33

VIII. PLAINTIFFS' TRADE SECRET CLAIMS DO NOT DISPLACE TORT
      CLAIMS ..............................................................................................................34

IX.  PLAINTIFFS IDENTIFY NUMEROUS MISAPPROPRIATED TRADE
     SECRETS ............................................................................................................34

X.   LT GAME FAILED - AND EMPIRE SUCCEEDED - BECAUSE OF
     DEFENDANTS ....................................................................................................37

XI.  THE KIELY, ALLISON, AND GSL CONTRACTS WERE BREACHED.......37

XII. DEFENDANTS INFRINGED PARADISE'S COPYRIGHTS ..........................39

XIII. CONCLUSION AND REQUEST FOR ENTRY OF RULE 56(F)
      SUMMARY JUDGMENT ...................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arc of Washington State Inc. v. Braddock*,
129 Fed. Appx. 348 (9th Cir. 2005) ............................................................................ 5

*Bank of Am., N.A. v. SFR Invs. Pool 1, LLC*,
2019 WL 1261358 (D. Nev. Mar. 19, 2019) ............................................................... 9

*Bradley v. Becerra*,
2020 WL 7407918 (C.D. Cal. Oct. 23, 2020) ........................................................... 32

*Capital Advisors, LLC v. Cai*,
548 P.3d 1202 (Nev. 2024) ........................................................................................ 10

*Chasman v. JP Morgan Chase Bank, NA*,
2020 WL 207784 (S.D.N.Y. Jan. 14, 2020) ................................................................ 8

*Collins v. Burns*,
741 P.2d 819 (Nev. 1987) .......................................................................................... 13

*Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*,
272 Cal. Rptr. 3d, 108 (Cal. Ct. App. 2020) ............................................................ 31

*Donovan v. Flamingo Palms Villas, LLC*,
2009 WL 10693913 (D. Nev. June 23, 2009) ...................................................... 12, 13

*Edmark Auto, Inc. v. Zurich American Ins. Co.*,
No.  2018 WL 1365846 (D. Idaho Mar. 16, 2018) .................................................. 5, 8

*Engenium Sols., Inc. v. Symphonic Techs., Inc.*,
924 F. Supp. 2d 757 (S.D. Tex. 2013) ...................................................................... 29

*Frantz v. Johnson*,
999 P.2d 351 (Nev. 2000) .......................................................................................... 33

*Galardi v. Naples Polaris, LLC*,
301 P.3d 364 (Nev. 2013) ............................................................................................ 5

*Google Inc. v. Beneficial Innovations, Inc.*,
No.  2014 WL 186016 (E.D. Tex. Jan. 16, 2014) ....................................................... 7

*Guar. Fed. Sav. & Loan Ass'n v. Am. Nat. Bank & Tr. Co. of Chicago*,
509 N.E.2d 1313 (Ill. App. 1987) .............................................................................. 37

*Hovbilt, Inc. v. Lair*,
2010 WL 668757 (N.J. Super. Ct. App. Div. Feb. 25, 2010) ................................... 37

*In re Activision Blizzard, Inc. S'holder Litig.*,
124 A.3d 1025 (Del. Ch. 2015) ............................................................................................ 7

*In re Signature Apparel Grp.*,
577 B.R. 54 (Bankr. S.D.N.Y. 2017) .................................................................................. 29

*In re Silverman*,
155 B.R. 362 (Bankr. E.D.N.C. 1993) ................................................................................ 29

*In re Stijakovich-Santilli*,
542 B.R. 245 (B.A.P. 9th Cir. 2015) ................................................................................... 13

*In re Wilbert L.*,
2010 WL 3565489 (Del. Ch. Sept. 1, 2010) ....................................................................... 13

*JPMorgan Chase Bank, N.A. v. KB Home*,
632 F. Supp. 2d 1013 (D. Nev. 2009) .................................................................................. 8

*Jud. Dist. Ct. of State ex rel. Cnty. of Clark*,
129 Nev. 1115, 2013 WL 7155069 (Nev. 2013).................................................................. 13

*Mae v. Creagan*,
129 F. Supp. 3d 994 (D. Nev. 2013) ..................................................................................... 6

*MAI Sys. Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993).............................................................................................. 39

*Matsugishi v. Chen*,
790 F. Supp. 3d 1007 (D. Nev. 2025) ................................................................................. 12

*N. Las Vegas Infrastructure Inv. & Constr., LLC v. City of N. Las Vegas*,
525 P.3d 836 (Nev. 2023) ..................................................................................................... 5

*Oakwood Labs. LLC  v. Thanoo*,
999 F.3d 892 (3d Cir. 2021)............................................................................................... 35

*Olenicoff v. UBS AG*,
2010 WL 8530286 (C.D. Cal. Mar. 16, 2010) ................................................................... 32

*Polaris Processing, LLC v. New Rise Renewables Reno, LLC*,
812 F. Supp. 3d 1133 (D. Nev. 2025) ................................................................................. 29

*Rasmussen v. Lopez*,
373 P.3d 953 n.2 (Nev. 2011) ............................................................................................. 11

*Robinson, Leatham & Nelson, Inc. v. Nelson*,
109 F.3d 1388 (9th Cir. 1997)....................................................................................... 11, 17

*Saini v. Int'l Game Tech.*,
434 F. Supp. 2d 913 (D. Nev. 2006) ................................................................................... 17

*Sandy Valley Assocs. v. Sky Ranch Ests. Owners Ass'n,*
   117 Nev. 948, 35 P.3d 964 (2001) ................................................................................ 6

*Semenza v. Caughlin Crafted Homes,*
   901 P.2d 684 (Nev. 1995) ......................................................................................... 34

*Serv. First v. Lee,*
   2022 U.S. Dist. LEXIS 147274 (E.D. Mich. Aug. 17, 2022) ...................................... 32

*Site Mgmt. Servs., Inc. v. Cingular Wireless LLC,*
   2014 WL 971714 (Cal. Ct. App. Mar. 13, 2014) ....................................................... 21

*Smallman v. MGM Resorts Int'l,*
   638 F. Supp. 3d 1175 (D. Nev. 2022) ........................................................................ 31

*Snider v. State ex rel. Oklahoma Real Est. Comm'n,*
   987 P.2d 1204 (Okla. 1999) ...................................................................................... 21

*Spangler v. Spangler,*
   451 F. Supp. 3d 813 (N.D. Ohio 2020) ..................................................................... 29

*T1 Payments LLC v. New U Life Corp.,*
   2022 WL 195111 (D. Nev. Jan. 21, 2022) ............................................................ 22, 24

*Talavera v. Global Payments, Inc.,*
   670 F. Supp. 3d 1074 (S.D. Cal. 2023) ..................................................................... 39

*Teets v. Chromalloy Gas Turbine Corp.,*
   83 F.3d 403 (Fed. Cir. 1996) ................................................................................. 17, 38

*Triton Const. Co., Inc. v. Eastern Shore Elec. Servs., Inc.,*
   2009 WL 1387115 (Del. Ch. May 18, 2009) ............................................................. 11

*United States v. Thomas,*
   2013 U.S. Dist. LEXIS 163855 (D. Conn. Nov. 18, 2013) ......................................... 32

*United States v. Wiseman,*
   274 F.3d 1235 (9th Cir. 2001) ................................................................................... 32

*Van Patten v. Vertical Fitness Grp., LLC,*
   847 F.3d 1037 (9th Cir. 2017) ..................................................................................... 5

**Statutes**

17 U.S.C. § 410 ................................................................................................................. 39

17 U.S.C. § 411 ................................................................................................................. 39

18 U.S.C. § 1839(5)(B) ...................................................................................................... 35

Cal. Bus. & Prof. Code § 19852 ............................................................................. 29, 30, 31

Cal. Bus. & Prof. Code § 19858 ............................................................................................ 29, 30

N.R.S. 600A.030(2)(c) .............................................................................................................. 35

N.R.S. §600.500 ........................................................................................................................ 17

Section 330 of the California Penal Code ................................................................................. 28

**Regulations**

Nev. Gaming Comm'n Reg. 15.1594-6 ..................................................................................... 15

**Other Authorities**

Restatement (Third) of Restitution and Unjust Enrichment, § 51(b) ........................................ 32

Restatement of Restitution, § 51(d) .......................................................................................... 32

## I.  **<u>INTRODUCTION</u>**

The sweeping fraud that Defendants perpetrated against Plaintiffs from 2016-2023 is equaled in its audacity by Defendants' attempt now to convince the Court that it never happened. According to Defendant Linyi "Frank" Feng's false narrative, he was an independent entrepreneur who started his own gaming company over a decade ago while later separately helping his brother-in-law, Paradise Chairman Dr. Jay Chun, with a discrete unrelated side-project, owing no special obligation to tell Macau management (or his own family) much of anything about what he was really doing. This is fiction. Mr. Feng, along with Defendants Daryn Kiely and Kelcey Allison, were *fiduciary employees* of Plaintiffs who had been hired to devote themselves exclusively to the expansion of LT Game into as many viable North American gaming opportunities as possible. Plaintiffs showered Defendants with *tens of millions of dollars* to get their assigned job done, including paying hundreds of thousands of dollars to Plaintiffs' own attorneys at the law firm of Lewis Roca to secure gaming licenses for Empire, which Plaintiffs understood to be LT Game's exclusive distributor under the control of Plaintiffs' own loyal fiduciary.

If Mr. Feng had wanted to start his own company he should have first resigned as President of LT Game in 2016. Instead, because he needed Plaintiffs' money, employees, resources, and name-recognition, Mr. Feng recruited the other Defendants to maintain a years-long façade while they built up Empire to usurp LT Game. To accomplish this, Defendants covertly diverted LT Game's employees and resources – and the majority of their own waking hours – to separate projects for Empire and Mr. Feng's cadre of other undisclosed businesses like F2. Mr. Feng even committed criminal acts, covertly stealing millions of dollars from LT Game. While Defendants now try to interpose an unpled affirmative defense of consent via Mr. Feng's Framework Agreement with Paradise, not only do Defendants misrepresent the meaning of that agreement, but there is simply no interpretation of it that would have given Defendants consent to lie, cheat, and steal. The law also prevents Defendants from arguing, as they now try to do, that the burden was on Plaintiffs to have figured out that Defendants were defrauding them.

Plaintiffs never would have invested tens of millions of dollars into LT Game and Empire if they had known what Defendants were actually doing. The fact that Defendants knowingly preyed upon Plaintiffs' ignorance to secure this funding and Plaintiffs' non-interference is evident not only from Defendants' stunning years-long silence about their true activities (with Mr. Feng withholding the truth

even from his own family), but also from the guilty conspiratorial internal communications among them seeking to maintain the cover-up. The simple fact is that if Defendants had actually believed that what they were doing was acceptable, they would not have concealed it in violation of their fiduciary duties. Defendants used deceit to propel Empire to success while leaving LT Game in shambles.

## II.    DEFENDANTS DISTORT HISTORY AND PLAINTIFFS' LEGAL THEORIES

### A.    Mr. Feng Was Dependent On Dr. Chun, And Dr. Chun Trusted Him As Family

Mr. Feng had no prior gaming experience and few career prospects before Dr. Chun invited him to become a fiduciary of the Paradise Group. Ex. 1-60 at 10:25–12:11; Ex. 2 at ¶¶8–10. As of the early 2000s, Mr. Feng was working at a beverage business in Africa before moving to Toronto to work in the restaurant industry. *Id.* Meanwhile, Dr. Chun (who holds a doctorate in business management) had by that time built up a major gaming company under the Paradise Group in Macau. Ex. 1-60, at 10:2–7, 11:5–23; Ex. 2, ¶¶1, 7–8. Dr. Chun's formula for success was diversification of business opportunities and investment in new technologies. Ex. 2 at ℙ 7; Ex. 1-60 at 60:10–61:17; 28:16–22. He developed the popular Live Table Game system referenced in Defendants' Motion, built up a robust casino equipment manufacturing and distribution business, and ultimately expanded Paradise into casino management services in Macau. *Id.* at 38:7–11; 39:5–11; 40:12–41:17; 45:12–16. As shown in its public reports, Paradise's annual revenue hit $150 million by 2019, and ended the pandemic in 2023 with $85 million in annual revenue. Ex. 3, ¶3.

In 2008, Dr. Chun offered his brother-in-law, Mr. Feng, a job by asking Mr. Feng to help expand the Paradise Group's business into the North American market. Ex. 2, ¶8. Paradise founded LT Game (Canada) Ltd. (now plaintiff LT Game) with Mr. Feng as its President (still living in Canada at that time). *Id.* Importantly, <u>Mr. Feng has admitted under oath that from 2008 until he resigned in 2022, he was a fiduciary of both LT Game and the Paradise Group</u>. Ex. 1-60, Feng Dep. I at 82:17–20; Ex. 1-61 at 122:25–123:4.1-61, Feng Dep. II at 122:25–123:4.

Although Paradise has many subsidiaries, Dr. Chun is personally involved with management across the organization, and (with his CFO Mr. Leo Chan) had regular monthly meetings with Mr. Feng to discuss LT Game business and provide direction. Ex. 2, ¶¶5, 28; Ex. 3, ¶¶4–5; Ex. 1-61, Feng Dep. II at 126:12–18; Ex. 1-62, Kiely Dep. at 25:21–26:12, 200:24–201:11; Ex. 1-56, Allison Dep. I at 64:2–

66:12; Ex. 1-64, Zhao Dep. at 16:16–23; Ex. 3-11; Ex. 3-12. During the relevant time period, Dr. Chun's Macau management team also included Mr. Feng's cousin Betty Zhao acting as COO. Ex. 2, ¶5; Ex. 3, ¶29. Acting under Dr. Chun's close direction, Mr. Chan and Ms. Zhao operated Paradise's Macao subsidiary, plaintiff LTG Limited, which in turn was upstream parent company to plaintiff LT Game and provided funding to LT Game. Ex. 2, ¶¶5–6.

Mr. Feng did not independently create Empire; rather, as President of LT Game, he *asked for Dr. Chun's authorization* to create a separate legal entity to act as LT Game's distributor, assuring Dr. Chun that this would be simpler for licensing purposes. Ex. 2, ¶11. Mr. Wang Tao Feng ("Mr. Wang," no relation to Mr. Feng) had been a long-time acquaintance of Dr. Chun, and had been distributing Paradise equipment under LT Game International (US) Ltd. *Id.* In 2015, Dr. Chun authorized transfer of Mr. Wang's company to Mr. Feng so that it could serve as LT Game's distributor, with the process being handled by Paradise CFO at the time, Stella Ho, under Dr. Chun's orders. *Id.*; Ex. 2-1 and 2–2; Ex. 2-3. Mr. Feng renamed it Empire.

To be clear, Mr. Feng was Plaintiffs' *fiduciary employee* – not an independent businessman. Ex. 1-61, Feng Dep. II at 122:25–123:8, 125:10–126:18; Ex. 1-60, Feng Dep. I at 15:12–16:25, 82:17–20. He was not selling any non-Paradise products, and was entirely dependent on the Paradise Group. ECF No. 168 at ¶¶14–16; Ex. 3, ¶12. In fact, Mr. Feng lived rent-free in Dr. Chun's own house in Las Vegas, worth millions of dollars. *Id.* at 85:5–23. In their frequent discussions about LT Game business, Mr. Feng repeatedly reaffirmed his loyalty to the Paradise Group and called Dr. Chun "boss."[1] Ex. 2-49; Ex. 1-60, Feng Dep. I at 18:5–19:18; Ex. 2-50.

As of the end of 2015, Dr. Chun had sold Paradise's Live Table Game business to another company (IGT) and directed that LT Game should pursue new business opportunities in North America. Ex. 1-6 at 512; Ex. 1-103 at 308. Because Paradise now intended to supply LT Game with new equipment, and because Mr. Feng was Dr. Chun's brother-in-law, the Hong Kong Stock Exchange Listing Rules required Paradise to disclose the terms of Paradise's supply to Mr. Feng as a "connected party" so as to assure shareholders that the supply arrangement was favorable to Paradise. Section III. This led to the February

---

[1] Defendants have mis-translated the Chinese characters for "Boss" in Mr. Feng's emails to "Sir," apparently to avoid the implications of Mr. Feng repeatedly acknowledging that Dr. Chun was indeed his "Boss." Ex. 2, ¶10; Ex. 3, ¶16; *see also* Ex. 2-17, ¶4.

2016 Framework Agreement and its renewals that are at the center of Defendants' Motion.

### B.    Defendants Incorrectly Frame Plaintiffs' Legal Theories

Defendants' Motion does not address any of Plaintiffs' damages theories, so any summary judgment challenge on that issue is waived. However, it is important to nominally identify the remedies that Plaintiffs are seeking, both because they help define the boundaries of the case, and because Defendants repeatedly misstate the corresponding liability theories, causing confusion. The below chart summarizes the remedies that Plaintiffs seek as set forth in the damages expert report of Clarke Nelson and Plaintiffs' discovery responses. *See generally*, Ex. 1-66 (Nelson Report); ECF No. 1; Ex. 1-68 at Rogs 8 and 26–28; Ex. 1-70 at Rogs 1, 5, 8, 14, 19–20, 22.

**(1) $25 million out of pocket loss on LT Game and Empire from 2016-2023 during Defendants' fraud and usurpation.** Plaintiffs claim this as an actual out of pocket loss on a venture that (a) failed because of Defendants' misconduct and (b) that Plaintiffs never would have continued funding if they had known the truth of what Defendants were doing. Alternatively, Plaintiffs claim this as ill-gotten gains/unjust enrichment from Defendants having defrauded Plaintiffs into unwittingly supporting the launch of Empire.

**(2)** ▮▮▮▮▮▮▮ **disgorgement of Empire's profits from equipment sales using Plaintiffs' IP.** In addition to resulting from fraud, these profits correspond to the trade secret and copyright remedies for Empire having sold technology derived from Plaintiffs. Plaintiffs also seek this as unjust enrichment. This remedy is independent from the $25 million out of pocket loss caused by Defendants' fraud and usurpation, which Plaintiffs would seek even if Empire had never used Plaintiffs' IP to sell equipment.

**(3)** ▮▮▮▮▮▮▮ **in F2's profits.** Plaintiffs claim F2 as a usurped business opportunity. In the alternative, Plaintiffs seek this as unjust enrichment from Mr. Feng having stolen the necessary $1 million seed money for F2, and otherwise having secured the opportunity through Plaintiffs.

**(4) $1 million for the fraudulent sale to Solution Gaming at below market price.**

### III.    THE FRAMEWORK AGREEMENT DOES NOT SUPPORT DEFENDANTS' UNPLED AFFIRMATIVE DEFENSE OF CONSENT

Although Defendants failed to ever plead an affirmative defense of consent, that is what they argue when they incorrectly contend that the Framework Agreement authorized Mr. Feng to engage in his

misconduct. It is thus Defendants' burden of proof to make out their consent defense.[2] *Van Patten v. Vertical Fitness Grp., LLC,* 847 F.3d 1037, 1044 (9th Cir. 2017) ("Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof.") Defendants cannot meet their burden because the evidence (discussed below) makes clear that the Framework Agreement only addresses the non-exclusivity of Plaintiffs' *supply* to Mr. Feng, and is silent as to any supposed non-exclusivity of Mr. Feng's downstream distribution.[3] Furthermore, as discussed in Section IV, there is no interpretation of the Framework Agreement that authorized Defendants to defraud and steal from Plaintiffs.

Plaintiffs never had a written employment contract with Mr. Feng. Ex. 1-61, Feng Dep. II at 125:10–126:18. This was because Plaintiffs did not expect that Mr. Feng – as both a fiduciary and family member – would need to be contractually restrained from competing with Plaintiffs. Ex. 2, ¶30; Ex. 3, ¶27. Because no contract prohibited Mr. Feng from competing in downstream sales, and because the Framework Agreement is silent on that question, Plaintiffs have no claim against Mr. Feng for breach of the Framework Agreement (which is why Plaintiffs are proceeding against him on other liability theories). Thus, the only relevance of the Framework Agreement in this case is to Defendants' consent defense.

Under basic contract interpretation principles,[4] the court first looks within the four corners of the contract to determine whether the meaning of the disputed term could reasonably mean more than one thing, also taking into consideration any materials incorporated by reference. *N. Las Vegas Infrastructure Inv. & Constr., LLC v. City of N. Las Vegas*, 525 P.3d 836, 840 (Nev. 2023). The fact that Mr. Feng was the fiduciary President of LT Game at the time he signed may also be considered in making a threshold assessment of ambiguity. *Edmark Auto, Inc. v. Zurich American Ins. Co.,* No. 2018 WL 1365846, at *5 (D. Idaho Mar. 16, 2018); *see also Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366–68 (Nev. 2013)

---

[2] Particularly for issues where Defendants bear the burden of proof, the threadbare conclusory affidavits submitted by Messrs. Feng, Allison, and Kiely are insufficient to carry Defendants' burden on summary judgment. *Arc of Washington State Inc. v. Braddock*, 129 Fed. Appx. 348, 351 (9th Cir. 2005). It would also be improper for Defendants to now try to introduce new arguments in their Reply brief.

[3] Defendants call the Framework Agreement the "Distribution Agreement," but it only concerns distribution from Paradise to Mr. Feng. All Renewals were entitled "Supply Framework Agreement."

[4] Although the Framework Agreement states that it is governed by Hong Kong law, the parties have not as of yet identified any aspect of Hong Kong contract interpretation law that differs from US law, and on that basis have (so far) stipulated to rely on US law. Each side has retained Hong Kong counsel to the extent analysis of Hong Kong contract interpretation law ever became necessary, and their counsel agree on basic principles of contract interpretation under Hong Kong law. Ex. 1, ¶2.

(considering circumstances "to determine whether a contract provision is ambiguous in the first place.") If the Court finds that the disputed clause is capable of more than one interpretation, extrinsic evidence must be considered. *Mae v. Creagan*, 129 F. Supp. 3d 994, 998 (D. Nev. 2013). The Court may also look to the subsequent course of conduct of the parties to help assess what they understood the contract to mean. *Sandy Valley Assocs. v. Sky Ranch Ests. Owners Ass'n,* 117 Nev. 948, 954, 35 P.3d 964, 968 (2001).

Here, contrary to Defendants' characterizations, the Framework Agreement[5] was unilaterally drafted by Paradise exclusively for its own benefit without any negotiation or input from Mr. Feng, who dutifully signed it as a condition of his employment as President of LT Game. Ex. 2, ¶¶26–27; Ex. Nos. 2-14, 2-34 thru 2-38 (showing Paradise sent already-complete agreement and Mr. Feng simply signing). Mr. Feng's admitted fiduciary duties to Paradise and LT Game prohibited him from competing with LT Game. (Section II.A.) Furthermore, Mr. Feng was not distributing any non-LT Game product at the time the 2016 Framework Agreement was signed (ECF No. 168, ¶14–16), nor was there any expectation that he would, as that would have violated his fiduciary duties to LT Game. Nor did he have any negotiating leverage, being dependent on LT Game for income and indeed even housing. Ex. 2, ¶9. Mr. Feng's ~10% commission under the Framework Agreement was a sales incentive on top of his core LT Game salary. Mr. Feng's unauthorized covert sales of non-LT Game equipment did not even start until months after the February 2016 Framework Agreement, and because of Defendants' years-long fraud, Plaintiffs never even knew that Defendants ever sold non-LT Game equipment until 2023. Ex. 2, ¶¶23, 33.

As expressly stated in Recital (E), the Framework Agreement was entered into to comply with Paradise's obligations as a public company under Section 14A of the Hong Kong Listing Rules which required that Paradise set forth certain terms (mainly pricing) of its relationship with Dr. Chun's brother-in-law to assure the shareholders that the deal was favorable to *Paradise* rather than Mr. Feng. Ex. 6 (Emily Li Decl.) at ¶¶12–20. Because the agreement incorporates by reference Section 14A, the Court may consider it as part of the Court's intrinsic analysis. *Id.* (attaching full text of Section 14A). The only concern of Paradise's shareholders was that the agreement not bind *Paradise* to exclusively use the Chairman's family member: Paradise shareholders would have had no motivation to afford Mr. Feng any

---

[5] "Framework Agreement" refers to the original Feb. 2016 agreement (ECF No. 173-01 at Ex. B-5, 00977–00988), however the content of the later renewals is essentially the same. *Id.* at Ex. B-3 (00947 – 00960), Ex. B-6 (00989–01002), Ex. B-7 (01003–01016), Ex. B-8 (01017–01030), Ex. B-9 (01031–01044).

benefit under the contract whatsoever, much less allow him to waive his fiduciary duties and sell non-LT Game products to Paradise's detriment. Ex. 3, ¶¶11–21. After Paradise unilaterally drafted the agreement, it was provided to Mr. Feng with instructions to simply sign it, which he dutifully did without negotiation. Ex. 2, ¶26; Ex. 2-14, 2-34 thru 2-38 (showing agreement sent and signed without changes).

Defendants want to read the first sentence of Clause 3.4 in a vacuum, but it is clear from the surrounding language of the agreement that the fact finder needs to look beyond that one sentence to understand what Paradise's lawyers meant when they wrote "non-exclusive." Every clause of Section 3 plainly is directed to Paradise's *supply* arrangement to Mr. Feng – not Mr. Feng's later distribution. This supply-focus is introduced in Clause 3.1, which refers only to Paradise's supply to Mr. Feng being non-exclusive given that Paradise is the subject of the sentence: "Supplier shall supply…on a non-exclusive basis." This is confirmed by Clause 3.1's use of "Products," which is defined in the agreement to mean only *Paradise* products. ECF No. 173-1 at Ex. B-5, 00980. Every other clause of Section 3 expressly refers to Paradise's *supply* arrangement (not Mr. Feng's downstream distribution) such that the term "arrangement" in Clause 3 should universally be defined to mean "supply arrangement." The omission of the word "supply" from the first sentence of Section 3.4 was obviously just an imprecision of the drafters. The meaning of the first sentence of Clause 3.4 is confirmed by the very next sentence (deliberately ignored by Defendants) that states "for avoidance of doubt" that Paradise is not obliged to *supply* to Mr. Feng when it does not want to. *See In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1059 (Del. Ch. 2015), as revised (May 21, 2015) ("As indicated by the prepositional phrase '[f]or the avoidance of doubt,' the language is confirmatory."); *Google Inc. v. Beneficial Innovations, Inc.*, No. 2014 WL 186016, at *3 (E.D. Tex. Jan. 16, 2014) ("avoidance of doubt" language revealed parties' intent where used to clarify the immediately preceding provision).

Contrary to Defendants' arguments, none of the Renewals of the Framework Agreement amounted to Plaintiffs agreeing to allow Mr. Feng to engage in non-LT Game business. As discussed further in Section IV, at no time did Plaintiffs ever understand that Mr. Feng was pursuing other business ventures. The correspondence surrounding the renewals shows that Plaintiffs prepared them each year as a matter of simple routine and Mr. Feng automatically signed them upon request with no input or discussion. *See e.g.,* Ex. 1-20. Defendants have pointed to later renewals of the Framework Agreement that refer to Mr.

Feng being engaged in the distribution of "Devices" to argue that Plaintiffs were aware Mr. Feng was engaged in selling his own competing products. That is a misreading of the plain language of the agreements. Looking at Clause 3.1 of the 2021 Renewal, it explains that Mr. Feng's "Devices" are just Plaintiffs' own "Products" that have been retrofitted for final sale by Mr. Feng. ECF No. 173-1 at Ex. B-8 (01017 – 01030) Indeed, that is exactly what was happening at that time, and why Paradise drafted the language that way. Ex. 3, ¶17; Ex. 2, ¶¶26–28. The language of the Renewals is otherwise passed down in substantially the same form from the original 2016 agreement.

The Court need look no further than within the four corners of the contract and the Hong Kong listing rules (which were incorporated by reference) to find that the Framework Agreement only addressed the non-exclusivity of Paradise's supply to Mr. Feng. However, the Court may also consider as part of its threshold analysis the basic pre-existing duties of the parties, namely that Mr. Feng was Plaintiffs' fiduciary, bound not to compete against Plaintiffs. *Edmark Auto,* 2018 WL 1365846, at *5. Defendants try to argue that the Framework Agreement waived Mr. Feng's fiduciary duties, but they are wrong. The law is clear that a waiver of such important duties must clearly call out the duties being waived, and unambiguously state that they are waived. *Chasman v. JP Morgan Chase Bank, NA*, 2020 WL 207784, at *3 (S.D.N.Y. Jan. 14, 2020) (disclaimer must "explicitly reference fiduciary duties"); *JPMorgan Chase Bank, N.A. v. KB Home*, 632 F. Supp. 2d 1013, 1025 (D. Nev. 2009) (finding no fiduciary relationship "[b]ecause the plain language of the Operating Agreement eliminates the Members' fiduciary duties"). No such express waiver is present, nor would Paradise, as the drafter of the document, have had any reason to make such a waiver against its own interests. There is a boilerplate sentence at Clause 5.9 that recites that the Parties are "independent principals" but this obviously was not intended as a waiver of Mr. Feng's fiduciary duties as President of LT Game, nor should it be construed as such. This conclusion goes beyond contract interpretation: Mr. Feng has *expressly admitted under oath* that he was a fiduciary to Paradise and LT Game. (Section II.A.) Mr. Feng's lawyers are estopped from arguing otherwise.

At a minimum the Court should deem the first sentence of Clause 3.4 to be ambiguous and thus consider all of the extrinsic evidence. This includes the fact that Mr. Feng was selling no products other than LT Game products, that he had no negotiating power, and that in fact the Framework Agreement was not negotiated but rather merely sent to Mr. Feng for signature by Paradise. A contemporaneous

shareholder announcement in February 2016 is also relevant as it assures shareholders that because Mr. Feng is "willing to be appointed on a non-exclusive basis" the agreement is favorable to Paradise, *i.e.*, because Paradise's *supply* is non-exclusive and Mr. Feng is willing to accept that. Ex. 1-1 at 705. Contrary to Defendants' assertions, Mr. Chan never claimed otherwise: he merely parroted the same language from the Framework Agreement. Ex. 3, ¶17; Ex. 3-1, 3-14.

Furthermore, the Parties' subsequent course of conduct confirms that neither side believed that the Framework Agreement allowed Mr. Feng to use Empire to sell non-LT Game products, or otherwise compete with LT Game. If Defendants had actually believed Plaintiffs consented to them being non-exclusive to LT Game, they would have told Plaintiffs what Empire was actually doing during any of their countless business conversations from 2016–2023. Instead, the guilty conspiratorial silence of Messrs. Feng, Kiely, and Allison (*see* Section IV) demonstrates that they knew very well that they had not been vested with any right to sell non-LT Game products. Ex. 3, ¶¶22–36; Ex. 2, ¶28.

Defendants misleadingly argue that the Court already ruled in their favor on the meaning of "non-exclusive" in the Framework Agreement. ECF No. 177 at 17. That is not what happened. Defendants are referring to a passing one-sentence comment in the Magistrate Judge's order that denied without prejudice Plaintiffs' Motion to Compel Defendants' attorney-client communications with Lewis Roca. ECF No. 128 at 11, also not addressing Clause 3.4 that is at issue. In making that motion, Plaintiffs had expressly not raised the Framework Agreement and argued that its construction was not necessary to the Motion to Compel and that it should be reserved for later proceedings on a full record. ECF No. 98 at 2; Ex. 1-106 at 34–38, 4–5, 8–9. The Magistrate Judge herself voiced concerns that a full evidentiary hearing would be needed. *Id.* at 37. Plaintiffs' present Summary Judgment Opposition marks the first instance when the Court will have been presented with sufficient facts and argument on the Framework Agreement.

Because the meaning and intent of the Framework Agreement are clear, and because contract interpretation is better resolved by the Court than the Jury, Plaintiffs request that the Court grant summary judgment under Rule 56(f) that the Framework Agreement only addressed non-exclusivity of Paradise's supply to Mr. Feng, and was silent as to Mr. Feng's ability to sell other products or compete with LT Game. *Bank of Am., N.A. v. SFR Invs. Pool 1, LLC*, 2019 WL 1261358, at *6 (D. Nev. Mar. 19, 2019).

## V.    DEFENDANTS COMMITTED YEARS OF FRAUD; PLAINTIFFS HAD NO NOTICE

Even if the Framework Agreement had afforded Mr. Feng non-exclusivity for Empire (which it did not), Defendants would still be liable for covertly re-directing LT Game resources and employees to Empire, concealing material facts to induce continued funding, misappropriating money from LT Game, and all their other misconduct described below. If Plaintiffs had known what Defendants were actually doing in Las Vegas, they would have cut them off and sued them long ago. Instead, Plaintiffs have lost $25 million on a usurped business venture, and are years behind Empire in the market.

### 1.    Defendants' Fiduciary And Contractual Duties

Each of Messrs. Feng, Kiely, and Allison affirmed under oath that they owed fiduciary duties to Plaintiffs while they were employed by them. Section II.A; Ex. 1-62, Kiely Dep. at 27:1–18; Ex. 1-56, Allison Dep. I at 61:10–14. Those fiduciary obligations included the duty to not undermine Plaintiffs. *Capital Advisors, LLC v. Cai*, 548 P.3d 1202, 1210 (Nev. 2024). Although Mr. Feng had no employment contract, Mr. Kiley was hired as Executive Director of Engineering pursuant to a 2016 employment contract and then promoted him to Chief Technology Officer pursuant to a 2019 employment contract. Mr. Allison was hired as SVP of Operations pursuant to a 2020 contract, and then transitioned to being engaged to consult through GSL under a 6/30/2022 contract. Under the terms of Mr. Kiely's and Mr. Allison's employment contracts (as well as GSL's contract), they were bound to not use confidential LT Game business information to aid other companies, and were required to assign ownership of any technologies they developed to LT Game. ECF No. 174-1 at 35, §§ 5(b), 6; ECF No. 1-1 at 51, §§ 5(b), 6; ECF No. 1-4 at 5–6, §§ 5(c), 6; Ex. 1-62, Kiely Dep. at 30:4–31:10, 35:2–8, 36:1–9; Ex. 1-56, Allison Dep. I at 54:17–55:12, 93:14–23. Furthermore, each of the relevant employment contracts required Messrs. Kiely and Allison to work full-time for LT Game from 9 to 5, Monday to Friday. ECF No. 174-1 at 34, § 3; ECF No. 1-1 at 3, § 3; ECF No. 1-4 at 3, § 3.

As discussed *infra*, Defendants violated their fiduciary and contractual duties by making Empire their primary employment and usurping LT Game resources and opportunities. Defendants have tried to argue that there is no prohibition on them holding multiple jobs, but that is not legally correct here. If a corporate fiduciary wants to undertake a second job that will consume most of their working hours and/or that risks being in conflict with the corporate opportunities of their company, they are legally obliged to

disclose that to their employer, who can then decide whether or not to replace that employee. *See Triton Const. Co., Inc. v. Eastern Shore Elec. Servs., Inc.*, 2009 WL 1387115, at \*14 (Del. Ch. May 18, 2009). Here, Plaintiffs never even knew Messrs. Kiely and Allison held separate jobs with Empire, and had no knowledge of theirs or Mr. Feng's true activities for Empire. Ex. 2, ¶¶23, 37, 39, 50; Ex. 3, ¶¶9–10, 46.

### 2.     The Scope Of LT Game's Potential Corporate Opportunities Was Broad

In assessing if a fiduciary has usurped business from their company, the law defines the scope of corporate opportunities broadly. *See Robinson, Leatham & Nelson, Inc. v. Nelson*, 109 F.3d 1388, 1392 (9th Cir. 1997) ("A corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage.") (internal quotation omitted); *Rasmussen v. Lopez*, 373 P.3d 953, at \*2 n.2 (Nev. 2011) ("This court declines the parties' request to adopt a rigid approach to the corporate opportunity doctrine.").

Defendants contend that Plaintiffs confined the scope of their business to Class III slot machines. This is false, and to the extent LT Game eventually landed there by 2023, it was because Mr. Feng took all other opportunities for himself. The Paradise Group has a highly diversified collection of businesses encompassing a wide range of casino services and equipment sales, and Plaintiffs pressed Mr. Feng to explore these for LT Game. Ex. 2, ¶¶7, 13; Ex. 2-33, PARADISE45803 (company overview); Ex. 2-13, PARADISE6492 (email discussing range of opportunities); Ex. 2-29, PARADISE27332 - 27333 (table game discussion); Ex. 2-26, PARADISE57378 - 57379 (video game discussion); Ex. 2-31, PARADISE57460 (other equipment proposals).

As discussed in Sections IV.5 and V.A below, Dr. Chun had specifically instructed Mr. Feng to explore opportunities in all the areas that Mr. Feng now claims for himself, including third party banking at California card rooms, and table games. Furthermore, Dr. Chun wanted licensing in a broadest possible range of jurisdictions, and so paid Lewis Roca hundreds of thousands of dollars for licensing across North America, while requiring Mr. Feng to submit regular progress reports. *E.g.*, Ex. 3-9, PARADISE420.

Defendants try to point to small number of examples of Plaintiffs supposedly not pursuing certain discrete business proposals as if that gave Defendants carte blanche to covertly usurp all other opportunities for themselves. These arguments fail. As discussed in Section IV.5, Dr. Chun had in fact *approved* of selling SMRT table game products in 2016, and it was *Mr. Feng* who retracted that proposal,

suddenly claiming he thought it was not profitable, while taking the opportunity for himself. Separately, Dr. Chun never categorically rejected internet gaming; rather, he rejected a cold call investment proposal that Mr. Feng forwarded to him from a stranger with no analysis. Ex. 2, ¶24. As to the proposed purchase of the company Lighting Gaming for $8 million, Plaintiffs in fact seriously considered this, and had discussions about it with Lewis Roca right before the pandemic hit. Ex. 2, ¶25; Ex. 2-13, PARADISE6492.

### 3.      Defendants Engaged In Both Express Misrepresentations And Concealment

Defendants try to argue that they never affirmatively lied to Plaintiffs. There are two things wrong with this: (1) they did expressly lie, and (2) Defendants ignore their fraudulent *concealment*, despite knowing from past briefing and discovery responses that concealment is at the heart of Plaintiffs' claims.

As discussed further in Section IV, Defendants did make affirmative fraudulent statements. In the case of Mr. Feng, for example, he deliberately misrepresented the facts in responding to the 2017 accusation made by a former employee, Frank Fico, that he was engaged in self-dealing. Section IV.3. Mr. Feng also lied when he said he thought the 2016 table games proposal was not profitable: in truth he had just decided he wanted the opportunity for himself. Section IV.5. All of the Defendants engaged in affirmative mis-representations when, month after month during status meetings, they professed to be working hard for LT Game – or professed that LT Game lacked business prospects – while not disclosing that they had actually re-directed the bulk of LT Game's time and employee resources to working on secret Empire projects that were profitable. Section IV.1, 8; Ex. 2, ¶¶28, 30; Ex. 3, ¶¶5, 7, 9–10. *See Matsugishi v. Chen*, 790 F. Supp. 3d 1007, 1020 (D. Nev. 2025) (making actionable representations that are misleading because they partially suppress or conceal information).

To prove fraudulent concealment, Plaintiffs must show that Defendants concealed material facts that they were under a duty to disclose wherein Plaintiffs would not have continued to employ and spend money on Defendants if Plaintiffs had known the truth. *Donovan v. Flamingo Palms Villas, LLC*, 2009 WL 10693913, at *12 (D. Nev. June 23, 2009). As the Nevada Supreme Court recognized in *Dow Chem. Co. v. Mahlum*, a duty to disclose "may also arise where the parties enjoy a 'special relationship,' that is, where a party reasonably imparts special confidence in the defendant and the defendant would reasonably know of this confidence…. Even when the parties are dealing at arm's length, a duty to disclose may arise from the existence of material facts peculiarly within the knowledge of the party sought to be charged."

114 Nev. 1468, 1486 (1998). Here, it is apparent that each of Messrs. Feng, Kiely, and Allison owed a duty of disclosure to Plaintiffs because they were fiduciaries, and all the more so in the case of Mr. Feng being Dr. Chun's own trusted brother-in-law. *See In re Wilbert L.*, 2010 WL 3565489, at *5 (Del. Ch. Sept. 1, 2010) ("[S]pecial trust is often found in the family context, where one justifiably places her trust in a close relative."); Ex. 2, ¶¶8, 27, 30. Mr. Feng's duty also survived his 2022 resignation from LT Game because he continued to profess loyalty to Dr. Chun (again calling him "Boss") and assured Plaintiffs he would alert them to gaming opportunities. Ex. 2, ¶31; Exs. 2-16, 2-17 at 1.

**4.      Defendants Are Estopped From Arguing That Plaintiffs Should Have Figured Out That They Were Being Defrauded**

Unclean hands bars Defendants from arguing that Plaintiffs should have independently discovered that Defendants were defrauding them while Defendants were simultaneously engaging in a cover-up. *In re Stijakovich-Santilli*, 542 B.R. 245, 257 (B.A.P. 9th Cir. 2015) ("[T]he perpetrator of an alleged fraud cannot avoid liability by showing that the victim could have uncovered the fraud had the victim investigated more carefully."); *Collins v. Burns*, 741 P.2d 819, 821 (Nev. 1987) (preventing fraud perpetrators from escaping liability by arguing victim negligence); *Jud. Dist. Ct. of State ex rel. Cnty. of Clark*, 129 Nev. 1115, 2013 WL 7155069, at *3 (Nev. 2013) (unclean hands bars relief).

Defendants could at any time have directly told Plaintiffs what they were really doing, but during all of their numerous interactions for years deliberately kept it a secret. Ex. 1-61, Feng Dep. II at 149:25–155:10; Ex. 1-62, Kiely Dep. at 116:14–117:20, 132:11–134:15, 146:13–19, 220:14–221:11; Ex. 1-56, Allison Dep. I at 133:10–134:15, 148:9–149:1, 158:2–159:4, 183:19–185:18, 214:20–217:6. And to be clear, Plaintiffs in fact never did have notice. Ex. 2, ¶¶23, 37, 39, 50; Ex. 3, ¶¶9–10, 46.

Ironically, Defendants point to an email exchange between Mr. Feng and Dr. Chun in 2017 as supposed evidence that Dr. Chun was on notice of Defendants' scheme, when in fact that exchange shows Mr. Feng deceiving Dr. Chun as to what was actually happening. ECF No. 177 at 20–21, ECF No. 173-1 at 504–515. In the email, the recently-fired Frank Fico tried to warn Dr. Chun that Mr. Feng was using LT Game resources to secretly develop other gaming products. When Dr. Chun asked his brother-in-law about Mr. Fico's email, Mr. Feng's dismissively short reply deliberately misrepresented the facts to make it seem as though the products in question were only a limited special order of unrelated equipment paid

for by Commerce Casino. In reality, those products were part of an entirely separate business line Mr. Feng was operating using LT Game resources. Mr. Feng's statements to Dr. Chun also make it sound as though Mr. Feng was only using Empire as a kind of doing-business-as for LT Game to evade questions from the Nevada Gaming authorities. Dr. Chun chose to believe his brother-in-law over a seemingly disgruntled and/or confused former employee (Mr. Fico) who Dr. Chun had never met. Ex. 2, ¶40.

Defendants also argue that Plaintiffs should have figured out that Empire was engaged in its own separate business based on Empire's website and a handful of industry news articles. However, it is clear that Defendants did not expect that Dr. Chun and Mr. Chan would actually see the website or those articles because Defendants knew that Macau management was relying on the monthly status meetings with Defendants to learn about what was happening in Las Vegas. Ex. 2, ¶¶28, 30; Ex. 3, ¶¶5, 7, 9–10. Indeed, neither Dr. Chun nor Mr. Chan were aware of Empire's website, nor did they read the articles Defendants identify or otherwise learn through the grapevine what Empire was actually doing. Ex. 2, ¶38; Ex. 3, ¶32. The evidence shows that Defendants were in fact worried over the risk that Dr. Chun or Mr. Chan would read about Empire in the news. *E.g.*, Ex. 1-34 at 2 ("███████████████████████████████████████████████████████████████████████████████████████████████.").

It is true that Mr. Chan did briefly skim a July 2021 Empire promotional announcement, though Mr. Chan did not understand the implications of it, and assumed that it was referring only to Empire selling LT Game products in its capacity as the public-facing distributor.[6] Ex. 3, ¶32. Plaintiffs in fact wanted Empire to be successful in its own branding and publicity (so long as it was in the exclusive service of LT Game), and arranged for Defendants to retrofit and re-brand LT Game equipment with Empire's own name. Ex. 3, ¶¶15, 32.

Defendants also try to argue that Dr. Chun and Mr. Chan should have noticed that buried within a handful of email chains were mentions of "Play Synergy," such as "play-synergy.com" email addresses. However, Plaintiffs had no idea that Defendants had adopted the brand name "Play Synergy" for Empire because Defendants deliberately hid that fact from Plaintiffs, nor did they pick up on these handful of references that they had no reason to be looking for in the first place. Ex. 2, ¶39; Ex. 3, ¶¶25, 33.

---

[6] Defendants accuse Mr. Chan of having deleted his text message with Mr. Allison to conceal it. Mr. Chan explains in his Declaration that this is baseless. Ex. 3, ¶32.

Defendants cite testimony from LT Game's accountant, Mr. Medero, that everyone "down to the warehouse guys" knew that Empire was engaged in non-LT Game business. ECF No. 177 at 19. However, as Mr. Medero explains, while people working for Mr. Feng in Las Vegas may have known about non-LT Game business, Macau management did not. Ex. 2, ¶¶23, 37, 39, 50; Ex. 3, ¶¶9–10, 30, 46; Ex. 4, ¶8. Nor would these lower-level employees have necessarily understood that a fraud was being committed since most assumed that Mr. Feng was operating under Dr. Chun's authorization. Ex. 1-49, Dolan Dep. at 127:18–134:20; Ex. 1-51, C. Omohundro Dep. at 20:11–21:17, 52:14–53:25; Ex. 1-52, Chattin Dep. at 41:5–18; Ex. 1-47, Olson Dep. at 23:2–24:4, 18:11–25. None of these lower-level employees had any meaningful direct communication with Macau, nor would they have presumed to interject themselves into what they perceived as a family affair, especially if it might cost them their job. Ex. 1-51, C. Omohundro Dep. at 52:14–53:25 ("[H]e [Dr. Chun] was kind of the Oz to me."); Ex. 1-52, Chattin Dep. at 97:5–99:3 (also conflating Mr. Chan and Dr. Chun); Ex. 1-49, Dolan Dep. at 29:10–15, 127:18–134:20, 165:5–24; Ex. 1-48, Mason Dep. at 169:5–20. Testimony from numerous witnesses confirms that Mr. Feng tightly controlled all communications with Macau. Ex. 1-52, Chattin Dep. at 60:9–13; Ex. 1-49, Dolan Dep. at 127:18–128:11, 133:22–25; Ex. 1-47, Olson Dep. at 116:8–117:7; Ex. 1-55, Medero Dep. at 38:8–18.

Mr. Medero himself had no understanding that Mr. Feng was engaged in fraud because he assumed that Mr. Feng was acting with the consent of his brother-in-law. Ex. 4, ¶8. During his deposition, Mr. Medero was confused over LT Game's reimbursements for Empire's legal fees to obtain gaming licenses, causing him to explain that from his point of view, whatever reimbursements Mr. Feng instructed him to seek from LT Game must necessarily have related to LT Game expenses. Ex. 4, ¶14. Mr. Medero now clarifies that he had no independent appreciation for why it was improper for LT Game to have been footing the bill for Empire's licensing under the circumstances. *Id.*

Finally, Defendants argue that because Plaintiffs relied on Empire to be separately licensed to distribute products for LT Game, Plaintiffs should have been on notice that Mr. Feng would be non-exclusive to Plaintiffs. ECF No. 177 at 28. But that conclusion does not logically follow. There is no reason why Empire could not have been separately licensed and also simultaneously an exclusive distributor for LT Game, as Plaintiffs understood that it was. Defendants point to Nev. Gaming Comm'n Reg. 15.1594-6, which states that one needs to obtain authorization to become a controlling owner of a

licensed company. *Id.* This has no bearing for two reasons. First, Empire being exclusive to LT Game does not equate to LT Game having control within the meaning of that regulation, and in any event Mr. Feng, who was President of LT Game, was in fact personally applying for a license consistent with that regulation. Second, Defendants must be estopped as a general matter from charging Plaintiffs with knowledge of US gaming regulations. Macau management – half a world away – had no meaningful understanding of any such regulations precisely because they had delegated handling of US legal matters to Mr. Feng with instructions to utilize Plaintiffs' lawyers at Lewis Roca to do whatever was necessary to secure licensing.[7] Ex. 3, ¶¶20-21, 39; Ex. 2, ¶¶45–47.

Importantly, it was *Mr. Feng* who had proposed the idea of having Empire be separately licensed from LT Game, assuring Dr. Chun that this was for LT Game's benefit and would make licensing easier. Ex. 2, ¶¶47–48; Ex. 2-1 and 2-2 at Mar. 3, 2015 email sent at 3:13; Ex. 2-27 at July 16, 2016 email sent at 0:05; Ex. 2-28 at Sept. 23, 2016 email sent at 10:36; *see also* Ex. 3-13 at 2–4. Plaintiffs only agreed to this structure – and to paying hundreds of thousands of dollars for Empire to obtain gaming licenses – because they understood that the arrangement was for Empire to exclusively distribute for LT Game. Ex. 2, ¶¶13, 29; Ex. 3, ¶¶39, 41; Ex. 3-5. Mr. Feng now tries to argue that Dr. Chun must have been concerned that Plaintiffs could not themselves be licensed, but this is not true: Paradise has been licensed in Macau and Plaintiffs have an exemplary business record. Ex. 2, ¶47.

### 5.   Defendants Conspired To Usurp Table Games

Coming off the success of the Live Table Games products, Paradise was interested in developing other table game technology. From 2013–2015, Paradise was working on the Table Operation System ("TOPS") for card room dealer cage operations, the CTS-3000 "E-Drop" for automated cash and chip drop, and the Trend Tracker Display ("TTD") display for showing real-time game results. Ex. 2, ¶7. Around September 2016, Mr. Feng proposed that Paradise build off these systems to launch a table game automation system called "LT Hub." Ex. 2, ¶22. Dr. Chun agreed this was a good idea and directed that it be pursued, but then Mr. Feng suddenly back-tracked and said he thought it was not financially feasible.

---

[7] Defendants included an obviously privileged legal memo from Lewis Roca at Ex. B-52 in their Motion, which was the first time Plaintiffs were made aware it had inadvertently been produced. However, without waiving privilege, Plaintiffs do not object to the Court reviewing the memo *in camera*, while otherwise maintaining it under seal. As Plaintiffs have here explained, they gleaned nothing relevant from that memo and in any event were relying on Mr. Feng to take the lead in addressing US legal matters.

Ex. 2, ¶22; Ex. 2-9 thru 2-12 (9/20/18 8:24 email). In fact, Mr. Feng has decided to secretly usurp the table game products for himself under Empire. Defendants went on to continue making and selling table game equipment, including trend boards and chip drop machines. Ex. 1-62, Kiely Dep. at 44:16–23, 78:17–19; ECF No. 168 at 15–18. Mr. Kiely developed all of these technologies under Mr. Feng's direction. Ex. 1-61, Feng Dep. II at 103:8–104:3, 109:1–24, 118:4–120:25; Ex. 1-62, Kiely Dep. at 83:19–84:23, 85:21–87:3, 118:13–121:19, 248:1–249:21. The problem, of course, is that Messrs. Kiely and Feng were fiduciaries of LT Game who should not have been devoting their time to working on these competing projects, much less conscripting LT Game employees to help them. Ex. 1-62, Kiely Dep. at 27:6–18, 53:9–54:11; Ex. 1-61, Feng Dep. II at 104:7–11, 122:25–123:4. Furthermore, Mr. Kiely was under contract to assign all of his inventions to LT Game, and to not allow other companies (like Empire) to use proprietary LT Game information. ECF No. 174-1 at 33, § 6; ECF No. 1-1, §5(b); NRS §600.500 (employer owns inventions created within scope of employment); *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996) (assignment either by express contract, or implied contract where inventing was part of the employee's job). As discussed in Section VIII, Defendants' sale of the table game technology thus constituted trade secret misappropriation. *See, e.g.*, *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 923 (D. Nev. 2006).

The only table game equipment that was ultimately sold by LT Game were Smart Card Shoes that dispense and track playing cards. However, Empire's other table game equipment was designed to be *interoperable* with LT Game's Card Shoes, and the evidence shows that Empire was bundling the table game equipment with LT Game's Card Shoes as a *package deal*, all while concealing that fact from Plaintiffs. Ex. 1-62, Kiely Dep. at 87:7–88:25, 103:17–104:20. Obviously equipment that could be bundled and sold together with Plaintiffs' own Card Shoes represented a usurped LT Game business opportunity. *Robinson, Leatham & Nelson, Inc. v. Nelson*, 109 F.3d 1388, 1392 (9th Cir. 1997) ("The corporate opportunity doctrine prohibits a fiduciary from acquiring, 'in opposition to the corporation, property in which the corporation has an interest or tangible expectancy…'").

**6.  Defendants Allowed Plaintiffs To Believe Empire Was Exclusive To Plaintiffs**

As with Mr. Feng asking Dr. Chun's permission to merge Mr. Wang's company to form Empire, Mr. Feng continued to allow Dr. Chun to believe that Empire existed solely to serve LT Game. In 2019,

after learning that Mr. Feng had granted Mr. Kiely shares in Empire, Dr. Chun ordered that Mr. Feng take them back, and Mr. Feng dutifully obeyed. Ex. 2, ¶29; Ex. 2-15; Ex. 3, ¶7; Ex. 3-17, ETG110699 [Oct. 2019 email], at 1; Ex. 1-9 at 3. In monthly meetings, Plaintiffs directed Mr. Feng to work with Plaintiffs' attorneys at Lewis Roca (who Plaintiffs were paying) to obtain more licenses for Empire, and requested regular updates on Empire's licensing status, which Plaintiffs monitored closely. Ex. 2, ¶¶45–47; Ex. 3, ¶¶20, 39; Ex. 3-7 at 1; Ex. 3-8; Ex. 3-9 at 1. Despite constant interactions with Macau management via monthly meetings and emails, at no time did Defendants say anything about the fact that they were devoting most of their time to separate pursuits for Empire, having colluded to keep that a secret. Ex. 1-61, Feng Dep. II at 149:25–155:10; Ex. 1-62, Kiely Dep. at 116:14–117:20, 132:11–134:15, 146:13–19, 220:14–221:11; Ex. 1-56, Allison Dep. I at 133:10–134:15, 148:9–149:1, 158:2–159:4, 183:19–185:18, 214:20–217:6; Ex. 2, ¶¶23, 37, 39, 50; Ex. 3, ¶¶9–10, 46.

**7.    Mr. Feng Covertly Formed Numerous Companies To Implement His Plans**

Between 2016 and 2023, Mr. Feng formed at least 16 companies while keeping their existence a secret from Plaintiffs because he knew that they would have been a red flag to Macau management. ECF No. 98-2 at ETG174098–100. As discussed in Section IV.6, Mr. Feng used Solution Gaming to ▇▇▇▇ ▇▇▇▇▇▇. Mr. Feng's secret formation of F2 in 2020 is discussed in Section V. Mr. Feng also formed numerous real estate companies, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇. Ex. 1-61, Feng Dep. II at 141:7–15 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇); Ex. 1-62, Kiely Dep. at 210:7–10 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇). Mr. Feng used one of those companies to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, which he kept secret from Plaintiffs.  Ex. 1-61, Feng Dep. II at 151:24–152:13 ("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."). In early 2021, Mr. Feng formed Akkadian as a holding company, and used it to self-deal and purchase assets from another gaming equipment company, Synergy Blue. Ex. 1-61, Feng Dep. II at 138:15–19. Defendants try to argue that this was not an LT Game corporate opportunity, but Defendants knew they were violating their fiduciary duties, which is why Messrs. Feng and Allison ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Ex. 1-22, ETG160968 (directive at bottom of email). And as discussed in Section IV.2, Dr. Chun had directed Mr. Feng to pursue all profitable gaming industry

opportunities, not just Class III slot machines.

### 8.      Defendants Devoted Their Time And LT Game Resources To Empire

Messrs. Feng, Kiely, and Allison breached their fiduciary duties by covertly devoting the majority of their working hours to secret Empire projects. Ex. 1-10, ETG133585 (██████████████████████), at 3; Ex. 1-18, PARADISE11768 (████████████████████████████), at 1–2; Ex. 1-36, ETG194619 (████████████████████████), at 3–4; Ex. 1-39, ETG204992 (████████████████████████████), at 1; Ex. 1-56, Allison Dep. I at 107:2–21; Ex. 1-62, Kiely Dep. at 225:3–23; Ex. 1-28, ETG171655 (2022 WeChat), at 3 ("████████████████████████████████"), 4 ("████████████████████████████████████████████ Ex. 1-32, ETG173685 (June 2022 WeChat), at 5 ████████████████████████ Ex. 1-101, ETG194672 at 673 ██████████, ████████████████████████████ Ex. 1-39, ETG204992 ████████████ Ex. 1-11, ETG135865 ████████████████ Ex. 1-17, ETG155552 (2021 Email from Feng: "████████████████████████████████ Ex. 4, ¶11.

To keep their employment at Empire secret from Plaintiffs, Mr. Feng ████████████████████████████████████████████. Ex. 1-39, ETG204992 (June 2023 email), at 1 ████████████████████████████████████████ Ex. 1-36, ETG194619 (Feb. 2023 email), at 4 ████████████████████████████ Ex. 1-62, Kiely Dep. at 69:12–20; Ex. 1-104, Allison Dep. II at 331:15–333:24, 335:17–336:2; Ex. 1-61, Feng Dep. II at 115:11–20. The three of them admit to ████████████████████████████. Ex. 1-61, Feng Dep. II at 150:23–151:7; Ex. 1-104, Allison Dep. II at 370:8–17; Ex. 1-62, Kiely Dep. at 65:20–23. If Defendants believed that what they were doing was permissible, then they would not have gone to such lengths to conceal it.

While Defendants pretend that LT Game and Empire were separate, the reality is that all the same people were always all under the same roof, and Defendants were covertly re-directing LT Game employees, money, and resources to fuel Empire. Until September 2021, both companies' primary address

was 6295 Harrison Drive, and LT Game paid 100% of the rent. Ex. 1-63, 2025.12.1 Feng Resp. To Paradise Interrog. No. 23. In 2021, Mr. Feng secretly purchased the property at 7175 West Post Road and relocated everyone – including LT Game employees – to that address. Ex. 4, ¶4. So as not to raise suspicion, Mr. Feng arranged for a lease to continue at 6445 W. Sunset Road to serve as LT Game's address when in fact no one used that location. *Id*.

Numerous depositions of former employees reveal that they viewed Mr. Feng as the head of a unified LT Game-Empire operation, with little difference between the two companies.  Ex. 1-52, Chattin Dep. at 24:7–26:23, 27:12–28:24, 126:3–8; Ex. 1-51, C. Omohundro Dep. at 18:18–19:17, 19:18–20:1, 21:4–17; Ex. 1-50, P. Omohundro Dep. at 20:23–22:20, 37:15–38:9, 53:7–54:6; Ex. 1-47, Olson Dep. at 21:9–26:1, 117:8–120:12; Ex. 1-48, Mason Dep. at 22:10–25:20, 164:17–165:12. Mr. Feng likewise treated LT Game employees as extra labor for Empire, ordering them to perform work for Empire's benefit despite those employees being on LT Game payroll. Ex. 4, ¶¶3, 5–6, 11–12; *see* Ex. 1-40, ETG205774, at 797 ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. 1-39, ETG204992 ██████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████; Ex. 1-23, Glaser Dep. Ex. 172 (████████████████████); Ex. 1-8, ETG69508 at 509 (██████████████████████████████████████████████████████ ████████████); Ex. 1-42, Medero Dep. Ex. 200; ECF No. 98-2 at 10–11 (ETG174095 at 4103).

Mr. Kiely has admitted ████████████████████████████████████████ ████████. ECF No. 169, ¶4; Ex. 1-62, Kiely Dep. at 33:11–14, 118:13–122:21; Ex. 1-44, 2024.08.02 Kiely Resp. To Paradise Interrog. No. 10; ECF No. 98-2 (ETG174095) at 4105; Ex. 1-40, ETG205774 at 797. Mr. Feng and Mr. Kiely even secretly recruited a Paradise computer engineer in China—Kevin Feng—to use Paradise resources and employees to develop software for Empire. Kevin Feng ████████ ████████████████████████████████████████████████. Ex. 1-62, Kiely Dep. at 39:7–17; Ex. 1-26, ETG169942 at 944–46; Ex. 1-28, ETG171655 at 658; Ex. 1-14, ETG147938, at 941–43; Ex. 1-94, ETG201528, at 529–534. Mr. Kiely and Kevin Feng engaged in conspiratorial correspondence that reflects their awareness of and participation in a years' long fraud upon Plaintiffs. *Id*.

### 9.    Mr. Feng Leveraged Plaintiffs' Own Lawyers To Deceive Plaintiffs

Plaintiffs (through LT Game) had engaged Lewis Roca as their US gaming law counsel in 2011, and there is a formal original engagement agreement that memorializes that. ECF No. 55-2 at 34–65 (engagement agreements). Although Plaintiffs paid Lewis Roca's bill, Dr. Chun and Mr. Chan delegated to Mr. Feng the responsibility to work with Lewis Roca to manage legal affairs for LT Game in the United States. Ex. 2, ¶¶43–45; Ex. 3 ¶¶37–43. Plaintiffs knew little about U.S. gaming law, and trusted that Mr. Feng would handle legal matters as a loyal fiduciary, just as they trusted that Lewis Roca, as LT Game's lawyers, would zealously advocate for LT Game. *Id.* That is not what happened.

Unbeknownst to Plaintiffs, Mr. Feng began using Lewis Roca to advise him on his separate dealings for Empire. At no time did Lewis Roca ever inform Macau management that they were advising Mr. Feng on separate projects, such as the F2 venture, or the formation of other gaming companies.[8] Ex. 2, ¶¶44–46; Ex. 3, ¶¶38, 43. Despite this, Lewis Roca perceived a clear conflict of interest, and on multiple occasions required Empire and LT Game to sign conflict waivers. ECF No. 90-7; ECF No. 90-9, ¶10; Ex. 1-15 (LT Game conflict waiver signed by Mr. Feng); Ex. 1-16, ETG350192 (Empire conflict waiver signed by Mr. Feng). The problem is that Mr. Feng never told Macau management about these waivers, and instead *secretly executed them all himself on behalf of both companies*. Ex. 2, ¶¶49–52; Ex. 3, ¶¶44–47. This was legally improper. *See Site Mgmt. Servs., Inc. v. Cingular Wireless LLC*, 2014 WL 971714, at *16–17 (Cal. Ct. App. Mar. 13, 2014) (agreements are voidable where procured by fraud due to an undisclosed conflict of interest); *Snider v. State ex rel. Oklahoma Real Est. Comm'n*, 987 P.2d 1204, 1208–09 (Okla. 1999) (contracts resulting from conflicted dual representation voidable).

Mr. Feng also used Lewis Roca to prepare a secret "Shared Services Agreement" between LT Game and Empire, again failing to inform Macau management and signing for both companies. Ex. 2, ¶37; Ex. 3, ¶44; Ex. 1-12, ETG322349. The purpose of that agreement was undoubtedly to make it appear as though there was daylight between LT Game and Empire for the benefit of the Nevada regulators, but the fact is that Plaintiffs never even knew the agreement existed. That is because Mr. Feng knew it would have raised red flags if Dr. Chun and Mr. Chan ever saw it.

---

[8] This briefing should not be taken as asserting legal claims against Lewis Roca. Plaintiffs merely state the Lewis Roca did not, in fact, inform Macau management of various information.

Believing that they were paying for their exclusive distributor to be licensed for LT Game's benefit, Plaintiffs reimbursed Empire over $600,000 to cover Lewis Roca legal fees directly related to Empire's licensing efforts. Ex. 1-66, Nelson Report, Sch. 10; Ex. 2, ¶29; Ex. 3, ¶43. However, at no time did Mr. Feng or Lewis Roca inform Plaintiffs that Empire had no intention of being exclusive to Plaintiffs, or about any other of Mr. Feng's secret dealings and misconduct. Ex. 2, ¶¶44–52; Ex. 3, ¶¶38–48.

In early 2025, Plaintiffs filed a motion to compel the communications of Messrs. Feng, Kiely, and Allison with Lewis Roca during the time periods when they were fiduciary officers of LT Game. ECF No. 55 (later re-filed at ECF No. 87). Plaintiffs argued that those communications should be deemed part of their own Lewis Roca client file, and should be discoverable under the crime-fraud exception to attorney-client privilege. *Id.* However, the evidentiary record presented at that time was quite limited, comprising only two affidavits and almost no exhibits, as well as occurring before party depositions and much of the parties' document productions. The Magistrate Judge denied the motion without prejudice, inviting Plaintiffs' to re-file their motion in the future with more evidence of Defendants' fraud that would justify invoking the crime-fraud exception. ECF No. 128 at 18. Plaintiffs have waited to re-visit this issue until after the resolution of summary judgment so as to allow the Court to be assured of the propriety of invoking the crime-fraud exception. Plaintiffs would otherwise have been filing a motion to compel that itself would have been tantamount to a preemptive summary judgment motion on the ultimate issue of whether Defendants did or did not commit fraud. In resolving the present Motion, the Court should bear in mind that evidence is not yet in the record of Defendants' communications with Lewis Roca, including any communications that may have been overtly in furtherance of committing fraud upon Plaintiffs.

**10.     All Post-2016 Agreements Are Void As Having Been Procured By Fraud, And Regardless Do Not Support Defendants' Arguments**

Defendants argue that their affirmative defense of consent is supported by the ongoing Renewals of the 2016 Framework Agreement as well as three other agreements dated October 31, 2021 between LT Game and Empire ("2021 Agreements") that, among other things, purport to assign LT Game's IP to Empire. ECF No. 177 at 6–7; ECF No. 173-1 Exs. B-4, B-10, B-57. However, Plaintiffs never would have entered *any* of these agreements if they had known of the fraud and criminal misconduct being perpetrated on them, or that Empire was not exclusive to LT Game. Thus, all those agreements are void for having

PLAINTIFFS' OPP. TO SUMMARY JUDGMENT
Case No. 2:24-cv-00428-JCM-BNW

been entered into under ongoing false pretenses and disinformation. *See T1 Payments LLC v. New U Life Corp.*, 2022 WL 195111, at *5 (D. Nev. Jan. 21, 2022) (rescission for fraudulent inducement).

Beyond this, the 2021 Agreements are also void because Mr. Feng falsely represented that Lewis Roca was acting as *Plaintiffs'* counsel in advising Dr. Chun to execute the agreements as a necessary step in Empire's licensing process, with Mr. Feng still maintaining the façade that Empire was exclusive to LT Game. Ex. 2, ¶50; Ex. 3, ¶46. All of this was a lie. Indeed, Plaintiff never even knew that Empire purported to have a separate engagement with Lewis Roca, and Mr. Feng kept them in the dark. Ex. 2, ¶44; Ex. 3, ¶38. Mr. Feng secretly worked with Lewis Roca to devise the 2021 Agreements exclusively for the benefit of *Empire* to dupe Nevada regulators into believing that Empire was unconnected to LT Game. Ex. 1-19, ETG282259 (Mr. Feng forwarding Mr. Chan's email separately to Glenn Light for review). Mr. Feng has admitted under oath that Lewis Roca was *adverse* to Plaintiffs with respect to the 2021 Agreements. Ex. 1-61, Feng Dep. II at 153:1–156:6. Despite this, Mr. Feng took advantage of the fact that Plaintiffs believed that Lewis Roca was acting as *Plaintiffs'* lawyers to tell Dr. Chun that "our lawyers" advised signing the agreements for *Plaintiffs'* benefit. Ex. 1-19, ETG282259 at ETG282261 (10/27/21 email referring to "our lawyers" forwarding 10/10/21 email from Lewis Roca).

Lewis Roca sent the October 10, 2021 email to Mr. Feng's LT Game hk1180.com email account, and Mr. Feng forwarded using his LT Game signature line as President of LT Game. Meanwhile, Lewis Roca separately sent the Nevada regulators and Mr. Feng (at his Empire email) an entirely *different* email laying out a master plan of what was actually going on, and attaching a Termination of the secret Shared Services Agreement (the one that Plaintiffs had never seen in the first place). Ex. 1-21, BARLOW1236; Ex. 1-13, BARLOW1299 (October 31, 2021 Termination of Shared Services Agreement). Mr. Feng admits never informing Plaintiffs that Lewis Roca was adverse to LT Game with respect to the 2021 Agreements, and Lewis Roca never separately advised Plaintiffs of that critical fact. Ex. 1-61, Feng Dep. II at 153:1–156:6; Ex. 2, ¶¶50–51; Ex. 3, ¶¶46–47.

Lewis Roca knew full well that there was a clear conflict of interest, which is why they prepared an elaborate *conflict waivers* for LT Game and Empire to execute for the 2021 Agreements. Ex. 1-15, September 21, 2021 LTG conflict waiver signed by Mr. Feng; Ex. 1-16, ETG350192 Empire conflict waiver signed by Mr. Feng. Yet, once again, the only person signing both conflict waivers was Mr. Feng

PLAINTIFFS' OPP. TO SUMMARY JUDGMENT
Case No. 2:24-cv-00428-JCM-BNW

himself: Plaintiffs never even knew these conflict waivers existed. Ex. 2, ¶51; Ex. 3, ¶47. This is fraud.

Mr. Feng has tried to argue that Plaintiffs must have known that Lewis Roca was adverse to them because they had Paradise's in-house counsel Boris Lee take a look at the draft agreements. This is nonsense. Mr. Feng knows full well that Mr. Lee has no substantive knowledge of U.S. gaming law (or what was actually going on with Empire generally), and only made a cursory review just as any in-house lawyer would when outside counsel sends something to sign. Ex. 2, ¶¶43, 45, 46, 50; Ex. 3, ¶46.

The fraudulent inducement here is twofold. First, had Plaintiffs known of all of Defendants' misconduct in the time period leading up to the 2021 Agreements (or the Framework Agreement Renewals), Dr. Chun never would have signed. Second, if Plaintiffs had known that their own lawyers were *adverse* to them in the 2021 transaction, or what Mr. Feng's real motivations were for the 2021 Agreements, Dr. Chun never would have signed. Ex. 2 at ℙ50-52; Ex. 3 at ℙ46-47. The Court has sufficient evidence at its disposal to grant summary judgment under Rule 54(f) that the 2021 Agreements and post-2016 Framework Agreement Renewals are void as having been procured by fraud. *See T1 Payments LLC v. New U Life Corp.*, 2022 WL 195111, at *5 (D. Nev. Jan. 21, 2022) (rescission for fraud).

Even if the 2021 Agreements were deemed valid (which they are not), they do not support Defendants' consent defense. Nothing about these agreements granted Defendants consent to lie, cheat, and steal. Nor do they state that Empire was non-exclusive to LT Game. As to the purported intellectual property transfer, the Game Development Agreement ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ (173-01, Ex. B-4 at p. 2–3, §4(a)), but there is no evidence that ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. That is because the 2021 Agreements were only for show, devised to mollify the Nevada gaming regulators rather than reflecting any legitimate business transactions.

### 11.     Defendants Covered Up Their 2022 Theft Of LT Game's Card Shoes

LT Game had a lucrative arrangement whereby, using Empire as its distributor, it leased LT Game Card Shoes to Commerce Casino. Ex. 2, ¶41; Ex. 3, ¶36. On January 21, 2022, Mr. Feng wrote to Dr. Chun and Mr. Chan to present a fraudulent narrative that Commerce had found a new supplier for card shoes and was thus terminating the lease. Exs. 2-18, 3-10 at 1. In fact, Mr. Feng re-labeled the LT Game card shoes to say "Play Synergy" and just re-directed the lease revenue to Empire, ultimately stealing over $600,000 in what should have been LT Game profit. Ex. 1-60, Feng Dep. I at 57:14–58:19; Ex. 1-41,

Private Investigator Report at 4, 9; Ex. 1-66 at ¶57, Sch. 18; Ex. 4, ¶10. Plaintiffs inquired many times about the status of the card shoes, but Mr. Feng deflected these questions and maintained the fraud. Ex. 2, ¶41; Ex. 3, ¶36; Ex. 1-27 at 2 [Mr. Feng to Mr. Allison]: "███████████████████████████ ████████████████████████████████████████████████████████████ ███████".

### 12.     Mr. Feng Misled Plaintiffs About His Resignation, And Continued To Conspire With Plaintiffs' Employees To Commit Fraud

When Mr. Feng resigned as President of LT Game in February 2022, Mr. Feng doubled down on his fraud, professing to Dr. Chun ("Boss") that he would continue to loyally bring opportunities to Plaintiffs. Exs. 2-16, 2-17. Plaintiffs had no real knowledge of what Mr. Feng did after that. Ex. 2, ¶¶9– 10; Ex. 3, ¶16. Consistent with Mr. Feng's professed intent to continue to help LT Game, Mr. Chan initially speculated that Mr. Feng would nominally keep Empire running so as to be in a position to distribute LT Game products if LT Game ramped back up. Ex. 3, ¶23. For Dr. Chun's part, he had assumed that Mr. Feng was now focusing on his frozen yogurt shop franchise. Ex. 2, ¶31.

In reality, Mr. Feng had not changed a thing about what he was doing. He was still at the same office giving orders to the same employees. Ex. 4, ¶6; Exs. 1-24; 1-27; 1-29; 1-30; 1-32; Ex. 1-55, Medero Dep. at 157:22–158:17. No sooner had he resigned then Mr. Feng was directing Messrs. Kiely and Allison to defraud Plaintiffs and re-direct employees to Empire. Ex. 1-67 at 476–478 (Feng eavesdropping on Kiely call with Mr. Chan, Mr. Feng instructing Kiely to lie to "stupid guy" Mr. Chan, "Who cares. F*ck them."); Ex. 1-24 at ETG167646 (████████████████████████████████ Ex. 1-105 at ETG172096 (█████████████████████████████████

In May 2022, Plaintiffs had engaged Mr. Allison (through LT Game) as their sales agent to sell inventory of slot machine units. Ex. 1-56, Allison Dep. I at 89:17–95:5; Ex. 1-45 at Rog no. 11. Mr. Allison reported finding a buyer: Solution Gaming. Ex. 1-45 at Rog No. 11. What neither Mr. Feng nor Mr. Allison revealed to Plaintiffs was that Solution Gaming was Mr. Feng's company, and that Mr. Allison was actually taking his orders from Mr. Feng in this transaction rather than acting as Plaintiffs' sales agent. Ex. 1-60, Feng Dep. I at 86:2–87:8; Ex. 2, ¶37k; Ex. 3, ¶34. The result is that Mr. Feng, using Mr. Allison, duped Plaintiffs into selling the equipment to Solution Gaming at $1 million below true market value.

Ex. 3-20 at 13–14; Ex. 1-29 at 2–3; Ex. 1-30 at 2; Ex. 1-31; Ex. 1-56, Allison Dep. I at 197:18–198:1.

In April 2023, Mr. Feng wrote a private message to Messrs. Kiely, Allison, Mason, and Olson instructing them that he wanted "████████████████████████." Ex. 1-38 at 2. He then instructed them to gather "█████████████████████████████████████████████████████ ████████████████████████." *Id.* None of the Defendants told Plaintiffs about this secret order, which amounts to Mr. Feng committing corporate espionage with the assistance of LT Game's own employees. Ex. 1-60, Feng Dep. I at 68:12–18; Ex. 1-56, Allison Dep. I at 222:17–20. Mr. Feng has since tried to justify his April 2023 directive as authorized by the 2021 Agreements, which he claims vested Empire with all LT Game IP. Ex. 1-60, Feng Dep. I at 65:14–67:10. That argument fails for the reasons explained in Section IV.10. Beyond that, if Defendants really believed that they were authorized, they would not have proceeded in guilty secrecy.

In February 2023, Mr. Chan alerted Mr. Allison that he had seen an announcement about the impending bankruptcy of gaming equipment manufacturer Aruze, and asked Mr. Allison (as GSL's consultant to LT Game) to explore what people and technology might be acquired by Paradise in the bankruptcy. Ex. 3-20 at 20. Mr. Allison of course knew that Mr. Feng was already eyeing an acquisition of Aruze, and admits that he killed the line of inquiry and failed to tell Plaintiffs what was actually happening. *Id.*; Ex. 1-56, Allison Dep. I at 266:15–267:7; Ex. 1-35 at 2 ("████████████████████ ████████████████████████████████████████").

After initially being informed of Empire's acquisition of the Aruze assets in mid-2023, Plaintiffs were confused about what was going on, and proposed to Mr. Feng that he assign the Empire licenses back to LT Game if he planned to pursue a different venture with Aruze, not appreciating that the licenses are non-transferrable. Ex. 2, ¶¶35–36. It was once litigation began that Plaintiffs uncovered all the misconduct discussed in Section IV that had happened over the preceding seven years. *Id.*; Ex. 3, ¶26. Amazingly, Mr. Feng continued to conscript Plaintiffs' employees to defraud Plaintiffs even after the Aruze acquisition. As Plaintiffs argued in their briefing on Betty Zhao's personal jurisdiction motion, there is substantial evidence pointing to Mr. Feng having recruited her to run cover for him within Paradise. ECF No. 78 at 13. Though Ms. Zhao denies this, the fact is that within one month of her resignation from Plaintiffs in October 2023, she had been appointed head of Empire's Macau office with

PLAINTIFFS' OPP. TO SUMMARY JUDGMENT
Case No. 2:24-cv-00428-JCM-BNW

a directive from Mr. Feng to compete directly with Paradise in the Macau market. ECF No. 77–1, ¶46.

### 13.    The Nevada Gaming Regulators Are Holding Up Empire's Licensing

The Nevada gaming regulators, having conducted their own independent investigation, have now twice declined to issue an unrestricted license to Empire and Mr. Feng. During a March 2023 hearing before the Nevada Gaming Control Board, Mr. Feng claimed that he used his own money to fund the 2020 creation of F2, instead of admitting the truth that he had taken $1 million out of LT Game's bank account. https://www.youtube.com/watch?v=-p9OlNWsh7Q, at 6:37:30–6:37:55; Ex. 1-40 at 31. During a July 2023 hearing, the Commission called Mr. Feng out on this and expressed concerns that something was amiss with respect to the story of LT Game and Empire, deciding to only grant Empire a temporary 2-year license pending further investigation. https://www.youtube.com/watch?v=0cmV2NjPpFU, at 2:02:40–2:13:00; 2:24:09–2:2730. When Empire came back up for re-licensing in July 2025, Mr. Feng's lawyers made all the same arguments they make in their summary judgment motion, including falsely alleging that the Framework Agreement gave consent for Mr. Feng to do essentially whatever he wanted. https://www.youtube.com/watch?v=2UnaLTJyc2o at 3:28:20–3:29:35. The Nevada Gaming Commission members were not persuaded and continued to voice concerns over this lawsuit. https://www.youtube.com/watch?v=6Ck262AKQPk at 2:41:50–2:46:41; 2:47:47–2:49:28, 2:53:25–2:54:13. They ultimately granted Empire only a 5-year limited license, thereby allowing this lawsuit to be resolved before full licensing would be considered. *Id.* at 3:19:50–3:29:25.

## VI.    F2 WAS A USURPED BUSINESS OPPORTUNITY, AND MR. FENG EMBEZZLED $1 MILLION FROM LT GAME TO GET IT

### A.    Mr. Feng's Unlawful Scheme To Usurp The Hawaiian Gardens TPPPS Opportunity

From 2011 and through the pre-pandemic years, Dr. Chun met many times with Jeff Harris – a senior manager of Commerce Casino, California's largest card room – to discuss becoming involved in third party banking and operations in California card rooms. Ex. 2, ¶¶14–20. Dr. Chun invited Mr. Feng to several of these meetings and specifically instructed Mr. Feng to explore such opportunities for LT Game. *Id.*; Ex. 2-8 (invite); Ex. 2-23 and 2-24 at item (5) about banking. Indeed, Mr. Feng prepared elaborate presentations to Dr. Chun recommending Paradise form new companies, including to act as Third Party Player Proposition Service ("TPPPS") banking vendors. Ex. 2 at ℙ 20, Exs. 2-5, 2-6

(recommending to establish a company for "banking the games" and noting that "our partner Jeff [Harris] is also willing to make a [] cash investment"), Exs. 2-7, 2-7A, 2-7B. Dr. Chun remained interested in TPPPS and instructed Mr. Feng to continue looking for such opportunities. Ex. 2 at ⁋ 18-19.

As of 2019, Commerce Casino's owners were engaged in a lucrative TPPPS business proving banking services for nearby Hawaiian Gardens casino under the banner of a company called Acme. Ex. 1-73, Lichtig Dep. at 43:2–46:17. Hawaiian Gardens Casino's managers we reciprocally providing TPPPS banking services to Commerce Casino under Progressive Gaming. *Id.* The reason for the existence of independent TPPPS vendors in California is that Section 330 of the California Penal Code (which is not otherwise at issue in this case) prohibits card room operators from acting as their own bankers. In 2019, California regulators decided that the Commerce-Hawaiian Gardens arrangement amounted to an end-run around this regulation, and so required Hawaiian Gardens to get a new TPPPS vendor. Ex. 1-73, Lichtig Dep. at 43:2–46:17.

This was precisely the moment that Dr. Chun was waiting for to break into the California card room market, except that he and Plaintiffs never knew about it. Leveraging his connections with Jeff Harris and Commerce Casino – connections Mr. Feng never would have had but for Dr. Chun and his role with LT Game – Mr. Feng got the inside track to take over the Acme TPPPS contract. Mr. Feng formed a new California company that he called F2 TPS, LLC ("F2"), and stepped into the shoes of Commerce Casino's pre-existing Acme TPPPS business with the blessing of Mr. Harris. Ex. 1-73, Lichtig Dep. at 145:7–148:15; Ex. 1-40 at ETG205779.

Mr. Feng was required to put up $3 million cash, but with the deadline looming, Mr. Feng was only able to secure $2 million, so turned to LT Game's bank account to misappropriate the remaining $1 million that he urgently needed. Ex. 1-40 at ETG205804 (confirming Mr. Feng would have lost the bid without LT Game's money). Mr. Feng instructed LT Game's accountant, Marcos Medero, to make the transfer, falsely telling him that Mr. Chan had approved, but then directing him to erase all records of the transaction. Ex. 4, ¶9. Following Mr. Feng's instructions, Mr. Medero edited LT Game's bank statements to delete the $1 million withdrawal. *Id.* From 2020–2025, F2 would go on to generate over ███████ in profit. Ex. 1-66, Expert Report of Clarke B. Nelson, Schedule 3. Mr. Feng put at least ███████ ███████ of that money back into Empire, ironically further facilitating Empire's usurpation of LT Game's

business. Ex. 1-61, Feng Dep. II, at 135:5–9; Ex. 1-37, BARLOW4291, at 314. F2 should have been LT Game's corporate opportunity, but Plaintiffs did not even know it existed. Ex. 2, ¶¶21, 28; Ex. 3, ¶¶7, 34.

## B.    Defendants' Affirmative Defense Of Legal Impossibility Fails

Defendants' arguments concerning F2 amount to an affirmative defense of legal impossibility for which they bear the burden of proof. *Polaris Processing, LLC v. New Rise Renewables Reno, LLC*, 812 F. Supp. 3d 1133, 1138 (D. Nev. 2025). While Plaintiffs may bear the burden to generally demonstrate what *types* of business constitute corporate opportunities, it is the fiduciary's burden to establish any supposed *impossibility* of the company to engage in a venture that the fiduciary wants to keep for themselves. *In re Signature Apparel Grp.*, 577 B.R. 54, 104 (Bankr. S.D.N.Y. 2017) ("The burden is on a fiduciary to show that…the corporation was not in a position to take advantage of the opportunity."); *Engenium Sols., Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757, 793–94 (S.D. Tex. 2013) (same); *In re Silverman*, 155 B.R. 362, 378 (Bankr. E.D.N.C. 1993) (same); *Spangler v. Spangler*, 451 F. Supp. 3d 813, 828 (N.D. Ohio 2020) (same).

Here, Mr. Feng has presented his legal impossibility defense through the testimony of a California gaming lawyer/business consultant Tiffany Lichtig, who has provided an expert report arguing that then-existing California regulations in 2020 would have barred Plaintiffs from participating in the Hawaiian Gardens TPPPS opportunity. ECF No. 171. Specifically, Ms. Lichtig points to the now-repealed 4 CCR §12204 to argue that it made Cal. Bus. & Prof. Code § 19858 applicable to TPPPS entities, meaning according to Ms. Lichtig that a company that derived revenue from forms of gambling that are unlawful in California (like slot machines) could not participate in TPPPS businesses in 2020 prior to the repeal of §12204 in 2021. *Id.* at ¶13. Ms. Lichtig also points to Cal. Bus. & Prof. Code § 19852 to assert that every Paradise shareholder would have needed to be licensed for TPPPS, and that this would have been impractical. *Id.* at ¶¶20–23. None of Ms. Lichtig's regulatory analysis is correct.

In response to Ms. Lichtig, Plaintiffs have presented California gaming lawyer Jarhett Blonien, whose Declaration is filed herewith as Ex. 5. As discussed by Mr. Blonien, a foundational error in Ms. Lichtig's analysis is her assumption that in order to have taken advantage of the Hawaiian Gardens TPPPS banking opportunity, Paradise or LT Game would needed to have directly applied in early 2020 and been immediately subjected to full licensing scrutiny at that time, with all Paradise shareholder subject to

licensing. All of this is either incorrect or misleading.

First, Mr. Blonien clarifies that there was no full licensing process happening for TPPPS entities in 2020. Ex. 5, ¶¶17–19, 24–25. Rather, then-existing regulations required Mr. Feng to do little more than fill out some simple paperwork, with substantive licensing deferred until much later. *Id.* ¶19. In fact, California regulators never ended up getting around to doing a full licensing examination of F2, with F2 operating only on temporary status until it wound down in 2025. Ex. 1-60, Feng Dep. I at 85:20–21. Thus, F2 was never actually subjected to full licensing requirements. This is relevant for several reasons discussed below, including the January 2021 change in regulations.

Second, Mr. Blonien explains that Ms. Lichtig's assumption that Paradise or LT Game would directly apply for the TPPPS business fails to address the obvious scenario of LT Game having simply arranged for Mr. Feng to do precisely what he actually did do: form a new company (F2) to take advantage of the opportunity, except doing so on behalf of LT Game instead of Empire. Ex. 5, ¶¶41–45. Indeed, this had been Mr. Feng's explicit proposal to Dr. Chun in 2016 when he recommended that *new* companies be created in California to pursue card room banking. 2-5, 2-6, 2-7, 2-7A, 2-7B. By failing to address this scenario, much of Ms. Lichtig's analysis is simply off base. As Mr. Blonien explains, Mr. Feng could have just started the TPPPS business with F2 as he in fact did, and, to the extent it were even necessary, join LT Game in the licensing process at a much later date. Ex. 5, ¶29. Indeed, the way things turned out LT Game would never have actually needed to be licensed. *Id.* ¶28.

Third, Mr. Blonien points out that Cal. Bus. & Prof. Code § 19858 expressly does not apply to TPPPS entities, but rather only to "gambling establishments," which are defined in § 19805(o) to refer to card rooms, not TPPPS vendors. *Id.* ¶22. While old 4 CCR § 12204 creates some confusion as to the state of the regulatory requirements at the start of 2020, the revised 2021 regulation, 4 CCR § 12040, clarifies that Cal. Bus. & Prof. Code § 19858 does not apply to TPPPS entities. *Id.* ¶23. Particularly given the minimalistic registration process in effect in 2020, no one would even have had to debate the applicability of § 19858 at the time because no substantive licensing examination of such issues was even happening. If there had been a later need to license LT Game directly, they could have been added to the process at a later time, and the regulation would have been repealed by January 2021 anyway. *Id.* ¶29. Moreover, LT Game was never even engaged in any "unlawful" gambling business in 2020 or at any other time, having

PLAINTIFFS' OPP. TO SUMMARY JUDGMENT
Case No. 2:24-cv-00428-JCM-BNW

only ever been an equipment seller. *Id.* ¶34.

Fourth, Mr. Blonien explains that Cal. Bus. & Prof. Code § 19852 would not have posed any impediment, and that there would not have been any need to license every Paradise shareholder. *Id.* ¶¶31–41. First of all, considering LT Game as the proper entity in question, its only "shareholder" is an intermediate holding company, not Paradise or Paradise's shareholders. *Id.*, ¶31. The express terms of § 19852(a) only call for licensing of immediate shareholders and expressly exempts from consideration any "holding or intermediary company." *Id.*, ¶¶35–36. Even if the California regulators had separately wanted to license persons higher up the ladder like Dr. Chun, there would have been no impediment to doing that. *Id.*, ¶¶37–39. Regardless, F2 never ultimately went through full licensing, operating through 2025 (until its closure) based on a temporary status. *Id.* ¶28; Ex. 1-60, Feng Dep. I at 85:20–21.

Finally, Ms. Lichtig did not address whether Mr. Feng had identified himself to the California regulators as the President of LT Game or informed them that LT Game was the key funding source of the $1 million seed money. Ex. 5, ¶47. If Mr. Feng did disclose these strong ties to Plaintiffs, the connection obviously caused no concern to the regulators under any of the applicable regulations. *Id.*

Notably, it was Mr. Feng himself who eagerly proposed to Dr. Chun that Paradise form a new TPPPS banking company in California and indicated that licensure would be simple. Exs. 2-5, 2-6 (recommending to establish a company for "banking the games," item (4) noting "compliance requirements…are much simpler"), 2-7, 2-7A, 2-7B (*see* PARADISE 68712, item (1)). In any event, it is clear that, at a minimum, there are disputed questions as to the legal impossibility issue that preclude summary judgment on this record.

**C.     Defendants Have Waived A Summary Judgment Challenge To Plaintiffs' Alternative Theory Of Unjust Enrichment Recovery Of F2 Profits**

Defendants' Motion incorrectly asserts that if the F2 opportunity were deemed legally impossible for Plaintiffs to take advantage of, "the claim fails." ECF No. 177 at 29–30. However, Plaintiffs' pleadings, discovery responses, and Mr. Nelson's damages expert report all explained that Plaintiffs seek to recover F2 profits as unjust enrichment in the alternative to a theory of actual injury. Ex. 1-66, Nelson Report ¶41 (F2 profit as unjust enrichment); ECF No. 69, ¶¶118–122, 223, 243, 249, 263, 277–280, 290; Ex. 1-53 at p.25–26; Ex, 1-65 at p.12–14, 18–40, 56–57. Unjust enrichment is an independent basis for recovery and

is available irrespective of Defendants' legal impossibility argument. *See Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*, 272 Cal. Rptr. 3d, 108, 120–21 (Cal. Ct. App. 2020) (unjust enrichment available even in the absence of actual injury); *Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175, 1198 (D. Nev. 2022) (unjust enrichment as alternative to remedy at law).

Plaintiffs' unjust enrichment theory is based upon: (1) Mr. Feng having embezzled $1 million to form F2, without which he has admitted F2 would never have existed given that he needed the money quickly to meet the deadline and could not get it elsewhere (Ex. 1-40 at ETG205804), and (2) Mr. Feng having used Plaintiffs' resources and connections (and even, secretly, Plaintiffs' own lawyers at Lewis Roca[9]) to take advantage of the TPPPS opportunity. When a fiduciary embezzles company funds to make an unauthorized investment, the law compels equitable disgorgement of secret profits even in the absence of actual injury to the company. *See Ctr. for Healthcare Educ. & Rsch., Inc.*, 272 Cal. Rptr. At 120–21 (unjust enrichment available even in absence of actual injury); *Olenicoff v. UBS AG*, 2010 WL 8530286, at *29 (C.D. Cal. Mar. 16, 2010) ("proper measure of damages is full disgorgement of any secret profit made by the fiduciary regardless of whether the principal suffers any damage"); Restatement (Third) of Restitution and Unjust Enrichment, § 51(b). Here, all the F2 profit can be traced back to Plaintiffs' stolen $1M seed money and connections, and Plaintiffs' initial burden is only to have calculated the total resulting profit: Mr. Feng must prove any equitable offsets. Restatement of Restitution, § 51(d); *Serv. First v. Lee*, 2022 U.S. Dist. LEXIS 147274, at *21–22 (E.D. Mich. Aug. 17, 2022).

Although Plaintiffs' damages expert identified the unjust enrichment theory, the facts supporting it, and the ███████ total resulting profit, (Ex. 1-66, ¶¶41–49), Defendants' rebuttal damages expert, Paul Peterson, did not address unjust enrichment, arguing only that the embezzled $1 million was merely a loan. That characterization is false. It is unlawful for a fiduciary to secretly withdraw a large sum of money from the company's bank account to use for a private investment (much less a usurped corporate opportunity), only to pay it back later and call it a "loan."[10] *See  United States v. Wiseman*, 274 F.3d 1235, 1241–42 (9th Cir. 2001) (intent to repay is not a defense to embezzlement or conversion); *Bradley v. Becerra,* 2020 WL 7407918, at *6 (C.D. Cal. Oct. 23, 2020) (same); *United States v. Thomas*, 2013 U.S.

---

[9] Ex. 1-60, Feng Dep. I at 142:9–11, 143:9–20.
[10] Mr. Feng claims that other withdrawals had been made in the past that justified him helping himself to LT Game's bank account. However, minor cash advances for innocuous purposes are not at issue here.

Dist. LEXIS 163855, at *5 (D. Conn. Nov. 18, 2013) (precluding evidence of repayment as irrelevant).

Mr. Feng was clearly aware that what he was doing was illegal, which is why he lied to the company accountant, Mr. Medero, by telling him that Mr. Chan had authorized the withdrawal, and then ordered Mr. Medero to erase all records of the transfer. Ex. 4, ¶9. Mr. Feng admits never having obtained clearance to take the $1 million, much less asking permission to usurp an LT Game opportunity. Ex. 1-60, Feng Dep. I at 78:12–19. And of course Mr. Feng kept the existence of F2 itself a secret from Plaintiffs. Ex. 1-61, Feng Dep. II at 149:25–150:7; Ex. 2, ¶¶21, 28, 37; Ex. 3, ¶¶28, 34. Mr. Feng also knowingly acted contrary to the advice of Lewis Roca, who previously required Mr. Feng to sign conflict waivers when taking a loan from LT Game (albeit with him improperly signing both in secret). ECF No. 90-7.

When Plaintiffs saw that Defendants' expert had conspicuously not addressed the unjust enrichment basis to disgorge the F2 revenue, Plaintiffs prompted Defendants on this. Ex. 1-69 (February 2026 email chain between counsel). Because Defendants' Motion does not raise any challenge to an unjust enrichment basis to disgorge F2 revenue (arguing instead only the different point addressed in Section VI), that argument should be deemed waived for purposes of summary judgment.

## VII.    PLAINTIFFS' UNJUST ENRICHMENT THEORIES ARE NOT SUPERSEDED

Defendants are wrong when they argue that the Framework Agreement and the 2021 Agreements covered all relevant misconduct such that written contracts would supersede Plaintiffs' unjust enrichment theories. As discussed in Section III, the Framework Agreement is silent as to the terms of Mr. Feng's downstream business, so Plaintiffs have no breach claim. Furthermore, even if the Framework Agreement had afforded Mr. Feng non-exclusive status (which it did not), Defendants engaged in a litany of different acts of fraud that went well beyond the bare concept of mere "non-exclusivity." Nor do the 2021 Agreements change the analysis. First of all, those agreements (and the Framework Agreement Renewals) are void as procured by fraud, as discussed in Section IV.10. Even if they were not void, they would not have covered the litany of misconduct that Defendants committed. Also, having only been executed at the end of 2021, the 2021 Agreements would have no bearing on earlier misconduct. Defendants argue that LTG Limited has no standing to seek unjust enrichment but in fact much of the funding to LT Game and Empire flowed out of LTG Limited at Paradise's direction. Ex. 3, ¶40.

## VIII.    PLAINTIFFS' TRADE SECRET CLAIMS DO NOT DISPLACE TORT CLAIMS

Defendants mischaracterize their misconduct as all boiling down to trade secret misappropriation such that the trade secret claims would displace Plaintiffs' tort claims. Defendants are wrong. *Frantz v. Johnson*, 999 P.2d 351, 357 n.3 (Nev. 2000) (tort claims are displaced only in cases where there is no independent basis for such torts other than the bare misappropriation of trade secret). Plaintiffs have defined their relevant trade secrets to specifically be the technology derived from Plaintiffs' intellectual property that Empire sold outside of Plaintiffs' knowledge. Ex. 1-66, Nelson Report ¶¶50–55, <u>seeking ████ profit disgorgement on equipment sales as the trade secret remedy</u>; Ex. 1-68, Feb. 26, 2026 Paradise ROG Resps., ROG 1; Ex. 1-70, Feb. 22, 2026 LT Game, Inc.'s ROG Resps., ROG 1; Ex. 1-65, Dec. 12, 2025 LT Game, Ltd. ROG Resps., ROG 1. The products at issue include those Mr. Kiely developed that should have been contractually assigned to LT Game, and that Mr. Allison then helped sell with his know-how as LT Game's SVP.[11] Ex. 1-104, Allison Dep. II at 359:18–22, 360:22–361:1.

The incorporation of Plaintiffs' IP into Empire products is different and distinct from the other misconduct and remedies that Plaintiffs are pursuing discussed in Section IV. The simple litmus test for this is that even if Defendants had never sold any products derived from LT Game IP (for example, if third parties had developed the products instead of Mr. Kiely), Plaintiffs would still be asserting all their other non-trade secret claims, and still seeking $25M in Plaintiffs' out-of-pocket loss in having been defrauded into funding joint LT Game-Empire operations under grossly false pretenses. (Section II.B.) To the extent any of the Empire products making up the ████ profit disgorgement are proven to not have been derived from Plaintiffs' IP, then Plaintiffs would seek recovery as unjust enrichment in the alternative.

## IX.    PLAINTIFFS IDENTIFY NUMEROUS MISAPPROPRIATED TRADE SECRETS

In Plaintiffs' interrogatory responses (Ex. 1-46 at pp. 4–9, 16–17; Ex. 1-53 pp. 4–8, 15–16, 23–24; Ex. 1-65 at pp. 4–12, 19–21, 49–52, 58–59; Exhibit 1-68 at pp. 2–8, 14–16, 41–45) and in the Nelson damages report (Ex. 1-66, ¶¶54–55), Plaintiffs have identified the trade secrets as amounting to two categories of Plaintiffs' intellectual property that were incorporated into Empire equipment: (1) software

---

[11] It should be noted as an overarching point in this briefing that Defendants do not dispute that the individual defendants can be personally liable for any torts that they personally committed, irrespective of the corporate form of Empire. *Semenza v. Caughlin Crafted Homes*, 901 P.2d 684, 689 (Nev. 1995) ("An officer of a corporation may be individually liable for any tort which he commits").

and code sourced from Plaintiffs, and (2) technology that Mr. Kiely developed for Empire while under contract to assign those inventions to LT Game. In addition to the Card Shoe and Golden Frog slot machine source code, Plaintiffs have identified electronic gaming technology used in Defendants' table game products (Trend Board, Trend Wall, Chip Drop, and Casino Hub) that were derived from existing Paradise Group products and technology (Live Table Game system, TOPS, TTD, Dynamic Display Wall, and CTS-3000). Ex. 2, ¶7; Ex. 1-62, Kiely Dep. at 61:9–16; Ex. 1-75, PARADISE20827; Ex. 1-77, PARADISE42848. Defendants' table game products were developed by Mr. Kiely prior to joining Empire using Plaintiffs' resources, know-how, and source code and thus should have been transferred to LT Game. Ex. 1-62, Kiely Dep. at 118:8–119:17. For example, when developing the Trend Wall product, Mr. Kiely directed Paradise Group employees to copy Plaintiffs' Dynamic Display Wall source code to a separate Empire repository for Defendants' use. Ex. 1-80, PARADISE34958; Ex. 1-82, PARADISE34947, at 34948; Ex. 1-86, PARADISE34956. Plaintiffs have also identified trade-secret game designs and development for games ███████████████████████████████████████████████████████████. Ex. 1-62, Kiely Dep. at 39:15–40:7, 152:19–153:17; Ex. 1-90, ETG171794, at 171795. Working secretly with a Paradise Group employee, Defendants directed him to use Plaintiffs' existing game development work despite his concerns about legal impropriety. Ex. 1-62, Kiely Dep. at 148:20–149:20, 150:19–151:2, 151:11–152:7; Ex. 1-38, ETG201583, at 201584; Ex. 1-91, ETG176807, at 176808; Ex. 1-94, ETG201528, at 201529. Plaintiffs also identified ████████████████████████████████████████████████. Ex. 1-62, Kiely Dep. at 121:20–123:7, 123:17–20, 186:9–17, 187:8–13; Ex. 1-38, ETG201583, at 201584; Ex. 1-28, ETG171655, at 171658.

Although Defendants misstate the law, Defendants' unauthorized <u>use</u> of the trade secrets constitutes misappropriation even if they may originally have had lawful access (which they did not, given their ongoing fraud). *See* 18 U.S.C. § 1839(5)(B); N.R.S. 600A.030(2)(c); *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 907–09 (3d Cir. 2021) (distinguishing improper use from improper acquisition under the DTSA and broadly defining "use"). Without Plaintiffs' knowledge or consent, Defendants "perpetually" accessed, modified, and recompiled the LTShoe source code after fraudulently misrepresenting that Commerce Casino "deci[ded] to remove [LT Game's] leasing card shoes" and "go with [an]other vendor's

products." Ex. 3-15, ETG164322 at 164323. Moreover, Defendants increased the number of card shoes placed at Commerce Casino, each using Plaintiffs' trade secret source code, from approximately 95 units in January 2022 to 238 units by April 2025. *Id.*; Ex. 1-99, COMMERCE00024798. And while Defendants are keen to frame their unauthorized use as a mere contract dispute, any use of the card shoes after Defendants fraudulently converted them in 2022 amounted to use of <u>stolen property</u> outside the ambit of any express or implied contract.

Regarding the Golden Frog slot game and other Paradise "Table Game Slots" slot games, evidence shows that Defendants were distributing and seeking approvals for the games around the time of and after Mr. Feng's directive "████████████████████." Ex. 1-38, ETG201583, at 201584; Ex. 1-92, ETG190696; Ex. 1-95, ETG203264; Ex. 1-96, ETG204782. Regarding Plaintiffs' electronic gaming technology used in Defendants' table game products, Defendants distributed these products to Commerce Casino and various other casinos without Plaintiffs' knowledge or consent. Ex. 1-78, ETG243728. Regarding the games co-opted by Defendants, the record shows that ███████████████ ████████████████████████████, and exhibited them at the 2024 Global Gaming Expo ("G2E") in Las Vegas. Ex. 1-95, ETG203264; Ex. 1-96, ETG204782; Ex. 7-1; Ex. 7-2. Finally, evidence shows that Defendants ████████████████████████████ ████████████████████████. Ex. 1-62, Kiely Dep. at 186:9–187:13; Ex. 1-38, ETG201583, 201584 (directing an employee to "████████████████" because "████████████").

While Defendants briefly argue what they deem to be a "complete defense" to Plaintiffs' allegations regarding the Paradise Golden Frog slot game source code, specifically, Empire's purported ownership of the source code, Defendants fail to offer proof of any such ownership. Defendants rely on the Game Development Agreement and Framework Agreement Renewals (which in any case are all void for fraud, *see* Section IV.10), but Defendants do not provide any Statement of Work or purchase order relating to the Golden Frog slot game showing that the terms of these agreements should be applied. Moreover, the source code was developed and completed in 2020—well before execution of the 2021 Game Development Agreement. *See* ECF No. 161, 74–76. Failing to prove Empire's ownership, Defendants fail to meet their burden for summary judgment.

Defendants also argue that summary judgment is appropriate because Plaintiffs lack "product-level sales data" relating to the Golden Frog slot game. Despite lacking individualized sales data for each separate game theme that Defendants placed in the field, Plaintiffs' damages expert has calculated profits Defendants generated through Empire's sales of table game and slot machine products outside of its distributor relationship with Paradise. Ex. 1-66, Nelson Report at 37. These profits relate to all of the identified trade secrets, necessarily also subsuming any use of the Golden Frog slot game for Defendants' sole benefit, and are a measure of Plaintiffs' damages and Defendants' unjust enrichment. *See id.* at 38–39. Accordingly, the Court should deny Defendants summary judgment on Plaintiffs' trade secret claims.

## X.      LT GAME FAILED - AND EMPIRE SUCCEEDED - BECAUSE OF DEFENDANTS

As is evident from Sections IV–V, Defendants devoted most of their energy to Empire (and F2) while cannibalizing LT Game. Defendants' arguments about the difficulty of breaking into the gaming market ring hollow when they in fact led Empire to success. The reason that Dr. Chun reduced LT Game funding towards the end was because he had justifiably concluded that Messrs. Feng, Kiely, and Allison were poor managers, and did not want to throw more good money after bad. Ex. 2, ¶53; Ex. 3, ¶49.

Moreover, Defendants' unclean hands bar them from trying to argue that they conferred a benefit on Plaintiffs while they were simultaneously actively undermining Plaintiffs. *See Hovbilt, Inc. v. Lair*, 2010 WL 668757, at *6 (N.J. Super. Ct. App. Div. Feb. 25, 2010) ("disqualified by his unclean hands from receiving quantum meruit compensation"); *Guar. Fed. Sav. & Loan Ass'n v. Am. Nat. Bank & Tr. Co. of Chicago*, 509 N.E.2d 1313, 1322 (Ill. App. 1987) (any services in furtherance of agreement entered into without authority could not confer benefit upon the plaintiff). Having pointed the Titanic at an iceberg, Defendants cannot seek credit for polishing the brass. Plaintiffs' damages expert has already taken into account any cognizable benefit received from Defendants by deducting the ~$4 million in revenue that LT Game generated in the 2016-2023 time frame. If Plaintiffs had known of any of Defendants' misconduct at any time during that period, they would have fired Defendants, so Defendants cannot equitably argue they benefited Plaintiffs. Ex. 2, ¶42; Ex. 3, ¶44.

## XI.      THE KIELY, ALLISON, AND GSL CONTRACTS WERE BREACHED

Regarding Mr. Allison's contract, there is no dispute that the Restrictive Covenant of Section 7 minimally applied, as Section 7(a) says, "during the term of this Agreement." ECF No. 1-4 at 7, § 7.

Defendants bizarrely argue that Mr. Allison was not compensated for his non-compete agreement, but it is clear that insofar as the non-complete applied during the term of the contract, Mr. Allison's contracted salary was that compensation. In the case of Mr. Kiely, although his 2016 contract does not expressly have a non-compete clause, the 2019 contract does at Section 7, likewise prohibiting competition during the term of the Agreement, as well as for 12 months after. ECF No. 1-1 at 4. Each of Mr. Kiely's, Mr. Allison's, and GSL's non-competes also prohibited soliciting LT Game employees or interfering with their work for LT Game. *Id.* at 7, § 7(1)–(3); ECF No. 1-4 at 7, § 7(b); Ex. 1-33 at § 7. Both Messrs. Allison and Kiely breached their non-competes while they were managers of LT Game by aiding and abetting Empire to make and sell non-LT Game equipment, usurping LT Game opportunities, and soliciting Plaintiffs' employees to help them. *See* Sections IV.1–IV.9, IV.12.

Messrs. Kiely's and Allison's separate work for Empire also competed with LT Game by taking so much of Messrs. Kiely's and Allison's time away from LT Game. Each of their contracts expressly required that they work "full time" for LT Game from at least 9am to 5pm Monday to Friday. ECF No. 174-1 at 01989, § 3; ECF No. 1-1 at 3, § 3; ECF No. 1-4 at 3, § 3. Regarding the confidentiality provisions of the employment contracts, all of these prohibited disclosure of confidential LT Game information, whether trade secrets or otherwise. Mr. Allison breached this provision at least when he informed Mr. Feng of LT Game's private negotiating positions with respect to the May 2022 Solution Gaming sale. Ex. 1-29 at 2–3; Ex. 1-56, Allison Dep. I at 199:17–200:25.

In the case of Mr. Kiely, his breach of confidentiality goes hand in hand with his breach of his obligation to assign his inventions to LT Game. Defendants' attempt to couch Mr. Kiely's work as being outside the scope of his LT Game employment fails. Nothing in any of the employment agreements limits the scope of Mr. Kiely's work to only Class III slot machines. To the contrary the contracts broadly defined Mr. Kiely's work as pertaining to all forms of "software testing, software modifications, customer systems integrations" etc. ECF No. 174-1 at 01988, § 2; ECF No. 1-1 at 3, § 2. Mr. Kiely's CTO Agreement even expressly called upon him to "Discover and implement new technologies that will yield competitive advantage." ECF No. 1-1 at 2, §2(f). Furthermore, Mr. Kiely developed all that technology with LT Game employees, LT Game equipment, and LT Game facilities while on the clock for LT Game. Ex. 1-40 at 24; Ex. 1-62, Kiely Dep. at 52:9–54:5. Thus, all that gaming technology belonged to LT Game. Section IV.5;

*Teets*, 83 F.3d at 407 (assignment of inventions where employee's very job was to invent).

With respect to the tortious interference claims against Mr. Feng, because he was well aware of the obligations imposed by Messrs. Kiley's, Allison's, and GSL's employment contracts (indeed, having been the signatory to Messrs. Kiley's and Allison's contracts), and because he was the manager in charge who intentionally instructed Messrs. Kiley and Allison and GSL to breach those contracts, Mr. Feng is liable for tortious interference. Not only did Mr. Feng induce breach, but he even secretly hired Mr. Kiley to be the full time CTO of Empire at the same time that Mr. Feng knew Mr. Kiley was already under contract to work full time as CTO for LT Game. ECF No. 174-1, ¶5; Ex. 1-62, Kiley Dep. at 32:2–17.

## XII.    DEFENDANTS INFRINGED PARADISE'S COPYRIGHTS

Contrary to Defendants' argument, Paradise is the owner of the Golden Frog source code copyright. A copyright registration is presumptively valid unless an applicant knowingly includes inaccurate information in their application without which the Register of Copyrights would have denied the application. *See* 17 U.S.C. §§ 410–11. As discussed in Section VIII, Defendants fail to offer any proof of their purported ownership of the Golden Frog slot game source code. Defendants also argue that Paradise cannot prove copying because Empire purportedly created a Golden Frog table game product. But as Defendants note, the table game product is "not a software product" and does not utilize source code; the table game and slot game "are two different things." ECF No. 177 at 33. Paradise's copyright claim relates to Defendants' unauthorized use of the Golden Frog *slot game*, as discussed above.

Regarding the LTShoe source code, Defendants misstate Paradise's claim. Not only did Defendants unlawfully *retain and use* the card shoes (which contain the copyrighted source code), Defendants regularly accessed, modified, and recompiled the LTShoe source code to maintain the card shoes unlawfully placed at Commerce Casino, as discussed above. Such continued use without a license or after a license expires constitutes copyright infringement of the source code. *Talavera v. Global Payments, Inc.*, 670 F. Supp. 3d 1074, 1099 (S.D. Cal. 2023); *see also MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) (copying occurs when a computer program is transferred from a permanent storage device to a the memory of a CPU).

Defendants also argue that they are not liable for copyright infringement because they had an implied license to copy and use the source code at issue. But even if at one time Defendants had permission

to engage in acts that would otherwise be infringement by way of a license, Defendants actions after their fraud and theft of the card shoes in 2022 constitute infringement. *See Talavera*, 670 F. Supp. 3d at 1099. Indeed, Paradise only seeks profits disgorgement for the period following Defendants' 2022 theft of the LT Game card shoes at Commerce Casino. Ex. 1-66, Nelson Report, ¶¶56–57. Defendants cannot establish they had an implied license to use stolen copyrighted property.

### XIII.  CONCLUSION AND REQUEST FOR ENTRY OF RULE 56(f) SUMMARY JUDGMENT

Plaintiffs respectfully request denial of Defendants' Motion. Plaintiffs also respectfully request entry of summary judgment under Rule 56(f) that (1) the Framework Agreement and its Renewals were silent as to non-exclusivity of Mr. Feng's downstream distribution, and (2) the 2021 Agreements and post-2016 Framework Agreement Renewals are void for having been procured under false pretenses and fraud.

DATED:  May 21, 2026[12]

Respectfully submitted,

*/s/ Jessica M. Lujan*

OLIVER J. PANCHERI, ESQ.
  Nevada Bar No. 7476
JESSICA M. LUJAN, ESQ.
  Nevada Bar No. 14913
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
          jlujan@spencerfane.com

JEAN-PAUL CIARDULLO, ESQ.  (*pro hac vice*)
  California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

ROBERT T. STEWART, ESQ.
  Nevada Bar No. 13770
STEWART RAY NELSON, ESQ. (*pro hac vice*)
  Utah Bar No. 17286
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
          srnelson@foley.com

Dariush Keyhani *(pro hac vice)*
**KEYHANI LLC**
1050 30th Street NW
Washington, DC 20007
Tel: (202) 748-8950
Email: dkeyhani@keyhanillc.com

---

[12] Due to a scheduling issue, the Parties jointly stipulated to a slight extension of the opening and opposition brief deadlines amounting to 4 days total. The Parties agree that their briefs should both be regarded as timely.