PATRICK J. REILLY, ESQ.
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
100 North City Parkway, 16th Floor
Las Vegas, Nevada  89106
Telephone:      (702) 382-2101
Facsimile:      (702) 382-8135
preilly@bhfs.com

MARK T. OAKES, ESQ. (*pro hac vice*)
ZACHARY P. MCHENRY, ESQ. *(pro hac vice*)
ETHAN GLENN, ESQ. (*pro hac vice*)
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Blvd., Suite 1100
Austin, Texas  78701-4255
Telephone:      (512) 474-5201
Facsimile:      (512) 536-4598
mark.oakes@nortonrosefulbright.com
zach.mchenry@nortonrosefulbright.com
ethan.glenn@nortonrosefulbright.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; LT GAME, INC., a Nevada corporation; and LT GAME LIMITED, a British Virgin Islands corporation, <br><br> *Plaintiffs*, <br><br> v. <br><br> EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; DARYN KIELY, an individual, <br><br> *Defendants*. | Case No. 2:24-cv-00428-JCM-BNW <br><br><br> **REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

**Table of Contents**

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.  Plaintiffs' Narrative Collapses When Measured Against the Record ........................... 2

II. Plaintiffs Improperly Conflate Distinct Theories of Liability ..................................... 4

III. Claims Based Merely on Empire's Separate Operations Fail as a Matter of Law ........ 4

    A.  Plaintiffs Concede There Is No Evidence for Their Exclusivity Theory ................. 4

    B.  The Plain Language of the Distributorship Agreement Controls ........................... 5

    C.  No Agreement Is Void for Fraudulent Inducement ....................................... 7

    D.  The Undisputed Facts Establish Inquiry Notice No Later Than 2017, Rendering Plaintiffs' Claims Untimely ....................................... 8

    E.  The Undisputed Facts Also Defeat Plaintiffs' Merits Theories of Ignorance, Reliance, and Concealment ....................................... 9

    F.  Empire's Product Development Does Not Create Liability ................................. 10

IV. The F2 Claim Fails ......................................................................................... 12

    A.  Plaintiffs Cannot Establish a Corporate Opportunity ..................................... 12

    B.  Plaintiffs' Alternative Unjust-Enrichment Theory Fails ..................................... 14

V.  The Trade Secret Misappropriation Claims Fail As a Matter of Law ......................... 16

    A.  The Golden Frog Theory Fails ................................................................. 16

    B.  The LT Shoe Theory Fails ..................................................................... 16

    C.  Plaintiffs' Remaining Theories Are Either Too Vague or Unsupported ............... 17

    D.  Any Remaining Trade Secrets Claims Displace Plaintiffs' Tort Claims .............. 18

VI. Plaintiffs' Copyright Claims Fail As a Matter of Law .............................................. 19

VII. The Contract Claims Fail As a Matter of Law .................................................... 20

CONCLUSION ............................................................................................................ 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aalmuhammed v. Lee*,
    202 F.3d 1227 (9th Cir. 2000) ........................................................................ 19

*Anguilla RE, LLC v. Lubert-Adler Real Est. Fund IV, L.P.*,
    No. C.A. N11C-10-061-MMJ ......................................................................... 15

*Backman v. Goggin*,
    No. 2:16-CV-1108, 2017 WL 1015008 (D. Nev. Mar. 15, 2017) (Mahan, J.) ...................... 15

*Collins v. Burns*,
    741 P.2d 819 (Nev. 1987) ............................................................................ 8

*Creative Surfaces, Inc. v. Swonger*,
    No. 2:17-CV-2494 JCM (VCF), 2018 WL 4279225 (D. Nev. June 19, 2018)
    (Mahan, J.) .......................................................................................... 6

*D.E. Shaw Laminar Portfolios, LLC v. Archon Corp.*,
    570 F. Supp. 2d 1262 (D. Nev. 2008), *aff'd in part sub nom.*, 483 F. App'x 358
    (9th Cir. 2012) ...................................................................................... 6

*Double Eagle Alloys, Inc. v. Hooper*,
    134 F.4th 1078 (10th Cir. 2025) .................................................................... 20

*Hartford Fire Ins. Co. v. Trynex, Inc.*,
    No. 11-CV-13360, 2013 WL 12183610 (E.D. Mich. July 25, 2013) .................................. 7

*Hexcel Corp. v. Ineos Polymers, Inc.*,
    681 F.3d 1055 (9th Cir. 2012) ....................................................................... 8

*Hughes v. Vanderbilt Univ.*,
    215 F.3d 543 (6th Cir. 2000) ....................................................................... 10

*Hukman v. Snackers Sinclair, Inc.*,
    No. 2:23-CV-0501-CDS-NJK, 2024 WL 2959277 (D. Nev. June 12, 2024) ........................... 16

*ImageKeeper LLC v. Wright Nat'l Flood Ins. Servs.*,
    No. 2:20-CV-01470-CDS-MDC, 2024 WL 1330046 (D. Nev. Mar. 27, 2024) ......................... 17

*JustMed, Inc. v. Byce*,
    600 F.3d 1118 (9th Cir. 2010) ................................................................... 16, 18

*Knickmeyer v. Nevada ex rel Eighth Jud. Dist. Ct.*,
    173 F. Supp. 3d 1034 (D. Nev. 2016), *aff'd sub nom.*, 716 F. App'x 597 (9th
    Cir. 2017) (Mahan, J.) ............................................................................. 12

*Magpiong v. Superdry Retail LLC*,
    304 F. Supp. 3d 983 (D. Nev. 2018) ................................................................. 8

*Mauwee v. Palmer*,
  No. 3:10-CV-00250-RCJ, 2015 WL 3764943 (D. Nev. June 16, 2015)................................ 10

*Musser v. Bank of Am.*,
  964 P.2d 51 (Nev. 1998) .............................................................................................. 6

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
  399 F. Supp. 2d 1064 (N.D. Cal. 2005) ...................................................................... 18

*Pincay v. Andrews*,
  238 F.3d 1106 (9th Cir. 2001)...................................................................................... 9

*Rd. & Highway Builders v. N. Nev. Rebar*,
  284 P.3d 377 (Nev. 2012) ............................................................................................ 6

*Robinson, Leatham & Nelson, Inc. v. Nelson*,
  109 F.3d 1388 (9th Cir. 1997)...................................................................................... 12

*Soffer v. Five Mile Cap. Partners, LLC*,
  No. 2:12-CV-1407 JCM GWF, 2013 WL 638832 (D. Nev. Feb. 19, 2013)
  (Mahan, J.) ..................................................................................................................... 7

*In re Stijakovich-Santilli*,
  542 B.R. 245 (B.A.P. 9th Cir. 2015)............................................................................ 8

*Topaz Mut. Co. v. Marsh*,
  839 P.2d 606 (Nev. 1992) ............................................................................................ 15

*United States v. Westlands Water Dist.*,
  134 F. Supp. 2d 1111 (E.D. Cal. 2001)........................................................................ 7

**Rules and Statutes**

18 U.S.C. § 1839(3)(B) ....................................................................................................... 18

CAL. BUS. & PROF. CODE §§ 19850,19855 ...................................................................... 14

CAL. CODE REGS tit. 4, §§ 12201(d), 12202(b), 12204(a)-(i) ......................................... 14

Fed. R. Civ. P. 56(f) .......................................................................................................... 7

iv

**<u>INTRODUCTION</u>**

Plaintiffs' Opposition reads like a closing argument in search of evidence. ECF 181 ("Opposition"). It tells a sweeping story of betrayal and secrecy, but does not answer Defendants' Partial Motion for Summary Judgment on the governing record. ECF 177 ("Motion"). The Motion shows that the parties repeatedly agreed to a non-exclusive relationship, that Plaintiffs had years of notice that Empire was conducting independent business, that LT Game's U.S. decline was a result of Plaintiffs' own funding and business decisions, and that Plaintiffs cannot tie Empire's profits to any actionable use of Plaintiffs' property or cognizable breach. The Opposition creates no genuine dispute on those points. Instead, it leans on hindsight declarations, makes assertions that outrun the cited record, and ignores the contemporaneous facts that defeat its theory.

*First*, summary judgment should be granted on the claims built on the premise that Empire's independent operations were wrongful per se. Plaintiffs' Opposition confirms the point: it offers no evidence that Empire or Mr. Feng agreed to operate exclusively for Plaintiffs' benefit. The parties' ***written agreements*** say the opposite—the relationship was non-exclusive. Once that false premise falls away, so do Plaintiffs' broader fraud-based theories. Plaintiffs cannot transform an explicitly non-exclusive relationship, plus years of inquiry notice, into actionable misrepresentation, concealment, reliance, or a $25 million out-of-pocket loss. *Second*, summary judgment should be granted on the F2 claim. Defendants identified three independent reasons the claim fails, but Plaintiffs meaningfully address only one. They never answer the threshold problems that TPPPS was outside Plaintiffs' business and that Plaintiffs could not, as a practical matter, have taken the opportunity. Where Plaintiffs do respond, they offer hindsight and hypotheticals, not evidence that they were legally capable of pursuing the opportunity; their unjust-enrichment fallback merely repackages the same failed premise.

*Third*, summary judgment should be entered on the trade secret and copyright claims. Plaintiffs do not overcome the parties' agreements allocating ownership and use rights, identify any protectable trade secret or infringing act with the required specificity, or support key assertions with their own evidence. *Fourth*, summary judgment should be entered on the contract claims. Plaintiffs identify no enforceable noncompete, no actual confidentiality breach, and no underlying

1

breach to support tortious interference. In the end, the Opposition substitutes rhetoric for analysis and accusation for proof. The Court should grant the Motion in full.

<u>**ARGUMENT**</u>

**I.      Plaintiffs' Narrative Collapses When Measured Against the Record**

Plaintiffs' story is that Defendants secretly looted LT Game, funneled everything of value to Empire, and therefore Empire must reimburse Plaintiffs for all funds invested in LT Game and disgorge every profit ever earned. Stripped of rhetoric, the Opposition makes key admissions, dodges dispositive facts, and cannot survive the record. Plaintiffs portray Mr. Feng as dependent on Dr. Chun and suggest that Dr. Chun effectively allowed him to begin operating Empire in 2015. The undisputed fact says otherwise. Mr. Feng has solely owned and operated Empire and its predecessor companies since 2011; the parties' written agreements expressly authorized separate business; Empire in fact operated separately for years; and despite the parties producing tens of thousands of documents, there is no evidence of the long-term exclusivity Plaintiffs' case requires. To the contrary, the Opposition admits that "no contract prohibited Mr. Feng from competing in downstream sales." Opp. at 5.[1]

That structure was not an accident; it was the point. Paradise wanted to distribute products in the U.S. without obtaining U.S. gaming licenses it either could not obtain or chose not to pursue. The parties therefore preserved Empire's separateness and independence so Paradise could reach the U.S. market without triggering the licensing obligations it sought to avoid. As to Plaintiffs' claim that they were somehow misled into supporting Empire, Plaintiffs point to legal fees and other assistance tied to Empire's licensing, but they do not dispute that the reason for this was because Plaintiffs needed Empire to be licensed to sell their products. Plaintiffs now ask the Court to disregard that arrangement—which Plaintiffs themselves agreed to and benefited from—because LT Game failed in the U.S. slot market while Mr. Feng succeeded in business lines Plaintiffs never actually conducted. Nor do Plaintiffs confront the evidence that LT Game's decline in the United States resulted from Paradise's own decisions: cutting funding, reducing headcount, refusing further investment, selling inventory, and retreating from the U.S. slot market. The Opposition

---

[1] All citations herein to "Opp." and "Mot." are to Plaintiffs' Opposition and Defendants' Motion, respectively.

2

sharpens that contradiction by claiming that Dr. Chun cut LT Game's funding because he concluded Feng, Kiely, and Allison "were poor managers, and did not want to throw more good money after bad." Opp. at 37. At the same time, Plaintiffs tout that Paradise's annual revenue was between $150 million and $85 million during 2019-2023. *Id*. at 2. Thus, on Plaintiffs' own telling, Dr. Chun either had no real interest in expanding the U.S. business or had already lost trust in Defendants.

The contradictions only deepen. The record shows that Mr. Feng brought multiple business ideas to Dr. Chun, yet LT Game pursued none. Either Dr. Chun did not want to expand U.S. business, or he allowed himself to be talked out of proposal after proposal—either way, Plaintiffs cannot square the record with their claim that "Dr. Chun's formula for success" was "diversification of business opportunities" or with their allegation that Dr. Chun "specifically instructed" Mr. Feng to explore a wide range of opportunities. And while Plaintiffs' papers have long asserted that Mr. Feng continued to pledge loyalty to Dr. Chun after resigning from LT Game, Plaintiffs now claim— to rebut notice—that they "had no real knowledge of what Mr. Feng did after that," and Dr. Chun ceased communicating with Mr. Feng after the resignation. Opp. at 25; Mot. at 19. They do not explain how their account shifted from constant contact to none.

The same mismatch infects Plaintiffs' theory of Empire's supposed "stolen" success. The Motion showed that Empire and LT Game made different products at different times and that Empire did not compete with Plaintiffs' narrow U.S. business. Mot. at 9-10. If Defendants siphoned everything valuable out of LT Game, Plaintiffs still must show where that value went and how it generated Empire's profits. They do not—which is telling. The Opposition instead asserts that Mr. Feng invested $40 million to $60 million from F2 into Empire. Opp. at 28. Yet even with that capital, Empire sold only table-game products until 2022, then began distributing niche slot products, and, by Plaintiffs' own damages theory, earned just $6.6 million in profits across the relevant period. Mot. at 9-10; Opp. at 4. That is not evidence of a company built on looted LT Game assets. It shows the opposite—Mr. Feng working to build his own business with his own money.

In the end, Plaintiffs offer rhetoric in place of proof. Their Opposition does not shore up their narrative; it exposes contradictions, concedes non-exclusivity, admits that Paradise elected to stop funding LT Game, and presents a damages theory that fails to connect Empire's profits to any

3

misappropriation. Dr. Chun and Mr. Chan's self-serving, after-the-fact declarations can no longer carry water for the Complaint—tested against the full record, Plaintiffs' narrative collapses.

## II.   Plaintiffs Improperly Conflate Distinct Theories of Liability

Defendants do not argue that every theory rises or falls together; they argue that claims premised on Empire's separate operations fail as a matter of law, and that any remaining theories must stand on their own elements and proof. Plaintiffs cannot save their fraud, fiduciary-duty, conspiracy, conversion, RICO, and unjust-enrichment theories by relabeling Empire's independent operations as inherently wrongful. The written agreements were non-exclusive. Plaintiffs had notice long before 2023 that Empire operated independently. And Empire's separate business does not itself establish actionable competition, concealment, or causation. The same defect runs through Plaintiffs' damages theories. Their $25 million out-of-pocket theory rests on the claim that they would never have funded the U.S. business had they known what Empire was doing. But if the relationship was non-exclusive and Plaintiffs had years of notice, that damages theory fails with the liability theory. For all other claims, Plaintiffs must identify specific actionable misconduct: a specific misrepresentation or omission, a specific fiduciary or contract breach, or actual trade-secret or copyright misconduct.[2] The Opposition collapses distinct theories into a single narrative of "years of fraud." The Court should reject that approach.

## III.   Claims Based Merely on Empire's Separate Operations Fail as a Matter of Law

### A.   Plaintiffs Concede There Is No Evidence for Their Exclusivity Theory

The Opposition effectively concedes *that there is no evidence that Empire or Mr. Feng ever agreed to operate exclusively for Plaintiffs' benefit*. Despite repeatedly alleging that Mr. Feng agreed to operate Empire "for the exclusive benefit of the Paradise Group," Plaintiffs now say that "*no contract prohibited Mr. Feng from competing in downstream sales*." *E.g.*, SAC ¶ 32; Opp. at 5 (emphasis added). That concession is fatal to the theory that Empire's separate operations were wrongful by definition. Plaintiffs' fallback—that Defendants "allowed" Plaintiffs to believe Empire was exclusive—is circular: it assumes the unproven premise and treats nondisclosure as evidence

---

[2] Plaintiffs do not dispute that they have abandoned the following discrete transactions as independent bases for liability or damages: (i) Empire's 2023 acquisition of Aruze assets, (ii) the 2021 purchase of Synergy Blue intellectual property, and (iii) the 2022 Sockeye Software transaction. *See* Mot. at 15 n.12.

of an agreement. *See* Opp. at 17-18. The failure of proof matters because Plaintiffs' broader fraud narrative depends on exclusivity. Without it, Plaintiffs cannot treat Empire's separate business, Mr. Feng's other ventures, or Defendants' failure to describe those activities in Plaintiffs' preferred terms as proof of fraud, fiduciary breach, or unjust enrichment. The Opposition is littered with assertions that Plaintiffs supposedly believed Empire was exclusive, but belief is not evidence of an obligation. *See id*. at 1, 14, 22, 23. Plaintiffs' explanation for Mr. Chan's review of a July 2021 Empire promotional announcement proves the point: they say Plaintiffs "wanted Empire to be successful in its own branding and publicity (so long as it was in the exclusive service of LT Game)." *Id*. at 14. That parenthetical does all the work—and the record supplies none of the proof. The Court should decide the Motion on the actual record.

**B.      The Plain Language of the Distributorship Agreement Controls**

Plaintiffs try to recast the Motion as an unpled "consent" defense, but the Distributorship Agreement is not an external defense. It defines the relationship the parties chose and negates the exclusivity premise on which Plaintiffs' claims depend. The text is straightforward: it describes the parties' arrangement was "non-exclusive"; Paradise would supply products on a "non-exclusive basis"; and the parties were "independent principals." Mot. at 16–18. Plaintiffs never dispute the ordinary meaning of a non-exclusive arrangement preserves the right to pursue other business. *See* Mot. at 17 (collecting cases). Instead, they insist the agreement addressed only Paradise's supply obligations and said nothing about Empire's downstream business. That reading is tortured. It cannot be reconciled with the agreement's plain reference to the "███████████████ ███████████████." *E.g*., Mot. Ex. B-5 § 3.4 (emphasis added).

The agreement's structure confirms the point. The recitals state that the parties entered the agreement to set out "███████████" and "███████"[3]  for "███████████████████" of products. Mot. Ex. B-5 at Recital; *see also, e.g*., Mot. Ex. B-8 (2022 renewal) at Recital D (setting out "general principles" and "key terms"  for the supply of products "███████████████████ ] ███████████████████████████████") (emphasis added). Section

---

[3] Defendants cite Mr. Chan's email to Mr. Feng listing the Distributorship Agreement's "key terms," including "Exclusivity: Non-Exclusive," with no mention of supply. *See* Mot. Ex. B-40. Plaintiffs' response that Mr. Chan "merely parroted" the Framework Agreement, citing *separate documents*, is insincere. *See* Opp. at 9.

3 is titled "███████████████████████████████." Mot. Ex. B-8 § 3 (bold added). Section 3.1 *requires Empire* to develop or manufacture products for sale or lease, and Section 3.4 governs *post-supply* matters, including risk transfer, Empire's authority to alter products, and regulatory approval. *Id*. §§ 3.1, 3.4(B), (D). Section 4.2 also excludes from Paradise's audit right Empire records "unrelated to the supply," showing Paradise knew how to write a supply-only limitation—and that Empire had other operations. *See id*. § 4.2. The Court has already recognized the point: "the supply framework agreement contradicts Paradise's belief . . . that Empire was its exclusive distributor." Dkt. No. 128 at 12. Plaintiffs' response—that the issue was not fully briefed—underscores Defendants' point. The language was clear enough for its ordinary meaning to be understood without Plaintiffs' revisionist reading. *See* Opp. at 9. Because the language is unambiguous, the Court should enforce it as written. *See Creative Surfaces, Inc. v. Swonger*, No. 2:17-CV-2494 JCM (VCF), 2018 WL 4279225, at *3 (D. Nev. June 19, 2018) (Mahan, J.).

Plaintiffs' reading creates surplusage. If Section 3.1 already made only Paradise's supply non-exclusive, Section 3.4 would say the same thing again. That would erase the broader "arrangement" language and ignore the renewal recitals recognizing Empire's independent distribution activities. Nevada law does not permit that. A contract must be read as a whole, giving effect to every word and avoiding interpretations that make provisions meaningless. *Musser v. Bank of Am*., 964 P.2d 51, 54 (Nev. 1998); *Rd. & Highway Builders v. N. Nev. Rebar*, 284 P.3d 377, 380 (Nev. 2012).

Unable to live with the words they chose, Plaintiffs entreat the Court to "look beyond" the text and correct what they call "an imprecision of the drafters." Opp. at 7. That is not contract interpretation. Courts enforce unambiguous contracts as written; they do not rewrite them. *D.E. Shaw Laminar Portfolios, LLC v. Archon Corp*., 570 F. Supp. 2d 1262, 1268 (D. Nev. 2008), *aff'd in part sub nom*., 483 F. App'x 358 (9th Cir. 2012). And the supposed "imprecision" was Paradise's own. Plaintiffs say Paradise's external legal advisors, auditors, and financial advisers reviewed the renewal agreements, while Mr. Feng had no drafting input. Opp. at 6; Opp. Ex. 3 (Chan Decl.) ¶ 12. That review makes mistake unlikely; at minimum, it confirms the text should be enforced against the party that chose it. *See Creative Surfaces*, 2018 WL 4279225, at *4. Plaintiffs also lean

on extrinsic themes: negotiation history, shareholder expectations, course of conduct, and fiduciary rhetoric. None creates ambiguity where the text is clear. The non-exclusive arrangement is the reason Plaintiffs cannot treat Empire's independence as inherently wrongful. Nor can Plaintiffs escape that agreement by invoking fiduciary duties in the abstract. Plaintiffs expressly agreed to a non-exclusive relationship and now seek liability for the very independence that relationship permitted.

Plaintiffs' reading also makes little commercial sense. Paradise had no obligation to supply products to Empire, while Empire received only an 8% to 10% commission. *E.g.*, Mot. Ex. B-8 §§ 3.4(A), 3.5. That arrangement is readily understandable if Empire remained free to pursue other business; it is difficult to explain if Plaintiffs meant to impose a one-way exclusivity obligation they never wrote. See *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1135 (E.D. Cal. 2001) ("[B]usiness contracts must be construed with business sense"). The Court should reject Plaintiffs' invitation to rewrite the contracts and evaluate the claims against the relationship the parties actually created—not the one Plaintiffs now wish they had made. Their request for affirmative relief on their one-way exclusivity theory should also be denied.[4]

### C. No Agreement Is Void for Fraudulent Inducement

Plaintiffs' fallback effort to invalidate the Distributorship Agreement renewals for fraudulent inducement fails at the threshold because Plaintiffs' theory is that they would not have signed the agreements had they known that "Empire was not exclusive to LT Game"; but the agreements expressly provide that the relationship was non-exclusive. Opp. at 22–24; *see Soffer v. Five Mile Cap. Partners, LLC,* No. 2:12-CV-1407 JCM GWF, 2013 WL 638832, at *9 (D. Nev. Feb. 19, 2013) (no fraudulent-inducement when theory "directly contradicts the terms of an express written contract") (Mahan, J.). The argument also fails because Plaintiffs identify no false statement about the agreements themselves. They instead repeat their broader concealment theory. Even if accepted, that is not proof Defendants misrepresented what the agreements said or how they

---

[4] Plaintiffs' affirmative request for summary judgment under Rule 56(f) is improper.  The rule provides for *sua sponte* rulings from the bench, not an affirmative requests from a party. *Hartford Fire Ins. Co. v. Trynex, Inc.*, No. 11-CV-13360, 2013 WL 12183610, at *1 (E.D. Mich. July 25, 2013). The Court should likewise deny Plaintiffs' improper Rule 56(f) request to void agreements for fraudulent inducement.

7

operated. Fraudulent inducement requires proof tied to formation, not a backdoor effort to relitigate the case through rescission. *See, e.g.*, *Magpiong v. Superdry Retail LLC*, 304 F. Supp. 3d 983, 989 (D. Nev. 2018). The Lewis Roca allegations do not change the analysis. Plaintiffs complain that Mr. Feng allegedly failed to disclose conflicts. Opp. at 21–24. But even under that narrative, Plaintiffs identify nothing false about the agreements themselves. And their effort to dismiss Paradise's in-house review because counsel was unfamiliar with U.S. gaming law proves too much—no gaming expertise is required to understand an express IP-ownership provision and the decision to undertake only a "cursory review" is not evidence of fraud. *See id*. at 24, Plaintiffs are not attacking a specific agreement-induced misrepresentation; they seek to avoid the consequences of the written agreements that undermine their litigation theory. That is not a basis to void them.

**D.      The Undisputed Facts Establish Inquiry Notice No Later Than 2017, Rendering Plaintiffs' Claims Untimely**

Plaintiffs lead with the incorrect assertion that Defendants are estopped from making any notice argument because a party accused of fraud cannot argue the plaintiff should have discovered the truth sooner. Opp. at 13. Nevada's discovery rule asks when Plaintiffs knew or reasonably should have known the material facts giving rise to their claims; constructive knowledge is enough. Mot. at 20-21. Fraudulent-concealment principles do not eliminate the duty to investigate once red flags appear.[5] *See Hexcel Corp. v. Ineos Polymers, Inc*., 681 F.3d 1055, 1060 (9th Cir. 2012) ("If a defendant proves that the plaintiff had actual or constructive knowledge of the facts giving rise to the claim, the doctrine of fraudulent concealment does not apply.").

Given Plaintiffs' premise that Empire was obligated to operate as their long-term exclusive distributor—despite Mr. Feng's sole ownership of Empire and the parties' non-exclusive agreements—the 2017 Fico email was a red flag. It went to the heart of Plaintiffs' case: whether Mr. Feng was using Empire as his own business rather than solely for Plaintiffs' benefit. Mot. at

---

[5] Plaintiffs' cases address unclean hands and victim negligence, not whether alleged concealment automatically defeats an inquiry notice defense; if anything, both confirm that a plaintiff cannot avoid inquiry notice by sticking its head in the sand. *See In re Stijakovich-Santilli*, 542 B.R. 245, 257 (B.A.P. 9th Cir. 2015) (recognizing both that a victim's "mere negligence" may not bar relief and that a plaintiff "cannot close his eyes and rely blindly") (internal citation omitted); *Collins v. Burns*, 741 P.2d 819, 821 (Nev. 1987) (no duty to investigate absent facts suggesting reliance is unreasonable, but inquiry is required where available information would signal danger to a reasonable person).

8

21. Plaintiffs do not deny the exchange occurred. They say only that Mr. Feng's response was misleading. Opp. at 13-14. But even on Plaintiffs' telling, the exchange revealed a dispute about Empire's activities and supplied a sufficient reason to investigate. *See, e.g., Pincay v. Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2001) ("It is hard to imagine what would constitute enough information to warrant an investigation if receiving a written disclosure of one's purported injury does not.") (internal quotations omitted). Plaintiffs' own allegations also describe 2017-era concerns about the legitimacy of Playful Games, another business Mr. Feng had established, which the Opposition is silent on. Mot. at 21. Plaintiffs either failed to pursue the inquiry the known facts required or knew all along. Either way, the fraud-based claims are untimely.

    E.    **The Undisputed Facts Also Defeat Plaintiffs' Merits Theories of Ignorance, Reliance, and Concealment**

    The notice record independently defeats Plaintiffs' claim that they did not learn Mr. Feng was "in business for himself" until 2023. The question is whether the information was concrete enough to trigger a reasonable investigation. It was. Plaintiffs do not dispute that, by 2020 at the latest, Empire's website and industry reporting openly described Empire's proprietary products and partnerships in at least 17 articles; nor do they dispute that Dr. Chun followed some of those trade sources and received industry reporting featuring Empire's products. *See* Mot. at 22-23. Plaintiffs also admit Mr. Chan reviewed a July 2021 Empire promotional announcement.[6] Opp. at 14. Their answer is only that Dr. Chun and Mr. Chan did not see some materials or appreciate their significance.[7] *Id.* Plaintiffs likewise fail to rebut the 2022 record: Mr. Feng's resignation communication that it was "now time for me to go out on my own again"; Mr. Chan's contemporaneous acknowledgment that Mr. Feng would keep his role in Empire; later Play Synergy communications; third-party knowledge of Empire's independent business, including from a

---

[6] Mr. Chan appears to have deleted from his phone the text messages about his review of the announcement. Mot. at 22. His declaration merely denies doing so, and Plaintiffs do not explain why his production contains only technical artifacts rather than the text messages themselves. *See* Opp. Ex. 3, ¶ 32.

[7] The lone contemporaneous document Plaintiffs cite cuts against them: it shows the information was readily accessible to Dr. Chun and Mr. Chan and strongly suggests they knew about Empire's activities. *See* Opp. Ex. 1-34 ██████████ ██████████████████████████████████████████████████████ ).

9

mutual business associate; and Mr. Medero's testimony that he told Mr. Chan about Mr. Feng's separate businesses. Mot. at 23-24. Plaintiffs answer again with self-serving declarations, but they do not negate the communications themselves or their significance.[8]

Plaintiffs' after-the-fact declarations do not defeat constructive notice, which turns on whether the information was sufficient to prompt a reasonable investigation. *See Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000). Nor do they create a genuine issue. Plaintiffs cannot reinterpret years of public reporting, direct communications, and business activity as meaningless until this litigation began. Summary judgment turns on the full record, and the nonmoving party cannot rely on evidence that is "merely colorable or is not significantly probative." *Mauwee v. Palmer*, No. 3:10-CV-00250-RCJ, 2015 WL 3764943, at *4, *5 (D. Nev. June 16, 2015). Plaintiffs cannot erase inquiry notice by declaring they chose not to connect the dots. A party that keeps dealing after learning material facts cannot later repackage the same conduct as concealment. Mot. at 24. Once the 2017 and 2020-2022 notice record is considered, Plaintiffs cannot prove reasonable reliance, ignorance, or concealment.

**F.    Empire's Product Development Does Not Create Liability**

Plaintiffs try to salvage their fraud and fiduciary-duty theories by presuming that Empire's table games and related products were stolen from LT Game, asserting that if any products included in the "$6.6M profit disgorgement" are "proven to not have been derived from Plaintiffs' IP," they will seek unjust enrichment instead. Opp. at 34. That is backwards. Plaintiffs must prove a specific corporate opportunity, specific competition, or other cognizable wrong tied to those products. They do not.

***First***, Plaintiffs' attempt to cast entire product categories as usurped corporate opportunities misunderstands the doctrine. There was no single, defined opportunity to develop "table games" or "table-game products" that Defendants took from Plaintiffs. These are broad product classes Plaintiffs knew about, discussed, remained free to pursue, and declined them. Plaintiffs admit Mr. Feng proposed table-game ideas to Dr. Chun in 2016, and Plaintiffs declined

---

[8] Plaintiffs' claim that Defendants "deliberately hid" the Play Synergy brand rings especially hollow as Plaintiffs' own evidence—screenshots of Empire's public LinkedIn profile—prominently shows Empire's d/b/a as "Play Synergy (now Aruze Gaming), an Empire Technological Group [Company]." Opp. at 14; *see* Opp. Exs. 7-1, 7-2.

them. Opp. at 16-18. That is not usurpation. **Second**, Plaintiffs cannot transform Empire's different products into actionable competition by invoking "gaming" at the highest level of generality. Plaintiffs' actual U.S. business was narrow: card shoes and, later, a Class III slot product. Defendants showed that Empire and LT Game made different products at different times. Mot. at 9-10. Plaintiffs offer no product-specific rebuttal. They instead ask the Court to presume competition because both sides operated somewhere in gaming. That is not enough—particularly where Mr. Feng raised various gaming opportunities and Plaintiffs declined them. Mot. at 9. Plaintiffs cite no authority allowing a market definition so broad that every distinct product line becomes "competition."

**Third**, Plaintiffs cannot turn time allocation into a standalone breach. The parties' relationship was non-exclusive, and the record shows shared services, shared facilities, and overlapping personnel at times. Mot. at 4-5. Plaintiffs cite evidence suggesting Defendants spent substantial time on Empire matters (Opp. at 19–20), but identify no noncompete, contractual bar on concurrent work, or authority making that time actionable once the exclusivity premise is removed. If particular work product belonged to LT Game, that is a contract or IP issue—not proof that Empire's operations were wrongful per se. The same is true of "resource diversion." Operational overlap does not create a free-floating tort, and Plaintiffs cannot bootstrap every shared expense, employee, or product Mr. Kiely touched into a fiduciary breach. Specific source code, inventions, confidential information, or products must stand on their own elements. **Finally**, these theories fail on causation and damages. Plaintiffs seek roughly $25 million in out-of-pocket loss, claiming they would not have funded LT Game had they known what Empire was doing. But LT Game's decline followed Paradise's own decisions to cut funding, reduce headcount, sell inventory, and retreat from the U.S. slot market. Mot. at 10-13. Plaintiffs do not rebut those facts. Independent business activity does not become tortious because Plaintiffs call it "usurpation," "competition," "resource diversion," or "working for Empire most of the day." Absent separate actionable misconduct, Empire's operations support neither liability nor damages.

11

## IV.   The F2 Claim Fails

### A.   Plaintiffs Cannot Establish a Corporate Opportunity

Plaintiffs never fully engage Defendants' F2 argument. Plaintiffs must show a practical—not theoretical—ability to take the Hawaiian Gardens opportunity, and Defendants showed they cannot do so for ***three independent reasons***: (i) legally incapable, (ii) outside present or prospective business, and (iii) Plaintiffs could not have been approved in the 60-day window and thus Hawaiian Gardens would never have selected them for the engagement. Mot. at 26-29. Plaintiffs devote essentially all of their response to the first argument and never meaningfully answer the second or third. Because each ground independently defeats the claim, those omissions are dispositive. *See Knickmeyer v. Nevada ex rel Eighth Jud. Dist. Ct.*, 173 F. Supp. 3d 1034, 1044 (D. Nev. 2016), *aff'd sub nom.*, 716 F. App'x 597 (9th Cir. 2017) (Mahan, J.).

Plaintiffs fail to show F2 fell within their actual line of business. *See* Mot. at 26; Opp. at 29 (acknowledging Plaintiffs bear burden). The question is whether this particular opportunity was reasonably incident to their actual present or prospective business—not whether Dr. Chun was broadly interested in growth. *See Robinson, Leatham & Nelson, Inc. v. Nelson*, 109 F.3d 1388, 1392 (9th Cir. 1997). It was not. TPPPS is a regulated California financial-services business. Plaintiffs, by contrast, operated a narrow gaming-equipment business focused on card shoes and later a Class III slot product. *See* Mot. at 3-5, 27-28. Plaintiffs also acknowledge Mr. Feng raised a TPPPS concept to Dr. Chun in 2016, and there is no evidence Plaintiffs did anything with it. *See id.* at 28. Nor do Plaintiffs dispute that, just months before the F2 opportunity arose, Paradise told Lewis Roca that it did not want to get licensed in the United States, a position flatly inconsistent with any claim that it intended to enter the TPPPS business.[9] *See id.* Faced with those facts, Plaintiffs resort to broad statements about diversification and new, unsupported declarations that Dr. Chun wanted Mr. Feng to explore every profitable gaming opportunity.[10] That hindsight narrative does not show that TPPPS was part of Plaintiffs' actual business.

---

[9] Plaintiffs are wrong to characterize the memorandum as newly surfaced. Opp. at 16 n.7. It was used at the deposition of Mr. Chan, who served as Plaintiffs' corporate representative. *See* Reply Ex. A (McHenry Decl.) ¶¶ 3-5.

[10] Plaintiffs' assertion that Dr. Chun "specifically instructed" Mr. Feng to explore TPPPS opportunities has no contemporaneous support. *See* Opp. at 11, 27. Instead, Dr. Chun offers a declaration claiming that, in or around 2011, he discussed "banking arrangements for Commerce Casino" with Jeff Harris and, at unspecified times, instructed Mr.

12

Nor do Plaintiffs rebut the timing problem. Hawaiian Gardens needed a replacement provider within 60 days. The casino therefore had every reason to choose an applicant with a predictable suitability profile and no obvious licensing complications. Mot. at 29. Plaintiffs offer only Mr. Blonien's hypothetical that Mr. Feng could have formed F2 for LT Game's benefit. But Paradise was a public company with numerous affiliates and subsidiaries, no public company had been approved, and COVID only increased risk of delay. *See* Mot. Ex. E (Lichtig Dec.) ¶¶ 21, 31. Mr. Blonien never explains why Hawaiian Gardens would have chosen Plaintiffs under those actual constraints. On this record, Paradise was not a realistic candidate in early 2020.

Plaintiffs' legal-impossibility response fares no better. Mr. Blonien never shows that Plaintiffs themselves had a lawful, practical way to take the opportunity when it arose. Plaintiffs do not dispute that Paradise's Macau casino-management business generated gross gaming revenue and involved operational control over banked games and slot-machine activity—interests prohibited for a TPPPS applicant under California law. Nor does Mr. Blonien say a Paradise entity could have taken the Hawaiian Gardens opportunity on the March 2020 timetable. He instead imagines Mr. Feng forming an entity, filing something, and sorting out licensing and disclosure problems later. That is not evidence. It assumes away the problem.

His registration-versus-licensure distinction does not help. Even if a TPPPS could begin operating while a full licensing investigation remained pending, the threshold question was whether the applicant could obtain registration at all. Under the 2020 regulatory framework, an applicant with prohibited gaming interests could not. Id . ¶ 13. Plaintiffs' problem was not that they might later fail a longer licensing review; their disqualifying interests barred the registration needed to start operations. The same defect defeats Mr. Blonien's "form F2 on LT Game's behalf and sort out licensing later" theory. Ownership, control, and financial-interest disclosures are made at the outset so regulators can identify and exclude ineligible parties before operations begin. *See id*. ¶¶

Feng to pursue such opportunities. *See* Opp. Ex. 2, ¶¶ 14–20. Putting aside that Dr. Chun's claim is wholly unsupported, Defendants' argument remains the same: Mr. Feng later presented a TPPPS idea to Dr. Chun, and Plaintiffs did not act on it. Plaintiffs also assert that Dr. Chun "directed Mr. Feng to pursue all profitable gaming industry opportunities." Opp. at 18–19. No record evidence supports that sweeping claim. While Plaintiffs point to a handful of documents discussing discrete opportunities, *see id*. at 11, none concerns TPPPS and none shows that LT Game actually developed those ideas—only reinforcing Defendants' point that LT Game's actual scope of operations was always narrow.

13, 18, 20, 22; CAL. CODE REGS tit. 4, §§ 12201(d), 12202(b), 12204(a)-(i) (repealed). The corporate-opportunity doctrine asks whether Plaintiffs could lawfully take the opportunity—not whether they might have delayed or obscured facts California law required them to disclose. Mr. Blonien identifies no lawful path to the Hawaiian Gardens business.[11]

His remaining points are no stronger. His assertion of "some confusion" about whether statutory disqualifications applied to TPPPS applicants is unsupported by analysis or authority. Opp. at 30; see Mot. at 27; Mot. Ex. E (Lichtig Dec.) ¶ 13. His suggestion that Paradise could avoid scrutiny because LT Game sat beneath an intermediate holding company would make the disclosure rules meaningless; those rules exist to reach ultimate ownership and economic beneficiaries. There is no public-company carveout, and Paradise could not realistically involve its shareholders in the compressed timeframe. Mot. Ex. E (Lichtig Dec.) ¶¶ 20-24; Mot. at 29. And Mr. Feng's approval proves nothing.[12] Regulators knew Mr. Feng served as LT Game's president. See Mot. Ex. B (Feng Dec.) ¶ 21. The issue was not whether Mr. Feng could work in the business; it was whether Paradise, as ultimate owner, could own, control, or profit from a TPPPS operation. It could not.

At bottom, Plaintiffs replace a practical doctrine with a hypothetical. They had to show they could lawfully, practically, and timely take the Hawaiian Gardens opportunity when it arose. They did not. F2 was not a corporate opportunity as a matter of law.

## B.  Plaintiffs' Alternative Unjust-Enrichment Theory Fails

Plaintiffs' unjust-enrichment theory is not a separate path to relief. It is the same bid for F2's profits under a different label. Plaintiffs seek "$127 million in F2's profits" either because F2 supposedly was a usurped corporate opportunity or, "in the alternative," because Mr. Feng allegedly used $1 million in "seed money" to form F2. Opp. at 4. But usurpation of an opportunity and misappropriation of funds are different theories with different harms and different measures of

---

[11] Mr. Blonien also wrongly assumes Mr. Feng formed F2 "on behalf of" Empire. Opp. at 30. F2 was wholly owned by Mr. Feng, not licensed on behalf of any entity. Mot. Ex. B-11 at 23. Mr. Feng invested his personal F2 earnings into Empire. California law required LT Game to be registered and licensed before it could legally receive F2 proceeds. See Mot. Ex. E (Lichtig Dec.) p.6 n.15; CAL. BUS. & PROF. CODE §§ 19850, 19855.

[12] Plaintiffs invite inferences about Mr. Feng's regulatory disclosures despite Mr. Blonien expressly stating he offers no opinion on what information was actually disclosed or how regulators evaluated it. Opp. Ex. 5 (Blonien Dec.) ¶ 47.

damages.[13] Plaintiffs cite no authority to allow collapsing distinct theories into a second bite at the apple for all F2 profits. That distinction is dispositive. This fallback theory necessarily requires Plaintiffs had no cognizable expectancy interest in F2, yet they seek the upside of a venture they could not lawfully or practically pursue. Plaintiffs cite no case analyzing damages in an unjust enrichment claim based on temporary use of corporate funds. Even on Plaintiffs' telling, the alleged advance was roughly one-third of F2's funding. Opp. at 28. Plaintiffs nevertheless demand all F2 profits—over $127 million. That is not restitution. It is a nine-figure windfall.

The theory also fails on the elements. A benefit conferred on the defendant is essential to unjust enrichment. *See Backman v. Goggin*, No. 2:16-CV-1108, 2017 WL 1015008, at *4 (D. Nev. Mar. 15, 2017) (Mahan, J.). Plaintiffs' acknowledge the alleged $1 million was repaid to LT Game. *See* Opp. Ex. 4 (Medero Dec.) ¶ 9. A repaid advance is not a retained unjust benefit warranting disgorgement of F2's profits. Nor have Plaintiffs shown any loss from the temporary use of those funds. *See Topaz Mut. Co. v. Marsh*, 839 P.2d 606, 613 (Nev. 1992); *Anguilla RE, LLC v. Lubert-Adler Real Est. Fund IV, L.P.*, No. C.A. N11C-10-061-MMJ CCLD, 2012 WL 5351229, at *6 (Del. Super. Ct. Oct. 16, 2012). And Plaintiffs never answer Defendants' point that F2 did not place Mr. Feng in conflict with any duty he may have owed Plaintiffs. *See* Mot. at 28.

Plaintiffs try to turn a damages dispute into a morality play, repeatedly calling Mr. Feng "criminal" while conceding prior advances they characterize as "innocuous." Opp. at 22, 32 n.10. They also dwell on supposedly "erased" and altered records, but rely only on Mr. Medero's post-deposition declaration—submitted to "clarify" testimony, all in Plaintiffs' favor. Opp. at 28-29; Opp. Ex. 4. The Court need not resolve that shifting account to reject unjust enrichment. Plaintiffs ask for all profits from an enterprise they had no practical right or ability to pursue based on a temporary advance their own witness says was repaid. That is not equity. It is overreach.

---

[13] Defendants' Motion does not seek summary judgment on any freestanding claim based directly on alleged misappropriation of funds. It seeks summary judgment on F2 because Plaintiffs had no legal or practical ability to pursue that opportunity. That point defeats both the corporate-opportunity theory and Plaintiffs' attempt to recover the same F2 profits under a restitution label. Plaintiffs' waiver argument therefore misses the mark.

15

**V.    The Trade Secret Misappropriation Claims Fail As a Matter of Law**

    **A.    The Golden Frog Theory Fails**

    The Golden Frog theory fails first because the parties' agreements vested ownership of the Golden Frog source code in Empire, and Plaintiffs' complaint about the absence of a product-specific statement of work or purchase order does not change the undisputed fact that Empire distributed the game within the parties' contractual relationship.[14] *See* Opp. at 36. Nor does Plaintiffs' timing point help: the 2021 Game Development Agreement is expressly retroactive, and the Distributorship Agreement independently gave Empire ownership and control over the products and related technology.[15] *See* Mot. Ex. B-4 § 7(a); Mot. Ex. B-6 (2020 renewal) § 3.4(B). Even apart from ownership, Plaintiffs still do not identify actionable misappropriation. Their proof boils down to a May 2023 BMM evaluation and a document reflecting an alleged December 2022 installation on three machines at a single casino. *See* Opp. Exs. 1-95, 1-96, 1-92. Neither suffices. A sole laboratory submission does not show the necessary "improper use," which requires reduced value or secrecy of the alleged trade secret, especially where the agreements and regulatory process authorized Empire to submit source code for certification. *See JustMed, Inc. v. Byce*, 600 F.3d 1118, 1130-31 (9th Cir. 2010); Mot. at 31. For the alleged casino-installation, Plaintiffs rely on a stray document no witness has explained, and does not establish who created it, what it was prepared for, whether it is accurate, whether the referenced machines were ever operational, or whether any installation involved the alleged trade secret at all. At most, the uncontextualized document invites speculation; it cannot substitute for competent evidence of misappropriation or damages. *See* Opp. at 37 (conceding lack of individualized sales data for the Golden Frog slot game).

    **B.    The LT Shoe Theory Fails**

    The LTShoe theory is no stronger. Effectively conceding that Defendants did not acquire the LTShoe source code by improper means, Plaintiffs pivot to supposed unauthorized use. But the

---

[14] *See* Mot. at 7 n.4 (quoting relevant provisions from Distributorship Agreement and Game Development Agreement).

[15] The Court need not reach Plaintiffs' timing argument because their only citation for the development date is the Second Amended Complaint, which is not evidence. Opp. at 36 (citing ECF No. 161); *see Hukman v. Snackers Sinclair, Inc.*, No. 2:23-CV-0501-CDS-NJK, 2024 WL 2959277, at *1-*2 (D. Nev. June 12, 2024).

cited evidence does not support the assertion Defendants "accessed, modified, and recompiled."[16] *See* Opp. at 35. Plaintiffs' complaint that Defendants continued distributing Plaintiffs' own product after the relationship broke down. That is, at most, a contract dispute. Mot. at 34.

### C.    Plaintiffs' Remaining Theories Are Either Too Vague or Unsupported

Plaintiffs' remaining theories fare no better. ***First***, as to "electronic gaming technology" allegedly used in Defendants' table-game products, Plaintiffs make no attempt to identify what technology supposedly constitutes the trade secret, and thus fail to sufficient particularity to survive summary judgment. *See* Opp. at 35; *ImageKeeper LLC v. Wright Nat'l Flood Ins. Servs., No.* 2:20-CV-01470-CDS-MDC, 2024 WL 1330046, at *3 (D. Nev. Mar. 27, 2024). And even aside from that defect, Plaintiffs' cited evidence neither shows that Empire's products actually incorporated any protectable Paradise technology nor that Defendants used Plaintiffs' "resources, know-how, and source code."[17] *See* Opp. at 35. At most, it confirms Defendants' position that Mr. Feng proposed the original SMRT concept, Dr. Chun declined to pursue it, and Empire regarded those products as its own. *See* Opp. Exs. 1-62 (Kiely Dep.) at 61:5–16; 1-75, 1-77.

***Second***, Plaintiffs' "game designs and development" theory for Cherry Blast, Leprechaun, Yeti, Thor, and Odin is similarly deficient. Plaintiffs never define with specificity what those trade secrets supposedly were, and their own evidence shows that Empire did *not* use Plaintiffs' artwork for those games. *See ImageKeeper*, 2024 WL 1330046, at *3; Reply Ex. A-3 (Kiely Dep.) at 153:19-154:4; Opp. Ex. 1-90. Putting this aside, their unauthorized use theory is equally weak: Mr. Kiely testified that only Cherry Blast was ever finished, though he did not know whether it was released, and the other four were never completed. Reply Ex. A-3 (Kiely Dep.) at 154:12-22. Plaintiffs point to BMM Cherry Blast evaluations, but limited laboratory approval evidence does not establish misappropriation (*see supra*). *See* Opp. at 35-36; Opp. Exs. 1-95, 1-96. Plaintiffs'

---

[16] Plaintiffs' sole citation is an email thread involving Dr. Chun, Mr. Chan, and Mr. Feng. *See* Opp. Ex. 3-15.

[17] Mr. Kiely's testimony says only that he managed development; not that Empire incorporated protectable Paradise technology into those products. *See* Opp. Ex. 1-62 (Kiely Dep.) at 118:8–119:17. Nor does Plaintiffs' assertion that the products "should have been transferred to LT Game" help them, Opp. 35, because Mr. Kiely's LT Game agreement at the relevant time did not contain any IP assignment clause, and he testified that the Trend Board was work he did for Empire. *See* Opp. Ex. 1-62 (Kiely Dep.) at 44:16-18; Mot. Ex. C-9 (2016 employment agreement). The same is true of Plaintiffs' assertion that Paradise employees copied Dynamic Display Wall source code into an Empire repository— the cited documents do not show actual use of Plaintiffs' code in Defendants' products. *See* Opp. at 35; Opp. Exs. 1-80, 1-82, 1-81 (Plaintiffs incorrectly cite the third document as Opp. Ex. 1-86).

proof reduces to a ***single photograph*** of a ***single machine*** merely displaying "Cherry Blast." Opp. Ex. 7-1. Plainly, the publicly-available photograph is not itself evidence any trade secret, *e.g.*, 18 U.S.C. § 1839(3)(B), nor does the document provide any information to determine what, if anything, about that machine supposedly reflects Plaintiffs' trade secrets: it does not show the source code, any protectable game logic, any internal software, or any Plaintiffs-developed feature embedded in the machine. At most, it shows that a machine bore the Cherry Blast name, which is not evidence that Defendants misappropriated any identifiable trade secret.

***Third***, Plaintiffs' gaming platform source code theory fails based on the undisputed evidence. Opp. at 35. Mr. Kiely testified that while Empire modified the code to get it running, Empire ▮▮▮▮▮▮▮▮▮▮▮▮," that the Speed and Hyper Speed cabinets ran Aruze titles rather than Plaintiffs' games, and that Empire never developed games for Plaintiffs' platform.[18] Opp. Ex. 1-62 (Kiely Dep.) at 186:9-187:13; Reply Ex. A-3 (Kiely Dep.) at 123:21-124:2, 158:8-18. Plaintiffs therefore have no evidence of actionable misappropriation. *See JustMed*, 600 F.3d at 1130-31. ***Finally***, all the theories fail on damages. Plaintiffs rely on broad profit figures for Empire products sold "outside of its distributor relationship with Paradise." Opp. at 37. But they assert multiple alleged trade secrets across different technologies, products, and supposed acts of use. Unless Plaintiffs can show which specific secret was misappropriated, in which specific product, and what specific loss or unjust enrichment followed, an undifferentiated profit figure proves nothing. *See, e.g.*, *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076–77 (N.D. Cal. 2005) (granting JMOL where plaintiff offered a single damages figure and jury found misappropriation of only some, leaving any apportionment impermissibly based on "speculation and guesswork, not . . . evidence").

**D.    Any Remaining Trade Secrets Claims Displace Plaintiffs' Tort Claims**

The Opposition confirms the overlap. Plaintiffs define their trade secret theory as "technology derived from Plaintiffs' intellectual property that Empire sold outside of Plaintiffs' knowledge," then describe that same conduct as part of the broader fraudulent scheme. Opp. at 34;

---

[18] *See also* Mot. Ex. A-29 (GGB October 30, 2022 article announcing licensing agreement for certain Aruze game titles on Speed and Hyper Speed cabinets); Mot. Ex. A-33 (GGB May 27, 2023 article announcing further use of Aruze game titles on Speed and Hyper Speed cabinets).

*see supra* III.F. They likewise say they were "defrauded into funding joint LT Game-Empire operations under grossly false pretenses," which is just another description of the same alleged diversion of technology, work, and product value. They make the overlap explicit by arguing that, if certain Empire products "are proven not to derive from Plaintiffs' IP," they will seek unjust-enrichment recovery "in the alternative." *Id*. That is not a separate factual episode; it is the same alleged course of conduct repackaged under different labels. NUTSA therefore displaces any surviving tort claim resting on that same alleged misuse of Plaintiffs' technology, confidential information, or product development. *See* Mot. at 25-26.

## VI.    Plaintiffs' Copyright Claims Fail As a Matter of Law

Plaintiffs' Golden Frog slot machine source code theory fails. The parties' agreements vested ownership to Empire (*supra*, IV.A), which a later copyright registration does not override here.[19] *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1236 (9th Cir. 2000). Nor do Plaintiffs identify any infringing act. Their evidence consists of a May 2023 BMM evaluation and a single document purportedly showing a December 2022 installation on three machines at one casino. The BMM evaluation shows only a regulatory submission, not public exploitation of the work. The uncontextualized alleged casino-installation document is not competent evidence of an infringing act. *See supra* V.A. Plaintiffs also identify no infringing act by GSL, Mr. Kiely, Mr. Allison, or Mr. Feng—requiring, at a minimum, the claim be dismissed as to them.[20] As for the LT Shoe, Plaintiffs offer no evidence that Defendants "accessed, modified, and recompiled" the code (*supra*, IV.B). Their theory remains that Empire retained and distributed Plaintiffs' card shoes after the relationship broke down, which is, at most, a contract dispute—not infringement. Mot. at 34. Plaintiffs never engage Defendants' authorities drawing that distinction. And *Talavera v. Global Payments* does not help them; that case involved continued use after a license was "unequivocally

[19] Plaintiffs confirm the "copyright claim relates to Defendants' unauthorized use of the Golden Frog *slot game*." Opp. at 39 (emphasis in original). This forecloses any theory based on Empire's Golden Frog Baccarat table game (Mot. at 33) or the alleged Playful Interactive Golden Frog Baccarat mobile application (*See* ECF No. 161 (SAC) ¶¶ 125-127).

[20] The Court previously dismissed Paradise's infringement claim against GSL, Kiely, and Allison without prejudice for failure to allege infringing conduct by any of them. *See* Dkt. No. 155 at 7. Although Plaintiffs repleaded the claim against all Defendants, they offer no evidence to support it as to those three.

terminated." 670 F. Supp. 3d 1074, 1100 (S.D. Cal. 2023).  The point here is simpler: even if Empire exceeded the scope of the parties' commercial arrangements, the remedy sounds in contract.

**VII.    The Contract Claims Fail As a Matter of Law**

As to Mr. Allison's agreement, Plaintiffs invoke Section 7 as though it contains a noncompete—it does not. Opp. at 37. It says only that he would be "subject to the non-compete clause" and that duration would be negotiated upon termination, but no noncompete clause appears anywhere. Mot. at 36-37. With no covenant ever written, Plaintiffs' consideration argument fails. So does the confidentiality theory. Plaintiffs cite a single exchange and recast it as disclosure of LT Game's "private negotiating positions" in the May 2022 Solution Gaming sale. Opp. at 38. It was no such thing. The exchange reflects only price bargaining, not protected information.[21] Plaintiffs' theory against Mr. Kiely fares no better. His agreement contains no noncompete; the term never appears, and Plaintiffs cite none. Mot. at 37-38; Opp. at 38. Their confidentiality and assignment theories also fail. The assignment provision reaches only IP Mr. Kiely created or received while providing services to LT Game under the agreement. Mot. at 37-38. Plaintiffs' broad assertion that he used LT Game employees or resources on Empire matters does not satisfy that requirement or identify any Empire product created for LT Game. Plaintiffs effectively abandon their GSL claims. Even assuming a valid noncompete, the clause is limited to specified companies not at issue here. Mot. at 39. Plaintiffs do not answer that textual point, and they never identify any GSL-specific disclosure that breached a confidentiality obligation. General accusations about Defendants' overall conduct cannot substitute for proof that *GSL* breached *its own contract*. That also ends the tortious-interference claim. Inducement requires an underlying breachable obligation. Mot. at 40. If Allison and Kiely were not subject to enforceable noncompetes, and if GSL's did not breach, then there was nothing to interfere with.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion.

---

[21] *See* Opp. Ex. 1-29 (Mr. Allison: "They want $4800 per cabinet." Mr. Feng: "No" Mr. Allison: "How about $4500?" Mr. Feng: "$4300" Mr. Allison: "Ok. I told Leo and Jay I have meeting tomorrow and will call afternoon"); *see also Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1093 (10th Cir. 2025) (pricing information is not a trade secret without evidence of competitive or economic value to its owner).

Dated: June 4, 2026

Respectfully submitted,

*/s/ Patrick J. Reilly*
Patrick J. Reilly
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
100 North City Parkway, 16th Floor
Las Vegas, Nevada 89106

Mark Oakes (*pro hac vice*)
Zach McHenry (*pro hac vice*)
Ethan Glenn (*pro hac vice*)
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Boulevard, Suite 1100
Austin, Texas  78701-4255

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I, Patrick J. Reilly, counsel for Defendants, hereby certify that, on June 4, 2026, Defendants' *Reply in Support of Defendants' Motion for Partial Summary Judgment* and attached appendices were served on the following counsel of record by electronic transmission at the email addresses listed below:

s/ Patrick J. Reilly
Patrick J. Reilly

OLIVER J. PANCHERI, ESQ.
Nevada Bar No. 7476
JESSICA M. LUJAN, ESQ.
Nevada Bar No. 14913
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 791-0308
Fax: (702) 791-1912
Email: Opancheri@spencerfane.com
Jlujan@spencerfane.com

JEAN-PAUL CIARDULLO, ESQ.
California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

HANNAH ANDREWS, ESQ.
Nevada Bar No. 18157
ROBERT T. STEWART, ESQ.
Nevada Bar No. 13770
STEWART R. NELSON, ESQ.
Utah Bar No. 17286
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, UT 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
srnelson@foley.com
handrews@foley.com

DARIUSH KEYNANI (pro hac vice)
New Jersey Bar No. 044062002
**KEYHANI LLC**
1050 30th Street NW
Washington, DC 20007
Tel: (202) 748-8950
Email: dkeyhani@keyhanillc.com

*Attorneys for Plaintiffs*

23