Oliver J. Pancheri, Esq. (Nevada Bar No. 7476)
Jessica M. Lujan, Esq. (Nevada Bar No. 14913)
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
jlujan@spencerfane.com

Jean-Paul Ciardullo, Esq. (*pro hac vice*)
California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

Robert T. Stewart, Esq. (Nevada Bar No. 13770)
Stewart Ray Nelson, Esq. (*pro hac vice*)
Utah Bar No. 17286
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
srnelson@foley.com

Dariush Keyhani *(pro hac vice)*
**KEYHANI LLC**
1050 30th Street NW
Washington, DC 20007
Tel: (202) 748-8950
Email: dkeyhani@keyhanillc.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; and LT GAME, INC., a Nevada corporation, and LT GAME LIMITED, a British Virgin Islands Corporation,

*Plaintiffs, Counterdefendants,*

vs.

EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; and DARYN KIELY, an individual; and YI ZHAO, an individual,

*Defendants, Counterclaimants.*

Case No. 2:24-cv-00428-JCM-BNW

**PLAINTIFFS' *DAUBERT* MOTION TO PRECLUDE TESTIMONY OF PETER BERNHARD**

[ORAL ARGUMENT REQUESTED]

## CONTENTS

I. INTRODUCTION ........ 1
II. BACKGROUND ........ 2
A. PLAINTIFFS' LIABILITY AND DAMAGES THEORIES ........ 2
B. DEFENDANTS' PAST INSINUATIONS THAT PLAINTIFFS COULD NOT HAVE BEEN LICENSED TO DISTRIBUTE GAMING EQUIPMENT ........ 5
C. MR. DOYLE'S EXPERT REPORT ........ 6
D. THE REALITIES OF OBTAINING A GAMING EQUIPMENT DISTRIBUTION LICENSE ........ 7
E. MR. BERNHARD'S REBUTTAL REPORT ........ 7
F. DEFENDANTS HAVE NOW STATED THEY DO NOT CURRENTLY PLAN TO CHALLENGE PLAINTIFFS' MORAL AND FINANCIAL FITNESS FOR LICENSING ........ 10
III. APPLICABLE LAW ........ 10
IV. ARGUMENT ........ 10
V. CONCLUSION ........ 12

# TABLE OF AUTHORITIES

**Cases**

*Blockchain Innovation, LLC v. Franklin Res., Inc.*, No. 21-cv-08787-TSH, 2024 WL 5483606 (N.D. Cal. Oct. 22, 2024) ........ 10

*Bourelle v. Crown Equip. Corp.*, 220 F.3d 532 (7th Cir. 2000) ........ 12

*Braun v. Medtronic Sofamor Danek, Inc.*, 719 Fed. Appx. 782 (10th Cir. 2017) ........ 11

*Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007) ........ 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ........ 1, 10

*Onyx Pharms., Inc. v. Bayer Corp.*, 863 F. Supp. 2d 894 (N.D. Cal. 2011) ........ 11

*Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*, 371 F. App'x 719 (9th Cir. 2010) ........ 10

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010) ........ 10

*Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018) ........ 11

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) ........ 10

*United States v. Hanna*, 293 F.3d 1080 (9th Cir. 2002) ........ 12

**Rules**

Fed. R. Evid. 702 ........ 10

## I. INTRODUCTION

Plaintiffs respectfully move pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) for an order excluding unsupported and prejudicial damages testimony from Defendants' gaming licensing expert witness, Peter Bernhard, whose anticipated testimony is reflected in his Rebuttal Report that Defendants served in February 2026. (Ex. 1-1, Bernhard Rebuttal Report.) Defendants are improperly using Mr. Bernhard – a respected former Nevada Gaming Commissioner – to try to lend credibility to the argument that Plaintiffs could not have obtained a gaming equipment distributor license. This is problematic because:

(1) Mr. Bernhard expressly admits having not assessed Plaintiffs' ability to be licensed, and in any event there is no evidence that Plaintiffs could not have been licensed,

(2) Mr. Bernhard's premise that Plaintiffs' expert Tom Doyle should have replicated a full-blown Nevada licensing examination is an impermissible conclusion of law concerning the evidentiary burden that is at odds with the preponderance of evidence burden of proof, and

(3) Defendants have now stated that they do not currently intend to challenge Plaintiffs' fitness for licensing in the first place.

Defendants' recent clarification on this last point begs the question of why Mr. Berhard's testimony – which exclusively concerns licensing – is needed any longer. Defendants appear to generally hope that the presence of a former Nevada Gaming Commissioner in the courtroom will sway the Jury in their favor, but it is prejudicial and improper to have an uninformed regulatory spokesperson take the stand to give a tacit endorsement to Defendants in the absence of that purported expert witness having anything of relevance to offer.

Plaintiffs may later separately seek relief via a motion *in limine* to preclude argument or insinuation from Defendants at trial that Plaintiffs suffered from a moral or financial impediment to being licensed. For purposes of the present *Daubert* motion, Plaintiffs seek preclusion of the planned testimony of Peter Bernhard on the grounds that it is untethered to the facts of the case, confusing, and prejudicial.

## II. <u>BACKGROUND</u>

### A. <u>Plaintiffs' Liability And Damages Theories</u>

As argued in Plaintiffs' Opposition to Defendants' Summary Judgment Motion, Defendants have proceeded from inaccurate assumptions about Plaintiffs' damages theories. As is relevant to this Motion, Defendants appear to assume that Plaintiffs have made their recovery contingent on having been able to be independently licensed as their own gaming equipment distributor (rather than using a licensed distributor, as they used Empire). This premise is not reflected in Plaintiffs' damages theories, which were set forth in the damages expert report of Clarke Nelson and Plaintiffs' discovery responses. (*See generally*, ECF No. 183-4 at 0726 [Nelson Report]; ECF No. 183-5 at 0868 [Feb. 22, 2026 Paradise ROG Resp. at ROGs 8, 26–28]; ECF No. 183-5, at 0938 [Feb. 22, 2026 LT Game ROG Resp. at ROGs 1, 5, 8, 14, 19–20, 22].) To summarize, Plaintiffs are seeking the following forms of remedies, none of which are contingent upon Plaintiffs having been independently capable of being licensed:

> **(<u>Category 1</u>) $25 million out of pocket spending loss on LT Game and Empire from 2016–2023 during Defendants' fraud and usurpation.** Plaintiffs claim this as an actual out of pocket loss on what they spent on the combined LT Game and Empire business operations in Las Vegas at a time when Defendants were actively undermining and usurping corporate opportunities from LT Game, which was money that Plaintiffs never would have spent on Defendants if they had known the truth of what Defendants were doing. Alternatively, Plaintiffs also claim this as ill-gotten gains/unjust enrichment from Defendants having defrauded Plaintiffs into unwittingly supporting the launch of Empire.

> **(<u>Category 2</u>) $6.6 million disgorgement of Empire's profits from non-LT Game equipment sales that used Plaintiffs' IP.** In addition to resulting from fraud, these profits correspond to the trade secret and copyright remedies for Empire having sold technology derived from Plaintiffs. This remedy is independent from the $25 million out of pocket loss caused by Defendants' fraud and usurpation, which Plaintiffs would seek even if Empire had never used Plaintiffs' IP to sell equipment. Plaintiffs also seek this as unjust enrichment.

(<u>Category 3</u>) **$127 million in F2's profits.** Plaintiffs claim F2 as a usurped business opportunity. In the alternative, Plaintiffs seek this as unjust enrichment from Mr. Feng having stolen the necessary $1 million seed money for F2, and otherwise having secured the opportunity through Plaintiffs.

**(<u>Category 4</u>) $1 million for the fraudulent sale to Solution Gaming at below market price.**

Regarding Category 1, as Plaintiffs have set forth in their discovery responses, and in Mr. Nelson's expert report, and as is otherwise apparent from the pleadings in this case, the premise of this category of damages is that Plaintiffs were fraudulently induced to continue spending millions of dollars on joint LT Game-Empire business operations from 2016–2023 under false pretenses, unaware that Defendants were in fact usurping LT Game opportunities for Empire in order to launch Empire as a separate competing business. Defendants were not employees of their own separate company engaged in fair competition with LT Game. Rather, Defendants have all admitted under oath that during the relevant time period they were *fiduciary employees* of LT Game and Paradise. (ECF No. 183 at Section V.1.) Plaintiffs' claims are premised on Defendants' violation of their fiduciary and contractual duties by running LT Game into the ground as they devoted most of their time and efforts to this secret launch of Empire and usurping LT Game's corporate opportunities, which ultimately resulted in Empire eclipsing and replacing LT Game. (*Id.* at Section V.) Empire went on to be successful, while LT Game was left a shell. (*Id.* at Sections III–V.) At any point from 2016 onward (when the fraud began), if Plaintiffs had known of Defendants' ongoing misconduct, Plaintiffs would have pulled the plug. (ECF No. 183-6 at 1242 [Chun Decl. ¶42]; ECF No. 183-8 at 1662 [Chan Decl. ¶44].) Note that Plaintiffs also seek recovery under Category 1 as unjust enrichment in the alternative to actual damages.

Regarding Category 2, Plaintiffs seek disgorgement of Empires' profits from secret past sales of non-LT Game equipment in the 2016–2023 timeframe. These sales represent not only the fruits of Defendants' fraud and breaches of their fiduciary and contractual duties, but also are recoverable under theories of trade secret misappropriation and copyright infringement because Plaintiffs allege that the non-LT Game equipment incorporated technology that belonged to Plaintiffs. (ECF No. 183 at Sections VIII–IX.) This $6.6 million profits disgorgement for past sales of non-LT Game equipment is separate and

distinct from the $25 million out of pocket spending loss on LT Game-Empire operations, though Defendants have tried to blur the line between them. For example, Defendants have argued that the $25 million out of pocket loss is premised on trade secret misappropriation, yet it is not. (*Id.* at Section VIII.) Note that Plaintiffs also seek recovery under Category 1 as unjust enrichment in the alternative to actual damages.

Regarding Category 3, Defendants have argued elsewhere that it implicates Plaintiffs' ability to have been licensed as a Third Party Player Proposition Service provider under California gaming regulations, but Mr. Berhard's proposed testimony does not relate to that issue, and he confirmed in his deposition that he is not offering opinions on that topic.[1] Mr. Berhard's testimony refers mainly to moral and financial fitness criteria for licensing such as those he was familiar with from his time with the Nevada Gaming Commission.

Category 4 pertains to a discrete transaction and does not implicate licensing issues.

In sum, none of the remedies that Plaintiffs seek are contingent on Plaintiffs having been able to have been independently licensed as an equipment distributor.

To be clear, this is not to say that the issue is irrelevant. Plaintiffs do argue that Defendants' misconduct has left them ten years behind Empire in the market, and delayed any attempt Plaintiffs might have otherwise made to get licensed on their own rather than relying on Empire for distribution. More generally, the subject of licensing is relevant to explain why Plaintiffs were paying so much money to help Empire obtaining gaming licenses to act as LT Game's distributor, which might otherwise be confusing to Jurors who may wonder why Plaintiffs did not just obtain licenses for themselves. Defendants have previously tried to insinuate that there was some problem with Plaintiffs that precluded them from being licensed on their own, so absent some stipulation or order precluding such insinuation, it will be

[1] Category 3 is implicated by the separate testimony of the parties' California gaming regulation attorneys: Jarhett Blonien for Plaintiffs, and Tiffany Lichtig for Defendants, who discuss the question of whether California regulations permitted Plaintiffs from benefiting from the F2 opportunity. To avoid burdening the Court with additional briefing, and because – in Plaintiffs' view at least – these witnesses' testimony is more akin to legal argument that will be exclusively heard by the Court rather than expert witness testimony for the Jury, the Parties reached a stipulation to not make *Daubert* challenges against these witnesses. However, Plaintiffs' agreement to not file a *Daubert* motion with respect to Ms. Lichtig should not be construed as agreement with any of her testimony. Plaintiffs dispute Ms. Lichtig's conclusions for reasons set forth in Mr. Blonien's Declaration (ECF No. 183-9, 1844 [Blonien Decl.]) and the Opposition to the Summary Judgment Motion (ECF No. 183 at Section VI).

useful for Plaintiffs to be able to explain that they relied on Empire's licenses for reasons unrelated to any purported inability to be licensed on their own. Indeed, as Plaintiffs have explained in their Opposition to Defendants' Summary Judgment Motion, it was Mr. Feng who had proposed to Dr. Chun that Empire be separately licensed instead of Plaintiffs, taking the position that this would make the licensing process proceed more efficiently. (ECF No. 183 at Section V.4.)

Rather than arguing that licensure is irrelevant, Plaintiffs' point here is that Defendants have distorted its relevance to the case by seemingly trying to make the fact-finder believe that licensing capacity is a prerequisite to Plaintiffs' recovery, which is untrue. Beyond which, not only would there have been no impediment to Plaintiffs being licensed as a gaming equipment distributor, but Plaintiffs could have also elected to skip the process and simply use another already-licensed company as their distributor the way they used Empire.

**B. <u>Defendants' Past Insinuations That Plaintiffs Could Not Have Been Licensed To Distribute Gaming Equipment</u>**

This dispute traces back to the fact discovery period when Defendants were fishing for evidence that Plaintiffs might have been disqualified from obtaining a Nevada gaming license based either on moral grounds (such as corrupt business practices), or financial incapacity. (Ex. 1, Ciardullo Decl. ¶2.) Plaintiffs provided exhaustive discovery demonstrating that they have a stellar business record and ample financial means to obtain a Nevada gaming license. (*Id.*) This included all of Plaintiffs' annual financial statements and corporate disclosures, direct witness testimony of Plaintiffs' executives, communications with Plaintiffs' independent auditors, and a host of other records. (*Id.*)

Defendants own witnesses – Linyi "Frank" Feng and Yi "Betty" Zhao, who are family members and former business partners of Paradise Entertainment Chairman Dr. Jay Chun – testified in their depositions that they are not aware of any improper business practices or other factors that would have precluded Plaintiffs from obtaining a Nevada gaming license. When asked at his deposition "Why do you believe Paradise could not get a gaming license in the United States?" Mr. Feng testified "Well, that was just my impression. …This is something you should ask Jay about, not me." (ECF No. 183-3, 0523 [Feng Tr. Vol. I] at 34:2–8.) Betty Zhao is the cousin of Mr. Feng and Dr. Chun's wife (Jenny Chun), and served as the Chief Operating Officer at the Paradise Entertainment Group in Macau for many years. She had

direct familiarity with Plaintiffs' business practices in Macau, and when pressed at her deposition she testified she was not aware of any business misconduct by Plaintiffs that would impair their ability to obtain a gaming license. (Ex. 1-4, Zhao Tr. at 71:12–73:12.)

### C. Mr. Doyle's Expert Report

Because Defendants had insinuated during fact discovery that they intended to argue that Plaintiffs could not have been licensed based on moral or financial fitness issues, Plaintiffs preemptively had their gaming industry expert, Tom Doyle, address the matter in his expert report, served on January 9, 2026. A copy of his expert report is attached as Exhibit 1-3. Mr. Doyle once served as a Nevada Gaming Control Board Investigator, and has otherwise worked in the Nevada gaming industry for over forty years, being amply familiar with licensing requirement among other things. Section III of his expert report sets forth the basic criteria for obtaining a gaming equipment distribution license. (*Id.*, ¶¶21–31.) Section V then summarizes Mr. Doyle's analysis of Plaintiffs' capacity to be licensed. (*Id.*, ¶¶37–42.) Mr. Doyle explains the various evidence he considered, which included among other things:

- Paradise Financial Statements from 2019 to 2024;
- Corporate documents and Macau license certificates, including various Macau, Philippine, and other documents;
- Witness depositions in the case;
- An extensive review of internet information for LT Game and Paradise regarding the companies for any evidence of fines or sanctions by any regulatory agencies or any other negative information that would impact licensing. (*Id.*, ¶38.)

Mr. Doyle concluded that he saw no evidence that suggested that Plaintiffs would lack moral or financial fitness to be licensed: "While it would be impractical to conduct a full-blown licensing investigation – a process that often takes a year or longer and a staff of multiple people – I believe that I have reviewed adequate evidence to say that there are no indications that LT Game would not have been able to be licensed to distribute gaming products in the US, including in Nevada. If Paradise (as the owner of LT Game) is as it appears to be – a reputable and adequately financed company – LT Game can expect to be successfully licensed after going through the application process." (*Id.*, ¶42.)

**D. The Realities Of Obtaining A Gaming Equipment Distribution License**

The reality is that it is exceedingly rare for the Nevada gaming regulators to ever deny a gaming license. Plaintiffs reviewed hundreds of Nevada Gaming Commission licensing reports over the past 5 years and in virtually all cases a license is granted, albeit sometimes with certain restrictions. (Ex. 1, Ciardullo Decl. ¶4.) In considering Section III of Mr. Doyle's report, it is apparent that the Nevada regulators' primary concerns are in not awarding licenses to criminal or corrupt businesses, or to businesses that are financially incapable of maintaining a functioning company. (Ex. 1-3, Doyle Report, ¶¶21–31.) Generally speaking, absent such concerns, the Nevada regulators would prefer to grant licenses in order to promote robust business growth in the State of Nevada. The regulators have no reason to deny licenses to companies that appear legitimate and adequately funded, especially for something like equipment distribution. Mr. Berhard admitted in his deposition that gaming licenses may be granted to companies even if they operate at a financial loss and even if they are in bankruptcy proceedings. (Ex. 1-2, Bernhard Tr. at 136:11–139:20.) As to moral qualifications, Mr. Bernhard said there were no defined standards, just a case by case assessment. (*Id.* at 64:6–65:5.)

Considering Defendants here, the Nevada regulators were willing to grant them a 5 year temporary license despite calling them out on the allegations of this lawsuit, and expressing concern that Empire had not yet turned a profit as of the time of the hearings. (ECF No. 183 at Section V.13.) While it is true that some companies may apply for a license and then voluntarily drop out before the process is complete, there is no indication that Plaintiffs would have done so if they had applied, and Mr. Bernhard admitted at his deposition to having no data about voluntary withdrawals. (Ex. 1-2, Bernhard Tr. at 135:25–136:4.)

**E. Mr. Bernhard's Rebuttal Report**

Peter Bernhard is a well-respected former Nevada Gaming Commissioner. Plaintiffs do not dispute that he is well-credentialed. The problem here, however, is that Mr. Bernhard's Rebuttal Report (which purports to respond to Section V of Mr. Doyle's Report) is being used by Defendants to suggest that Plaintiffs could not be licensed. Mr. Berhard paints a picture of the Nevada licensing process as being quite difficult. Plaintiffs do not dispute that the process is time consuming, intensive, and expensive. But that is a different question from whether applicants who have adequate resources are at risk of ultimately being denied a license when the process is over. Plaintiffs do very much dispute the implication that they

could not have been licensed if they had applied.

While he claimed to be generally familiar with the allegations of the case, Mr. Berhard did not investigate them or take any position on the merits. (Ex. 1-2, Berhard Tr. at 19:12–20:13.) Mr. Bernhard conducted no assessment of Defendants' own gaming license application, and did not watch the recorded public hearings on their application that are available on YouTube. (*Id.* at 54:5–19.)

Mr. Bernhard admitted not speaking with any of the Defendants or Ms. Zhao about Plaintiffs. This is a glaring omission given that (1) these were the managers of LT Game and would have been prime candidates to have been interviewed by the Nevada regulators to assess licensure, and (2) they were directly familiar with Dr. Chun (indeed, Mr. Feng and Ms. Zhao are family relatives) and familiar with Paradise's business practices. (*Id.* at 102:5–114:23.) Most notably, Mr. Bernhard was unaware that Mr. Feng and Ms. Zhao had testified that they had no knowledge of any business misconduct by Plaintiffs that would have disqualified them from getting a license. (*Id.*)

Mr. Bernhard also admitted having no basis in the expansive document productions and comprehensive discovery from the litigation to argue that Plaintiffs could not have obtained a license. (*Id.* at 115:16–117:17.) In fact, Mr. Bernhard had been engaged when fact discovery was still ongoing, and could have advised Defendants of any areas to investigate, but still nothing came out of discovery that would suggest Plaintiffs could not be licensed. (*Id.*)

Mr. Bernhard also admitted not evaluating the evidence that was considered by Mr. Doyle. (*Id.* at 121:19–122:12.)

When confronted with a full compilation of all the Nevada licensing decisions from the past five years, Mr. Bernhard admitted that he had not conducted any analysis of how many were denied (effectively none), and had no actual data regarding how many applicants may voluntarily drop out of the process, rendering any testimony on that subject speculation. (*Id.* at 124:8–136:10.)

Mr. Bernhard admitted that there are no defined parameters under which the Nevada regulators would deny a license based upon moral integrity, and that it is a case by case assessment. (*Id.* at 64:6–65:5.) When pressed about whether he considered the allegations against Defendants in this case to be disqualifying for Defendants' ability to obtain a license, he insisted that they were not, which is an admission that even if there were severe allegations of misconduct against Plaintiffs (which there are not)

even those would not have prevented Plaintiffs from obtaining a license, just like Empire obtained a license despite the allegations of this lawsuit. (*Id.* at 56:14–64:22.)

To defend this lack of basic investigation, Mr. Bernhard admitted that he had no basis to argue that LT Game could not be licensed: "Again, **I was not asked to determine whether or not LT Game would be licensed.** I was asked to investigate whether or not anything that Mr. Doyle opined to was rebuttable. …Yeah, **I did not opine at all on whether they could or could not be licensed at any point in time.**" (*Id.* at 104:16–19, 108:16–17.)

Confusingly, despite this admission and his lack of other basic investigation, Mr. Bernhard nevertheless attempts to accuse Plaintiffs of disqualifying moral misconduct by interjecting unsupported innuendo.

First, he stated that an "area of concern" was the fact that Paradise acted as a vendor to a casino owned by a company called SJM, whose manager Stanley Ho was deemed suspicious by Mr. Berhard for reasons he declined to disclose. (*Id.* at 67:23–70:12.) When pressed about this Mr. Bernhard admitting having no basis to believe that Paradise was engaged in any misconduct even if he had concerns about Mr. Ho: "Q. Okay. And you don't have any evidence that, notwithstanding any supposed issues of Mr. Ho, that that actually implicates Paradise in any way; right? A. No. My information is only that SJM was the concession grantor, and Paradise was the concessionaire and trusted to operate a casino in Macau." (*Id.* at 70:13–23.)

Next, Mr. Bernhard implied that Paradise might somehow be involved in unlawful casino operations. (*Id.* at 70:24–73:3.) To be very clear, Paradise is not, and it has a stellar business record. When pressed on this at his deposition Mr. Bernhard conceded he had no evidence of Plaintiffs being involved in any unlawful activities (because there is no such evidence). (*Id.*) Mr. Bernhard's next example was the fact that Dr. Chun's wife, Jenny Chun, was involved with a charity that gave an award to someone who Mr. Bernhard deemed a "nefarious character," but here again when pressed he admitted he had no evidence of any misconduct (because there was none): "Q. But, again, you don't have any evidence of any impropriety by plaintiffs or Ms. Jenny Chun? A. No, no." (*Id.* at 73:1–17.)

**F. Defendants Have Now Stated They Do Not Currently Plan To Challenge Plaintiffs' Moral And Financial Fitness For Licensing**

In the lead up to this Motion, Plaintiffs asked Defendants whether, in light of everything that had ultimately come out of discovery, they intended to challenge Plaintiffs' moral or financial fitness to obtain a gaming equipment distributor license. (Ex. 1, Ciardullo Decl. ¶3.) Defendants answered that "Mr. Bernhard is not expected to offer an affirmative opinion that Plaintiffs lack fitness for licensure, and instead is expected to testify consistent with his report and deposition testimony." (*Id.*) Because Mr. Bernhard testified at his deposition that he is not offering any opinions as to whether Plaintiffs could have been licensed, Plaintiffs understand Defendants to have confirmed that no such testimony is intended.

## III. APPLICABLE LAW

Expert testimony is admissible under Rule 702 if the expert is qualified and if the testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Courts consider a purported expert's knowledge, skill, experience, training, and education in the subject matter of his asserted expertise. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000); *see also* Fed. R. Evid. 702. Relevance, in turn "means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") The purpose of the Court's gatekeeping role is to ensure that expert testimony is "properly ground, well-reasoned and not speculative." Fed. R. Evid. 702, Adv. Comm. Notes (2000). Where an expert's analysis is not grounded on factual issues in the case, those opinions are subject to exclusion both as being unreliable and out of risk of causing prejudicial juror confusion. *Blockchain Innovation, LLC v. Franklin Res., Inc.*, No. 21-cv-08787-TSH, 2024 WL 5483606, at *11 (N.D. Cal. Oct. 22, 2024) (striking expert report when he "provide[d] no explanation of the factual basis for his opinion"); *Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev. Inc.*, 371 F. App'x 719, 720–21 (9th Cir. 2010) (no abuse of discretion in striking portions of expert declarations lacking factual support and providing no explanation of methodology used).

## IV. ARGUMENT

Mr. Berhard's testimony is not founded in any relevant factual analysis, is highly prejudicial, and

should be excluded.

As discussed above in Section II.E, Mr. Bernhard had expressly admitted performing no analysis of Plaintiffs' ability to have been licensed, saying that was not what he was hired to do, and admitting that he in fact did not investigate that question. Where an expert admittedly lacks knowledge on a topic, he axiomatically cannot be an expert on that topic. *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1031–32 (C.D. Cal. 2018) (striking expert's opinion that energy drink consumers are energy drink purchasers, "[expert's] expertise is in marketing generally, and he does not profess to have any particular expertise in sports drinks. Such a general observation is therefore outside the scope of his expertise.") Now, Defendants themselves have confirmed that they do not intend to argue at trial that Plaintiffs lacked moral or financial fitness to have been licensed. So what basis is there, then, for Mr. Bernhard's proposed testimony?

To the extent that Mr. Berhard's testimony amounts to nothing more than a criticism that Mr. Doyle did not perform a full-blown Nevada licensing examination, this impermissibly intrudes on the Court's role in setting evidentiary standards: a pure question of law. Plaintiffs' capacity to be licensed should not be disputed at trial, but even if the matter were put to the Jury, the applicable evidentiary burden is a basic preponderance of the evidence standard. *Onyx Pharms., Inc. v. Bayer Corp.*, 863 F. Supp. 2d 894, 904 (N.D. Cal. 2011) (indicating that an estimated 57% likelihood of FDA approval was sufficient). There was this never any requirement that Mr. Doyle have duplicated a full-blown licensing exam, and Mr. Doyle expressly concedes doing so would have been impractical. *See also Braun v. Medtronic Sofamor Danek, Inc.*, 719 Fed. Appx. 782 (10th Cir. 2017) (rejecting argument that expert needed to "prove in detail every step of a hypothetical approval process that never occurred"). Mr. Bernhard's exaggerated advocacy of an elaborate licensing assessment improperly tries to impose something akin to a beyond-a-reasonable-doubt standard. But Mr. Bernhard is not an expert witness on the evidentiary standards that should apply in this case, and it should be for the Court to define the evidentiary burdens. If Mr. Bernhard had something substantive to offer on the merits of whether Plaintiffs could have been licensed then the assessment of his testimony might be different, but absent any such substance, his testimony reduces to an attempt to skew the evidentiary burden. His testimony would amount to an admission that there is no record evidence to disqualify Plaintiffs from being licensed yet still, somehow,

Mr. Doyle did not investigate deeply enough. It is illogical.

All the foregoing must also be considered against the fact that – contrary to Defendants' suggestions – Plaintiffs' recovery in this case is not contingent on them having been able to be independently licensed. Now that Plaintiffs have recently clarified that they do not plan to challenge Plaintiffs' ability to have been licensed, that issue is best resolved by a pre-trial stipulation rather than expert testimony.

Finally, in view of Mr. Bernhard's lack of useful testimony on any disputed merits issue, it would be highly prejudicial to allow him to nonetheless take the stand for Defendants and give them a tacit endorsement. Despite the fact that Mr. Bernhard has admitted taking no position on Defendants' liability, a Jury would still likely assume that Mr. Bernhard must in some way be supporting Defendants' cause by testifying on their behalf. Because of his stature as a respected former Nevada Gaming Commissioner, this risks unfairly skewing Juror perceptions and suggesting a kind of governmental imprimatur. If Mr. Bernhard had something important to say on the merits it might be a different matter, but because he does not, his role at trial would be akin to a paid celebrity endorser who does not actually know whether the product they are endorsing is good or not. Such a prejudicial appearance by an expert witness is not proper. *See United States v. Hanna*, 293 F.3d 1080, 1086–87 (9th Cir. 2002) (remanding for new trial due to prejudice that jurors would erroneously defer to the experts resulting from admission of expert testimony from highly trained Secret Service agents); *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 537 n.11 (7th Cir. 2000) (affirming district court's exclusion of expert and rejecting appellants' attempt to conflate expert's experience and credentials with reliability).

## V. **CONCLUSION**

For the foregoing reasons, Plaintiffs seek an order precluding Mr. Bernhard's planned rebuttal testimony.

DATED: June 25, 2026

Respectfully submitted,

*/s/ Jessica M. Lujan*______

OLIVER J. PANCHERI, ESQ.
Nevada Bar No. 7476
JESSICA M. LUJAN, ESQ.
Nevada Bar No. 14913
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
jlujan@spencerfane.com

JEAN-PAUL CIARDULLO, ESQ. (*pro hac vice*)
California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

ROBERT T. STEWART, ESQ.
Nevada Bar No. 13770
STEWART RAY NELSON, ESQ. (*pro hac vice*)
Utah Bar No. 17286
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
srnelson@foley.com

Dariush Keyhani *(pro hac vice)*
**KEYHANI LLC**
1050 30th Street NW
Washington, DC 20007
Tel: (202) 748-8950
Email: dkeyhani@keyhanillc.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of June, 2026, a true and correct copy of **PLAINTIFFS' DAUBERT MOTION TO PRECLUDE TESTIMONY OF PETER BERNHARD** was served via the United States District Court CM/ECF system on all parties or persons requiring notice.

By: *Is/ Adam Miller*
Spencer Fane LLP