Oliver J. Pancheri, Esq. (Nevada Bar No. 7476)
Jessica M. Lujan, Esq. (Nevada Bar No. 14913)
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
        jlujan@spencerfane.com

Robert T. Stewart, Esq. (Nevada Bar No. 13770)
Stewart Ray Nelson, Esq. (*pro hac vice*)
  Utah Bar No. 17286
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
        srnelson@foley.com

Jean-Paul Ciardullo, Esq. (*pro hac vice*)
  California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

Dariush Keyhani *(pro hac vice)*
**KEYHANI LLC**
1050 30th Street NW
Washington, DC 20007
Tel: (202) 748-8950
Email: dkeyhani@keyhanillc.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; and LT GAME, INC., a Nevada corporation, and LT GAME LIMITED, a British Virgin Islands Corporation,

        *Plaintiffs, Counterdefendants*,

        vs.

EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; and DARYN KIELY, an individual; and YI ZHAO, an individual,

        *Defendants, Counterclaimants*.

Case No. 2:24-cv-00428-JCM-BNW

**PLAINTIFFS' *DAUBERT* MOTION TO LIMIT TESTIMONY OF PAUL PETERSON**

[ORAL ARGUMENT REQUESTED]

# CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ...................................................................................................1

    A.    PLAINTIFFS' LIABILITY AND DAMAGES THEORIES .........................................1

    B.    PLAINTIFFS' RELEVANT EXPERT REPORTS .........................................................3

    C.    MR. PETERSON'S REBUTTAL REPORT ................................................................3

III.  APPLICABLE LAW ...........................................................................................4

IV.   ARGUMENT.......................................................................................................5

    A.    MR. PETERSON'S REBUTTAL TESTIMONY REGARDING THE F2 BUSINESS OPPORTUNITY SHOULD BE EXCLUDED ...........................................5

    B.    MR. PETERSON'S REBUTTAL TESTIMONY REGARDING WHAT DEFENDANTS CHARACTERIZE AS A SHORT-TERM CASH ADVANCE SHOULD BE EXCLUDED ...................................................................................9

V.    CONCLUSION....................................................................................................11

PLAINTIFFS' DAUBERT MOTION RE PETERSON
Case No. 2:24-cv-00428-JCM-BNW

2026-06-25 - Daubert Motion - Peterson - 6/25/2026 2:17 PM

# TABLE OF AUTHORITIES

**Cases**

*Bradley v. Becerra,* 2020 WL 7407918 (C.D. Cal. Oct. 23, 2020) ............................................................ 9

*Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*, 272 Cal. Rptr. 3d, 108 (Cal. Ct. App. 2020) ................................................................................................................... 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ................................................... 1, 5

*Neal v. Tep*, No. 2:21-cv-00433-JCM-DJA, 2022 WL 18455978 (D. Nev. Apr. 14, 2022) ..................... 4

*Olenicoff v. UBS AG*, 2010 WL 8530286 (C.D. Cal. Mar. 16, 2010) ........................................................ 7

*Serv. First v. Lee*, 2022 U.S. Dist. LEXIS 147274 (E.D. Mich. Aug. 17, 2022) ....................................... 8

*Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175 (D. Nev. 2022) ................................................... 7

*U.S. v. Hanna*, 293 F.3d 1080 (9th Cir. 2002) ...................................................................................... 4, 6

*United States v. Hylton*, No. 2:17-cr-00086-HDM-NJK, 2018 WL 5795799 (D. Nev. Nov. 5, 2018) . 5, 7, 8, 10

*United States v. Thomas*, 2013 U.S. Dist. LEXIS 163855 (D. Conn. Nov. 18, 2013) ............................... 9

*United States v. Wiseman*, 274 F.3d 1235 (9th Cir. 2001) ...................................................................... 9

**Rules**

Fed. R. Evid. 403 ...................................................................................................................................... 5

Fed. R. Evid. 702 ...................................................................................................................................... 4

**Treatises**

Restatement of Restitution, § 51(d) .......................................................................................................... 8

## I.     <u>INTRODUCTION</u>

Plaintiffs respectfully move pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) for an order excluding unsupported and prejudicial damages testimony from Defendants' damages rebuttal expert witness, Paul Peterson, whose anticipated testimony is reflected in his Rebuttal Report that Defendants served in February 2026. (Ex. 1A, Peterson Rebuttal Report.). Mr. Peterson's rebuttal testimony includes unsupported opinions regarding the California regulatory scheme governing Third-Party Providers of Proposition Player Services ("TPPPS")—opinions which he is unqualified to provide. Among other things, Plaintiffs are seeking recovery of $127 million in profits generated by F2 TPS, LLC ("F2"), a California TPPPS owned by Defendant Linyi "Frank" Feng. Plaintiffs claim F2 as a usurped business opportunity, or in the alternative, Plaintiffs seek this as unjust enrichment from Mr. Feng having stolen from Plaintiff LT Game, Inc. ("LTGC"), the necessary $1,005,000 seed money for F2, and otherwise having secured the opportunity through Plaintiffs. Mr. Peterson's testimony improperly characterizes Mr. Feng's taking of LTGC's funds for his personal benefit as the "normal course of business," which is false, legally erroneous, unfairly prejudicial, and highly likely to mislead the jury given Mr. Peterson's professed expertise in fraud investigations.

Plaintiffs therefore seek an order precluding Mr. Peterson's planned rebuttal testimony reflected in Paragraphs 32.c and 81–89 of his Rebuttal Report, including his calculation in Footnote 141, concerning California gaming law and Mr. Feng's taking of $1,005,000 from LTGC for his personal benefit.

## II.     <u>BACKGROUND</u>

### A.     <u>Plaintiffs' Liability And Damages Theories</u>

As argued in Plaintiffs' Opposition to Defendants' Summary Judgment Motion, Defendants have proceeded from inaccurate assumptions about Plaintiffs' damages theories. As is relevant to this Motion, Defendants appear to assume that Plaintiffs have made their recovery contingent on having been able to be directly licensed as a California TPPPS (rather than forming a new California company, like Mr. Feng did). This premise is not reflected in Plaintiffs' damages theories, which were set forth in the damages expert report of Clarke Nelson and Plaintiffs' discovery responses. (*See generally*, ECF No. 183-4 at 0726 [Nelson Report]; ECF No. 183-5 at 0868 [Feb. 22, 2026 Paradise ROG Resp. at ROGs 8, 26–28]; ECF No. 183-5, at 0938 [Feb. 22, 2026 LT Game ROG Resp. at ROGs 1, 5, 8, 14, 19–20, 22].)

As is relevant to this Motion, Plaintiff seek disgorgement of $127 million reflecting the profits that Defendants earned from F2. In the first instance, Plaintiffs claim F2 as a business opportunity that Defendants Mr. Feng usurped in violation of his fiduciary duties as President of LT Game. In the alternative, Plaintiffs disgorgement as unjust enrichment from Mr. Feng having stolen the necessary $1 million seed money for F2, and otherwise having secured the opportunity through Plaintiffs. This unjust enrichment remedy is in the vein of a "secret profits" remedy in cases concerning breach of fiduciary duties and embezzled funds, and is not dependent on whether Plaintiffs could have otherwise taken advantage of the F2 opportunity themselves.

Defendants have argued elsewhere that Plaintiffs' recovery of F2's profits is entirely contingent upon Plaintiffs having been able to be directly licensed as a TPPPS business under then-existing California gaming regulations in 2020. In support of this false and misleading premise, Defendants engaged a California gaming lawyer, Tiffany Lichtig, to opine that Plaintiffs could not have been directly licensed as a TPPPS provider in 2020. As Plaintiffs have argued in Section VI of their co-pending Opposition to Defendants' Summary Judgment Motion (ECF No. 183), Defendants' argument is wrong on many counts: (1) there is no reason LT Game could not have been licensed as a TPPPS provider, (2) in any event, LT Game need not have because what most likely would have happened is exactly what Mr. Feng actually did, i.e., form a separate company to be licensed (F2) and then have LT Game later share in the profits the way Empire did, and (3) even if Plaintiffs could not have participated in F2, they would still be entitled to an unjust enrichment remedy in view of Mr. Feng having embezzled the necessary $1 million seed money for F2 (without which he has admitted he never could have launched F2), and otherwise having secured the opportunity through Plaintiffs.

Substantial evidence supporting all the foregoing arguments was included in Section VI of Plaintiffs' co-pending Opposition to Defendants' Summary Judgment Motion (ECF No. 183.)[1] Plaintiffs

---

[1] The question of TPPPS eligibility was the subject of testimony from the parties' California gaming regulation attorneys: Jarhett Blonien for Defendants, and Tiffany Lichtig for Defendants, who discuss the question of whether California regulations permitted Plaintiffs from benefiting from the F2 opportunity. To avoid burdening the Court with additional briefing, and because – in Plaintiffs' view at least – these witnesses' testimony is more akin to legal argument that will be exclusively heard by the Court rather than expert witness testimony for the Jury, the Parties reached a stipulation to not make *Daubert* challenges against these witnesses. However, Plaintiffs' agreement to not file a *Daubert* motion with respect to Ms. Lichtig should not be construed as agreement with any of her testimony. Plaintiffs dispute Ms. Lichtig's conclusions for reasons set forth in Mr. Blonien's Declaration (ECF No. 183-9, 1844 [Blonien Decl.]) and

will not re-litigate those issues in this briefing, but rather merely refer to the same arguments that Plaintiffs have already made in their Summary Judgment Opposition for the sake of explaining Plaintiffs objections to Mr. Peterson.

### B.     Plaintiffs' Relevant Expert Reports

Defendants did not serve any affirmative expert reports, and instead only served purported rebuttals to Plaintiffs' January 9, 2026 opening expert reports. Mr. Peterson purports to rebut Plaintiffs' damages expert, Clarke Nelson.

Mr. Nelson reviewed extensive financial records from Plaintiffs and Defendants to calculate various categories of damages. To do this, he necessarily and properly assumed that Defendants would be found liable under Plaintiffs' claims. Mr. Nelson was familiar with Plaintiffs' legal theories and included discussion of them in his report, explaining which of his calculations corresponded to which liability theory.

Regarding the F2 profit disgorgement, Mr. Nelson considered profit and loss statements for F2 for the years 2020–2022 and 2024 and audited financial statements for the years 2021–2023. (ECF No. 183-4 at 0726 [Nelson Report, ¶48].) Based on the data in these statements, Mr. Nelson calculated that from 2020 through 2024, F2 generated total revenue of approximately $267.5 million and total EBITDA (operating profit) of approximately $127.7 million. (*Id.*) Mr. Nelson opined that the profits Defendants generated through the F2 business opportunity represent claimed lost profits to Plaintiff and, in the alternative, unjust enrichment that Plaintiffs could recover in view of Defendants' misconduct, including Mr. Feng's breach of fiduciary duty and embezzlement of the necessary $1 million seed money for F2. (*Id.* [Nelson Report, ¶41].)

### C.     Mr. Peterson's Rebuttal Report

Mr. Peterson's Rebuttal Report purports to respond to Mr. Nelson.

Section IV of Mr. Peterson's report provides a summary of his opinions. (Ex. 1A, Peterson Rebuttal Report, ¶32.) In Paragraph 32.c, Mr. Peterson argues that "[t]he Nelson Report incorrectly assumes that Plaintiffs, either as a primary license holder or affiliate party, could meet the legal requirement to obtain a TPPPS license in California and would have been able to participate in the F2

the Opposition to the Summary Judgment Motion (ECF No. 183 at Section VI).

business." (*Id.*)

Paragraphs 81–89 of Mr. Peterson's report contain his opinions regarding Plaintiffs' ability to obtain a California license or otherwise benefit from the F2 business opportunity under the California TPPPS regulatory scheme. (*Id.*, ¶¶81–89.) Mr. Peterson argues that none of the Plaintiffs could have obtained a TPPPS license and no company can receive revenue from TPPPS without a license.

Although Plaintiffs' damages expert report identified the unjust enrichment theory and the facts supporting it, and also identified the $127.7 million total profit figure, Mr. Peterson's rebuttal fails to address unjust enrichment. All that Mr. Peterson argues is that the stolen $1,005,000 was merely a short-term cash advance, providing a calculation of $3,260 for "the time value of money and interest accrued" in Footnote 141. (*Id.*, ¶89 n.141.)

## III.    <u>APPLICABLE LAW</u>

"District courts are the 'gatekeepers' of expert testimony, tasked with excluding testimony that does not meet that standard articulated in Federal Rule of Evidence 702." *Neal v. Tep*, No. 2:21-cv-00433-JCM-DJA, 2022 WL 18455978, at *2 (D. Nev. Apr. 14, 2022) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). Rule 702 provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is only potentially admissible if it concerns matters "beyond the common knowledge of the average layperson." *U.S. v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002) (*quoting U.S. v. Morales*, 108 F.3d 1031, 1039 (9th Cir. 1997)).

Expert testimony must be "both relevant and reliable." *Neal*, 2022 WL 18455978, at *2 (*quoting U.S. v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001)). "To be relevant, testimony must 'logically advance a material aspect of the party's case.'" *United States v. Hylton*, No. 2:17-cr-00086-HDM-NJK, 2018 WL

5795799, at *2 (D. Nev. Nov. 5, 2018) (*quoting Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)). "To be reliable, the testimony must have 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* (*quoting Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).

Even if expert testimony is admissible under Rule 702, courts may exclude it "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," so "the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal citation omitted).

## IV.     **ARGUMENT**

### A.     **Mr. Peterson's Rebuttal Testimony Regarding the F2 Business Opportunity Should Be Excluded**

Mr. Peterson's testimony regarding the F2 business opportunity should be excluded because he is admittedly unqualified to provide an opinion regarding the California TPPPS regulatory scheme, his opinion is irrelevant and unreliable, and his testimony is unfairly prejudicial, needlessly cumulative, confusing, and misleading.

Throughout his deposition Mr. Peterson repeatedly made clear that his only rebuttal opinion regarding the F2 business opportunity "is that Nelson incorrectly assumes that plaintiffs could meet the legal requirements of obtaining a TPPPS license in California, and would have been able to participate in the F2 business." (Ex. 1B, Peterson Tr. at 103:17–20; *see, e.g.*, *id.* at 93:2–4 ("My opinion is based on the license, and if the license would have been able to be granted to the plaintiff or not."), 96:24–97:1 ("I don't engage in a math process. It's based off of the ability to get the license or not."), 104:25–105:2 ("Yeah, my opinion, as stated within page 10 of my report, speaks to the ability to get a license or not."); *see also id.* at 95:6–11, 109:9–13, 111:11–14.) When pressed, Mr. Peterson confirmed that he had no rebuttal opinions independent of this licensing argument. (*Id.* at 105:4–9.)

Mr. Peterson, however, lacks any specialized knowledge, skill, experience, training, or education to testify regarding Plaintiffs' ability to obtain a California license or otherwise benefit from the F2

business opportunity under the California TPPPS regulatory scheme. Mr. Peterson admitted that he is "not an expert with the licensing around TPPPS, and the requirements around that." (*Id.* at 83:13–15.) He further admitted that he is "not an expert in California gaming law" and has "no independent knowledge of California gaming law." (*Id.* at 84:2–7; *see also id.* at 85:9–12 ("[I]n general, the California law, I'm not an expert on. And I don't have a strong grasp of, under California law, what's required for a TPPPS license.").) And while Mr. Peterson's testimony relates only to whether Plaintiffs could have captured or participated in the F2 opportunity under California law, Mr. Peterson admits that he is "not a legal expert." (*Id.* at 117:7; *see also id.* at 142:3–6.)

Lacking any specialized knowledge, skill, experience, training, or education to offer his opinion regarding California licensing, Mr. Peterson is entirely reliant on the opinion of Defendants' California gaming regulation attorney, Ms. Lichtig. (*Id.* at 84:8–85:1.) Despite admittedly having no expertise in California gaming law or the legal requirements of obtaining a TPPPS license, Mr. Peterson—citing to no evidence—intends to testify regarding "the steep barriers to entry for this market" and that "under California law, no company can operate TPPPS without a license; therefore, no company can receive revenue from TPPPS without such license." (Ex. 1A, Peterson Rebuttal Report, ¶¶85–86.) Further, Mr. Peterson states that "none of the Plaintiffs could have obtained a TPPPS license that was required to secure the F2 TPPPS opportunity," citing only to a "Discussion with Tiffany Lichtig." (*Id.*, ¶86.) While Plaintiffs disagree with Ms. Lichtig's conclusions, Mr. Peterson is not qualified to provide this expert testimony, and his opinion should therefore be excluded. *See Hanna*, 293 F.3d at 1086 (requiring expert testimony to concern matters "beyond the common knowledge of the average layperson").

Not only is Mr. Peterson unqualified to provide his opinion regarding licensing, his testimony regarding the F2 business opportunity is irrelevant, particularly given the admittedly narrow scope of his work "to rebut Nelson's damage claims." (Ex. 1B, Peterson Tr. at 48:3–6; *see also id.* at 146:16–17 ("I wasn't engaged to come up with an alternative number to Nelson's damage.").) Mr. Peterson fails to rebut Mr. Nelson's damages opinion; in fact, Mr. Peterson testified that, "mathematically, we confirmed that his—that [Mr. Nelson] properly pulled those EBITDA numbers from those financials" and "I don't have a problem with the source that [Mr. Nelson] used to come up with the EBITDA number." (*Id.* at 113:25–114:13.) Failing to "engage in a math process" to rebut Mr. Nelson's calculations, his testimony regarding

the F2 business opportunity does not otherwise rebut any material aspect of the Plaintiffs' damages analysis. (*Id.* at 96:24–97:1 ("I don't engage in a math process. It's based off of the ability to get the license or not.").) *See Hylton*, 2018 WL 5795799, at *2 (*quoting Cooper*, 510 F.3d at 942) (requiring expert testimony to "logically advance a material aspect of the party's case").

Mr. Peterson's testimony is also unreliable, as he was plainly unfamiliar with the facts alleged in the First Amended Complaint, the claims asserted against Defendants, and Plaintiffs' liability and damages theories. (Ex. 1B, Peterson Tr. at 36:6–37:11 (demonstrating a lack of awareness that Plaintiffs claim Defendants committed fraud), 31:20–33:19 (confirming he had not reviewed an unredacted copy of the First Amended Complaint); *see also* Ex. 1A, Peterson Rebuttal Report, ¶30 (referencing only Plaintiffs' breach of fiduciary duty claims).)

Contrary to Mr. Peterson's planned testimony, Plaintiffs' recovery in this case is not contingent on them having been able to be independently licensed. First, as Plaintiffs have argued, they need not have been directly licensed as a TPPPS entity to profit from the F2 business, just as Empire was not licensed as a TPPPS provider yet still received money from F2. Second, Plaintiffs' unjust enrichment theory of recovery is not dependent on Plaintiffs having been able to be licensed. Plaintiffs' unjust enrichment theory is based upon: (a) Mr. Feng having embezzled $1 million to form F2, without which he has admitted F2 would never have existed given that he needed the money quickly to meet the deadline and could not get it elsewhere (ECF No. 182, Ex. 1-40 at ETG205804), and (b) Mr. Feng having used Plaintiffs' resources and connections (and even, secretly, Plaintiffs' own lawyers at Lewis Roca) to take advantage of the TPPPS opportunity.

A plaintiff is entitled to recover a fiduciary's secret profits earned from breach of their duties and embezzlement regardless of whether the plaintiff suffered actual injury. *See Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*, 272 Cal. Rptr. 3d, 108, 120–21 (Cal. Ct. App. 2020) (unjust enrichment available even in the absence of actual injury); *Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175, 1198 (D. Nev. 2022) (unjust enrichment as alternative to remedy at law); *Olenicoff v. UBS AG*, 2010 WL 8530286, at *29 (C.D. Cal. Mar. 16, 2010) ("proper measure of damages is full disgorgement of any secret profit made by the fiduciary regardless of whether the principal suffers any damage"); Restatement (Third) of Restitution and Unjust Enrichment, § 51(b). Here, all the F2 profit can

be traced back to Plaintiffs' stolen $1M seed money and connections, and Plaintiffs' initial burden is only to have calculated the total resulting profit: Mr. Feng must prove any equitable offsets. Restatement of Restitution, § 51(d); *Serv. First v. Lee*, 2022 U.S. Dist. LEXIS 147274, at *21–22 (E.D. Mich. Aug. 17, 2022).

As detailed in Mr. Nelson's report, Plaintiffs claim that "the profits Defendants generated through the F2 TPPPS opportunity at Hawaiian Gardens Casino represent claimed lost profits to Plaintiffs and/or unjust enrichment to Defendants that pertain to the following asserted claims: fraud, constructive fraud, conspiracy, RICO, unjust enrichment, breach of fiduciary duty, and aiding and abetting." (ECF No. 183-4 at 0726 [Nelson Report ¶41].) But in his deposition, Mr. Peterson seemed unaware that Plaintiffs' unjust enrichment claim relates to the F2 opportunity and that Mr. Nelson's analysis of F2's EBITDA (operating profit) represents a measure of Defendants' unjust enrichment. (Ex. 1B, Peterson Tr. at 114:24–116:15; *see also id.* at 116:24–117:1 ("I wouldn't be able to opine about the unjust enrichment as it relates to F2 …"), 131:16–17 ("I did not conduct an unjust enrichment analysis for F2.").) Mr. Peterson was also unaware whether Mr. Nelson assumed liability for purposes of his damages analysis (which he expressly did, *see* ECF No. 183-4 at 0726 [Nelson Report ¶6]), and Mr. Peterson himself failed to assume liability when rendering his rebuttal. (*See, e.g.*, Ex. 1B, Peterson Tr. at 81:3–82:20 ("I can't say what Mr. Nelson assumed."), 158:9–160:25 ("I'm not opining on assumed liability.").) Having failed to grasp Plaintiffs' liability and damages theories—let alone the basic factual allegations of this case—Mr. Peterson's rebuttal opinion is unreliable. *See Hylton*, 2018 WL 5795799, at *2 (*quoting Kumho Tire Co., Ltd.*, 526 U.S. at 149) (requiring expert testimony to have "a reliable basis in the knowledge and experience of the relevant discipline").

In addition to failing to comply with Rule 702, Mr. Peterson's testimony regarding the F2 business opportunity should be excluded pursuant to Rule 403. Mr. Peterson's testimony regarding the California TPPPS regulatory scheme is unfairly prejudicial as it improperly buttresses the opinions of Defendants' California gaming regulation attorney, Ms. Lichtig. Mr. Peterson's testimony is also needlessly cumulative as he offers no opinion independent of Ms. Lichtig's licensing argument. Last, Mr. Peterson's F2 testimony is likely to confuse the issues and mislead the Jury because he failed to recognize that Plaintiffs' unjust enrichment claim relates to the F2 opportunity and Mr. Nelson's analysis of F2's profits

represents a measure of Defendants' unjust enrichment.

**B.      Mr. Peterson's Rebuttal Testimony Regarding What Defendants Characterize as a Short-Term Cash Advance Should Be Excluded**

Mr. Peterson's testimony regarding the transaction where Mr. Feng took $1,005,000 from LTGC to fund F2, which Defendants characterize as a short-term cash advance, should be excluded because his opinion, including his calculation of the time value of money and interest accrued, is legally unfounded, unreliable, highly prejudicial, and misleading.

In footnote 141 of his rebuttal report, Mr. Peterson calculates that "the time value of money and interest accrued" for the $1,005,000 Mr. Feng took from LTGC to fund F2 "was $3,260." (Ex. 1A, Peterson Rebuttal Report, ¶89 n.141.) This calculation is wholly irrelevant, and the characterization of Mr. Feng's embezzlement as merely a short term loan is legally erroneous and prejudicial. Plaintiffs allege that Mr. Feng's taking of these funds from LTGC—and his efforts to conceal the transaction and modify LTGC's bank statements—constitutes fraud, unjust enrichment, and breach of fiduciary duty. (*See* ECF No. 183-4 at 0726 [Nelson Report ¶¶41–47].) Mr. Feng has not disputed that he took the $1 million without permission and without telling Plaintiffs what he was doing with it, and LT Game's accountant, Marcos Medero, has explained that Mr. Feng instructed him to conceal the transaction. (ECF No. 183, Section VI.A.) It is unlawful for a fiduciary to secretly withdraw a large sum of money from the company's bank account to use for a private investment (much less a usurped corporate opportunity), only to pay it back later and call it a "loan." *See United States v. Wiseman*, 274 F.3d 1235, 1241–42 (9th Cir. 2001) (intent to repay is not a defense to embezzlement or conversion); *Bradley v. Becerra,* 2020 WL 7407918, at \*6 (C.D. Cal. Oct. 23, 2020) (same). Indeed, even the embezzler's evidence of repayment is excludable as irrelevant. *See United States v. Thomas*, 2013 U.S. Dist. LEXIS 163855, at \*5 (D. Conn. Nov. 18, 2013) (precluding evidence of repayment as irrelevant).

Mr. Peterson states that "Empire occasionally advanced funds to LTGC." (Ex. 1A, Peterson Rebuttal Report, ¶81.) But this thinly veiled attempt to justify Mr. Feng's misconduct has no relevance or bearing on the propriety of Mr. Feng taking funds from LTGC for his personal benefit. And Mr. Peterson admitted that whether Mr. Feng's taking of the $1,005,000 to fund F2 was appropriate was not relevant to his rebuttal opinion regarding F2, which narrowly relates to the California licensing issue. (Ex. 1B,

Peterson Tr. at 107:24–108:23 ("It's not relevant to my opinion. … [T]hat's not relevant to my opinion as it relates to my opinion on category 3 on F2.").) This testimony therefore fails to comply with Rule 702. *See Hylton*, 2018 WL 5795799, at *2 (*quoting Cooper*, 510 F.3d at 942) (requiring expert testimony to "logically advance a material aspect of the party's case").

In addition to being irrelevant, Mr. Peterson's testimony regarding this transaction is unreliable. As discussed above, Mr. Peterson was unaware that Plaintiffs alleged that Defendants committed fraud and admitted that he had reviewed only a redacted copy of the First Amended Complaint—where the factual allegations relating to Mr. Feng's taking of LTGC funds for his personal benefit were redacted. (*See* Ex. 1B, Peterson Tr. at 31:20–33:19, 36:6–37:11; *see also id.* at 90:1–6 (testifying that he did not recall Plaintiffs' position regarding the $1,005,000 Mr. Feng took).) Mr. Peterson further admitted that he made no effort to investigate whether Mr. Feng's taking of LTGC's funds and his subsequent cover-up were appropriate. (*Id.* at 95:19–96:12 ("Whether it was appropriate or not is not something that I was engaged to review."), 108:6–10 ("That's not something that I looked into and reviewed."), 108:25–109:13 ("My testimony today is to rebut Nelson's report and calculations, not to opine on this separate transaction that occurred.").) Because he failed to investigate the nature of Mr. Feng's taking of the $1,005,000, Mr. Peterson's testimony is unreliable. *See Hylton*, 2018 WL 5795799, at *2 (*quoting Kumho Tire Co., Ltd.*, 526 U.S. at 149) (requiring expert testimony to have "a reliable basis in the knowledge and experience of the relevant discipline").

Although Mr. Peterson failed to appropriately examine this transaction, he nevertheless characterizes it as "short-term cash advances from LTGC." (Ex. 1A, Peterson Rebuttal Report, ¶81.) Mr. Peterson also characterizes it as "the amount Empire borrowed from LTGC … for F2" rather than funds Mr. Feng took for his own personal use. (*Id.*, ¶89.) And by providing a calculation for "the time value of money and interest accrued"—using an unnegotiated, unreliable 8% interest rate from a promissory note executed by Mr. Feng between Mr. Feng and Mr. Feng's company—Mr. Peterson tacitly argues, without any basis, that the transaction represents a typical loan. (*Id.*, ¶89 n.141; *see also* Ex. 1B, Peterson Tr. at 93:9–95:17.)

Mr. Peterson's irrelevant, unreliable testimony characterizing Mr. Feng's personal use of LTGC's funds is highly prejudicial and misleading. Although Defendants intend to produce Mr. Peterson in a

narrow role solely as a damages rebuttal expert, (*see* Ex. 1B, Peterson Tr. at 41:6–8 ("[I]n terms of the merits of the fraud, my work was not scoped to determine or assess the merits of the fraud.")), Mr. Peterson professes to be an expert in fraud. (*See, e.g.*, Ex. 1A, Peterson Rebuttal Report, ¶¶8–10; Ex. 1B, Peterson Tr. at 22:17–19 ("[F]rom my experience and my education and knowledge, I do have a sense of corporate fraud.") 29:15–31:19.) For example, Mr. Peterson testified that he could identify "anomalies" and "red flags" that might suggest fraud, (Ex. 1B, Peterson Tr. at 28:23–29:11), but when pressed whether Mr. Feng's taking of LTGC's funds and his subsequent cover-up might suggest fraud, Mr. Peterson refused to answer, claiming that it was "outside of [his] scope" and he "wouldn't be able to opine yes or no, if that's a red flag." (*Id.* at 100:5–103:7.) Mr. Peterson's testimony characterizing Mr. Feng's taking of $1,005,000 from LTGC for personal use as merely the "normal course of business" is unfairly prejudicial and highly likely to mislead the jury given Mr. Peterson's expertise in fraud—particularly where he made no effort to investigate this transaction. (*Id.* at 87:15–88:24, 95:19–96:12, 108:6–10, 108:25–109:13.)

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs seek an order precluding Mr. Peterson's planned rebuttal testimony reflected in Paragraphs 32.c and 81–89 of his Rebuttal Report, including his calculation in footnote 141.

DATED:  June 25, 2026

Respectfully submitted,

*/s/ Jessica M. Lujan*

OLIVER J. PANCHERI, ESQ.
  Nevada Bar No. 7476
JESSICA M. LUJAN, ESQ.
  Nevada Bar No. 14913
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
        jlujan@spencerfane.com

JEAN-PAUL CIARDULLO, ESQ.  (*pro hac vice*)
  California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

ROBERT T. STEWART, ESQ.
  Nevada Bar No. 13770
STEWART RAY NELSON, ESQ. (*pro hac vice*)
  Utah Bar No. 17286
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
        srnelson@foley.com

Dariush Keyhani *(pro hac vice)*
**KEYHANI LLC**
1050 30th Street NW
Washington, DC 20007
Tel: (202) 748-8950
Email: dkeyhani@keyhanillc.com

PLAINTIFFS' DAUBERT MOTION RE PETERSON
Case No. 2:24-cv-00428-JCM-BNW

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of June, 2026, a true and correct copy of **PLAINTIFFS'** *DAUBERT* **MOTION TO LIMIT TESTIMONY OF PAUL PETERSON**  was served via the United States District Court CM/ECF system on all parties or persons requiring notice.

By:  */s/ Adam Miller*
Spencer Fane LLP