# Exhibit A-1

# Expert Rebuttal Report of Richard Baldwin

# Feb. 13, 2026

CONFIDENTIAL

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; and LT GAME INC., a Nevada corporation; and LT GAME LIMITED, a British Virgin Islands corporation,<br><br>*Plaintiffs*,<br>v.<br><br>EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; DARYN KIELY, an individual,<br><br>*Defendants*. | Case No. 2:24-cv-00428-JCM-BNW<br><br><br>**EXPERT REBUTTAL REPORT OF RICHARD BALDWIN** |

**February 13, 2026**


Richard Baldwin (Feb 13, 2026 19:50:58 PST)
_____
Richard Baldwin

CONFIDENTIAL

**Table of Contents**

I.      INTRODUCTION .................................................................................................... 3
    A.      Assignment ................................................................................................... 3
    B.      Qualifications ............................................................................................... 3
    C.      Case Background .......................................................................................... 5
    D.      Methodology ................................................................................................ 5
II.     SUMMARY OF REBUTTAL OPINIONS ............................................................ 6
III.    OVERVIEW OF THE GAMING MARKETS AND RELEVANT PRODUCTS ... 6
    A.      The Nevada Gaming Market ........................................................................ 6
    B.      The U.S. Gaming Market ............................................................................. 7
    C.      The Different Products and Their Markets: Slot Machines, Table Games, Card
            Rooms, and What Makes Products Successful, and Product Life Cycles .......... 8
    D.      Explanation of Standard Industry Commissions for Distributors & 3rd Party
            Sales Agents .............................................................................................. 10
    E.      Competition and Competitors in the Relevant Gaming Markets;
            Disadvantages for Smaller Companies ....................................................... 11
    F.      Entry into Relevant Gaming Markets and Costs and Challenges for the Same
            ................................................................................................................... 12
    G.      Sustained Success in Relevant Gaming Markets and Costs and Challenges for
            the Same .................................................................................................... 14
    H.      Foreign Manufacturers are not necessarily successful in the U.S. ............ 14
IV.     PLAINTIFFS' EXPERT REPORTS ..................................................................... 18
    A.      Summary of Mr. Nelson's Opinions Relevant to this Report .................... 18
    B.      Summary of Mr. Doyle's Opinions Relevant to this Report ..................... 18
V.      EXPLANATION OF MY OPINIONS AND ANALYSIS ..................................... 19
    A.      Contrary to Plaintiffs' expert opinions, Plaintiffs did receive value and benefits
            as a result of their investment in LT Game, Inc. ...................................... 19
    B.      Contrary to Plaintiffs' expert opinions, Defendants' alleged actions are not the
            reason that Plaintiffs failed to break into the U.S. slot machine market and did
            not give it a "head start" over Plaintiffs. ................................................. 20
    C.      Contrary to Plaintiffs' expert opinions, Defendants alleged actions are not the
            sole, or even a significantly meaningful, reason that it will be difficult for
            Plaintiffs to compete in the U.S. gaming markets. .................................... 23
    A.      Produced Documents .................................................................................. 27
    B.      Public Materials ......................................................................................... 30
    C.      Depositions ................................................................................................. 32
    D.      The Parties' Filings .................................................................................... 32

**CONFIDENTIAL**

## I. INTRODUCTION

### A. Assignment

1. I have been retained by counsel for Defendants to provide expert analysis and opinions in rebuttal to certain opinions offered by Plaintiffs' experts Mr. Clarke B. Nelson and Mr. Thomas Doyle.

2. Specifically, I have been asked by counsel for Defendants to review the expert reports served by Plaintiffs on January 9, 2026 and to analyze the opinions and analysis therein and, if appropriate, rebut those opinions and analysis. This includes addressing the Nevada and U.S. gaming markets during the relevant period, entry into the same, identifying and analyzing Plaintiffs' attempts to enter said markets and the associated products and agreements, and other related matters.

3. In preparing this report, I relied on the documents referenced in this report as well as those listed in **Appendix A**. I also had access to a database of all documents that have been produced in this case and considered many documents that were produced by the Parties, filed by the Parties, or are otherwise publicly available.

### B. Qualifications

4. My current resume is attached to this report as **Appendix B.**

5. I am an accomplished senior executive with more than 30 years' experience working directly for and on behalf of a diverse number of global and domestic gaming companies, including advising the boards of directors for publicly traded and privately held companies. My experience includes serving as Chief Financial Officer for Shuffle Master Gaming (2004-2007), a global technology and manufacturing company included in the S&P 600 SmallCap Index with 2007 revenue of $180 million and enterprise value of $710 million; Director of Corporate Finance & Investor Relations for International Game Technology (2001-2004), a Fortune 1000 company listed on the S&P 500 with 2004 revenue of $2.5 billion and enterprise value of $14.0 billion; Director of Corporate Finance and Financial Controller for Anchor Gaming (1998-2001), a diversified global technology and systems company that was acquired by IGT in December 2001 with 2001 revenue of $385 million and enterprise value of $1.0 billion; and Chief Financial Officer for Tropicana Entertainment (2009), a privately held, multi-jurisdictional leisure and hospitality company with annual revenue of $800 million. I also served as a Member of the Board of Directors for Galaxy Gaming, Inc. (2011-2012), a company that develops and markets technology and entertainment based products for the worldwide gaming industry. I have significant financial, operational, M&A and capital markets experience having led and participated in transactions ranging from $10 million to $1.5 billion. I have also served as a Board of Director or on the Advisory Board for multiple gaming companies, including currently serving as a Member of the Board of Advisors for the UNLV International Gaming Institute (2025-present) and as Audit Committee Member for the International Association of Gaming Advisors (2023-present).

*Expert Rebuttal Report of Richard Baldwin*

**CONFIDENTIAL**

6. I received my BS, Accounting degree in 1995 from the University of Nevada, Las Vegas and my MBA from the University of California, Irvine in 2012. I have been a licensed CPA in the state of Nevada since 1997.

7. I started my professional career with Deloitte & Touche in Las Vegas, NV, one of the world's largest public accounting firms, and quickly transitioned to holding CFO and senior level finance/operational positions for several public gaming companies with divergent profiles including high-growth international technology and manufacturing companies (Shuffle Master Gaming, International Game Technology, and Anchor Gaming) as well as for companies in middle market turnaround and/or bankruptcy emergence situations (Tropicana Entertainment).

8. During my tenure serving in the C-suite or as a Board member for various gaming companies, I was required to hold key employee gaming licenses in several domestic and international gaming jurisdictions since I had significant influence or control over the company's operations.

9. In 2012, I transitioned my professional career to investment banking and joined Union Gaming as Managing Director based out of the Las Vegas office, where I served from 2012 to 2020. Union Gaming was founded in 2009 as a boutique investment bank and advisory firm focused exclusively on the global gaming and hospitality industries, which the firm defined as the $400 billion-plus market to include land-based casinos, lottery, online, and pari-mutuel wagering. The company specialized in global equity and high yield research, securities dealing, investment banking, advisory and analytics/market research, with offices in Las Vegas, New York, Macau, and Hong Kong. Given my extensive C-suite gaming industry experience, I was recruited by the founders of Union Gaming to help lead and develop the company into one of the preeminent boutique advisory/consulting firms covering the global gaming industry. Approximately 1 year after my departure from Union Gaming in early 2020, the firm was acquired by CBRE Group, Inc., a Fortune 500 and S&P 500 company headquartered in Dallas, the world's largest commercial real estate services and investment firm.

10. Since 2021, I serve as Managing Partner for GGHM, a leading global gaming industry advisory and consulting firm dedicated to providing its clients with trusted, highly-focused and comprehensive services that help them achieve their long-term strategic objectives. GGHM is focused exclusively on the global casino and integrated resort industry. In my capacity as Managing Partner, I work closely with the firm's other managing partners to support the company's diverse client base that includes public and private companies, governments, Native American tribes, regulatory agencies and investment funds with respective annual revenues ranging from several million to over a billion dollars individually. I frequently work side-by-side with client owners, Boards and senior management teams to assist in the evaluation and development of growth and other strategic initiatives, M&A opportunities, capital allocation, operational/strategic planning, market research, negotiating material contracts and arranging financing. Concurrently, since November 2021, I also serve as Managing Principal for RVNC Advisors, LLC, a Las Vegas-based advisory firm.

11. I am not aware of any conflicts of interest presented in this engagement with any of my work as a gaming regulator, attorney, or consultant.

**CONFIDENTIAL**

12. I am being compensated for my time at a rate of $850 per hour. My compensation does not depend on the outcome of this case or on any opinion that I may offer.

### C.    Case Background

13. Plaintiffs Paradise Entertainment Limited, LT Game, Inc., and LT Game Limited (collectively, "Plaintiffs") allege that Defendants Empire Technological Group Limited and related entities and individuals (collectively, "Defendants") engaged in misconduct by covertly developing a competing business, usurping business opportunities, diverting revenue, and otherwise negatively impacting Plaintiffs' business.

14. Plaintiffs' Complaint alleges, among other things, that LT Game, Inc. was not successful in the U.S., and likely will not be successful in the near future, solely because of Defendants' actions. This allegations requires that Plaintiffs otherwise did and are doing everything necessary to enter and become a successful gaming business in the U.S. and Nevada gaming markets.

15. I understand that additional document productions may be forthcoming in this case, and that additional relevant documents may be produced in this case by Plaintiffs after I issue this report. I may, and reserve the right to, review and rely on additional documents in conducting my work and forming my opinions in this case. I also reserve the right to supplement or amend this report if my opinions change or require supplementation as a result of my ongoing review of documents.

### D.    Methodology

16. To form my opinions, I applied the principles, theories, and tools that stem from my education, expertise, experience, and training. I applied those principles, theories, and tools using commonly used methods of analysis and research in those fields. Using that analysis, I reached the opinions set out below.

17. Additionally, I was given unrestricted access to a database of documents from Defendants' counsel, which I understand contained all documents that the Parties have produced in this litigation. I conducted my own searches for material relevant to this case using key terms from my expertise and experience. At the time I submitted this report, the database included 92,675 documents. I searched and reviewed a large volume of these documents, ignoring documents that did not appear relevant to my assignment and tracking any on which I relied to form my opinion.

18. When appropriate, I include specific references in this report to documents which I relied on to form my opinion. Some of these documents come from the database. However, these specific references should not be viewed as the only documents on which I relied on forming my opinion; the full list of the materials I relied on are attached to this report. Additional documents not listed in that appendix were also examined to provide a fuller understanding of the issues at hand, though those documents were not relied on to form my opinions and thus are not listed in the appendix.

**CONFIDENTIAL**

19. For purposes of better understanding the issues at hand, I consulted industry publications, market and sales data, financial reports, and other similar material that is applicable to this subject, as well as other publicly-available material.

## II.    SUMMARY OF REBUTTAL OPINIONS

20. Based on my review of the relevant reports, the evidence, documents, and other materials, I have formed the following rebuttal opinions:

> a.   Contrary to Plaintiffs' expert opinions, Plaintiffs did receive value and benefits as a result of their investment in LT Game, Inc..
>
> b.   Contrary to Plaintiffs' expert opinions, Defendants' alleged actions are not the reason that Plaintiffs failed to break into the U.S. slot machine market and did not give Empire a "head start" over Plaintiffs.
>
> c.   Contrary to Plaintiffs' expert opinions, Defendants and their alleged actions are not the reason it will be difficult for Plaintiffs to compete in the U.S. gaming markets.

## III.    OVERVIEW OF THE GAMING MARKETS AND RELEVANT PRODUCTS

### A.    The Nevada Gaming Market

21. For calendar 2025, Nevada casinos generated a total of $5.1 billion in table games revenues and $10.7 billion in slot revenues, accounting for approximately 32% of all casino revenue (excluding small amounts of sports book and racing revenues). This represents the highest share of table revenue in any commercial gaming market. As of the most recent reporting period, the Nevada Gaming Control Board (NGCB) reported there were 456 licensed non-restricted gaming locations with 126,040 slot machines and 4,913 table games across the state.[1]

22. Based on data from the NGCB, for the fiscal year ending June 30, 2024 there were 190 licensed Manufacturers and 204 licensed Distributors in Nevada.[2] These figures represent entities licensed to manufacture and/or distribute gaming devices, including slot machines and associated equipment, in the state. It is worth highlighting that many of the casino operators in Nevada also hold manufacturer and distributor licenses. Nevertheless, there are still is a significant number of slot manufacturers, gaming technology providers and distributors competing for space on the gaming floor of casinos.

---

[1] *See, e.g.*, NEVADA GAMING CONTROL BOARD, *Monthly Revenue Report, December 2025*, https://www.gaming.nv.gov/siteassets/content/about/gaming-revenue/december-2025-monthly-revenue-report.pdf (last visited Feb. 13, 2026).

[2] *See, e.g.*, NEVADA GAMING CONTROL BOARD, *Nevada Gaming Abstract 2024*, https://www.gaming.nv.gov/siteassets/content/about/abstract/Nevada_Gaming_Abstract_2024.pdf (last visited Feb. 13, 2026); *see also* NEVADA GAMING CONTROL BOARD, *Press Release: Nevada Gaming Abstract—2024*, https://www.gaming.nv.gov/siteassets/content/about/abstract/Nevada_Gaming_Abstract_2024_Press_Release.pdf (last visited Feb. 13, 2026).

*Expert Rebuttal Report of Richard Baldwin*                                    Page **6** of **33**

**CONFIDENTIAL**

23. Gaming revenues are driven by the Las Vegas Strip market.[3] Overall, 56% of the State's total gaming revenue, or $8.8 billion, came from casinos classified as in the Strip market by the NGCB. Table games generated $3.9 billion, or 76% of the state's total table game revenue. Most notably 98% of state baccarat revenue of $1.4 billion was generated on the Strip, while 82% of the state's roulette revenue of $408 million was generated on the Strip. Additionally, 73% of craps revenue and 75% of Twenty-One revenue came from Strip casinos. Slot revenues on the Strip comprised 46% of the State's total. This lower relative share illustrates the strength of the table game market on the Las Vegas Strip and its prominence in the State and the national gaming market.[4] The Strip market, comprised of 60 licensed non-restricted locations, offered 35,232 slots and 2,616 table games.[5]

24. Nevada also has 2,072 "restricted" license locations which do not report revenues.[6] These locations can offer up to 15 gaming machines in limited formats at allowed bars/taverns, supermarkets, and convenience stores. The latest reported count of operating machines under these restricted licenses was 19,540. While specific revenue numbers are not available, these machines collectively are believed to generate close to $1 billion per year.

## B.      The U.S. Gaming Market

25. The U.S. has many large gaming jurisdictions.[7]  The commercial market in the U.S. with the second highest total gaming revenue is Pennsylvania. In fiscal year 2025, slot machines generated $2.4 billion in slot revenue (72% of total) and $925m in table games across the Pennsylvania's 17 casinos.[8] During the year, there were approximately 24,200 slots and 1,260 tables. Online casinos are also offered statewide, which likely cannibalize land-based casino market's potential revenue in the future. Pennsylvania breaks down online gaming revenue by game type and reported $653m was generated from table games online in FY25 and online slots generated $2.1 billion. This figure has been growing since online gaming was first offered

---

[3] *See, e.g.*, NEVADA GAMING COMMISSION AND THE NEVADA GAMING CONTROL BOARD, *Gaming Revenue Information (GRI)*, https://www.gaming.nv.gov/about-us/gaming-revenue-information-gri/ (last visited Feb. 13, 2026); *see also* NEVADA GAMING COMMISSION AND THE NEVADA GAMING CONTROL BOARD, *Quarterly Statistical Information (QSI)*, https://www.gaming.nv.gov/about-us/quarterly-statistical-information-qsi/ (last visited Feb. 13, 2026).

[4] *See, e.g.*, NEVADA GAMING CONTROL BOARD, *Press Release: December 2025 Nevada Gaming Revenues and Collections*, https://www.gaming.nv.gov/siteassets/content/about/abb-revenue/mrrdec2025.pdf (last visited Feb. 13, 2026).

[5] *See, e.g.*, NEVADA GAMING COMMISSION AND THE NEVADA GAMING CONTROL BOARD, *Restricted and Nonrestricted Locations Report*, https://www.gaming.nv.gov/about-us/restricted-and-nonrestricted-locations-report/ (last visited Feb. 13, 2026).

[6] *See* n. 5.

[7] *See, e.g.*, AMERICAN GAMING ASSOCIATION, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, https://www.americangaming.org/wp-content/uploads/2025/05/AGA-State-of-the-States-2025.pdf (last visited Feb. 13, 2026).

[8] *See, e.g.*, PENNSYLVANIA GAMING CONTROL BOARD, *Revenue Reports*, https://gamingcontrolboard.pa.gov/news-and-transparency/revenue (last visited Feb. 13, 2026).

**CONFIDENTIAL**

in the state. The trends show retail gaming slightly declining, while online revenue has been surging.

26. Based on data from the Pennsylvania Gaming Control Board (PGCB), as of February 9, 2026 there were 20 Slot Machine Manufacturers. These figures represent entities licensed to manufacture and/or distribute gaming devices, including slot machines and associated equipment, in the state.

27. The U.S. market with the next highest share of table game revenue as a share of land-based casino revenue is New Jersey. In 2025, slot revenues were $2.1 billion, while table games and poker revenue were $763m for a total land-based revenue (26%) of $2.9 billion.[9] Atlantic City currently offers 9 casinos with approximately 15,500 slot machines and 950 table games. This data excludes the significant online gaming industry revenue in the state. Digital gaming revenues in New Jersey are not segregated by table-style games and slot-style games.

28. California, due to its large population and wide distribution of gaming offerings in both Tribal casinos and in cardrooms in certain municipalities, is also a large U.S. gaming market. Tribal gaming revenue was approximately $12 billion in financial year 2024.[10] Commercial cardroom revenue numbers are not publicly reported. Cardroom revenue is hard to compare to traditional casinos due to California regulatory requirements prohibiting commercial cardrooms from "banking" these games, restricting their revenue to charging set per hand fees for games offered.

**C.    The Different Products and Their Markets: Slot Machines, Table Games, Card Rooms, and What Makes Products Successful, and Product Life Cycles**

29. Modern slot machines are mostly video slots, the most competitive and successful segment of the gaming industry in the U.S. Video slot machines succeed or fail due to their ability to attract and maintain the attention and interest of the gaming patron. Surveys indicate about a third of all adults in the U.S. (~80-90m) visit a casino at least once a year.[11] The vast majority of these casino patrons play video slots as their primary form of gambling.

30. There are several different "classes" of slot machines, each of which is a separate market of products. Traditional "Las Vegas style" slot machines, or Class III slots, make up the majority of the U.S. gaming market, including Nevada. These machines are found in Las Vegas, Atlantic

---

[9] *See, e.g.*, STATE OF NEW JERSEY, DEPARTMENT OF LAW & PUBLIC SAFETY, DIVISION OF GAMING ENFORCEMENT, FINANCIAL AND STATISTICAL INFORMATION, *Monthly Gross Revenue Reports*, https://www.njoag.gov/about/divisions-and-offices/division-of-gaming-enforcement-home/financial-and-statistical-information/monthly-gross-revenue-reports/ (last visited Feb. 13, 2026); *see also, e.g.*, PlayNJ.com, *Atlantic City Casino Revenue*, https://www.playnj.com/atlantic-city/revenue/ (last visited Feb. 13, 2026).

[10] *See, e.g.*, NATIONAL INDIAN GAMING COMMISSION, *NIGC FY 2024 Gross Gaming Revenue Report*, https://www.nigc.gov/?wpdmdl=12761&ind=1754333463993 (last visited Feb. 13, 2026).

[11] AMERICAN GAMING ASSOCIATION, *American Attitudes Toward Gaming 2025*, https://www.americangaming.org/resources/american-attitudes-towards-gaming/ (last visited Feb. 13, 2026).

*Expert Rebuttal Report of Richard Baldwin*                                    Page **8** of **33**

**CONFIDENTIAL**

City, and most commercial casinos, as well as in tribal casinos with state gaming compacts. The outcome of every spin is entirely independent and determined by a complex mathematical formula (RNG).

31. Class II machines (or bingo slots) are frequently found in tribal casinos that do not have a specific gaming agreement (compact) with the state. To comply with federal laws like the Indian Gaming Regulatory Act (IGRA), these machines function as "technologic aids" to bingo. When slot players press "spin," they are assigned a virtual bingo card, and the server draws numbers until a winner is determined among the current pool of players.

32. Skill-based slot machines are a hybrid of traditional gambling and video gaming where a player's physical or mental performance directly influences the payout. They use standard RNG's for the base game (i.e., spinning reels), but can trigger interactive bonus rounds. In these rounds, you might play a mini-game—like shooting targets, racing cars, or solving puzzles—where a higher score leads to a larger cash bonus. Other variants of skill games often found in gas stations or bars, have the look and feel of traditional slots but may require players to identify a winning pattern or "nudge" a reel to complete a win. In some versions, everything is predetermined, and the "skill" is simply selecting the correct winning square before a timer expires.

33. According to the American Gaming Association, there were 492 commercial casinos in 2024, which generated $36 billion in slot revenue and $10 billion in table game revenue for a total of approximately $46 billion in land-based casino gaming revenue. Tribal casino revenue in 2024 was reported at $44 billion, almost the same amount as commercial casino revenue. The majority of total slot revenue from commercial land-based casinos is generated by video reel slot machines.

34. There are 3 major top tier slot manufacturers that dominate the U.S. market (Aristocrat, Light & Wonder (LNW), IGT/Everi), along with 3 secondary mid-tier suppliers (AGS, Konami, Ainsworth), and then dozens of other smaller manufacturers competing for space on casino floors. The sheer size of the Nevada and overall casino gaming markets has led to fierce competition amongst all the various slot manufacturers.

35. Slot machines ultimately succeed or fail due to their ability to attract and maintain the attention and interest of patrons. A challenge that all gaming machine manufacturers face is the shorter life cycle of slot game content offered electronically on machines versus live table game content. Slot players are always seeking new and innovative game themes and interactivity which can be proven out by the fact that only a handful of slot titles/themes have withstood the test of time (i.e., Wheel of Fortune (IGT), Buffalo Series (Aristocrat), Lightning Link & Dragon Link (Aristocrat), Monopoly Series (Light & Wonder). Over time, this phenomenon has been proven out in the marketplace given the much slower game play and social environment of live table games creates a longer life span than a game played on an electronic machine.

36. Space on a casino floor is similar to shelf space in a traditional retail establishment. The owner/operator is incentivized to maximize a finite amount of real estate with the best performing slot machines/game themes, or in the case of brick-and-mortar retail the most

**CONFIDENTIAL**

popular selling items. How best to effectively yield a finite amount of "real estate" and make the most profit is the ultimate goal. One of the most important considerations for casino managers when making capital investments in slot machines is the depth and breadth of the game library available on each manufacturers slot machine. Even further, casino managers are looking beyond just the current game libraries of the various manufacturers, but their perceived ability to continue to develop new and popular game themes/titles based on previous track records of outperforming slot floor averages measured over many years. Inevitably, given enough time and adequate financial resources on game development any number of the smaller, less capitalized manufactures may produce an occasional hit game. But even in those circumstances, casino managers are always skeptical about their ability to repeat cycle and sustain at the same level of success given the resources and scale of total R&D spend of the larger manufacturers compared to the smaller manufacturers.

37. To maintain and increase market share, the three major slot manufacturers spend between 10-15% of their revenues on research and development annually. The R&D spend is massive and creates significant competitive advantages smaller manufacturers cannot match. In FY24, Aristocrat spent about $550 million in R&D,[12] LNW spent $262 million in R&D,[13] and IGT spent $200 million on R&D.[14] The dominant slot manufacturers spent a combined $1.0 billion to develop new game content, its market leading cabinets, and the various systems used to offer and track its market leading games. While not broken out, Konami spent $175 million on R&D, with much of it spent on its Gaming & Systems division.[15] Play AGS commented it spent roughly $44m on R&D, or about 12% of its annual revenue.[16] It's clear that the largest and most successful slot manufacturers must spend tens and hundreds of millions of dollars annually on R&D to remain relevant in this highly competitive marketplace.

**D.      Explanation of Standard Industry Commissions for Distributors & 3rd Party Sales Agents**

38. When slot manufacturers are looking to penetrate an existing gaming market with their products, they often pursue selling directly into those markets with their own dedicated sales

---

[12] ARISTOCRAT, *Full-Year 2024 Results Investor Presentation*, https://ir.aristocrat.com/static-files/f3577bdd-0126-4953-ad42-0dafc134196e (last visited Feb. 13, 2026); *see also* ARISTOCRAT, *Website*, https://www.aristocrat.com/ (last visited Feb. 13, 2026).

[13] LIGHT & WONDER, INC., *Reports Fourth Quarter and Full Year 2024 Results*, https://explore.lnw.com/media/g40bua2m/lnw-12-31-2024-er-final-02-24-25-1715.pdf (last visited Feb. 13, 2026).

[14] IGT, *International Game Technology PLC Reports Fourth Quarter and Full Year 2024 Results*, https://s205.q4cdn.com/821653831/files/doc_financials/2024/q4/IGT-Q4-24-Earnings-Press-Release-FINAL.pdf (last visited Feb. 13, 2026).

[15] IBCG MATRIX, *What is Growth Strategy and Future Prospects of Konami Group Company*, https://matrixbcg.com/blogs/growth-strategy/konami#:~:text=Konami%20allocated%20%C2%A525%20billion,Gaming%20&%20Systems%20Advancements (last visited Feb. 13, 2026).

[16] U.S. SECURITIES AND EXCHANGE COMMISSION, *Form 10-K: Play AGS, Inc.*, https://www.sec.gov/ix?doc=/Archives/edgar/data/1593548/000143774925006461/ags20241231_10k.htm#fact-identifier-1061 (last visited Feb. 13, 2026).

*Expert Rebuttal Report of Richard Baldwin*                                                    Page **10** of 33

**CONFIDENTIAL**

and service employees. Under certain circumstances, slot manufacturers will utilize 3rd parties such as distributors or sales agents. It's not very often whereby slot manufactures are selling directly into the same market with their own dedicated sales teams and a distributor. However, there may be instances where they augment direct sales efforts with 3rd party sales agents.

39. In situations where slot manufacturers enter into agreements with licensed 3rd party distributors, the distributor generally purchases the machine from the manufacturer at a negotiated price, title to the machine transfers and the distributor takes on the resale, inventory obsolescence and credit risk since the ultimate end customer is the casino, not the distributor. Under these arrangements between manufacturers and distributors, both parties need to make an appropriate margin on the ultimate sale to the casino in order to cover their respective overhead costs and turn a profit necessary to achieve an acceptable ROI. In my experience, a commensurate split or share of the profit margin would typically fall in the range of 70-80% for the manufacturer and 20-30% for the distributor.

40. When a manufacturer is not satisfied with the sales performance of its distributor over a reasonable period of time, I would expect the manufacturer would be looking to make some changes rather than continue with the status quo for multiple years. In my experience, they would likely attempt to terminate the relationship and engage another distributor. Alternatively, if the relationship between a manufacturer and distributor is non-exclusive, then at the very least I would expect the manufacturer might attempt to hire another distributor on a non-exclusive basis.

41. When slot manufacturers enter into agreements with 3rd party sales agents, the economic arrangement is different because the manufacturer retains title of the machine. So the resale, inventory obsolescence, credit risk, etc. remain with the manufacturer. In my experience, 3rd party sales agents would typically be paid a 5-10% commission based on the sales price to the casino as determined by the manufacturer.

### E.      Competition and Competitors in the Relevant Gaming Markets; Disadvantages for Smaller Companies

42. Slot machine manufacturers, typically referred to as Original Equipment Manufacturers (OEMs), invest heavily in R&D to maintain a competitive edge primarily in the following areas: game content and math models, cabinet hardware and ergonomics, regulatory compliance and testing and in more recent years, digital transformation and omni-channel strategy given the digitization of gaming.

43. The most significant portion of R&D spend goes into the "math" and "art" of the game. For example, developing the mathematical algorithms (RNG) and "hit frequency" models that balance player excitement with casino profitability. Further, the thematic design by investing in high-end graphics, cinematic animations, and sound engineering to create immersive themes (i.e., licensed game shows and movie franchises, ancient civilizations, etc.)

44. The volume of a slot manufacturer's game titles/content is directly tied to its R&D spend. As mentioned above, having a deep and constantly growing library of game offerings is crucial to competing for slot floor space in the U.S. casino market as game titles and accompanying game math models are regularly changed out when performance is disappointing or starts to lag slot

**CONFIDENTIAL**

floor averages. Slot machine game kits (often referred to as conversion kits) are specialized packages used to change the game theme, game software, or payout denomination of an existing slot machine without replacing the entire physical cabinet. They are sold to casino customers at a cost significantly less than the cost of the slot machine itself, or in some instances given away as a promotion due to the importance of maintaining floor share.

45. Companies that do not keep up their volume, or who actually decrease their R&D spend, are more likely to start a negative spiral, as fewer games begets less revenue, which then contributes to lower R&D spend, which starts the cycle again. It's commonly known across the industry that many game themes/titles will never achieve any significant traction in the marketplace and manufacturers expect that only 10-30% of new game releases will gain market acceptance and even then, the success can be somewhat limited given the short life cycle mentioned above.

46. Gaming industry sources like Eilers-Fantini often post the "hottest" slot games with above average results. These sources contain market news for companies, and being included on their lists is generally considered a big deal. These are typically dominated by the large manufacturers. Other suppliers are lucky to have one or two games appear on these lists, and often they are placed in a handful of casinos at the time of making it on the list. For a smaller supplier this is to be expected because these lists are dominated by the latest titles which are unique and get a bump from premium placement and familiarity for slot patrons to previously released titles. For a major supplier, placement on this list is mostly about identifying titles that work and can be placed on existing machines as game changes to improve performance. For the smaller manufacturers, these games generally represent new titles going onto new gaming machine cabinets with the hope that more casinos will notice their outperformance and be willing to make a capital investment in that machine.

47. Another competitive advantage of the larger gaming manufacturers is their ability to bundle various products, offer package deals and in some instances provide favorable extended financing terms to casino customers. Smaller manufacturers with less R&D spend have to rely on fewer product offerings and more limited gaming verticals. Furthermore, the largest slot manufacturers also have casino management systems to offer customers that tend to be long tenured in nature given the high switching costs. This is a highly competitive market as well and also dominated by the largest slot manufacturers, which provides opportunities for high volume package deals at a scale that the smaller manufacturers cannot compete with.

### F.    Entry into Relevant Gaming Markets and Costs and Challenges for the Same

48. Licensing requirements vary in cost and complexity across all gaming markets. The U.S. gaming marker is individualized across numerous states and Tribe, each of which has their own licensing and regulatory structure. The sheer number of jurisdictions typically results in smaller manufacturers needing to be more judicious with capital and focus their market entry efforts where they believe they will have the greatest chance of success and return on investment. This is not the case for the large slot manufacturers given their significant capital resources, deep product offerings and efficient licensing/compliance teams which allows them more efficient and timely access into any new or existing gaming market.

**CONFIDENTIAL**

49. The casino slot manager position has become a highly analytical job with game performance tracked closely by dozens of available software tools that provide game performance broken down to any degree of detail desired. While like any business, there is a personal relationship element when it comes to purchasing decisions, but at the end of the day performance drives decisions with highly analytical managers. The highly analytical direction adopted by the gaming industry in more recent years makes having a successful product backed by a very deep library of available game content extremely important for competing in the marketplace. In such an environment, slot managers are looking for not only performance but also the best deals where they can lump purchases together and obtain the best price with the most discounts. Above all else, slot managers are rarely questioned or criticized by purchasing slot machines from the larger manufacturers given their reputation of proven and reliable game performance over decades.

50. An additional competitive dynamic that favors the larger slot manufacturers is that purchasing decisions by the largest domestic casino operators tend to be made at the corporate or regional office level versus at the casino property level. Sales and game placements are typically done for groups of casinos, often representing thousands of video slot machines. This is the domain of the large manufacturers given their broad reach and extensive product offerings. For those manufactures in secondary or tertiary market position, corporate/regional sales pose a more difficult challenge. For this reason, many start with smaller gaming jurisdictions or single tribal casinos.

51. Due to the difficulty of selling into the major commercial gaming markets such as NV, slot manufacturers have found some initial success by focusing on the tribal casino markets. Many perceive this as an easier path for smaller, less established manufacturers. Some of the largest manufacturers today got their start in this market by selling their cabinets and games exclusively through distributors before they ever received their own gaming licenses.

52. Generally speaking, Tribal casinos are perceived to be easier to break into compared to commercial casinos for a few reasons. The first is that Tribal casinos are often single location operations. Property level management teams make buying decisions without many layers of approvals as is typical with corporate buyers of commercial casinos who quite often are buying for multiple locations. This also simplifies the transactions as corporate purchases often are working to obtain discounts and free/discounted products across multiple floors and departments. Second, Tribal casinos are largely standalone operations that have minimal or in many instances no debt, in contrast to corporate controlled commercial casinos which generally have fixed rent payments, debt obligations and significant parent company overhead expenses to cover so any excess profits and cash flow are distributed back to corporate where overall capital allocation decisions are made. Lastly, at a state level Tribal casinos benefit from much lower gaming tax rates than commercial casinos. Hence, many Tribal casinos generate significant free cash flow and have the ability and autonomy to aggressively reinvest in capital expenditures, such as slot machines.

53. Field trials of new product launches are typically required in commercial casino markets, including Nevada whereby the process is well documented before full licensure of new gaming products is given. While in practice some Tribal casinos may also opt for field trials in a similar fashion, since Tribal casinos are self-governed they have more flexibility to bypass a formal

**CONFIDENTIAL**

field trial process which ultimately provides slot manufacturers with less red tape, less time and cost and faster speed to market.

### G.    Sustained Success in Relevant Gaming Markets and Costs and Challenges for the Same

54. The resources and requirements to establish and maintain a presence in a licensed market are significant. Senior leadership, legal/compliance, accounting/finance, manufacturing/assembly, tech support, on-site service technicians, logistics, and other staff are required to ensure smooth operation once licensed and operating in U.S. jurisdictions. Before reaching this stage, manufacturers must devote significant resources to game developers, programmers, product and project managers, mathematicians, sound/graphics engineers, quality assurance, and strategy leaders to create the games which will earn sufficient market share to pay for this large organization and still yield a profit.

55. Smaller companies face the challenge of establishing themselves and growing in a market with their leadership and management needing to undergo constant changes. Those who have been successful in limited markets with lesser requirements may find it difficult to go into more rigorously regulated markets such as Nevada. Maintaining compliance in these markets can take up a significant amount of resources and mental share of executive's time which could be more efficiently deployed for other strategic endeavors.

56. Once licenses are obtained, ongoing compliance requires continued effort and resources. If team members serving the market change, that often requires filings and fees to make changes. These are costs that can be more easily absorbed once a company achieves scale, but smaller companies will have more difficulty staying on top of their required compliance efforts in every market they operate in.

57. The rise and decline of IGT over the past 20 years and its hold on the U.S. slot machine market is a good illustration of the competitive nature of the industry and the fact that at any given time, there are at most 6 or 7 meaningful competitors for slot sales and placements. I reviewed the ship share trends in 5-year increments starting with IGT's share and perspective as until the last decade they were the force that drove the marketplace. During these 5-year ship share snapshots, there were always more small companies fighting for share that didn't register in the competitive landscape. Some later found success, but most tended to remain under 1% of the installed base, a level at which sustained profitable operation is difficult.

### H.    Foreign Manufacturers are not necessarily successful in the U.S.

58. Over the past 25 years or so, some successful European and Asian gaming manufacturers expected their successful slot or gaming machine products in other international markets to make the transition into the U.S., the most lucrative slot market in the world. Even low single digit ship share is enough for profitable and sustained operations, so many of these foreign slot manufacturers believed they could compete for market share by leveraging existing gaming products, game content, intellectual property, development resources and overall gaming industry knowledge and experience. Over time, only a few international slot suppliers have seen sustained success in the U.S. marketplace.

*Expert Rebuttal Report of Richard Baldwin*                                             Page **14** of 33

**CONFIDENTIAL**

59. Cultural attitudes toward legalized gaming vary from seeing it as a mainstream recreational activity to forbidden based on religious beliefs. These views directly shape how casino games are developed, played, marketed, and regulated in different regions.

60. In general, some of the key cultural differences by region are as follows:

    a. North America – mainstream entertainment. Celebration of risk-taking, often integrated into tourism and local identity.

    b. East Asia – tradition and superstition. Emphasis on luck, numerology and rituals

    c. Western Europe – structured leisure. Heavy focus on responsible gaming, fair play and consumer protections over high-stakes spectacle.

    d. Middle East – prohibition. Primarily forbidden under Islamic law, leading to significant social stigma resulting in total bans in most countries.

61. The world's most successful slot supplier today is Aristocrat, an Australian-based company which began to find success bringing its unique game styles and math models developed for the Australian club and pub markets to the U.S. in the 1990s. In 2000, it received its Nevada gaming license.

62. When Aristocrat entered the U.S. market, casinos has rapidly proliferated, especially into Tribal lands. The wide distribution of gaming options led other manufacturers to focus on entertainment value, giving slot patrons more time on device. Aristocrat had been serving a local market where gaming on machines usually was a brief session, with patrons interested in quickly winning a larger amount, or losing all the money they had staked. Their game math models were built for "volatility" as the industry calls it and they have continued with the same philosophy.

63. The timing of Aristocrat's rise aligned with a change in casino patron preferences to video slots as opposed to mechanical reel machines, which had long dominated casino floors until new technology called "ticket-in, ticket-out" or TITO gained wide distribution around the early 2000s. Using tickets instead of coins made video slots more attractive as slots could now offer penny denominated bets. TITO adoption was the main driver which saw the share of video slots exceed the share of legacy mechanical reel games on casino floors. Currently, floor share varies by market but in most states mechanical reel games are at best 20% of casino floors, while video reel slots have 60-80% share, with the remaining minimal share held by video poker and ETGs. In most international markets, video slots are 90% or more of casino floors.

64. Ainsworth is another Australian-based, publicly traded slot manufacturer. Ainsworth was founded in 1995 by Len Ainsworth, the founder of Aristocrat. The company was created to serve the same markets with a similar strategy to that found at Aristocrat, namely the pubs and clubs market with a potential channel into casinos. The company first entered the U.S. market in 1997, but was mostly focused on markets outside Nevada and worked almost exclusively with various distributors. Ainsworth received its first U.S. license in 2006 in California. It received its Nevada license in 2012 and began to expand its operations in 2016 with a newly

**CONFIDENTIAL**

built North American headquarters in Las Vegas. Currently about 50% of its global revenues come from North America despite still having a strong pubs and clubs market in Australia.

65. Ainsworth ship share began registering above 2% in the U.S. market after it obtained its Nevada license. Prior to the Nevada entry, the company was largely focused on game creation and manufacturing in Australia with sales through distributors worldwide. The company made a $38 million purchase of Nova Gaming in 2016, a specialized slot provider of Class II games to Tribal casinos. The company saw further growth when it created a new HHR platform for Kentucky racetracks, quickly becoming the leading supplier to the market and creating a period of growth ship share. This platform was made possible by the purchase of Nova due to the similarity of Class II and HHR systems.

66. Despite its growth and success, Ainsworth rarely has topped 5% of ship share until recent years. Ainsworth has recently increased its R&D spending significantly, increasing R&D spend from 11% in 2015 to 21% in the first half of 2024, with  plans to stabilize spend at 17.5% of its revenue in 2025. This surpasses levels spent by Aristocrat and LNW significantly and is aimed at increasing ship share to higher levels than its usual 2-4% seen in most years.

67. Konami was a highly successful video game creator and studio in Japan which saw growth in tandem with the worldwide popularity of the Nintendo Entertainment consoles beginning in the 1990s. Around the same time Konami decided to enter the U.S. gaming market in 1997, the company was generating $1.0 billion in global revenue. To put into context, around this same time IGT was generating approximately $750 million in total revenue.

68. Konami founded its first gaming office in Las Vegas with the intention of manufacturing gaming machines and slot systems targeting the U.S. market. While Konami didn't arrive with the extensive experience and unique gaming offerings that Aristocrat and Ainsworth had, it did have a highly profitable, large-scale business with significant IP and other art that could be used for its unique offerings. Video games and content for them are highly dependent on continuous R&D investments, not much different from the slot industry. Both need new platforms and cabinets/consoles on a regular basis, supported by a large library of games that are continuously improved upon.

69. Konami's entrance into the U.S. market also benefitted from the wave of video slots and the domestic replacement cycle fueled by the implementation of ticket in, ticket out technology. Based on review of various gaming industry reports and research, Konami was able to garner approximately 2% ship share in 2004 which grew to 8% in 2009. It has maintained share near this level since that time. While not quite in the big 3 supplier group, today it usually is the #4 supplier by share, backed by consistent performance and the significant infrastructure it has built in the U.S. This position is further supported by the popularity of its slot data management system, which gives Konami opportunities to build deeper relationships with certain customers that can lead to outsized floor share and longer-term buying commitments.

70. Novomatic is a global gaming supplier based in Austria, which was founded in 1980 to produce gambling machines. Novomatic began serving markets outside of Europe in 1990 and found success by offering advanced electronic innovations and video slots before most competitors in Europe. They also have gained market share due to their operation of over 2,000 gaming

**CONFIDENTIAL**

facilities, mostly across Europe. Being an operator has given them outsized market share in controlled facilities and has driven some game development efforts using performance data from their properties.

71. Novomatic formally entered Nevada in 2008 and has continually offered gaming machines and game content. However, machines that were seen as innovative and market leading in Europe have not resonated with U.S. customers. The company has never held meaningful market share in the U.S. casino market. Various industry reports that I have reviewed show Novomatic as 0% floor share in almost all tracked markets, except for VLT/route markets where they register a 2% share nationwide. This contrasts greatly with the same report's estimate of 22% floor share for Novomatic across 150 tracked casinos in Europe.

72. Their lack of success in North America likely drove Novomatic to acquire a controlling interest of Ainsworth, an Australian-based slot manufacturer started by the original founder of Aristocrat. Novomatic bought a 52.2% share of the company in 2018 for approximately $370m. Ainsworth's North American EBITDA is likely about 1-2% of the levels of either of the two biggest slot suppliers. This aligns with the industry report which indicate Ainsworth maintained about a 2% ship share nationwide in 2024.

73. Merkur is a German-based gaming supplier that has had extensive success in European gaming markets. The company's roots go back to its founding in 1957 as an amusement supplier. European gambling occurs largely in small casinos, gaming arcades with a limited number of gaming machines, and machines found in bars/taverns and other licensed businesses allowed to have limited gaming machines. These markets utilize lower-cost machines with less developed graphics and lower complexity math models, with a focus on engaging customers for shorter periods of time and less emphasis on gambling. Bet sizes and payouts/jackpots are lower, often capped by local regulations, and attract a lower-spending customer on average.

74. Merkur obtained a Nevada gaming license in 1998 with the intention of bringing its games to the U.S. market. Merkur found very little success during a period of strong gaming growth in the U.S. as gaming was expanding rapidly. Merkur pulled out of the U.S. market in the early 2000s and let their licenses expire, preferring to expand their operations in markets with characteristics more like those found in Germany and Europe.

75. In late 2025, Merkur completed its acquisition of Gaming Arts, a small Las Vegas-based slot supplier. This purchase signaled their re-entry into the U.S. market, including obtaining a new Nevada gaming license. Reports of this transaction indicate MG paid minimal cash for this struggling operator, with much of the value paid in debt forgiveness and assumption of existing debts, along with potential future earnouts. The stated rationale for the deal was to gain access to Gaming Arts' 155+ gaming licenses so it could begin to place its products in U.S. casinos.

**CONFIDENTIAL**

IV.    **PLAINTIFFS' EXPERT REPORTS**

    A.    **Summary of Mr. Nelson's Opinions Relevant to this Report[17]**

76. Plaintiffs' expert Mr. Clarke B. Nelson's report assumes Plaintiffs' allegations are correct to support his opinions that Plaintiffs suffered substantial damages due solely to Defendants' actions and that Plaintiffs should recover damages in the amounts they used to fund LT Game, Inc. over a period spanning more than a decade, in large part because—according to Plaintiffs—Plaintiffs did not receive any benefits from the money used to fund LT Game, Inc. He also opines that Plaintiffs should recover lost profits from business opportunities that Plaintiffs allege they were entitled to and could have taken advantage of in the relevant gaming markets.

77. Specifically, Mr. Nelson opines that Plaintiffs lost approximately $24.9 million from monies, spare parts, and machines that Plaintiffs transferred directly to LT Game, Inc. or to vendors on behalf of LT Game, Inc. and/or Defendant Empire Technological Group, Ltd. during the period from January 2017 through June 2023. Nelson Report ¶¶ 33-39.

78. Mr. Nelson also opines that, as a subset of the $24.9 million, Plaintiffs lost approximately $13.6 million from monies transferred for expenditures that are specifically attributable to Empire, including budgeted employment costs allocated separately for Empire, BMM invoices billed to Empire, Lewis Roca invoices for matter numbers related to Empire, rent for a shared office, and LTGC payroll costs for employees doing work for Empire's benefit. Nelson Report ¶ 40.

    B.    **Summary of Mr. Doyle's Opinions Relevant to this Report[18]**

79. Plaintiffs' expert Thomas Doyle's report opines that, because of Defendants' actions, Empire has a "headstart" on LT Game, Inc. in the U.S. gaming market and, as a direct result, that it will be more difficult for LT Game, Inc. to compete in the U.S. and Nevada gaming market because of Empire.  *See* Doyle Report ¶¶ 33-36.  Mr. Doyle also opines, and assumes, that Plaintiffs did (and are doing) everything else they need to do to enter the U.S. and Nevada gaming markets.

---

[17] I do not address all of Mr. Nelson's opinions and analysis in this report.  However, that should not be seen as an admission that those opinions are correct or appropriate.  If opinions or analysis are not addressed in this report, I take no position on them.

[18] I do not address all of Mr. Doyle's opinions and analysis in this report.  However, that should not be seen as an admission that those opinions are correct or appropriate.  If opinions or analysis are not addressed in this report, I take no position on them.

**CONFIDENTIAL**

## V.    EXPLANATION OF MY OPINIONS AND ANALYSIS

### A.    Contrary to Plaintiffs' expert opinions, Plaintiffs did receive value and benefits as a result of their investment in LT Game, Inc.

80. Mr. Nelson opines that Plaintiffs were damaged and Defendants were unjustly enriched at the expense of Plaintiffs due to the money, parts, and machines Plaintiffs sent to LT Game, Inc. during the relevant period. *See, e.g.*, Nelson Report ¶¶ 33, 40. Mr. Doyle also opines that Empire's "head start" is due to Defendants' alleged acts. *See, e.g.* Doyle Report ¶ 36. These opinions are incorrect.

i.    Empire was selling Plaintiffs' products in the US.

81. One of the main reasons these opinions are incorrect is that, as admitted by Mr. Nelson, Plaintiffs received almost five million dollars in revenue from Empire's distribution efforts from 2017 to 2023. *See* Nelson Report ¶ 38. In my experience, it is not unusual for a manufacturer, when trying to break into a new market, to initially spend more than they receive back in revenue. This is true in almost any business, but particularly in gaming. It is incredibly expensive to break into a new market, and the failure to obtain a certain return on investment is not necessarily indicative of misconduct. In my experience, it can take companies several years and millions of dollars to even begin to break into the Nevada market, with no guarantee of any sustained success given the highly competitive nature of the market. The fact that Plaintiffs were not cash-flow positive during those years is not unusual.

82. Further, Empire's performance was to an extent tied to the performance of Plaintiffs' products, in that Empire earned revenue in the form of commission payments by distributing Plaintiffs' products. The evidence shows that Defendants are no longer distributing Plaintiffs' products; from a business perspective, that means Empire lost those revenue streams. That reduces any "head start."

83. Additionally, it's unclear whether Plaintiffs and Defendants ever were, or are, actually competing against each other. The evidence does not seem to show that Empire was selling equivalent products at the same time it was selling Plaintiffs' products, and even now, my review of Plaintiffs' current distribution agreements seem to indicate that Plaintiffs do not seem to be attempting to compete in the same markets that Defendants are currently in. Specifically, LT Game, Inc. initially only sold two products in the U.S. market, a smart card shoe (the LTShoe) and a Class III slot machine (the LTS-1). It later sold a low-cost cabinet for the Puerto Rican street market (the Mini Mite). At that time, Empire was primarily selling table games and related table game technology (like trend boards).

84. Mr. Nelson also opines about Plaintiffs' costs of game certifications. *See* Nelson Report ¶ 39. But that ignores the fact certifications were a necessary expense for LT Game, Inc. to sell its products, and that any certifications obtained for Plaintiffs' games could still be valuable and usable in the jurisdictions they were obtained for.

85. Similarly, Mr. Nelson does not account for the value of Plaintiffs games outside the U.S.. Products LT Game, Inc. developed in the U.S. could (with proper certification) be sold abroad.

*Expert Rebuttal Report of Richard Baldwin*                    Page **19** of **33**

**CONFIDENTIAL**

Further, as mentioned elsewhere in my report, that game's performance in the U.S. might not be a direct indicator of that game's success elsewhere.

     iii. Plaintiffs paid Empire a lower commission than the industry standard

86. It also seems as though Plaintiffs paid Empire a commission lower than the industry standard for distributing their games and products. At the very least, it's significantly lower than the commission Plaintiffs paid to IGT (a distributor used before Empire) or any of Plaintiffs' current distributors.

  **B.** **Contrary to Plaintiffs' expert opinions, Defendants' alleged actions are not the reason that Plaintiffs failed to break into the U.S. slot machine market and did not give it a "head start" over Plaintiffs.**

87. Inherent in Mr. Doyle's opinion about Empire's "head start" is that Defendants' alleged actions caused Plaintiffs to be unsuccessful in the U.S.. *See, e.g.*, Doyle Report ¶ 36. This goes hand-in-hand with Mr. Nelson's theory of unjust enrichment (*see* Nelson Report ¶ 40) and Plaintiffs' allegations that Empire profited at the expense of Plaintiffs, and that but-for Defendants' actions, Plaintiffs would have been successful. These opinions and theories are incorrect.

     i. Plaintiffs did not adequately fund LT Game, Inc.

88. As a general matter, it is my opinion that Plaintiffs were not funding LT Game, Inc. at a high enough level to be able to break into the U.S. gaming market. As explained elsewhere in this report, it takes significant resources and sustained commitment to even have a chance to break into these markets. The evidence does not show that Plaintiffs had those resources or commitment. The evidence also suggests that Mr. Feng even requested additional funds for LT Game, Inc., a request which was denied. This is summarized in a February 10, 2022 email Mr. Feng sent to Jay Chun:

> "The development of the North American slot machine market is inseparable from the investment and support of the head office. Over the past year, our U.S. team has had several rounds of layoffs, and expenses have been cut. Further cuts will not only fail to achieve the revenue balance required by the boss in the near future, but will also further weaken the market competitiveness of our slot machine products."[19]

89. Plaintiffs' own financial data, included in Mr. Nelson's report, demonstrates that LT Game was not adequately capitalized to compete in the U.S. gaming market. Paradise's total investment in LT Game fell sharply in 2020, and continued to decline to a near-zero amount in 2023. Paradise's investment in R&D and product development followed the same trend. Notably, Paradise was continuously decreasing its annual investment in LT Game despite LT Game's revenue increasing during much of this period. For Plaintiffs' but-for causation theory to be plausible, there would need to be poor revenue/performance despite sufficient R&D

---

[19] ETG_00000166384.

**CONFIDENTIAL**

spend.    However, the opposite occurred here—demonstrating that Plaintiffs' theory is incorrect.  This information is reflected in the below graph:[20]



90. Plaintiffs' decision to reduce investment shortly after it started selling slot machines is significant because, as I noted previously, it can take companies several years to even begin to break into the Nevada market.  Acknowledging this steep learning curve, Jay Chun stated in a February 2022 email:  "Regarding SLOT development, the Group probably overestimated our capabilities in development and promotion, while underestimating our market competitiveness. . . . There have been calculation errors, including in our costs and sales pricing for the product, which has created a situation in which making a profit will never be possible."[21]  And just weeks prior, LT Game Inc.'s then Vice President of Engineering and Technology (who was responsible for leading development of LT Game Inc.'s slot machine platform and

---

| [20] | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|------|------|------|------|
| [1] | $3,054,340 | $5,680,293 | $8,924,268 | $5,631,938 | $3,311,140 | $2,949,535 | $329,422 |
| [2] | $507,607 | $1,446,916 | $2,330,530 | $1,110,076 | $764,307 | $395,000 | $177,442 |
| [3] | $292,515 | $135,157 | $161,790 | $273,578 | $1,400,822 | $2,732,184 | $0 |

[1] Total Investment. *See* Nelson Report Schedule 4, pg. 59.  Reflects sum of rows 1 and 2, less row 3.
[2] R&D Investment. *See* Nelson Report Schedule 6, pg. 63.  Includes "Product Development - Hardware/Software," "Product Development – Testing," and "Budget - Research and Development Costs" requisition cost categories.
[3] Revenue. *See* Nelson Report Schedule 4, pg. 59.

[21] ETG_00000166384

*Expert Rebuttal Report of Richard Baldwin*                                       Page **21** of 33

**CONFIDENTIAL**

slot machine games) observed that Paradise management had "no understanding of [slots] at all" because "Jay wants it to be a build once sell forever product and its the exact opposite."[22]

91. There is also evidence that Plaintiffs were either trying to sell LT Game, Inc. or solicit investment for it during the relevant period (or both); Plaintiffs were unsuccessful at doing either. Regardless of which they preferred to do, being unsuccessful at both prevented LT Game, Inc. from receiving any additional support.

92. There is also evidence that Plaintiffs wanted to actually leave the U.S. markets during the relevant period in favor of focusing on China and the Macau market. That lack of commitment to breaking into the U.S. market would likely have impacted LT Game, Inc.'s performance; businesses do not want to deal with other businesses that are unlikely to stay in the market.

        ii.    LT Game Inc. did not have appropriate staff to break into US/Nevada markets

93. Appropriate funding is not just a theoretical number to be reached; those necessary funds are used to hire key personnel to develop and sell games. By not funding LT Game, Inc. appropriately, Plaintiffs cut off LT Game, Inc. from access to the people and equipment needed to be successful. Resources are used to hire staff who will develop games and products, sell them, and maintain them. Plaintiffs' funding levels were not sufficient to do that.

94. To the contrary, the evidence shows that Plaintiffs were actually reducing LT Game, Inc.'s staff during the period that Mr. Nelson's and Mr. Doyle's opinions analyze. Notably, Garrett Olson, LT Game Inc.'s former Vice President of Engineering and Technology (who was responsible for leading development of LT Game's slot machine platform and slot machine games) testified that, in early 2022, there were "significant downsizes" at LT Game—specifically, "the whole EGM [electronic gaming machine (i.e., slot machine)] team that was here in the U.S. was let go."[23] By reducing staff, Plaintiffs prevented LT Game, Inc. from being successful; at that time, LT Game, Inc. needed more staff, not less.

95. On top of that, the evidence shows that Plaintiffs were actually reducing LT Game, Inc.'s staff during the period that Mr. Nelson's and Mr. Doyle's opinions analyze. By reducing staff, Plaintiffs prevented LT Game, Inc. from being successful; at that time, LT Game, Inc. needed more staff, not less.

        iii.    Empire was not a direct competitor to Plaintiffs

96. Plaintiffs' experts also miss the mark and inappropriately give credence to Plaintiffs' allegations by assuming and opining that Empire was a direct competitor to Plaintiffs. This is incorrect.

---

[22] ETG_00000164148.

[23] G. Olson Dep. at 15:14-19, 21:16-25, 64:15-65:3.

**CONFIDENTIAL**

97. The gaming market is massive and diffuse; the number of different products and services offered is almost uncountable. The mere fact that Empire sold other gaming products while it distributed Plaintiffs' products does not make it Plaintiffs' competitor.

98. Additionally, it is not accurate to assume, as Mr. Nelson does, that Empire would have been able to sell the same products or make the same revenue in the but-for world had Empire only sold Plaintiffs' games and products. It is not clear that Plaintiffs had equivalent products to sell and it is not clear that any products Plaintiffs did have were of quality to entice a buyer. Gaming products generally are not easily interchangeable; the success of one cannot be construed to indicate the success of another.

        **C.**        **Contrary to Plaintiffs' expert opinions, Defendants alleged actions are not the sole, or even a significantly meaningful, reason that it will be difficult for Plaintiffs to compete in the U.S. gaming markets.**

99. Mr. Doyle opines that it will be a "difficult path" for Plaintiffs to compete in the U.S. and that Empire's "significant head start makes it meaningfully difficult to catch up. Doyle Report ¶ 36. Essentially, Mr. Doyle blames all of Plaintiffs' future business troubles on Defendants. In part, Mr. Doyle bases these other opinions on his opinion that there is a "limited universe of companies" that distribute gaming equipment in the markets Empire operates in and in which Plaintiffs allegedly want to operate. Doyle Report ¶ 32. These opinions are incorrect.

        i.        It's difficult to become licensed in the U.S., and particularly in Nevada

100. Regardless of Defendants' alleged actions, the first hurdle to entering and meaningfully competing in the markets Plaintiffs want to compete in is to be licensed. I understand that Plaintiffs may not even be able to become licensed in certain relevant jurisdictions. *See, e.g.*, Expert Report of Peter Bernhard (February 6, 2026) (opining that Plaintiffs would likely encounter difficulties and delay in obtaining licensure in Nevada). Regardless, it's incredibly difficult to become licensed from a business perspective. I have gone through several application processes in multiple jurisdictions, both to obtain licensure for an entity and as a key employee needing licensure. It is a time- and resource-intensive process that can take years, particularly if a company has never done it before. It is also incredibly expensive, and there is no guarantee of success. Further, even if Plaintiffs were to obtain licensure in one jurisdiction, that does not guarantee licensure elsewhere.

        ii.        LT hasn't even attempted to get licensed in U.S. jurisdictions.

101. Plaintiffs' employees testified that Plaintiffs have never attempted to obtain licensure in the U.S. The evidence also suggests that they are not currently attempting to obtain licensure, and are relying on third-party distributors to sell their products in the U.S. They are thus unfamiliar with the process, likely making it more difficult. To put it in Mr. Doyle's terms, if Plaintiffs want to enter the U.S., the "clock" will continue to tick until they attempt to obtain licensure. Plaintiffs' decision to not attempt to obtain licensure does not seem to be tied to anything Defendants did. Instead, it seems that Plaintiffs are content to rely on distributors to sell their products in the U.S. In that scenario, Empire's "headstart" on Plaintiffs would not

**CONFIDENTIAL**

matter, as Plaintiffs' new distributors would likely already have their own relationships with casinos that they could rely on to sell Plaintiffs' products.

iii.     It is difficult to enter the U.S. and Nevada gaming market.

102.    On top of that, Plaintiffs would likely struggle to enter the U.S. and Nevada markets for reasons unrelated to Defendants or their alleged acts.

1.    The market is huge, with large international players

103.    As discussed above, Empire is one small piece of a massive market.  The top competitors in the market that would have the most effect on Plaintiffs would likely be the biggest players. Some of these are international companies with names that most people in the industry recognize, and some are based in the U.S..  This market is a very large pond with a lot of very big fish. At present, the U.S. slot market is represented by several slot manufacturers, broken down as follows; the top tier global providers which represent approximately 70% of the market; mid-tier providers which represent approximately 20% of the market; tier 3 providers which can be characterized as "up and comers" that collectively garner 5% market share; and finally a longer list of "niche" providers that represent the remaining 5% market share. Note that since 2018, the combined market share of the same group of the 7 top and mid-tier manufacturers has consistently hovered around 90%.

104.    Those big fish also have, over years and decades, committed substantial resources to competing in these markets, more resources than Empire or Plaintiffs could bring to bear. Their budgets for game development are in the hundreds of millions of dollars, they have massive teams committed to sales, marketing, research & development, manufacturing, and maintenance, and they use those resources to get the best spaces in the prime areas of the most valuable casinos. Further, competition for the most prolific game designers, visionaries, mathematicians, etc. is fierce, including relationships with well-known 3rd party game studios. The top tier providers can offer a combination of both guaranteed and performance-based incentive compensation packages that are nearly impossible to compete with. Not to mention all the "perks" that are commensurate with multi-national, global corporations. There is virtually no incentive for the most talented people to defect to even the mid-tier manufacturers, let alone the longer list of smaller manufacturers. Even if they tried, they are typically locked up under multi-year contractual non-compete provisions. There are also a steady stream of smaller companies attempting to enter the market and sell new products.  While they may not have the resources of the biggest fish, there are still a lot of them only effectively competing for 10% of the market.

105.    Further, each jurisdiction has its own ecosystem; not all competitors compete in all markets, and not all markets are the same (or even similar).  For these and other reasons, Plaintiffs will likely have difficulty entering the U.S. and Nevada gaming markets.

**CONFIDENTIAL**

> 2. Empire's relationship with Commerce Casino will not affect Plaintiffs' ability to enter relevant gaming markets

106.    Mr. Doyle also opines that it would be "valuable" to have a business relationship with Commerce Casino. Doyle Report ¶ 15. He also opines that, because Empire has a relationship Commerce Casino, it will be "meaningfully more difficult for LT Game" to enter the U.S. markets and to sell to those customers. *Id.* ¶ 34-35  This is incorrect.

107.    Commerce Casino is in California.  Empire's relationship with Commerce Casino, whatever it may be, has no effect on LT Game Inc.'s ability to enter any other U.S. market, including Nevada. Moreover, LT Game Inc. seems to be focusing on selling slot machines, and Mr. Doyle does not appear to consider the fact that Commerce Casino is a California card room, and thus is prohibited from operating slot machines (the Tribes have the exclusive right to directly operate slot machines in California).

108.    Further, I disagree that Empire's relationship is the reason that it would be "meaningfully more difficult" for Plaintiffs to even operate in California.  Nor is there any reason to assume that Commerce Casino could not have a relationship with both Empire and LT Game Inc. at the same time.  As is routine in the industry, I would expect that Commerce Casino buys/leases products from multiple manufacturers. The equipment distribution market in the U.S. is massive, and Empire is a small player.  The other factors I discuss in this report are more likely to prevent Plaintiffs from being successful than any one relationship between Empire and Commerce Casino.

> 3. Empire's relationship with other casinos will not affect Plaintiffs' ability to enter relevant gaming markets

109.    Similarly, Mr. Doyle opines that Empire's "established relationships" with other casinos will also make it "meaningfully more difficult" for Plaintiffs to sell to those customers. Doyle Report. ¶ 34-35.  This is also incorrect.

110.    As I mentioned above, the relationship between a single gaming distributor and a casino is unlikely to "meaningfully" make it more difficult for Plaintiffs to sell to that customer. Casinos engage with dozens of distributors providing hundreds of different products and services.  As I explained previously, while a personal relationship may impact sales, purchasing decisions are ultimately driven by products (in the case of slot machines, a deep library of available game content with a reputation of proven and reliable game performance).  It's also not clear whether Empire and Plaintiffs are even directly competing against one another, as there are so many distinctions in products and market offerings within the equipment distribution space, and Mr. Doyle's opinion does not delineate among them.  In light of that and all the other factors I discuss in this report, Empire's relationship with other casinos will likely have, at most, a negligible effect on Plaintiffs' success going forward.

**CONFIDENTIAL**

iii.    Entering the U.S. and Nevada gaming markets is difficult for foreign companies.

111.    I discuss above all the hurdles to entering the U.S. and Nevada gaming markets.  All of those hurdles hold true, and in fact become more difficult, when considering a foreign company like Plaintiffs.

1.  There's no guarantee that products that are successful abroad will be successful here.

112.    I have seen many foreign companies with successful international businesses and products fail to succeed in the U.S. and in Nevada.  Some of this has to do with knowledge of the relevant markets, and the differences between those markets and foreign markets.  But also, some products just do not translate to domestic markets; for whatever reason, U.S. and Nevada customers might not like a foreign game, even if that game was successful elsewhere.  Sometimes these games fail because of cultural reasons; for instance, many games from Macau include references, names, and symbols that are well-known and valued in Chinese culture but which will not have the same impact on American customers.  Some of it may be historical; some games have historically been more popular and widely-known in certain markets; for instance, baccarat is much bigger in China than in the U.S., while Texas Hold'em or Blackjack are both more popular here than elsewhere.  Some of that success can be attributed to marketing; while a foreign company may be able to succeed and attract customers in its home market based on its name alone (for instance, some customers may try to find games from certain companies because of prior good experiences), that likely won't have the same affect in foreign markets, because they are not known there.  And some of it is just luck.

iv.    Entering, and staying in, the U.S. and Nevada gaming markets requires a constant flow of games and funds to develop them.

113.    On top of those issues that arise when breaking into a market, merely breaking in is half the battle.  Entry into a market does not guarantee sustained success.  While a single cabinet may be able to sit in a casino for an extended period, it will only be successful if it receives a steady flow of new games to play on it. Setting aside the high end of the spectrum comprised of the most successful slot theme franchises previously mentioned, the average lifespan of popular slot machine games in the U.S. market is approximately 6-9 months. However, the lifespan of popular games have shrunk considerably over the last 5 years and more so over the last 10 years. Failing to update or provide new games is a recipe for business failure; the revenue generated from a game often decreases over time, as customers become used to it and are drawn to other, newer games.  To stay competitive, a company must provide a constant flow of new games. Failure to do so will lead to business failure.  There are many examples of businesses who were established in these markets that lost significant market share. Based on the financials produced by Plaintiffs and the available evidence, it is unclear whether they have committed sufficient funds to successfully compete in the U.S. and Nevada markets, regardless of Empire's actions.

CONFIDENTIAL

**APPENDIX A: MATERIALS RELIED ON**

### A. Produced Documents

1. ETG_00000000439

2. ETG_00000011879

3. ETG_00000060133

4. ETG_00000079833

5. ETG_00000082267

6. ETG_00000098080

7. ETG_00000109178

8. ETG_00000111488

9. ETG_00000117043

10. ETG_00000124400

11. ETG_00000125661

12. ETG_00000130738

13. ETG_00000158050

14. ETG_00000159194

15. ETG_00000159205

16. ETG_00000159220

17. ETG_00000162360

18. ETG_00000162969

19. ETG_00000164148

20. ETG_00000166384

21. ETG_00000166414

22. ETG_00000167656

23. ETG_00000246424

**CONFIDENTIAL**

24. ETG_00000246425

25. ETG_00000246426

26. ETG_00000246427

27. ETG_00000282643

28. ETG_00000285163

29. ETG_00000291588

30. ETG_00000315565

31. ETG_00000319354

32. PARADISE 00000562

33. PARADISE 00000765

34. PARADISE 00002754

35. PARADISE 00003647

36. PARADISE 00004092

37. PARADISE 00004177

38. PARADISE 00008816

39. PARADISE 00009063

40. PARADISE 00021605

41. PARADISE 00021744

42. PARADISE 00022193

43. PARADISE 00022252

44. PARADISE 00027823

45. PARADISE 00027855

46. PARADISE 00027863

47. PARADISE 00027865

48. PARADISE 00028118

**CONFIDENTIAL**

49. PARADISE 00030769

50. PARADISE 00031003

51. PARADISE 00080245

52. PARADISE 00080256

53. PARADISE 00080292

54. PARADISE 00080310

55. PARADISE 00080327

56. PARADISE 00080411

**CONFIDENTIAL**

### B. Public Materials

1. NEVADA GAMING CONTROL BOARD, *Monthly Revenue Report, December 2025*, https://www.gaming.nv.gov/siteassets/content/about/gaming-revenue/december-2025-monthly-revenue-report.pdf (last visited Feb. 13, 2026),

2. NEVADA GAMING CONTROL BOARD, *Nevada Gaming Abstract 2024*, https://www.gaming.nv.gov/siteassets/content/about/abstract/Nevada_Gaming_Abstract_2024.pdf (last visited Feb. 13, 2026); *see also* NEVADA GAMING CONTROL BOARD, *Press Release: Nevada Gaming Abstract—2024*, https://www.gaming.nv.gov/siteassets/content/about/abstract/Nevada_Gaming_Abstract_2024_Press_Release.pdf (last visited Feb. 13, 2026).

3. NEVADA GAMING COMMISSION AND THE NEVADA GAMING CONTROL BOARD, *Gaming Revenue Information (GRI)*, https://www.gaming.nv.gov/about-us/gaming-revenue-information-gri/ (last visited Feb. 13, 2026); *see also* NEVADA GAMING COMMISSION AND THE NEVADA GAMING CONTROL BOARD, *Quarterly Statistical Information (QSI)*, https://www.gaming.nv.gov/about-us/quarterly-statistical-information-qsi/ (last visited Feb. 13, 2026).

4. NEVADA GAMING CONTROL BOARD, *Press Release: December 2025 Nevada Gaming Revenues and Collections*, https://www.gaming.nv.gov/siteassets/content/about/abb-revenue/mrrdec2025.pdf (last visited Feb. 13, 2026).

5. NEVADA GAMING COMMISSION AND THE NEVADA GAMING CONTROL BOARD, *Restricted and Nonrestricted Locations Report*, https://www.gaming.nv.gov/about-us/restricted-and-nonrestricted-locations-report/ (last visited Feb. 13, 2026).

6. AMERICAN GAMING ASSOCIATION, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry*, https://www.americangaming.org/wp-content/uploads/2025/05/AGA-State-of-the-States-2025.pdf (last visited Feb. 13, 2026).

7. PENNSYLVANIA GAMING CONTROL BOARD, *Revenue Reports*, https://gamingcontrolboard.pa.gov/news-and-transparency/revenue (last visited Feb. 13, 2026).

8. STATE OF NEW JERSEY, DEPARTMENT OF LAW & PUBLIC SAFETY, DIVISION OF GAMING ENFORCEMENT, FINANCIAL AND STATISTICAL INFORMATION, *Monthly Gross Revenue Reports*, https://www.njoag.gov/about/divisions-and-offices/division-of-gaming-enforcement-home/financial-and-statistical-information/monthly-gross-revenue-reports/ (last visited Feb. 13, 2026); *see also, e.g.*, PlayNJ.com, *Atlantic City Casino Revenue*, https://www.playnj.com/atlantic-city/revenue/ (last visited Feb. 13, 2026).

9. NATIONAL INDIAN GAMING COMMISSION, *NIGC FY 2024 Gross Gaming Revenue Report*, https://www.nigc.gov/?wpdmdl=12761&ind=1754333463993 (last visited Feb. 13, 2026).

**CONFIDENTIAL**

10. AMERICAN GAMING ASSOCIATION, *American Attitudes Toward Gaming 2025*, https://www.americangaming.org/resources/american-attitudes-towards-gaming/ (last visited Feb. 13, 2026).

11. ARISTOCRAT, *Full-Year 2024 Results Investor Presentation*, https://ir.aristocrat.com/static-files/f3577bdd-0126-4953-ad42-0dafc134196e (last visited Feb. 13, 2026); *see also* ARISTOCRAT, *Website*, https://www.aristocrat.com/ (last visited Feb. 13, 2026).

12. LIGHT & WONDER, INC., *Reports Fourth Quarter and Full Year 2024 Results*, https://explore.lnw.com/media/g40bua2m/lnw-12-31-2024-er-final-02-24-25-1715.pdf (last visited Feb. 13, 2026).

13. IGT, *International Game Technology PLC Reports Fourth Quarter and Full Year 2024 Results*, https://s205.q4cdn.com/821653831/files/doc_financials/2024/q4/IGT-Q4-24-Earnings-Press-Release-FINAL.pdf (last visited Feb. 13, 2026).

14. IBCG MATRIX, *What is Growth Strategy and Future Prospects of Konami Group Company*, https://matrixbcg.com/blogs/growth-strategy/konami#:~:text=Konami%20allocated%20%C2%A525%20billion,Gaming%20&%20Systems%20Advancements (last visited Feb. 13, 2026).

15. U.S. SECURITIES AND EXCHANGE COMMISSION, *Form 10-K: Play AGS, Inc.*, https://www.sec.gov/ix?doc=/Archives/edgar/data/1593548/000143774925006461/ags20241231_10k.htm#fact-identifier-1061 (last visited Feb. 13, 2026).

16. GAMING AMERICA, *LT Game G2E Preview: Invaluable Experience*, https://gamingamerica.com/news/14263/lt-game-g2e-preview-invaluable-experience (last visited Feb. 13, 2026).

17. GGR ASIA, *Betty Zhao departs LT Game, Eddie Au new COO*, https://www.ggrasia.com/betty-zhao-departs-lt-game-eddie-au-new-coo (last visited Feb. 13, 2026).

18. GGR ASIA, *LT Game shows new sic bo products, eyes more slot sales*, https://www.ggrasia.com/lt-game-shows-new-sic-bo-products-eyes-more-slots-sales#:~:text=LT%20Game%20Ltd%2C%20a%20Macau,day%20MGS%20Entertainment%20Show%202019 (last visited Feb. 13, 2026).

19. Inside Asian Gaming, *LT Game suspends sale of gaming equipment to United States just as new Macau production line kicks into gear*, https://asgam.com/2025/04/15/lt-game-suspends-sale-of-gaming-equipment-to-united-states-just-as-new-macau-production-line-kicks-into-gear/ (last visited Feb. 13, 2026).

**CONFIDENTIAL**

### C. Depositions[24]

1. Deposition of Leo Chan (October 14-15, 2025) (Volumes 1 and 2).

2. Deposition of Jay Chun (October 30, 2025).

3. Deposition of Linyi (Frank) Feng (October 21-22, 2025) (Volumes 1 and 2).

4. Deposition of Kelcey Allison (October 2-3, 2025) (Volumes 1 and 2).

5. Deposition of Eddie Au (October 21, 2025).

6. Deposition of John Glaser (September 22, 2025).

7. Deposition of Garrett Olson (February 4, 2025).

### D.  The Parties' Filings

1. Plaintiffs' First Amended Complaint (February 27, 2025).

2. Expert Report of Mr. Thomas Doyle (January 9, 2026) (including any materials relied upon or exhibits referenced).

3. Expert Report of Mr. Clarke B. Nelson (January 9, 2026) (including any materials relied upon or exhibits referenced).

4. Expert Rebuttal Report of Paul Peterson (February 6, 2026) (including any materials relied upon or exhibits referenced).

5. Expert Rebuttal Report of Peter Bernhard (February 6, 2026) (including any materials relied upon or exhibits referenced).

---

[24] This includes the transcript and any exhibits entered in that deposition.

**CONFIDENTIAL**

**APPENDIX B: RESUME**

## Contact

www.linkedin.com/in/richbaldwin
(LinkedIn)

## Top Skills

Mergers

Investor Relations

Restructuring

## Certifications

Certified Public Accountant

Uniform Securities Agent State Law
Examination (Series 63) (inactive)

Licensed Investment Banking
Representative (Series 79) (inactive)

## Publications

2013 Gaming Industry Forecast: Part
2

2014 Gaming Industry Forecast: Part
2

# Richard Baldwin

CFO, Advisor and Investment Banker
Las Vegas, Nevada, United States

## Summary

Senior financial executive with broad public and private company
experience in all aspects of financial and accounting management.
Direct experience with hospitality, real estate, technology and
manufacturing.

Specialties: Financing, investor relations, mergers and acquisitions,
restructuring, financial reporting and corporate governance.

## Experience

UNLV International Gaming Institute
Member of the Board of Advisors
July 2025 - Present (8 months)
Las Vegas, Nevada, United States

International Association of Gaming Advisors (IAGA)
Audit Committee Member
July 2023 - Present (2 years 8 months)
Las Vegas, Nevada, United States

IAGA's Audit Committee works with the outside auditors for IAGA, reviews the
annual audit, addresses any management issues noted by the auditors and
makes recommendations to the Board of Trustees for any changes in policies
or procedures related to financial matters or internal controls.

GGHM
Managing Partner
June 2021 - Present (4 years 9 months)
Las Vegas, Nevada, United States

GGHM is a leading global gaming industry advisory, analytics and investment
firm dedicated to providing its clients with trusted, highly-focused and
comprehensive services that help them achieve their strategic objectives.

RVNC Advisors, LLC
Managing Principal

November 2021 - Present (4 years 4 months)
Las Vegas, Nevada, United States

## Union Gaming
Managing Director
October 2012 - March 2020 (7 years 6 months)
Las Vegas, Nevada Area

Union Gaming is a boutique investment bank and advisory firm focused exclusively on the global gaming industry, which we define as the $400 billion–plus market to include land–based casinos, lottery, online, and pari-mutuel wagering. The company specializes in global equity and high yield research, securities dealing, investment banking, advisory and analytics/market research. Founded in 2009, the company has offices in Las Vegas, New York, Macau, and Hong Kong.

## Galaxy Gaming, INC
Member, Board of Directors
March 2011 - October 2012 (1 year 8 months)
Las Vegas, NV

Galaxy Gaming develops and markets technology and entertainment based products for the worldwide gaming industry.

## Tropicana Entertainment
Chief Financial Officer
January 2009 - November 2009 (11 months)
Las Vegas, NV

Tropicana Entertainment is a privately held, multi-jurisdictional leisure & hospitality company.

Annual revenue: $800 million

## Herbst Gaming
Corporate Finance Consultant
February 2008 - December 2008 (11 months)
Las Vegas, NV

Herbst Gaming is a privately held, multi-jurisdictional leisure & hospitality company.

Annual revenue: $700 million

## Shuffle Master

**Chief Financial Officer**
September 2004 - November 2007 (3 years 3 months)
Las Vegas, NV

Shuffle Master Gaming ("SHFL") is a global technology and manufacturing company.  SHFL is included in the S&P 600 SmallCap Index.

2007 Revenue: $180 million

Enterprise Value at October 31, 2007: $710 million

## International Game Technology
**Director of Corporate Finance & Investor Relations**
December 2001 - September 2004 (2 years 10 months)
Reno, NV

International Game Technology ("IGT") is a global technology and manufacturing company.  IGT is a Fortune 1000 company and is currently listed on the S&P 500.

2004 Revenue: $2.5 billion

Enterprise Value at September 30, 2004: $14.0 billion

## Anchor Gaming
3 years 10 months

**Director of Corporate Finance**
September 1999 - December 2001 (2 years 4 months)
Las Vegas, NV

Anchor Gaming ("SLOT") was a diversified global technology & systems company.  Anchor was acquired by IGT in December 2001.

2001 Revenue: $385 million

Enterprise Value at December 31, 2001: $1.0 billion

**Financial Controller**
March 1998 - August 1999 (1 year 6 months)
Las Vegas, NV

Anchor Gaming was a diversified global technology & systems company.

2001 Revenue: $385 million

Enterprise Value at December 31, 2001: $1.0 billion

## Becker CPA Review Course
Live Classroom Instructor

January 1997 - April 2001 (4 years 4 months)

## Deloitte & Touche, LLP
Senior Auditor
September 1995 - April 1998 (2 years 8 months)
Las Vegas, NV

Directed all phases of audit engagements for a diversified, public company client base.

---

## Education

**University of California, Irvine - The Paul Merage School of Business**
MBA, Finance, General · (2010 - 2012)

**University of Nevada-Las Vegas - College of Business**
BS, Accounting · (1990 - 1995)