# Exhibit A-2

# Deposition of Richard Baldwin

# Apr. 3, 2026

Videotaped Deposition of

# Richard "Rich" Baldwin

April 03, 2026

Paradise Entertainment Limited

vs.

Empire Technological Group Limited

Case 2:24-cv-00428-JCM-BNW   Document 195-3   Filed 07/31/26   Page 3 of 28

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; and LT GAME LIMITED, a British Virgin Islands Corporation,

Plaintiffs,        Case No. 2:24-cv-00428-JCM-BNW

vs.

EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS, LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; DARYN KIELY, an individual; and YI ZHAO, an individual,

Defendants.
_____/

VIDEOTAPED & V/C
DEPOSITION OF:  RICHARD "RICH" BALDWIN
TAKEN:        Pursuant to Notice by Counsel
for Plaintiffs Paradise Entertainment
Limited and LT Game Limited
DATE:        April 3, 2026
TIME:        9:16 a.m. to 2:29 p.m. PST
PLACE:        Witness's Location
Las Vegas, Nevada  89117

VIA:        Zoom Videoconferencing (Aptus)

STENOGRAPHICALLY REPORTED BY:
Courtney N. Langhoff, CSR, RDR, CRR, FPR-C
CSR #14876, California | CSR #084.004996, Illinois
Notary Public, States of Florida & Wisconsin

JOB NO. 10187314

---

Page 2

APPEARANCES:
JEAN-PAUL "J.P." CIARDULLO, ESQUIRE (Via Videoconference)
OF: Foley & Lardner, LLP
555 South Flower Street
Suite 3300
Los Angeles, California  90071
(213) 972-4500, FAX-(213) 486-0065
jciardullo@foley.com
-and-
DARIUS KEYHANI, ESQUIRE (Via Videoconference)
FRANCES HELEN STEPHENSON, ESQUIRE (Via Videoconference)
OF: Keyhani, LLC
1050 30th Street Northwest
Washington, DC  20007
(202) 748-8950, FAX-(202) 318-8958
dkeyhani@keyhanillc.com
fstephenson@keyhanillc.com
APPEARING ON BEHALF OF THE PLAINTIFFS PARADISE ENTERTAINMENT LIMITED, LT GAME, INC., AND LT GAME LIMITED
ETHAN GLENN, ESQUIRE (Via Videoconference)
OF: Norton Rose Fulbright
98 San Jacinto Boulevard
41st Floor
Austin, Texas  78701
(512) 536-2437, FAX-(213) 892-9494
ethan.glenn@nortonrosefulbright.com
APPEARING ON BEHALF OF THE DEFENDANTS EMPIRE TECHNOLOGICAL GROUP LIMITED, GAMING SPECIALIZED LOGISTICS, LLC, LINYI FENG, ROY KELCEY ALLISON, DARYN KIELY, AND YI ZHAO
ALSO PRESENT:
Miranda Perales, Aptus Court Reporting Videographer
(Via Videoconference)

------

---

Page 3

STIPULATIONS

It is hereby stipulated and agreed by and between the counsel for the respective parties and the witness that the reading and signing of the deposition transcript be reserved.

* * * * *

---

Page 4

INDEX

EXAMINATION OF RICHARD "RICH" BALDWIN:        PAGE
April 3, 2026

DIRECT EXAMINATION BY MR. CIARDULLO            8

CROSS-EXAMINATION BY MR. GLENN            159

REDIRECT EXAMINATION BY MR. CIARDULLO        162

CERTIFICATE OF OATH            171

CERTIFICATE OF REPORTER            172

DECLARATION SHEET            173

DEPOSITION ERRATA PAGE #1            174

DEPOSITION ERRATA PAGE #2            175

INITIAL
DEPOSITION EXHIBIT            REFERENCE
Exhibit 1  CONFIDENTIAL: Expert Rebuttal        29
Report of Richard Baldwin
dated 2/13/26
(Attached to original and copy transcripts.)

INITIAL
PREVIOUSLY MARKED DEPOSITION EXHIBITS:    REFERENCE
(None)

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
(None)

Richard "Rich" Baldwin

Page 9

Q. Were you acting as an expert witness in those cases or as a witness for one of the parties?

A. I was -- well, I'm currently serving as an expert witness on another case now, but I haven't been deposed yet. I previously served as an expert witness for -- for a -- and with -- for a matter within the gaming industry. I honestly don't recall being deposed, but I provided written testimony.

And then there were a few other depositions, just as a -- a -- that I was -- I was asked to -- to be -- I was asked to be deposed, but not as an expert witness but just other litigation matters, as it relates to various busi- -- business activities with some of my clients and my former -- in my former corporate world, my -- my -- my corporate positions within the gaming industry.

Q. Okay. Well, since you've been deposed before, I -- I won't spend a lot of time going over the basics of it. I'll just ask you: Is there any reason why you wouldn't be able to give truthful testimony today? You feeling all right?

A. Feeling good, uh-huh.

Q. Okay.

A. Yep.

Q. Well, so let's talk a little bit about your --

Page 10

your -- your background. I know you obviously provided a CV with -- with your report, but -- and I'll have you just summarize your -- your qualifications for the expert opinions you've given, in terms of your -- your professional background.

A. Sure. Well, I've been working in the gaming industry pretty much on an exclusive basis for about 30 years now. Started my career in public accounting here in Las Vegas. Being in Las Vegas, of course, most of our clients were all gaming clients; that really encompassed both the operating side, the casino operating side of -- of gaming, as well as on the technology side of gaming.

So started my career there. Proceeded to work with a number of kind of leading gaming technology companies, all of which happened to be public companies at the time. That would -- that's what I would -- just -- and a number of senior level of finance and, you know, operating positions. Subsequently worked for a few of the casino operators, one regional casino operator called Tropicana Entertainment, as the CFO, and a -- another regional casino operator called Herbst Gaming, another regional owner and operator of casinos and -- and slot routes for the past -- that -- that would -- that's

Page 11

what I would refer to as essentially my corporate career, if you will, for the past, I guess, 15 years or so. I'm back on the client service side, previously working with a similar firm to my own firm now, called Union Gaming, where we were an advisory and consulting firm focused exclusively on the global gaming industry. At Union, our -- our mandate was really global, more global in orientation.

And so there, I was serving as a managing director for about eight years with my own firm now, GGHM. With my three partners, we've been together for about six years, again, focusing primarily ex- -- on -- on the -- on the gaming industry, mostly domestic, mostly U.S., a little bit of international. And when I say "mostly," what I mean there is some of our travel gaming clients will pull us into things that are tangential to the gaming industry and other investments and other businesses that they own, but primarily, we hold ourselves out as gaming experts that are focused exclusively on the gaming industry.

Q. All right. And -- and -- and in the -- your expert testimony here, are you giving that in your personal capacity or -- or is that your -- your company is -- is providing the expert services?

MR. GLENN: Objection. Form.

Page 12

THE WITNESS: Yeah, I'm not sure if I really understand the question.

But, I mean, I'm -- our firm, GGHM, I'm one of the partners. I have three other partners, but this -- my -- my report is based on -- it's my report, and certainly in -- in performing the work and the analysis supporting the report, I may have drawn on some of our internal resources of our company, but ultimately, it's my report.

BY MR. CIARDULLO:

Q. Okay. I want to ask a little bit about your history with -- with the defendants. I'll -- I'll preface this by saying that: At no time am I asking you to reveal the substance of communications with them, unless we somehow get into that, but I do want to ask some questions that relate to your engagement.

My first question is: When were you first engaged by the defendants?

A. Let's see here. I believe mid-January-ish --

Q. Okay.

A. -- I recall.

Q. And had you previously been familiar with any of the defendants?

A. Well, sure. I mean, just -- just from a -- from a -- the -- the gaming industry is a -- is a --

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 25

Those are kind of the -- the kind of -- and I'm -- and I'm not talking about just Commerce now; I'm talking just generally, kind of U.S. gaming, live table gaming markets. I think those are -- those would be ano- -- and I'm just trying to think if I'm missing anybody here, but I think generally that that's who would come to my mind.

Q. So specifically as to the smart card shoes, who would you understand or expect to be providing that to Commerce Casino?

MR. GLENN: Objection. Form.

THE WITNESS: Well, again, I -- I would be speculating here. I mean, I -- by virtue of some of the information that I was provided as it relates to this case, I could see that it -- it -- that -- if I'm understanding correctly, the evidence correctly, that Paradise had some of their technology there at one time, and then at some point, Empire had some technology there, as I understand what I've -- what I've read.

Beyond that, I would assume Light & Wonder because they're -- they're just -- they're -- they are, by far, the biggest provider of table game technology and content domestically, so that -- that -- that would be my assumption.

Page 26

BY MR. CIARDULLO:

Q. Uh-huh. What about the -- the trend boards? Who -- who would you expect or understand to be providing the trend boards to Commerce Casino?

A. I think it's --

MR. GLENN: Object to form.

THE WITNESS: Yeah. I mean, I think it's just some combination of the same companies that I referred to. Look, that's not to say that there may not be some other smaller technology providers out there that, perhaps, I'm not as generally aware of, but I'm just speaking generally.

I -- I believe, between Light & Wonder, AGS, and Galaxy Gaming -- and remember, my former employer, Shuffle Master, at one time, was really the kind of dominant provider of table technology, mostly shufflers, which was subsequently acquired by Light & Wonder -- well, formerly Scientific Games, which is now Light & Wonder.

So, yeah, I mean, just -- just broadly, I believe those three companies encompass the majority of the market share across live table game operations domestically.

BY MR. CIARDULLO:

Q. Uh-huh. Were you ever acquainted with

Page 27

Mr. Haig Papaian, the former CEO of Commerce?

A. No, I -- I don't ever -- I -- I just know the name, but I don't ever recall meeting him, and certainly have -- and I have no relationship.

Q. Uh-huh. Have you ever met Jeff Harris, the current CEO of Commerce?

A. I have, yeah. Yeah, I've met Jeff. Over the -- over the course of the last -- I don't know -- five years, I may have met with Jeff two or three times.

Q. Uh-huh. Was that in connection with that engagement you described with Commerce?

A. You know, I don't recall really working with Jeff much on that. We worked mostly with -- the CFO at the time was a gentleman named Ileana Harris. I don't -- so I don't really remember meeting or spending much time with Jeff during that work.

I have another existing client that has an existing relationship with Commerce, and in the -- in -- in the course of performing that work, I have met and had been on property in meetings with Jeff, as I mentioned, probably two or three times in the last two or three years.

Q. Uh-huh. Have you had any discussions with anyone at Commerce Casino regarding this case?

Page 28

A. No.

Q. Okay. Going back to your -- your report in this case, I believe you said that you were engaged for that this past January 2026?

A. Oh, for -- for this particular -- I -- I believe so. Again, I can -- I can pull my engagement letter, if you'd like, and re- -- and tell you the exact date, but sometime in January, I believe, is when I was formally engaged.

Q. Well, and just to confirm, have you been engaged by the defendants for any other purpose at any time?

A. No.

Q. Okay. And approximately how much time would you estimate you spent in -- or how -- let me rephrase that.

Approximately how much time would you say you spent preparing your report?

A. Forty -- well, just -- just what -- just to be clear on the question --

Q. Uh-huh.

A. -- I mean, just the -- there's -- there's the research, there's the analysis, and then there's the actual writing of the report, so I would say, in total, 40, 50 hours.

Richard "Rich" Baldwin

Page 29

Q. And do you mean that to be -- that's your own time, or is that the combination of your time and your colleagues'?

A. That would be my time. I would say, with the addition of my colleagues, maybe another 15 to 20 hours.

Q. Okay. Let me do something here, just to have it for reference.

MR. CIARDULLO: I'm going to introduce your report as the -- Exhibit 1 to the deposition.

(Deposition Exhibit 1 was marked for identification.)

BY MR. CIARDULLO:

Q. And what I'll do here -- you may have it with you, but just so we also have it circulated is I'm going to drop it into the chat as a document there. So this is the -- and --

A. I do have -- I do --

Q. Mr. Baldwin --

A. Sorry to interrupt you --

Q. Go ahead.

A. -- but I do have my report in front of me, so if I'm looking down --

Q. Okay.

A. -- if I'm looking down, it may just be easier

Page 30

for me to work off of the hard copy, just so you're aware.

Q. And that's -- that's fine. That -- that's probably simpler.

MR. CIARDULLO: For the court reporter here, we'll -- we'll call this "Exhibit 1" to the deposition, and I -- I just put it in the chat, so --

THE COURT REPORTER: (Indicates affirmatively.)

BY MR. CIARDULLO:

Q. And, Mr. Baldwin, you can feel free to reference this at any time, with the questions.

MR. CIARDULLO: I'll also note this was marked as confidential under the protective order.

Counsel, do you want to designate any testimony about this confidential at this time, or maybe you and I should discuss that on a break, maybe, and go back on the record and designate that later?

MR. GLENN: We'll see where it goes.

MR. CIARDULLO: Okay. All right. So we'll -- we'll follow up a little bit later about any confidentiality designations for the deposition.

BY MR. CIARDULLO:

Q. First of all, let -- let -- let me ask you this question: What do you understand your -- in -- to your own mind, that you have been offered to

Page 31

provide expert testimony on in this case?

MR. GLENN: Object to form.

THE WITNESS: To -- well -- well, I'm sorry. I'm not sure I completely understand the question, but what I have done is provide my expert opinions and rebuttal report to -- and sorry. I -- there's so many names, so I want to make sure I don't miss- -- miss- -- misspeak anybody's name here -- Mr. Nelson and Mr. Doyle, primarily.

BY MR. CIARDULLO:

Q. Okay. To your mind, what is your expertise in that you -- you're offering opinions on?

MR. GLENN: Object to form.

THE WITNESS: Well, I think there's a number of areas here. I mean, just over the course of my professional career, having spent 30 years in -- in the industry, in different capacities, certainly just my -- my general knowledge of the dom- -- domestic gaming market, obviously, including Nevada, just across every vertical of gaming, whether it be casinos, land-based casinos, whether it be slot routes or other forms of distributed gaming, the various technology providers, as I've been discussing a little bit here.

You know, as a firm, both at my -- you know,

Page 32

even when I was on the corporate side and with my former firm, Union Gaming, and with my existing firm now, I mean, you know, we track all of the markets every month, right? So we're -- we're just kind of staying in tune of what's happening, essentially, across the industry, in every market, as best as we can, you know, based upon information that's in the public domain and obviously, the work that we're doing with our various clients or have done and just the continual -- the dialogue that we have with many of our advocates and folks across the industry, so --

You know, generally, you know, that's all we do when we consume gaming, as a firm and individually. And we spend lots of time traveling. More than I would prefer probably. But we spend lots of time traveling and spending time in casinos, meeting with and talking to casino managers, et cetera. So I think that's how I would -- I would -- I would offer that in my kind of capacity as kind of a gaming advisor and consultant over the past 15 years or so.

In my former corporate life, as I like to say, you know, obviously, a -- a significant amount of -- of knowledge there, just being in a senior -- being a senior executive of us and pretty successful companies that span many gaming markets, both domestically and

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 33

internationally. And so I don't know. Hope -- hopefully that answers the question, but if -- if you -- if there's something more specific, you know, I'm -- I can certainly try to answer that.

BY MR. CIARDULLO:

Q. No, I -- I -- I appreciate that.

And we may have tread through this already, but just to confirm: To your understanding, the engagement with defendants in this case, is it with -- with your company or with you?

MR. GLENN: Object to form.

THE WITNESS: Well, if I go back and look at the engagement letter, I think it's in the name of our -- of our company, but, again, it's my report.

BY MR. CIARDULLO:

Q. Oh, and understood. I -- I -- I was just trying to get clarity on the -- you know, the -- whether you were performing this engagement somehow outside the scope of your current business.

A. Oh, no, no. No, no.

Q. Okay. So you -- you would consider this to be work performed by your company? Or in other words, it was -- let me rephrase that.

This was work performed by you in your capacity as a representative of your company or as

Page 34

a part- --

A. Or as a managing partner of the company, yes.

Q. Okay. Do you have any degrees in finance or accounting? I see -- well, I see on your C- --

You're a CPA; is that correct?

A. I am, yeah. I'm still a licensed CPA in Nevada, so my undergraduate degree is in accounting, and then I have an MBA as well.

Q. Okay. Do you -- do you do any accounting work professionally?

A. No, we do not provide any, as the accountants would -- would refer to in the profession, any type of attest work. No, we're not rendering any opinions on financial statements. We're not -- we don't -- we don't touch the general ledger of our clients. We don't do any accounting or bookkeeping or any of those types of services.

Q. Uh-huh. And in this case, you're not providing any opinions that relate to financial or accounting issues; is that correct?

MR. GLENN: Object to form.

THE WITNESS: Can you -- can you be a little more specific with your question?

BY MR. CIARDULLO:

Q. Yeah. So -- and this goes to sort of just

Page 35

putting a finer point on -- on what expertise you're offering in the case.

Maybe I'll ask the question more narrowly: The -- are -- are you pr- -- are you offering any expert opinions on accounting matters in this case?

A. No.

Q. Okay. So you -- you're not opining on any analysis of the financial records and accounting of any of the litigants?

A. No. In performing my work in -- in -- in -- in my report and the opinions in my report, I took the -- the -- the -- whatever financial information was included in Mr. Doyle and Mr. Nelson's report. I did not attempt to audit or verify or perform any accounting on -- on any of those -- on any of those figures.

Q. Okay. And in terms of materials that you relied upon, I understand you have this appendix here, Appendix A, and it lists various documents.

Can we rely on that as an accurate list of the materials that -- that you considered?

A. Yes. The -- the information that I state in my report that I relied upon, yes, that -- that's what I relied upon.

Q. Okay. And I'll include within that -- I -- I

Page 36

see the way it's broken out here is that you also have -- you've identified various deposition transcripts and certain court pleadings and other expert reports that you reviewed.

So including that within my question, does your report accurately identify the materials that you considered for purposes of forming your opinions?

A. Yes.

Q. Have there been any other materials that you have reviewed, since the time that you submitted this report, that you would like to identify that you're relying upon?

A. No.

Q. Okay. I see here that you had reviewed the expert report of Mr. Paul Peterson, who was offered as a rebuttal expert by Defendants.

Do you recall the substance of -- of Mr. Peterson's report?

A. Hmm, I --

MR. GLENN: Object to form.

THE WITNESS: -- I -- I -- yeah, I might need you to pull it up to refresh my memory a little bit there.

BY MR. CIARDULLO:

Q. Okay. Well, let -- let me also ask something else: In the time since your report, there have been

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 37

depositions of various expert witnesses.

Have you reviewed any of the transcripts of those depositions?

A. I recall reading the transcript of Mr. Nelson and Mr. Doyle. I -- I think that's it. I believe that's it.

Q. Is there anything you can recall, based upon your review of those deposition transcripts, that -- well, I'll -- and I'll come back to that. We'll -- maybe we'll look into that in more detail.

But going -- going back to Mr. Peterson, so I'll -- I'll represent he -- he was offered as a rebuttal to Mr. Nelson on the topic of damages, and he provided various opinions relating to that.

A. (Witness nodded head up and down.)

Q. Does that refresh your memory as to Mr. Peterson's testimony?

A. A little bit. I really didn't focus a lot of my effort on that; I focused more -- most of my effort on Mr. Nelson and Mr. Doyle's reports.

Q. Are you familiar with the concept of a "damages expert" in litigation?

A. Yeah, sure. Generally speaking.

Q. Uh-huh. Do you consider yourself to be a damages expert?

Page 38

MR. GLENN: Object to form.

THE WITNESS: Have I ever -- well, I -- I would consider myself a gaming expert. I would consider myself a -- a finance and accounting expert.

In the context of litigation, have I ever provided written testimony in serving as a damages expert? No.

BY MR. CIARDULLO:

Q. Okay. From your experience and, otherwise, being an expert in -- in litigation, are you familiar with the role of a damages expert in a case?

MR. GLENN: Object to form.

THE WITNESS: I would say generally, yes.

But whatever nuances there might be for someone that holds themselves out as an expert in that particular niche of expertise, I would probably say no.

BY MR. CIARDULLO:

Q. Do you believe that you're acting in the capacity of a damages expert in -- in this case?

A. No.

MR. GLENN: Object to form.

THE WITNESS: Oh, sorry.

No.

BY MR. CIARDULLO:

Page 39

Q. So would you say you're -- you're acting as a -- sort of a gaming industry expert?

MR. GLENN: Object to form.

THE WITNESS: Yes.

BY MR. CIARDULLO:

Q. And, now, obv- -- obviously, your report describes it, but just in your own words: What -- what opinions of Mr. Nelson's, the plaintiffs' damages expert, do you feel that you're rebutting?

MR. GLENN: Object to form.

THE WITNESS: Well, I -- I would rather kind of just -- I mean, if we want to -- if we want to have this -- if we want to go down this path, if you will, it might just be easier to just walk through the report and just go through each of the -- the various sections, if you -- if you'd like.

BY MR. CIARDULLO:

Q. Well, I was just looking to -- to -- to get, you know, sort of a one- or two-sentence summary of what you understand your rebuttal position to be.

Are you comfortable saying that? Or if not, I mean, we -- we can go to other questions. I -- I was just looking to get a basic un- -- understanding from you of what you understood your rebuttal to Mr. Nelson to be.

Page 40

A. Well, I'd like --

MR. GLENN: Object to form.

THE WITNESS: Yeah. I mean, if, I -- I, you know, essentially read both of those reports and was asked to, based on my experience and -- as a gaming expert, a gaming industry expert, rebut the various opinions within those reports.

So, again, I think, rather than just kind of speak generally, I think if we -- if we'd like to -- I'm happy to go through each one of them, in -- in as much detail as you'd like, but I'd rather not just generalize.

BY MR. CIARDULLO:

Q. Okay. It's something that -- that we're allowed to ask as attorneys is if you were provided with any facts to assume by counsel, so obviously, you have this list of materials that you considered.

Can you recall, sitting here today, that you were told to assume certain facts to be true or not true for purposes of your opinion?

A. No.

Q. Okay. Have you conferred with Mr. Paul Peterson in preparing your report?

A. No.

Q. Have you spoken to him at any time?

Richard "Rich" Baldwin

Page 41

A. No.

Q. In looking at your -- in looking at your report -- maybe I missed it somewhere, but did you have any direct conversations, such as sort of doing an interview with any of the defendants directly?

A. No.

Q. Are there any other persons who you interviewed for your report? and exclude from this discussions with counsel, but are -- are there any other people that you interviewed for purposes of your report?

A. No.

Q. Okay. So Mr. Nelson, one -- one of the experts who you're rebutting, is the plaintiffs' damages expert, and in his report, he put forward a few different theories of -- of damages.

Do you -- do you recall that?

A. Yeah, gen- -- generally, yes.

Q. Do -- do you -- do you recall specifically what damages theories he presented?

A. Well, again, I'm happy to refer to each of them here in what I -- what I included in my report or even refer -- ref- -- refer in his report, but generally, what I understood, the numbers I saw in his report were essentially monies that were provided by

Page 42

Paradise, either -- either directly or indirectly, on behalf of, I believe, LT Game Canada.

Q. Uh-huh.

A. And so I -- what I kind of understood was essentially an accounting of the dollars that were spent and the areas they were spent in and then whatever revenue or benefit they received in return, as a result of the sale of -- of -- of -- of those products.

Q. There's been discussion among some of the experts regarding a company called "F2" in California.

Are you providing any opinions relating to that?

A. No.

Q. Okay. And -- and just to sort of round that out, the issues there relate to California gaming regulations.

Do -- do you hold yourself out as any form of an expert on California gaming regulations?

A. Well, I wouldn't -- I'm not sure I would call myself an expert on the regs, but I am familiar with -- I don't know what the right word here is -- kind of the -- the format or the structure of -- of how card rooms operate and why they're different than a traditional casino.

Page 43

And so, you know, I'm happy to elaborate on that, but as far as am I an expert in -- on the reg- -- like, with -- within all of the California gaming regulations? No, I -- I -- I wouldn't say I am.

Q. Well -- and I guess more to the point: You -- you're not providing any opinions in this case pertaining to California regulations; is that right?

A. That's correct.

Q. Okay. One of the issues that's discussed in Mr. Nelson's report is a -- a deal that occurred with a company called "Solution Gaming."

You're not providing any opinions about the Solution Gaming transaction specifically; is that correct?

A. Correct.

Q. Okay. If you go to Paragraph 14 of your report --

A. Okay. One moment. Just give me one second here.

Q. Uh-huh.

A. Okay. Yep, I have it.

Q. Yeah. This is -- this is -- yeah, Page 5 of -- of this report that we're calling "Exhibit 1."

And it says, [as read]:

Page 44

Plaintiffs' complaint alleges, among other things, that LT Game, Inc., was not successful in the U.S. and likely not -- will not -- will not be successful in the near future, solely because of Defendants' actions. This allegation requires that Plaintiffs otherwise did and are doing everything necessary to enter and become a successful gaming business in the U.S. and Nevada gaming markets.

So does your analysis of Plaintiffs' position turn on an assumption that the plaintiffs or other responsible parties to, as you say -- that they did everything necessary to enter and become a successful gaming business in the U.S.?

MR. GLENN: Object to form.

THE WITNESS: Yeah, I'm not -- I'm not sure I understand the question.

BY MR. CIARDULLO:

Q. When you say the -- the -- that -- that you're -- the allegations require that Plaintiffs otherwise did -- talking about the past -- everything necessary to enter and become successful in the gaming business, what actual people are you referring to there?

A. Well, I'm -- I'm sorry. Let me just -- okay. I'm on Page 5 of 33 here at Paragraph 14.

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 45

Q. Yes.

A. This is just background, as I understood it --

Q. Uh-huh.

A. -- so I -- I don't see that I'm stating any opinion here. This is just the -- the background or -- or what the -- what the plaintiffs are -- are alleging.

Q. Yep.

A. So are you referring to another section in the report where I -- where I may have offered an opinion?

Q. Well, I do think that this -- the statement or ones like it are, otherwise, made in the report as well.

I guess what I'm trying to understand is: When you speak about Plaintiffs -- well, to your understanding here, as you're referring to them in the sentence, what -- what people are those? Who -- who's -- who are the people behind the plaintiffs, to your understanding here?

A. Who are the people behind the plaintiffs? My understanding --

MR. GLENN: Objection. Form.

THE WITNESS: Yeah. Okay. Sorry.

My understanding of the plaintiffs are para- -- I'm -- I'm read -- it -- it's -- it's written

Page 46

right here, in Paragraph 13, [as read]:

"Plaintiffs" are defined as Paradise Entertainment Limited, LT Game, Inc., and LT Game Limited, collectively "Plaintiffs."

BY MR. CIARDULLO:

Q. And do you know who the managers of the plaintiffs are?

Well, let me put it this way: During the time period, let's say, 2017 to 2023, do you know who the managers of the plaintiffs were during that time period?

A. Well, I would say during that time period, I -- I don't recall having any recollection of who the -- I think you said the word "managers" --

Q. Uh-huh.

A. -- but as a result of reading the information that I was provided that -- that's listed here, all of the information that I relied upon in writing my report, then yes. Then I -- then I became aware of who -- who those -- who those managers were at that time.

But -- but during that time, I don't have any recollection of who the various managers were of these various entities, other than -- I mentioned earlier -- I was familiar that Jay, Jay Chun, was the CEO and, I

Page 47

believe, founder of Paradise.

BY MR. CIARDULLO:

Q. Well, and -- and so today, do you know who the managers of the plaintiff entities were during the time period, approximately 2017 to -- to 2023? And I'll -- I'll just explain. By managers, I mean, like, the -- the C-suite and anyone else who's sort of in management, who- -- whoever you would know.

Do you know who the managers of the plaintiffs were in the 2017 to 2023 time frame?

MR. GLENN: Object to form.

THE WITNESS: Well, I'm -- you know, I'm trying to answer what you're asking me, so I'm -- I'm -- I'm --

So again, "the plaintiffs" being Paradise Entertainment, the only manager, if you will, that I would have had any, at least, name familiar- -- familiarity with would have been Jay.

As far as LT Game, Inc., and LT Game Limited, having read what I read as in -- in -- as background on -- on the case, I believe the managers of eith- -- of -- on the case, I believe the managers of eith- -- either some combination of LT Game and some combination of LT Game Limited were the defendants: Frank, Kelcey, the other gentleman -- I'm for- -- forgetting his name now.

Page 48

And there was one other person referenced, but that's based on what I'm being pre- -- presented here as evidence. I really wouldn't have known otherwise.

BY MR. CIARDULLO:

Q. Okay. Using that, that definition, your second sentence of Paragraph 14, would this necessarily mean that the defendants, then, were also doing everything necessary for LT Game, Inc., to become successful?

MR. GLENN: Object to form.

THE WITNESS: Yeah, that -- that just seems like speculation. I'm not sure I'm comfortable speculating.

BY MR. CIARDULLO:

Q. Uh-huh. Are you familiar with the type of damages called "lost future profits"?

A. Again, I'm not a -- I wouldn't consider myself a -- a -- a damages expert, but, I mean, as a -- as a -- someone with an accounting background and having been a CFO of a few different companies and -- it -- it seems pretty straightforward to me, what -- what that means.

Q. Uh-huh. And the plaintiffs are not seeking lost future profits remedy in this case; is that correct?

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 49

MR. GLENN:  Object to form.

THE WITNESS:  I'm sorry.

Can you repeat that?

BY MR. CIARDULLO:

Q.  The -- the plaintiffs are not seeking a lost future profits damages remedy in this case; is -- is that correct, to your understanding?

MR. GLENN:  Object to form.

THE WITNESS:  I -- I don't -- actually don't recall.  But, I mean, I can -- I can -- I can look.  I -- yeah.

BY MR. CIARDULLO:

Q.  In -- in -- in your report, you refer to the -- sort of a term called "but for," so damages but for the defendants' misconduct.

Do you -- do you recall that?

A.  Yeah, gen- -- yes.  I mean, I would want to specifically look at where it's referenced, but -- but yes.

Q.  Okay.  And -- and actually, that -- here, let me -- that may be helpful.  One moment.

So if you go to, for example, Paragraph 87 of your report --

A.  Yes, just one second.  Yeah, let me just get there real quick.

Page 50

Q.  It's at Page 20.

A.  Okay.  Yeah, 8- -- Paragraph 87.  Maybe just give me a second to refamiliar- --

Q.  Sure.

A.  -- refamiliarize myself here.

(Witness perused document.)  Okay.

Yeah, I -- I -- I read Paragraph 87.

Q.  Okay.  This paragraph also makes a reference to something called "unjust enrichment," and I'll ask about that in -- in reference to the -- the "but for" terminology.

From -- according to my search function here, this reference to "unjust enrichment" is the only one in your report.

Do you know what unjust enrichment is as a legal remedy?

MR. GLENN:  Object to form.

THE WITNESS:  As a -- as a legal remedy, no.

BY MR. CIARDULLO:

Q.  Okay.  Now, apart from it having been mentioned in this one spot in your report, you don't do any other analysis of unjust enrichment for purposes of your opinions, correct?

A.  Yes, correct.

Q.  Okay.

Page 51

A.  Well, I mean, I -- I -- I would have to go back and read every page here to -- to -- to make sure that's accurate, but -- but I'm just reading the one paragraph here where I refer to that.

I don't -- I don't recall, off the top of my head, if there was any other sections where I did.

Q.  And so going back to the -- the terminology "but for," is your analysis premised on a theory of "but for" an action of a defendant that the plaintiff, otherwise, would have made more money, essentially?  Is -- is that the -- the -- sort of the -- the context in which you're assessing or rebutting the damages theories?

MR. GLENN:  Object to form.

THE WITNESS:  Okay.  Again, I just want to make sure I understand what you're asking me.

BY MR. CIARDULLO:

Q.  Sure.

A.  Are you asking just generally, or are you asking me about what I'm saying here in Paragraph 87?

Q.  More generally.  It doesn't -- it's not just limited to Paragraph 87.

Let me ask it this way:  What -- what is your understanding of -- and here, there's another instance of you mentioning "but for."  If you go to

Page 52

Paragraph 89, it's the second line up from the bottom of Page 20, the same page.  You reference the "plaintiffs' but-for causation theory."

What is your understanding of what that means, "the plaintiffs' but-for causation theory"?

A.  Yeah.  Let me -- let me just read this paragraph, 89, here, if I -- if I can, for a second.

Q.  Sure.

A.  Just -- just give -- just give me a minute or two here.  (Witness perused document.)

Okay.  I read 89, and I'm looking at the chart, so -- so your -- I'm sorry.  So your question is?

Q.  Well, what do you mean by, as you say here, the "plaintiffs' but-for causation theory"?  What -- what is -- what do you mean by that?

MR. GLENN:  Objection.  Form.

THE WITNESS:  Well, I'm -- what I'm -- well, I guess what I'm stating here is, is that, as I'm understanding the -- the evidence or the allegations, we're -- we're just trying to -- trying to come up with the right words here, that -- that were it not for the distributor doing -- or -- or doing the things that they were alleged to be doing, that plaintiffs would have, otherwise, been successful in

Richard "Rich" Baldwin

Page 65

knowledge of a market that they are looking to penetrate with a competitive product, I think it's reasonable to assume that one would want to -- if -- if they don't already possess that knowledge -- which some may; some may not -- to the -- and even if some possess knowledge, right, there -- there may be more knowledge to gain, right? So --

But under that presumption, sure, I think it's reasonable to assume that they might want to work with an advisor or consultant or somebody that could help -- help them understand the market, perhaps, better than they might -- may already or may not -- in other words, they may already have some understanding or may have no understanding.

Again, I'm kind of talking in the theoretical world here, but I'm trying to answer your question.

BY MR. CIARDULLO:

Q. Yeah. No, no, no, and I appreciate that.

If -- if -- well, let me ask this: Have you ever consulted for any companies that were trying to enter into the gaming market as a new distributor or manufacturer?

A. I don't recall being retained specifically for market entry strategy. We have certainly worked with some of the smaller -- what I -- what I would refer to

Page 66

as the smaller -- or manufacturers that are trying to break into, but not necessarily at the formation stage; a little bit later stage.

Q. Okay. What kind of work have you done for smaller manufacturers or distributors that were sort of at an earlier stage of trying to get into the market?

A. Primarily, trying to help them raise capital.

Q. Okay. So do you feel that you have a good understanding as to the quantities of money that are required in order to be successful in entering the market as a manufacturer or distributor?

A. Yes.

Q. If Paradise had come to you in approximately 2016 and said that they would like to enter into the U.S. market as a manufacturer or distributor, would you have had any general advice for them as to the amount of money they should be prepared to spend to do that?

MR. GLENN: Object to form.

THE WITNESS: Well, it's -- okay. If -- if -- if we were asked in -- in the -- in the -- in the course of our -- of our -- of our company -- which we're an advisor and consultant to the gaming industry -- if a manufacturer came to us and said,

Page 67

Hey, we're thinking about entering a new market. A, do you want to work with us? And how can you help us? Well, sure, I think that we'd entertain that opportunity.

And ultimately, you know, that could take many different forms, in terms of what they might want us to do or ask us to do, but -- but do I feel that we would have been in a position to -- or myself and my -- my team -- to help them understand the cost and the time and the effort involved? Yes.

BY MR. CIARDULLO:

Q. Well, what I'm trying to get to -- you don't have to be, you know, precise, but I just want to get a general sense of: If they had asked, Hey, look, what's this going to cost us, if we want to become a manufacturer and distributor in the U.S. market? We want to get licensed in major jurisdictions, including Nevada, as a manufacturer or director. What would you have roughly said that they should be prepared to spend in order to do that?

A. Yeah, that's a --

MR. GLENN: Object to form.

THE WITNESS: Yeah, that's a -- that -- that -- the answer to that is it depends, right?

BY MR. CIARDULLO:

Page 68

Q. Yes.

A. I mean, if one is -- if one is saying, we want to bring a product that doesn't exist, and we want to develop it specifically for a specific market --

Q. Uh-huh.

A. -- that's one scenario; if it's, we have products, we want to try and figure out a way to get these existing products into a single market or multiple markets, that's a different scenario.

Q. Yep.

A. Re- -- re- -- and I could probably name several different scenarios, right? I think -- but in any of those scenarios, right, I think the expectation that we would have set with our -- with a client under those circumstances would be: It will be tens of millions of dollars, if not more; it will likely be a significant amount of investment and resource and time because there's just a lot of good precedent for that happening with just about every kind of new -- and a lot that have failed, right, for those that have been successful. And, again, it's a question of: How do you define "success," right?

But ultimately, it's an extremely capital-intensive business, and it's an extremely competitive business. You know, if you go back,

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 69

you know, 30, 40 years ago, you know, things were a little different, right? I mean, you know, the -- the -- the -- the casinos were opening up at a very fast rate, and there weren't as many manufacturers. Budgets for slot machines were -- were kind of endless, if you will, but over the past, call it, five to ten years, maybe a little bit longer, I mean, the U.S. market, both domestically and commercially, is maturing. There certainly are some new markets that are opening up, but by and large, you know, you're seeing a shrinking of slot floors and a shrinking of the overall install base of slot machines domestically, which just makes the marketplace even more competitive than it was years back, right?

So certainly we would have tried to help educate, under that scenario, that in order to be successful for the long term, it's going to require a significant amount of investment.

Q. Uh-huh. And being a bit more specific, you know, and trying to pull it back a bit more to Paradise, you know, assume, for purposes of my question, you have a company that already has manufacturing capacity to make slot machines, and they also want to distribute table games, but it's -- you know, it's -- it's an existing business; they're

Page 70

not starting totally from scratch, but they're just not in the U.S. market yet.

Does that change your answer at all? In other words, you -- or would you still say that -- that you'd tell them, generally speaking, it's going to be in the tens of millions or more to -- of investments to break into the U.S. market?

MR. GLENN: Objection. Form.

THE WITNESS: I mean, I don't really think it changes the answer much because I can speak for my own experience. When I was a CFO of Shuffle Master gaming, you know, we acquired an Australian manufacturer of electronic table games and slot machines, and breaking those markets into the U.S. proved to be extremely difficult, and we were a pretty large, successful company with lots of resources, and that proved to be quite the challenge.

And -- and -- and I can cite other examples -- and I do in my report -- where you do have large, very well-funded and established gaming technology providers that have found success in other parts of the world that look to the U.S. market, which many of them do because the U.S. slot market is the biggest market, by far --

BY MR. CIARDULLO:

Page 71

Q. Uh-huh.

A. -- and on Internet -- Macau being the largest table games market, right? But the U.S. market being the largest slot market, so, of course, many of those companies that profile -- which, again, I mention some in the report -- they set -- at various points in time, they have set their sights on the U.S. market and wanted to break in with -- with existing know-how and having -- with -- with -- with some gaming technology. And some have succeeded; some have failed. And those that have succeeded, it -- it's -- it's -- you're in it for the long haul.

Q. If -- if someone seeking to enter the U.S. market had hired a consultant to try to advise them on the subject matter that you discuss in Section 3 of your report, concerning costs and challenges of entering the market, and that consultant had not been able to provide their client with the kind of information that you provide in Section 3, would you say that that consultant had done a poor job advising the client?

MR. GLENN: Object to form.

THE WITNESS: Well, look, we're speculating here a little bit, but I -- I can only speak to how I would approach a situation like that. And in a --

Page 72

and, again, it just depends on the business plan, right? I mean, what -- what is -- what is the business plan? What is it that you're seeking to do?

And if you're -- if you're -- you know, what -- are you seeking entry into a particular market? Are you seeking entry into a particular region? Are you seeking entry -- you know, what -- what is your -- what is the business plan, right? I think you've got to start fundamentally there --

BY MR. CIARDULLO:

Q. And --

A. And then --

Q. Go ahead.

A. And in establishing that business plan, you have to think multiyear. Okay. Let's say we're successful with, you know, Phase 1, you know, what's Phase 2? what's Phase 3? what's Phase 4? Like, where -- where do we want to go with this, right? And I think you have to recognize that every step of the way you're going to need capital to continue to get to the next phase, right? In other words, you're not going to just grow your way into becoming -- it -- it's just -- there's -- there's -- there's no precedent for that, really.

What -- what -- what we've seen for companies

Case 2:24-cv-00428-JCM-BNW   Document 195-3   Filed 07/31/26   Page 14 of 28

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 73

that have had any level of success coming into the U.S. market is -- for example, right, they might -- they might get lucky right out of the gates and develop a hot game, right? and that hot game -- even the hottest games, right? their -- their shelf life is 6 to 12 months, and so you can't just reap the rewards and the profits off of that game. You have to continue to reinvest in the business, right, and continue to develop your -- your game content and your library and your -- your con- -- your execution capabilities, your sales, your service, your marketing, your everything.

So, you know, for -- for -- for me, if -- under that scenario that you just described, you know, it would have been very focused on: What's the short-term plan? what's the midterm plan? what's the long-term plan? And try to set some realistic expectations that highly likely you're going to be losing money for several years, given the capital intensive nature of the business, and at some point, you might get to scale where you're actually -- you can continue to reinvest at the rate that you need to reinvest and, also, start to be profitable.

Q. Would -- would a reasonably prudent industry consultant have been aware of the information that

Page 74

you're providing in Section 3 of your report?

MR. GLENN: Objection.

THE WITNESS: It's hard to say -- I mean, it's hard to say. I mean, there's a lot of consultants that are out there that claim to be experts and -- and consultants, and -- and, you know, frankly, many of them don't have the experience that I do.

And so I really -- you know, that calls for speculation. You asked me what I would do and how I would approach it. There's lots of folks out there holding themselves out to be gaming experts and consultants that may not know what they're doing.

BY MR. CIARDULLO:

Q. Well, and acknowledging that, I'm referring to people that you would consider -- that do know what they're doing.

So for someone you would consider to be a reasonably prudent gaming industry advisor, would you expect them to be aware of the type of information that you've prevented -- presented in Section 3 of your report?

MR. GLENN: Objection.

THE WITNESS: Again, it's hard for me to -- yeah, sorry.

Again, it's hard for me to speculate there.

Page 75

I -- I don't know what knowledge they possess. I don't know what experience they have.

I know what I have, and I know what I've experienced, and -- and I know what I've experienced firsthand as a CFO of -- of a public company that was very successful in the U.S. and struggled to break into the U.S. market with electronic gaming products, just given the -- how competitive the market is and continues to be, and I've seen other clients of mine with similar struggles.

BY MR. CIARDULLO:

Q. Do you have an awareness, based on your experience, of -- of the kinds of advice that -- that other gaming industry consultants give to companies that are trying to enter the gaming market?

A. I don't really understand the question. I'm sorry.

Q. Well, you -- you have a -- a -- a history of providing, in one form or another, consulting services to people in the gaming industry.

What I'm trying to understand is -- is: In -- in your time doing that, have you developed any sense of what the sort of standard is among people who provide consulting services to companies that are trying to enter the gaming market, in terms of what

Page 76

kind of advice they give and, you know, how -- how well researched it is?

What is your understanding of the type of consulting services that other gaming industry professionals provide to companies that are trying to enter the market?

A. Again, it's hard for me to -- it's hard for me to speculate there. I -- I can only speak to what I -- well, how -- what I would do, what we can do, based on our own experience and our own knowledge, how others might approach it, at whatever standard the -- you're -- you're suggesting there might be.

Q. Uh-huh.

A. To me, it's just case specific, right? Everything is case specific. Everything is -- and -- and, you know, it's a moment-in-time kind of thing, right?

Q. Uh-huh.

A. If you ask me that question today versus five years ago versus ten years ago versus 15 years ago, right? I mean, the marketplace is dynamic and competitive and changing constantly, right? And so, to say that there's a standard --

I know what my standard is, and my standard would be what I've explained to you. And when working

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 81

consultant at that time could have provided a reasonably accurate five-year game plan for how much money should be budgeted and what should be done?

MR. GLENN: Objection. Form.

THE WITNESS: Well, again, speaking for myself as opposed to how someone else might approach it, I think the way that I would have approached that situation would to be very conservative in my thinking and to make sure that -- and I probably would have put that business plan together on the basis that -- assume we're going to have a very low success rate in the first five years of launching any new products and we're unlikely to -- to generate positive cash flow for the first -- at least the first five years, if not longer.

The amount of investment it takes, not just in the development of the product and products and any ongoing reinvestment in -- in the hardware and the software and the game content, just the cost of doing business in every state and having the size and scale of the resources to sell, to market, to service, administrative, and all in addition to the development side, right?

I -- I think any -- like, it's -- it's -- that's how I would have handled and would have advised

Page 82

a client under those circumstances.

BY MR. CIARDULLO:

Q. Are there, in fact, people that companies hire, who are consultants, who are -- they hire them as employees to assist them with breaking into the U.S. market?

A. Yes. I mean -- I mean -- I mean -- presumably, yes. I mean, there are -- there are other folks out there, besides myself and our firm, that manufacturers might look to -- to help advise or consult them or -- or -- or get under their employ --

Q. Uh-huh.

A. -- to enter into a -- enter into the U.S. market.

Q. You -- you'd given some examples in your report of other companies that had tried to enter into the U.S. market.

Do you know whether or not they had hired people, either as consultants or employees, who they deemed to be industry experts to help them do that?

A. I can't -- I can't speak to that specifically because, I think -- I mean, the companies that I reference in my report, I mean, you know, they're the -- they're -- the time in which they first had desire to crack into the market, it -- it dates back

Page 83

several years.

So exactly what their strategy was, who they worked with, you know, what their business plans were, I don't have -- I don't have specific visibility into those kind of what I would call "the early formation" of all of that.

Q. Okay. In -- in your opinion, if one wanted to be successful in breaking into the U.S. market, wouldn't they need to have a multiyear plan and budget that they should try to stick to, rather than an ad hoc year-to-year approach?

MR. GLENN: Object to form.

THE WITNESS: I'm sorry.

Would you repeat the question?

BY MR. CIARDULLO:

Q. Yeah. For a company that was serious about wanting to break into the U.S. market -- and I'll say -- you know, we'll say, in these examples -- they are hypotheticals I'm giving -- assume it's for a manufacturer/distributor; I'm not talking about someone who wants to open a new casino. So you could use that assumption for my questions, unless I say otherwise, and that's for -- for a company that wants to break into the U.S. market.

In your opinion, shouldn't they have a

Page 84

multiyear plan and budget that they stick to, rather than doing things sort of ad hoc year to year?

MR. GLENN: Objection. Form.

THE WITNESS: I would say that, under -- under that scenario, one should certainly set out to have a business plan and try to be disciplined in their approach to the market. Because what I've seen and what happens -- again, I'm not -- I'm not really distinguishing between the manufacturer and the distributor; I'm kind of thinking of them as -- thinking of them as one, right?

A -- a man- -- you know, here's what happens, right? Somebody comes into the market; they're trying to break into the market; they show up at a trade show. They get 15 different people from 15 different states saying, oh, hey, I saw your product at the G2E. You exhibited the product. I want five of them, right? And -- and that -- that is a very challenging way to enter into the market where I've seen companies fail. Where I've seen companies have some success is you focus on a single market or a single region and you -- you try and establish yourself as successful whenever you choose, right? It doesn't necessarily have to be -- and it's really whatever the bus- -- whatever the strategy is, right? Some folks find it

Richard "Rich" Baldwin

Page 85

better to -- let's -- let's do something a little less profile. Let's bring a product into a market that is a little bit under the radar, per se, and let's try to find some success there before we go prime time, if you will, into a bigger market and then kind of grow regionally from there.

Because remember, it's not just dev- -- it's not just placing the game, right, and the games? You have to have people in the region that can continue to get in front of the customer, continue to look after the customer, to service the product when there are failures because there's hardware, right? These things fail.

So, really, where I've seen folks be smart about it -- and I can go back to my time at IGT. And, I mean, IGT was really smart about it. In the early years of IGT, that's exactly what they did, is, you know, rather than to be -- rather than try and overstep and be -- be everything to everybody, right, let's be strategic. Let's get into a handful of markets and focus all of our energies there and grow accordingly.

So again, it -- it -- it just depends, really, and I think for me, as somebody who has had a lot of experience in this area, certainly, there's been a lot

Page 86

of learning, and you can see what has worked successfully, and you can see what has not worked successfully. So when I share these opinions, I share them -- they're my opinions. I -- I can't -- I can't speak to what others -- others who hold themselves out to be experts, how they would approach it.

BY MR. CIARDULLO:

Q. So something I'd like to try to get an understanding of -- and I appreciate -- it's hard to be precise, but I'm just looking for your -- your best assessment.

Put yourself back in around 2016, and let's say Paradise approaches you and they say, Hey, you know, we've got a lot of manufacturing capacity to come up with gaming equipment, but we're mostly -- you know, we're not in the U.S. We'd like to --

A. Uh-huh.

Q. -- we'd like to expand into the U.S. We'd like to get into the major jurisdictions in the U.S., and we're willing to do what it takes to do that.

So, Mr. Baldwin, what would you advise that we should do going forward to -- to -- to maximize our -- our chances of success?

MR. GLENN: Objection.

BY MR. CIARDULLO:

Page 87

Q. What would -- what would you have told them, and specifically in terms of, you know, major actions they should have taken and how much money they should expect to spend over -- over the future years?

MR. GLENN: Objection. Form.

THE WITNESS: Yeah. Well, again, I -- I feel like -- and I'm not trying to be argumentative at all by -- by saying this. I -- I feel like I've -- I feel like I've answered that. I'll -- I'll try to answer it again.

I -- I think it's -- it just -- it depend- -- you know, but my advice, under that scenario, would be we need a -- what is the business plan, right?

BY MR. CIARDULLO:

Q. Uh-huh.

A. You've got to start there. And what is the ultimate goal, right? I mean, are -- are you seeking to become the next Aristocrat? Are you seeking to become what I would refer to as, you know kind of a Tier 3 manufacturer, whereby the Tier 1s and the Tier 2s effectively control 90 percent of the floor space? So, like, what is it --

Q. Now --

A. -- what -- what is it that you're seeking to accomplish, right? And there are some companies that

Page 88

might say, I want to be the next Aristocrat. What's that going to take? There may be some that say, I want to be -- you know, I want -- my goal is to get 5 percent of the market, right? So it really just depends.

Q. Yeah.

A. And -- and so I think, under either of those scenarios, certainly if your goal is to be the next Aristocrat, well, all else equal, right? That's a lot more money and a lot more time and -- and -- and -- and a lot more luck along the way. Let -- let's -- let's be real. I mean, there's -- there's certainly some skill in all of this, but there's also luck.

So versus -- you know, I -- I -- my -- my aim is to -- some- -- something smaller, you know, is what I'm saying. So, like, it really just depends, but whatever -- whatever that plan is, it's -- it's a significant uphill battle, and it's a significant amount of time and capital, regardless.

Q. So the reason I'm asking is because I -- I take it that your opinions is that you're critical of -- Paradise did not do what it needed to do to become successful. So my -- my -- I'll put the question this way: What do you think they should have done to become successful?

Case 2:24-cv-00428-JCM-BNW    Document 195-3    Filed 07/31/26    Page 17 of 28

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 89

A. Well, I'm not sure -- I'm not -- I don't know that I've ever criticized them or suggest- -- or being critical of -- of them. I think what -- I'm doing what I'm asked to do, which is look at the evidence, and -- and in doing so, I can see the amount of investment that was made over that -- whether -- whether it was, like, a six- or seven-year period.

And I apologize if I don't have that exactly right. But I can see the dollars and where the dollars were spent, and -- and obviously, a small percentage of those dollars, best I can tell, based on the evidence presented, was actually on R&D; the rest of it was on, you know, human capital and other operating costs, right, that you would need.

So I'm not -- I'm not intending or want -- or suggesting or trying to be critical of Empire. I'm -- I'm just providing my opinions based upon the information that was provided.

Q. Have you formed any opinions about what would have been an appropriate level of investment --

A. Not a specific --

Q. -- other than -- oh, I'm sorry. Go ahead.

A. Not -- yeah. Sorry. Not a specific dollar amount, no.

But, again, having worked for and having

Page 90

visibility to smaller manufacturers that were trying to break into the U.S. market, having seen their financials, having seen the level of investment, having seen, you know, they're several years in and still not making money because of the working capital, intensive nature of the business, as I said, like, it -- it -- you -- you -- the business is not so simple, right? It -- it's not: Build a product, sell it forever.

Q. Uh-huh.

A. That would -- that would assume that product was -- even if -- even if that product was initially successful, you -- it -- the -- the business is much more complex than that, right? You have -- as I -- as I state repeatedly in my report, right, you just have to continually continue to reinvest.

At some point, you get to some sort of critical mass, perhaps, where you've -- you've -- you've -- you've kind of gotten yourself to a point where you can reinvest appropriately and also get a return on your investment, in terms of taking cash out of the business.

But in -- in all of my experience, whether it was on the corporate side or as an advisor or consultant to the industry, it's a multiyear, mill- --

Page 91

you know, tens, if not hundreds of millions of dollars of investment to get to that point.

Q. So if you look at the section headings within Section 5 of your report, specifically under Subsection B, the -- the little (i) -- this is on Page 20 of the report, just before Paragraph 88 -- you state, [as read]:

Plaintiffs did not adequately fund LT Game, Inc.

And then if you go to the paragraphs below that, you know, you're -- you're talking about the funding, in your view, being inadequate.

Are you not able to articulate what you think would have been an adequate level of funding?

A. I can't -- I can't specify a number because I'd have -- it -- it -- it starts with, again: What was the business plan?

Q. Uh-huh.

A. And -- and I think you have to -- you have to approach it that way, right? Like, what is the business plan, and what is an appropriate level of funding for that plan? And business plans evolve, right?

Q. Uh-huh.

A. So what was the initial business plan? If

Page 92

we're successful there, what's the next phase of this? What's the phase after that?

So to -- to just say -- but -- but I can -- but I -- and as I do state in my report, my understanding was the market that the manufacturer and the distributor were most focused on was Nevada and kind of breaking into the Nevada market, which just happens to be the most competitive market.

Q. Uh-huh.

A. And -- and the reason it's the most competitive is, well, it's the largest slot market, so there's just lots of opportunities to sell slot machines in the largest market.

But it's also Nevada, right? So there's this view, right, that if one could have some success in Nevada, that that could open doors for other markets, but I don't necessarily agree that that's the right approach.

I think, as I stated in my report, I've seen others focus on some of the other markets that are, frankly, easier to break into --

Q. Uh-huh.

A. -- for the reasons that I mentioned.

So -- so again, I'm trying to answer your questions as best as I can --

Richard "Rich" Baldwin

Page 97

you want to go direct?  Well, I don't want to spend the money on licensing, or I don't want to get licensed, or whatever the case might be.  So you have to kind of start there.

But regardless, now -- or -- I'm sorry.

But in a scenario where the manufacturer has decided that they want to enter into the U.S. market, whatever the state might be or states, and they choose to work with a distributor, like, my assumption would be, under that scenario, is that manufacturer and distributor are partnering on these decisions.  Like, they're -- they're -- they're -- like, what is the business mod- -- let's work on the business plan together, right?  How much funding is it going to require?  How much time is it going to take?  How are we going to define "success" under the agreement, right?

Like, if I'm the distributor, I want to know: How am I measured?  Am I measured that I'm being successful if I sell a thousand machines? 10,000 machines? 200 machines?  Like, what -- what's the measurement, right?  So it's pretty typical, under those arrangements, that those are the types of things that would be discussed and agreed upon under a business plan, right?

Page 98

So again, I -- I'm -- I'm just speaking to what -- how I would think that, at that moment in time, as the parties were coming together and talking about the market entry strategy, that these are the types of discussions that they were having or should have been having amongst themselves.  Because, you know, for -- for one to say -- for -- for one to be making all those decisions in a vacuum, if you will, doesn't seem, to me, that that's going to bode well for the partnership.

BY MR. CIARDULLO:

Q.  Now -- and, again, what I'm trying to get at here is that in -- in your report -- and looking, again, at -- at the sections that I was just pointing you to, one of which says that, [as read]:

Plaintiffs did not adequately fund LT Game.

The next says, [as read]:

LT Game did not have appropriate staff to break into the U.S./Nevada markets.

I just want to be clear on:  Are you able to articulate what you do think would have been the appropriate level of funding and staff to accomplish breaking into the U.S./Nevada market?

A.  No.  I -- I don't have a specific number that I could state to you today, but what I -- what I --

Page 99

what I said in my report is that it was significantly lower than what others have spent trying to do the same thing and with no guaranteed success of those other -- of those other folks, right?

I mean, that's the best way that I can answer that.  I mean, if -- again, if -- if -- if I -- if I had the benefit of being their advisor in 2016 and laying it all out and saying, here's the business plan.  Let's figure out what it's going to take, that's a lot of work and a lot of effort to do that.

I'm -- I'm not prepared to just state a number; I just know that the number seems very low to me.

Q.  Uh-huh.  And then, now, do you have any -- just a ballpark?  In other words, we're talking about -- let's talk about the amount of money it takes.  I mean, before you were talking about "tens of millions or more," as you put it.

So appreciating that you're saying you don't have a precise number in mind for how much investment you think LT Game should have made, is there any ballpark you'd like to offer?

A.  Well, two situations come to mind.  I don't remember the exact numbers, but said manufacturer, approaching a hundred million dollars of investment

Page 100

total over ten years, still not generating positive cash flow and owner of said business selling to a bigger company with more resources in -- in hopes that more investment could bring more scale and more success over time, with no expectation that that's going to happen immediately.  What I would call "in the short term."

And I could speak to another specific situation that was basically a repeat of that, and -- but the initial investment was probably closer to 150 to 200 million.  So now, again, is that specific to a single state?  You know, the -- it -- it -- it -- you know, it may be a little apples to oranges here, if we're talking about just a single state.

But, again, what I know about -- what I've learned from my own experience in the C-suite and what I've learned in representing and advising other companies and having access to their business plans and seeing their results and the level of investment, it's those facts and those experiences upon which I'm drawing upon --

Q.  Yeah.

A.  -- in formulating my rep- -- my opinions in my report.

Q.  It's not your opinion, is it, that it would

Richard "Rich" Baldwin

Page 109

Q. Do you have any knowledge about what the -- the terms of any agreements were between LT Game and Empire?

A. Well, I think, in -- as I recall -- and I think I listed it somewhere in here as one of the reports that I may have seen or -- or agreements I may have seen or relied upon. I don't -- there was a lot that I -- in here. (Witness perused document.)

But I'm happy to look at any report that you'd like me to look at now, if -- if you're asking me questions about a spe- -- a specific report.

Q. No, I -- I -- I'm more just trying to see what -- you know, what information you may be calling upon to form conclusions.

Let me ask it this way: On what do you base the position that Empire was a nonexclusive distributor for -- for the plaintiffs?

MR. GLENN: Objection. Form.

THE WITNESS: I believe it was based on the review of that agreement.

BY MR. CIARDULLO:

Q. All right. So -- so -- and -- and to your recollection, there was an agreement that you feel said that?

A. My understanding of the evidence was that the

Page 110

relationship was not exclusive.

Q. Okay. And is -- is that a conclusion that you reached on your own based upon review of an agreement or other evidence, or is that an assumption you were asked to make?

A. No, it's -- that was based on my own review.

Q. All right. And -- and just to be -- I kind of asked this, but just to confirm: Are you able to recall what you reviewed that led you to that conclusion?

A. I don't recall specifically, no. But I thought I saw, in one of the agreements between the parties, that the relationship was nonexclusive.

Q. Okay. And we ask these sort of questions to confirm the contours of your expertise.

You don't purport to be a legal expert, correct?

A. No, I'm -- I'm -- I'm not a legal expert.

Q. Okay. And -- and not an expert in -- in interpretation of contracts?

A. Well, I would answer that by saying: In the course of performing my work as an advisor and a consultant and in my prior life as a C-suite executive, I mean, I have certainly read and negotiated -- not -- not necessarily the legalese, if

Page 111

you will, underlying or included in many of these agreements, but principle economic terms, business relationship terms. Those types of things, I'm pretty familiar with.

Q. But for purposes -- and to put a finer point on it, for purposes of your opinions in this case, you're not purporting to construe any contracts; is that fair?

A. "Construe"?

Q. Interpret.

A. I -- I -- well, again, I -- I -- my report -- the opinions in my report are based on the evidence that I -- what I believe to be the evidence in the case that I have been -- that I received and all of the materials that I list here in my report. That's what I'm relying upon.

(At this time, Ms. Stephenson and Mr. Keyhani reentered the Zoom videoconference deposition room.)

MR. GLENN: And, J.P., maybe we can just cut to the chase on this and say that Defendants have not disclosed Mr. Baldwin as an expert in this case to interpret the legal meaning of any of its terms of the contract --

MR. CIARDULLO: Okay.

MR. GLENN: -- or agreements between the

Page 112

parties. He -- as he testified, he has reviewed them, and he can form conclusions in his experience as an expert in these industries, but he is not going to attempt to assert a legal opinion on what those specific contractual terms mean.

MR. CIARDULLO: Okay. No, I appreciate that.

BY MR. CIARDULLO:

Q. And I don't believe there's any discussion in your report, Mr. Baldwin, specifically about an agreement as to non-exclusivity, is there?

A. Well, I don't -- I'd have to go back and reread -- reread everything. I mean, it's a 33-page report, but I -- I -- I don't recall.

Q. Okay. In -- in your report, you say that, among the evidence that you reviewed was a copy of the complaint that is operative as between the plaintiffs -- the plaintiffs and defendants.

What is your own understanding as to what the basis for Plaintiffs' legal claims are in the case?

MR. GLENN: Objection. Form.

THE WITNESS: Okay. I mean, you're -- which -- I'm looking at Page 32 of 33 of my report --

BY MR. CIARDULLO:

Q. Uh-huh.

A. -- and it lists the depositions, and it

Page 121

A. I recall seeing an agreement --

Q. Uh-huh. Is --

A. -- yes.

Q. Is there anything else that you're basing that on?

A. No.

Q. Okay. So you're not aware of what other communications and understandings that might have existed between LT Game and Empire outside of that agreement, with respect to exclusivity?

A. And I -- again, based on review of the evidence, which I looked at a lot of things, and it was -- it's going back a couple of months now, it -- you know, prior -- you know, leading up to the actual writing of my report --

Q. Uh-huh.

A. -- what I saw was, was a lot of -- that the evidence that was presented and shared with me, I saw a lot of dialogue and communication and various e-mails and whatnot with the parties commun- -- communicating with one another in kind of a manufacturer-distributor kind of capacity, as it appeared to be.

I don't recall seeing other correspondence making any reference to other distributors during

Page 122

the -- during the same time period.

Q. Do you know what contractual obligations the plaintiffs have alleged that Mr. Daryn Kiely owed to them?

A. I don't recall specifically, no.

Q. Do you -- do you know what contractual obligations the plaintiffs allege that Mr. Kelcey Allison owed to them?

A. No, I don't recall specifically.

Q. While I appreciate you're not a lawyer, are you familiar with the concept of a fiduciary duty of a manager?

MR. GLENN: Objection. Form.

THE WITNESS: Yes.

BY MR. CIARDULLO:

Q. Uh-huh. What is -- what is your own layperson's understanding of what that means?

MR. GLENN: Objection. Form.

THE WITNESS: Well, it -- yeah, I mean, that -- that seems fairly subjective and -- and -- and speculating, so I'm not really sure I -- I feel comfortable answering that.

I mean, what are you asking me specifically?

BY MR. CIARDULLO:

Q. Well, let me ask it this way: So what is your

Page 123

understanding of what Plaintiffs have alleged in this case to have been Mr. Feng's fiduciary duties to them?

MR. GLENN: Objection. Form.

THE WITNESS: Repeat, please.

BY MR. CIARDULLO:

Q. Yeah. So -- well, I'll -- and I'll represent to you that Plaintiffs have alleged that Mr. Feng owed them fiduciary duties, and -- and that is something that was stated in the complaint.

And what I'm asking is: What -- when you were preparing your report, what was your understanding concerning what fiduciary duties the plaintiffs alleged that Mr. Feng owed to them?

MR. GLENN: Objection. Form.

THE WITNESS: Yeah. I mean, in preparing my report, I mean, I -- it -- you know, it's -- it -- I wrote -- it -- the purpose -- the scope of my work was focused on rebutting Nelson and Doyle's reports.

And so in the context of doing my work, within the confines of that scope of work, I'm not sure that I was -- I was focused on or asked to focus on anything in regards to the fiduciary responsibilities of any of the parties.

BY MR. CIARDULLO:

Q. Okay. And what do you know about what

Page 124

business opportunities Mr. Feng was pursuing for Empire prior to 2023?

MR. GLENN: Objection. Form.

THE WITNESS: It -- the -- the only knowledge I have of any of that is based upon the evidence here that I was provided and -- and reviewed, and precisely what all -- what those opportunities were and et cetera. I mean, I -- I don't recall what -- what they all were.

The -- the -- so is there something specifically you're referring to?

BY MR. CIARDULLO:

Q. Well, I'm -- I'm just trying to gain an understanding as to what -- what you understood those to be when you're preparing your report.

But are there -- are there any of Mr. Feng's business pursuits on behalf of Empire, prior to 2023, that you can recall, sitting here today?

A. I -- I don't remember --

MR. GLENN: Objection. Form.

THE WITNESS: Oh, sorry.

I don't remember the -- the timeline, but I remember reading, in some of the evidence that was provided, that Mr. Feng had a -- pursued an opportunity with -- I believe it was Commerce -- one

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 125

of the card rooms.  I remember reading something about that.

That's the one that comes to mind.  I feel like there might have been another that I recall reading about, but that's the one that comes to the top of my mind.

BY MR. CIARDULLO:

Q.  For purp- -- for purposes of your assessments of whether LT Game was -- well, let me -- let me find the language.  I think we were looking at Paragraph 14 of your report.

And yeah, if you go to Paragraph 14 of your report, you -- there was -- the second sentence there said that, [as read]:

This allegation requires that Plaintiffs otherwise did and are doing everything necessary to enter and become successful -- a successful gaming business in the U.S. and Nevada gaming markets.

For purposes of your report, did you make any assumptions about whether the defendants were doing everything they could to enable LT Game to be successful in the U.S. and Nevada gaming markets?

MR. GLENN:  Objection.  Form.

THE WITNESS:  What -- what I wrote here on Page 14 -- or -- Paragraph 14 was just my -- it -- it

Page 126

was -- it was what I understood to be just background on the case, as I understood the allegations to be or the complaint to be.  So that's in eff- -- if somehow what I wrote there is not accurate or -- or -- or I missed a word or two, that was -- that was certainly not my intention.  That was really just int- -- intended to just be general background.

So I'm not sure I really understand what you're asking me because you're referring to that paragraph as if somehow it may -- that the -- that it may not be reflective of the actual allegations or -- or -- or -- or -- or whatnot, so I'm just a little confused by your question.

BY MR. CIARDULLO:

Q.  Yeah.  Did -- did you do any -- in -- in forming your opinions, did you do any assessment -- well, let me just ask it apart from this, Paragraph 14.

In forming your opinions, did you do any assessment of whether the defendants were doing everything they could to help LT Game be successful in the U.S. and Nevada gaming markets?

A.  I -- I did not.  That was -- I -- my -- my focus was -- that would call for speculation.  That -- I mean, there's -- there's information in there that I

Page 127

was not -- wouldn't have -- wouldn't be privy to, to try and form those types of opinions.

So -- so the answer is no.

Q.  Okay.  So you haven't done any analysis, for example, of how much time the individual defendants spent working for LT Game while they were managers there --

A.  No.

Q.  -- as they're -- okay.  I'm sorry.  Go ahead.

A.  No.  No, I didn't -- I didn't.  My -- my only assumption, in -- in reading and the information I was provided, was they held positions, and in those positions, they were -- how -- how -- how much time and effort and energy they spent, I wouldn't know.

Q.  If I were to tell you that they simultaneously were acting as managers for Empire at the same time that they were also managers of LT Game for a period of time, and taking that as -- as true for purposes of my question, have you done any assessment of how much of their time and energy was devoted to LT Game as compared to Empire?

A.  No, I did not.

MR. GLENN:  Objection.  Form.

THE WITNESS:  Sorr- -- sorry.

No, I did not perform any such assessment.

Page 128

BY MR. CIARDULLO:

Q.  Do you know anything about the physical locations where LT Game and Empire had their offices where their employees worked?

A.  I mean, I remember seeing addresses somewhere in the various evidence.  I live in Las Vegas, of course, so, I mean, I may have recognized the street names, but I have no recollection of ever visiting either one of those offices.

Q.  Uh-huh.  Do you know the locations where the LT Game employees worked versus where the Empire employees worked?

A.  Again, I -- just based on what I recall reading in the evidence, there was a time period where they were sharing an office, and then there was a time period where they were no longer -- I -- I be- -- I believe.  I recall there was a time period where they were sharing some office space.

I don't recall, at the same time, if there was also a separate location where they -- where -- but then at some point, they weren't sharing office space.  So I -- I may have my understanding a little garbled there, but generally, it's -- at -- at -- at one point, along the time, I recall that there were -- there was -- there was some shared office space.

Richard "Rich" Baldwin

Page 129

Q. Uh-huh. So you don't know, one way or the other, whether the employees of LT Game and Empire were substantially always working in the same office, up until approximately 2023?

A. Yeah, I -- I don't re- --

MR. GLENN: Objection. Form.

THE WITNESS: Sorry.

I don't recall.

BY MR. CIARDULLO:

Q. Uh-huh. For purposes of your analysis, you didn't perform any assessment of how LT Game would have fared, if Mr. Feng and the employees working under him had devoted 100 percent of the time and energy to advancing LT Game interests, right?

A. No, I did not -- I did not consider that assessment of -- of some allocation of one's time.

Q. Were you -- when you were forming your opinions, were you aware that the plaintiffs accused Mr. Feng of usurping LT Game business opportunities and keeping them for himself?

MR. GLENN: Objection. Form.

THE WITNESS: I recall reading some of those allegations. But, again, I -- I wouldn't know if it -- it was an allegation; that's all I know.

BY MR. CIARDULLO:

Page 130

Q. Uh-huh. Did you assume those allegations were true for purposes of your forming your opinions?

A. Well, that would be spec- --

MR. GLENN: Objection. Form.

THE WITNESS: Yeah, that would be speculating. I mean, I -- I -- I don't know. They're allegations, right? So the work that I did was based upon the evidence that was presented, and the report is based on my experience and my opinions.

I didn't -- my -- my -- my report and opinions weren't -- weren't influenced by an allegation. I -- I -- I was working with what I believed to be factual evidence that was prov- -- that was provided to me.

BY MR. CIARDULLO:

Q. So -- I'm sorry. This is something similar to what I was asking, but just to round it out, the --

So you didn't perform any analysis, in forming your opinions, as to how much it harmed LT Game that Mr. Feng and employees working under him were devoting so much of their time and attention to Empire?

A. Can -- can you repeat that, please?

Q. In forming your opinions, you didn't perform any analysis of harm to LT Game caused by Mr. Feng and employees working under him, devoting significant time and attention to Empire, in lieu of LT Game?

Page 131

A. No, that -- I -- that was outside -- outside of the scope of -- of my work.

Q. Uh-huh. At Paragraph 83 of your report -- it's on Page 19 -- you -- you -- you make reference here to different classes of gaming equipment --

A. Uh-huh.

Q. -- and you're drawing a distinction between the type of equipment being sold by LT Game versus the type of equipment being sold by Empire; is that right?

A. Yeah, I'm -- I'm just rereading 83 real quick, if you could just give me --

Q. Sure.

A. -- give me maybe a minute or two --

Q. No, take --

A. -- to read it, please.

Q. Take your time.

A. Yeah. (Witness perused document.)

Okay. Yeah, I -- I -- I reread 83 here.

Q. So the -- this distinction you're drawing between equipment that Empire developed and the -- and equipment that LT Game had, you're assuming that Empire was at liberty to develop and sell its own product, independent of LT Game, correct?

A. Well, again, I'm just kind of reading what -- what I wrote here, which was just based on my review

Page 132

of -- excuse me -- based on my review of the evidence that was presented to me.

So as I state here, it was unclear whether they were selling competing products.

Q. So you've -- you've made no assessment as to whether the sale of these other products by Empire constituted a -- a usurped business opportunity of LT Game?

A. No, I didn't -- I --

MR. GLENN: Objection. Form.

THE WITNESS: I didn't -- I didn't opine on that or -- on -- in my report.

BY MR. CIARDULLO:

Q. Uh-huh. Do you know what person or persons developed the equipment that was being sold by Empire?

A. Which "equipment" are -- well, which "equipment" are you referring to?

Q. So you're drawing a distinction in this paragraph, 83, as to equipment that LT Game sold and then equipment that -- that Empire sold.

You -- you characterize it, in the last sentence of Paragraph 83, as, [as read]:

Empire is primarily selling table games and related table game technology, like trend boards.

A. Uh-huh.

Richard "Rich" Baldwin

Page 133

Q. Do you know what persons were developing the Empire equipment?

A. I don't recall, no.

Q. Uh-huh. Now, in -- in -- in your report, you -- you -- you had made critiques about LT Game, in your view, having not spent enough money to support the LT Game business.

In -- in -- in your experience, if someone engages somebody to run a comp- -- a business for them and they seem to not be performing well, wouldn't the person who engaged the person who's not performing well have a desire to not throw good money after bad by investing even more into someone that seems, perhaps, not reliable?

MR. GLENN: Objection. Form.

THE WITNESS: Well, yeah. Again, it -- it -- you're asking me to speculate. I think just bringing it back to the evidence that I received in part of forming my opinions in my report, I mean, I'm looking at a timeline -- and I'm just specifically looking now on Page 21 of the report, at the bottom.

I'm looking at a timeline of investments, starting in '17 and ending in '23, and while it ramped up initially, it -- it wound down, and I alluded earlier about the overall level of investment, in my

Page 134

opinion, is just low --

BY MR. CIARDULLO:

Q. Uh-huh.

A. -- relative to what I've seen others have to spend and still not be successful, commercializing in any jurisdiction.

So what I would -- what I would expect this chart to look like for somebody that was in it for the long haul would -- for these -- to see these dollars increasing, not shrinking. And what I would typically expect to see in a manufacturer-distributor kind of relationship would be, if the manufacturer's not happy with the performance of the distributor, they would typically look to replace that distributor with another distributor or --

Q. Uh-huh.

A. -- or -- or just decide to go sell direct, right?

So I -- again, based on my review of the evidence, I don't recall seeing where Empire engaged another distributor along the timeline or was talking to other distributors along the timeline. I'm not sure. I'm just looking at the evidence that was presented and, again, stating my opinions of the level of investment and what I would have expected would

Page 135

have happened kind of in the normal course, if you will, right? either -- or I guess a- -- or, I guess, abandoned the opportunity, right? I guess that's the other option, right? To just say, well, we're going to no longer pursue this market or the U.S. And -- and maybe that's what the decision was here, is to -- to abandon those efforts.

But what I don't see is -- as I said, typically -- and I alluded to this earlier -- in a manufacturer-distributor type of arrangement, how do you define success? What are the benchmarks? And if you're not happy with the performance of the distributor, you would terminate the distributor and hire another distributor or just decide no longer to pursue that market.

Q. Uh-huh. So, you know, if one looks at the graph that you have on Page 21, for purposes of your analysis, you didn't look to whether this might be reflective of Paradise's confidence level in Mr. Feng as someone who could lead LT Game to success?

A. Based on the evidence that I saw, these dollars that are referred to in this chart that, I think, we pull- -- I pulled from -- I think this was pulled directly from Nelson's report, as I recall. What I recall, based upon the evidence, was the

Page 136

dollars that were being -- and I'm -- I'm just using the term "funded." I don't know if that's the right way to characterize that. But the numbers -- the amounts that were being funded by Paradise were all -- all at Paradise's discretion.

They were -- I saw the evidence of the back and forth, and -- and so the -- the control of those dollars was -- it was my understanding was res- -- was -- was residing with Paradise, not -- not Empire. So -- so again, I look at that, and I just say to myself: If the manufacturer was not pleased with the direction of the business, if the parties didn't have clea- -- didn't kind of clearly define amongst themselves kind of what the business plan was, what were the -- what were the goalposts? What were the milestones year to year? The manufacturer, typically, under a typical distribution agreement, always has the ability to terminate the distributor.

Q. Do you know how much money Paradise had invested in Empire as of 2023?

MR. GLENN: Objection. Form.

THE WITNESS: Well, I'm reading -- I think I -- I mean, on this chart here, if I just do the math in my head -- I recall the number -- net of the revenue was somewhere around $24 million or something

Page 145

Q. So your -- your opinions, as stated in your report, don't perform any assessment of what level of success LT Game could have, if it took advantage of the opportunities that Empire did, right?

MR. GLENN: Objection.

THE WITNESS: No, I did -- I did not opine on those in my report.

BY MR. CIARDULLO:

Q. Uh-huh. In -- in your report, in Section C, you -- that you're addressing whether or not the -- the plaintiffs had been disadvantaged by Empire and, you know, it -- so just looking at the -- the -- the -- the title of the Sub- -- of Subsection C, it reads, [as read]:

Defendants' alleged actions are not the sole or even significantly meaningful reason that it will be difficult for Plaintiffs to compete in the U.S. gaming markets.

Doesn't it disadvantage a business to take all of their employees?

MR. GLENN: Objection. Form.

THE WITNESS: Call for spec -- I mean, you're asking me to speculate, and I'm reading those -- that -- that -- that Subsection C, and I think the keywords there are "sole."

Page 146

I mean, as I list throughout my report, I mean, there's a whole host of reasons why a manufacturer may not be successful entering a market, period.

BY MR. CIARDULLO:

Q. Uh-huh.

A. As I've stated consistently throughout my report, at the end of the day, it comes down to game performance and market acceptance.

Q. Uh-huh.

A. And game performance and market acceptance are directly correlated to a level of investment, in particular, a level of investment in research and development. And so what I'm reading there is what I wrote, the "sole." And to suggest that the -- so, you know, that's -- that's -- that is my opinion, right?

So I'm not exactly sure what you're asking me.

Q. Well, does -- does your -- your report doesn't take into consideration how many employees that Empire took from LD game, right?

A. I --

MR. GLENN: Objection. Form.

THE WITNESS: Yeah. Again, I -- I -- I'm -- my report is based on the evidence.

Page 147

When you say "took," I -- I don't know that to be -- I don't know how to -- I don't know how to answer "they took." What I know is, is -- or what I believe to be the facts are certain managers of LTG resigned and then were under the employ of Empire.

So I -- the facts and circumstances on how that came to be, I'm not aware.

BY MR. CIARDULLO:

Q. And in a -- in assessing whether the defendants have disadvantaged LT Game, your report does not go into the effects of any trade secret misappropriation, correct?

A. It does not.

Q. Would you say that it would -- it would disadvantage a business to take the trade secrets?

MR. GLENN: Objection. Form.

THE WITNESS: Yeah. You're -- I'm not comfortable speculating on that.

BY MR. CIARDULLO:

Q. All right. When I was asking before about Commerce Casino, if -- if -- if I were to tell you that most of the card shoe -- the electronic card shoes and trend boards at Commerce Casino are being provided by Empire, does that change your opinion about how easily LT Game could come in now and provide

Page 148

those products instead of Empire?

A. Which -- which products are you referring to?

Q. The electronic card shoes and trend boards at the -- at the table games in Commerce Casino.

A. Well, Commerce is one casino. I mean, there's hundreds of casinos in the U.S. Between commercial and tribal, there must be -- I mean, don't quote me to this exact number, but there's -- there's probably 600-plus casinos in the U.S.

And so is Commerce a well-known, successful casino? Well -- well, sure, it is, but there's a whole sea of opportunity for those same products across California and everywhere else in the country.

Q. Okay. Well, it -- but in your report, I think, you know, you had a section -- I can see if I can find it here -- where you're specifically talking about whether it would be difficult to form a relationship with Commerce Casino. I thi- -- I believe Paragraph 108, it says, [as read]:

Nor is there any reason to assume that Commerce Casino could not have a relationship with both Empire and LT Game at the same time.

So my question is: If I were to ask you to assume for -- that most, if not all, of the tables at Commerce Casino use Empire equipment, does that change

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 149

your view as to how easy it would be for LT Game to also sell equipment to Commerce Casino?

A. Yeah, I'm -- I'm not -- I'm trying to answer your question. I'm not sure I exactly understand what you're asking me, but maybe I can just answer it gen- -- generally.

In my experience, casinos, whether it's Commerce or any other casino, their loyalty to any one particular manufacturer only goes so far. And so you -- you -- you -- there's always -- just because one casino may happen to have one manufacturer's con- -- product today does not -- does not suggest they will have it forever. In fact, that's quite the opposite.

I mean, you -- you see -- you see -- while it -- while it's still the larger technology providers that are still the -- the -- the -- the ones that are providing the majority of the -- of the -- of the equipment, like we've been talking about, casinos make changes all the time, right?

And so that just speaks to what I've mentioned, I think, a couple of times here, which is how competitive the marketplace really is, that even if you happen to have a significant amount of product at a particular casino and you've had all kinds of

Page 150

success and history with them, that guaranties you very little in the future with that particular casino, right?

I mean, so the marketplace is just extremely competitive. So again, if the question is, you know -- you know, I think -- I think I'm trying to -- I'm trying to answer what I think you're asking me, which is, you know, Commerce is one casino. There's lots of casinos, and there's lots of opportunities to sell product across many other markets, and that's the best, I think, I can answer that.

Q. Uh-huh. At Paragraph 100 of your report, the -- the -- the section heading right above it says, [as read]:

It's difficult to become licensed in the U.S. and particularly in Nevada.

And at Paragraph 100, you're describing your -- your -- your opinions relative to that.

Well, what are you basing your opinions on here, as to the difficulty of getting licensed?

A. Well, I mean, I -- when I was on the -- in my former corporate life, as I think I've referred to it a few times here today, I personally have been through

Page 151

licensing and more jurisdictions than I can ever remember, and that was with, you know, a large organization with lots of resources and people to help me along with filling out all of the paperwork and everything that's required and all of the interviews, and it's a very extensive and exhaustive and expensive proposition --

Q. Uh-huh.

A. -- whether it be a single state or multistate.

So, I mean, I've been through it myself personally. I don't currently hold any gaming licenses. I don't -- I don't need to in my -- in one of -- in my current profession, if you will, but I'm intimately familiar with the difficulty of that. I'm also intimately familiar with the privileged nature of those licenses and the keyword being "privileged."

And so many people simply choose not to pursue a license because they're concerned that they won't be licensable. And so, you know, I -- I'm -- while I'm not a gaming regulatory expert, I -- having gone through this and having worked with lots of companies with executives that have or are going through it, I'm pretty familiar with it.

Q. I'd like to draw a distinction between difficulty, in terms of time and expense, versus

Page 152

difficulty, in terms of ultimate success, and I certainly appreciate that you're describing here diff- -- difficulty, in terms of, as you say, it's a resource-intensive process that can take years, as you -- as you point out, and in Paragraph 100, you also say it can be -- it can be also incredibly expensive. But then you also say there's no guarantee of success.

Have you done any analysis as to the likelihood of obtaining a license for those who have applied for one?

A. Well, I'm sorry. Can you repeat the last part of the question? What are you asking me specifically?

Q. Well, have -- have you done any analysis as to the -- the likelihood of obtaining a license after having applied for one, setting aside time and expense?

A. No, I have never done that. I've -- I've never been retained or asked to perform such an analysis, but what I know is -- which is very typical of folks that are making the decision: Should I or should I not get licensed or pursue a license? I think everybody generally understands it is a timely and costly pursuit --

Q. Uh-huh.

Page 157

A. No. I mean, it -- they're -- as -- as I mentioned earlier, it -- there's different kind of market entry strategies, right? One may choose to not work through a distributor, work to get licensed, and then go -- and then just go direct and sell without a distributor.

There are instances where companies may choose to want to get into a market prior to getting licensed, but in parallel, they're going through licensure themselves, with the idea being that, if the distributor is able to achieve some commercial success, going back to -- it's the product ultimately that's going to define your success.

So it's naturally -- in a situation where a manufacturer was getting -- was -- was able to accelerate their access to a market with using a distributor, at some point, right, if that product is -- if the product or products are successful, they typically, then, want to go direct because it's more cost-effective, and you can essentially cut out the distributor, right?

And so I just kind of go back to -- you've asked me questions about market entry strategies and, you know, what companies have done, and -- and so I'm just giving you examples of -- of -- of how that can

Page 158

work, but -- but --

And there are some instances, perhaps, where the distributor may have a longer-tailed relationship that -- that -- that they may want to continue on with, so it really is market-specific. It really is kind of product-specific and -- but ultimately these are all -- these options are only kind of avail- -- available to you as the manufacturer, if you actually have a product that has achieved some level of commercial success.

MR. CIARDULLO: Uh-huh. Okay. Let's -- let's take a break. Let's go off the record.

THE VIDEOGRAPHER: Going off the record at 1:16 p.m.

(Lunch break held from 1:16 p.m. to 2:13 p.m.)

(At this time, Ms. Stephenson and Mr. Keyhani exited the Zoom videoconference deposition room.)

THE VIDEOGRAPHER: Back on the record at 2:13 p.m.

MR. CIARDULLO: Welcome back from the break, Mr. Baldwin.

And for me, I decided I'm going to pass the witness.

So Counsel, subject to if you have any questions, pass the witness to you.

Page 159

MR. GLENN: Just a couple questions.

CROSS-EXAMINATION

BY MR. GLENN:

Q. Mr. Baldwin, there was a lot of questions in the last session about Plaintiffs' allegations and whether those allegations affected your analysis, so I would like to ask you: Would your opinion about what it takes for a manufacturer to break into the U.S. and Nevada gaming markets change if Plaintiffs' allegations about Defendants were true?

A. No.

Q. Earlier -- it might have been two sessions ago -- there were questions and answers about Paradise's investment, and I think that you had testified about Paradise's investment into LT and Empire.

And I just want to ask you: Do you recall seeing any evidence that Paradise ever invested in or paid Empire directly?

A. No.

Q. There was also some questions about the managers, Mr. Frank Feng, Daryn Kiely, and Kelcey Allison, that were working at LT and when exactly they worked for LT and when they worked for Empire and whether there was any crossover there.

Page 160

And just broadly, would the exact dates that those defendants worked at either company change your analysis of what Paradise needed to do to invest into LT Game for it to be successful?

A. You -- you -- you referenced "analysis."

I mean, are you referring to analysis and my -- my opinions?

Q. Yeah. Would your opinions change about what Paradise and Plaintiffs needed to do for LT Game to be successful?

A. No.

Q. Okay. There was also some questions about exclusivity or not exclusivity between the parties and the relationship between the parties. I think you mentioned that you had seen an agreement about the relationship between the plaintiffs and the defendants, particularly Paradise and Frank Feng and Empire.

Were you referring to the Distributor (sic) Framework -- or Distributorship Framework Agreement?

A. Yes.

Q. When you were forming your opinions and drafting your report, did you also review the subsequent agreements between the parties, like, the Supply Framework Agreement and the renewed Supply

Richard "Rich" Baldwin

Page 161

Framework Agreement?

A. Yes.

Q. And to your understanding, were there explicit provisions in those agreements that stated that they were nonexclusive?

A. Yes.

Q. And were there any provisions in those agreements that indicated to you, as someone who's worked in the gaming industry for 30 years, that those agreements were actually exclusive?

A. I'm sorry. Can you just repeat that, that question?

Q. Were there any provisions or terms in those agreements that stated they were actually exclusive?

A. No.

Q. In your experience, having worked in the gaming industry for 30 years, if the relationship between a manufacturer and a distributor was exclusive, would that be explicitly stated in the parties' agreement?

A. I -- I would expect it to be, yes.

Q. And if the agreement between a manufacturer and a distributor didn't state that it was exclusive, would you ex- -- assume, in your 30 years of experience, that it was nonexclusive?

Page 162

A. Yes.

Q. There was also a question about whether you had seen any evidence, besides the agreements between the parties, that indicated the agreements were nonexclusive.

Is it possible that when you were forming your opinions and drafting your report, that you also saw communications between the parties that stated the relationship was nonexclusive?

A. Yes.

MR. GLENN: Pass the witness.

REDIRECT EXAMINATION

BY MR. CIARDULLO:

Q. Oh, just on this issue, the exclusivity, what are these communications that you're thinking of in response to that last question?

A. Well, I think as I alluded to or mentioned earlier, I do recall seeing an agreement or agreements that explicitly stated that the relationship was -- between the parties was nonexclusive. And I -- I recall there was other evidence, whether it be e-mail exchanges or internal memos or whatever the case may be, that also had included -- I recall just some of the -- the -- the salient business terms that would ultimately, you know, make their way into these

Page 163

agreements, and I recall seeing some language there, too, that I -- I recall seeing some nonexclusive language there as well.

Q. Do you recall anything else about what these communications were that would help me identify them?

A. I mean, just, again, what -- everything that I was provided and relied upon in -- in my re- -- in my written report, and it -- beyond the agreements, I just -- I just recall seeing other correspondence. I -- perhaps, an e-mail or e-mails or some internal memos or something outside of the agreements themselves.

Q. Uh-huh. But your -- your report does not discuss a basis for assuming that Empire was nonexclusive, right?

A. I'm sorry. Would you -- would you mind repeating that question?

Q. Yeah. Just looking at -- at your report, there's nothing in the report that discusses a basis for forming an assumption that the -- Empire was nonexclusive to LT Game, right?

A. I did -- I don't recall mentioning in my report, including any reference to whether the agreement was exclusive or nonexclusive.

Q. Uh-huh.

Page 164

A. I was just answering the questions about what -- what knowledge I had or what information I had seen in the -- in the evidence, so I -- I was just responding to those questions.

Q. Do you know anything about the Hong Kong Listing Rules for public companies in Hong Kong?

A. Not specifically, no.

Q. Do you know anything about their interplay with what are called "connected party transactions"?

A. Not specifically.

Q. Do you know when the original Distribution Framework Agreement with Mr. Feng was signed?

A. I don't remember the exact date, but I'd be -- I'd be guessing. But I remember seeing the agreement, and I -- and I think the extensions of the original agreement, but I don't recall, offhand, the exact dates.

Q. If -- if I -- if I were to ask you to assume that the original agreement was executed in 2016, my question is: Do you know whether Mr. Feng was, in fact, distributing any product that was not LT Game product as of 2016?

A. Yeah. I mean, I'd rather not speculate. I mean, I -- I don't recall the -- the date of when the agreement was actually executed and then subsequently

Richard "Rich" Baldwin

Paradise Entertainment Limited vs.
Empire Technological Group Limited

Page 169

MR. GLENN:  That's correct.

And I'll direct you to Page 21, which is the Nel- -- the Nelson chart, but specifically Footnote 20, which has the various investments and revenue and such, which were pulled -- pulled from Nelson's report schedule.

MR. CIARDULLO:  Yep.

MR. GLENN:  Which I do think -- and I don't recall, off the top of my head, but I think some of those schedules were -- some "confidential," some "AEO."

MR. CIARDULLO:  Uh-huh.

MR. GLENN:  So I think that that would be the extent of it, but yeah, just let us know.

MR. CIARDULLO:  We can -- and, Counsel, we can discuss that, and I'm sure we can come to an arrangement on it.

And then in terms of orders, you know, I think the court reporter -- I think you probably have our -- our order from -- from my team.

THE COURT REPORTER:  You want a draft; is that correct?

MR. CIARDULLO:  Yeah.  I mean, you don't have to -- and I don't know whether you observe the holiday today, so, you know, don't be doing anything,

Page 170

you know, over the weekend or if -- if that's anything problematic, but some time, you know, early next week, if -- for, like, a rough.

THE COURT REPORTER:  You'll be able to have it tonight.

MR. CIARDULLO:  Okay.  All right.

THE COURT REPORTER:  Would you like a copy of the rough draft, Mr. Glenn?

MR. GLENN:  No thanks.

We'll just take the -- the transcript in the normal course.

THE COURT REPORTER:  And is regular delivery okay for your final?

MR. GLENN:  Yes.

THE COURT REPORTER:  Okay.  I think we're all set.

THE VIDEOGRAPHER:  Are we ready to go off record?

MR. GLENN:  Yes.

MR. CIARDULLO:  That's right, yes.

THE VIDEOGRAPHER:  This concludes the deposition for today.  We're now off the record at 2:29 p.m. Pacific Time.

(Deposition concluded at 2:29 p.m.)

Page 171

CERTIFICATE OF OATH
(VIA VIDEOCONFERENCE)

STATE OF FLORIDA:
COUNTY OF PINELLAS:

I, COURTNEY N. LANGHOFF, CSR, RDR, CRR, FPR-C, Notary Public, States of Wisconsin and Florida, at Large, do hereby certify that RICHARD "RICH" BALDWIN personally and remotely appeared before me via Zoom videoconference on April 3, 2026, and was duly sworn.

Signed this 17th day of April, 2026.

_____

COURTNEY N. LANGHOFF, CSR, RDR, CRR, FPR-C
California CSR #14876
Illinois CSR #084.004996
Notary Public, State of Wisconsin
My Commission No.: 190335
Expires:  08/01/2029
Notary Public, State of Florida
My Commission No.: HH 609936
Expires: 03/05/2029

Page 172

CERTIFICATE OF REPORTER
(VIA VIDEOCONFERENCE)

STATE OF FLORIDA:
COUNTY OF PINELLAS:

I, COURTNEY N. LANGHOFF, CSR, RDR, CRR, FPR-C, Notary Public, States of Wisconsin and Florida, at Large, certify that I was authorized to and did stenographically and remotely report the Zoom videoconference deposition of RICHARD "RICH" BALDWIN; that a review of the transcript was requested; and that the foregoing transcript, pages 6 through 170, is a true and accurate record of my stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 17th day of April, 2026.

_____

COURTNEY N. LANGHOFF, CSR, RDR, CRR, FPR-C
California CSR #14876
Illinois CSR #084.004996