# Exhibit A-3

# Expert Report of Thomas Doyle

# Jan. 9, 2026

# EXPERT REPORT of THOMAS DOYLE

Paradise Entertainment Ltd., et al. v. Empire Technological Group, Ltd. et al.

District of Nevada Case No. 2:24-cv-00428-JCM-BNW

January 9, 2026

## I.    <u>INTRODUCTION AND QUALIFICATIONS</u>

1.    I have been engaged by the Plaintiffs Paradise Entertainment Ltd., LT Game Limited, and LT Game Inc. to provide objective expert opinions on the subject of gaming licensing as well as related issues relating to the operation of businesses that distribute casino gaming equipment.

2.    I am being compensated at a rate of $450/hr for my work, and my compensation is not dependent on the outcome of the case.

3.    I have extensive experience in the gaming industry, both on the regulatory side and the business side.

4.    My experience in the gaming industry is summarized as follows:

    a.  From 1977 to 1987 I was employed by Nevada Gaming Control Board.  In my final position I served as Audit Supervisor.  Experience included involvement in multiple investigations.

    b.  From 1987 to 1993 I was employed by Peppermill Hotel Casinos as Vice President of Administration which included Internal Audit, regulatory compliance and HR.

    c.  From 1993 to 1997 I was employed by Lodging and Gaming Systems as Director of Consulting and Project Financial Officer for Jazz Enterprises (Riverboat license in Louisiana).

    d.  From 1997 to 1998 I operated a consulting company as sole proprietor.  The services focused on casino consulting including training on casino operations and preventing money laundering relative to Bank Secrecy Act. Clients included Commerce Casino, Bicycle Club, and numerous other casinos.

    e.  From 1999 to 2002 I was General Manager of Spa Resort Casino in Palm Springs, California.

f.   From 2002 to 2017 I served as the Vice President of Product Management and Compliance for Scientific Games System Division (aka Bally Technologies, Alliance Gaming, and now Light and Wonder).    In this position I handled licensing, software and hardware compliance in multiple jurisdictions worldwide.

g.   From 2017 to 2020 I was the Chief Financial Executive for Thunderbird Lodge, a historical 501(c)(3) property operating on shores of Lake Tahoe.

h.   From 2020 to 2025 I was employed in the iGaming online wagering industry. I was hired by Spin Games LLC which was eventually acquired by Bragg Gaming Group. My position with both entities was Vice President of Compliance.   Duties included all product compliance activities for iGaming products and for licensing in North America for the entities and key employees.   I retired from Bragg in June 2025 and concluded post-employment contract work in October 2025.

5.    Credentials include being a CPA (Certified Public Account), inactive status.

6.    I graduated from University of Nevada Reno with a Bachelor's degree in 1977.   The degree was in Business Administration.

7.    My resume is attached as an Exhibit for reference purposes detailing my 45+ years in the gaming industry.  In addition, materials considered to generate this report are attached as Exhibits.

## II.    <u>**GENERAL BACKGROUND ON THE GAMING INDUSTRY**</u>

8.    The gaming industry has several key markets.  The dominant market in the US is Las Vegas. The majority of States offer casino gambling in the form of commercial casinos and Tribal casinos. US commercial casino revenues now exceed $70 billion annually.   Canada also offers extensive gaming. The largest casino market outside the US  is Macau, China, which generates over $30 billion in annual gaming revenue.  Macau

2

revenues are dominated by table games, primarily baccarat.  This information is based on my knowledge of the gaming industry and data provided in public records.

9.    Many casinos operate table games with cards, slot machines, poker, games of chance like Roulette and Craps, and various kinds of betting like sports betting.  Table games and slot machines generate the vast majority of gaming revenues in all markets.

10.    Table card games include blackjack, baccarat, and many variations including specialized patented games.  My knowledge of table games is derived from general industry experience, my work with Scientific Games which had casino management software for tables and other table games products, and consulting services provided to multiple California casinos and card rooms (including Commerce Casino).

11.    Slot machines operate with a reasonably reliable statistical hold percentage.  This is the expected percent of player wagers the casino can expect to win as gross gaming revenue.  Generally, casinos establish a statistical hold ranging from 5% to 10% depending on market conditions, often predicated by population demographics and propensities, local competition, and regulatory requirements.  Individual slot machines often generate between $50 and $500 per day in gaming revenue.  This information is derived from my knowledge of casino operations and statistical information available during my activities in gaming.

12.    Regarding electronic slot machines, these come in cabinets of different shapes and sizes. Game design is intended to attract player attention and engagement.

13.    Similar to slot machines, table games have a statistical hold percentage that favors the casino.  Wagers are often much higher in table games and vary based on the type of table game and the game's rules.

14.    As a by-product of my gaming experience, I have conducted numerous training sessions on casino operations nationwide both as a consultant and in conjunction with gaming education provided by University of Nevada Reno.

3

15.     One of the largest table game casinos in the world is Commerce Casino in Los Angeles, which has over 300 tables (including poker) and features baccarat and other table games. Annual revenues at Commerce Casino are hundreds of millions of dollars. One report indicates revenue over $500 million annually.   Commerce Casino is an important player in the gaming industry, and it would be valuable to have a business relationship with Commerce Casino if you were a gaming equipment supplier.    This information is based on consulting services provided to card rooms, including Commerce Casino, and visits and providing products to the Macau market.

16.     Table games often use electronic card shoes that track which cards are drawn by the dealer. They also often use display boards called trend boards that show players the history of the progress of the game. Trend boards can be wired up to the card shoes to display content tracked by the card shoes.

17.     Any gaming equipment that relies on software usually is required by regulators to go through careful independent third party testing to ensure that it works correctly. The requirement for testing can vary by jurisdiction.  The testing verifies, where applicable, that the math is accurate, properly coded, and provides the required randomness. GLI (Gaming Laboratories Inc.) is the leading testing laboratory that companies often engage to perform mandatory product testing.  There are other labs, such as BMM, that are certified to do testing, depending on the market.  Each state or other jurisdiction sets their own rules, guidelines and regulations for operation of gaming equipment.   I have worked extensively with GLI and BMM on certification of products and systems.

18.     Macau is a major gaming market in Asia located on a peninsula near Hong Kong. Macau is under the control of China.  Macau's primary source of gaming revenue is derived from table games, specifically baccarat.  Electronic shoes, card shufflers and trend boards are frequently used in baccarat.

4

19.   There are many gaming industry trade shows each year. The most important is called G2E, which is held in Las Vegas and Macau.

20.   In California, there are companies called Third Party Player Proposition Services (TPPPS) that perform casino banking services for card rooms.  In commercial California casinos (non-Tribal), the casinos are not permitted to bank games.  In other words, the casino cannot directly benefit from player wins and losses, but instead derive revenue from commissions based on a percent of wagers.  TPPPS act as the bank on the games participating in the funding for player wins and profiting from player losses.  As an example, the banking function is offered to the players and commonly resides with the TPPPS person at the table.  Since odds favor the house/bank, this is a very profitable business activity.   This information is based on my experience consulting with California card room operations.

## III.   LICENSING REQUIREMENTS FOR EQUIPMENT DISTRIBUTORS

21.   A company that wants to distribute gaming equipment to casinos is required to obtain licenses from each jurisdiction where they want to sell.  Without a license they cannot sell equipment in that market.

22.   Licensing in key jurisdictions like Nevada is a very expensive and time intensive process, often taking years and possibly millions of dollars. The Nevada Gaming Control Board conducts thorough investigations of applicants to determine suitability for licensing.  Due to the fact that the Nevada Gaming Control Board has operated as the primary, and for many years the only, USA jurisdiction, it is considered the gold standard for regulations and licensing.  Other jurisdictions similarly require licensing with varying regulations that must be complied with to be granted a license. A company that wants to get licensed in multiple jurisdictions across the country can expect to spend many years and possibly millions of dollars doing so.

23.     In Nevada, licenses are required for both the legal entity and key employees.  Key employee licensing costs often range from $60,000 to $80,000 or more. Legal entity license costs vary based on complexity of the entity and the nature of license. Entity costs vary and can potentially exceed $1 million.

24.     The Nevada Gaming Control Board (NGCB) regulates all casino activity in the State of Nevada.  This includes enforcement of regulations, auditing of casino financial activities, background investigations of entities and key employees, certification of gaming equipment, and all other aspects to ensure the integrity of gaming in Nevada and proper collection of tax revenues.  While individual states and jurisdictions developed their own rules and regulations, Nevada's standards are frequently the genesis.

25.     Because of the complexity of the licensing process, most companies hire legal counsel to handle all or a portion of the licensing efforts.

26.     It would not be expected that a company new to the US gaming market would be familiar with US gaming regulations. To the contrary, it would be expected that they would rely on lawyers to guide them through the process. This would be especially true of a company based in another country entering the US market for the first time.

27.     When evaluating a gaming equipment distribution company for licensing, the Nevada gaming authorities – like authorities in other jurisdictions – are looking for several key things. First, are the people running the company reliable honest people who can be trusted to make quality product that will function properly? Second, does the company have enough money and profit to operate a high quality operation, make high quality equipment, and provide appropriate customer support and technical assistance in case any of the equipment does not function properly?

28.     One of the objectives of Nevada Gaming Control investigations is to ensure that an entity has the expertise and financial resources necessary for long term operations and solvency.   This objective is critical to ensure that the prospective licensee will not tarnish the image of gaming in Nevada once the NGCB has licensed the entity.

6

29.    When conducting their investigations, the Neveda Gaming Control Board – like authorities in other jurisdictions – will collect a substantial amount of information and documents from applicants. They will also conduct interviews of the managers and their associates.  Examples of documents that are commonly required for the primary entity being licensed:

    a.  Corporate or similar founding and structure documents

    b.  Business licenses for all locations where licensed

    c.  Financial statements

    d.  Recent bank statements to support the financial disclosure

    e.  Loan documents and other obligations

    f.  Lawsuits and all regulatory sanctions, fines, etc.

    g.  Clear criminal background documents (i.e. FBI checks)

    h.  Related party information

    i.  Tax returns and statements

30.    In addition to the information required for the primary licensed entity, request will be made for a more limited set of documents from any parent organizations.  These documents usually include financial statements (Audited Financials preferred) and tax returns.

31.    If a company seeking to be licensed does not put forward a related company or person in the licensing process, that means that the company seeking to be licensed is effectively telling the regulators that the other entities are not involved in the management or operation of the business.

**IV.    <u>COMPETITION IN THE GAMING EQUIPMENT DISTRIBUTION MARKET</u>**

32.    There is a limited universe of companies that distribute gaming equipment in the United States, and the universe of such companies based in Nevada more limited still.

33.     It is difficult to break into and stay profitable in the gaming equipment distribution business.  Casinos will consider acquisition of a new company's equipment only after the company has been licensed and the equipment has been certified by the regulatory agency and probably by the independent testing lab.  To successfully launch equipment in Nevada and other markets, the company must get licensed, obtain equipment certification, prove a competitive advantage based on either features or potential player acceptance, establishing a working relationship with the casino executives, and (where applicable) clear intellectual property rights.  The bottom line, is that entry into the casino market requires a substantial investment of money and resources. The above conditions and the existing competition in the market makes it difficult for newcomers to enter.

34.     While I am not taking any position on the merits of the lawsuit as part of my expert opinion, the fact that Empire now occupies a position in the market as a Las Vegas-based distributor of gaming equipment makes it meaningfully harder for LT Game to enter that same market given the level of competition and the limited resources and customers. If Empire has already established relationships with casinos like Commerce Casino and others, it will be meaningfully more difficult for LT Game to try to sell to any of those same customers now.

35.     Most of these casinos probably also purchase gaming equipment from suppliers other than Empire, such that Empire itself is already competing with other suppliers.  In view of Empire already being an equipment distributor to these casinos, it will be that much harder for LT Game to compete.

36.     Empire now also effectively has a 10 year head start on LT Game. It is my understanding that as of the end of 2023, LT Game had been left a shell with essentially no business operations or employees left, but that as of 2024, LT Game has tried to start over again. This will be a difficult path for LT Game because it will now need to begin again with seeking gaming licenses, hiring employees, and generating relationships with

8

customers and business partners. Empire's significant head start makes it meaningfully difficult for LT Game to catch up and compete.

## V.    CAPACITY OF PARADISE / LT GAME TO BECOME LICENSED

37.    I am informed that the arrangement between LT Game and Empire prior to this lawsuit was that Empire acted as the distributor for LT Game.  While I take no position on the substance of the relationship between the parties and what legal obligations they had to one another, I can say that it is not unusual that a company without a license might rely upon another company with a license to handle distribution, and there is nothing improper about that arrangement in and of itself, assuming that all the parties involved fully understood the situation and had appropriate legal counselling about it.  In fact, this often occurs since a distributor has established relationships with existing operator shortcutting the sales process. For a foreign company like Paradise that lacked prior experience in the US gaming market, I would have expected them to rely on their US gaming lawyers and consultants to present options and advice about how to proceed regarding licensing.  My experience included work in the online gaming market.  The company that originally hired me, Spin Games LLC, was acquired by Bragg Gaming Group primarily due to the relationships Spin had with those entities that game content is targeted for distribution.

38.    I understand that Defendants have suggested that perhaps LT Game could not have been licensed. Based on my extensive work with the Nevada Gaming Control Board and numerous other regulatory agencies, as well as my long experience in the gaming industry, I have done a basic assessment of whether there appears to be any impediments to LT Game Inc. becoming licensed. While it would be impractical to duplicate a full blown Nevada licensing investigation (which could consume thousands of hours over multiple years), based on a reasonable review of key evidence, I do not see

9

any basis for Defendants to argue that LT Game could not have been licensed.  My review included:

    a.  A review of financial statements of Paradise Entertainment Limited

        i.  Paradise Financial Statements from 2019 to 2024.  (See Exhibits)

        ii.  Paradise Interim Financial Statements from 2019 to 2025 (See Exhibits)

    b.  Corporate documents and Macau license certificates

        i.  Various Macau, Philippine, and other documents (See Exhibits)

    c.  Review of depositions of Jay Chun and Leo Chan (See Exhibits)

    d.  An extensive review of internet information for LT Game and Paradise regarding the companies for any evidence of fines or sanctions by any regulatory agencies or any other negative information that would impact licensing. (See Exhibits)

39.    A licensing body investigating LT Game would conduct background checks on its managers, including Paradise managers, to understand whether there were any red flags, such as criminal records or corrupt business dealings. The financial health of the company would also be assessed to ensure that it could adequately support the manufacture and distribution of high quality gaming equipment.

40.    As noted previously, I reviewed the transcripts of the depositions of Jay Chun and Leo Chan. These witnesses testified under oath about their first hand knowledge of Paradise/LT Game, including its business practices and finances. None were aware of any business misconduct or bad business practices. Paradise's witnesses also confirmed the financial health of the company consistent with its annual financial reports.  I am further informed that Mr. Frank Feng and Ms. Betty Zhao – who are both closely affiliated with Paradise (including being relatives of Dr. Chun and his wife) and have knowledge of its operations over many years – were not able to identify any misconduct or inappropriate business practices of Paradise when asked about this under

oath in their depositions, which is compelling.   I also conducted an internet search to try to find evidence of any publicly reported misconduct but did not locate any.   I am not aware of any such evidence having been put forward by the Defendants in this case despite their own investigation as part of this litigation having been pending for several years.

41.   I am informed that Defendants have called attention to a VIP Room license that Dr. Chun's wife, Jenny Chun, was granted approximately two decades ago in Macau. Defendants apparently imply that operation of a VIP Room suggests some form of business misconduct. I am familiar with the Macau VIP Rooms: they are essentially casino operations that cater to gamblers who bet large amounts of money and are frequently associated with junket operations. My familiarity with Macau casinos is based on the fact that during my tenure with Scientific Games, our casino management systems were sold to a high percentage of major Macau operators and included multiple visits to Macau during my employment there.   Merely operating a VIP Room does not mean that the operator is engaging in any misconduct: VIP Rooms are a legal form of business that is officially licensed in Macau.  Absent evidence of illegal business practices, there is nothing about Jenny Chun's possession of a VIP Room license many years ago that would impede Paradise/LT Game in getting gaming licenses in the US.  In addition, it should be noted that VIP Rooms are operated in major Macau properties such as MGM, Sands, Venetian, Wynn and others that operate casinos in Nevada and have existing NGCB licenses.

42.   While it would be impractical to conduct a full-blown licensing investigation – a process that often takes a year or longer and a staff of multiple people – I believe that I have reviewed adequate evidence to say that there are no indications that LT Game would not have been able to be licensed to distribute gaming products in the US, including in Nevada. If Paradise (as the owner of LT Game) is as it appears to be – a reputable and

11

adequately financed company – LT Game can expect to be successfully licensed after going through the application process.

I declare under penalty of perjury that the foregoing truthfully reflects my opinions based upon my knowledge and the evidence I have considered.

Dated: January 9, 2026

Thomas Doyle