PATRICK J. REILLY, ESQ.
Nevada Bar No. 6103
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
100 North City Parkway, 16th Floor
Las Vegas, Nevada  89106
Telephone:      (702) 382-2101
Facsimile:      (702) 382-8135
preilly@bhfs.com


MARK T. OAKES, ESQ. (*pro hac vice*)
ZACHARY P. MCHENRY, ESQ. (*pro hac vice*)
ETHAN GLENN, ESQ. (*pro hac vice*)
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Blvd., Suite 1100
Austin, Texas  78701-4255
Telephone:      (512) 474-5201
Facsimile:      (512) 536-4598
mark.oakes@nortonrosefulbright.com
zach.mchenry@nortonrosefulbright.com
ethan.glenn@nortonrosefulbright.com


*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; LT GAME, INC., a Nevada corporation; and LT GAME LIMITED, a British Virgin Islands corporation,<br><br>                    *Plaintiffs*,<br><br>          v.<br><br>EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; DARYN KIELY, an individual,<br><br>                    *Defendants.* | Case No. 2:24-cv-00428-JCM-BNW<br><br><br>**DEFENDANTS' OPPOSITION TO MOTION TO LIMIT TESTIMONY OF PAUL PETERSON** |

**Table of Contents**

Page

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ...................................................................................................................... 6

      I.      Peterson is Amply Qualified to Offer Damages Rebuttal Opinions ....................... 6

      II.     Peterson's Opinions Are Reliable ............................................................................. 8

      III.    Peterson's Testimony Should Not Be Excluded Under Rule 403 .......................... 10

      IV.    Peterson's Testimony Regarding the $1,005,000 Transfer Is Proper ................... 11

CONCLUSION ................................................................................................................. 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Boyne USA, Inc.*,
No. CV 21-95-BU-BMM, 2025 WL 1475529 (D. Mont. Feb. 11, 2025) ................................ 8

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014), overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) .................................................. 7

*Calvert v. Ellis*,
No. 2:13-CV-00464-APG-NJK, 2014 WL 3897949 (D. Nev. Aug. 8, 2014) ........................ 12

*Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*,
57 Cal. App. 5th 1108 (2020) ........................................................................ 5, 9, 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ............................................................... 1, 2, 5, 6, 7, 8

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) ........................................................................ 7

*Laflamme v. Safeway, Inc.*,
No. 3:09-CV-00514-ECR-VPC, 2010 WL 3522378 (D. Nev. Sept. 2, 2010) ........................ 12

*Lux v. Buchanan*,
No. 2:23-CV-00839-MMD-NJK, 2024 WL 1598805 (D. Nev. Apr. 12, 2024) ..................... 11

*Micro Chem., Inc. v. Lextron, Inc.*,
317 F.3d 1387 (Fed. Cir. 2003) ........................................................................ 7

*Olenicoff v. UBS AG*,
No. SACV 08-1029 AG (RNBx), 2010 WL 8530286 (C.D. Cal. Mar. 16, 2010). ........................................................................ 10

*Pelican Int'l, Inc. v. Hobie Cat Co.*,
655 F. Supp. 3d 1002 (S.D. Cal. 2023) ........................................................... 7

*Pinterest, Inc. v. Pintrips, Inc.*,
No. 13-CV-04608-HSG, 2015 WL 2268498 (N.D. Cal. May 14, 2015) ............................... 12

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ........................................................................ 6

*SiteLock LLC v. GoDaddy.com LLC*,
562 F. Supp. 3d 283 (D. Ariz. 2022) ................................................................... 12

*Smallman v. MGM Resorts Int'l,*
  638 F. Supp. 3d 1175 (D. Nev. 2022) .................................................................................... 10

*Summit 6, LLC v. Samsung Elecs. Co.,*
  802 F.3d 1283 (Fed. Cir. 2015) .............................................................................................. 8

**Rules and Statutes**

Fed. R. Evid. 403 ......................................................................................................... 2, 10

Fed. R. Evid. 702 ......................................................................................................... 1, 2, 6

Fed. R. Evid. 703 ................................................................................................................ 7

Defendants Empire Technological Group Limited ("Empire"), Gaming Specialized Logistics, LLC, Linyi "Frank" Feng, Roy Kelcey Allison, and Daryn Kiely (collectively "Defendants") respectfully submit this opposition to Plaintiffs' *Daubert* Motion to Limit Testimony of Paul Peterson, ECF No. 192 ("Mot.").[1]

**<u>INTRODUCTION</u>**

Plaintiffs ask the Court to do through *Daubert* what they could not do in opposing Defendants' summary judgment motion: transform a short-term transfer that was repaid within a month into a claim for more than $127 million in profits from a business Plaintiffs could not pursue themselves. Their motion is not a genuine challenge to expert methodology. It is a vehicle for relitigating two merits issues already before the Court on summary judgment: whether Plaintiffs could lawfully and practically have pursued the F2 opportunity at all; and, *if Plaintiffs could not have pursued the opportunity*, whether they may nevertheless seize F2's profits by relabeling a failed corporate opportunity claim as unjust enrichment. Those are legal and merits questions for the Court, not grounds for excluding a rebuttal damages expert.

Paul Peterson is precisely the kind of expert needed to rebut Plaintiffs' expert, Clarke B. Nelson: a seasoned forensic accountant retained to test the assumptions underlying Plaintiffs' extraordinary F2 damages model. Plaintiffs do not challenge Peterson's qualifications. They do not identify any error in his arithmetic. They do not dispute the mechanics of his time-value-of-money calculation. Instead, they object that Peterson refused to accept Nelson's central premise that every dollar of F2's profit belongs to Plaintiffs. But Peterson was not required to assume away the dispositive defects in Plaintiffs' theory. He properly relied on the separate licensing analysis of Defendants' California gaming expert, Tiffany Lichtig, who explained why Nelson's wholesale-disgorgement model is untethered to the governing facts and law. Peterson then offered an alternative measure tied to the only F2-related theory that remains even conceivably available to Plaintiffs based on the facts of this case: temporary use of funds that were repaid within a month. That is classic rebuttal testimony, not a Rule 702 problem.

---

[1] The Parties agreed to file their respective *Daubert* opposition briefs on July 31, 2026.

Plaintiffs' remaining attacks only confirm the point. Their effort to bar Peterson from discussing the $1,005,000 transfer, and their demand that he brand disputed conduct as "embezzlement" or "fraud," do not address methodological unreliability. They instead are transparent attempts to use *Daubert* to secure a merits ruling Plaintiffs cannot otherwise obtain. Peterson's opinions satisfy Rule 702; they are reliable, relevant, and properly confined to damages. Any disagreement with his assumptions or conclusions goes to weight, not admissibility. And nothing about his testimony risks confusing the jury or unfairly prejudicing Plaintiffs under Rule 403. The motion should be denied in full.

## BACKGROUND

***Peterson's Retention and Scope***

Paul Peterson is a Principal in BDO's Forensics Practice with more than 28 years of experience as an auditor and forensic accountant. ECF No. 189 at 253-502 (Expert Rebuttal Report of Paul Peterson, Feb. 6, 2026 ("Peterson Rep.")) at ¶¶ 5-11 and Attachment 2;[2] Ex. A-1 (Deposition of Paul Peterson, Mar. 13, 2026 ("Peterson Dep.")) at 13:12-13. He has held leadership positions at BDO, Grant Thornton, and Deloitte. ECF No. 189 at 253-502 (Peterson Rep.) at ¶¶ 5-11 and Attachment 2. He is a Certified Public Accountant (CPA), Certified Fraud Examiner (CFE), Certified in Financial Forensics (CFF), and Certified Internal Auditor (CIA). *Id.* He has extensive litigation experience, including working on damages calculations for hundreds of cases. Ex. A-1 (Peterson Dep.) at 14:3-11.

Defendants retained Peterson to respond to Plaintiffs' damages expert, Clarke Nelson. Nelson proposes to offer opinions on four categories of alleged damages: (1) $24.9 million for monies, spare parts, and machines allegedly expended on Plaintiffs' U.S. subsidiary, LT Game, and/or Empire; (2) $127.7 million in operating profit earned by non-party F2 TPS, LLC ("F2") on the theory that F2 was a usurped corporate opportunity; (3) $6.6 million in profits earned by Empire

---

[2] Defendants filed the Peterson Report under seal as Exhibit A-10 to their *Motion to Exclude Certain Opinions and Testimony of Plaintiffs' Damages Expert Clarke B. Nelson*. ECF No. 189 at 253-502. The parties later filed a joint motion to seal certain exhibits submitted with that motion, in which Plaintiffs requested that portions of the Peterson Report remain sealed. ECF No. 194 at 4. That motion remains pending. To avoid burdening the Court with a duplicative sealing motion as to the same document, Defendants respectfully refer the Court to the Peterson Report already filed under seal. For these same reasons, Defendants respectfully refer the Court to the sealed versions of the Nelson Report (ECF No. 189 at 25-160) and the Supplemental Nelson Report (ECF No. 189 at 161-175) already filed under seal.

2

apart from its business with Plaintiffs on the theory that those profits stem from usurped opportunities or from Plaintiffs' copyrights and unidentified trade secrets; and (4) $959,030 in alleged lost profits from the sale of certain slot machines. *See* ECF No. 189 at 25-160 (Expert Report of Clarke B. Nelson, Jan. 9, 2026 ("Nelson Rep.")) at 24–44 & Schedule 21; *see also* ECF No. 189 at 161-175 (Supplemental Report of Clarke B. Nelson, Mar. 26, 2026) at Schedule 24 (chart purporting to set forth Clarke's four damages categories).

***Peterson's Challenged Opinions***

Plaintiffs' motion focuses on Peterson's rebuttal to Nelson's second damages category: F2's operating profits ($127.7 million). Nelson reached that figure by assuming the central liability issue in dispute—namely, that F2 "represents a business opportunity usurped by Defendants"—and then treating every dollar of F2's profit as "lost profits to Plaintiffs and/or unjust enrichment to Defendants." ECF No. 189 at 25-160 (Nelson Rep.) at ¶¶ 41, 48. He performed no damages analysis, nor did he make any attempt to tie F2's profits to any business Plaintiffs could lawfully or practically have obtained. Nelson simply lifted F2's profit figures from its financial statements and relabeled them as damages—more specifically, as "lost profits and/or unjust enrichment." *Id.*

Peterson correctly identified that Nelson's conclusion is based on the flawed assumption that F2 is a usurped business opportunity that Plaintiffs could have captured. ECF No. 189 at 253-502 (Peterson Rep.) at ¶¶ 82-86. In reality, Plaintiffs could not lawfully operate the F2 business— third-party proposition player services ("TPPPS")—because California gaming law required registration and licensure that Plaintiffs could not obtain. *See id*. This TPPPS licensing issue is addressed by Defendants' separate gaming expert, Ms. Lichtig, who explains three independent reasons why Plaintiffs could not obtain the necessary license: (i) they were legally incapable under California law, (ii) they could not have obtained the necessary registration in time to take advantage of the F2 opportunity, and (iii) because of timing constraints, the relevant casino (Hawaiian Gardens) would not have selected Plaintiffs as its TPPPS applicant. *See* Ex. A-2 (Expert Rebuttal Report of Tiffany Lichtig, Feb. 6, 2026 ("Lichtig Rep.")) at §§ VI.A, VI.B, VI.C. Peterson therefore calculated the time value of the funds Plaintiffs allege Mr. Feng used to help capitalize F2, because that is the only measure conceivably tied to Plaintiffs' remaining F2-related theory: alleged misuse

of money, not loss of a business opportunity Plaintiffs never could have pursued. *See* ECF No. 189 at 253-502 (Peterson Rep.) at ¶ 89 and n.141. In short, Peterson's rebuttal shows that Nelson's wholesale-disgorgement model depends on an assumption Nelson never analyzed and cannot presume.

Plaintiffs do not challenge Peterson's arithmetic. They do not identify any error in his time-value-of-money calculation, and they do not attack the methodology he used to compute it. Their motion instead contests two predicate propositions: first, that F2 was ***not*** a corporate opportunity available to Plaintiffs; and second, that if F2 was not such an opportunity, Plaintiffs ***cannot*** recover all of F2's profits under a fallback unjust enrichment theory. *See* Mot. at 7-8. Neither is a basis for exclusion—***those are merits issues already squarely before the Court in Defendants' summary judgment motion***.

And on those merits issues, Plaintiffs are wrong. Nevada law requires Plaintiffs to show they had a practical ability to pursue the alleged corporate opportunity before they can claim it was usurped. ECF No. 177 (Defendants' Partial Motion for Summary Judgment, ("Defs.' MSJ")) at 26. A party that was legally incapable of entering the business cannot satisfy that requirement as a matter of law. *Id*. at 27. That is exactly what Ms. Lichtig establishes: California law prohibited Plaintiffs from obtaining the licensure necessary to participate in the F2 business; and, even if they could, they would not have been approved in time to take advantage of the F2 opportunity nor selected by the casino.[3] Plaintiffs' corporate-opportunity theory therefore fails—and thus any F2-related liability must be analyzed as a claim concerning the alleged misuse of funds that were repaid within a month, not as a claim to six years of profits from a business Mr. Feng was free to pursue himself. Attempting to avoid this reality, Plaintiffs merely relabel the defective claim for F2's profits as "unjust enrichment." *See* ECF No. 187 (Defs.' MSJ Reply) at 14. That is not the law. Plaintiffs cite no authority permitting disgorgement of profits from a venture to which they were

---

[3] Plaintiffs attempt to dispute Ms. Lichtig's TPPPS licensability opinions through Mr. Blonien, but he identifies no lawful path by which Plaintiffs could have entered the F2 business. ECF No. 187 (Defs.' MSJ Reply) at 13-14. Moreover, legal impossibility was only one of several independent reasons Defendants advanced on summary judgment for why F2 was not a corporate opportunity available to Plaintiffs. ECF No. 177 (Defs.' MSJ) at 27-29. Defendants also showed that F2 fell outside Plaintiffs' existing or prospective line of business and that Plaintiffs could not have obtained regulatory approval within the 60-day window, meaning the casino would not have selected them in any event. *Id*. Plaintiffs never meaningfully answered those points. ECF No. 187 (Defs.' MSJ Reply) at 12.

not entitled as a matter of law. *See* ECF No. 187 (Defs.' MSJ Reply) at 14-15; *see also supra*, n.3. To the contrary, Plaintiffs' own authority forecloses that result. *See Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*, 57 Cal. App. 5th 1108 (2020), discussed *infra*. And even if such a damages theory were legally viable, which it is not, the facts here still would not support Plaintiffs' unjust enrichment claim—much less the extraordinary windfall they seek of more than $127 million in downstream profits. ECF No. 187 (Defs.' MSJ Reply) at 15.

These merits issues are legal questions for the Court to decide, and Plaintiffs effectively concede as much.[4] Moreover, Defendants do not offer Peterson to resolve those legal questions. Plaintiffs' motion to exclude is therefore not a genuine challenge to Peterson's qualifications, methodology, or calculations. It is an effort to repackage summary-judgment arguments as a *Daubert* motion in a bid to rescue their defective F2 claims. Because Plaintiffs' objections go to legal and merits questions—not to anything improper in Peterson's analysis—their motion supplies no basis to exclude his testimony. The motion should be denied.

### Plaintiffs False "Embezzlement" Narrative

Unable to defend the analytical gap in Nelson's F2 opinion, Plaintiffs fall back on rhetoric. They fault Peterson for refusing to adopt pejorative labels such as "embezzlement" and "fraud" to describe the short-term cash advances from LT Game. Their complaint is simply that Peterson declined to supply the inflammatory terminology they would prefer. That is not a methodological challenge. It is advocacy masquerading as *Daubert*, and Plaintiffs cannot manufacture an exclusion issue by demanding that Peterson characterize disputed conduct in the most prejudicial terms available. More broadly, this portion of Plaintiffs' motion thus confirms the larger problem with the motion as a whole: it is not directed at unreliable expert testimony, but at testimony that undermines Plaintiffs' preferred narrative. As explained below, Plaintiffs' effort fails because it is wrong on both the law and the facts.

---

[4] Plaintiffs contend that whether they could lawfully participate in and receive profits from a California TPPPS business "is more akin to legal argument that will be exclusively heard by the Court rather than expert witness testimony for the Jury." Mot. at 2 n.1.

**LEGAL STANDARD**

Federal Rule of Evidence 702 permits expert testimony where: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The trial court's gatekeeping function under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is designed to screen out junk science and untethered speculation—not to resolve legitimate disputes between competing expert opinions. 509 U.S. at 597. Where challenges implicate the weight and credibility of an expert's opinion rather than its admissibility, exclusion is inappropriate. *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

**ARGUMENT**

**I.       Peterson is Amply Qualified to Offer Damages Rebuttal Opinions**

Peterson is qualified to provide damages testimony and Plaintiffs do not contend otherwise. His career spans 28 years in forensic accounting work. ECF No. 189 at 253-502 (Peterson Rep.) at ¶¶ 5-11 and Attachment 2; Ex. A-1 (Peterson Dep.) at 13:12-13. He holds CPA, CFE, CFF, and CIA certifications, which require continuing professional education and examinations. ECF No. 189 at 253-502 (Peterson Rep.) at ¶¶ 5-11 and Attachment 2. He has assisted with damages calculations in hundreds of litigation matters. Ex. A-1 (Peterson Dep.) at 14:3-11.

While Plaintiffs do not challenge Peterson's ability to testify on damages, they contend he is "unqualified to provide his opinion regarding licensing." Mot at 6. But Peterson is not providing an opinion on the ability or inability of Plaintiffs to obtain a license. As he explained in his report, Peterson obtained that information from Tiffany Lichtig, an expert on California gaming license requirements who provided a separate report and whose opinions Plaintiffs do not seek to exclude. ECF No. 189 at 253-502 (Peterson Rep.) at ¶ 86 & n.137; Mot. at 2 n.1; *see also* Ex. A-2 (Lichtig Rep.) at §§ VI.A, VI.B, VI.C. At deposition, Peterson confirmed that he is not an expert on California law and is relying on Ms. Lichtig with respect to her opinion that Plaintiffs could not

lawfully engage in the business conducted by F2. Ex. A-1 (Peterson Dep.) at 84:8-85:12. The law is clear that experts can reasonably rely on the opinions of other experts for expertise outside their field. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field."), overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1037 (S.D. Cal. 2023) (damages expert may properly rely on technical expert with expertise outside their field); *see also* Fed. R. Evid. 703 (explicitly allowing an expert to rely on information he or she has been made aware of "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject").

Nelson assumed for purposes of his analysis that F2 constitutes a usurped corporate opportunity. Peterson performed a calculation assuming that F2 is *not* a usurped corporate opportunity. The only difference is that Peterson's assumption, unlike Nelson's, is actually supported by facts and evidence.[5] Specifically, as Ms. Lichtig explains in detail, Plaintiffs could not lawfully engage in F2's business, or otherwise could not have obtained it. *See* Ex. A-2 (Lichtig Rep.) at §§ VI.A, VI.B, VI.C. Plaintiffs are free to challenge those facts through cross-examination, but that is not grounds for exclusion. *Pelican Int'l, Inc.*, 655 F. Supp. 3d at 1037 (disagreement with first expert's opinion relied on by second expert "is not [a] proper basis for exclusion"); *see also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("the test under *Daubert* is not the correctness of the expert's

---

[5] As Mr. Peterson recognized, Nelson's underlying assumption that Paradise would have captured the F2 business opportunity is supported by oral discussions with Dr. Chun, who alleged that he "expressed interest" in TPPPS opportunities. ECF No. 189 at 253-502 (Peterson Rep.) at ¶ 87. As Defendants explained in their summary judgment briefing, the contemporaneous record points the other way. *E.g.*, ECF No. 187 (Defs.' MSJ Reply) at 12 ("Plaintiffs also acknowledge Mr. Feng raised a TPPPS concept to Dr. Chun in 2016, and there is no evidence Plaintiffs did anything with it. Nor do Plaintiffs dispute that, just months before the F2 opportunity arose, Paradise told Lewis Roca that it did not want to get licensed in the United States, a position flatly inconsistent with any claim that it intended to enter the TPPPS business. Faced with those facts, Plaintiffs resort to broad statements about diversification and new, unsupported declarations that Dr. Chun wanted Mr. Feng to explore every profitable gaming opportunity.") (internal citations omitted).

conclusions"); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299 (Fed. Cir. 2015) ("To the extent [the expert]'s credibility, data, or factual assumptions have flaws, these flaws go to the weight of the evidence, not to its admissibility."); *Anderson v. Boyne USA, Inc.*, No. CV 21-95-BU-BMM, 2025 WL 1475529, at *4–5 (D. Mont. Feb. 11, 2025) (challenges to a damages expert's assumptions underlying his calculations are matters for cross-examination, not grounds for exclusion).

## II.      Peterson's Opinions Are Reliable

Plaintiffs next assert Peterson's F2 opinions are unreliable because, in their view, Plaintiffs' recovery "is not contingent on them having been able to be independently licensed." Mot. at 7. That is not a *Daubert* challenge to Peterson's methodology, qualifications, or analytical rigor. It is another disguised attempt to litigate the merits of their failed F2 claims by indirectly attacking Ms. Lichtig's opinions. The argument therefore fails for the two reasons already discussed.

First, Plaintiffs misstate what Peterson is doing. Peterson does not purport to opine on whether F2 was a corporate opportunity belonging to Plaintiffs. Nor does he opine on the legal question of whether disgorgement would be available if Plaintiffs cannot establish that F2 was such an opportunity. Those are legal issues for the Court. Peterson instead performs a damages analysis while relying on Ms. Lichtig's licensability opinions, which as discussed above is appropriate. Second, to the extent Plaintiffs disagree with the assumptions or inputs underlying Peterson's analysis, including the conclusion that Plaintiffs could not lawfully be licensed to receive F2-related proceeds, that disagreement goes to weight, not admissibility, and may be explored on cross-examination.

Even putting this aside, Plaintiffs' arguments fail on their own merits. Their first contention is that Plaintiffs "need not have been directly licensed as a TPPPS entity to profit from the F2 business, just as Empire was not licensed as a TPPPS provider yet still received money from F2." Mot. at 7. That assertion—which is unsupported by any citation—is premised on the same factual distortion Defendants have already addressed in their summary judgment reply. F2 was not formed "on behalf of" Empire; Mr. Feng invested his personal F2 earnings into Empire. ECF No. 187

(Defs.' MSJ Reply) at 14 n.11. And Defendants likewise already established that, under California law, Plaintiffs could not lawfully receive F2 proceeds unless they were registered and licensed. *Id*. Plaintiffs' contrary position is an invitation to disregard the governing licensing regime, and it demonstrates their continued misunderstanding of the applicable California gaming law.

Plaintiffs' second argument fares no better. They contend that, even if F2 was not an available corporate opportunity, they may still recover F2's profits under an unjust enrichment theory. Mot. at 7–8. They then attempt to frame Peterson as uninformed by asserting that he "seemed unaware that Plaintiffs' unjust enrichment claim related to the F2 opportunity." *Id*. at 8. But the problem here is not Peterson's understanding. It is Plaintiffs' law. The relevant question is not whether unjust enrichment can exist without a conventional damages showing. The relevant question is whether Plaintiffs may obtain disgorgement of profits from **a business venture that has already been determined to have not been their corporate opportunity in the first place**. On that point, Plaintiffs' authorities do not help them, and their leading case cuts squarely against them.

Specifically, in *Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*, 57 Cal. App. 5th 1108 (2020), the plaintiff sought disgorgement of several categories of profits from its former Chief Operating Officer, including profits from symposia that it claimed were a usurped corporate opportunity. 57 Cal. App. 5th at 1119-20. The trial court found that the symposia business was not a corporate opportunity and declined to order disgorgement of those profits, even though it found that a breach of a fiduciary duty by failing to disclose information about the business. *Id*. at 1121, 1131 ("[T]he court concluded that running the symposia was not a corporate opportunity [plaintiff] would have taken for itself, and that [plaintiff] was therefore not harmed by, and **could not recover** for, the nondisclosures.") (emphasis added). The company appealed, pointing to evidence that the defendant used company resources to assist with the symposia business. *Id*. at 1132. The Court of Appeal affirmed on the basis that there was substantial evidence that the symposia was not a company opportunity. *Id*. at 1132-33.

*Ctr. for Healthcare Educ. & Rsch.* is fatal to Plaintiffs' theory. If the underlying venture is not a corporate opportunity, there is no disgorgement of profits. Moreover, in affirming that

disgorgement was not available, the Court of Appeal noted that the unapproved use of company assets was potentially actionable to the extent the plaintiff "pursued recovery of the purportedly misappropriated assets." *Id*. at 1133 n.12. This is the same distinction between F2 claims related to a usurped business opportunity and misappropriation of funds. *See* ECF No. 187 (Defs.' MSJ Reply) at 14-15, 15 n.13. And this is the same distinction Mr. Peterson makes in providing a damages figure based on a time-value-of-money calculation rather than profits.

The other cases Plaintiffs cite do not address this issue at all. *Smallman v. MGM Resorts Int'l* did not authorize disgorgement; it dismissed the unjust enrichment claim because the plaintiffs failed to plead the absence of an adequate remedy at law. 638 F. Supp. 3d 1175, 1198 (D. Nev. 2022). Not only does the case say nothing about whether a plaintiff may recover profits from a venture that was not its corporate opportunity, it highlights that Plaintiffs' unjust enrichment claim is also detective because they failed to allege that they do not have adequate legal remedies. *See* ECF No. 161 (SAC) at ¶¶ 305-310. The same is true of *Olenicoff v. UBS AG*, which involved allegedly excessive banking fees; it is not a usurpation of corporate opportunity case nor does it address whether a party can obtain disgorgement of profits from a business venture that was not a corporate opportunity. *See* No. SACV 08-1029 AG (RNBx), 2010 WL 8530286, at *29 (C.D. Cal. Mar. 16, 2010).

Defendants' summary judgment briefing recognized that Plaintiffs offered no authority to justify their alternative damages theory, and they again provide none. *See* ECF No. 187 (Defs.' MSJ Reply) at 14–15. Plaintiffs likewise fail to respond to Defendants' separate point that the facts here do not support their unjust enrichment claim, let alone recovery of the six years of downstream profits they seek. *See id*. In the end, Plaintiffs' so-called reliability challenge never identifies any flaw in Peterson's methodology because none exists. It is a merits argument repackaged as expert exclusion. The Court should reject that tactic and deny the motion.

**III.   Peterson's Testimony Should Not Be Excluded Under Rule 403**

Plaintiffs invoke Rule 403, but never do the required Rule 403 work. They do not weigh Mr. Peterson's probative value against any alleged prejudice, confusion, or cumulative effect, much less show that those concerns substantially outweigh the testimony's value. The Court should reject

10

these undeveloped arguments at the threshold. *See Lux v. Buchanan*, No. 2:23-CV-00839-MMD-NJK, 2024 WL 1598805, at *1 (D. Nev. Apr. 12, 2024) ("Courts only address well-developed arguments").

Regardless, their arguments are meritless. Plaintiffs say Mr. Peterson "improperly buttresses" Ms. Lichtig's TPPPS licensing opinion, but they never explain how. Mot. at 8. Mr. Peterson does not offer an independent licensing opinion or vouch for Ms. Lichtig. He relies on her regulatory analysis as an input to his damages rebuttal, which is permissible for the reasons explained above.

Nor is the testimony needlessly cumulative. Plaintiffs say Mr. Peterson offers no opinion independent of Ms. Lichtig's licensing analysis. *Id.* But Ms. Lichtig evaluated the regulatory and licensing assumptions underlying Mr. Nelson's opinions with respect to California gaming law. In contrast, Mr. Peterson addressed damages. Relying on Ms. Lichtig's licensing conclusion, he explained why Mr. Nelson's opinion that F2's operating profits reflect damages owed to Plaintiffs is flawed, and he calculated the actual damages by determining the time value of the money Plaintiffs claim was improperly used.

**IV.      Peterson's Testimony Regarding the $1,005,000 Transfer Is Proper**

Plaintiffs' second challenge targets Mr. Peterson's limited discussion of the $1,005,000 transfer used to fund F2. That challenge also fails.

Plaintiffs mischaracterize both Mr. Peterson's opinion and the record. Mr. Peterson does not opine that Mr. Feng acted properly, that the transfer was lawful, that repayment defeats liability, or that Plaintiffs cannot pursue their fraud, fiduciary-duty, or other liability theories. His opinion is limited to damages: he addresses the financial consequences of a $1,005,000 transfer that was repaid within the month, including the limited time-value calculation associated with that short-term use of funds. ECF No. 189 at 253-502 (Peterson Rep.) at ¶¶ 81, 89 & n.139, n.140, n.141.

That testimony is relevant because Plaintiffs seek to convert a short-term $1,005,000 transfer into more than $127 million in F2 profits. Mr. Peterson's time-value calculation rebuts Mr. Nelson's damages opinion by presenting an alternative measure that matches the factual reality of Plaintiffs' claim: an alleged short-term misappropriation of corporate funds, repaid in full, in the

context of a separate business venture that Plaintiffs were legally incapable of exploiting and to which they had no entitlement. Mr. Nelson's damages treatment bears no reasonable relationship to this context—and a damages rebuttal expert may identify that disconnect. *Laflamme v. Safeway, Inc.*, No. 3:09-CV-00514-ECR-VPC, 2010 WL 3522378, at *3 (D. Nev. Sept. 2, 2010) ("Contradicting expert opinions, questioning methodology, and opining on methods and facts plaintiffs' experts did not consider are precisely the type of rebuttal testimony the court would expect."); *SiteLock LLC v. GoDaddy.com LLC*, 562 F. Supp. 3d 283, 332 (D. Ariz. 2022) (noting a rebuttal opinion directly attacking the assumptions made by the initial expert should not be excluded); *Pinterest, Inc. v. Pintrips, Inc.*, No. 13-CV-04608-HSG, 2015 WL 2268498, at *1 (N.D. Cal. May 14, 2015) ("Of course, challenging the assumptions of an expert witness' report is a permissible topic of rebuttal testimony."); *Calvert v. Ellis*, No. 2:13-CV-00464-APG-NJK, 2014 WL 3897949, at *3 (D. Nev. Aug. 8, 2014) (holding that "the function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party").

Plaintiffs also argue that Mr. Peterson's testimony is unreliable because he "failed to investigate" whether Mr. Feng's conduct with respect to the transfer was "appropriate." Mot. at 10. But that is a liability question, not a damages-accounting question. A damages rebuttal expert need not resolve liability to test whether the claimed measure of damages follows from the financial facts. Mr. Peterson's opinions are limited to damages issues; not whether the transfer was lawful. Plaintiffs' disagreement with Mr. Peterson's characterization of the transfer does not make his financial analysis inadmissible, and Plaintiffs offer no legal authority to support such a sweeping proposition.

Plaintiffs also talk out of both sides of their mouth. They criticize Mr. Peterson for describing the transaction as a short-term advance, while they repeatedly label the same event "embezzlement" even though the record does not support that criminalized narrative. Plaintiffs falsely claim that "Mr. Feng has not disputed that he took the $1 million without permission." Mot. at 9. There was a history of funds being advanced between LT Game and Empire, and Mr. Feng explained that the transfer was part of this broader intercompany advance and borrowing practice

12

where no specific approvals had ever been required.[6] Indeed, Dr. Chun and his wife used LT Game funds for all sorts of personal purposes, including apparently a custom motorcycle.[7] And it is undisputed that the $1,005,000 transfer was repaid within the month. *E.g.*, ECF No. 189 at 253-502 (Peterson Rep.) ¶ 81; Ex. A-3 (Medero Dep.) at 167:14-16. That history is material, particularly in the context of closely related, family-controlled businesses. Plaintiffs further omit that their allegations about supposedly "erased" or altered bank records rest on Mr. Medero's post-deposition declaration that conflicts with Mr. Medero's unequivocal prior sworn testimony on the issue,[8] and which Mr. Feng denies. Ex. A-4 (Feng Dep.) at 150:8-22.

---

[6] Ex. A-3 (Deposition of Marcos Medero, Sept. 26, 2025 ("Medero Dep.")) at 78:10-79:17 (Mr. Feng helped fund LT Game payroll at times when Paradise had cash flow issues during pandemic), 105:7-107:6 (at times, Empire covered certain LT Game's expenses, such as health insurance, utilities, and storage); Ex. A-4 (Deposition of Frank Feng, Oct. 21 & 22, 2025 ("Feng Dep.")) at 76:5-19 ("Q. Did you get permission from the management and Jay Chun to take this money from LT Game Canada and use it for the purposes that you were using it? A. Well, here was the situation: LT Game Canada and Empire were both very small companies. It was quite common for them to advance payments to each other. For us it was quite common for us to advance payments to each other. Not only did LT Game Canada advance payments to Empire, Empire also advanced cash back to LT Game Canada. So this back-and-forth happened frequently, so there was never a need to go through upper management for approval. Even when they asked to borrow money from me, it didn't have to be approved by higher management. That's just how our companies operated. Small companies working closely together approving things among ourselves.").

[7] When initially asked, Dr. Chun unequivocally denied having used LT Game funds for personal expenses. Ex. A-5 (Deposition of Jay Chun, Oct. 30, 2025) at 139:14-16 ("No. Doesn't exist"). But when confronted with evidence of LT Game's financial records reflecting such expenses, Dr. Chun admitted to doing so. *E.g.*, *id*. at 141:6-21 ("Q. So the transactions reflected in Exhibit 196, are those loans from LT Game Canada form your personal expenses? A. Let's say you have the kids and get in the visa or the passport. When I United States, we need hire somebody to do that. . . . So, you know, let's say if I need to spend some money for the personal purposes, I will tell Frank to advance the money first. And then I use my check -- and use my personal check to pay back."); *see also* Ex. A-6 (Deposition of Leo Chan, Oct. 14, 2025) at 90:23-91:5 (testimony of Paradise's Chief Financial Officer) ("Q. How did you book Dr. Jay Chun and Jenny Feng's [Dr. Chun's wife's] expenses? A. The expenses needs to be reviewed and looked at individually. How to book the expenses, it all depends on the content of the expenses. For instance, if it is a personal expense, then it is supposed to be listed under 'personal.' If it's company related, then it's company-related expenses."); Ex. A-7 (ETG_00000093220) (May 3, 2019 email from Linda Chattin to Leo Chan) ("Leo [Chan] will provide instruction on how we handle book [Dr. Chun and his wife's] expenses"); ECF No. 189 at 25-160 (Nelson Rep.) at Schedule 6 (reflecting 2018 LT Game payment requestion of $10,000 for "Reimbursement for Deposit Paid by LTGC for Custom Motorcycle").

[8] Mr. Medero previously submitted a declaration in this litigation stating that Mr. Feng had "requested the transaction be kept off LT Game's books and records" and it did not mention altering bank records or any related conduct. *See* Ex. A-8 (ECF No. 55-2, Declaration of Marcos Medero, dated Feb. 21, 2025) at ¶ 8. Mr. Medero then confirmed this at deposition. Ex. A-3 (Medero Dep.) at 165:19-167:23 ("Q. Can you give me that -- what did he exactly say regarding this request, sir? A. He said that he just -- that Leo did not want to see it on the books, he just wants to keep everything as it was before, and this will be paid back, so it would kind of be -- like washes out at the end of the year. . . . They don't want to see the liability as a loan on the balance sheet. They just want to keep it as it is, and it will eventually, you know, wash out before the end of the year. Q. That was Mr. Feng's words? A. Yes. . . . Q. Did you do anything affirmatively to keep the transaction off of LT Game's books and records? A. Yes. Q. What did you do? A. I just didn't -- I didn't enter it into LT's books. But it was entered into Empire's books. . . . **Q. Any other affirmative conduct that was done regarding that? A. That I can remember, no**. . . . **Q. Did you do anything at that point, when the money came back, affirmatively on the books and records of the company, of LT? A. No**.") (emphasis added).

Plaintiffs' repeated "embezzlement" label is prejudicial advocacy, not an established fact. It assumes misconduct and accuses Mr. Feng of criminal culpability before the jury has resolved liability. The use of this language will be the subject of a motion in limine before trial, and it is certainly not language Plaintiffs can foist on Defendants' own expert.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion to exclude the testimony of Paul Peterson in its entirety.

Dated: July 31, 2026

Respectfully submitted,

*/s/ Patrick J. Reilly*
Patrick J. Reilly
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
100 North City Parkway, 16th Floor
Las Vegas, Nevada 89106

Mark Oakes (*pro hac vice*)
Zach McHenry (*pro hac vice*)
Ethan Glenn (*pro hac vice*)
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Boulevard, Suite 1100
Austin, Texas  78701-4255

*Attorneys for Defendants*

## INDEX OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | Declaration of Zach McHenry |
| A-1 | Deposition of Paul Peterson, dated March 13, 2026 |
| A-2 | Expert Rebuttal Report of Tiffany Lichtig, dated February 6, 2026 |
| A-3 | Deposition of Marcos Medero, dated Sept. 26, 2025 |
| A-4 | Deposition of Frank Feng, dated Oct. 21 & 22, 2025 |
| A-5 | Deposition of Jay Chun, dated Oct. 30, 2025 |
| A-6 | Deposition of Leo Chan, dated Oct. 14, 2025 |
| A-7 | ETG  00000093220, May 3, 2019 email from Linda Chattin to Leo Chan |
| A-8 | ECF No. 55-2, Declaration of Marcos Medero, dated Feb. 21, 2025 |

14

**CERTIFICATE OF SERVICE**

I, Patrick J. Reilly, counsel for Defendants, hereby certify that, on July 31, 2026, *Defendants' Opposition to Limit Testimony of Paul Peterson* was served on the following counsel of record by electronic transmission at the email addresses listed below:

*s/ Patrick J. Reilly*
Patrick J. Reilly

OLIVER J. PANCHERI, ESQ.
Nevada Bar No. 7476
JESSICA M. LUJAN, ESQ.
Nevada Bar No. 14913
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Tel.: (702) 791-0308
Fax: (702) 791-1912
Email: Opancheri@spencerfane.com
Jlujan@spencerfane.com

JEAN-PAUL CIARDULLO, ESQ.
California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

HANNAH ANDREWS, ESQ.
Nevada Bar No. 18157
ROBERT T. STEWART, ESQ.
Nevada Bar No. 13770
STEWART R. NELSON, ESQ.
Utah Bar No. 17286
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, UT 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
        srnelson@foley.com
        handrews@foley.com

DARIUSH KEYNANI (*pro hac vice*)
New Jersey Bar No. 044062002
**KEYHANI LLC**

15

1050 30th Street NW
Washington, DC 20007
Tel: (202) 748-8950
Email: dkeyhani@keyhanillc.com

*Attorneys for Plaintiffs*

16