# Exhibit A-2

# Expert Rebuttal Report of Tiffany Lichtig

# February 6, 2026

CONFIDENTIAL

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; and LT GAME INC., a Nevada corporation; and LT GAME LIMITED, a British Virgin Islands corporation, | Case No. 2:24-cv-00428-JCM-BNW |
| *Plaintiffs*, | |
| v. | **EXPERT REBUTTAL REPORT OF TIFFANY LICHTIG** |
| EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; DARYN KIELY, an individual, | |
| *Defendants*. | |

**February 6, 2026**

Tiffany Lichtig

**CONFIDENTIAL**

**Table of Contents**

I.  INTRODUCTION ........................................................................................ 4
  A. Assignment ....................................................................................... 4
  B. Qualifications ................................................................................... 5
  C. Case Background ............................................................................. 6
  D. Methodology ..................................................................................... 7
II.  SUMMARY OF REBUTTAL OPINIONS ............................................... 8
III. HISTORICAL OVERVIEW OF THE CALIFORNIA GAMBLING CONTROL ACT ...................................................................................... 9
  A. Origins and Purpose of the Gambling Control Act ....................... 9
  B. Distinction Between Tribal Gaming and Cardroom Gaming in California .... 10
  C. Cardrooms and the Use of TPPPS .................................................. 10
IV. REGULATORY FRAMEWORK GOVERNING TPPPS REGISTRATION AND LICENSURE (CIRCA JANUARY–MARCH 2020) ............................ 12
  A. Registration is a Regulatory Determination of License Qualification. ............. 12
  B. TPPPS Registration Requirements in Effect Circa January-March 2020 ....... 12
  C. Business and Professions Code Sections 19858 and 19858.5 and Former Regulation 12204(f) ...................................................................... 13
  D. California Requirement That All Owners Be Licensed or Found Suitable ..... 14
  E. Paradise Entertainment Limited – Ownership and Corporate Structure ....... 14
  F. Paradise's Macau Casino Management Revenues ............................... 15
  G. Plaintiffs' Expert Reports – Summary of Reports and Critiques ..................... 16
V.  ELEMENTS OF A BUREAU REGISTRATION INVESTIGATION CONDUCTED BETWEEN JANUARY AND MARCH 2020 ...................................... 18
VI. EXPLANATION OF OPINIONS AND ANALYSIS ................................ 19
  A. Mr. Doyle's and Mr. Nelson's opinions are incorrect because Paradise's and its subsidiaries' Macau casino management operations, which generated gross gaming revenue from banked table games and slot machines, constituted prohibited gaming interests under California Business and Professions Code sections 19858 and 19858.5; because Plaintiffs were engaged in prohibited gaming interests, it is my opinion that they were ineligible to obtain or hold a TPPPS registration, and it is my opinion that the Bureau would not have allowed Plaintiffs' to obtain or hold the TPPPS registration necessary to take advantage of the F2 opportunity. ........................................................................................... 19
  B. Mr. Doyle's and Mr. Nelson's opinions are incorrect because Paradise's status as a publicly traded company would have made Plaintiffs' timely TPPPS registration practically impossible due to California Business and Professions Code section 19858, which mandates individual registration and licensure of all corporate officers, directors, and shareholders, without any de minimis or public-company exemption, rendering Plaintiffs unable to obtain the TPPPS registration necessary to take advantage of the F2 opportunity. ........................ 20
  C. Mr. Doyle's and Mr. Nelson's opinions are incorrect because, given the strict deadlines facing Hawaiian Gardens, the substantial consequences of delay or denial of Plaintiffs' registration, and the operational disruptions caused by the onset of COVID-19 in March 2020, it would have been unreasonable and

**CONFIDENTIAL**

**unlikely for a cardroom to rely on a TPPPS applicant like Plaintiffs whose ownership structure materially increased the likelihood of regulatory delay or failure. ........................................................................................................... 21**

**APPENDIX A: MATERIALS RELIED UPON ........................................................... 23**

    **A.   Produced Documents ....................................................................... 23**

    **B.   Relevant Statutes and Regulations ............................................... 23**

    **C.   Other Public Materials .................................................................. 24**

    **D.   Depositions ...................................................................................... 24**

    **E.   The Parties' Filings ....................................................................... 25**

**APPENDIX B: RESUME AND PRIOR EXPERT ENGAGEMENTS ..................................... 26**

**CONFIDENTIAL**

## I.      INTRODUCTION

### A. Assignment

1.  I have been retained by counsel for Defendants to provide rebuttal expert analysis and opinions on behalf of the Defendants in this matter. Specifically, I have been asked to review and, if appropriate, rebut the expert reports served by Plaintiffs on January 9, 2026, including (i) the expert report of Thomas Doyle, which addresses gaming licensing issues, and (ii) the expert report of Clarke B. Nelson, which addresses Plaintiffs' claimed damages. My assignment is to, among other things, evaluate the regulatory and licensing assumptions underlying those expert opinions and determine whether the conclusions reached are consistent with California gaming law, regulatory practice, and the realities of licensing investigations conducted by California gaming regulators, and to opine on the resulting outcomes and consequences.

2.  With respect to Mr. Doyle's licensing report, I have been asked to evaluate whether his opinions accurately reflect California's regulatory framework governing cardrooms and third-party providers of proposition player services ("TPPPS"), including the registration and licensing requirements applicable during the relevant period (January–March 2020), the investigative standards applied by the California Bureau of Gambling Control and the California Gambling Control Commission, and whether his conclusions regarding Plaintiffs' ability to become licensed are consistent with how California regulators assess suitability, ownership, control, and eligibility to engage in regulated gaming activities.

3.  With respect to Mr. Nelson's damages report, I have been asked to evaluate the regulatory assumptions underlying his damages opinions, specifically his conclusion that Plaintiffs are owed approximately $127.7 million in profits allegedly arising from the F2 opportunity to provide TPPPS services at Hawaiian Gardens Casino, and his assumption that, but for Defendants' alleged conduct, Plaintiffs would have captured that opportunity. My analysis of Mr. Nelson's opinions does not address the mathematical calculation of alleged damages. Rather, it is limited to assessing whether his causation and lost-profits conclusions properly account for the threshold regulatory requirement that any entity performing TPPPS services in California must be registered or licensed, and whether Plaintiffs were capable of becoming registered during the relevant period to receive revenue from the F2 opportunity under California law.

4.  In performing this assignment, I considered California's statutory and regulatory framework governing TPPPS operations, public regulatory records, deposition testimony, and my experience with California gaming investigations and licensing practice. I do not offer legal opinions and assume that the applicable legal standards will be determined by the Court. In preparing this report, I relied on the documents referenced in this report as well as those listed in **Appendix A**.  I also had access to a database of all documents that have been produced in this case and considered many documents that were produced by the Parties, filed by the Parties, or are otherwise publicly available.

**CONFIDENTIAL**

### B. Qualifications

5. My current resume is attached to this report as **Appendix B**.

6. I am an attorney, regulatory consultant, and expert witness with nearly two decades of experience in California governmental affairs, administrative law, and gaming regulation. My background includes extensive work interpreting and applying California's Gambling Control Act, Gambling Control Commission regulations and policies, licensure and suitability requirements, and the lawful operation and regulation of cardrooms and TPPPS. I have served as both a regulator and a regulated-industry advisor and have testified as an expert in multiple matters involving California gaming law and regulatory compliance.

7. I received my Juris Doctor degree from the University of the Pacific, McGeorge School of Law, where I emphasized governmental affairs and served as Editor-in-Chief of the *McGeorge California Initiative Review*. I also hold a Bachelor of Arts degree in Government from California State University, Sacramento.

8. My relevant professional experience includes serving as a Commissioner of the California Gambling Control Commission from 2010 to 2016, where I reviewed and voted on applications for licensure, evaluated proposed settlement agreements, analyzed Commission regulations, and ensured compliance with the Gambling Control Act and implementing regulations. I am the founder and owner of California Gaming Advisors LLC, a government relations and regulatory compliance firm serving licensed gaming entities, including cardrooms and TPPPS, and the owner of The Law Office of Tiffany E. Lichtig, where I represent clients in licensing, disciplinary, and administrative proceedings before state agencies, including the Gambling Control Commission.

9. I have previously been retained as an expert witness in matters involving the interpretation and application of the Gambling Control Act and related regulatory requirements, including testimony regarding cardroom regulatory fees, licensing processes, Commission policies and regulations, and the lawful operation of gaming enterprises. These engagements are detailed in **Appendix B**.

10. I am being compensated for my time at a rate of $700.00 per hour. My compensation does not depend on the outcome of this case or on any opinion that I may offer.

11. I am not aware of any conflicts of interest presented in this engagement with any of my work as a gaming regulator, attorney, or consultant.

**CONFIDENTIAL**

### C. Case Background[1]

12. This matter arises from a dispute between Plaintiffs Paradise Entertainment Limited, LT Game, Inc., and LT Game Limited (collectively, "Plaintiffs") and Defendants Empire Technological Group Limited and related entities and individuals (collectively, "Defendants"). Plaintiffs allege that Defendants engaged in misconduct that resulted in the misappropriation of Plaintiffs' intellectual property, the usurpation of business opportunities, and the diversion of revenue that Plaintiffs contend should have accrued to them.

13. Paradise is a publicly traded global supplier of electronic gaming equipment and systems, and LT Game and LTG Limited are its subsidiaries involved in the development, marketing, and distribution of gaming products in North America and internationally.

14. Relevant to my opinion, Plaintiffs' Complaint alleges that Defendants captured gaming-related business opportunities that Plaintiffs contend should have been presented to or pursued by Plaintiffs or their affiliates.

15. Among the opportunities Plaintiffs claim were improperly diverted is the so-called "F2 opportunity," which Plaintiffs characterize as a TPPPS business opportunity associated with Hawaiian Gardens Casino in California. Plaintiffs allege that Defendants captured and profited from this opportunity, and that Plaintiffs were deprived of the ability to do so as a result of Defendants' alleged wrongful conduct. Plaintiffs further allege that, absent Defendants' conduct, Plaintiffs would have pursued and realized profits from the F2 opportunity.

16. Based on the pleadings and evidence, it is my understanding that the F2 opportunity arose in early 2020 when Frank Feng became aware of a potential opportunity to become the TPPPS at Hawaiian Gardens Casino in California.[2] At that time, Hawaiian Gardens faced the imminent expiration of its existing TPPPS arrangement. The California Bureau of Gambling Control granted the incumbent provider a final 60-day extension, requiring Hawaiian Gardens to identify and secure a replacement TPPPS by March 2020 in order to avoid an interruption of proposition player services.[3] On January 14, 2020, Feng formed F2 TPS, LLC by filing the Articles of Organization with the California Secretary of State.[4] F2 TPS, LLC entered into a

---

[1] Unless otherwise noted, the factual background summarized herein is derived solely from Plaintiffs' First Amended Complaint, dated February 27, 2025. This summary is provided for contextual purposes only and does not reflect independent factual findings or opinions regarding the truth or accuracy of Plaintiffs' allegations.

[2] Deposition of Linyi (Frank) Feng, October 22, 2025 (Volume 2), pp. 141-142.

[3] *See* Capitol Weekly, *The Tangled Web of California Cardrooms and Third-Party Proposition Players*, available at **https://capitolweekly.net/the-tangled-web-of-california-cardrooms-and-third-party-proposition-players/** (last visited Feb. 5, 2026).

[4] *See* BizFile Online, California Secretary of State, Business Search for F2 TPS, LLC (showing Articles of Organization filed with the California Secretary of State on January 14, 2020), available at https://bizfileonline.sos.ca.gov/search/business (last visited Feb. 5, 2026).

**CONFIDENTIAL**

TPPPS contract with Hawaiian Gardens on February 24, 2020,[5] and the Commission approved F2 TPS, LLC's and Frank Feng's registration on March 6, 2020.[6]

17. Plaintiffs' damages expert Mr. Nelson relies on these allegations to support a claim that Plaintiffs suffered substantial lost profits attributable to the F2 opportunity. Plaintiffs' licensing expert Mr. Doyle likewise opines that Plaintiffs could have obtained the necessary gaming approvals to participate in gaming-related activities in the United States, including the F2 opportunity.

18. I understand that Plaintiffs made a new document production on February 4, 2026. Given the timing of Plaintiffs' production and the deadline to serve this report, I was not able to adequately review all documents in that production before serving this report. I therefore reserve the right to rely on documents from that production that may be relevant to my opinions herein, and to supplement or amend this report as necessary based on my review of those documents.

19. I also understand that additional document productions may be forthcoming in this case that may contain additional relevant documents after I issue this report. I may, and reserve the right to, review and rely on additional documents in conducting my work and forming my opinions in this case. I also reserve the right to supplement or amend this report if my opinions change or require supplementation as a result of my ongoing review of documents.

### D. Methodology

20. To form my opinions, I applied the principles, theories, and tools that stem from my education, expertise, experience, and training. I applied those principles, theories, and tools using commonly used methods of analysis and research in those fields. Using that analysis, I reached the opinions set out below.

21. Additionally, I was given unrestricted access to a database of documents from Defendants' counsel, which I understand contained all documents that the Parties have produced in this litigation. I conducted my own searches for material relevant to this case using key terms from my expertise and experience. At the time I submitted this report, the database included 92,675 documents. I searched and reviewed a large volume of these documents, including those referenced in Plaintiffs' expert reports, ignoring documents that were not relevant to my assignment and tracking any on which I relied to form my opinion.

22. When appropriate, I include specific references in this report to documents which I relied on to form my opinion. Some of these documents come from the database. However, these specific references should not be viewed as the only documents on which I relied on forming my opinion; the full list of the materials I relied on are attached to this report as **Appendix A**. Additional documents not listed in that appendix were also examined to provide a fuller understanding of the issues at hand, though those documents were not relied on to form my opinions and thus are not listed in **Appendix A**.

---

[5] ETG_00000144836.
[6] ETG_00000328526.

**CONFIDENTIAL**

23. For purposes of better understanding the issues at hand, I also consulted documents and materials that experts in my field would reasonably rely on to form an opinion on these subjects, like legal statutes, treatises, and regulations applicable to this subject. I also consulted other publicly available material.

## II. SUMMARY OF REBUTTAL OPINIONS

24. Based on my review of the relevant reports, the evidence, documents, and other materials, I have formed the following rebuttal opinions to Plaintiffs' expert opinions that Plaintiffs were capable of taking advantage of the F2 opportunity, were suitable for TPPPS registration in California,[7] could have obtained registration in time to do so, are owed approximately $127.7 million in profits from the alleged F2 opportunity, and that Defendants' alleged conduct caused Plaintiffs to lose that opportunity:

    a. Mr. Doyle's and Mr. Nelson's opinions are incorrect because Paradise's and its subsidiaries' Macau casino management operations, which generated gross gaming revenue from banked table games and slot machines, constituted prohibited gaming interests under California Business and Professions Code sections 19858 and 19858.5; because Plaintiffs were engaged in prohibited gaming interests, it is my opinion that they were ineligible to obtain or hold the TPPPS registration, and it is my opinion that the Bureau would not have allowed Plaintiffs to obtain or hold the TPPPS registration necessary to take advantage of the F2 opportunity.

    b. Mr. Doyle's and Mr. Nelson's opinions are incorrect because Paradise's status as a publicly traded company and as the parent company of LT Game Ltd. and LT Game, Inc. would have made Plaintiffs' timely TPPPS registration practically impossible due to California Business and Professions Code section 19852, which mandates individual registration and licensure of all corporate officers, directors, and shareholders, without any de minimis or public-company exemption, rendering Plaintiffs unable to obtain the TPPPS registration necessary to take advantage of the F2 opportunity.

    c. Mr. Doyle's and Mr. Nelson's opinions are incorrect because, given the strict deadlines facing Hawaiian Gardens, the substantial consequences of delay or denial of Plaintiffs' registration, and the operational disruptions caused by the onset of COVID-19 in March 2020, it would have been unreasonable and unlikely for a cardroom to rely on a TPPPS applicant like Plaintiffs whose ownership structure materially increased the likelihood of regulatory delay or failure.

---

[7] Mr. Doyle's opinions regarding Plaintiffs' suitability for licensure necessarily include that Plaintiffs would have been found suitable for TPPPS registration under California law.

III.    HISTORICAL OVERVIEW OF THE CALIFORNIA GAMBLING CONTROL ACT

### A. Origins and Purpose of the Gambling Control Act

25. Cardroom gaming has existed lawfully in California for more than 100 years, dating back to the earliest days of California statehood. Unlike casino-style gambling prohibited by the California Constitution, cardrooms developed as a distinct and lawful form of gaming centered on non-banked card games, subject historically to local control and regulation.[8] By the mid-1990s, however, the Legislature determined that California's gaming industry had grown sufficiently complex and economically significant to require a comprehensive, statewide regulatory framework. In response, the Legislature enacted the Gambling Control Act of 1997 ("GCA"), codified at Business and Professions Code section 19800 et seq. The GCA marked the first unified statutory scheme governing the licensing, regulation, and oversight of California cardrooms and related gaming service providers, including TPPPS. The Legislature expressly declared that gambling is a matter of public trust and that the regulation of controlled gambling is intended to promote public confidence in the integrity of the gaming industry.[9] To effectuate these purposes, the GCA established a dual-agency regulatory structure consisting of the California Gambling Control Commission ("Commission") and the California Bureau of Gambling Control ("Bureau"), a division of the Department of Justice. Under this structure, the Commission is vested with primary licensing and adjudicatory authority, including the power to issue, deny, condition, suspend, and revoke licenses for cardrooms, TPPPS entities, and individual gambling employees.[10] The Bureau, in turn, is responsible for conducting extensive background investigations of applicants for licensure and suitability and monitoring licensed gambling establishments on an ongoing basis.[11]

26. The GCA reflects two interrelated and overarching legislative goals. First, it authorizes and preserves lawful cardroom gaming as a legitimate and regulated business activity in California. Second, it seeks to ensure that gambling activities are conducted in a manner that protects the public interest by preventing criminal influence, unsuitable ownership, and indirect or hidden participation by prohibited persons. To advance these goals, the Legislature mandated strict licensing and suitability standards designed to ensure that only individuals and entities meeting high standards of honesty, integrity, and financial responsibility may participate in the gambling industry.[12]

---

[8] California Business and Professions Code section 19801.
[9] *Id.*
[10] Cal. Bus. & Prof. Code, § 19824.
[11] Cal. Bus. & Prof. Code, §§ 19826, 19827.
[12] Cal. Bus. & Prof. Code, §§ 19857, 19859.

### B. Distinction Between Tribal Gaming and Cardroom Gaming in California

27. California maintains a deliberately segmented system of regulated gaming, under which different forms of gambling are authorized, regulated, and overseen pursuant to distinct constitutional, statutory, and regulatory frameworks.[13] This structure reflects long-standing policy choices by the Legislature and the voters to permit certain forms of gaming while strictly limiting others. Tribal gaming in California operates pursuant to tribal-state gaming compacts authorized under the federal Indian Gaming Regulatory Act ("IGRA") and approved by both the Governor of California and the Legislature. Tribal gaming activities are conducted on federally recognized tribal lands and are governed primarily by the terms of the applicable compact, tribal gaming ordinances, and federal law.[14]

28. Although tribal gaming in California is primarily governed by federal law and tribal–state gaming compacts, the State of California does conduct findings of suitability for certain non-tribal persons and entities that provide goods or services to tribal gaming operations. These persons and entities are commonly referred to as tribal gaming resource suppliers. Pursuant to the terms of California's tribal–state gaming compacts, the Commission is authorized to determine the suitability of tribal gaming resource suppliers whose services relate directly to the operation, management, or integrity of tribal gaming activities.[15] This suitability process is distinct from the registration and licensure of cardrooms and TPPPS under the GCA because it does not require an application for a finding of suitability from shareholders of a gaming resource supplier who own ten percent or less of a corporation.[16]

29. In conducting these suitability determinations, the Bureau performs background investigations to ensure that non-tribal vendors, contractors, and service providers meet standards of honesty, integrity, and financial responsibility before they are permitted to conduct business with tribal gaming operations.[17] These investigations typically include reviews of ownership and control structures, financial arrangements, criminal history, and associations that could pose a risk to the integrity of gaming operations.[18] The results of these investigations are then presented to the Commission, which makes the final determination regarding suitability. This process reflects the State's limited but important role in safeguarding the integrity of gaming activities conducted pursuant to tribal–state compacts, while respecting tribal sovereignty and the federal regulatory framework established by IGRA.

### C. Cardrooms and the Use of TPPPS

30. A central feature of California's regulated cardroom model is the longstanding prohibition on "banking games." Under California law, a "banking game" has a fixed and well-established meaning: one in which the "house" participates in the game by wagering against all players,

---

[13] *Hotel Employees & Restaurant Employees Int'l Union v. Davis*, 21 Cal.4th 585, 589–590, 594–595 (1999).
[14] *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 718–719 (9th Cir. 2003).
[15] *See* California's Tribal–State Gaming Compact, § 6.5.6.
[16] California Code of Regulations, title 4, section 12120.
[17] Cal. Bus. & Prof. Code, § 19805(j).
[18] Cal. Bus. & Prof. Code, §§ 19857, 19859.

*Expert Rebuttal Report of Tiffany Lichtig*                                    Page **10** of **26**

**CONFIDENTIAL**

paying all winners, and collecting from all losers using the house's funds.[19] This model is characteristic of casino gambling in jurisdictions such as Nevada and New Jersey, where a single dealer—an employee and agent of the casino—represents the house and uses house funds to wager against patrons. California law has prohibited gambling conducted in this manner since 1872.[20] In 1984, California voters elevated this statutory prohibition to a constitutional mandate. Through an amendment to the California Constitution, the State expressly banned "casinos of the type currently operating in Nevada and New Jersey," while preserving the legality of the gaming establishments already operating in California—commonly referred to as "card rooms."[21]

31. Consistent with this framework, California cardrooms have long offered what are known as "player-dealer" games.[22] In a player-dealer game, the cardroom itself does not participate in the wagering and does not assume the role of the bank. For each hand or round of play, one player position is designated as the player-dealer position. The individual occupying that position wagers a fixed amount of their own funds, and the remaining players at the table generally wager against that player-dealer position—not against the cardroom.

32. TPPPS exist within this legal and constitutional structure. TPPPS are independent businesses licensed by the Commission to provide player-dealer services in cardrooms pursuant to contractual arrangements with those cardrooms that must be approved in advance by the Bureau.[23] They employ licensed "proposition players" who participate in cardroom games as players and who may elect to accept the player-dealer position when it is offered during the normal rotation of play. TPPPS participation is governed by detailed statutory, regulatory, and licensing requirements designed to ensure that the player-dealer role remains distinct from the house and that no cardroom directly or indirectly acts as the bank.[24] TPPPS entities, individual owners, supervisors, and proposition players are subject to licensing, background investigation, and ongoing regulatory oversight by the Commission and Bureau.[25] An owner, supervisor, or player cannot provide TPPPS services or receive revenue from TPPPS without first applying for and obtaining registration or licensure under the GCA.

---

[19] *Sullivan v. Fox* 189 Cal. App. 3d 673, 678 (1987).
[20] California Penal Code section 330; *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 981 P.2d 990, 996 (Cal. 1999).
[21] *Hotel Employees*, supra, at 1003–05 (quoting Cal. Const., art. IV, § 19).
[22] Cal. Bus. & Prof. Code, § 19805(ag).
[23] Cal. Bus. & Prof. Code, § 19984.
[24] *Id.*
[25] *Id.*

**CONFIDENTIAL**

IV.    **REGULATORY FRAMEWORK GOVERNING TPPPS REGISTRATION AND LICENSURE (CIRCA JANUARY–MARCH 2020)**

**A. Registration is a Regulatory Determination of License Qualification.**

33.    During the relevant period, "registration" for TPPPS owners acted as a type of temporary licensure that allowed a TPPPS to begin offering services to cardrooms pursuant to a Bureau-approved contract while it was subjected to the full initial license investigation.[26] An owner could not begin to offer services without that registration.  Consistent with this statutory framework, to be issued a registration, Commission regulations governing TPPPS required owners, supervisors, and proposition players to be eligible for licensure and free from disqualifying conditions.[27]

34.    Both registration and licensure under the GCA are subject to mandatory statutory and regulatory disqualifiers that apply by law. The GCA expressly prohibits licensure by persons[28] who fail to meet suitability standards or who fall within enumerated grounds of ineligibility, including criminal history, false statements or omissions, failure to disclose required information, or associations that pose a threat to the integrity of gambling.[29] These prohibitions are not limited to full licensees. The GCA provides that a person is deemed unsuitable to hold a state gambling license to own a cardroom if the person, or any partner, officer, director, or shareholder of the person has any financial interest in any business or organization that is engaged in any form of gambling prohibited in California.[30] The Commission's regulations in effect at the relevant time extended this prohibition to applicants for TPPPS registration.[31] Accordingly, an individual or entity that is statutorily ineligible for licensure is likewise ineligible for registration. Registration does not operate as a provisional status that can override or postpone the application of mandatory disqualifiers. Rather, it is subject to the same prohibitory constraints imposed by statute and regulation for licensure.

**B.  TPPPS Registration Requirements in Effect Circa January-March 2020**

35.    During the period circa January through March 2020, TPPPS were regulated under California Code of Regulations, Division 18, Title 4, Chapter 2.1.[32] This Chapter implemented and gave regulatory effect to the GCA's requirement that all TPPPS owners, supervisor, and players be

---

[26] Cal. Code Regs., tit. 4, §§ 12201-12203.

[27] Cal. Code Regs., tit. 4, § 12204.

[28] Under the GCA, "person" includes a natural person, corporation, partnership, limited partnership, trust, joint venture, association, or any other business organization. Cal. Bus. & Prof. Code, § 19805(ae).

[29] Cal. Bus. & Prof. Code, §§ 19857, 19859.

[30] Cal. Bus. & Prof. Code, §§ 19858, 19858.5.

[31] Cal. Code Regs., tit. 4, § 12204(f).

[32] The Commission's regulations governing TPPPS were subsequently reorganized and renumbered as part of later regulatory amendments to Title 4 of the California Code of Regulations that went into effect on January 1, 2021. All citations in this report refer to the regulatory provisions in effect during the relevant period.

*Expert Rebuttal Report of Tiffany Lichtig*                    Page **12** of 26

**CONFIDENTIAL**

licensed.[33]  If an owner, supervisor, or player was not registered or licensed, they could not participate in TPPPS or receive revenue from the same.

36. The TPPPS regulations in effect at that time expressly defined the categories of persons associated with TPPPS who were required to apply for registration.[34] If the owner of the TPPPS was a corporation, then each officer, director, and shareholder of the corporation were required to individually apply for registration.[35] Each individual applicant for registration was required to submit personal history information and was subject to background investigation by the Bureau prior to registration.[36]

37. TPPPS registration was expressly subject to the same mandatory statutory and regulatory disqualifiers applicable to licensure. Commission regulations required denial of any application where statutory or regulatory grounds for disqualification existed.[37]

    **C. Business and Professions Code Sections 19858 and 19858.5 and Former Regulation 12204(f)**

38. Between January and March 2020, former California Code of Regulations, title 4, section 12204(f) ("Regulation 12204(f)") remained in full force and effect. That regulation implemented and gave regulatory effect to California Business and Professions Code sections 19858 and 19858.5, which govern prohibited interests in gambling enterprises and restrict ownership or financial participation for participation in gambling activities that are unlawful in California.

39. California Business and Professions Code section 19858 ("Section 19858") prohibits any person from holding a direct or indirect ownership or financial interest in any gambling business or activity that is not permitted under California law. California prohibits house-banked table games and traditional casino games—such as slot machines, roulette, and dice games—from being operated by non-tribal entities.[38]

40. Business and Professions Code section 19858.5 ("Section 19858.5") contains a narrow exception permitting the holding of a de minimis ownership interest of one percent or less in a gambling business or gambling activity that would otherwise be unlawful in California. However, the one-percent exception is strictly limited and does not operate as a blanket safe harbor. Section 19858.5 makes clear that the exception applies only to passive ownership interests and does not extend to any person or entity that exercises control, influence, or managerial authority over the gambling business. Thus, even where an ownership interest does not exceed one percent, the exception is unavailable if the applicant has the ability to direct, manage, or materially influence the operations or financial decisions of the prohibited gambling interest.

---

[33] Cal. Bus. & Prof. Code, § 19984.
[34] Cal. Code Regs., tit. 4, § 12201(d).
[35] *Id*., Cal. Bus. & Prof. Code, § 19852(a).
[36] Cal. Code Regs., tit. 4, § 12202(b).
[37] Cal. Code Regs., tit. 4, § 12204(a)-(i).
[38] Cal. Pen. Code, § 330.

**CONFIDENTIAL**

41. Regulation 12204(f) implemented this statutory scheme by barring registration for any TPPPS applicant who either exceeded the one-percent ownership threshold *or* exercised control over an unlawful gambling business. This prohibition was categorical and mandatory, leaving no discretion to approve or condition registration where the disqualifying interest existed.

### D.  California Requirement That All Owners Be Licensed or Found Suitable

42. California Business and Professions Code section 19852 ("Section 19852") establishes a mandatory ownership-suitability requirement for gambling enterprises in California. Where the owner of a gambling enterprise is a corporation, the statute requires that each officer, director, and shareholder of the owning entity must individually apply for and hold a state gambling license or be found suitable by Commission.[39]

43. The TPPPS registration regulations required that all individuals identified under Section 19852 apply and be approved for registration before the registration for the TPPPS could issue.[40]

44. The individual application requirements imposed by Section 19852 present substantial practical obstacles for large or publicly traded companies seeking to participate directly in California gambling enterprises. Publicly traded entities often have numerous shareholders, frequently changing ownership interests, and institutional investors that do not and cannot realistically submit to individualized gambling licensure or suitability review within short regulatory timeframes.

45. Section 19852 has, in practice, confined TPPPS licensure to entities with ownership and control structures capable of meeting the statute's individualized licensing requirements. As a result, no publicly traded company has ever been licensed as a TPPPS in California.[41]

### E.  Paradise Entertainment Limited – Ownership and Corporate Structure

46. Paradise Entertainment Limited ("Paradise") is a publicly traded holding company listed on the Hong Kong Stock Exchange. Paradise sits at the top of a complex corporate structure encompassing numerous subsidiaries engaged in gaming equipment development, sales, and casino management services.[42]

47. Paradise's ownership is widely dispersed through public trading. As a public company, Paradise's shares are freely bought and sold on the open market, and the identity and number of its shareholders change on a daily basis. Deposition testimony confirms that Paradise cannot

---

[39] Cal. Bus. & Prof. Code, § 19852(a).

[40] Cal. Code Regs., tit. 4, § 12201(d).

[41] See *Third-Party Providers of Proposition Player Services – Active Licenses*, California Gambling Control Commission, https://www.cgcc.ca.gov/?pageID=ActiveTPPP, last visited Feb. 4, 2026.

[42] PARADISE 00032985, pg. 4.

**CONFIDENTIAL**

identify all of its shareholders at any given time and that ownership is likely to include hundreds or thousands of individual and institutional investors worldwide.[43]

48. Notwithstanding its public ownership, Paradise is controlled by Dr. Jay Chun, who serves as Chairman and Managing Director and holds a controlling equity interest exceeding 60 percent.[44] Paradise's board of directors and senior management include multiple executive and non-executive directors, officers, and senior executives who exercise operational and strategic control over the company and its subsidiaries. These individuals include executive directors with equity interests, independent non-executive directors, and senior officers responsible for casino management services and gaming operations.[45]

49. Paradise/Dr. Jay Chun also own all of Paradise's affiliates and subsidiaries, which include LT Game Ltd. and LT Game, Inc.[46]

### F.  Paradise's Macau Casino Management Revenues

50. Paradise's public filings for the 2019–2020 period, the period relevant to potential TPPPS registration for the F2 opportunity, reflect that a substantial portion of Paradise's revenue was derived from casino management services in Macau, including management of Casino Kam Pek Paradise and Casino Waldo.[47] These revenues were generated from gross gaming revenue ("GGR") associated with banked table games and slot machines operated under Macau gaming concession agreements.[48] Paradise's 2019 Annual Report identified casino management as a core business segment and disclosed that casino operations accounted for the majority of Paradise's consolidated revenue during this period.[49]

51. Paradise's casino management activities in Macau were conducted through satellite casino operations.[50] A satellite operator is an entity that manages and operates a casino gaming floor under a gaming concession held by a separate, licensed concessionaire, rather than holding the concession itself. Although the satellite operator does not directly hold the gaming concession,

---

[43] Deposition of Leo Chan, October 14, 2025 (Volume 1 of 2), pp. 51-52.

[44] Deposition of Jay Chun, October 30, 2025, pg. 27.

[45] PARADISE 00032985, pg. 2.

[46] *See, e.g.*, PARADISE 00080368.

[47] PARADISE 00032985, pg. 4.

[48] Paradise Entertainment Limited, Press Release: *Paradise Entertainment Limited to Provide Sales, Marketing, Promotion, Player Development and Referral Services to Waldo Casino, Macau* (Feb. 26, 2014), https://www.hk1180.com/media/1192/14_02_26-1-_en.pdf (describing a services arrangement under which LT (Macau), a Paradise subsidiary, is entitled to approximately 56% of the net win from Waldo Casino's tables, Live Multigame Machines, and slot machines).

[49] Paradise 2019 Annual Report, pg. 7.

[50] The descriptions in paragraphs 49-51 reflect my understanding of Macau gaming regulatory practice in effect prior to 2022 based on Administrative Regulation No. 6/2002, guidance and licensing practices of the Gaming Inspection and Coordination Bureau (DICJ), and my review of publicly disclosed satellite casino management arrangements in Macau.

**CONFIDENTIAL**

its compensation is tied to GGR from banked table games and slot machines operated under the concession.[51]

52. Under Macau's regulatory framework in effect prior to 2022, satellite operations of this nature were commonly structured in conjunction with licensed gaming promoters (junkets) to permit the satellite operator to lawfully receive GGR-based compensation where the entity had non-natural shareholders and was therefore legally prohibited from holding a junket license in its own name.[52]

53. To bridge this gap, a key executive of the satellite operator would hold the junket license as a natural person. This individual license allowed the concessionaire to pay GGR-based commissions and management fees to a "licensed promoter," who could then operationally direct those funds according to the service agreement between the concessionaire and satellite operator.[53]

54. Paradise's 2019 Annual Report indicates that it had non-natural shareholders at the time it managed Casino Kam Pek Paradise and Casino Waldo, which would prohibit it from holding a junket license and directly receiving GGR.[54]

55. Paradise's Annual Report for 2019 identified Jeny Yi Feng, spouse of Paradise's controlling shareholder Dr. Jay Chun, as its Casino General Manager.[55] The record indicates that Ms. Feng may have previously held a junket license, a structure consistent with the regulatory framework governing satellite casino operations during the relevant period.[56]

## G. Plaintiffs' Expert Reports – Summary of Reports and Critiques

56. Plaintiffs submitted two expert reports dated January 9, 2026: a licensing report by Thomas Doyle and a damages report by Clarke B. Nelson. Although the reports address different subject matters, both rest on common assumptions regarding Plaintiffs' ability to lawfully participate in the F2 opportunity in California. As explained below, those shared assumptions are inconsistent with California's statutory and regulatory framework governing TPPPS registration and licensure.

---

[51] *See* Administrative Regulation No. 6/2002 (Macau), governing gaming promoters and satellite casino operations, https://www.dicj.gov.mo/web/pt/legislation/FortunaAzar/regAdm_02_006.html; *see also* Gaming Inspection and Coordination Bureau (DICJ), *Regulatory Framework for Gaming Promoters and Satellite Casinos* (pre-2022 guidance and practice), describing satellite casinos as operations conducted under concessions held by licensed concessionaires, with compensation structures tied to gross gaming revenue from table games and slot machines, https://www.dicj.gov.mo/web/cn/licensing/LicPromJogo/20060202.html.

[52] *Id.*

[53] *Id.*

[54] PARADISE 00032985, p. 24.

[55] *Id.*, at p. 19.

[56] Deposition of Leo Chan, October 14, 2025 (Volume 1 of 2), p. 39.

57. Mr. Doyle's expert report focuses on general gaming industry practices and licensing standards applicable to gaming equipment distributors, with particular emphasis on Nevada's regulatory framework. Mr. Doyle generally opines that Paradise Entertainment Ltd., and its subsidiaries LT Game Ltd. and LT Game, Inc., would not have faced impediments to licensure and likely could have obtained gaming licenses, including in Nevada. His analysis centers on assumed financial stability, the absence of criminal or regulatory misconduct, and the presumed outcome of background investigations conducted by gaming regulators.[57]

58. Mr. Nelson's expert report addresses Plaintiffs' alleged economic damages and opines that Plaintiffs are owed approximately $127.7 million in profits allegedly realized by F2 from 2020 through 2024. Mr. Nelson further opines that, but for Defendants' alleged conduct, Plaintiffs would have captured the F2 opportunity and earned those profits. Mr. Nelson expressly states that his analysis assumes compliance with applicable statutes and regulatory requirements.[58]

59. Notwithstanding their different subject matter, both expert reports rely on a common premise: that Plaintiffs were legally capable of taking advantage of the F2 opportunity in California through TPPPS operations. Neither report analyzes whether Plaintiffs were eligible for TPPPS registration or licensure under California law during the critical January–March 2020 timeframe, nor do they address the statutory provisions that govern prohibited interests, ownership disclosure, and suitability for TPPPS applicants.

60. In particular, both reports fail to account for Sections 19858 and 19858.5, which impose categorical prohibitions unique to California. Unlike Nevada and many other jurisdictions, California law expressly bars licensure or registration of any person or entity that holds a direct or indirect ownership interest in, or exercises control over, gambling businesses or gambling activities that are unlawful in California—including house-banked table games, slot machines, roulette, and dice games—even if those activities are legal and licensed elsewhere. California's regulatory inquiry therefore extends beyond reputation and criminal history to include an applicant's external gaming interests and control relationships.

---

[57] *See* Expert Report of Thomas Doyle dated January 9, 2026, §§ I–V (describing general gaming industry practices, licensing standards for gaming equipment distributors, and regulatory processes, with primary emphasis on Nevada and other non-California jurisdictions); *Id*., ¶¶ 21–31 (discussing licensing requirements and background investigations for gaming equipment distributors); *Id*., ¶¶ 37–42 (opining that LT Game and Paradise would not face impediments to licensure and could be successfully licensed to distribute gaming products in the United States, including in Nevada, based on financial condition, absence of identified misconduct, and anticipated outcomes of regulatory background investigations).

[58] *See* Expert Report of Clarke B. Nelson dated January 9, 2026, ¶ 10 (opining that Plaintiffs are owed approximately $127.7 million in profits allegedly realized from the F2 business opportunity); *Id*., ¶ 41 (opining that Defendants' alleged conduct caused Plaintiffs to lose the F2 opportunity and that, but for such conduct, Plaintiffs would have captured that opportunity); *Id*,. ¶¶ 6–9 (stating that Mr. Nelson does not offer legal opinions and assumes compliance with applicable statutes and regulatory requirements for purposes of his economic analysis).

**CONFIDENTIAL**

61. Both reports also implicitly assume the existence of a de minimis or public-company ownership exception that does not exist under California law. Section 19852 requires that, when a gambling enterprise is owned by a corporation rather than a natural person, each officer, director, and shareholder must apply for registration and licensure. California law provides no exemption based on ownership percentage, public-company status, or passive investment. Neither Mr. Doyle nor Mr. Nelson addresses the practical and legal consequences of this requirement for Paradise, a publicly traded company, or explains how universal shareholder registration could have been achieved within the narrow timeframe associated with the F2 opportunity.

62. As a result of these shared omissions, both expert reports assume a regulatory reality that did not exist under California law. Mr. Doyle's opinions regarding licensure feasibility and Mr. Nelson's opinions regarding causation and damages each depend on the unsupported premise that Plaintiffs could have lawfully obtained TPPPS registration and operated in California. As explained in Section VI. below, because Plaintiffs were not eligible for registration during the relevant period, California law precluded their participation in the F2 opportunity regardless of Defendants' alleged conduct. This regulatory impossibility materially undermines the relevance and reliability of both experts' conclusions as applied to the California-specific issues presented in this case.

## V.  ELEMENTS OF A BUREAU REGISTRATION INVESTIGATION CONDUCTED BETWEEN JANUARY AND MARCH 2020

63. Under the GCA and Commission regulations, registration of a TPPPS owner, supervisor, or proposition player required an investigation by the Bureau to determine if any mandatory statutory or regulatory disqualifiers were present. [59] As part of the registration process, applicants were required to provide detailed personal history information and submit fingerprints to allow the Bureau to conduct criminal history and records checks. [60]

64. The Bureau would evaluate the applicant's ownership interests and financial relationships to determine whether the applicant holds any direct or indirect ownership or financial interest prohibited by statute or regulation, including interests in gambling businesses or activities unlawful in California. [61] This review identified any indirect participation, influence, or managerial authority that would constitute a statutory basis for mandatory disqualification under Section 19858.

65. The investigation also includes a review of the accuracy and completeness of the information provided by the applicant. False statements, material omissions, or misleading disclosures in application materials constitute independent grounds for mandatory denial. [62]

---

[59] Cal. Bus. & Prof. Code, §§ 19858, 19859; Cal. Code Regs., tit. 4, § 12204(a)-(i).
[60] Cal. Code Regs., tit. 4, § 12202.
[61] Cal. Code Regs., tit. 4, § 12204(f).
[62] Cal. Code Regs., tit. 4, § 12202(d).

**CONFIDENTIAL**

66. The Bureau could not deem a TPPPS application for registration complete until it received the individual applications for all persons required to apply pursuant to Section 19852.[63] Upon determining that an application for registration was complete, the Bureau had 60 days to process the application and submit its findings to the Commission. The Commission's Executive Director would either issue the registration or notify the applicant of the denial and the grounds therefore under Regulation 12204.[64]

## VI.    EXPLANATION OF OPINIONS AND ANALYSIS

**A. Mr. Doyle's and Mr. Nelson's opinions are incorrect because Paradise's and its subsidiaries' Macau casino management operations, which generated gross gaming revenue from banked table games and slot machines, constituted prohibited gaming interests under California Business and Professions Code sections 19858 and 19858.5; because Plaintiffs were engaged in prohibited gaming interests, it is my opinion that they were ineligible to obtain or hold a TPPPS registration, and it is my opinion that the Bureau would not have allowed Plaintiffs' to obtain or hold the TPPPS registration necessary to take advantage of the F2 opportunity.**

67. Paradise's Annual Reports for 2019 and 2020 identify casino management services as a core business segment and disclose that revenues from those services constituted the majority of Paradise's total consolidated revenue.[65] Plaintiffs' witnesses also confirmed during depositions that Plaintiffs provided casino management services and received revenue from them.[66] Those revenues were derived directly from GGR generated by house-banked table games and slot machines, rather than from fixed management fees unrelated to gaming performance.[67] Paradise's filings further reflect that it shared in GGR from these casino operations and that casino gaming activity formed a central and ongoing component of its business during the relevant period.

68. Under California law, house-banked table games, slot machines, and similar casino-style games are unlawful unless conducted pursuant to a tribal-state gaming compact or other narrow constitutional authorization.[68] Sections 19858 and 19858.5 prohibit any person from holding a direct or indirect ownership or financial interest in a gambling business or gambling activity that is unlawful in California, regardless of whether that activity is lawful in another jurisdiction.

69. Although Paradise did not hold the gaming concessions for the Macau casinos and did not own the casinos themselves, that distinction is not dispositive under California law. Section 19858.5

---

[63] Cal. Code Regs., tit. 4, § 12203(a).
[64] Cal. Code Regs., tit. 4, § 12203(b).
[65] PARADISE 00032985, p. 7; PARADISE 00033167, p. 9.
[66] I understand that Plaintiffs' casino management service agreements have been requested but have not been produced as of the date of this report.  If produced, they would likely be relevant to my opinion.
[67] PARADISE 00032985, pp. 10-11; PARADISE 00033167, pp. 11-12.
[68] Cal. Pen. Code, § 330; Cal. Const., art. IV, § 19.

**CONFIDENTIAL**

extends the prohibited-interest analysis beyond formal ownership to include control over a gambling business or gambling activity that would be unlawful if conducted in California.

70. Paradise's role as a casino management service provider in Macau involved operational control over casino gaming activities, including management of banked table games and slot machine operations and receipt of revenue derived from GGR. This level of managerial authority and financial participation constitutes "control" within the meaning of Sections 19858 and 19858.5, regardless of whether Paradise held the underlying gaming concession or a formal ownership interest in the casino property.

71. Accordingly, even in the absence of direct ownership of the Macau casinos, Paradise's management and control of casino gaming operations triggered the prohibition set forth in Section 19858 and rendered Paradise disqualified for licensure or registration in California during the relevant period.

    **B.** **Mr. Doyle's and Mr. Nelson's opinions are incorrect because Paradise's status as a publicly traded company would have made Plaintiffs' timely TPPPS registration practically impossible due to California Business and Professions Code section 19858, which mandates individual registration and licensure of all corporate officers, directors, and shareholders, without any de minimis or public-company exemption, rendering Plaintiffs unable to obtain the TPPPS registration necessary to take advantage of the F2 opportunity.**

72. Paradise's status as a publicly traded company, as well as its web of affiliates and subsidiaries, would have made it practically impossible to cause all shareholders to apply for TPPPS registration within the January – March 2020 timeframe. The factual record demonstrates that Paradise's shares were publicly traded on the Hong Kong Stock Exchange, with ownership that was widely dispersed, continuously changing, and not fully knowable to the company at any given time. Deposition testimony confirms that Paradise could not identify every individual or entity that owned shares in the company, that ownership changed daily through public market, and that the shareholder base likely included hundreds or thousands of individuals and entities worldwide.[69]

73. Under California law, the obligation to apply for registration and licensure is not limited to substantial or controlling shareholders. Section 19852 requires licensure or suitability determinations for *all* shareholders of a gambling enterprise owned by a corporation, without any de minimis ownership threshold or exemption for publicly traded companies. Compliance would therefore have required Paradise to (1) identify every shareholder as of the relevant application period, (2) compel each shareholder to submit to California gambling registration requirements, including personal history disclosures, fingerprinting, and background investigations, and (3) ensure that no shareholder was subject to a statutory or regulatory disqualifier.[70]

---

[69] Deposition of Leo Chan, October 14, 2025 (Volume 1 of 2), pp. 51-52.
[70] Cal. Bus. & Prof. Code, §§ 19852, 19858, 19858.5, 19859; Cal. Code Regs., tit. 4, §§ 12201, 12202, 12204.

**CONFIDENTIAL**

74. The record reflects that Paradise had no legal or practical mechanism to compel this level of participation by a constantly shifting global shareholder base, many of whom would have been passive investors with no operational role, no connection to California, and no incentive to submit to an invasive gambling-licensing process.[71] The inability to compel participation was not speculative; it was inherent in Paradise's public-company structure as documented in its filings and deposition testimony.

75. Moreover, the regulatory risk associated with this process was binary. A single shareholder, officer, or director's failure to apply, refusal to participate, or disqualification would have mandated denial of the corporation's registration application, regardless of Paradise's own suitability. By way of example, the record identified Jenny Yi Feng as Paradise's Casino General Manager[72] and its Senior Vice President,[73] a position that would have required Ms. Feng to submit an application for registration under Section 19852(a). Deposition testimony indicates that Ms. Feng may have held a license to operate a gaming promoter (junket) in Macau at some point.[74] While I do not have information confirming whether Ms. Feng personally held such a license during the January–March 2020 period, her executive role in casino management activities that generated GGR from house-banked table games and slot machines would, independent of any such license, have constituted a disqualifying gaming interest under Section 19858. This example illustrates the practical reality that Paradise's ownership and management structure exposed it to a substantial risk of automatic disqualification based on the interests of a single individual. Accordingly, based on the factual record, Paradise's publicly traded ownership structure did not merely complicate compliance with California's licensing regime, it rendered compliance practically impossible within the January-March 2020 timeframe.

76. The same analysis and conclusions would apply whether Paradise itself applied for registration or whether its subsidiaries, particularly LT Game Ltd. or LT Game, Inc., applied.

    **C. Mr. Doyle's and Mr. Nelson's opinions are incorrect because, given the strict deadlines facing Hawaiian Gardens, the substantial consequences of delay or denial of Plaintiffs' registration, and the operational disruptions caused by the onset of COVID-19 in March 2020, it would have been unreasonable and unlikely for a cardroom to rely on a TPPPS applicant like Plaintiffs whose ownership structure materially increased the likelihood of regulatory delay or failure.**

77. Once Hawaiian Gardens was notified by the Bureau in January 2020 that its existing TPPPS relationship was no longer viable, it became subject to a compressed regulatory deadline of 60

---

[71] Deposition of Leo Chan, October 14, 2025 (Volume 1 of 2), pp. 51-52.
[72] PARADISE 00032985, p. 19.
[73] PARADISE 00032985, p. 20.
[74] Deposition of Leo Chan, October 14, 2025 (Volume 1 of 2), p. 39.

**CONFIDENTIAL**

days within which it was required to secure a new TPPPS or to discontinue offering player-dealer services to patrons.[75]

78. Failure to meet this deadline would have resulted in immediate and substantial consequences. If Hawaiian Gardens was unable to secure a registered TPPPS within the prescribed timeframe, it would have been unable to offer TPPPS services for its player-dealer games, resulting in an immediate loss of gaming activity and a corresponding loss of revenue. Given the importance of player-dealer games to cardroom operations, the financial impact would have been significant and ongoing, rather than speculative or minimal.

79. Under these conditions, Hawaiian Gardens had an incentive to select a TPPPS applicant with a predictable, manageable, and already-vetted suitability profile. An ownership structure like F2 TPS, LLC., involving a single individual, presented a materially lower risk than an untested or complex ownership structure requiring extensive investigation.

80. Paradise's publicly traded ownership structure, and Plaintiffs' web of affiliates and subsidiaries, substantially increased the likelihood of regulatory delay or failure. As documented in deposition testimony and internal communications, Paradise could not identify all of its shareholders, whose identities and ownership interests changed continuously through public trading.[76] Compliance would have required disclosure, fingerprinting, and background investigation of a large and fluctuating global shareholder base, creating multiple potential points of failure and a binary regulatory risk in which a single unsuitable or non-participating shareholder would mandate denial.

81. These risks were further compounded by the extraordinary operational environment that developed in February and March 2020 with the onset of the COVID-19 pandemic. The relevant period coincided with stay-at-home orders, the closure or limited operation of government offices, and widespread disruption of third-party vendors and services necessary to complete suitability investigations. Government agencies were operating with reduced staff, delayed processing times, and evolving emergency protocols.

82. Taken together, the strict regulatory deadlines facing Hawaiian Gardens, the significant consequences of delay or denial, the inherent regulatory risks associated with Paradise's ownership structure, and the unprecedented operational disruptions caused by COVID-19, it is my opinion that it would have been unreasonable and unlikely for Hawaiian Gardens to have chosen Plaintiffs as its TPPPS under the circumstances.

---

[75] *See* Capitol Weekly, *The Tangled Web of California Cardrooms and Third-Party Proposition Players*, available at **https://capitolweekly.net/the-tangled-web-of-california-cardrooms-and-third-party-proposition-players/** (last visited, Feb. 5, 2026).

[76] Deposition of Leo Chan, October 14, 2025 (Volume 1 of 2), pp. 51-52.

**CONFIDENTIAL**

## APPENDIX A: MATERIALS RELIED UPON

### A. Produced Documents

1. ETG_00000144836

2. ETG_00000328526

3. ETG_00000036489

4. ETG_00000144836

5. ETG_00000328526

6. PARADISE 00007369

7. PARADISE 00013730

8. PARADISE 00013729

9. PARADISE 00021770

10. PARADISE 00022252

11. PARADISE 00032985

12. PARADISE 00033167

13. PARADISE 00040401

14. PARADISE 00040402

15. PARADISE 00049371

16. PARADISE 00064820

17. PARADISE 00064821

18. PARADISE 00080368

19. PARADISE 00080503

### B. Relevant Statutes and Regulations

1. California Business and Professions Code, §§ 19800 et. seq.

2. California Penal Code, § 330.

3. California Code of Regulations, Title 4, Division 18, including provisions governing TPPPS registration, suitability, and operation in effect during January–March 2020.

*Expert Rebuttal Report of Tiffany Lichtig*  Page **23** of **26**

4. California Constitution, Article IV, section 19, governing prohibitions on casino-style gaming except as expressly authorized.

5. California's Tribal–State Gaming Compact, § 6.5.6.

**C. Other Public Materials**

1. *Hotel Employees & Restaurant Employees Int'l Union v. Davis*, 21 Cal. 4th 585 (1999)

2. *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003)

3. *Sullivan v. Fox*, 189 Cal. App. 3d 673 (1987)

4. Capitol Weekly, *The Tangled Web of California Cardrooms and Third-Party Proposition Players*, available at https://capitolweekly.net/the-tangled-web-of-california-cardrooms-and-third-party-proposition-players/.

5. F2 TPS, LLC Articles of Organization filed with the California Secretary of State on January 14, 2020, available at https://bizfileonline.sos.ca.gov/search/business.

6. List of registered and licensed TPPPS, available on California Gambling Control Commission website, https://www.cgcc.ca.gov/?pageID=ActiveTPPP.

7. Paradise Entertainment Limited, Press Release: *Paradise Entertainment Limited to Provide Sales, Marketing, Promotion, Player Development and Referral Services to Waldo Casino, Macau* (Feb. 26, 2014), https://www.hk1180.com/media/1192/14_02_26-1-_en.pdf.

8. Administrative Regulation No. 6/2002 (Macau), governing gaming promoters and satellite casino operations, https://www.dicj.gov.mo/web/pt/legislation/FortunaAzar/regAdm_02_006.html.

9. *Gaming Inspection and Coordination Bureau (DICJ), Regulatory Framework for Gaming Promoters and Satellite Casinos* (pre-2022 guidance and practice), https://www.dicj.gov.mo/web/cn/licensing/LicPromJogo/20060202.html.

**D. Depositions[77]**

1. Deposition of Leo Chan (October 14-15, 2025) (Volumes 1 and 2).

2. Deposition of Jay Chun (October 30, 2025).

3. Deposition of Linyi (Frank) Feng (October 21-22, 2025) (Volumes 1 and 2).

---

[77] This includes the transcript and any exhibits entered in that deposition.

**CONFIDENTIAL**

### E.  The Parties' Filings

1.  Plaintiffs' First Amended Complaint (February 27, 2025)

2.  Expert Report of Mr. Thomas Doyle (January 9, 2026) (including any materials relied upon or exhibits referenced)

3.  Expert Report of Mr. Clarke B. Nelson (January 9, 2026) (including any materials relied upon or exhibits referenced)

**CONFIDENTIAL**

**APPENDIX B: RESUME AND PRIOR EXPERT ENGAGEMENTS**

# TIFFANY E. LICHTIG

1017 L Street, #362 · Sacramento, CA 95814-3805 · 916.290.3500
tiffany@cagamingadvisors.com

## AFFILIATIONS

Admitted to the **California State Bar** - October 2007 (Bar #250765)

## EDUCATION

***Juris Doctor*, University of the Pacific, McGeorge School of Law**
*Sacramento, CA 2003-2006*

· Editor-in-Chief, McGeorge California Initiative Review
· Emphasis in Governmental Affairs

***Bachelor of Arts*, Government**, **California State University, Sacramento**
*Sacramento, CA 1998-2001*

## EXPERIENCE

### Expert Witness

*Sutter's Place, Inc. dba Bay 101 v. City of San Jose* (1-13-CV-258057)
Provided expert witness testimony on the city's cardroom regulation fee and whether it exceeded the reasonable costs of regulating cardroom activities within the city.

*BVK Gaming, Inc. v. Timothy J. Long, et al* (17CV001155)
Expert witness on licensing processes and requirements of California's Gambling Control Act.

*Guy Calamia v. Frank and Deon Calamia* (AAA Case No. 01-23-00000-0581)
Testified as an expert on the Gambling Control Act, Gambling Control Commission regulations and policies, licensing requirements, and lawful gaming-establishment operations.

**The Law Office of Tiffany E. Lichtig**                                    Sacramento, CA
*Owner – 2019 to Present*

Represent clients in hearings before state agencies in licensing and disciplinary proceedings with a focus on Administrative Procedures Act and Gambling Control Act matters.

**California Gaming Advisors LLC**                                    Sacramento, CA
*Owner – 2017 to Present*

Founder of a full-service government relations firm in the state offering legislative, regulatory
compliance, and public affairs services to licensed owners, operators, and vendors within
California's gaming industry.

**California Gambling Control Commission**                           Sacramento, CA
*Commissioner – 2010 to 2016*

Ensured conformance with the Gambling Control Act and implementing regulations by
California cardrooms and compliance with applicable provisions of Tribal-State Gaming
Compacts by the state's gaming tribes. Reviewed civil litigation filed against the
Commission for further action or handling by the California Attorney General's office.
Voted on applications for licensure, findings of suitability, and proposed settlement
agreements put before the Commission. Analyzed and provided input regarding
Commission regulations and proposed legislation introduced by the Commission and the
gaming industry.

**State Senator Tom Harman**                                        Sacramento, CA
*Chief of Staff - 2001 to 2010*

Supervised and managed all aspects of the member's Capitol and District offices;
developed and managed legislative package encompassing a wide array of policy issue
areas; advised member on policy issues; recruited, mentored, and trained legislative,
press, and administrative staff.

**Tom Harman for Attorney General 2010**                            Sacramento, CA
*Campaign Manager – 2008 to 2010*

Coordinated grassroots, finance, and major fundraising objectives for Senator's 2010
attorney general campaign.

**Golden Gate University**                                          Sacramento, CA
*Graduate Adjunct Instructor - 2008 to 2010 and 2019 to 2022*

Developed courses and provide weekend and online instruction to undergraduate and
graduate students.

**REFERENCES AND SUPPORTING DOCUMENTATION PROVIDED UPON REQUEST.**