# Exhibit A-3

# Deposition of Marcos Medero

# Sept. 26, 2025

# In the Matter Of:

*Paradise Entertainment Ltd, et al., vs*

*Empire Technological Group Ltd., et al.*

---

## *MARCOS MEDERO*

*September 26, 2025*

---



Attorneys Eyes Only                    Marcos Medero - September 26, 2025

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PARADISE ENTERTAINMENT LIMITED, a  )
Bermuda corporation; and LT GAME,  )
INC., a Nevada corporation; and    )
LT GAME LIMITED, a British Virgin  )
Islands Corporation,               )Case No.
                                   )2:24-cv-00428-JCM-BNW
                 Plaintiffs,       )
                                   )
vs.                                )
                                   )
EMPIRE TECHNOLOGICAL GROUP LIMITED,)
a Nevada corporation; GAMING       )
SPECIALIZED LOGISTICS LLC, a Nevada)
limited liability company; LINYI   )
FENG, an individual; ROY KELCEY    )
ALLISON, an individual; DARYN      )
KIELY, an individual; and YI ZHAO, )
an individual,                     )
                                   )
                 Defendants.       )
_____)

CONFIDENTIAL - CONTAINS ATTORNEYS' EYES ONLY TESTIMONY

VIDEOTAPED DEPOSITION OF MARCOS MEDERO

Taken on Friday, September 26, 2025

By a Certified Stenographer and Legal Videographer

At 9:17 a.m.

At 300 South 4th Street, Suite 1600

Las Vegas, Nevada

Stenographically reported by:

Holly Larsen, NV CCR 680, CA CSR 12170

Job No. 2025-998167 - Firm No. 116F

**2**

APPEARANCES:

For the Plaintiffs:

    FOLEY & LARDNER LLP
    BY:  JEAN-PAUL CIARDULLO, ESQ.
    555 South Flower Street
    Suite 3300
    Los Angeles, California 90071
    213.972.4500

For the Defendants:

    NORTON ROSE FULBRIGHT US LLC
    BY:  BRIAN STOLARZ, ESQ.
    799 9th Street NW
    Suite 1000
    Washington, DC 20001
    202.662.0309

    NORTON ROSE FULBRIGHT US LLC
    BY:  ZACHARY P. McHENRY, ESQ. (Via Zoom)
    98 San Jacinto Boulevard
    Suite 1100
    Austin, Texas 78701
    512.474.5201

Also Present:

    BRYAN PAULSON, Legal Videographer
    JAZLENE TORRES, Zoom tech (Via Zoom)

**4**

| Exhibit 198 | Email chain | 103 |
| Exhibit 199 | Summary of Funding to LT Game, June 2008 to December 2023 | 109 |
| Exhibit 200 | Summary of Payrolls, LT Game | 119 |
| Exhibit 201 | Transaction chart | 125 |
| Exhibit 202 | First Amended Complaint | 130 |
| Exhibit 203 | Remittance with Requisition Form | 140 |
| Exhibit 204 | Declaration of Marcos Medero | 144 |

REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

**3**

        I N D E X

WITNESS                                        PAGE
MARCOS MEDERO
    Examination by Mr. Stolarz          7, 187
    Examination by Mr. Ciardullo    175, 189

    TESTIMONY DESIGNATED ATTORNEYS' EYES ONLY
        PAGE/LINE to PAGE/LINE
        85/8          85/24
        95/3          96/24

        E X H I B I T S

| NUMBER | | PAGE |
| Exhibit 189 | LinkedIn profile, Marcos Medero | 13 |
| Exhibit 190 | Nevada Secretary of State business entity information for LT Game, Inc. | 20 |
| Exhibit 191 | Email chain | 29 |
| Exhibit 192 | Email chain | 58 |
| Exhibit 193 | Remittance Advice, 06 June 2019, with attachments | 70 |
| Exhibit 194 | Paradise Entertainment Limited Annual Report - 2023 | 80 |
| Exhibit 195 | Email chain | 87 |
| Exhibit 196 | Spreadsheet | 95 |
| Exhibit 197 | Email chain | 101 |

**5**

        P R O C E E D I N G S
            -oOo-

        THE VIDEOGRAPHER:  Today is September 26, 2025.  The time is approximately 9:17 a.m.  Your court reporter is Holly Larsen, and I'm your videographer, Bryan Paulson.  We are here on behalf of Lexitas.

        The witness today is Marcos Medero, and we are here in the case Paradise Entertainment Limited, et al., versus Empire Technological Group Limited, et al.

        Will counsel please state your appearances, and the court reporter will administer the oath.

        MR. STOLARZ:  Good morning.  My name is Brian Stolarz, senior counsel at Norton Rose Fulbright, representing the defendants, Empire Technological Group Limited; Gaming Specialized Logistics LLC; Linyi Feng; Roy Kelcey Allison; Daryn Kiely; and Yi Zhao.

        MR. McHENRY:  Zachary McHenry, also with the firm Norton Rose Fulbright, representing the same group of defendants.

        MR. CIARDULLO:  This is Jean-Paul

**78**

along with the requisitions.

Q.    Okay.

A.    So they can look at exactly what they're paying for.

Q.    Thank you.  We'll put that one away.

MR. CIARDULLO:  I'm sorry.  Was that Exhibit 193 we just had?

MR. STOLARZ:  I believe so, yes.

BY MR. STOLARZ:

Q.    In your time with LT Game, do you recall them having cash flow issues?

A.    Yes.

Q.    From what period of time?

A.    The pandemic, so 2020.

Q.    Until when did the cash flow issues begin to loosen up or stop or get better?

Sorry.  Bad question.

A.    '21.

Q.    Approximately when?

A.    If I had to guess, the beginning.

We stopped sending the overheads.  Paradise stopped sending money to us during the whole pandemic because they were shut down as well.

Q.    So how were employees paid during that time frame?

**79**

A.    We had -- they provided some for the payroll, but not the amount of -- like these.  Not these large monthly amounts.  And Frank would provide some of his own money as well.

Q.    Okay.  Tell me about that.

So Frank would provide his money to fund LT's operations?

A.    To fund LT's payroll.

Q.    I see.

A.    Just the payroll.

Q.    Okay.  From what time to what time, if you can sort of ballpark it for me?

A.    2020 through middle of '21, maybe first quarter '21.

Q.    Until when?

A.    That.  From 2020 through first quarter of '21.

Q.    I misheard you.  Sorry.  Okay.

Do you know sort of the order of how much money that was?

A.    No.

Q.    All right.  I'm going to show you a very large document, and I'm going to make you read every single page.  Just kidding.  I have very little to go over.

**80**

MR. STOLARZ:  Exhibit 194.

(Exhibit 194 marked.)

BY MR. STOLARZ:

Q.    I'm going to direct you to specific pages.  I don't expect you to read it all.  You're absolutely welcome to page through it.

I'm going to be directing your attention to page 13, if you want to get there.

Showing you, sir, what's been marked as Exhibit 194, Paradise's annual report for 2023.

Do you see that?

A.    Yes.

Q.    I am going to ask you to go -- did you have any role in preparing any of the documents or any information that goes into this report?

A.    Not that I'm aware of.  Unless they're having LT Game information in here.  But this seems like Paradise stuff.  I've never seen this.

Q.    Okay, yeah, that was my next question, had you ever seen this before?

And you have not?

A.    No.  Unless -- like I said, unless they're flowing in LT Game numbers, I wouldn't know.

Q.    Go to page 13.  Can you go to that, please?

**81**

A.    Yeah, I'm there.

Q.    All right.  It says, "For the year ended September [sic] 31, 2023, the Group did not generate any revenue from the sale/leasing of electronic gaming equipment and systems in overseas markets."

Do you see that?  First sentence.

A.    First sentence.  Yeah, I see that.

Q.    Under the "Sale/Leasing of Electronic Gaming Equipment and Systems Overseas."

Do you see that sentence?

A.    Uh-huh.

Q.    For that sentence, is that accurate, that the Paradise Group did not generate any revenue from the sale or leasing of electronic gaming equipment and systems in overseas markets?

A.    I'm not sure.

Q.    Did LT Game generate any revenue from the sale and leasing of electronic gaming equipment and systems in overseas markets in 2023?

A.    No.

Q.    Go to the sentence where it says "Under the prevalence."  Do you see that?  It's about three or four lines down, five lines down.

"Under the prevalence of the COVID-19 pandemic, the Group's deployment strategy during

102

accounting process. It's accrual accounting, which is GAAP in America.

Q. And when you said "ETG gave them the advance," what does that mean?

A. That, I wouldn't remember what it meant.

(Reporter clarification.)

THE WITNESS: Wouldn't remember what it meant.

So I'm guessing I put in the accrued revenue before we received payment, which is a normal process in accounting.

Q. And does that relate to the bottom email, where it says total revenue, US $160,124?

A. I've never seen that email, so I don't know if it's included or not.

Q. It was sent to you. I'm not trying to trap you from an email from four years ago of course. But is there anything in that bottom email that refreshes your memory as to what this is all about?

Take your time, sir.

A. So I'm guessing it just shows the revenue that we received in April of '21.

Q. If you go up to the top email, it says, "So I would include the $147k in your report to Leo

103

so there's no follow-ups from their side."

What does that mean?

Your second sentence in the top email, sir.

A. I'm assuming it was to show everything that we were entitled to receive.

We do the leasing by day, so we bill at the beginning of the next month. So we're not -- we haven't received anything. That's why.

Q. In the prior sentence, just to clarify so I understand, "ETG gave them the advance."

Is that an advance of money that Empire gave to Paradise -- or to LT? I'm sorry.

A. It could have been.

Q. Do you remember this particular advance from Empire?

A. I don't, no.

Q. You can put that away. Thank you.

(Exhibit 198 marked.)

BY MR. STOLARZ:

Q. On the same topic, sir, showing you 198.

Whenever you're ready. Just tell me when you're ready, sir.

A. Okay. Go ahead.

Q. I'm directing your attention to the

104

second email from Kim Hancock to you, dated April 14, 2023, 5:03 p.m.

Do you see that?

A. Yes.

Q. Actually, I should have mentioned this earlier.

This email is to you at hk1180.com.

Do you see that?

A. Yes.

Q. What is that email handle?

A. The one from Paradise that they gave me, the Hong Kong email.

Q. Right. Did you also have an Empire email too?

A. Yes.

Q. How would you know when to use either in your day-to-day work?

A. Common sense.

Q. Good answer.

A. If I'm emailing Hong Kong, I use the HK email. If I'm emailing Frank, I use the Empire email.

Q. Great.

So on this here it says, "I caught up with Frank and requested" -- "he requested I review

105

where we are for the balance owed. For the past few months, Empire has covered several LTG expense items, such as health insurance, utilities, and storage expenses."

Do you see that?

A. Yes.

Q. And can you break that out for me? For those past few months Empire had paid health insurance?

A. Yeah, for the employees that were doing work for Empire, such as Daryn and the warehouse guys.

Q. But it says it's covered several "LTG expenses."

Do you see that?

A. Yeah. They're on -- we have the health insurance with LTG. So if Daryn and the warehouse guys are on the LTG payroll, they're getting LTG benefits, but they weren't doing LTG work.

Q. At that time, April 2023?

A. Yes.

Q. But when you had mentioned that when Frank -- when Empire paid the payroll. Can you remind me of that time frame again?

A. That was '21. Maybe 2020.

106

Q.    So this is separate, obviously?

A.    This is when Paradise can fund the payroll.

Q.    Say that again, please, sir.

A.    This was when Paradise was able to fund the payroll.

Q.    Okay.  But Empire was paying for the health insurance expenses for whom?

A.    That I don't know.  I'm assuming it was the people that was on both payrolls, like Daryn and the warehouse guys.

Q.    Was Empire paying for your health insurance, for example?

A.    Was Empire paying for mine?

Q.    Right.

A.    I don't think so, no.  Not that I can remember.

Q.    And what utilities are mentioned in this email, sir?  As far as --

A.    The utilities, I'm guessing it's the utilities for the warehouse.

Q.    Which one?

A.    The one on 6445.

Q.    And storage expenses, what is that?

A.    We had a separate storage where there

107

was also items there.  That was somewhere on Valley View Boulevard.

Q.    And what type of items were in that place?

A.    That I don't remember.  From what I can assume, it was both Empire and LT items.

Q.    Did you ever personally inspect what was in that warehouse?

A.    No.

Q.    You had mentioned earlier, you said that Frank had moved people to his payroll at a certain period of time; right?

A.    Yes.

Q.    Were these people that had been laid off by LT Game?

A.    No.

Q.    They were transitioning from LT Game to Empire?

A.    Yes.  Either Empire or Solution Gaming.

Q.    Okay.  On this email here, who is Kim Hancock?

A.    She was the accountant after me.

Q.    Okay.  You can put that one away.

      As far as you can recall, what expenses was Empire covering for LT's expenses?

108

A.    That I wouldn't know.  I waited on a reconciliation, and I don't remember ever receiving one.

Q.    So you don't know the order of magnitude money-wise?

A.    No.

Q.    LT Game paid Empire for services; right?

A.    Rephrase that.

Q.    You're right, I should.

      Empire -- how was Empire paid by LT Game, if at all?

A.    They're not.

Q.    You had mentioned that 90/10 split; right?

A.    Yes.

Q.    Is that --

A.    That comes to Empire first.  And then Empire sends the 90 to LT Game.

Q.    Got it.  Okay.

      Is there any other services that are paid by LT Game to Empire?

A.    They used to pay for the payroll for them.

Q.    For whom?

A.    For Empire.

109

Q.    At what period of time?

A.    When I first got there.  I believe they stopped also during the pandemic.

Q.    Okay.

A.    And then they never went back to paying for it.

MR. STOLARZ:  All right.  I'm going to show you 199.

(Exhibit 199 marked.)

MR. STOLARZ:  You had this in front of you, but now I'm giving you this.

JP, do you have that one?

MR. CIARDULLO:  Yeah.

MR. STOLARZ:  Wanted to make sure you had it.

MR. CIARDULLO:  It's 199?

MR. STOLARZ:  Yes, sir.

BY MR. STOLARZ:

Q.    You can page through it.  Just let me know when you're ready.

A.    Go ahead.

Q.    Can you tell me what Document 199 is?

A.    It looks like it's a sum of all payments made from LT for any LT-related expenses whether LT paid for them or Empire paid for them.

162

A.   June '22, when I left.

Q.   All right.  The final sentence of paragraph 10 says that "LT Game employees had been simultaneously working for both LT Game and Empire, which were being treated as related operations."

Do you see that?

A.   Yes.

Q.   What does "related operations" mean?

A.   So for the warehouse people, for example, whenever they would go and distribute things, they're getting paid from LT, but sometimes they would go and put those Golden Frog baccarats somewhere.  So they're doing work for both.

Q.   So that's what you mean by that?

A.   Yes.  And then, you know, when we acquired Synergy Blue, they were obviously doing work with Synergy Blue inventory.

Q.   LT Game tech guys?

A.   Yes.

Q.   Warehouse guys?

A.   Yes.

Q.   That's what you mean by that, "related operations"?

A.   Yes.

Q.   Moving up to Number 8.  Prior to that,

163

we already established that Empire paid payroll for LT Game for a period of time; right?

A.   Yes.

Q.   And at some point also paid health insurance, utilities, and rent?

A.   For -- rent, I don't believe -- was it rent?  I don't remember if it was just rent.  I know it was employee benefits that were -- only for the employees that were doing work for both.

Q.   And then as we also looked at earlier, there was a time in which there was either an advance or some form of loan from Empire to LT.

Do you remember that?

A.   No.

Q.   All right.  Do you have any personal knowledge of any money being advanced or loaned from Empire to LT to cover operations?

A.   To cover operations, no.

Q.   That's separate?

A.   As a loan, no.  I don't remember it as a loan.

Q.   Were the monies that were used to pay -- Empire used to pay for LT Game's payroll, was that paid back to Empire?

A.   No.

164

Q.   Okay.

A.   Which prompted the -- Kim Hancock to do the reconciliation, which I never received.

Q.   So at this point you don't know whether --

A.   No.

Q.   -- Empire was ever repaid for --

A.   No, they weren't, because I didn't pay it out from LT.  So if there's money owed, you've got to let us know.  She never gave me that reconciliation that she said she was going to make.

Q.   Got it.  Thank you for that.

A.   Yeah.

Q.   All right.  Going to Number 8.  "On one occasion in 2020, Mr. Feng asked me to facilitate the release of approximately $1 million from LT Game's account to help fund F2 TPS."

Do you see that?

A.   Yes.

Q.   It says "2PS," but it's TPS.

Do you remember when in 2020 that was?

A.   Early 2020.

Q.   And how did this request come in?

It says "asked me to facilitate the release."

165

How did that come to you?

A.   Verbally.

Q.   Where were you?

A.   In the office.

Q.   Which office?

A.   The Harrison.

Q.   And to the best of your recollection, tell me exactly what Frank said to you.

A.   That he's going to use some of the LT money that comes in for purchase of a different company, another, you know, endeavor that he had, and that Leo and Jay were fine with it.

Q.   Okay.  The next sentence, "He specifically requested the transaction be kept off LT Game's books and records, claiming that Mr. Leo Chan had approved it."

Do you see that?

A.   Yes.

Q.   Can you give me that -- what did he exactly say regarding this request, sir?

A.   He said that he just -- that Leo did not want to see it on the books, he just wants to keep everything as it was before, and this will be paid back, so it would kind of be -- like washes out at the end of the year.

166

Q.    Leo does not want to see it on the books?

A.    They don't want to see the liability as a loan on the balance sheet.  They just want to keep it as it is, and it will eventually, you know, wash out before the end of the year.

Q.    That was Mr. Feng's words?

A.    Yes.

Q.    Did you speak to Mr. Chan about this request?

A.    No.

Q.    At the time?

A.    No.

Q.    Did you do anything affirmatively to keep the transaction off of LT Game's books and records?

A.    Yes.

Q.    What did you do?

A.    I just didn't -- I didn't enter it into LT's books.  But it was entered into Empire's books.

Q.    When you say you didn't enter it into the books?

A.    I didn't enter the transaction, no.

Q.    I see.

How would you normally have done it, if

167

it were not to be kept off?

A.    It would be a credit to cash, debit to the liability.

Q.    And that was not done?

A.    That was not done.

Q.    On LT's books?

A.    On LT's books.

Q.    But you did make a notation on Empire's books?

A.    Yes.

Q.    Any other affirmative conduct that was done regarding that?

A.    That I can remember, no.

Q.    Do you recall whether the money was repaid?

A.    It was.

Q.    And how were you made aware of that?

A.    Frank told me.  And then it showed up on the bank statements.

Q.    Did you do anything at that point, when the money came back, affirmatively on the books and records of the company, of LT?

A.    No.

Q.    Just the money came back in?

A.    Yeah.  It's an in-and-out, like nothing

168

ever happened.

Q.    How did you record it at all?

A.    I didn't record it.

Q.    I see.

It says here, "I have been subsequently informed that neither Dr. Chun nor Mr. Leo Chan had approved the transaction."

Do you see that?

A.    Yes.

Q.    How did you become aware of that, sir?

A.    Leo told me when we had that FaceTime.

Q.    The one in late 2022?

A.    Yes.

Q.    And what exactly did he say?

A.    That there was no approval of movement of money for Frank to use.

Q.    Specifically for F2 did he say?

A.    No.  Because he didn't even know what F2 was until I told him.  I told him once the money was moved, he purchased F2 with it.  And he didn't know what F2 was exactly.

Q.    And all of this discussion was during that one FaceTime call?

A.    Yes, that I can remember.  It could have been some WeChat stuff, but that I don't remember.

169

Most of it was through the FaceTime.

Q.    So there may have been -- go ahead, sir.

A.    So it wouldn't have been -- there wouldn't have been a lot of back-and-forth or waiting because of the time difference, we got on a call, and just, Let's talk about everything right there.

Q.    You said there may be WeChats between you and Mr. Chan?

A.    Maybe.

MR. STOLARZ:  Just make a request, JP, if you can see if there's any WeChats between Mr. Medero and Mr. Chan, please.

BY MR. STOLARZ:

Q.    In that -- but you -- subsequently on that call is when most of the discussion was happening?

A.    Yes.

Q.    In that late 2022 call, that's also when you disclosed the -- or let Mr. Chan know of the other companies; right?

A.    Yes.

Q.    Including F2?

A.    Yes.

Q.    And did this million-dollar transfer

190

being done was?

A.    No.  I would just look at the name of the company.  That's it.  I wouldn't look at what work was done, what detailed work they did.

If it says Empire, I split it off.  If it says LT, I'll split it off.  Not -- could have been they might have put the wrong name for work done for LT and put Empire.  Who knows?  Maybe before I got there they slipped in an Empire invoice.  Maybe I did and they didn't notice either.  I don't know.  Could be.

This is, you know, tons of invoices going out monthly.

Q.    Is it possible that sitting here today you may not remember whether certain legal expenses were actually for Empire that were paid for Paradise?

A.    I won't remember.  I worked for a different company.  My mind is not on what happened five years ago for Empire.

MR. CIARDULLO:  Okay.

MR. STOLARZ:  Thank you, sir.  I appreciate you taking the time today.  I appreciate your time and attention.

We are off the record.

191

THE VIDEOGRAPHER:  Before we go off the record, I just need to get orders.

Mr. Ciardullo, would you like a copy of the video and transcript?

MR. CIARDULLO:  Yes.  And a rough when you can get it.

We'd like the 30 days to read and sign.

THE VIDEOGRAPHER:  This concludes the deposition.

MR. STOLARZ:  I just don't want you to work the weekend on it.  Promise me you won't.

THE VIDEOGRAPHER:  This concludes the deposition of Marcos Medero consisting of four clips.  The time is 1:31 p.m., and we are off the record.

(Proceedings concluded at 1:31 p.m.)

192

CERTIFICATE OF REPORTER
STATE OF NEVADA      )
                     )SS
COUNTY OF CLARK      )

I, Holly Larsen, a duly certified court reporter licensed in and for the State of Nevada, do hereby certify:

That I reported the taking of the deposition of the witness, Marcos Medero, at the time and place aforesaid;

That prior to being examined, the witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That I thereafter transcribed my shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate record of testimony provided by the witness at said time to the best of my ability.

I further certify (1) that I am not a relative or employee of counsel of any of the parties; nor a relative or employee of the parties involved in said action; nor a person financially interested in the action; nor do I have any other relationship with any of the parties or with counsel of any of the parties involved in the action that may reasonably cause my impartiality to be questioned; and (2) that transcript review pursuant to FRCP 30(e) was requested.

IN WITNESS HEREOF, I have hereunto set my hand in the County of Clark, State of Nevada, this 30th day of September, 2025.

*Holly Larsen*
_____
HOLLY LARSEN, CCR NO. 680

193

ERRATA SHEET

I declare under penalty of perjury that I have read the foregoing _____ pages of my testimony, taken on _____ (date) at _____ (city), _____ (state), and that the same is a true record of the testimony given by me at the time and place herein above set forth, with the following exceptions:

Page  Line   Should read:      Reason for change:
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____