Oliver J. Pancheri, Esq. (Nevada Bar No. 7476)
Jessica M. Lujan, Esq. (Nevada Bar No. 14913)
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
jlujan@spencerfane.com

Jean-Paul Ciardullo, Esq. (*pro hac vice*)
California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

Robert T. Stewart, Esq. (Nevada Bar No. 13770)
Stewart Ray Nelson, Esq. (*pro hac vice*)
Utah Bar No. 17286
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
srnelson@foley.com

Dariush Keyhani *(pro hac vice)*
**KEYHANI LLC**
1050 30th Street NW
Washington, DC 20007
Tel: (202) 748-8950
Email: dkeyhani@keyhanillc.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

PARADISE ENTERTAINMENT LIMITED, a Bermuda corporation; and LT GAME, INC., a Nevada corporation, and LT GAME LIMITED, a British Virgin Islands Corporation,

*Plaintiffs, Counterdefendants*,

vs.

EMPIRE TECHNOLOGICAL GROUP LIMITED, a Nevada corporation; GAMING SPECIALIZED LOGISTICS LLC, a Nevada limited liability company; LINYI FENG, an individual; ROY KELCEY ALLISON, an individual; and DARYN KIELY, an individual; and YI ZHAO, an individual,

*Defendants, Counterclaimants*.

Case No. 2:24-cv-00428-JCM-BNW

**PLAINTIFFS' OPPOSITION TO *DAUBERT* MOTION TO PRECLUDE TESTIMONY OF CLARKE NELSON**

[ORAL ARGUMENT REQUESTED]

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. PLAINTIFFS' ALLEGATIONS ..... 2

A. PLAINTIFFS' THEORY OF LIABILITY ..... 2

B. PLAINTIFFS' DAMAGES THEORIES ..... 5

III. MR. NELSON'S DAMAGES OPINIONS ..... 7

A. MR. NELSON IS AN EXCEPTIONALLY QUALIFIED DAMAGES EXPERT WHO HAS BEEN QUALIFIED AS AN EXPERT IN MORE THAN TWENTY-FIVE TRIALS ACROSS THE COUNTRY ..... 7

B. MR. NELSON'S OPINIONS ..... 7

IV. A TOTAL LOSS RECOVERY IS JUSTIFIED ..... 9

A. A TOTAL LOSS RECOVERY IS JUSTIFIED IF THE JURY AGREES THAT DEFENDANTS INTENTIONALLY USURPED LT GAME WITH EMPIRE ..... 9

1. Plaintiffs Never Would Have Spent The Money In The First Place If They Had Known Of Defendants' Misconduct ..... 9

2. Defendants Are Liable For The Total Loss Because They Rendered LT Game A Sham Operation That Was Ultimately Left A Shell Without Meaningful Operations ..... 11

B. A TOTAL LOSS RECOVERY IS ALSO JUSTIFIED AS UNJUST ENRICHMENT ..... 14

V. ALTERNATIVELY, PLAINTIFFS SHOULD RECOVER AMOUNTS THEY UNWITTINGLY SPENT TO HELP LAUNCH EMPIRE ..... 16

A. EVEN IF IT WERE APPROPRIATE TO OFFSET SUPPOSED BENEFITS CONFERRED TO PLAINTIFFS, DEFENDANTS HAVE THE BURDEN TO PROVE SUCH OFFSETS, IF ANY ..... 16

1. Payroll For LT Game Employees ($8,314,160) And Certain Empire Employees ($2,169,220) ..... 18

2. Lewis Roca Bills To Obtain Empire Gaming Licenses - $625,358 ..... 20

3. Rent for Harrison Drive Office - $472,605 ..... 21

B. EVEN IF DEFENDANTS DID NOT BEAR THE BURDEN TO PROVE OFFSETS, MR. NELSON SHOULD BE CROSS-EXAMINED RATHER THAN EXCLUDED ..... 21

C. RECOVERY OF PLAINTIFFS' SPENDING THAT HELPED EMPIRE IS ALSO JUSTIFIED AS UNJUST ENRICHMENT ..... 22

VI. BECAUSE DEFENDANTS DO NOT DISPUTE MR. NELSON'S UNDERLYING ACCOUNTING, MR. NELSON SHOULD BE ABLE TO PRESENT HIS

CALCULATIONS ........ 23
VII. CONCLUSION ........ 24

# TABLE OF AUTHORITIES


Page(s)

**Other Authorities**

*Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017 (9th Cir. 1999) ..... 12

*Bluetooth SIG, Inc. v. FCA US LLC*, 468 F. Supp. 3d 1342 (W.D. Wash. 2020) ..... 23

*Collins v. Burns*, 741 P.2d 819 (Nev. 1987) ..... 10

*Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082 (9th Cir. 2003) ..... 16, 23

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017 (9th Cir. 2022) ..... 22

*Frey v. Jud. Dist. Ct. of State ex rel. Cnty. Of Clark*, 129 Nev. 1115, 2013 WL 7155069 (Nev. 2013) ..... 10, 16, 23

*Ice Corp. v. Hamilton Sundstrand Corp.*, No. 05-4135-JAR, 2007 WL 1742163 (D. Kan. May 24, 2007) ..... 17

*In re POM Wonderful LLC*, No. ML 10-02199 DDP RZX, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ..... 14

*In re Stijakovich-Santilli*, 542 B.R. 245 (B.A.P. 9th Cir. 2015) ..... 10

*In re Straightline Invs., Inc.*, 525 F.3d 870 (9th Cir. 2008) ..... 16, 23

*LeGrand v. Abbott Lab'ys*, 22-cv-05815-TSH, 2025 WL 2323352, at *10–*11 (N.D. Cal. Aug. 12, 2025) ..... 13, 14

*Maese v. Garrett*, 329 P.3d 713 (N.M. Ct. App. 2014) ..... 17

*Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932 (9th Cir. 1999) ..... 17

*Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, No. 2019-0002, 2021 WL 1592473 (Del. Ch. Apr. 23, 2021) ..... 17, 20

*Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 4008822 (W.D. Wash. Aug. 5, 2013) ..... 24

*Miller v. Fuhu Inc.*,
No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015)..................................... 14

*Mullins v. Premier Nutrition Corp.*,
178 F. Supp. 3d 867 (N.D. Cal. 2016) ................................................................................. 13

*Primiano v. Cook,*
598 F.3d 558 (9th Cir. 2010)................................................................................................. 22

*RKI, Inc. v. Grimes*,
200 F. Supp. 2d 916 (N.D. Ill. 2002) ................................................................................... 17

*S. Nuclear Operating Co. v. United States*,
637 F.3d 1297 (Fed. Cir. 2011)............................................................................................ 17

*Skydive Arizona, Inc. v. Quattrocchi*,
673 F.3d 1105 (9th Cir. 2012).............................................................................................. 17

*Strategic Diversity, Inc. v. Alchemix Corp.,*
666 F.3d 1197 (9th Cir. 2012).............................................................................................. 13

*Suchanek v. Sturm Foods, Inc.*,
No. 11-CV-565-NJR-RJD, 2017 WL 3704206 (S.D. Ill. Aug. 28, 2017) .......................................... 13

*Taddeo v. Am. Inv*sco Corp.,
No. 2:12-CV-01110-APG, 2015 WL 4416490 (D. Nev. July 20, 2015) ..................................... 10, 12

*United States v. L.E. Cooke Co.*,
991 F.2d 336 (6th Cir. 1993)................................................................................................. 22

*United States v. Pac. Health Corp.*,
No. 12-cv-00960, 2018 WL 1026361 (C.D. Cal. Feb. 20, 2018)........................................................ 21

*W. Pac. Elec. Co. Corp. v. Dragados/Flatiron*,
534 F. Supp. 3d 1209 (E.D. Cal. 2021)................................................................................. 24

*Waldrup v. Countrywide Fin. Corp.*,
No. 213CV08833CASAGRX, 2018 WL 799156 (C.D. Cal. Feb. 6, 2018) ....................................... 13

*Women's Fed. Sav. & Loan Ass'n of Cleveland v. Nevada Nat. Bank*,
673 F. Supp. 401 (D. Nev. 1987) ................................................................................... 16, 23

*Zimmerman v. Loose*,
425 P.2d 803 (Colo. 1967) ................................................................................................... 12

**Rules**

Fed. R. Evid. 702 ........................................................................................................................ 7

**Other Authorities**

Restatement (Second) of Agency § 403 (1958) ........ 16

Restatement (Second) of Torts § 920 ........ 17

## I. INTRODUCTION

Plaintiffs here oppose Defendants' *Daubert* Motion (ECF No. 188, "Motion") to exclude certain testimony of Plaintiffs' damages expert Clarke Nelson, a highly credentialed and experienced CPA who has successfully testified as a damages expert at more than 25 trials. Notably, Defendants do not dispute Mr. Nelson's qualifications or any of Mr. Nelson's underlying accounting concerning the spending amounts and/or profits in question; rather, Defendants only dispute Mr. Nelson's ability to call any of those figures "damages," which is ultimately a legal question unrelated to his accounting methodology.

Defendants' Motion is based on a fundamental mischaracterization of what it means to assume liability in this case for purposes of assessing damages. Under Defendants' version of liability, they are entitled to a damages offset for having made purported contributions to try to help LT Game succeed despite the fact that LT Game was left a shell and without meaningful operations by 2023. Plaintiffs reject Defendants' narrative and instead allege that Defendants conferred no benefit on them because Defendants operated LT Game as a sham business. Plaintiffs allege that Defendants knowingly and deliberately put LT Game on a pathway to failure, usurping its corporate opportunities for Empire so that Empire could replace LT Game. Plaintiffs allege that rather than quit as fiduciary managers of LT Game and start their own separate company, Defendants maintained a years-long façade of operating LT Game because Defendants wanted to continue receiving Plaintiffs' financial support, utilizing Plaintiffs' employees, and preventing Plaintiffs from discovering and interfering with Defendants' true plans.

Defendants argue that Plaintiffs cannot recover for a total loss. That is not correct. Unlike the pomegranate juice and other physical products at issue in Defendants' cited cases that did have some intrinsic value despite being falsely advertised, LT Game was left with no value in light of Defendants' misconduct. The proof for that is this: if LT Game had been put up for sale on the open market with full disclosure of Defendants' liability (as is assumed for assessing damages), no rational purchaser would have paid any money to buy LT Game because no one would want to own a sham business whose officers were in the process of covertly winding it down to replace it with a competing company. The Defendants themselves admit to considering LT Game as only fodder for the benefit of Empire, arguing even that all LT Game intellectual property ultimately belonged to Empire. The only "benefit" to Plaintiffs derived from LT Game's operation was $5 million in offsetting revenue that Mr. Nelson already accounted for to

arrive at Plaintiffs' net loss of $25 million.

Alternatively, Plaintiffs are at least entitled to recover the $11 million they unwittingly spent on activities that benefited Empire as it steadily displaced LT Game. To the extent there is ambiguity about parsing that $11 million – for example, what percentage of a given employee's time was spent assisting Empire versus arguably LT Game – it is Defendants' burden of proof as the wrongdoers to prove such apportionment, if any. Defendants' own misconduct in covertly intermingling the LT Game and Empire businesses is the source of the ambiguity in reconstructing the history of precisely what percentage of work was done for what purpose, and it is the Defendants, as the ones who were giving the orders, who know first-hand how resources were allocated. Under such circumstances, the law places the burden of apportionment on Defendants. Moreover, concepts of damages offsets and mitigation are routinely considered affirmative defenses for which the defendant bears the burden of proof.

## II. PLAINTIFFS' ALLEGATIONS

### A. Plaintiffs' Theory Of Liability

Defendants' version of what transpired between them and Plaintiffs since 2008 is at odds with the factual record that Plaintiffs have now presented in their Opposition, (ECF No. 183, "MSJ Opposition"), to Defendants' co-pending Motion for Summary Judgment. As set forth in greater detail in the MSJ Opposition, in 2008, Paradise Chairman Dr. Jay Chun hired his brother-in-law, Defendant Linyi "Frank" Feng, to serve as President of the North American branch of the Paradise Group, LT Game, Inc. ("LT Game," originally called LT Game Canada). (*Id.* at 2.) Mr. Feng had no prior gaming industry experience and little money at that time, but Dr. Chun chose to trust him as a family member. (*Id.*) Plaintiffs have made no allegations in this lawsuit of Mr. Feng engaging in misconduct from 2008 to 2015, during which time Mr. Feng primarily focused on distribution of LT Game's Live Table Game products for card rooms. (*Id.* at 1.) Until his resignation as President of LT Game in 2022 – and even after – Mr. Feng repeatedly referred to Dr. Chun in correspondence as "Boss," and repeatedly affirmed his loyalty to LT Game and the Paradise Group. (*Id.* at 3, 13, 25.) Mr. Feng and the other Defendants all admitted in their depositions that they were fiduciaries of both LT Game and Paradise during their tenure as the managers of LT Game until not long before this lawsuit was filed. (*Id.* at 3, 10.)

After Plaintiffs effectively sold off the Live Table Game business in 2015, LT Game needed a new

direction. (MSJ Opposition at 3.) Dr. Chun was eager to pursue a wide range of business opportunities, including third party player proposition ("TPPPS") services at California card rooms, and sales of more electronic table game equipment to follow on the success of the Live Table Game platform. (*Id.* at 2, 27–28.) Dr. Chun had invested considerable time and resources into advancing these goals, including development of new table game systems at Paradise's facilities in China, ongoing in-person meetings with Jeff Harris (the manager of California's largest card room, Commerce Casino) about TPPPS banking opportunities, and repeatedly directing Mr. Feng to expand LT Game's business into these areas. (*Id.* at 11, 20, 27–28.) In early 2016, Mr. Feng initially followed through on Dr. Chun's directives, presenting Dr. Chun with some preliminary ideas on California card room opportunities, and on new electronic table game equipment. (*Id.* at 27–28.) It was at this time that LT Game also hired Defendant Daryn Kiely to act as its head of technology, with an employment agreement that specifically directed him to work full time for LT Game (literally 9am – 5pm, Monday through Friday), and instructed him to broadly "[d]iscover and implement new technologies that will yield competitive advantage." (*Id.* at 10, 38–39.)

Contrary to Mr. Feng's narrative of being an independent entrepreneur who started his own company (Empire), he had in fact asked permission from Dr. Chun to create a separate legal entity (then called LT Game International) for the purpose of acting as LT Game's distributor. (MSJ Opposition at 1, 3.) Mr. Feng convinced Dr. Chun to do this by saying that having a separate legal entity as the distributor would make it easier to obtain necessary gaming equipment distribution licenses. (*Id.* at 3.) Mr. Feng made this proposal in his capacity as President and fiduciary of LT Game, and the understanding was always that LT Game International (which Mr. Feng ended up calling "Empire") existed for the sole purpose of distributing LT Game's equipment. (*Id.*) Until 2023, all the same employees were at all times working under the same roof under the same managers (Defendants) and even using the same legal counsel (the law firm Lewis Roca). (*Id.* at 19–21, 25–26, 32.) Plaintiffs understood and believed that the entirety of LT Game and Empire operations in Las Vegas was for LT Game's exclusive benefit, and on that understanding paid the employees' salaries, paid the rent for the office space, and paid for the law firm Lewis Roca to obtain gaming licenses across North America for Empire. (*Id.* at 1, 16, 18–20.)

But then, in 2016, Mr. Feng decided to build up Empire into his own separate competing business. (MSJ Opposition at 1, 6.) Instead of explaining himself to Plaintiffs and stepping down as President and

fiduciary of LT Game as he should have done, Mr. Feng deliberately chose to maintain a façade of continuing to operate LT Game so that he could continue securing Plaintiffs' substantial financial funding and prevent Plaintiffs from interfering with Empire's ascent as a direct competitor of LT Game. (*Id.* at 1–2, 10–11, 17, 23.) From that point on, LT Game ceased being a legitimate business and instead became a sham: a front for covertly funneling money and resources to Empire to assimilate and replace LT Game. (*Id.* at 1–2, 10–11, 18–19.)

Mr. Feng began deliberately steering Plaintiffs away from selling table game equipment under the false pretense that he did not think it was financially worthwhile so that he could secretly build up Empire to pursue table game opportunities instead. (MSJ Opposition at 11–12, 16–19.) Mr. Feng intentionally put LT Game on a path to decline by relegating it to the narrow niche of only selling slot machines, which was contrary to the directives of Dr. Chun. (MSJ Opposition at 11–12, 16–19.) Though LT Game did sell card shoes for table games, Mr. Feng usurped the rest of the table game equipment opportunities, even going so far as to bundle sales of Empire table game equipment with LT Game card shoes without LT Game's knowledge. (*Id.* at 17.) By 2022, Mr. Feng misappropriated the LT Game card shoes too, falsely claiming that Commerce Casino had found a new supplier while covertly switching the lease revenue from the LT Game card shoes to Empire. Simply put, Mr. Feng stole the card shoes. (*Id.* at 24–25.)

As alleged in the complaint and detailed in the MSJ Opposition, Mr. Feng conscripted Messrs. Kiely and Allison into the secret plan to leverage Plaintiffs' own funding to usurp LT Game with Empire. (MSJ Opposition at 1, 19, 25.) Despite constant meetings and strategy discussions with Plaintiffs for years, neither Mr. Feng nor the other Defendants ever informed Plaintiffs of their covert plan to build up Empire as a competitor, nor were Plaintiffs ever aware that Defendants were using Empire to sell non-LT Game products. (*Id.* at 9.) Mr. Feng also usurped the coveted TPPPS banking opportunity in California, leveraging Plaintiffs' established connections and business relationship with Commerce Casino to secure the lucrative F2 TPPPS business that ultimately generated $127 million in profit, at least $40 million to $60 million of which Mr. Feng put right back into Empire. (*Id.* at 27–29.) Mr. Feng even went so far as to embezzle $1 million in necessary seed money from LT Game to secure the F2 TPPPS bid, without which he has admitted he never would have been able to secure F2. (*Id.* at 4, 28, 31.) Mr. Feng concealed the misappropriation from Plaintiffs and instructed LT Game's accountant to wipe the books. (*Id.* at 28.)

Defendants have tried to blame the downfall of LT Game on Dr. Chun, arguing that he did not devote sufficient resources to LT Game. (MSJ Opposition at 37.) Plaintiffs reject any such premise, and will argue to the Jury that Defendants deliberately caused LT Game to fail by usurping the business opportunities LT Game needed to succeed. The result was that by 2023, LT Game was left an empty shell with no meaningful business operations while Empire went on to be successful. (*Id.* at 1–2.) In addition to having stolen all its corporate opportunities, Empire had poached all of LT Game's valuable employees, including Yi "Betty" Zhao, the longtime COO of Paradise who Mr. Feng installed as Empire's new branch manager in Macau to compete directly with Paradise in its own home market. (*Id.* at 3, 26.)

To the extent Dr. Chun decreased LT Game's funding towards the end it was only because Mr. Feng fraudulently painted such a pessimistic picture of LT Game's prospects, and because Defendants had shown themselves to be poor managers (though Dr. Chun assumed at the time that Defendants' failure to generate business was due to incompetence). (MSJ Opposition at 37.) The facts show that starting in 2016, Mr. Feng had already pegged LT Game for failure, and used the remaining dwindling years of its operation to drain its resources to launch Empire. (*Id.* at 6, 19.) If at any time from 2016 to 2023 Plaintiffs had discovered the fraud that Defendants were committing, Plaintiffs would not have spent further money on Defendants. (*Id.* at 1, 10.) Perhaps Plaintiffs could have then hired competent and loyal managers to start a North American business for them. Or perhaps Plaintiffs could have invested the money in some other productive way. But because of their fraud, Defendants robbed Plaintiffs of any such opportunity.

**B. <u>Plaintiffs' Damages Theories</u>**

Plaintiffs' damages theories were set forth in the damages expert report of Clarke Nelson and Plaintiffs' discovery responses. (*See generally*, ECF No. 183-4 at 0726 [Nelson Report]; ECF No. 183-5 at 0868 [Feb. 22, 2026 Paradise ROG Resp. at ROGs 8, 26–28]; ECF No. 183-5, at 0938 [Feb. 22, 2026 LT Game ROG Resp. at ROGs 1, 5, 8, 14, 19–20, 22].)

Plaintiffs' damages theories have now also been articulated in the MSJ Opposition and Plaintiffs' other *Daubert* briefing. (ECF No. 183 [MSJ Opposition] at 4; ECF No. 190 [Baldwin Daubert] at 4–7; ECF No. 191 [Bernhard Daubert] at 5–8; ECF No. 192 [Peterson Daubert] at 4–6.)

To summarize, Plaintiffs are seeking the following forms of remedies, only the first of which (Category 1) is at issue in Defendants' present *Daubert* Motion to exclude Clarke Nelson:

**(Category 1) $25 million out of pocket spending loss on LT Game and Empire from 2016–2023 during Defendants' fraud and usurpation.** Plaintiffs claim this as an actual out of pocket loss on what they spent on the combined LT Game and Empire business operations in Las Vegas at a time when Defendants were actively undermining and usurping corporate opportunities from LT Game, thereby causing it to fail. This was money that Plaintiffs never would have spent on Defendants if they had known the truth of what Defendants were doing. Alternatively, Plaintiffs also claim this as ill-gotten gains/unjust enrichment from Defendants having defrauded Plaintiffs into unwittingly supporting the ascent of Empire.

**(Category 2) $6.6 million disgorgement of Empire's profits from non-LT Game equipment sales that used Plaintiffs' IP.** In addition to resulting from fraud, these profits correspond to the trade secret and copyright remedies for Empire having sold technology derived from Plaintiffs. This remedy is independent from the $25 million out of pocket loss caused by Defendants' fraud and usurpation, which Plaintiffs would seek even if Empire had never used Plaintiffs' IP to sell equipment. Plaintiffs also seek this as unjust enrichment. (Defendants do not take issue with this accounting calculation by Mr. Nelson.)

**(Category 3) $127 million in F2's profits.** Plaintiffs claim F2 as a usurped business opportunity. In the alternative, Plaintiffs seek this as unjust enrichment from Mr. Feng having stolen the necessary $1 million seed money for F2, and otherwise having secured the opportunity through Plaintiffs. (Defendants do not take issue with this accounting calculation by Mr. Nelson, or that the $127 million in F2's profits could be awarded under either an actual loss or unjust enrichment damages remedy.)

**(Category 4) $1 million for the fraudulent sale to Solution Gaming at below market price.** (Defendants do not take issue with this accounting calculation by Mr. Nelson.)

## III. MR. NELSON'S DAMAGES OPINIONS

### A. Mr. Nelson Is An Exceptionally Qualified Damages Expert Who Has Been Qualified As An Expert In More Than Twenty-Five Trials Across The Country

Defendants' Motion makes no attempt to attack Mr. Nelson's credentials – nor could it. Mr. Nelson is a Certified Public Accountant, is a Chartered Global Management Accountant, and is Accredited in Business Valuation and Certified in Financial Forensics by the American Institute of Certified Public Accountants. Moreover, he holds an MBA degree from The Wharton School at the University of Pennsylvania and a Bachelor of Science degree in accounting from Brigham Young University. (*See* Ex. 2, accompanying Declaration of Clarke Nelson ["Nelson Decl."] at ¶3; *see also* ECF No. 183-4 at 0730–31 [Nelson Report, ¶¶1–4].) Thus, Mr. Nelson clearly holds "scientific, technical, or other specialized knowledge [that] will help the trier of fact." Fed. R. Evid. 702.

Defendants' reliance on *San Diego Comic Convention* and *SB IP* is inapposite because Defendants do not challenge Mr. Nelson's qualifications or even his accounting methods in the present case. Nor is there any question about what facts Mr. Nelson relied upon: he summarized them in detail in his report after putting in over 200 hours of copious research into the record of this case. Mr. Nelson's 135-page report details Mr. Nelson's thorough methodology including, for example, review of payments and transfers, (ECF No. 183-4 at 0754–55 [Nelson Report, ¶¶34–35]), identification of funding sources, (*id.* at 0755 [Nelson Report, ¶36]), identification of costs, (*id.* at 0755–76 [Nelson Report, ¶37]), subtraction of revenues, (*id.* at 0756 [Nelson Report, ¶38]), and a final net-loss calculation based on the preceding numbers, (*id.* [Nelson Report, ¶39]).

Rather than attacking Mr. Nelson's expertise, Defendants' Motion raises only questions of <u>law</u> about (1) whether, if one assumed all of Plaintiffs' alleged facts to be true, Plaintiffs would be legally permitted to pursue a "total net loss" recovery, and (2) if a total net loss recovery were not legally permitted, whether the law places the burden of further apportionment on Defendants under the circumstances of this case. These are pure questions of law for the Court – not bases to exclude Mr. Nelson under *Daubert*.

### B. Mr. Nelson's Opinions

Mr. Nelson's exhaustive analysis of financial records is reflected not only in the text of his detailed

report, but also in the copious attached schedules of charts and underlying data, in all totaling 135 pages. (ECF No. 183-4 at 0726 [Nelson Report].) As discussed above in Section II.B, Mr. Nelson has offered opinions on four basic categories of remedies, presenting each in terms of both actual loss and alternatively as unjust enrichment. The opinions relevant to Defendants' Motion concern the first category, *i.e.*, the net loss to Plaintiffs / unjust gain to Defendants from LT Game and Empire operations.

Having devoted over 200 hours to this case, Mr. Nelson grounds his opinions in the allegations and the evidence. Schedule 2 of his Report details the many documents he reviewed. (ECF No. 183-4 at 0781–783 [Nelson Report, Sch. 2].) With respect to treatment of Plaintiffs' net spending loss on joint LT Game and Empire operations during the relevant time period, Mr. Nelson reviewed detailed financial statements, requisitions, and other records reflecting LT Game spending, and also familiarized himself with Defendants' accused misconduct such as enlisting LT Game personnel to perform work for Empire. (*See* Ex. 2, Nelson Decl., ¶11; ECF No. 183-4 at 0734–0757 [Nelson Report, Sections III and IV.A].) As stated at Paragraph 33 of Mr. Nelson's Report, in assuming liability for purposes of assessing damages, he treated Defendants as having used Plaintiffs' funding during the relevant time period to further their objective of launching Empire rather than serving the interests of LT Game, and further proceeded on the understanding that Plaintiffs would have not spent the money in the first place if they had known of Defendants' misconduct. (ECF No. 183-4 at 0753–754.)

In view of his understanding of the factual allegations, Mr. Nelson performed an accounting that resulted in his opinion that the balance of Plaintiffs' spending on joint LT Game and Empire operations during the relevant time period of Defendants' misconduct, including an offset of approximately $5 million in revenues earned by LT Game, totals approximately $25 million. (*Id.*) This is economically consistent with Plaintiffs' allegations that Defendants were intentionally undermining LT Game and causing it to fail, ultimately causing it to fail, all while causing Plaintiffs to spend money that they would not otherwise have spent. (*Id.*) This is economically dissimilar from scenarios that Defendants have described where a falsely advertised consumer product still had some intrinsic, albeit lesser, value to the purchaser of the good. Mr. Nelson has properly assumed liability consistent with Plaintiffs' allegations, specifically that because of the way LT Game was operated, it had no value as a business enterprise, and no prospect for success, and was instead being steadily drained of resources to launch Empire. Thus,

Mr. Nelson's accounting calculation of Plaintiffs' net loss from funding LT Game's operations is economically consistent with deeming LT Game a sham business that was ultimately left a shell and without meaningful operations. In the alternative to actual out-of-pocket loss, Mr. Nelson also identifies the $25 million as equally reflective of Defendants' unjust enrichment. (*Id.*) This is consistent with Plaintiffs' allegations because this amount represents the total amount Defendants received to support its launch of Empire, as discussed further in Section IV.B, *infra*. (Ex. 2, Nelson Decl., ¶12.)

As an alternative measure of loss, Mr. Nelson considered the subset of the $25 million in Plaintiffs' spending that went to expenses that benefited Empire in one manner or another. (Ex. 2, Nelson Decl., ¶13.) Although Plaintiffs' counsel directed Mr. Nelson to look into specific categories, Mr. Nelson independently assessed those himself based on his own review of the financial records, and based upon his own interviews with each of Plaintiffs' witnesses. (*Id.*) After considering the Rebuttal Report of Defendants' damages expert, Paul Peterson, Mr. Nelson amended his Expert Report to remove BMM testing spending as an Empire-related expense. (*Id.*) However, the remaining expense categories – employment costs allocated for Empire, Lewis Roca invoices for Empire matters, rent shared by Empire and LT Game at Harrison Drive, and LT Game payroll costs – are properly characterized as having provided benefit to Empire. (*Id.*) In all, Mr. Nelson calculated total expenses on the relevant spending categories to be approximately $11 million. Defendants do not dispute the amounts of these remaining accounting calculations. Instead, Defendants argue that Mr. Nelson should have further apportioned them as between LT Game and Empire. For reasons explained in Section V, *infra*, Mr. Nelson's figures are appropriate on the available factual record, and Defendants should bear the burden of any further apportionment.

## IV. <u>A TOTAL LOSS RECOVERY IS JUSTIFIED</u>

### A. <u>A Total Loss Recovery Is Justified If The Jury Agrees That Defendants Intentionally Usurped LT Game With Empire</u>

#### 1. Plaintiffs Never Would Have Spent The Money In The First Place If They Had Known Of Defendants' Misconduct

As a threshold point, Plaintiffs believe that it is sufficient to seek a "total net loss" recovery of the $25 million on the simple grounds that Plaintiffs would not have spent the money in the first place if they

had known of Defendants' ongoing fraud and misappropriation. Plaintiffs were obviously not paying for the pleasure of having their business usurped; rather, Plaintiffs were paying for a fair shot at having a successful gaming company. Defendants robbed Plaintiffs of that fair chance.

Plaintiffs would have immediately cut off funding to Defendants if Plaintiffs had known of any of the litany of fraudulent misconduct Plaintiffs detailed in the MSJ Opposition in Section V, (ECF No. 183), from Mr. Feng's embezzlement of $1 million in 2020 that was used to usurp the F2 opportunity, to Defendants covertly selling non-LT Game equipment that incorporated Plaintiffs' intellectual property. (ECF No. 183-6 at 1261 [Chun Decl., ¶42]; ECF No. 183-8 at 1669–70 [Chan Decl., ¶14].) While Defendants may claim that they nonetheless conferred benefits on LT Game, Plaintiffs reject that narrative and will argue to the Jury that Defendants were actively *preventing* LT Game from succeeding. At every juncture from 2016–2023, Defendants robbed Plaintiffs of the opportunity to stop the bleeding on what had become a sham business. Plaintiffs might have otherwise decided to invest their $25 million in a different way, or Plaintiffs might have wiped the slate clean by restarting LT Game with a new set of loyal and effective officers, managers, and employees. LT Game was not a fungible commodity that Plaintiffs could have simply gone out and bought a replacement for: Plaintiffs have been irreparably set back ten years in having their fair shot at a North American gaming business.

Because Plaintiffs would not have spent (or continued spending) the $25 million in the first place, a total net loss recovery is proper. *Taddeo v. Am. Invsco Corp.*, No. 2:12-CV-01110-APG, 2015 WL 4416490, at *6 (D. Nev. July 20, 2015), *adhered to on reconsideration sub nom. Taddeo v. Koval Flamingo, LLC*, No. 212CV01110APGNJK, 2016 WL 6272367 (D. Nev. Oct. 25, 2016) (affirming jury's damages award of full out-of-pocket damages where plaintiffs were fraudulently induced to purchase condominium they would not have otherwise purchased had they known of the issues).

Furthermore, as a matter of equity, Defendants' unclean hands should estop them from seeking an offset on monies that they induced Plaintiffs to spend through fraud. *Frey v. Jud. Dist. Ct. of State ex rel. Cnty. Of Clark*, 129 Nev. 1115, 2013 WL 7155069, at *3 (Nev. 2013) (unclean hands bars relief); *In re Stijakovich-Santilli*, 542 B.R. 245, 257 (B.A.P. 9th Cir. 2015) ("[T]he perpetrator of an alleged fraud cannot avoid liability by showing that the victim could have uncovered the fraud had the victim investigated more carefully."); *Collins v. Burns*, 741 P.2d 819, 821 (Nev. 1987) (preventing fraud

perpetrators from escaping liability by arguing victim negligence).

**2. Defendants Are Liable For The Total Loss Because They Rendered LT Game A Sham Operation That Was Ultimately Left A Shell Without Meaningful Operations**

Defendants' Motion is premised on the idea that they imparted value to LT Game. That premise is false, and Plaintiffs instead argue that Defendants deliberately undermined LT Game to fuel the ascent of Empire, maintaining LT Game as a sham business operation for several years only to drain its resources and cover their tracks. (*See* Section II.A, *supra*.) In the MSJ Opposition, Plaintiffs analogized Defendants' conduct to having pointed the Titanic at the iceberg yet wanting credit for polishing the brass while it sank. (ECF No. 183 at 37.) Another analogy is to think of Plaintiffs as a landowner who hired a farmer (Defendants) to transform arid land into a farm. Instead of doing the assigned job, the farmer makes a token show of working the landowner's property while secretly diverting water and crops to the farmer's own adjoining field, knowingly causing the landowner's land to grow fallow and fail. In essence, Plaintiffs accuse Defendants of operating LT Game as a front for laundering resources and opportunities that were ultimately to benefit Empire. Defendants may disagree with Plaintiffs' theory of liability, but if the Jury agrees with Plaintiffs, Plaintiffs should be entitled to a total net loss recovery.

Defendants themselves viewed LT Game as little more than fodder for Empire. The evidence has shown that, despite their fiduciary obligations to LT Game, Defendants devoted their time to building up Empire, and had no qualms about re-directing LT Game's business opportunities, funding, and personnel to serve Empire's interests. (ECF No. 183 [MSJ Opposition] at 10–11, 16–20.) Defendants' usurpation was so complete that they even stole Plaintiffs' card shoes at Commerce Casino so that Empire could fully control that relationship and the table game products business. (*Id.* at 24–25.) Defendants have even argued that all of LT Game's intellectual property really belonged to Empire, supposedly justifying Mr. Feng's April 2023 directive to the other Defendants to raid LT Game for all remaining source code and technology so that it could be fully re-purposed to Empire. (*Id.* at 25–27.) The following is what Mr. Feng said about this issue when asked about it at his deposition:

> Q. So in your -- in Exhibit 2 when you told Daryn Kiely [] under your direction said for all LT-Game-developed games you wanted all the source code and all the intellectual property, you, in your mind, it was all

> yours, right? All of LT Game []'s intellectual property belonged to you and you could just take it, isn't that true?
>
> A. On all the products being represented by Empire in the North American market, yes, all belong to Empire.
>
> Q. So you believe that this arrangement that you set up with your brother-in-law and with Empire would basically give Empire ownership of all of Paradise's and all of LT Game[]'s intellectual property for all products that were going to be distributed, whether they were created before this October agreement or at any time; that's right?
>
> A. Correct.

(Ex. 1-33, Feng Tr. Vol. II at 182:20–183:11.)

Plaintiffs received no cognizable benefit from Defendants' misconduct, and have already deducted the $5 million revenue that was incidentally generated from Defendants' sham efforts. The simple litmus test is that if at any time from 2016 to 2023 LT Game had been put up for sale on the open market with full disclosure of Defendants' activities, no one would have paid a penny for it because no one would have wanted to buy a sham business operation in the midst of being undermined for the sake of launching a competitor. *Taddeo*, No. 2015 WL 4416490, at *6 (affirming jury's award of total recovery of down payment on condominium because defendants' fraud left them unable to sell it given floor defects); *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1033 (9th Cir. 1999) (finding that, as a result of the fraud committed by defendants, plaintiff lost not only the total purchase price of the property but also everything else it had invested in the project and should be "awarded damages for all losses proximately caused by the fraud"); *see also Zimmerman v. Loose*, 425 P.2d 803, 805 (Colo. 1967) (holding that the proper measure of damages is the plaintiff's actual total loss rather than traditional difference-in-value formula where "the fraudulent acts of the defendants … have resulted in Loose being deprived of the very property which they sold him").

The reason that Defendants' rebuttal expert, Paul Peterson, disputes Mr. Nelson's identification of the $25 million net loss figure is because Mr. Peterson treated LT Game as a legitimate "going concern" business rather than a sham operation. When pressed on this at his deposition, he conceded that he had not considered how to assess the value of LT Game if one assumed it was being run as a fraud:

> [by Mr. Peterson]:· Certainly the concept of who is benefitting from a transaction would inform the split of the expense.· And as indicated, for the 24.9 [million dollars], Mr. Nelson took the approach of providing zero benefit to LTGC, even though this is an entity that is -- what we call in the accounting world, a going concern, and an entity that was operating.· And

> based off of that, he overstates that 24.9 million.
>
> [by Plaintiffs' counsel]: You would agree that if the whole enterprise was being done by Mr. Feng as part of a fraud and forwarding fraud, and that he was going to benefit from all of it, all his expenses, that would influence how to apportion the expenses between Empire and LTGC?
>
> [by Defense Counsel]:· Objection, calls for a legal conclusion.· You can answer.
>
> [Mr. Peterson]:· Yeah, I -- I wouldn't be able to provide an opinion or response to that question.

(Ex. 1-34, Peterson Tr. at 69:6–25.)

Defendants' suggestion that there is a categorical ban on "total loss" type damages models is not supported. In one of Defendants' cited cases, *LeGrand v. Abbott Lab'ys*, No. 22-cv-05815-TSH, 2025 WL 2323352, at *10–*11 (N.D. Cal. Aug. 12, 2025), the court did not hold that a "total loss" recovery is categorically improper, but rather distinguished *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867 (N.D. Cal. 2016), where a full refund was deemed appropriate because the plaintiff alleged there was no reason to purchase the product at issue except to obtain health benefits. *LeGrand*, 2025 WL 2323352, at *11 ("Under California law, a full refund may be available in a UCL case when the plaintiffs prove the product had no value to them.") (citation omitted). That Defendants disagree with the type of damages model that should be applied to this case, (*see* ECF No. 188 at 7 citing *Strategic Diversity, Inc. v. Alchemix Corp.,* 666 F.3d 1197, 1208 (9th Cir. 2012) for recissionary damages), is not a reason to preclude Nelson's proper application of a total net loss model in this case.

Indeed, a full refund is the proper measure of loss where a defendant's misconduct completely deprives the plaintiff of value. *See, e.g.*, *Suchanek v. Sturm Foods, Inc.*, No. 11-CV-565-NJR-RJD, 2017 WL 3704206, at *12 (S.D. Ill. Aug. 28, 2017) ("[T]his Court has indicated more than once that a full refund may be the proper measure of damages based on the evidence in the case…the Court also has indicated that it is ultimately up to a jury to decide whether the evidence supports that measure of damages."). Further, the full refund model is appropriate where the difference in purchase is not mere quality, but where "the very essence of what was being purchased" was misrepresented. *Id.* at 6 (consumers thought they were purchasing ground coffee instead of instant coffee).

Because Plaintiffs allege that Defendants' fraudulently operated LT Game as a pretextual sham business to provide cover and funding to replace LT Game with Empire, a full refund is appropriate. *See, e.g.*, *Waldrup v. Countrywide Fin. Corp.*, No. 213CV08833CASAGRX, 2018 WL 799156, at *16 (C.D.

Cal. Feb. 6, 2018) ("In light of plaintiffs' allegations that they were required to pay for illegitimate and pre-textual appraisals that systematically violated USPAP, the Court finds that a full refund could be found to be an appropriate remedy and therefore plaintiffs' damages model is consistent with their theory of liability."). In the present case, LT Game had no value because Defendants intentionally put it on a steady course to failure in order to systematically replace it with Empire.

The authorities cited by Defendants are inapposite because they involve a different kind of injury and a different damages framework. Defendants cite a series of cases in the false advertising context where the plaintiff received a benefit based on the inherent value of the product at issue, even if it was not quite as advertised. (ECF No. 188 at 6–7.) That reasoning is inapplicable here. In *Pom Wonderful*, the court rejected the "Full Refund" model because consumers who purchased pomegranate juice still received some health benefits regardless of misleading health claims. *In re POM Wonderful LLC*, No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *2–3 (C.D. Cal. Mar. 25, 2014). In *LeGrand v. Abbott Lab'ys*, No. 22-CV-05815-TSH, 2025 WL 2323352, at *11–12 (N.D. Cal. Aug. 12, 2025), the court rejected a full-refund model because the nutrition shakes at issue contained some sort of nutritional and taste benefit. In *Miller v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794, at *19 (C.D. Cal. Dec. 1, 2015), the court found a full refund model inapplicable because even when the electronic tablet products at issue malfunctioned, consumers "often able to derive at least some benefit from their tablets." Unlike consumer purchases of pomegranate juice, nutrition shakes, and electronic tablets, there is no inherent benefit to Plaintiff for any of Defendants' fraudulent actions from a sham business operation that was put on a deliberate trajectory to fail. Here, Plaintiffs' theory is not that they overpaid for a legitimate business that delivered only partial value; it is that Defendants used LT Game as a façade to secure Plaintiffs' funding while diverting resources to build Empire, ultimately causing LT Game's failure by intentional design.

Arguably even if one buys pomegranate juice that is not the elixir that it was falsely advertised to be, one still at least has fruit juice, and the open market would fetch some kind of fair value price for ordinary fruit juice. By contrast, if LT Game had been hypothetically put up for sale on the open market as a sham business in the midst of being assimilated into Empire, its fair market value would be $0.

**B. <u>A Total Loss Recovery Is Also Justified As Unjust Enrichment</u>**

Viewed through the lens discussed in Section IV.A above, the failed Las Vegas operations

constitute actual out-of-pocket loss damages to Plaintiffs. But the other side of the same coin is that the $25 million effectively funded an incubator for Defendants to launch Empire, such that Plaintiffs may recover the $25 million in equity as unjust enrichment. Everything LT Game had, Defendants ultimately repurposed for Empire, leaving LT Game a hollowed-out shell without meaningful operations:

- LT Game's managers – Mr. Kiely and Mr. Allison – were simultaneously working for both companies and ultimately took everything they learned on the job on LT Game payroll to help Empire succeed, working exclusively for Empire in the end. (ECF No. 183 [MSJ Opposition] at 10–11, 16–20, 25–27.)
- The balance of the employees on LT Game payroll were also conscripted to work on various Empire projects, and many ultimately ended up working for Empire when LT Game collapsed. (*Id.* at 19–20, 25–27.)
- The rent that Plaintiffs paid to house such employees gave Empire zero-cost office space. (*Id.* at 19–20.)
- Business connections fostered by Plaintiffs (such as with Commerce Casino) were leveraged for Defendants' gain. (*Id.* at 27–29.)
- Intellectual property developed by Mr. Kiely and other of Plaintiffs' employees that should have belonged to LT Game was misappropriated for Empire. (*Id.* at 16–17, 34–40.)
- Plaintiffs' reputation and good will opened doors for Empire. (*Id.* at 2–3, 19–20, 27–29.)

Defendants will argue that some of their activities benefited LT Game. That may be the case under Defendants' theory of liability, but not according to Plaintiffs. Plaintiffs instead allege that such activities were undertaken as part of their fraud to prevent Plaintiffs from learning that Defendants were actually raiding LT Game to fuel Empire. Under Plaintiffs' theory of liability, time that Defendants spent on knowingly hopeless business pursuits for LT Game amounted to valueless wheel-spinning: a show put on for Plaintiffs' benefit to cover for the fact that Defendants were secretly taking all the valuable business opportunities for themselves. Simply put, from 2016–2023, Plaintiffs were paying for a charade.

Defendants may disagree with Plaintiffs' theory of the case, but that is a factual dispute concerning a question of liability – not a basis to exclude a damages expert under *Daubert*. If the fact finder agrees that the $25 million essentially amounted to funding the incubation of Empire and its usurpation of

LT Game, then recovery of that full accounting of $25 million is appropriate in equity as unjust gain to Defendants. *See Women's Fed. Sav. & Loan Ass'n of Cleveland v. Nevada Nat. Bank*, 673 F. Supp. 401, 404 (D. Nev. 1987) ("When a fiduciary's personal interests compete with those of the party to whom the fiduciary duty is owed, creating the risk that the needs of that party may be subordinated to those of the fiduciary, the slighted party may be awarded profits earned in the disloyal activity."); *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1086–88 (9th Cir. 2003) (employees are required to turn over profits received as a result of breaching their fiduciary duties to prevent unjust enrichment); *see also* Restatement (Second) of Agency § 403 (1958) ("If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal.")

Furthermore, because unjust enrichment is a matter of equity, Defendants' unclean hands should bar them for arguing that they deserve an offset. *Frey*, 2013 WL 7155069, at *3 ("The doctrine of unclean hands bars relief to a party who has engaged in improper conduct in the matter in which that party is seeking relief.") (internal quotation omitted); *In re Straightline Invs., Inc.*, 525 F.3d 870, 882 (9th Cir. 2008) (refusing to apply analogous doctrine of recoupment to reduce recovery in bankruptcy context "because it is an equitable remedy and equitable remedies may not be invoked to compensate someone who has engaged in inequitable conduct").

## V. ALTERNATIVELY, PLAINTIFFS SHOULD RECOVER AMOUNTS THEY UNWITTINGLY SPENT TO HELP LAUNCH EMPIRE

If the Court were to not allow Plaintiffs to seek the entire $25 million net loss / unjust enrichment, then Plaintiffs should minimally be able in the alternative to seek recovery of the approximately $11 million in expenses that benefited Empire, specifically (1) payroll spent on Empire and LT Game employees; (2) Lewis Roca invoices for Empire matters, principally related to obtaining gaming licenses for Empire; and (3) rent shared by Empire and LTGC at Harrison Drive in Las Vegas.

### A. Even If It Were Appropriate To Offset Supposed Benefits Conferred To Plaintiffs, Defendants Have The Burden To Prove Such Offsets, If Any

Defendants do not argue with Mr. Nelson's accounting in calculating the foregoing figures from the underlying financial records. Rather, Defendants try to argue that these expenses should be parsed further, and some unidentified percentage of each should be allocated as having benefited LT Game rather

than Empire, and deducted from damages. It is telling that Defendants' own damages rebuttal expert, Paul Peterson, was unable to perform any such percentage allocation of how much LT Game was supposedly benefited versus Empire. (*See* ECF No. 192-1 at 016–029 [Peterson Report, ¶¶33–80].) That is because Defendants' own misconduct has made it impossible to reconstruct the full details of the past. As discussed below, the evidence supports the conclusion that the lion's share of these expenses went to benefit Empire.

Under such circumstances, it is the Defendants' burden as the wrongdoers whose misconduct created the ambiguity to prove any apportionment, particularly where it is the Defendants who are in the position of superior knowledge concerning how resources were allocated under their fraudulent business operations. *S. Nuclear Operating Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011) (shifting burden of identifying avoided costs to defendants, "Plaintiffs cannot be expected to brainstorm every possible cost they would have saved in the non-breach world. Hence, a defendant must move forward by pointing out the costs it believes the plaintiff avoided because of its breach."); *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012) ("Upon proving causation, the plaintiff's evidentiary burden relaxes considerably."); *Marsu, B.V. v. Walt Disney Co*., 185 F.3d 932, 938–39 (9th Cir. 1999) ("The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. This is especially true where…it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss."); *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, No. 2019-0002, 2021 WL 1592473, at *10 (Del. Ch. Apr. 23, 2021) ("So long as a plaintiff provides a reasonable method to calculate damages, the risk that such cannot be determined with mathematical certitude falls on the wrongdoer, not the wronged."); *Ice Corp. v. Hamilton Sundstrand Corp.*, No. 05-4135-JAR, 2007 WL 1742163, at *4 (D. Kan. May 24, 2007) ("It is well established that in federal court, mitigation of damages is an affirmative defense."); *RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 927 (N.D. Ill. 2002) ("[A] defendant whose own misconduct creates the uncertainty cannot complain the damages are too speculative.") (citations omitted); *Maese v. Garrett*, 329 P.3d 713, 718–19 (N.M. Ct. App. 2014) ("The burden of proving that a tortfeasor's negligence benefitted the plaintiff is generally the defendant's."); Restatement (Second) of Torts §920 (framing defendant's incidental benefit to the plaintiff as being in the nature of mitigation of damages, which is an affirmative defense for which the defendant bears the burden).

**1. Payroll For LT Game Employees ($8,314,160) And Certain Empire Employees ($2,169,220)**

LT Game directly paid various Empire employees on the understanding that they were part of a business that was acting as LT Game's exclusive distributor, unaware that Empire was in fact engaged in separate competing business and seeking to usurp LT Game's corporate opportunities. Defendants' rebuttal damages expert, Paul Peterson, points to anecdotal evidence that certain work performed by some of these employees was directed to LT Game slot machines rather than Empire work. However, Mr. Peterson was unwilling or unable to apportion beyond a handful of examples, and the record evidence points to the conclusion that most of the work performed by these Empire employees was for Empire.

With respect to LT Game's own employees, discovery yielded substantial evidence that Defendants ordered them to devote much or most of their time to work that benefited Empire in one way or another. All but a small subset of the employees at issue had Empire email addresses, and those addresses were used in communications concerning Empire's internal operations – emails that Plaintiffs were entirely unaware of until they were obtained in discovery. (*See e.g.*, Ex. 1-1, ETG147947 [[redacted]]; Ex. 1-2, ETG77705 [[redacted]]; Ex. 1-3, ETG77706 [[redacted]]; Ex. 1-4, ETG134782 [[redacted]]; Ex. 1-5, ETG104769 [[redacted]].) For example, in [redacted]" (Ex. 1-6, ETG125497.) Other communications show direct employee involvement in Empire's licensing efforts, (*see e.g.*, Ex. 1-7, ETG105893; Ex. 1-8, ETG100855; Ex. 1-9, ETG150236; Ex. 1-10, ETG121037; Ex. 1-11, ETG120424; Ex. 1-12, ETG106953), product development and strategy, (*see e.g.*, Ex. 1-13, ETG139128; Ex. 1-14, ETG71674; Ex. 1-15, ETG69397), and field deployment and support, (*see e.g.*, Ex. 1-16, ETG119413; Ex. 1-17, ETG118990; Ex. 1-18, ETG112394; Ex. 1-19, ETG98810; Ex. 1-20, ETG98149; Ex. 1-21, ETG92970; Ex. 1-22, ETG92899; Ex. 1-23, ETG85457; Ex. 1-24, ETG72996). The inclusion of LT Game-paid employees on this exemplary subset of internal Empire communications shows that Defendants treated them as members of their own operation team, rather than

as personnel working solely for LT Game.

Deposition testimony confirms the same conclusion. For instance, when asked if any LT Game employees were recruited to work just for Empire, Colleen Leda testified that "a lot of the employees, myself included, were hired by LT Game, and then we were told 'you now work for Empire.'" (Ex. 1-25, Leda. Tr. at 47:1–8.) Other witnesses similarly testified that they were treated as Empire personnel and tasked with Empire-related work. (Ex. 1-26, Mason Tr. at 22:7–27:23, 158:4–161:8; Ex. 1-27, Kiely Tr. at 52:9–54:16, 83:19–87:3, 118:8–121:19, 148:20–155:9, 194:16–200:23; Ex. 1-28, Chattin Tr. at 24:22–26:23, 36:7–44:3; Ex. 1-29, Medero Tr. at 157:22–163:9; Ex. 1-30, Olson Tr. at 27:2–34:16; Ex. 1-31, Glaser Tr. at 31:11–33:21; Ex. 1-32, Cranford Tr. at 149:3–151:3.)

As to Messrs. Feng and Kiely, emails found in discovery show that they considered the vast majority of their time to have been spent on work for Empire rather than LT Game. (ECF No. 183-1 at 0073 [[redacted]]; *id.* at 0106 [[redacted]]; *id.* at 0207 [[redacted]].)

Defendants fault Mr. Nelson for not consulting employee "time sheets," (ECF No. 188 at 8 [Motion, p. 4]), but Plaintiffs are not aware of there being any such records parsing how much time employees were spending on Empire projects versus LT Game projects. Defendants also have a skewed view of what projects were Empire projects or not. For example, Defendants argue that the copious work LT Game employees performed in assisting Empire obtain gaming licenses was actually for LT Game's own benefit. Plaintiffs of course disagree, and if the fact finder sides with Plaintiffs, then such work of LT Game employees to help Empire get licensed should be deemed entirely for the benefit of Empire. (*See* Section V.A.2, *infra*.)

It is of course Defendants' own misconduct that has created ambiguity here. These employees never should have been simultaneously doing work for two competing companies under the same roof in the first place: if Defendants wanted Empire to be its own company unbeholden to LT Game, Defendants should have resigned from LT Game in 2016 and started their own separate business with their own separate employees doing their own separate work. It is also perplexing that Defendants now seek to put the burden on Plaintiffs (who were on the other side of the world in Macau) to reconstruct which employees did how much work for which company when it was the *Defendants* who were literally in

charge of these personnel in Las Vegas and telling them how much time to spend doing what in furtherance of Defendants' fraud upon Plaintiffs. Plaintiffs spent two years of exhaustive discovery trying to learn as much as they could about what happened under Defendants' tenure from 2016–2023, and Mr. Nelson consulted that record in detail. Neither Plaintiffs nor Mr. Nelson could discern from that diligently researched record any precise formula for saying that X% of a given employee's time benefited LT Game but did not benefit Empire. It should be telling to the Court that even Defendants' own damages expert makes no serious attempt at allocating employee work time.

Because Defendants' own misconduct is the cause of the ambiguity, and because Defendants are in the position of superior direct knowledge, Defendants have the burden of proof to attempt to apportion expenses – not Plaintiffs or Mr. Nelson. (*See* cases cited in Section V.A, *supra*.) Put another way, when Defendants embarked on their fraud and deliberately chose to co-mingle LT Game and Empire employee work assignments, Defendants assumed the risk that they would be liable for all of Plaintiffs' payroll spending that benefited Empire to one degree or another since the very structure of Defendants' own fraudulent enterprise made it difficult to parse. *Maverick*, 2021 WL 1592473, at *10 ("[T]he risk that [damages] cannot be determined with mathematical certitude falls on the wrongdoer, not the wronged.").

**2. Lewis Roca Bills To Obtain Empire Gaming Licenses - $625,358**

There should be no question that Plaintiffs are entitled to recover the full amount of Lewis Roca legal bills that Plaintiffs were fraudulently induced to pay under Defendants' false pretenses. Plaintiffs were led to believe that Lewis Roca was acting as their own attorneys – not Empire's. (ECF No. 183 [MSJ Opposition] at 21–22.) And Plaintiffs' payment of over $600,000 in legal fees for Empire to obtain gaming licenses was based on the understanding that Empire was LT Game's exclusive distributor. (*Id.* at 17–18.) Instead, Defendants left LT Game a shell and kept the gaming licenses for themselves.

Plaintiffs did not benefit from this fraud, and in fact lost money compared with how they could have otherwise allocated their resources. Indeed, if Plaintiffs had wanted to hire another licensed company to act as their distributor, they could have gone out to the open market and contracted with pre-existing businesses that were already licensed. Plaintiffs would never have paid to obtain brand new gaming licenses from scratch for Empire if Plaintiffs had known that Empire was not exclusive to them, and Defendants were in fact using Empire to sell other gaming equipment in competition with LT Game.

Defendants have tried to point to some confused deposition testimony from LT Game accountant Marcos Medero who was asked about whether LT Game ever covered Empire expenses. Mr. Medero has explained in his recent Declaration that he lacked substantive knowledge of the underlying billings, and assumed that Mr. Feng would not have asked him to have LT Game pay for Empire expenses. (ECF No. 182-9 at 1842–43 [Medero Decl., ¶14].) Ultimately, Defendants do not seriously contest that virtually all of the money sought in this category was in the service of getting gaming licenses for Empire. Rather, Defendants argue that about $200,000 of it had been billed directly to Plaintiffs rather than Empire. But that is irrelevant: the point is that Plaintiffs were defrauded into paying for Empire to obtain gaming licenses, so it does not matter whether Plaintiffs were sent the invoice directly or whether Empire was invoiced and put in for reimbursement from Plaintiffs.

**3. Rent for Harrison Drive Office - $472,605**

In his sworn interrogatory responses to Plaintiffs' Interrogatory No. 23, Mr. Feng stated that: "During the period from approximately 2016 through 2021, Empire shared a facility with LT Game, which was located at 6295 Harrison Dr., Las Vegas, NV 89120. The facility was used as an office, showroom, and warehouse. Paradise and/or LT Game paid 100% of the rent expenses for this facility during the time it was shared with Empire." (ECF No. 183-3 at 0640–41 [Dec. 1, 2025 Feng ROG Resp. at ROG 23].)

Defendants now argue that Plaintiffs should deduct whatever percentage of the rent benefited LT Game. But here again, the burden of apportionment should be on Defendants. The evidence Plaintiffs have collected in discovery supports the conclusion that the vast majority of work being performed at Harrison Drive was for Empire's benefit – not LT Game's. (*Supra* Section V.A.1.) Under these circumstances, where Defendants' own fraud has created the ambiguity, and Defendants are in the position of superior direct knowledge of how resources were being allocated during the time period of their fraud, Defendants bear the burden to apportion expenses.

**B. <u>Even If Defendants Did Not Bear The Burden To Prove Offsets, Mr. Nelson Should Be Cross-Examined Rather Than Excluded</u>**

Even if Plaintiffs bore the burden of proof to apportion the $11 million in expenses discussed in Section V.A, *supra*, Defendants' criticisms of Mr. Nelson are properly the subject of cross-examination, and do not warrant the extreme measure of total exclusion. *United States v. Pac. Health Corp.*, No. 12-

cv-00960, 2018 WL 1026361, at *4 (C.D. Cal. Feb. 20, 2018) ("[S]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.") *citing Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010), as amended (Apr. 27, 2010); *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) (finding mere "weaknesses in the factual basis of an expert witness' opinion ... bear on the weight of the evidence rather than on its admissibility"); *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020, 1025 (9th Cir. 2022) ("[T]his Court has cautioned that the district court is a gatekeeper, not a fact finder" and that "Rule 702's 'sufficient facts or data' element requires foundation, not corroboration." The court used this guidance to reverse a district court's exclusion of expert testimony, explaining that a fire-causation expert whose conclusions may have been speculative, conflicted with eyewitness testimony, relied too heavily on one side's version of events, and were susceptible to alternative explanations are susceptible to impeachment and cross-examination, not exclusion) (internal citations omitted).

To the extent that Defendants will reply to this Opposition by debating the facts of the severity and consequences of Defendants' misconduct, that presents a purely factual dispute that does not implicate *Daubert*. If one accepts all of Plaintiffs' allegations as true, then the remedies that Mr. Nelson articulates are legally cognizable, and any factual attack is the province of cross-examination. Importantly, Defendants do not dispute that Mr. Nelson properly accounted for the $11 million figure from the identified financial records, they just dispute what percentage of it should be deemed for LT Game's benefit versus Empire's. That is a fact question best left to the fact finder. Even Defendants' own rebuttal damages expert, Paul Peterson, was unable to arrive at any percentage apportionment, which supports the conclusion that there is no flaw in Mr. Nelson's accounting methodology nor a mathematical formula for arriving at such a percentage, and that the question should be put to the finder of fact to arrive at whatever apportionment (if any) they deem to be proper based on the evidence presented about the extent of LT Game resources that Defendants allocated to Empire. (*See* cases cited in Section V.A.)

**C. <u>Recovery Of Plaintiffs' Spending That Helped Empire Is Also Justified As Unjust Enrichment</u>**

Defendants offer no supporting case law for their argument that actual loss and unjust enrichment remedies require separate calculations. (ECF No. 188 at 13.) Just as Plaintiffs' spending on Empire can

be viewed as actual out-of-pocket loss to Plaintiffs, it is equally proper to view it as an ill-gotten gain to Defendants, and for Plaintiffs to be able to seek such amounts in the alternative as unjust enrichment. Plainly money that benefited Empire constituted gain to Empire, and it was unjust gain because Defendants defrauded Plaintiffs to get that funding. Through their unlawful conspiring, Defendants tricked Plaintiffs into financing the launch of their own replacement. Plaintiffs should be able to recover such amounts that unjustly enriched Defendants. *See Women's Fed. Sav. & Loan Ass'n*, 673 F. Supp. at 404; *Eckard Brandes*, 338 F.3d at 1086–88. Furthermore, because unjust enrichment is an equitable remedy, it is appropriate for the Court to consider Defendants' unclean hands and preclude them from arguing entitlement to an offset. *See Frey*, 2013 WL 7155069, at *3; *In re Straightline Invs.*, 525 F.3d at 882. Both actual loss and unjust enrichment are reliable measures of Plaintiffs' damages in this matter.

## VI. BECAUSE DEFENDANTS DO NOT DISPUTE MR. NELSON'S UNDERLYING ACCOUNTING, MR. NELSON SHOULD BE ABLE TO PRESENT HIS CALCULATIONS

As discussed supra, Defendants' present Motion does not attack Mr. Nelson's qualifications or his accounting calculations. Rather, the Motion presents only questions of law concerning the availability of a full net loss recovery and which party has the burden of proof on certain issues. While Mr. Nelson is more than qualified to present the opinions reflected in his report, to the extent that the Court precluded Mr. Nelson from characterizing his figures in terms of either actual damages or unjust enrichment, Mr. Nelson should minimally be qualified to testify as an expert CPA in order to present the underlying data. In either event, the Court's jury instructions would set out how the jury is to assess damages based on the evidence presented.

Defendants have voiced no objections to Mr. Nelson's summation and tabulation of the vast array of financial and accounting figures that Mr. Nelson pulled together from many different sources: Defendants only object to Mr. Nelson calling any of his accounting calculations "damages." As such, Defendants have no basis to object to Mr. Nelson presenting the underlying data, tables, and charts at trial to assist the fact finder in compiling and totaling all of the figures that were derived from myriad complex financial statements and underlying accounting data that only a professional accountant could realistically render digestible. *Bluetooth SIG, Inc. v. FCA US LLC*, 468 F. Supp. 3d 1342, 1347 (W.D. Wash. 2020)

(damages expert testimony found reliable and relevant because the expert applied basic accounting principles, simple arithmetic, and elementary mathematical calculations to the available record data); *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 4008822, at *6 (W.D. Wash. Aug. 5, 2013) (admitting expert testimony where "what he did required accounting expertise"); *W. Pac. Elec. Co. Corp. v. Dragados/Flatiron*, 534 F. Supp. 3d 1209, 1256–57 (E.D. Cal. 2021) (finding expert's methodology proper based on his expertise and historical data).

But the Court should not reach this question. As argued in Section IV, Mr. Nelson properly presents the full accounting loss of $25 million on joint LT Game / Empire operations as a total loss, or as argued in Section V, he is alternatively justified in presenting the $11 million accounting of total spend on activities that benefited Empire, regardless of whether Defendants may, for their part, seek an offset or apportionment. As such, there is no cause to question Mr. Nelson's opinions. Defendants are free to raise their issues via cross-examination, and the Court can instruct the jury on what scope of damages they may award based on the evidence.

## VII. CONCLUSION

For the reasons set forth herein, Defendants' Motion should be denied.

DATED: July 31, 2026[1]

Respectfully submitted,

*/s/ Jessica M. Lujan*______

OLIVER J. PANCHERI, ESQ.
Nevada Bar No. 7476
JESSICA M. LUJAN, ESQ.
Nevada Bar No. 14913
**SPENCER FANE LLP**
300 South Fourth Street, Suite 1600
Las Vegas, Nevada 89101
Telephone: (702) 408-3400
Fax: (702) 938-8648
Email: opancheri@spencerfane.com
jlujan@spencerfane.com

JEAN-PAUL CIARDULLO, ESQ. (*pro hac vice*)
California Bar No. 284170
**FOLEY & LARDNER LLP**
555 Flower Street, Suite 3300
Los Angeles, California 90071
Tel: (213) 972-4500
Fax: (213) 486-0065
Email: jciardullo@foley.com

ROBERT T. STEWART, ESQ.
Nevada Bar No. 13770
STEWART RAY NELSON, ESQ. (*pro hac vice*)
Utah Bar No. 17286
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Tel.: (801) 401-8900
Email: rtstewart@foley.com
srnelson@foley.com

Dariush Keyhani *(pro hac vice)*
**KEYHANI LLC**
1050 30th Street NW
Washington, DC 20007
Tel: (202) 748-8950
Email: dkeyhani@keyhanillc.com

---

[1] Due to scheduling conflicts, Plaintiffs and Defendants mutually agreed to extend their deadlines for *Daubert* Oppositions to July 31. Because this modest extension from the original July 23 deadline was done by stipulation, the parties both respectfully request that their respective briefs be deemed timely.